UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
ATARA WISDOM,                                                     :

                        Petitioner,                                :

         -against-                                             :

ADA PEREZ, Superintendent, Bedford Hills Correctional  :
    Facility, Department of Corrections and Community
    Supervision                                             :
                    Respondent.
------------------------------------------------------------------------x

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

To the Honorable Judge of the United States District Court for the Eastern District of New York:

## PROCEDURAL HISTORY

1.     Petitioner was convicted in the Supreme Court of the State of New York, Kings County.

2.     The date of the judgment of conviction was October 8, 2014.

3.     Petitioner was sentenced under one count of one indictment.  She was not sentenced on more than one indictment in the same court at the same time.

4.     Petitioner is currently incarcerated in the custody of the New York State Department of Corrections and Community Supervision, DIN 14-G-0936, serving a prison term of 18 years to life.

5.     Petitioner was convicted, after a jury trial, of one count of murder in the second degree [N.Y. Penal Law § 125.25(1)] (Tomei, J., at trial and sentencing).

6.     The facts of petitioner's appeal from the judgment are as follows:

(a)     Petitioner appealed her conviction to the Appellate Division of the Supreme Court of the State of New York, Second Department.

(b)     The Appellate Division affirmed petitioner's conviction on August 29, 2018. *People v. Wisdom*, 164 A.D.3d 928, 82 N.Y.S.3d 97 (2d Dep't 2018). A copy of that decision is attached as Exhibit A.

(c)     Copies of the Brief for Defendant-Appellant, the Brief for Respondent, and the Reply Brief for Defendant-Appellant are attached as Exhibits B, C, and D.

(d)     Leave to appeal to the New York State Court of Appeals was denied on February 14, 2019. *People v. Wisdom*, 32 N.Y.3d 1211, 99 N.Y.S.3d 227 (2019). A copy of the leave application is attached as Exhibit E, and a copy of the decision is attached as Exhibit F.

## STATEMENT OF FACTS

Introduction

Petitioner Atara Wisdom was tried in 2014 for second-degree murder involving the death of Anthony Wilson. The People's case rose and fell on petitioner's emotional statements to police. According to these statements—the only direct evidence of what happened— petitioner stabbed Wilson in self-defense when he attempted to rape her.

Wilson was twice her age and 40 pounds heavier, and his toxicology showed a .20% blood alcohol level and cocaine byproducts.  At the time, 25-year-old petitioner was homeless and had been staying in his apartment temporarily.  Corroborating petitioner's account, a witness who saw her later that night saw a visible injury to her face and also testified that petitioner outcried to him about the attempted rape.

Petitioner underwent several custodial interviews in the span of 24 hours.  She initially waived her *Miranda* rights and made oral statements that the interrogating police detective subsequently reduced to a written statement, which petitioner signed.  She then cooperated with a video-recorded interview hours later, making consistent additional statements, but became increasingly distraught and ultimately asked to stop the interrogation.  On video, the interviewing prosecutor stated that there would be no more questions until the video resumed, and the detective who had been present for all questioning repeatedly agreed at the suppression hearing that petitioner had said that night that she "didn't want to speak anymore."  Nevertheless, the detective resumed questioning the following morning without resuming video recording, and petitioner gave answers that the prosecutor used at trial to impeach her credibility regarding what happened after the stabbing.  The lower court refused to suppress that morning's statements, over defense counsel's objection that the police were required to readminister *Miranda* warnings once petitioner had made clear she wanted to stop talking.

The People's witness who unexpectedly corroborated petitioner's account was produced by material witness order, and the People represented that he would not speak with defense counsel before testifying.  Counsel learned otherwise and sought to interview him in court, but the prosecutor insisted that he was "her" witness and, over counsel's objections that the prosecutor had the right to be present, the court precluded counsel from interviewing him.  Unwilling to conduct an interview under the eye of the prosecutor, counsel did not speak with the witness and repeatedly challenged his credibility before the witness unexpectedly revealed petitioner's outcry that Wilson had tried to rape her.

Although the key issue in this case was whether petitioner reasonably feared rape, thus justifying her use of deadly force to prevent it, the court precluded defense counsel from exploring whether the decedent's psychiatric history—which included hallucinations of harm to himself and others, and hearing voices—and the fact that he was intoxicated and not taking prescribed medication, would have tended to support petitioner's account of what happened on the night of the incident.  Not only did the court preclude counsel from admitting certified medical records that had been turned over by the People, but it also refused to conduct an *in camera* interview with the decedent's doctor.  Instead, the court reached its own conclusion, unsupported by those records, that the prescribed medication was solely to treat depression and that the decedent had no history of violence.  The court also restricted counsel's cross-

examination of the decedent's friend and sister about his history of substance abuse, and possible domestic violence as alluded to in the medical records.

On the other hand, the court granted the People's application to admit a 911 call, placed by the decedent that night, in which he claimed that a girl was acting crazy in his house and he wanted her gone. Despite the lack of any further details or any corroboration, the court ruled the call admissible under the present sense impression exception to the hearsay rule.

The jury convicted petitioner of murder in the second degree and the court sentenced her to 18 years to life in prison.

On appeal, petitioner argued, as relevant here: (1) suppression of the second day's statement should have been granted because petitioner was questioned after she invoked her right to silence; (2) the court violated petitioner's right to present a defense and to the effective assistance of counsel by requiring counsel to interview a key witness in the prosecutor's presence; (3) the court further violated her right to present a defense by precluding her from introducing evidence and cross-examining witnesses about the decedent's psychiatric history, including violent hallucinations, and his substance abuse, and (4) the court violated her right to a fair trial by admitting the 911 call, which it incorrectly deemed a present sense impression.

The Appellate Division determined that the second-day statement was admissible because petitioner's invocation of her right to silence was not unequivocal and unqualified. Agreeing that that it was improper to deny defense counsel a private

interview with a prosecution witness, the Appellate Division nevertheless ruled the error harmless. The Appellate Division summarily rejected petitioner's claim about the preclusion of decedent's history. Finally, it deemed petitioner's claim about the 911 call unpreserved but added that the trial court's ruling was correct. The New York Court of Appeals denied petitioner's application for leave to appeal, in which she raised the same arguments.

<u>The Court Denies Suppression of Statements Obtained After Petitioner Invoked Her Right to Silence</u>

On January 3, 2012, Detective <u>Christopher Scandole</u> joined the investigation into the death of Anthony Wilson, who had been found in his apartment (H. 4-5).[1] Scandole began searching for petitioner in March of 2012 after a DNA hit (H. 5, 17). He ultimately picked her up from a Brooklyn shelter on July 25, 2012, at about 9:45 a.m. (H. 5-6, 13, 17; 209, 211).

Around 11:00 a.m. on July 25, at the precinct, Scandole began a two-to-three-hour interview with petitioner, who waived her *Miranda* rights (H. 7-9; 209-10, 212; Hrg. Ex. 1). Petitioner verbally admitted stabbing Wilson, explained that she had believed he was going to rape her, and described what happened that night as well as a prior incident when "she woke up to find [Wilson] touching her underneath her shirt," which

---

[1] Parenthetical numbers preceded by "H" refer to minutes of the *Huntley* hearing, which was reopened during trial (150-52). Parenthetical numbers preceded by "JS" refer to minutes of jury selection, and numbers without prefix refer to the trial.

led to a heated argument because their relationship was "not like that" (H. 10-12). Petitioner said that she went to see her friend Ebony after the stabbing (H. 12).

At about 7:30 p.m., petitioner signed a written statement (drafted by Scandole outside her presence) (H. 12-13; 210, 213-14; Hrg. Ex. 2).  Petitioner was in the interview room for the entire day, except for a 15-minute period in which Detective Deborah Batanjay conducted a lineup (H. Scandole: 18-19; Batanjay: 22-30; 212). Petitioner was arrested after the lineup (214-15).

Around 9:00 p.m., Assistant District Attorney Ed Purce conducted a videotaped half-hour interview with petitioner (H. 15-16; 210-11, 214; Hrg. Ex. 3).  On the video, petitioner is visibly distraught (217; Hrg. Ex. 3).[2]  She becomes more upset as the interview goes on until she says at around 9:30, "I need a little--" while making a hand gesture and bending over to cry; petitioner agrees she wants a break and to "stop for a second," and then says "yeah" when Purce asks if she wants to "stop right now" (218-19; Hrg. Ex. 3).  Ending the interview, Purce states that "There will be no further questions until we resume the tape" (219-20).

Scandole did not leave the precinct until "sometime later" that evening (211). Petitioner remained at the precinct overnight.  The following morning, at about 10:00 a.m., Scandole, without resuming the videotaping, continued the interrogation (205-06,

---

[2]  This description is based on appellate counsel's review of the video, which was admitted at trial and is provided as Exhibit G.

211, 215).  Scandole told her he had a couple more questions and "reminded her that [the police had] read her rights yesterday," but he did not administer fresh *Miranda* warnings (206, 211, 215-16).

During cross-examination, Scandole repeatedly agreed with defense counsel that petitioner had said the night before that she no longer wished to discuss the incident:

> Q:      . . . And she spoke [during the video interview], then she stopped speaking, she didn't want to speak anymore, correct?
>
> A:      Correct.
>
> Q:      She said, I don't want to speak anymore?
>
> A:      Correct.
>
> <p style="text-align:center">*      *      *</p>
>
> Q:      And subsequent to her saying she didn't want to talk anymore, you didn't take her to Central Booking, did you?
>
> A:      No.
>
> Q:      And she was held in the interview room overnight?
>
> A:      I wasn't at the 83rd Precinct overnight. I don't know where she was held. I don't know if in the interview room or in the cell. I'm not --
>
> Q:      She didn't want to talk, say anything else? She said, I don't want to talk anymore, right?
>
> A:      Right.
>
> Q:      But you held her overnight then took a statement in the morning, didn't you?
>
> A:      Yes.

> Q:     And moreover, that morning, . . . you orally reminded her of her Miranda warnings, saying do you remember, do you remember we gave you those warnings about your not having to talk, something like that?
>
> A:     Correct.
>
> Q:     You didn't go through the --
>
> A:     I did not.
>
> Q:     -- the entire --
>
> A:     I did not.
>
> Q:     <u>But she had said the night before that she didn't want to make anymore statements, correct</u>?
>
> A:     <u>She said I don't want to talk about it anymore.</u>

(214-16; emphasis added).  At no point did Scandole testify that petitioner made any other statements indicating that her wish to stop talking was temporary.  There also was no other testimony as to when and why Purce and/or Scandole decided that there would be no attempt to resume the video interrogation that evening.

During the morning interview, Scandole asked petitioner "about [Wilson's] property," and petitioner admitted taking his phone, wallet, and keys when she left (206-07).  Petitioner threw away the keys, admitted to using the phone "for a while," and specifically denied using the welfare benefit card in Wilson's wallet (206-08).  Petitioner also said she went to her friend Tiffany's house after the stabbing (207-08).  This follow-up interview was not recorded.  Petitioner did not request a lawyer (216).

Legal Arguments and Ruling

Defense counsel argued that readministration of *Miranda* was necessary on the morning of July 26 for the second set of statements to be admissible because, *inter alia*, petitioner had said, "I don't want to talk anymore" (218).  Counsel also pointed out that it was unreasonable to hold petitioner overnight rather than send her to Central Booking for arrest processing, "especially after [she] said I don't want to talk anymore," and that the overnight delay "softened [her] up" (220).

The People acknowledged that petitioner "stopped and did not want to continue speaking to Mr. Purce on the video," but maintained that she only expressed a desire to not talk anymore "right now."  Despite Scandole's cross-examination testimony, the People claimed that petitioner had never said "I don't want to talk to anybody[ or about this] anymore" (217).

The court agreed that petitioner "wanted to stop" (220).  It nevertheless concluded that the police were permitted to resume questioning, noting that Scandole had "reminded her . . . of the fact that he had given her rights and if she wanted to continue" (220).  The court rejected counsel's argument that Scandole had to re-administer the *Miranda* warnings, ruling that this was "not required.  Once she's informed, she's been warned.  She doesn't have to be re-advised" (220).  Accordingly, the court denied suppression of petitioner's July 26 statement (222).

Pre-Trial Ruling Granting the People's Motion to Admit a 911 Call

Shortly after midnight on November 29, 2011, Wilson called 911 and stated, "I got this girl in my house and I don't know what's wrong with her, she's acting all crazy and I want her out of my house" (JS. 166-67). Noting that time of death was not clear, defense counsel objected to the People's application to introduce the call as either an excited utterance or present sense impression:

> We don't know what [the call] refers to, whether it refers to this incident or something else, and so absent any background or testimony, it is just this man calling. We don't know if there's an upsetment [sic], an intervening event, things calm down and something happened. It's significant, there's nothing on the call like look out or ouch or hearing anything . . ." (JS. 167-68).

The People responded that phone records showed that, after the call, petitioner used Wilson's phone; that setting time of death as the night of the call was consistent with forensic evidence; that petitioner admitted stabbing Wilson to stop him from raping her; and that Wilson's relatives last saw him before the call was made (JS. 168-69). Defense counsel again protested that the call consisted of "just a bald statement, we have nothing else, and there is nothing else on this," adding that "intervening actions . . . could have been occurring" between whatever Wilson was referring to and the stabbing, which petitioner had said took place at about 2:00 or 3:00 a.m. (JS. 170). Counsel also repeatedly argued that any probative value was outweighed by the prejudicial impact (JS. 167, 170).

Without elaboration, the court deemed the call admissible as a present sense impression (JS. 170).

Opening Statements

The prosecutor told the jury it was "going to actually hear the final words that were said by Mr. Wilson presumably before he is murdered by the defendant" and described his 911 call (JS. 304).  The prosecutor also previewed petitioner's July 26 statement that she took Wilson's phone, keys, and wallet, and used the phone but not anything in the wallet.  The prosecutor highlighted that petitioner initially told police she went to her friend Ebony's house but, in her statement the following morning, "now there was a Tiffany" (JS. 307-08).  Specifically with respect to Wilson's welfare benefit card, the prosecutor said:

> . . . she denied ever using it.
>
> You are going to actually hear from the . . . Human Resources Administration responsible for Welfare benefits cards, there actually is activity on Mr. Wilson's benefit card after the date of November 29, 2011 and it shows consistent areas with where the defendant used to use her benefits card (JS. 309).

Before addressing petitioner's statements, the prosecutor said that petitioner met with Matthew Shepard around Thanksgiving and told him only, "I was paying [Wilson] rent and he wanted to have sex with me and I wasn't having that so I poked him" (303-04).

Defense counsel opened by arguing that petitioner was upset when she called Shepard and her statement was "shorthand [for] the man was trying to rape me"—to

which the court sustained an objection—and that the evidence would show "that she in fact said that . . . the decedent tried to rape her. That's what she said to the police" (315-17).

The State's Case Against Petitioner

Petitioner's Statements Asserting Justification

As petitioner later told detectives and an assistant district attorney, in late November 2011, she fatally stabbed Anthony Wilson because she believed he was going to rape her (Police Officer Garrett Marsden: 113-16; Detective Christopher Scandole: 274-76; Matthew Shepard: 352-53, 355, 366-68; Peo. Exs. 55 [petitioner's written statement], 56 [petitioner's videotaped statement]). Wilson's landlord found him and called the police on January 3, 2012 (Donet Robinson: 77-78, 80-83, 85). Twenty-five-year-old petitioner was 5'6" and weighed 115 pounds in July 2012 (Detective Deborah Batanjay: 388, 390-91). Fifty-year-old Wilson was 5'9" and weighed 155 pounds when he died (Medical Examiner Irini Scordi-Bello: 230).

Police began looking for petitioner in late March after speaking to "witnesses," and blood samples from Wilson's bathtub and bathroom wall later led to a DNA profile that matched petitioner (Detective Stephen Markowski: 9, 12-13, 15-16, 23-25, 33-37; Scandole: 267-68; Criminalist Sarah Phillips: 322-23; Stipulation 3: 394-95 [buccal swab]; Peo. Exs. 14-18, 36-41 [bathroom photos], 57 [DNA case file]).

On July 25, 2012, Scandole picked up petitioner from a homeless shelter shortly before 10:00 a.m., isolated her for 45 minutes, and then elicited several statements during a three-hour interrogation that began around 11:00 a.m. (Scandole: 283-86). Explaining her connection to Wilson, petitioner told Scandole that she "had lost her place to live and . . . moved in with this man she had met by the doctor's office on Broadway." She "would give him money from time to time for rent, when she had [it]." Petitioner described Wilson as "a crack user and [said] that when he smoked crack he became a completely different person." One night, she "woke up to find him touching her underneath her shirt," told him, "we are not like that, that is not why I'm here," and left the apartment after a "rather heated" argument. She returned after "calm[ing] down" but left again following another "loud and heated" argument around Thanksgiving. She then "stay[ed] with her sister for a couple days" (Scandole: 274-75).

Petitioner spoke to Wilson by phone a couple times and "had to go back" on the night of the incident, "because she had set up an interview[ and] needed to get some clothes out of the apartment." Initially, "everything was okay, he was nice . . . like when they had first met, [and] there was no problem[]." Scandole recounted petitioner's description of what ultimately happened as follows:

> Later that night, the same day, she was sitting on the couch getting her clothes and he says to her, I am going to get some pussy tonight. She says, well, okay, then I'll get out of here. And he steps in front of the doorway and says, uh-uh. At that point she tells us that he picks up a belt and starts wrapping the belt around his hand. At that point she said, I picked up a knife and I put it inside my sweater.

14

> She went to get up off the couch, then he punched her in the face.  After he punched her in the face, he grabbed her sweater and she says he pulled the sweater over her head and started punching her in the shoulders and in the back.
>
> While he was punching her, she said he was pushing her head towards the ground.  As he is pushing her head toward the ground, if my head hits the ground, thinking to herself, I'm dead, and I stabbed at him.
>
> She said she then ran into the bathroom, she saw she had a big knot on her head and some bruises on her shoulders.  She came out, gathered her stuff into a duffle bag and then she left and went to her friend Ebony's house (275-76).

Around 7:30 p.m., petitioner signed a written statement prepared by Scandole that was virtually identical to the oral statement except for a line at the end indicating that petitioner "didn't tell Ebony . . . or anyone else what happened" (Scandole: 277-81; Peo. Ex. 55).  Petitioner made no corrections to the statement, which Scandole wrote solely from memory since he took no notes during the interrogation (276-78, 289-90).

Petitioner made consistent and additional statements to Assistant District Attorney Ed Purce in a videotaped interview between 9:00 and 9:30 p.m. (Purce: 299-303; Peo. Ex. 56).  In the video, petitioner speaks softly and, at times, haltingly, and readily answers all questions asked of her.  Petitioner could not remember dates but believed she stayed with Wilson for about a month, first meeting him after Halloween. Petitioner received public assistance and acknowledged she was not contributing enough money to be considered rent, but she gave Wilson money for food, his transportation, and other miscellaneous expenses.  Because she paid him different

amounts at different times, she was unsure how much she gave overall but estimated it was $50 to $60 (Peo. Ex. 56).

Wilson was unemployed and spent his time attending a drug program and seeing his daughter. Wilson's drug use was a problem for petitioner; they argued because she refused to give him money to buy drugs (Peo. Ex. 56).

Petitioner explained that she was not Wilson's girlfriend and they never had any sexual contact, even though Wilson had indicated he wanted to have sex with her. Petitioner had been temporarily staying with her sister leading up to the incident after a recent argument with Wilson about him wanting to sleep with her. She had ignored this in the past but left that time because of "crazy" insults he hurled at her, including calling her a "bitch" and a "whore." Of this, petitioner explained: "I never gave him any reason to say anything like that. I never slept with him, we had no type of intercourse, no nothing." During the two days that petitioner was at her sister's house, Wilson kept calling her to ask if she was coming back (Peo. Ex. 56).

Petitioner did not want to return but she had an interview the next morning, her clothes were still at Wilson's, and his apartment was more convenient than her sister's for getting to the interview. She also had nowhere else to live so she felt she had no choice. She got to Wilson's around 9:00 p.m. and he let her inside when he got to the building. Petitioner soon went to sleep on the couch, where she had always slept (Peo. Ex. 56).

16

On the video, when the prosecutor directs her to the incident itself, petitioner begins to weep, her voice becomes even softer, and her answers more halting. Petitioner explained that she woke up at around 3:00 a.m., she believed, to feel Wilson rubbing her stomach. She told him to stop and started putting her sneakers on, and Wilson began arguing with her, asking why she won't "give him some pussy," to which she replied "we already discussed that." Wilson picked up a pink belt and wrapped it around his hand, and did not respond when petitioner asked, "Are you going to hit me?" Wilson kept saying he was going to "get some pussy tonight" and petitioner said she might as well leave. Wilson again called her a "bitch" and a "fucking whore" and said other "crazy shit." Petitioner remained on the couch and Wilson paced back and forth from the door to the TV for ten to fifteen minutes while they continued to argue (Peo. Ex. 56).

Petitioner knew he would assault her so when she put on a sweater from one of her bags near the couch, she put a folding knife from the bag in its right pocket. When she got up to pass Wilson for her jacket, he began punching her in the face (no longer holding the belt). When the A.D.A. asks petitioner where, she uses her hands to demonstrate that she was hit in the left cheekbone and eye socket area. Wilson then pulled petitioner's hood over her head, entrapping it, and started hitting her in the back. She was standing but he pushed her down toward the floor—she demonstrates this— and she struggled to push him off but could not free herself. Petitioner then stabbed him but was not sure how many times or where on his body. She remembered being

close to the floor and believed she "must have caught him in his legs or something." She also remembered pushing her body up and pushing him away "a little bit" but he kept fighting her even after she stabbed him and tried to free herself (Peo. Ex. 56).

On the video, when petitioner admits to the stabbing, her voice is barely a whisper, and Purce makes her repeat herself. She is still crying, and now begins sighing and holding her head (around 9:28). She soon asks to stop. She spends two to three minutes crying while hunched over before Purce ends the interview around 9:33 p.m. (Peo. Ex. 56).

Phone records corroborated petitioner's statement that Wilson called her repeatedly during the two days before the incident—he called her phone 25 times (Sprint Records Custodian Norman Ray Clark: 154-55, 160-61, 173-81; Peo. Ex. 45 at 3-6; Peo. Ex. 46 at 32-35). Wilson's phone records began on October 1, 2011, and he first called petitioner's phone on November 24, 2011. Petitioner used her phone heavily but never called Wilson from it (Peo. Exs. 45-46).

At 12:37 a.m. on November 29, 2011, Wilson called 911, and his phone began calling petitioner's contacts at 12:57 a.m. (Clark: 154-55, 160-61, 173-81; Peo. Exs. 45-51). Estimating that Wilson's death occurred around November 29th was consistent with his state of decomposition (Scordi-Bello: 240-41).

<u>The Outcry to Matthew Shepard, Whom Defense Counsel is Precluded from Interviewing Unless the Prosecutor is Present</u>

The only witness who saw petitioner on the night of the incident was <u>Matthew Shepard</u>.  Around January 3, 2012, Shepard spoke with police and gave an audiotaped statement to an Assistant District Attorney (357-58).  He later identified petitioner in a lineup and testified before the grand jury (Shepard: 358-59; Batanjay: 375-86, 391; Peo. Exs. 58A-D [lineup]).

The People obtained a material witness order to compel Shepard's testimony at trial (335-41).  Before he was called to the stand, the court granted defense counsel's request to personally confirm with Shepard the prosecutor's representation that Shepard did not wish to speak with counsel (335). Shepard then told defense counsel he would speak to counsel, but the detectives and the prosecutor refused to allow counsel to close the door for a private conversation (337-38).  When counsel asked the court to direct them to do so, the prosecutor objected that she had a right to be present during counsel's conversation with Shepard because Shepard was "her" witness and counsel was "not his lawyer" (336-38).  Defense counsel protested that the prosecutor's position was baseless:

> Your Honor, the rules allow the People to speak to any of my witnesses, they can go privately . . . without me and they are allowed to talk without me.
>
> There is no requirement that I am with a witness and the . . . People know what I am saying to their witness.  I am an officer of the Court, I am not going to say anything unethical (338-39).

Counsel, who had already noted that it was "intimidating to have an A.D.A. there, have a detective there" (336), added that the prosecutor "would be free to . . . ask [Shepard] what [counsel] said in that room" (339).

After the court ruled that the prosecutor "ha[d] a right to be there," counsel told Shepard he did not want to speak with him under observation, objected again, and moved for a mistrial (339-40).  The court asked "what principle or rule" supported counsel's argument that he was "allowed to speak to [Shepard] privately without anybody there," and counsel replied that "Witnesses are available to either side and there is no rule that requires that a prosecutor or a defense attorney needs to be there. I think that's the common law" (340).  Although the court remarked, "You may be right," it did not change its ruling (340-41).

Following this, the prosecutor called Shepard to the stand and elicited that he met petitioner when he asked a mutual friend to introduce him because he was attracted to her; Shepard did not recall when they met (346-50).  During their brief conversation, petitioner told him she was staying with Wilson, whom Shepard knew as a neighborhood "panhandl[er]" (344-45, 347).  Petitioner said she had no other place to stay (347).  Shepard and petitioner exchanged phone numbers, though petitioner gave Wilson's number instead of her own because Shepard "didn't want [his] girl to find out another girl was talking to [him]" (347, 351).

Around Thanksgiving 2011, petitioner called Shepard (from Wilson's phone) sometime between 2:00 and 5:00 a.m., "sound[ing] stressed" (Shepard: 350-51, 364-65).

20

Shepard agreed to meet her on DeKalb Avenue, expecting to have sex with her (350-52, 365-66).  When Shepard got there, petitioner had three or four bags and Shepard asked her "what was going on, you know, because she seemed a little bit" (sic) (351-52).  Petitioner told him that she and Wilson "had an altercation," that she was "not going to pay rent and fuck him too," and she had "poked" him (352-53).  Petitioner said Wilson had hit her, and Shepard noticed she had "a swelling up on her face" (355, 366).  She had no blood on her clothes, and Shepard could not say whether she "was acting unusual" because he did not know "her norm" (355-56).  Shepard did not take what she said seriously, was "not paying attention" because he was focused on the possibility of sex, and agreed that she could come to his place for a short time (353-54, 365-66).  Someone, possibly a man, picked up petitioner a few hours after Shepard took her home (356).  Shepard had no further contact with her (356).

The prosecutor cursorily elicited that Shepard had several New York and out-of-state drug convictions for which he spent time in jail (343-44).  Defense counsel began cross-examination by highlighting Shepard's convictions, eliciting how many years he served, and that his drug problem required treatment (362-64). Shepard refused to answer counsel's question, "When was the last time you got high" (364).  Counsel elicited that Shepard had "very possibly" been "up the whole night" before meeting petitioner, and that he had stated in his audiotaped interview with an assistant district attorney that he was "bad fucked up" when he met with petitioner (364-66).

Then, discussing what happened when Shepard brought petitioner home, defense counsel asked, "Did she tell you that Anthony tried to rape her at that time?" Shepard replied, "He tried to force his self on her, she did say that" (366-67). Evidently surprised by this revelation, the court interrupted counsel's follow-up question to ask a series of its own regarding the context of petitioner's statement. Shepard explained that he had again asked petitioner "what was wrong" and she had responded, "this guy is crazy, I'm not going to pay rent and fuck him[, he tried to take it, tried to force his self on her"; Shepard added, "That is where I got that from, out of her mouth" (367-68). When counsel resumed cross, Shepard agreed he had suggested that petitioner go back to check on Wilson but refused her request that he go with her (368). Counsel asked no further questions.

<u>The Crime Scene and Forensic Evidence</u>

Wilson lived in an "extremely small" studio apartment, and Section 8 and Welfare paid his entire rent directly to the landlord (Markowski: 8-9; Robinson: 78-79). When police responded to the apartment, the room temperature was 28 degrees and it was in disarray, with blood stains on a nightstand and kitchen cabinet and smears of blood and feces on the floor (Markowski: 7, 12-13, 18-20, 25, 27, 29-30, 32; Peo. Exs. 4-9, 12-13, 17-19, 23-25, 31-32, 34-35). Serious injuries can cause a person to defecate (Scordi-Bello: 257). Wilson's landlord, younger sister <u>Victoria Wilson</u>, and longtime friend <u>Shakeema Fortune</u> all agreed that Wilson's apartment was "neat" on the few occasions

they were inside and not in the condition the photos displayed (Wilson: 67-68, 73; Robinson: 81-82, 87; Fortune: 133-34, 138-39).

Wilson had seven stab wounds of varying depths but no defensive wounds (Scordi-Bello: 231-38, 241, 248-50; Peo. Exs. 52 [autopsy report], 53 [diagram]). There was a single wound about 2 ½ inches deep on his upper back, and petitioner could have inflicted it when standing in front of Wilson (237-38, 243, 250). A wound on Wilson's right side was ½ an inch deep (232-33, 249). The remaining five wounds were on his left side, with four in a cluster; two of these wounds were about 2 inches deep and three were about 5-6 inches deep (233-37, 250). The deeper ones that injured the heart and left lung were fatal but not "instantaneously lethal," and Wilson could have lived for another 20 minutes (238-39, 250, 257-58). The sequence of the wounds was undetermined but the clustered ones likely occurred in close succession, and suggested Wilson was not "actively moving" (231, 241-43). Scordi-Bello could not tell how petitioner and Wilson were positioned; her opinion was based on the directional paths of the wounds (252-54).

When he died, Wilson's blood alcohol content was .20 percent and he tested positive for an antidepressant (Fluoxetine), a cocaine byproduct (Benzoylecgonine), and a common cocaine contaminant (Levamisole) (Scordi-Bello: 246-47, 255-56). Wilson's Seroquel prescription bottle was found open, 39 pills were on the floor, and his DNA was on the cap, but his toxicology exam did not detect Seroquel (Markowski: 12, 26-27, 29; Scordi-Bello: 255-56; Phillips: 316-19, 321; Stipulation 2: 393-94 [DNA collection];

Peo. Exs. 1, 18-19, 28-29).  Because there was no Seroquel in Wilson's body, the court sustained an objection when counsel attempted to ask the medical examiner about the use of Seroquel (Scordi-Bello: 255-56, 262-63).

Wilson was naked when discovered and a penile swab tested positive for semen but not saliva or vaginal secretions (Phillips: 318-19, 324-25; Peo. Exs. 7, 9-11, 18). Clothing, a towel, and a washcloth were vouchered and tested for DNA due to possible bloodstains, but neither the items nor the test results were admitted into evidence (Markowski: 9, 11-12, 15-16, 26-28; Stipulation 1: 392-93 [DNA collection]; Peo. Exs. 1, 20, 22-27).

<u>The Court's Refusal to Allow Evidence of Wilson's Documented Mental Illness, Substance Abuse, and Domestic Violence Allegations</u>

After the People's first witness, defense counsel sought to introduce a certified copy of Wilson's medical records disclosed by the People (54-55).  In these records, counsel explained, "Wilson noted hallucinations, to harm himself or others," and reported hearing "voices"; was "diagnosed with major depressive disorder with psychotic features"; and was prescribed "Prozac for his depression," Benadryl for allergies and sleeplessness, and Seroquel, "which is an antipsychotic" (53).  Wilson also had reported that "half his stomach [was] removed because of alcoholic ulcers" and he had "giv[en] up alcohol" and cocaine (53-54, 59).  The records, which the People

provided to counsel and the court, comport with counsel's representation of their contents (*see* pp. 2-4, 7-8, 11-14, 17-23).[3]

Counsel requested introduction of the records based on Wilson's toxicology report showing a high blood alcohol content, cocaine byproducts, and no Seroquel, as well as petitioner's statements about Wilson's behavior that night.  Counsel also wanted to call Wilson's treating physician to ask whether Seroquel was prescribed to "control [his] hallucinations," about the effect of noncompliance, and whether "alcohol abuse exacerbate[d] the hallucinations" (53-57).

Although the People did not contest that the records contained this information, the court baselessly opined that Wilson's hallucinations were not violent, he was not hearing voices, and he was treated solely for depression rather than psychosis (54-58). Admonishing counsel for trying to "dirty the victim," the court denied his requests, because petitioner had not said that Wilson was hallucinating and, in its view, there was "no evidence" that Seroquel was for hallucinations or that noncompliance caused violent tendencies (57-61).  The court refused counsel's plea to "bring in the doctor for an in camera inspection" as to the "reason that [Wilson] was prescribed the Seroquel." The court remarked, without record support, "if anything, it's the alcohol in his system that in all probability caused him to do what she alleged," if true (61).

---

[3]  Wilson's records were provided to the Appellate Division and will be provided to this Court as Exhibit H.

<u>The Testimony of Wilson's Sister and Friend, and the Court's Limiting of Their
Cross-Examination</u>

Wilson's sister testified that she saw him monthly and visited his apartment after
his daughter was born (Wilson: 68, 73-74).  Wilson's daughter and her mother lived
with him sometime during the year or so he spent at that apartment, and he was "mad"
when they left (Robinson: 79-80; Fortune: 143).  Defense counsel elicited from Wilson's
sister that he "had a long-standing problem with --," or "abuse[d] alcohol" (Wilson: 74-
75).  But she was unaware that he had undergone stomach surgery (74).

Fortune had known Wilson for twelve or thirteen years; they were supposedly
"like brother and sister" (133, 141).  Fortune claimed she never drank alcohol with
Wilson and never saw him drunk or "stoned" (142).  The People elicited from Fortune
that Wilson had introduced a woman named Renee as his girlfriend when Fortune went
to the apartment four days before Thanksgiving, and that Renee stopped Wilson from
going to play pool with Fortune and her boyfriend (134-37).[4]  On cross, Fortune said
that this happened about two weeks before Thanksgiving, after backtracking from a
claim that she saw Wilson four or five times a week between 2009 and 2011 (141, 143-
44).  Fortune did not recall seeing Wilson at all in October, and clarified that they had
been "going out [in]" May and June of 2011 (144-45).  Fortune also did not remember
Wilson's age, ultimately agreeing that he was in his early forties (144-45).  The court

---

[4]  Fortune did not identify petitioner as Renee.  Shepard knew petitioner as Renee (346-47), and
Fortune agreed that she knew Shepard (134).

sustained objections to counsel asking Fortune whether Wilson ever spoke about "health issues he might have" (142, 145-46).

After Fortune's testimony, counsel asked the court to reconsider letting him use Wilson's medical records, arguing that he "ought to be allowed to go into certain personal aspects of the decedent's life," that the "records show that he had lost half his stomach due to alcohol abuse and people who know him well and see him regularly would know that he drinks a lot" (146-47).  He added that the toxicology report made Wilson's drinking habits important, and that he was "trying to establish whether [Wilson] became aggressive if he drank" (147).  When the court responded that Fortune had answered counsel's questions, counsel explained that her testimony that she had known Wilson for twelve or thirteen years and never saw him drink "ma[de] the medical records more relevant in terms of rebuttal" (147-48).  The court adhered to its prior ruling, remarking that Wilson's blood alcohol level was in evidence and counsel could "explore that in whatever fashion [he] wish[ed]" (148).

<u>Evidence Admitted Over Defense Objection</u>

Wilson's 911 call was admitted over renewed objection and played for the jury (Wilson: 71-72; NYPD Technician <u>Richard Schoen</u>: 125-31; Peo. Ex. 42).

Petitioner's July 26, 2012 statement to Scandole also was admitted.  In it, she said that she had taken Wilson's phone, wallet, and keys when she left the apartment.  She threw away the keys, "kept his wallet and[ ]didn't use it," but used the phone "for a little

while" before also discarding that.   She remembered "talking to somebody" when she left the apartment, "but [she] was in a bit of a fog" and could not remember who.  She then went to her friend Tiffany's house where she stayed for a couple days.  Asked if she used Wilson's welfare benefits card, petitioner "said absolutely not." (Scandole: 281-83).

After the prosecutor referred in her opening statement to Wilson's and petitioner's benefits cards (JS. 309), defense counsel objected to "invit[ing] speculation" that petitioner used Wilson's card, even though she had denied it and left the wallet at a friend's house (39-40, 45-48, 51).  The court agreed to instruct the jury that "the testimony regarding those items . . . have no bearing on her guilt or innocence" and gave the following *Molineux* instruction regarding the People's opening statement (39-40, 52-53, 64):

> there's evidence that after the defendant allegedly stabbed
> the victim in this case she took some items off the bureau, a
> wallet of the defendant [sic], keys and benefit card.  That
> evidence -- those are uncharged crimes and they are not
> offered to show a propensity on the part of the defendant to
> commit the crime in question.  They are only being -- that
> evidence is only offered to complete the narrative, complete
> the narrative, that's all (65).

The People subsequently called <u>Richard LeBlond</u>, welfare fraud investigator from the Human Resources Administration (LeBlond: 90-91), and introduced records showing

Wilson's and petitioner's benefit cards' transactions between September 2011 and May 2012 (94-97; Peo. Exs. 43-44).[5]

LeBlond testified that Wilson typically used his card at certain locations on Broadway Avenue in Brooklyn from September through November 2011 (100-01; Peo. Ex. 43). Beginning on December 6, the card was used on Rockaway Avenue, East 98th Street, Ralph Avenue, and Rutland Road in Brooklyn (101-02; Peo. Ex. 43). Petitioner typically used her own card at various locations, including Rutland Road (103-04; Peo. Ex. 44). Petitioner also used her card in Pennsylvania and New Jersey (106-07). Anyone with Wilson's PIN could have used his card, including to directly obtain cash (93, 107-08).

The Motion to Dismiss

Once the People rested, defense counsel moved for a trial order of dismissal, arguing that they "failed to prove a prima facie case" (397). Counsel summarized the People's evidence, which consisted of the seven stab wounds, the location of Wilson's and petitioner's blood in the disarrayed apartment, and the 911 recording. "[A]bsent" the 911 recording, "the only testimony" was petitioner's statement "that she was being attacked, [Wilson] said I'm going to get some pussy tonight, hit her several times and

---

[5] Counsel made unsuccessful *Molineux* objections to all of this evidence and unsuccessfully moved for a mistrial, or at least additional contemporaneous curative instructions (43-53, 64, 91-97, 120-23). Specifically, counsel argued that rather than completing the narrative—the *Molineux* ground upon which this evidence was admitted—"all it does is support the fact that the People are trying to get across she took the card, she used it illegally and she's bad for that reason" (122).

she defended herself."   Although the People called Shepard to elicit petitioner's "admission" to him, Shepard in fact revealed her outcry of attempted rape and testified that petitioner had "swelling around the eye, which is consistent with having been hit in the face."  Shepard also recalled that she "was upset and that she asked to return to check []on [Wilson]."  The People's theory was "entirely speculative" rather than based on "circumstances . . . so strong as to flow into pretty much one conclusion," and even if there was sufficient proof of intent to kill, the evidence showed that petitioner was justified to prevent rape (397-99).

The People responded that petitioner's outcry to Shepard, "during her stay with him or trying to convince him to allow her to stay in his apartment is of no consequence."  Given her admission to stabbing Wilson "because she wasn't going to pay him rent and have sex with him," "the 911 tape and the fact that the forensic evidence doesn't support what her claim is," the People argued that they had made out a prima facie case (399-400).

Without ruling, the court prompted counsel to make his motion at the close of the case since he planned to rest.  Accordingly, counsel renewed "[f]or the same reasons" and added that "the forensic evidence does not support the People's contention."  The evidence showed that "there was a scuffle on one side," that Wilson's blood showed that he moved, "he pulled down his pants because there wouldn't be excrement on the floor, there wouldn't be what appeared to be urine stains to the ME on the pants."  Counsel continued, "something happened and we don't know what and

it . . . certainly cannot support any verdict of guilt beyond a reasonable doubt." He concluded that "[t]his is all speculative" (400-01).

Making no new arguments, the People opposed counsel's motion and the court implicitly denied it (401).

Defense Counsel's Closing Arguments

Defense counsel argued in summation that the evidence was consistent with justification and that any conclusion to the contrary could only stem from speculation (410-15, 426, 431, 440-42). Counsel highlighted the toxicology results, petitioner's outcry to Shepard, and Shepard's testimony that petitioner's face was swollen when he saw her, urged the jury to watch her video-recorded statement, and suggested that her written statement was less accurate because police wrote it and she signed it without making a single correction after having been interrogated all day (416-22, 427-31, 435-39). Counsel suggested that petitioner did not initially go to police because she was afraid, and the court sustained an objection that this "was not the testimony" (427). Counsel accurately recounted Shepard's testimony that petitioner sounded "stressed" when she called him and wanted to go back and check on Wilson, but the court sustained objections that Shepard "didn't say" those things (435-36, 439-40).

Counsel reminded the jury of the medical examiner's testimony that the stab wounds likely happened in quick succession and that Wilson had no defensive wounds, and counsel explained why the stab wounds were consistent with petitioner's

description of how events unfolded (421-23, 433).  The court sustained an objection that counsel's argument that the actual stabbing "probably took less than a minute" "calls for speculation" (432-33).  The reason that petitioner stabbed Wilson so many times, counsel argued, was because he "wasn't feeling it" in his extremely intoxicated state and would not let her go (422, 434).  Counsel suggested that Wilson urinated in his jeans and took off his clothes while petitioner was in the bathroom, and that Wilson, who did not die immediately, may have called 911 during this time but was so drunk he did not realize he was seriously injured and, thus, did not report the stabbing (414, 423-25, 433-34).  The court sustained an objection to "speculation" that Wilson was stabbed before he called 911, and a general objection to the jury considering their own experiences to understand that a drunk person might not feel pain (414, 422).  Addressing the blood smears around the apartment, counsel believed that Wilson must have been "walking around or grabbing at something" after the stabbing occurred (425-26).  The court sustained a general objection to counsel's argument that petitioner may have cut herself to explain her blood in the bathroom, and sustained an objection to counsel saying it was not menstrual blood because "That was not the testimony" (424).

Counsel concluded by pointing out that the People had not proven intent to kill, and that their evidence on lack of justification was circumstantial and insufficient (440-42).  When counsel noted that "the definition of circumstantial evidence . . . holds the People to a very high standard," the court sustained a general objection (441).

The Prosecutor's Closing Arguments

The prosecutor argued that 25-year-old petitioner and 50-year-old Wilson had an "arrangement" that petitioner would have sex with him in exchange for a place to stay, "or that they may have been even boyfriend and girlfriend" based on Fortune's testimony (451-52, 461-62, 468, 472-73). Under either scenario, the prosecutor repeatedly maintained that Wilson's attempt to have sex with petitioner against her will was not rape:

> Maybe he tried to have sex with her. I am not saying he didn't try to have sex with her. Just because you don't want to have sex with someone doesn't mean that they are trying to rape you, okay. One is totally different from another (452).

> \*     \*     \*

> She wanted him dead because he had the nerve to not only try and maybe change the arrangements that she had for her living there, or maybe he was trying to have sex with her, she just didn't feel like it . . . (468)

> \*     \*     \*

> . . . she was consensually having sex with him and maybe on November 29th he wanted to have sex, she didn't. That doesn't mean it's rape, that just means I didn't want to have sex with him, okay (473).

The court overruled defense counsel's objection that the reference to a sexual arrangement was "Well beyond the evidence, speculation" (451). It also overruled his objection that there was "no testimony as to where [petitioner] could have stayed for the long term" when the prosecutor stated that petitioner chose to return to Wilson

instead of going to her sister, Ebony, or Tiffany "when she was supposedly mad at Mr. Wilson for [previously] trying to have his way with her" (461-62).

Dismissing petitioner's outcry, the prosecutor asserted that petitioner told Shepard that Wilson had tried to force himself on her only because Shepard was "not going to let her stay[ with him and] she needs him." The prosecutor also claimed that petitioner's statement that Wilson used force came "a couple of hours" after she initially told Shepard that she "wasn't going to give [Wilson] sex and pay him rent." The court overruled counsel's protest that "There is absolutely no evidence regarding any of this. It's speculation" (455). The prosecutor twice reiterated that petitioner "was trying to make excuses" so that Shepard would let her stay, and accused petitioner of implicitly threatening Shepard, "don't you try and have sex with me because I'm telling you what happened to Anthony Wilson, I'll do the same thing" (456, 479). The prosecutor insisted that petitioner confessed murder to Shepard—"she [first] said, I wasn't going to pay him rent and fuck him, so I poked him up" (447); "the 911 call[ and] what she said to Matthew Shepard . . . [showed] that she stabbed [Wilson] because he wanted . . . to kick [her] out now because [she would not] give [him] sex" (481).

Throughout her summation, the prosecutor maintained that Wilson's 911 call revealed "the motive for why [petitioner] stabbed him"—it was purportedly proof that he kicked her out and that she was angry her "free ride" was ending (451-52):

> . . . she was pissed that not only was he going to try and have sex with her, but now he is going to kick her out because he says [on the call] I want her out.

34

> No doubt he told her, look, if you are not going to have sex with me, you gotta get out, and then that's what put her over the edge and that is what made her stab him (453).

> \*      \*      \*

> . . . she was mad because he had the nerve to call the cops, that when he calls the cops he says I want her out, he was kicking her out. . . . He was terminating her ability to stay where she was and give $20 whenever she could to pay for food.  He was going to stop that free trade that she had (468).

> \*      \*      \*

> . . . it wasn't until after [the 911 call] . . . that she committed this murder, it's because he was trying to kick her out of that house.  The free ride that she was getting all of November was going to end and she killed him (470).

> \*      \*      \*

> . . . she stabbed him because he wanted her out of the apartment, that's the reason why that flipped her head like, oh, you trying to renegotiate our deal and you want to kick me out now because I won't give you sex, I'm going to kill you now, okay. . . . He doesn't mention anything of [the knife or stabbing on the 911 call] because, I submit to you, that knife wasn't taken out until after she got proof from Anthony Wilson that he was going to try and get her out because he calls 911 and that is what set her off, that is what made her . . . stab him (481-82).

The court overruled counsel's objections that the prosecutor's arguments about the 911 call and motive were based on "absolutely no evidence," and "sheer speculation" (452, 481).

After the court had sustained her objection to defense counsel's "speculati[ve]" suggestion that the stabbing occurred before the 911 call, the prosecutor questioned

why Wilson would have called 911 at all if he had tried to rape petitioner or was "the one that is being aggressive" (450, 453-54, 467-70). To the contrary, the prosecutor argued, "What the 911 [call] proves is the only one that was angry here was her. She is the only one that's acting crazy . . . [and] in an arousal state like that" (454, 467-69).

Next, the prosecutor argued that petitioner's admission to taking Wilson's keys, wallet, and phone, and her efforts to "cover up what she did" proved that this was an intentional murder (458-59, 471-72). The prosecutor suggested that petitioner turned off the heat in Wilson's apartment and repeatedly accused petitioner of intentionally locking the apartment door with his key when she left "so no one can find him" (458-59, 471). Again, the court overruled counsel's objections that there was "no testimony the heat was on at any time" and that this was all "a tale of speculation" (458-59). The prosecutor then told the jury that petitioner "says in her statement," "I lock the door, make sure no one can discover what happened--" and, referring to the out-of-state activity on her benefit card, that petitioner "admits [i]n her statement that she went to different places because she is not trying to get caught up in what happened there" (460; emphasis added). The court overruled counsel's repeated objections that this was "not the testimony" (460-61). In the midst of this argument, the prosecutor referred to petitioner's denial of using Wilson's benefit card and remarked, "I am not suggesting to you that it was used by her, but I am suggesting that it was used by someone that wasn't Anthony Wilson because it's going to all different places" after November 29, 2011 (459-60).

Persistently, the prosecutor claimed that petitioner had expressly admitted intent

to kill, and had implicitly done so by raising self-defense:

> We also know that she intended to kill him, okay,
> because she, according to her defense, is saying that he was
> trying to rape her.  I had to kill him because he was trying to
> rape her (447).

<p style="text-align:center">*       *       *</p>

> And we know she wanted to kill him.  According to
> her defense she is saying he is trying to rape me so I had to
> kill him, right.  She wants that self-defense, justification
> because he was trying or allegedly trying to rape her.

> So the only thing that you have to decide here, ladies
> and gentlemen, is whether or not she was acting in self-
> defense that day.  That is all you have to decide.  Because if
> she wasn't acting in self-defense, then she's guilty of murder
> (448-49).

<p style="text-align:center">*       *       *</p>

> We know at the time she stabbed him she was not
> being raped.  Forget about that.

> So if you are not preventing a rape, then that means
> the only other thing it could be is you intentionally murdered
> him (468).

<p style="text-align:center">*       *       *</p>

> So if it's not self-defense, meaning that she was not
> being or he wasn't trying to  rape her at the time she actually
> stabbed him, then it's -- the only thing it could be is murder,
> intentional murder, that she stabbed him because he wanted
> her out of the apartment . . . (481).

The court overruled counsel's objection that the express admission was "not really what

was said" (447-48).  The prosecutor contended that the justification issue turned on

<p style="text-align:center">37</p>

whether the jury believed that Wilson actually attempted to rape petitioner, and argued that petitioner was "not entitled to that defense," which was "available in very limited circumstances" if a defendant met "very specific" criteria, because the attempted rape "couldn't possibly be true" (449, 468, 480-81, 483). The court overruled counsel's objections that it was petitioner's state of mind that mattered and that the prosecutor should not be "instructing the jury" (449, 483).

The Charge, Verdict, and Sentence

The People unsuccessfully requested submission of first-degree manslaughter [N.Y. Penal Law § 125.20] as a lesser included offense on the basis that "there is a reasonable view of the evidence that could support that although [petitioner] was acting in self defense, she didn't really intend to kill" (401-02).

To convict petitioner of second-degree murder [N.Y. Penal Law § 125.25], the court instructed the jury that the People had to prove beyond a reasonable doubt that she was not justified in stabbing Wilson; that she was justified in using deadly force if she actually and reasonably believed that he was going to rape her [N.Y. Penal Law § 35.15(2)(b)]; and that the jury could consider whether her outcry to Shepard tended to support her believability (499-500, 504-08). The court also instructed that, to infer guilt from circumstantial evidence, "that inference must be the only one that can be fairly and reasonably drawn from the facts" (492-95). Finally, the court gave a *Molineux* instruction that petitioner was not "charged with any crime" for taking Wilson's property, and that the jury could not consider "[t]hat evidence" as proof of petitioner's

38

"propensity or predisposition to commit the crime charged" but only for the "limited purpose" of "complet[ing] the narrative of what happened on the night of the incident" (495-96).

The jury convicted petitioner of second-degree murder (524; Ct. Ex. 6).  The court sentenced her to 18 years to life in prison (S. 12).

The Appellate Division's Decision

On appeal, petitioner argued, among other things, that the lower court should have suppressed her July 26, 2012 statement because the police questioned her without readministering her *Miranda* rights after she had invoked her right to silence.  Petitioner also argued that the lower court violated her right to present a defense and to the effective assistance of counsel by ruling that defense counsel could only interview key witness Shepard in the prosecutor's presence.  Further violating her right to present a defense, petitioner argued, the court unfairly precluded her from introducing evidence and cross-examining witnesses about Wilson's substance abuse and psychiatric history, which included violent hallucinations.  Finally, petitioner argued that the lower court improperly admitted Wilson's 911 call as a present sense impression, in violation of petitioner's right to a fair trial.

The Appellate Division held that suppression of the July 26 statement was properly denied because petitioner's invocation of her right to silence was not "unequivocal[] and unqualified[]":

. . . <u>Had the defendant unequivocally and unqualifiedly invoked her right to remain silent the previous evening, the request would have had to be scrupulously honored (</u>*see id.* at 479; *People v Ferro*, 63 NY2d 316, 322), and further interrogation would have had to cease (*see People v Gray*, 31 NY2d 68, 70). Under such circumstances, further inquiry can be made, but only if a significant period of time has passed and the police reiterate the requisite warnings (*see Michigan v Mosley*, 423 US 96, 103-104; *People v Brown,* 266 AD2d 838). However, since the defendant in this case had not unequivocally and unqualifiedly invoked her right to remain silent (*see People v Horton,* 46 AD3d 1225, 1226; *People v Caruso*, 34 AD3d 860, 862; *cf. People v Legere*, 81 AD3d 746, 749) and remained in continuous custody in the interim, police and prosecutors were free to resume their questioning of the defendant within a reasonable time, and to do so without repeating the *Miranda* warnings (*see People v Legere*, 81 AD3d at 748; *People v Santalis*, 302 AD2d 614; *People v Holland*, 268 AD2d 536, 537; *People v Baker*, 208 AD2d 758; *People v Glinsman*, 107 AD2d 710). The further questioning at issue here was within a reasonable time under this Court's precedent (*see People v Holland*, 268 AD2d at 536; *People v Thomas*, 233 AD2d 347; *People v Baker*, 208 AD2d at 758). <u>The suppression hearing testimony of a detective who, in response to questions by defense counsel that the defendant did not want to talk anymore during the prior evening's videotaped interview, answered, "Right," and in another instance said, "Correct," does not require [suppression]. This testimony does not change the fact that there was no unequivocal invocation of the defendant's right to remain silent at that time</u>. The suggestion that the detective's answers refer instead to an unrecorded communication by the defendant, despite the colloquy on the videotape that there would be no further questioning until the tape is resumed, is mere speculation and conjecture that reads into the record information that simply is not present, and provides no basis for concluding that the defendant's 10:00 a.m. statement should have been suppressed.

*People v. Wisdom*, 164 A.D.3d 928, 929-30, 82 N.Y.S.3d 97 (2d Dep't 2018) (emphasis added).

The Appellate Division agreed that it was error for the court to condition counsel's interview of Shepard on the prosecutor being present, but held the error harmless, citing *People v. Crimmins*, 36 N.Y.2d 230 (1975). *Wisdom*, 164 A.D.3d at 931. Petitioner's claim about the 911 call was deemed unpreserved, but "in any event," properly admitted as a present sense impression. *Id.* at 930. Finally, the Appellate Division rejected petitioner's right-to-present-a-defense claim premised on the preclusion of the medical records and related cross-examination on the merits by holding that her "remaining contention is without merit" *Id.* at 931.

The New York Court of Appeals denied petitioner's application for leave to appeal, in which she raised the same arguments and incorporated her briefs submitted to the Appellate Division.

## GROUNDS OF UNCONSTITUTIONALITY OF PETITIONER'S CONVICTION AND SENTENCE

### POINT I

THE COURT SHOULD HAVE SUPPRESSED CUSTODIAL STATEMENTS OBTAINED FROM PETITIONER AFTER SHE INVOKED HER RIGHT TO REMAIN SILENT, AND THE USE OF THOSE STATEMENTS AT TRIAL PAINTED HER AS A LIAR IN A CASE WHERE HER CREDIBILITY WAS KEY TO GUILT OR INNOCENCE.

Petitioner agreed during the A.D.A.'s videotaped interview about the stabbing that she wanted to "stop right now," and the A.D.A. responded that there would be no further questioning. Detective Scandole understood that petitioner "[did not] want to talk about it anymore." And yet the following morning, after petitioner was detained in the precinct overnight, Scandole resumed questioning her. Because Scandole did not re-administer *Miranda* warnings, he violated petitioner's constitutional right to remain silent and the court should have suppressed her response. U.S. Const., Amends. V, XIV; N.Y. Const., Art. I, § 6.

When a suspect in custody "indicates <u>in any manner, at any time prior to or during questioning</u>, that he wishes to remain silent, <u>the interrogation must cease.</u>" *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966) (emphasis added). The right to cut off questioning "must be scrupulously honored." *Id.* at 479; *Michigan v. Mosley*, 423 U.S. 96, 104 (1975); *People v. Ferro*, 63 N.Y.2d 316, 322 (1984). Once it is invoked, the suspect "may not within a short period thereafter and <u>without a fresh set of warnings</u> be

42

importuned to speak about the same suspected crime." *Ferro*, 63 N.Y.2d at 322 (citing *Mosley*, 423 U.S. at 106; emphasis added). *See also People v. Gary*, 31 N.Y.2d 68, 70 (1972).

There is no magic phrase required to invoke the right to silence. A suspect simply needs to convey that she "wanted to remain silent or that [s]he did not want to talk with the police." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). When considering whether a suspect invoked her right to silence, the same standard applies as to the invocation of the right to counsel; ambiguous or equivocal requests are insufficient. *Id.* at 381-82. Viewing the totality of the circumstances, if a reasonable officer must have understood from the suspect's words or conduct that she did not wish to talk., the interview must stop. *Davis v. U.S.*, 512 U.S. 452, 459 (1994) ("suspect need not speak with the discrimination of an Oxford don, but he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney) (internal quotation and citation omitted); *U.S. v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011) (suspect's "conduct, on the whole," reflected indecision about whether to invoke his right to counsel).

Here, during her videotaped interview, after eleven hours in custody, which included hours of interrogation, petitioner became increasingly distressed during her videotaped interview and said "yeah" when Purce asked whether she wanted to "stop right now" (219; Hrg. Ex. 3). Purce properly ended the interview, and stated on video that there would be no further questioning until the taping resumed (219-20), which never happened. Scandole, who was involved at each step of petitioner's lengthy

43

interrogation, explicitly and repeatedly agreed on cross-examination that petitioner had said, "I don't want to talk about it anymore" (214-16).

Thus, petitioner clearly invoked her right to remain silent. *Mosley*, 423 U.S. at 97, 104 (defendant who waived *Miranda* rights then invoked right to silence by stating that he did not want to discuss robberies); *Jones v. Harrington*, 829 F.3d 1128, 1139-40 (9th Cir. 2016) ("No fairminded jurist could determine that [defendant's] invocation was ambiguous" when he "stated: 'I don't want to talk no more' . . . [and] did not equivocate by using words such as 'maybe' or 'might' or 'I think.'") (internal citation omitted); *McGraw v. Holland*, 257 F.3d 513, 515, 518 (6th Cir. 2001) ("I don't wanna talk about it" was unambiguous invocation); *People v. Leflore*, 154 A.D.3d 1164, 1167 (3d Dep't 2017) (same where defendant stated, "'I will get a lawyer. As a matter of fact, I don't wanna talk no more' . . . , thereby unequivocally asserting his right to counsel and to remain silent").

Petitioner did all that was required when she answered, unequivocally, "yeah," to the invitation to "stop right now." She did not remain mute or express any uncertainty about wanting to stop. *See Berghuis*, 560 U.S. at 375-76, 381-82 (not responding to questions is insufficient to invoke right to silence); *United States v. Mir*, 224 F. Supp. 3d 217, 218-19 (S.D.N.Y. 2016) (when asked whether he wanted to speak with FBI, defendant answered, "Yeah, I don't know"). Petitioner did not ask to speak with a different official to try to negotiate a plea deal, or solicit additional interviews. *Williams v. Bradt*, 2016 WL 1273228, *20-21 (E.D.N.Y. 2016); *Sanchez v. Sup., Five Points*

*Correctional Facility*, Case No. 16-cv-428, 2018 WL 3040361, *13-16 (S.D.N.Y. 2018) (Report and Recommendation ("R&R")); *see Sanchez v. Sup.*, *Five Points Correctional Facility*, Case No. 16-cv-428, 2018 WL 3038495 (S.D.N.Y. 2018) (adopting R&R).

Nor did petitioner merely request a break. *Compare People v. Legere*, 81 A.D.3d 746 (2d Dep't 2011) (defendant who waived *Miranda* rights and made statements to police later invoked right to silence when said he "wanted to speak to his mother, that's it," and, when asked if he wanted to continue the interview, he replied, "no," and "I'm not feeling too good"), *with Sanchez*, 2018 WL 3040361 at *13-16 (denying habeas relief where defendant told police, "I do want to talk, but not to you guys right this second"); *Bradt*, 2016 WL 1273228 at *20-21.

To the contrary, the totality of the circumstances show that Purce and Scandole both understood that petitioner did not want to continue discussing the incident at all. True, Purce's on-video remarks show that he intended to give petitioner a temporary break. Although Purce may have anticipated resuming the interview based on his remark when he stopped the video. But it was petitioner's intention, not Purce's, that mattered, and the hearing evidence was not limited to her videotaped statements. Scandole was asked three times whether petitioner had said that "she didn't want to speak anymore" and he repeatedly said that was "correct," even testifying in his own words, "She said I don't want to talk about it anymore" (214-16). His testimony, which the hearing court found credible, explains why Purce never attempted to resume the video interview as planned—further demonstrating that petitioner clearly expressed her

wish to stop talking completely.  *See Sessoms v. Grounds*, 776 F.3d 615, 629 (9th Cir. 2015) ("detectives' behavior confirms that—like any reasonable law enforcement officers—they understood that [defendant] was requesting counsel").

Once petitioner invoked her right to silence, Scandole was required to re-read her rights before questioning her again.  *Mosley*, 423 U.S. at 104 (police ceased questioning when defendant said he did not wish to discuss robberies; suppression not required of statements made later in different location to different detective who re-read *Miranda* warnings in full before asking about unrelated murder); *Perkins v. Herbert*, 596 F.3d 161, 174 (2d Cir. 2010) (suppression required for statements obtained after invocation of right to silence when police failed to readminister *Miranda* warnings); *Saunders v. Lavalley*, 2014 WL 2624763, *5, 17 (S.D.N.Y. 2014) (same; statements from next morning after fresh *Miranda* warnings were admissible); *Ferro*, 63 N.Y.2d at 322; *Gary*, 31 N.Y.2d at 70; Legere, at 748-49.  There has never been any dispute that Scandole questioned petitioner the following morning without providing fresh *Miranda* warnings.

This clear constitutional error had a "substantial and injurious effect or influence" on the verdict and, therefore, caused "actual prejudice" that warrants habeas relief.  *Davis v. Ayala*, — U.S. —, 135 S.Ct. 2187, 2197-98 (2015); *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995); *Brecht v. Abrahamson*, 507 U.S. 619, 623-24, 637-38 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 116-21, n. 3 (2007).  In assessing an error's likely impact, a habeas court must consider the strength of the People's case absent the inadmissible

evidence, whether that evidence was material and/or cumulative, and whether it was highlighted by the government. *Brecht*, 507 U.S. at 639; *Spirles v. Kaplan*, Case No. 16-cv-1044, 2020 WL 210093, *8 (W.D.N.Y. 2020) (citing *Brown v. Keane*, 355 F.3d 82, 92 (2d Cir. 2004)). The strength of the State's case is the most important factor. *Rodriguez v. Heath*, 138 F. Supp. 3d 237, 262 (E.D.N.Y. 2015). Here, the factors favor petitioner.

Petitioner's emotional series of custodial statements were the only direct evidence of her guilt and those statements established that petitioner justifiably defended herself. She said that she stabbed Wilson because he told her he was going to "get some pussy" and then blocked her from leaving and physically attacked her. He wrapped a belt around his hand, punched her in the face, bent her down while restraining her with her clothing, and hit her in the back. She struggled to escape, but was unable to. Only then did she stab him, and even then he did not immediately cease. During the hours she spent in police custody on July 25, her story remained consistent, and the videotape entered into evidence clearly displayed her distress at having to recall the event.

Moreover, petitioner's account was corroborated by prosecution witness Matthew Shepard, albeit unexpectedly (*see* Point II, *post*). Petitioner was "stressed" when she called him for a ride, and told him that she had stabbed Wilson because he "tried to force his self on her." Shepard saw visible swelling on her face, consistent with Wilson hitting her, which she also told Shepard about. Notably, Shepard also corroborated petitioner's statement that she had been staying with Wilson out of

necessity, and he testified that petitioner wanted to go back to check on Wilson on the night of the incident but he refused to accompany her.

Further supporting petitioner's description of Wilson's bizarre and violent behavior that night, a toxicology report showed that Wilson had a .20 BAC and the presence of a cocaine byproduct and contaminant in his system upon death. This also corroborated petitioner's description of him as a crack user and supported the reasonableness of her belief that deadly force was necessary to prevent him from raping her, especially considering that he was taller than her, twice her age, and outweighed her by 40 pounds. In the same vein, petitioner's fear was reasonable in light of Wilson's psychiatric history of violent hallucinations, noncompliance with prescribed psychiatric medication, and substance abuse, which the court unfairly precluded defense counsel from exploring (Point III, *post*).

Relying wholly on circumstantial evidence—the 911 call, the crime scene, the wounds, and Shepard's testimony on direct examination—the People posited an alternative sequence of events to disprove justification: petitioner became enraged and murderous after Wilson simply asked for sex, not attack and attempt to rape her. But the People's theory was "based upon conjecture, supposition, suggestion, [and] speculation." *People v. Leyra*, 1 N.Y.2d 199, 206 (1956). Not only was the 911 call inadmissible hearsay (Point IV, *post*), Wilson's remarks were unreliable because he was intoxicated at the time he made them and possibly high on cocaine. Even assuming that Wilson was referring to something real rather than a hallucination, he said nothing

48

about petitioner attacking or threatening him, or anything else that contradicted what she told police, and he did not sound afraid. Similarly, while concededly gruesome, the crime scene also shed no light on what actually happened during the struggle. Wilson's wounds did not exclude justification, since the medical examiner testified that most likely were inflicted in rapid succession while Wilson was not actively moving, and the wound on his back could have been inflicted with petitioner standing in front of him. This evidence was not at odds with petitioner's description of desperately stabbing Wilson as he refused to let go of her.

The People's witnesses also failed to disprove justification. Shepard's direct testimony that petitioner "poked" Wilson because she did not want to have sex with him was not inconsistent with Shepard's cross-examination testimony that expanded upon this to add that petitioner also told him Wilson tried to rape her. Relying on Shakeema Fortune, the People suggested that petitioner may have been Wilson's girlfriend but that obviously does not mean she could not be raped, despite the prosecutor's offensive summation comments to that effect. In any event, the record supported petitioner's denial of any romantic involvement with Wilson. Phone records showed that she never called Wilson despite using her phone heavily, and he incessantly called her over two days as she had told police. Moreover, Shepard had been attracted to petitioner and testified that she gave him Wilson's number so that Shepard's girlfriend would not suspect him of cheating—petitioner would not have asked another man to call her through her boyfriend. Finally, Fortune's recollection that she briefly

49

met Wilson's girlfriend Renee—purportedly petitioner—shortly before his death was completely unreliable because she forgot or did not know things that she had reason to remember.  Fortune claimed to be like a sister to Wilson but did not know his age, could not recall and was grossly inconsistent as to how often they saw each other, and supposedly never saw Wilson drunk or "stoned" in the decade-plus that they were friends.  Given the toxicology report, which corroborated petitioner's statements about his drug problem and ongoing treatment for it, Fortune either lied about his substance abuse, forgot, or did not know Wilson as well as she maintained.

That petitioner was eventually located months later in a homeless shelter out of state added little to the People's case.  At most, flight constitutes consciousness of guilt and fear of not being believed easily explains why petitioner fled—that fear was obviously reasonable given that she was, in fact, prosecuted rather than believed.  *See People v. Moses*, 63 N.Y.2d 299, 308 (1984) ("an innocent person may attempt to extricate himself from a situation by denying incriminating evidence even though he knows it can be truthfully explained or by fleeing . . . because of fear of wrongful conviction").

In short, the People's case against petitioner was extremely problematic because they needed the jury to accept petitioner's statement that she had stabbed Wilson, while rejecting essentially every other aspect of her story even though it was corroborated in many ways by Shepard and the phone records, and uncontradicted by the forensic evidence.  Indeed, the People even acknowledged at the end of trial when requesting

submission of a lesser included offense that "there [was] a reasonable view of the evidence that could support that . . . [petitioner] was acting in self defense" (401-02).

The People therefore needed more ammunition to undermine petitioner's credibility, which they found in her statements to Scandole on the morning of July 26, after she had invoked her right to silence.  That morning was the only time that petitioner made an inconsistent statement, by saying that she had gone to a different friend's home after the incident.  Petitioner also was questioned for the first time about whether she took any of Wilson's property, and she agreed that she had taken his keys, phone, and wallet, but she expressly denied using his benefit card from the wallet, which was nevertheless used after his death.  Thus, the statements were clearly not cumulative. *Cf. Spirles*, 2020 WL 210093 at *9 (although improperly obtained video statements damaged defendant's credibility, she had already made numerous inconsistent statements).

Throughout the trial, the prosecutor took full advantage of the statements to attack petitioner's credibility and depict her as a thief and a liar.  *Compare Sessoms*, 776 F.3d at 629-30 (granting habeas relief because admission of confession taken after *Miranda* invocation was not harmless when it was the linchpin of the State's otherwise circumstantial case and the prosecutors repeatedly emphasized the confession), *with Spirles*, 2020 WL 210093 at n. 4 (habeas denied; prosecutor did impugn defendant's credibility by highlighting her demeanor during video interview following *Miranda* invocation, but the same argument was supported by properly admitted 911 call);

*Rodriguez*, 138 F. Supp. 3d at 262-63 (denying habeas for *Miranda* violation where State had strong circumstantial case absent improperly obtained confession, confession was sole evidence of justification, and State tried to avoid rather than emphasize it in summation).

Based solely on petitioner's July 26 admission that she took Wilson's key, the prosecutor argued that petitioner locked Wilson inside his apartment and turned off the heat so no one would find him even though there was no evidence of this (458-61, 471-72). She also highlighted the discrepancy between petitioner's initial and next-morning statements about going to Ebony versus Tiffany after the stabbing (JS. 308-09), and listed both as friends whom petitioner purportedly could have gone to rather than return to Wilson's apartment if he had previously touched her as she claimed (461-62).

In addition, from the outset, the prosecutor used petitioner's July 26 admission as a springboard to introduce irrelevant *Molineux* evidence which begged the jury to conclude that petitioner had lied to police about using Wilson's benefit card. In her opening statement, the prosecutor said that while petitioner "denied ever using" Wilson's card, "there actually is activity on Mr. Wilson's benefit card after the date of November 29, 2011 and it shows consistent areas with where the defendant used to use her benefits card" (JS. 309). The fraud investigator's testimony about overlapping activity on both cards beginning after Wilson's death, and supporting records, strengthened the implication that petitioner had lied. In summation, the prosecutor referenced Wilson's card while arguing that petitioner left the state, having previously

established that Wilson's card could be used to withdraw cash.  Although the prosecutor denied accusing petitioner of using the card, it was the only logical inference for the jury to make since petitioner admitted taking it and it was indisputably "used by someone that wasn't Anthony Wilson" (459-60).   Indeed, the court agreed when counsel had objected to its admission that the overlapping card activity suggested that Wilson's "[w]elfare benefits [were] being utilized by" petitioner (40-41).

In sum, any reason to discount petitioner's believability was no small thing because justification rested principally upon her statements, especially since other constitutional errors rendered defense counsel unable to adequately support the defense with the corroboration provided by Shepard (Point II, *post*), or Wilson's psychiatric history (Point III, *post*).   Given the overall weakness of proof that petitioner was not justified, and how the People used the July 26 statements to attack petitioner's credibility, including by linking those statements to uncharged crime evidence,  there is at least "grave doubt" as to whether the *Miranda* error likely affected the verdict.  Habeas relief is therefore warranted.

<u>POINT II</u>

THE COURT VIOLATED PETITIONER'S RIGHTS TO
DUE PROCESS, TO PRESENT A DEFENSE, AND TO
THE EFFECTIVE ASSISTANCE OF COUNSEL BY
REQUIRING DEFENSE COUNSEL TO INTERVIEW
AN AMENABLE KEY PROSECUTION WITNESS IN
THE PRESENCE OF THE PROSECUTOR.

Matthew Shepard was produced and detained in the courthouse as a material

witness for the People, who opened by introducing him as a key witness who would

testify that petitioner admitted stabbing Wilson because he wanted to have sex with her.

Although the court properly granted defense counsel's request to speak to Shepard

before the People called him to the stand, and Shepard agreed to an interview, the court

refused to allow defense counsel to interview him alone and ruled that the prosecutor

could insist on being present.  Rightfully unwilling to conduct a witness interview under

the watchful eye of his adversary, defense counsel was unable to effectively prepare to

defend petitioner and attacked Shepard's credibility before Shepard unexpectedly

revealed petitioner's outcry.  The interference with counsel's attempt to interview

Shepard violated petitioner's rights to due process, to present a defense, and to the

effective assistance of counsel.  U.S. Const., Amends. V, VI, XIV; N.Y. Const., Art. I,

§ 6.

A defendant, through his attorney, has a due process right to speak with a willing

prosecution witness as part of investigating potential defenses.  *Schulz v. Marshall*, 528

F. Supp. 2d 77, 98 (E.D.N.Y. 2007), *aff'd*, 345 Fed. Appx. 627 (2d Cir. 2009) ("New

York State courts have consistently held that prosecutors may not refuse defense counsel requests for interviews with prosecution witnesses, and that courts will enable these interviews if necessary"); *see, e.g., People v. Harris*, 84 A.D.2d 63, 102-03 (2d Dep't 1981) ("not only was the prosecutor entitled to attempt to speak to a defense witness, but any effort by defense counsel to prevent [this] . . . might well have constituted an ethical violation"); *People v. Eanes*, 43 A.D.2d 744, 744 (2d Dep't 1973) ("We know of no rule or law which prohibits defense counsel from interviewing a person who has appeared at the request of the prosecutor").

For a criminal defendant, this rule is of constitutional dimension, implicating the rights to due process, effective assistance of counsel, and the right to present a defense. *See Washington v. Texas*, 388 U.S. 14, 17-19, 23 (1967) (defendant has Sixth Amendment right to "compulsory process for obtaining witnesses in his favor"; reversing when state statutes prevented defendant from calling charged accomplice); *Int'l Bus. Machines Corp. v. Edelstein ("IBM")*, 526 F.2d 37, 43-44 (2d Cir. 1975) (impeding defense counsel's ability to "search for the truth" by freely interviewing adverse witnesses violates right to effective assistance); *Schulz*, 528 F. Supp. 2d at 95-99, *aff'd*, 345 Fed. Appx. at 627-30 (defendant received ineffective assistance because counsel did not request court's help to permit interview of key witness after prosecutor allegedly obstructed access); *see also People v. Sapia*, 41 N.Y.2d 160, 165 (1976) (under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), a prosecutor's "suppressing" or "withholding" of a witness's exculpatory testimony violates the accused's constitutional right to due process); *Herring v. New York*,

422 U.S. 853, 857-65 (1975) (right to effective assistance of counsel requires "that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process") (citing *Brooks v. Tennessee*, 406 U.S. 605 (1972); *Ferguson v. Georgia*, 365 U.S. 570 (1961)).

In *IBM*, the Court of Appeals granted defendant IBM's petition for a writ of mandamus for relief from the district judge's pre-trial ruling that interviews with adverse witnesses had to be in the presence of opposing counsel or a court stenographer who would provide the transcript to the judge. 526 F.2d at 41-44. That ruling was "contrary to time-honored and decision-honored principles, namely, that counsel for all parties have a right to interview an adverse party's witnesses (the witness willing) <u>in private, without the presence or consent of opposing counsel</u> and without a transcript being made." *Id.* at 42 (emphasis added). Following the Supreme Court's lead, the Court of Appeals explained that the "legitimate need for confidentiality" serves "the goals of maximizing unhampered access to information and insuring the presentation of the best possible case at trial." *Id.* at 42-43 (discussing *Hickman v. Taylor*, 329 U.S. 495 (1947)). The Court of Appeals also "wholeheartedly" endorsed the view espoused in *Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966), that a prosecutor's insistence that witnesses not speak with defense counsel unless in his presence unfairly "interfere[d] with the preparation of the defense." *IBM*, 526 F.2d at 43-44.

In petitioner's case, defense counsel's legitimate procurement of an interview with an amenable Shepard was shattered when the court ruled that the prosecutor had

a right to be present during that interview.  Like counsel said, it is "intimidating" to have a prosecutor stand guard (336).  Her presence could have affected Shepard's candor since he could have feared, especially as an unwilling witness appearing by court order, that the prosecutor had the power to penalize him if he changed or even supplemented his account in ways the prosecutor did not like.  *Cf. People v. Earle*, 17 Misc. 2d 157, 157 (Ct. Gen. Sess., N.Y. Cty. 1957) (People's request to instruct their witnesses that they need not speak with defense counsel, "if carried out, would be fraught with much danger in that it could deprive a defendant of his basic constitutional rights to freely and fully prepare his defense"); *see Webb v. Texas*, 409 U.S. 95, 95-98 (1972) (reversing because lengthy judicial admonishment about perjury likely contributed to defense witness's change of heart about testifying).  Moreover, counsel should have been able to fully explore Shepard's recollection without worrying about providing additional fodder for the People's case.  As counsel noted, affording privacy posed no unfairness to the prosecutor, who "would be free" to ask Shepard what they discussed (339).  Notably, this was not a situation in which defense counsel wished to privately interview someone who was represented by his or her own attorney on a pending/potential criminal matter.

There is no basis for the Appellate Division's cursory and unexplained determination that the error here was harmless.  The only issue for the jury was whether the People proved beyond a reasonable doubt that petitioner was not justified in stabbing Wilson to prevent him from raping her.  As discussed extensively in Point I,

*ante*, the circumstantial evidence relied upon by the People largely corroborated petitioner's account or at least was not inconsistent with it.  Shepard was a critical witness for the People, as he was the only person who saw petitioner the night of the incident, and the record makes clear that counsel's efforts to defend petitioner were impaired by his inability to interview Shepard.

Shepard's direct testimony was that petitioner told him she was not going to pay rent and have sex with Wilson, which the People had anticipated and spun in their opening statement as meaning that Wilson merely "wanted" to have sex with petitioner, but did not attempt to rape her (JS. 303-04).  On cross, however, defense counsel elicited—clearly unexpectedly, based on his and the court's reaction—extraordinarily powerful exculpatory testimony that petitioner actually told Shepard, Wilson "tried to take it, tried to force his self on her" (367-68).  Counsel may have been able to elicit additional exculpatory evidence, such as petitioner's exact words to Shepard, given a fair and meaningful opportunity to interview Shepard, rather than having to avoid asking questions to which he did not know the answers for the first time in front of the jury.

Significantly, the prosecutor used counsel's inability to develop the outcry evidence to her advantage in summation.  She proclaimed that petitioner told Shepard about Wilson trying to rape her "hours later," and it was merely an "excuse" to convince Shepard to let him stay with her, as well as an implicit threat that she would stab Shepard, too, if he tried to initiate sex (455-56, 479).  The court overruled counsel's

well-founded objections that there was no evidence to support any of those arguments. This was after the court had sustained the prosecutor's objection that Shepard "didn't say" that petitioner sounded "stressed" when she called him or that she wanted to check on Wilson, as defense counsel had, accurately, stated in his closing argument (435-36, 439-40).

Moreover, counsel initially sought to impeach Shepard's credibility by highlighting his convictions and drug problems (362-66).  Had counsel known that Shepard would fully support petitioner's account of being the victim of a violent, forcible, attempted rape, he surely would have done things differently.  Since Shepard's testimony went straight to the heart of this case and the court's ruling prevented counsel from adequately preparing to cross-examine him, and the prosecutor capitalized on the error, the ruling caused actual prejudice.  *Cf. Schulz*, 528 F. Supp. 2d at 101-02 (counsel's failure to seek court's assistance to interview crucial witness after alleged obstruction was prejudicial error warranting habeas relief).  At a minimum, there is grave doubt as to whether the interference with counsel's access to Shepard likely affected the verdict.

<u>POINT III</u>

THE COURT VIOLATED PETITIONER'S RIGHT TO
PRESENT A DEFENSE BY PRECLUDING HER
FROM: USING MEDICAL RECORDS TO SHOW THE
DECEASED'S HISTORY OF PSYCHOSIS AND
LONGTIME SUBSTANCE ABUSE; EXPLORING
WHETHER HE WAS MORE LIKELY TO
EXPERIENCE VIOLENT HALLUCINATIONS WHEN
INTOXICATED AND OFF HIS MEDICATION, AS
ON THE NIGHT OF THE STABBING; CROSS-
EXAMINING PROSECUTION WITNESSES ABOUT
THESE TOPICS.

Petitioner confessed to stabbing Wilson, but set forth a justification defense,

explaining that she did so to prevent him from forcibly raping her.  That night, she said,

he was saying "crazy" things and became violent.  Medical records showed Wilson

suffered from depression "with psychotic features," heard voices and had violent

hallucinations of harming others, and had a prescription for Seroquel—a drug often

used as an antipsychotic.  Wilson's toxicology report detected alcohol and cocaine, but

not Seroquel.  Inexplicably, however, the court opined that Wilson had no psychosis

and precluded defense counsel from exploring whether Wilson's mental illness,

Seroquel noncompliance, and substance abuse cumulatively made it more likely that

Wilson attacked petitioner.  The court also precluded counsel from asking Wilson's

sister about his alcohol abuse, or using the medical records' details of Wilson's

substance abuse problem to "rebut" Fortune's claim that, during their long friendship,

she never drank with Wilson or saw him drunk or "stoned." By hamstringing

petitioner's justification defense, and restricting her right to question the weight and

credibility of Wilson's sister and friend who essentially testified about his good character, the court deprived petitioner of a fair trial, and her rights to present a defense and confrontation.  U.S. Const., Amends. VI, XIV; N.Y. Const., Art. I, § 6.

The right to present a defense is "among the minimum essentials of a fair trial," *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (internal citations omitted), and "an essential component of procedural fairness."  *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  *See also People v. Hudy*, 73 N.Y.2d 40, 56-58 (1988), *abrogated on other grounds by Carmell v. Texas*, 529 U.S. 513 (2000); *People v. Gibian*, 76 A.D.3d 583, 585 (2d Dep't 2010).  This includes the right to "present the defendant's version of the facts," as contrasted with the prosecution's, which is critical for the defense to do because the jury's ultimate job is to "decide where the truth lies."  *Washington*, 388 U.S. at 19; *see also People v. Carroll*, 95 N.Y.2d 375, 385 (2000) ("Just as the People are allowed to rebut key assertions of the defense . . . the defendant also is allowed to attempt to disprove the People's theory and rebut their key assertions").

A defendant charged with homicide, in particular, may introduce evidence that the deceased was a "quarrelsome, vindictive, or violent" person.  *People v. Miller*, 39 N.Y.2d 543, 548-49 (1976) (quotations omitted).  Such evidence "enables [the accused] to judge the danger and aids the jury in deciding whether [she] acted in good faith."  *Id.* at 549.  In other words, "it shows the state of [her] mind as to the necessity of defending [her]self."  *Id.*

Objective evidence demonstrating that the deceased was "exhibiting aberrant behavior sufficient to cause fear and warrant a forceful response" is also admissible, even if unknown to the defendant, as this helps the jury to "better judge the reasonableness of the defendant's conduct." *People v. Chevalier*, 220 A.D.2d 114, 116-18 (1st Dep't 1996), *aff'd.* 89 N.Y.2d. 1050, 1053 (1997) (right to present defense requires allowing evidence of the defendant's conduct); *see also People v. Frazier*, 6 A.D.3d 455, 456 (2d Dep't 2004) (same).  A defendant is not limited to live testimony but, rather, may submit documentary proof of a victim's character pertaining to justification. *Miller*, 39 N.Y.2d at 551-53.  "A basic sense of fairness mandates that the defendant be permitted to substantiate his claim." *Id.*

Here, defense counsel had medical records demonstrating that Wilson suffered from psychiatric problems including violent hallucinations of harming others, heard voices, was diagnosed with depression "with psychotic features," and was prescribed Seroquel, a drug commonly used as an antipsychotic, which he was not taking at the time of his death.  The records also showed a significant history of abusing alcohol and cocaine.  The court's ruling that counsel could not use the records, because they would "dirty the victim" and, "if anything, it's the alcohol" that affected Wilson's behavior that night (59-61), unfairly restricted petitioner's right to present a defense.

Petitioner clearly was aware of Wilson's substance abuse.  She told police that Wilson was in a drug program, that they argued because she would not help feed his habit, and that "when he smoked crack he became a completely different person"

(Scandole: 274; Peo. Ex. 56).  The medical records, meanwhile, showed that Wilson had abused alcohol so severely that "alcoholic ulcers" led to a major stomach surgery and he had claimed to his doctor(s) that he "no longer" used cocaine, indicating that he previously had (53-54, 59, 146-47).  Petitioner undoubtedly was also aware of Wilson's psychiatric issues, given that she had been living with him for about a month and his prescription bottles were in plain view.  Notably, petitioner told police that he was saying "crazy shit" while pacing and blocking her from leaving (Peo. Ex. 56).

Aside from petitioner's subjective awareness of it, Wilson's pattern of substance abuse and his psychiatric history were clearly "relevant on the issue of whether it was <u>objectively</u> reasonable for [petitioner] to perceive him as dangerous." *Frazier*, 6 A.D.3d at 456 (court erred in precluding evidence that victim had PCP in blood at time of death) (emphasis added); *accord. Chevalier*, 220 A.D.2d at 114-16 (same); *see People v. Rivera*, 138 A.D.2d 169 (1st Dep't 1988) (denial of access to psychiatric records deprived defendant opportunity to fully prepare case and present justification defense, and violated *Brady v. Maryland*, 373 U.S. 83 (1963), because victim's psychological history was relevant to whether he was initial aggressor).

Thus, counsel was wholly right to want to explore, through Wilson's medical records, doctor, or an expert, whether Wilson's Seroquel noncompliance and extreme intoxication increased the likelihood of experiencing hallucinations and/or acting aggressively.  The court improperly curtailed counsel's investigation despite his good-faith basis.  It summarily decided that the medical records were not probative, arguing

63

with defense counsel about Wilson's diagnosis and symptoms—despite the medical records themselves and the prosecutor's agreement with counsel's representations— and baselessly opined that Seroquel was prescribed as an antidepressant instead of an antipsychotic (53-61). *See Fuentes v. T. Griffin*, 829 F.3d. 233, 252-53 (2d Cir. 2016) (granting habeas relief for *Brady* violation where New York Court of Appeals misunderstood the materiality of complainant's psychiatric records because it misread them); *see also People v. Baranek*, 287 A.D.2d 74, 80 (2d Dep't 2001) (court "erred in precluding the defense from offering expert testimony regarding the complainant's psychiatric condition"); *Frazier*, 6 A.D.3d at 456 (same, as to "expert testimony concerning the effects of [PCP] on a person's behavior").

In the face of the court's ruling, counsel asked the court to, at a minimum, conduct an in camera interview of Wilson's doctor to ascertain the purpose of the Seroquel prescription.  The court refused even this, when it was clearly the proper, minimal solution. *See People v. Knowell*, 127 A.D.2d 794, 794 (2d Dep't 1987) (court erred in refusing in camera inspection of psychiatric records of key prosecution witness when defendant's offer of proof, detailing history of psychiatric problems, established "a reasonable likelihood" that the records were material); *see also People v. Arnold*, 177 A.D.2d 633, 634-35 (2d Dep't 1991) (when defendant seeks access to witness's psychiatric records, after sufficient showing, "proper procedure is for the court . . . to order production of the records and to inspect them in camera").  Both *Knowell* and *Arnold* cite to *People v. Gissendanner*, 48 N.Y.2d 543, 547-50 (1979), in which the New

York Court of Appeals held that a defendant's federal rights to compulsory process and confrontation required providing access to otherwise confidential records upon a sufficient showing of materiality.

Another basis for admitting Wilson's psychiatric history and potential reaction to alcohol and cocaine was that the People put his credibility in issue. They used his 911 call that a woman was "acting all crazy" and he wanted her out of his house (Peo. Ex. 42), to argue that it was petitioner who suddenly became violent that night (454, 467-69). It is well settled that a witness's mental health history may be relevant to his credibility. *U.S. v. Sasso*, 59 F.3d 341, 347 (2d Cir. 1995). Courts should consider the nature of the psychological condition, its remoteness or recency, and whether the witness suffered from the condition at the time of the events at issue. *Id.* at 347-48. Evidence of delusions is particularly probative. *Id.*; *Chnapkova v. Koh*, 985 F.2d 79, 81 (2d Cir. 1993); *People v. Rensing*, 14 N.Y.2d 210, 213-14 (1964) (jury should have been told about testifying codefendant's paranoid schizophrenia in order to properly "assess and evaluate the testimony given by him"); *Baranek*, 287 A.D.2d at 79-80 (barring introduction of complainant's history of delusions, which was relevant to her ability to perceive and recall events, violated right to present a defense); *Knowell*, 127 A.D.2d at 794 (court erred in barring cross-examination of key witness about his mental condition despite history of psychiatric problems).

Evidence of Wilson's substance abuse and psychiatric history would not have been cumulative so as to warrant the court's preclusion. Faced with a strikingly similar

claim in a self-defense case, the Eleventh Circuit held that the district court did not err in precluding the deceased's mental health records and expert testimony about possible consequences of medication noncompliance. This was because the jury learned through multiple witnesses of the deceased's mental illness, recent refusal to stop taking his medication, and aggressive behavior toward the defendant while drunk on the day of the incident. *U.S. v. Higginbotham*, 577 Fed.Appx. 948, 950-51 (11th Cir. 2014).

By contrast, petitioner's jury knew nothing at all of Wilson's history of violent hallucinations and hearing voices, so they could not consider whether this supported petitioner's version of events, *i.e.* that he became violent and she reasonably feared him. If Wilson's drinking and using cocaine—especially while off his medication—did, in fact, risk triggering delusions or aggression, that was not before the jury either. Even with respect to his substance abuse, the jury had only petitioner's statements and was entitled to question her credibility as an interested witness (*see* Charge: 497-98). Although the toxicology report corroborated petitioner by proving that Wilson had at least used cocaine somewhat recently and showed that he was very drunk, his medical records would have fully supported petitioner's description of Wilson as a drug user in a program, when her credibility was the most important issue. *See Fuentes*, 829 F.3d. at 252-53 (granting habeas relief when People failed to turn over psychiatric records which "would have revealed a disorder that both provided a basis for questioning [the complainant's] credibility and provided further support for [defendant's] version of the events"). Revealing Wilson's psychiatric history and medication noncompliance would

also have gutted the People's arguments at trial that Wilson's 911 call proved petitioner was the one initiating violence and acting "crazy" that night—a position they maintained on appeal while persistently stating that the 911 call "by itself" disproved justification (*see* Point IV, *post*).

Further hampering petitioner's defense, the court restricted defense counsel's cross-examination about Wilson's psychiatric prescription and his substance abuse. Cross-examination, critical to the right of confrontation, is improperly curtailed when relevant and important facts bearing on the trustworthiness of crucial testimony is kept from the jury. *See Olden v. Kentucky*, 488 U.S. 227, 231 (1988); *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). This is especially true when, as here, the court's ruling leaves the accused "without any support for [her] theory of the case." *Alvarez v. Ercole*, 763 F.3d 223, 232 (2d Cir. 2014); *see Van Arsdall*, 475 U.S. at 677, 679 (Confrontation Clause violated when "trial court prohibited all inquiry into" witness's potential bias).

As counsel explained, and should have been obvious to the court, he was trying to explore whether Wilson was more aggressive while intoxicated and the consequences of Wilson not taking medication that is often prescribed to control antipsychotic symptoms, which went directly to the likelihood of petitioner's version of events and the reasonableness of her fear. Yet, after precluding the medical records themselves, the court precluded counsel from even asking the medical examiner about the use of Seroquel (255-56, 262-63), asking Wilson's sister if she was aware that he "abuse[d]

alcohol" (74-75), and asking Fortune if Wilson ever told her about "health issues he might have" (142).

The testimony that counsel <u>was</u> permitted to elicit was inadequate to explore how Wilson behaved when drunk.  Counsel knew that Wilson underwent stomach surgery due to alcoholic ulcers but Wilson's sister was unaware of the surgery, so counsel could not ask her about its cause.  Fortune, meanwhile, claimed she had known Wilson for twelve to thirteen years and flatly denied ever seeing him drink alcohol. Counsel should have been able to use the records to show her testimony was incredible given his history and to ask her about his behavior when drunk, or to undermine her claim that they were like brother and sister.  *Compare Alvarez*, 763 F.3d at 232-33 (confrontation violation where court restricted all cross-examination about police report which would have supported the sole defense that police failed to thoroughly investigate the crime and another possible suspect) (applying *Van Arsdall*, 475 U.S. at 677, 679; *Chambers v. Mississippi*, 410 U.S. at 302); *with Garcia v. Franchi*, 2020 WL 353099, *8 (E.D.N.Y. 2020) (questions defense unsuccessfully tried to ask "would have had additional impeachment value, but the preclusion of one of several impeachment arguments rarely rises to the level of constitutional error").

<div align="center">*     *     *</div>

Wilson's psychiatric history, and any evidence that he became aggressive while drunk and/or off of his medication, would have upended the People's case.  Thus, completely preventing defense counsel from exploring these issues, had a "substantial

and injurious effect or influence" on the verdict.  *See Spencer v. Capra*, 788 Fed. Appx.

21, 23 (2d Cir. 2019) (*Brecht* standard applies to habeas review of claimed violation of

right to present a defense).  In determining whether excluding the records was harmless,

this Court "must ascertain the materiality of the excluded evidence to the petitioner's

defense" and decide whether "the omitted evidence evaluated in the context of the

entire record creates a reasonable doubt that did not otherwise exist."  *Drake v. Woods*,

547 F. Supp. 2d 253, 264-65 (S.D.N.Y. 2008) (quoting *Jones v. Stinson*, 229 F.3d 112, 120

(2d Cir. 2000) (alteration and internal quotation marks omitted).  Whether limitations

on cross-examination were harmless depends on: "(1) the overall strength of the

prosecution's case; (2) the importance of the witness's testimony; (3) whether the

testimony was cumulative; (4) the presence or absence of evidence corroborating or

contradicting the testimony of the witness on material points; and (5) the extent of

cross-examination otherwise permitted."  *Alvarez*, 763 F.3d at 233 (internal quotation

marks and alteration omitted).  Neither of these interrelated errors was harmless.

This case completely turned on Wilson's behavior on the night of his death and

whether it was reasonable for petitioner to believe he would rape her.  Petitioner had

compelling evidence in support of her justification defense and the court entirely

precluded her from presenting it in any fashion.  Instead, her defense was framed solely

by the People, who introduced her statements as a confession and did all they could to

urge the jury to reject her reason for stabbing Wilson.  As explained, the People could

only ask the jury to speculate that petitioner was not justified here based on the

circumstantial evidence.  But the People nevertheless had a significant advantage due to the court's unbalanced rulings.  The People capitalized on the improper admission of petitioner's July 26 statement to attack petitioner's credibility, and mischaracterized and dismissed the surprise outcry testimony by Shepard, which was underdeveloped by defense counsel due to the court's refusal to allow him private access to Shepard before he testified.

The only meaningful way for petitioner to defend herself against the State's allegation was by presenting the information about Wilson's mental health and substance abuse, which would have significantly strengthened petitioner's justification claim.  Evidence that Wilson was prone to violent hallucinations of harming others and hearing voices was relevant to the likelihood that he was acting violently, and had Wilson's doctor confirmed that Seroquel was prescribed to treat his psychosis and hallucinations, it was extremely relevant that he was not taking it.  If Wilson's doctor or an expert went on to say that substance abuse exacerbated his symptoms, that made it all the more likely that he was having a psychotic episode at the time of his death.  The details of Wilson's substance abuse also would have corroborated petitioner's statements that Wilson was a habitual crack user in a drug program, which was a source of conflict because he asked her for money to buy drugs.  Not only would this have supported petitioner's credibility, but telling the jury about the extent of Wilson's substance abuse would have further undermined the credibility of Fortune, a longtime close friend who would have been expected to know about this, and whose testimony

the prosecutor relied upon in summation to argue that petitioner lied about having no sexual relationship with Wilson.

The jurors heard none of this—all they knew was that Wilson was extremely drunk at the time of his death and had possibly ingested cocaine recently. And, they heard his sister and Fortune essentially vouched for his good character. Juxtaposed against that was the prosecutor's unrelenting attacks on petitioner's character throughout the trial, from introducing the irrelevant uncharged crimes evidence to baselessly arguing that she was a prostitute (as if that somehow lessened her right to say no) who took steps to conceal Wilson's death (despite Shepard's testimony that petitioner wanted to check on him).

Since the court prevented petitioner from introducing abundant evidence that significantly weakened the People's case, and this was petitioner's only way to support her justification defense, habeas relief should be granted. *Alvarez*, 763 F.3d at 232-34 (habeas relief granted when trial court's ruling deprived defendant of presenting any evidence to support his sole defense theory that the police investigation was unreliable).

POINT IV

VIOLATING PETITIONER'S DUE PROCESS RIGHT TO A FAIR TRIAL, THE COURT IMPROPERLY ADMITTED THE DECEASED'S 911 CALL COMPLAINING ABOUT "A GIRL" "ACTING ALL CRAZY" AS A PRESENT SENSE IMPRESSION WHEN THERE WAS NO EVIDENCE OF CONTEMPORANEITY WITH HIS OBSERVATIONS OR ANY CORROBORATION.

Over objection, the court admitted Wilson's 911 call under the present sense impression hearsay exception. Under that exception, the hearsay's proponent must demonstrate both "contemporaneity" and "corroboration." *People v. Vasquez*, 88 N.Y.2d 561, 575 (1996); *People v. Brown*, 80 N.Y.2d 729, 736 (1993); *Phoenix Ins. Co. v. Golanek*, 50 A.D.3d 1148, 1150 (2d Dep't 2008). Neither of these criteria was met here, and because the People's case revolved around the call, its admission violated petitioner's rights to due process and a fair trial. U.S. Const., Amend. XIV; N.Y. Const., Art. I, § 6.

An improper admission of evidence by a state court violates due process when the evidentiary ruling is "'so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990). To meet that standard, the erroneously admitted evidence must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir.1992); *Collins v. Scully*, 755 F.2d 16,

19 (2d Cir.1985) (to give rise to due process violation, inadmissible evidence must be "crucial, critical, highly significant," and its impact is to be assessed "in light of the entire record before the jury"). As the Third Circuit has recognized, "[t]hese principles have their roots in the Supreme Court decision in *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973), which held that trial errors cannot 'defeat the ends of justice' or otherwise deprive a defendant of her right to a fair trial." *Ege v. Yukins*, 485 F.3d 364, 375 (3d Cir. 2007).

New York law defines a "present sense impression" as a description of an event from a person perceiving it as it unfolds or immediately afterward. *Vasquez*, 88 N.Y.2d at 574-575; *Brown*, 80 N.Y.2d at 732-733. The present sense rule requires proof that the statement was made "substantially contemporaneously" with the person's observations, *Brown*, 80 N.Y.2d at 734, because "contemporaneity . . . minimizes the opportunity for calculated misstatement as well as the risk of inaccuracy from faulty memory." *Vasquez*, 88 N.Y.2d at 574. While a "marginal time lag" may occur, the statement must not be "a recalled or recast description of events that were observed in the recent past." *Id.* at 575. The passage of "a few" or "several minutes" is too long for a statement to qualify as a present sense impression of the event. *Id.* at 578-80.

Here, there was no evidence of contemporaneity. Wilson told the 911 operator, "I got this girl in my house and I don't know what's wrong with her, she's acting all crazy and I want her out" (JS. 166-67; Peo. Ex. 42). Because Wilson did not describe anything she was doing, and there is no background noise, it is impossible to know

whether he was referring to ongoing conduct or calling to complain about something that had happened earlier—as counsel duly protested to the trial court. With it equally likely that the event(s) to which he referred had ended, his statement was, thus, not admissible as a present sense impression. *Vasquez*, 88 N.Y.2d at 578-80; *People v. Parchment*, 92 A.D.3d 699, 699 (2d Dep't 2012) ("the People failed to demonstrate that the delay between the conclusion of the event and the beginning of the [911] call [did] not . . . destroy the indicia of reliability upon which the present sense impression rests"); *People v. Robinson*, 282 A.D.2d 75, 82 (1st Dep't 2001) ("it cannot be said . . . that [911 caller] did not have time to reflect on the [robbery]" when several minutes had passed and she had called employer first).

The present sense rule also requires corroboration. As the New York Court of Appeals discussed in distinguishing present sense impression from the excited utterance rule,

> a hearsay statement under any exception deprives the defendant of the right to test the accuracy and trustworthiness of the statement by cross-examination. The defendant's only protection against the admission of fabricated testimony or unfounded rumor is that there be sufficient safeguards to assure the statement's reliability. With the excited utterance exception, this assurance is found in the fact that the statement is made under the stress of nervous excitement from the event and before there has been time to contrive and misrepresent. <u>We think that when statements are admitted under the present sense exception without the assurance of reliability that excitement affords, it is reasonable and prudent to require some additional indicia of reliability</u>.

*Brown*, 80 N.Y.2d at 736 (emphasis added; citations omitted); *Vasquez*, 88 N.Y.2d at 574-75.   Therefore, "the content of the communication must be corroborated by independent proof." *Vasquez*, 88 N.Y.2d at 575-76.  *See also People v. Osbourne*, 69 A.D.3d 764, 765 (2d Dep't 2010) ("substance of the call [must be] sufficiently corroborated by other evidence") (emphasis added); *People v. Orth*, 201 A.D.2d 510, 510 (2d Dep't 1994) (lower court properly precluded 911 call offered as present sense impression "since there was insufficient corroboration of the contents of the call") (emphasis added).

The Appellate Division long ago explained that "independent proof" requires more than conclusory assumptions.  In *People v. Watson*, the deceased was found beaten to death with a blunt instrument in her bathroom.  Yet even the defendant-landlord's possession of bloodstained clothing, shoes, and vinyl-handled pliers was insufficient to demonstrate the reliability of the deceased's statement to a friend before her death that the defendant was entering her apartment to fix a bathtub leak.  100 A.D.2d 452, 453-59, 463-69 (2d Dep't 1984).  In its decision, foreshadowing New York's adoption of the corroboration requirement, the Appellate Division deemed it significant that the friend had not observed the defendant's entrance and "there were no other indicia of the statement's reliability" since the friend had not heard a knock, doorbell, or any background noise during the statement to indicate someone was entering.  *Id.* at 463-69.  The New York Court of Appeals later endorsed much of *Watson*'s reasoning.  *See Brown*, 80 N.Y.2d at 735-37.

Here, as defense counsel argued, nothing Wilson said during the call alluded to him being stabbed, as opposed to something else entirely (JS. 167-68).  He did not describe violent behavior or threats, or say he was afraid, and the fact that he hung up (without crying out) indicates he was not being attacked at that time.  There is simply no way to know what prompted Wilson to call 911.  After all, Wilson could have been the one "acting all crazy" and calling 911 for no reason whatsoever, given that his blood alcohol content was more than twice the legal limit and he had cocaine in his system. *Cf. Watson*, 100 A.D.2d at 463-69; *compare In re Odalis F.*, 85 A.D.3d 441, 442 (1st Dep't 2011) ("other than the recording of the 911 call itself, there is no evidence of the existence of the allegedly startling event that led to the alleged excited utterance"); *with People v. McCall*, 80 A.D.3d 626, 627 (2d Dep't 2011) ("[911 caller's comments indicated that he was observing the subject crimes as they occurred"); *People v. Johnson*, 280 A.D.2d 613, 613-14 (2d Dep't 2001) (court properly allowed victim's sister to testify to overhearing victim say to defendant, "get off of me.  I can't breathe," as a present sense impression, since sister immediately saw defendant on top of victim holding her throat).

That petitioner ultimately killed Wilson that night is not corroboration that she was "acting all crazy" when Wilson placed the call (JS. 167), because she explained that she stabbed him when he tried to rape her.  Her statement was the only direct evidence of what happened that night and it contradicted Wilson's conclusory 911 accusation. Petitioner's recollection that the attempted rape happened around 2:00 or 3:00 a.m. was also direct evidence that there were intervening events after the 911 call—again, just as

76

counsel argued to the trial court. *See Vasquez*, 88 N.Y.2d at 569-71, 576 (evidence about shooting insufficient to corroborate 911 call describing shooter in same area, when caller could have been referring to different person); *Allstate Ins. Co. v. Stricklin*, 93 A.D.3d 717, 718-19 (2d Dep't 2012) (mere fact accident had occurred was insufficient to corroborate bystander's report of hit-and-run driver's license plate); *Phoenix Ins. Co.*, 50 A.D.3d at 1149-51 (insufficient corroboration of eyewitness's statement that white pickup truck with certain license plate caused accident when owner of white pickup truck with same license plate denied involvement); *see also Orth*, 201 A.D.2d at 510; *Osbourne*, 69 A.D.3d at 765. The phone records, showing that Wilson's phone called petitioner's contacts twenty minutes after he called 911, do not prove that the call was about the stabbing. It was equally possible that Wilson called 911 after a dispute with petitioner, they resolved the problem, and he then let her use his phone, especially since petitioner estimated that the attempted rape happened about two hours later. Indeed, the People contended in summation that the stabbing happened after the call.

In sum, the 911 call was improperly admitted because the People failed to show that Wilson made his statement as petitioner actually was doing something he considered "crazy" (or immediately thereafter), and they also failed to point to any independent proof that petitioner was, in fact, "acting all crazy." *Vasquez*, 88 N.Y.2d at 575-76; *Phoenix Ins. Co.*, 50 A.D.3d at 1149-51; *Lee v. City of New York*, 40 A.D.3d 1048, 1049 (2d Dep't 2007) (coworker's statement inadmissible as present sense

impression because there was "no evidence that the coworker was describing [event] as he was perceiving it and . . . no evidence corroborating his statement").

The error in admitting the 911 call was "so pervasive" that petitioner was denied "a fundamentally fair trial." *Collins*, 755 F.2d at 18 (citing *United States v. Agurs*, 427 U.S. 97, 108 (1976)). The People relied heavily on the 911 call in this weak case (Point I) when discussing both intent and justification, the only issues the jury was called upon to resolve. When responding to defenses counsel's motion to dismiss at the end of trial, the 911 recording was the only specific piece of evidence that the People highlighted after disputing the significance of the outcry testimony (397-440). Even on appeal, the People maintained that the 911 call "by itself" disproved justification (Ex. C at 40).

To the jury, the People declared again and again that the call revealed petitioner had motive to kill Wilson because he had ended her "free ride," and that Wilson's description of her "acting all crazy" disproved petitioner's version of what happened (450-54, 467-70, 481-82). The pervasive motive arguments were especially problematic since the People's case on both elements they needed to prove—intent and lack of justification—was entirely circumstantial. As the Appellate Division has previously recognized, "in such a case . . . 'the motive often becomes not only material but controlling, and in such cases the facts from which it may be inferred must be proved. It cannot be imagined any more than any other circumstance in the case'." *People v. Schatz*, 37 A.D.2d 584, 585 (2d Dep't 1971) (quoting *People v. Lewis*, 275 N.Y. 33, 40

(1937). Though beside the point of whether the call was admissible, it is worth noting that the prosecutor's motive argument was not a fair inference from the record.  Even if Wilson did kick petitioner out of the house, killing him was a completely disproportionate and illogical response. Wilson's statement on the 911 call that petitioner was acting "crazy," with no further detail, was not insufficient to support the prosecutor's theory.

The court nevertheless endorsed the prosecutor's theory in the jury's eyes, exacerbating the prejudicial impact of admitting the call.  After sustaining her objection to defense counsel's "speculati[ve]" suggestion that the stabbing occurred before the 911 call (450), the court then overruled counsel's objections that any argument that the 911 call showed motive amounted to "sheer speculation" supported by "absolutely no evidence" (452, 481).  *See People v. Lippolis*, 246 A.D.2d 557 (2d Dep't 1998) (court "compound[ed]" prejudice caused by prosecutor's improper summation remark when counsel objected and the court told him not to interrupt, thereby signaling to the jury that it was free to accept the prosecutor's argument); *People v. Kent*, 125 A.D.2d 590 (2d Dep't 1986) (failure to sustain defense objections to improper summation arguments "greatly increased" prejudicial effect).

The admission of the 911 call was fundamentally unfair in light of the weakness of the People's case and their emphasis on the call.  *Compare Brown v. Keane*, 355 F.3d 82, 92 (2d Cir. 2004) ("In light of the importance of the [911] tape to the prosecution's overall case and the manner in which the prosecutor stressed the tape at trial, we cannot

find that its admission was harmless error. We agree with the district court that it 'had substantial and injurious effect or influence' on the verdict")[6]; *with Collins*, 755 F.2d at 20 (hearsay error did not cause unfair trial because the testimony was "hardly significant" under the circumstances).

Viewing the record as a whole further compels the conclusion that the call's admission violated petitioner's due process right to a fair trial.  The jury saw the court siding with the prosecutor over the defense in how to apply the call to the facts of this case.  And while the court allowed the People to pit petitioner's credibility against Wilson's with the call without establishing that his statements were reliable, it left the jury ignorant of the possibility that Wilson was experiencing psychosis and hallucinations when he made the call (Point III, *ante*).  Moreover, the court allowed the People to use additional inadmissible evidence to undermine petitioner's credibility in other ways (Point I, *ante*), and refused petitioner a meaningful opportunity to prepare to confront a crucial witness (Point II, *ante*).  On the whole, the court's handling of the 911 call and its unbalanced rulings "resulted in a trial that was decidedly skewed in the People's favor." *People v. Hudy*, 73 N.Y.2d 40, 58 (1988) (improperly admitted evidence "went to the heart of defendant's case" while, at the same time, "his ability to develop the defense theory was seriously curtailed" by the improper preclusion of cross-examination questions relevant to witness veracity).  Accordingly, since the state

---

[6] *Brown*'s pre-*Crawford* analysis of the present sense impression exception "remains pertinent to hearsay law." *Phillips v. Lee*, 2012 WL 847432, *9 (E.D.N.Y. 2012).

courts's misapplication of New York law in admitting the call was far beyond an ordinary trial error, habeas relief is warranted.

## PETITIONER'S ENTITLEMENT TO A WRIT OF HABEAS CORPUS

This Court has the power to issue a writ of habeas corpus because the Appellate Division's decision affirming her conviction and sentence resulted in a decision, as to each of her claims, that was "contrary to" and "involved an unreasonable application" of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see Cotto v. Herbert*, 331 F.3d 217 (2d Cir. 2003).

A.     <u>Exhaustion</u>

1.     <u>*Miranda* Claim (Point I)</u>

Petitioner fully exhausted her *Miranda* claim in state court.  Citing controlling Supreme Court precedent, *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966), and *Michigan v. Mosley*, 423 U.S. 96, 104 (1975),  petitioner argued in the Appellate Division that the lower court should have suppressed statements obtained from her after she invoked her right to silence, because the questioning detective failed to readminister *Miranda* warnings in violation of the Fifth Amendment (*see* Ex. B at 72-76; Ex. D at 22-26).  The same error is presented in this petition.  The Appellate Division ruled against petitioner on the merits, citing *Mosley* in its analysis.  *Wisdom*, 164 A.D.3d at 929-30.  The Court of Appeals denied petitioner's leave application in which she again presented this error

and argued that the Appellate Division had misapplied Supreme Court law by ruling that petitioner's invocation was not unequivocal and unqualified; petitioner also incorporated her Appellate Division briefs (see Ex. E).

### 2.   Witness-Interference Claim (Point II)

Petitioner also fully exhausted her claim that not allowing defense counsel to privately interview an amenable prosecution witness violated her rights to due process, effective assistance of counsel, and to present a defense in violation of the Fifth and Sixth Amendments.  She made the same arguments contained in this petition and, again, pointed to Supreme Court precedent, federal authority applying constitutional principles on analogous facts, and state decisions holding that the same error implicated well-known constitutional rights, *i.e.*, the right to prepare and present a defense (Ex. B at 49-55; Ex. D at 8-10).  *See Rosa v. McCray*, 396 F.3d 210, 219 (2d Cir. 2005).  The Appellate Division agreed there was error, but deemed it harmless.  In her unsuccessful leave application, petitioner presented the error again and argued that the Appellate Division's harmlessness determination was incorrect (Ex. E).

### 3.   Right to Present a Defense (Point III)

Petitioner's claim regarding the preclusion of Wilson's medical records and unfair restriction on cross-examination about issues relating to his mental health and substance abuse was also fully exhausted in state court.  As in this petition, she pointed to Supreme Court precedent, factually analogous federal law, and factually similar state law applying constitutional principles, which established her right to present a defense

under the Fifth Amendment encompassed the right to support her version of events through documentary evidence and cross-examination. Petitioner also argued in state court that the preclusion was particularly unfair in light of the ruling that interfered with her ability to prepare for Shepard's testimony, and the rulings that allowed the prosecutor to use her improperly obtained custodial statement and the 911 call that did not fit a hearsay exception (*see* Ex. B at 56-66; Ex. D at 11-19). The Appellate Division (summarily) ruled against petitioner on the merits, and petitioner presented the same arguments in her leave application, incorporating her Appellate Division briefs on this point as well (*see* Ex. E).

### 4.   Hearsay Claim (Point IV)

The Appellate Division found that petitioner failed to preserve her Fifth Amendment due process hearsay claim, and such a procedural default generally constitutes "an adequate and independent ground" for a state court's rejection of a federal claim. *See Coleman v. Thompson*, 501 U.S. 722, 729-30, 749-50 (1991). As here, "even when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted." *Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005).

The procedural default rule is not jurisdictional but is based upon the "exigencies of federalism," *Fay v. Noia*, 372 U.S. 391, 433 (1963), and "considerations of comity." *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977); *Coleman*, 501 U.S. at 731; *id*. at 765 (Blackmun, J., dissenting); *see* Randy Herz & James S. Leibman, Federal Habeas Corpus Practice

and Procedure, § 26.2(a) at 1419-20 (Sixth Ed., Mathew Bender, 2011). Such an adequate and independent basis does not exist merely because a state court recites in its decision that a claim is barred by a procedural default; rather, the federal court must make its own determination whether the state court's finding of default constitutes an independent and adequate basis. *Arce v. Smith*, 889 F.2d 1271, 1273 (2d Cir. 1989) (on habeas, question of state procedural default "is itself a federal question") (quoting *Henry v. Mississippi*, 379 U.S. 443, 447 (1965).

Here, this Court may reach the merits of petitioner's claim because she did, in fact, preserve her claim in the trial court; the Appellate Division misapplied New York's preservation rule; and, even if the Appellate Division's ruling was correct, reliance on procedural default would result in a miscarriage of justice. *See Coleman*, 501 U.S. 722, 750, 754; *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

a. <u>Defense Counsel Substantially Complied With the State's Preservation Requirement</u>

The United States Supreme Court has recognized that procedural default may not be applied by the state in a technical or extreme fashion to frustrate review of a federal question in federal court. So long as the purpose of the state's rule has been served, invocation of the procedural rule by the state will not bar habeas corpus relief. *Henry*, 379 U.S. at 448-49 (state rule's contemporaneous preservation requirement was "substantially served" where motion for directed verdict due to admission of unlawful search and seizure evidence, although not contemporaneous; nevertheless alerted court

of error in time to take corrective action); *Lee v. Kemna*, 534 U.S. 362, 385 (2002) (purposes of witness notice rule were "substantially met" where counsel apprised court of nature of the witnesses' expected testimony and efforts to locate them; nothing would have been gained by requiring counsel to repeat "in (a), (b), (c) and (d) order the showings the rule requires"). The purposes of New York's preservation rule were fully satisfied in this case.

As the Court of Appeals has recognized, New York's preservation rule is strictly applied in order to ensure that a trial court has the opportunity to consider an alleged error when a remedy is still possible, and to avoid "sandbagging" the opposing party and trial court on appeal. *See Whitley v. Ercole*, 642 F.3d 278, 288-91 (2d Cir. 2011). Here, the trial court had a fair opportunity to consider, and rejected, the same arguments that petitioner has presented to this Court as to why the 911 call was not admissible. Nor is there any concern of sandbagging the People, since petitioner was objecting to their application and the court permitted oral argument from both sides.

When the People moved to introduce the call as either an excited utterance or present sense impression, counsel protested:

> We don't know what [the call] refers to, whether it refers to this incident or something else, and so absent any background or testimony, it is just this man calling. We don't know if there's an upsetment [sic], an intervening event, things calm down and something happened. It's significant, there's nothing on the call like look out or ouch or hearing anything . . ." (JS. 167-68).

85

When the People responded that other evidence corroborated that Wilson died on the night he made that call, counsel again objected that, even assuming Wilson died that night, there was nothing to show that the 911 call was related to the stabbing. He stated it was "just a bald statement, we have nothing else, and there is nothing else on this," adding that "intervening actions . . . could have been occurring" between whatever Wilson was referring to on the call and the stabbing, which petitioner had said took place at about 2:00 or 3:00 a.m. (JS. 167-70). In addition, counsel repeatedly emphasized that the call would be unduly prejudicial compared to its probative value (JS. 167, 170).

The court then expressly ruled that the call could come into evidence as a present sense impression (JS. 170). On that note, it is difficult to see how even "perfect compliance" would have made a difference here, since the trial court clearly understood and decided the legal question presented. *See Morency v. Annucci*, 2017 WL 4417718, 5 (E.D.N.Y., 2017) (relevant consideration in whether lack of preservation is adequate state ground to preclude habeas review); *accord Lee*, 534 U.S. at 385.

On appeal, petitioner argued that the court's ruling was incorrect because it was unclear what Wilson was even referring to when describing a girl acting crazy; and that there was no background noise or other evidence to establish that Wilson's statement was contemporaneous with his alleged observation, or that it was either true or had anything to do with the stabbing, which could have occurred hours later. Petitioner also argued that the admission of the call deprived her of her due process right to a fair trial because of the People's emphasis on it (Ex. B at 66-67, 71-72; Ex. D at 19-22).

86

Petitioner maintained in her opening brief on appeal that her hearsay claim was preserved, and the People did not dispute this in their response (see Ex. C at 58-63).

Under these circumstances, the purposes of the state preservation rule were "substantially served," and the Appellate Division's unexplained preservation holding is not an adequate ground on which to deny habeas relief.[7]  *See Zarvela v. Artuz,* 364 F.3d 415, 417 (2d Cir. 2004) (though ultimately denying relief, Court of Appeals agreed with district court that habeas petitioner had raised excited utterance issue at trial, contrary to Appellate Division's decision).

> b.  The State Preservation Rule Was Not Applied According to Controlling State Court Precedent

The Appellate Division's procedural default ruling conflicted with controlling state court authority by seemingly requiring a perfect objection to preserve this claim, even though all that New York requires is fair presentation of an alleged error at a time when the trial court and opposing party can address it and provide a remedy if one is warranted.  *See People v. Gray*, 86 N.Y.2d 10, 19 (1995).

A state court's procedural holding is not "adequate" to support a judgment "unless the procedural rule is strictly or regularly followed" by the courts of that state. *Hathorn v. Lovorn*, 457 U.S. 255, 262-263 (1982); *Morales v. Calderon*, 85 F.3d 1387, 1392

---

[7]  Because petitioner substantially complied with the state's contemporaneous objection rule such that there is no adequate and independent state ground on which this court may deny her petition, this Court "need not consider the application of the 'cause and prejudice' test to noncompliance." *Ronson v. Commissioner of Corrections*, 604 F.2d 176, 178 n.4 (2d Cir. 1979).

(9th Cir. 1996) (state cannot "preclude federal review by invoking procedural rules that the state does not apply consistently"); *Wedra v. Lefevre*, 988 F.2d 334, 339 (2d Cir. 1993) (applying "strictly or regularly followed" standard); *Arce v. Smith*, 889 F.2d 1271, 1273 (2d Cir. 1989) (same).

Here, the Appellate Division's holding that petitioner's hearsay claim was unpreserved was contrary to established New York law.  Indeed, the People never even asserted lack of preservation (*see* Ex. C, Point IV)—the Appellate Division reached that conclusion *sua sponte*, and incorrectly.  First, under New York's Criminal Procedure Law and New York Court of Appeals precedent, an express ruling by the trial court on a particular issue preserves that issue for appellate review.  C.P.L. § 470.05(2); *People v. Prado*, 4 N.Y.3d 725, 726 (2004); *see also People v. Hawkins (Eduardo)*, 11 N.Y.3d 484, 491, 872 N.Y.S.2d 395 (2008) (when the court below was "plainly aware of, and expressly decided, the question raised on appeal," the argument is preserved for appellate review); *cf. People v. Hughes*, 22 N.Y.3d 44 (2013) (issue preserved because court decided it on the merits, even though defense counsel had raised it in a belated motion brought under the wrong statutory provision).

Second, there can be no question that petitioner's objection was timely made in response to the People's pretrial motion seeking admission of the 911 recording.  The only possible explanation for the Appellate Division's holding is that it did not view petitioner's objections to be sufficiently specific.  *See Green v. Travis*, 414 F.3d 288, 295 (2d Cir. 2005) (since defendant promptly made *Batson* objection to prosecutor's pattern

of strikes, Appellate Division's holding that defendant failed to preserve *Batson* claim under § C.P.L. 470.05(2) "must have been premised on the view that defense counsel failed to . . . [object] with the requisite specificity").

Finding a lack of specificity was incorrect, however, because the Appellate Division has held a similar hearsay objection sufficient.  In *People v. Dockery*, 107 A.D.3d 913, 914 (2d Dep't 2013), the defendant had unsuccessfully objected to admission of a 911 call made 75 seconds after a shooting because "'[t]his isn't a tape where a woman is describing what she is seeing' (Transcripts: 64). In fact, he noted, she 'had just driven away,' making this a 'recollection of what she saw' (Transcripts: 64)."  *Dockery*, Brief for Defendant-Appellant, 2012 WL 12937225 at 38.  The prosecutor responded that the call occurred soon enough after the shooting to qualify as a present sense impression, and the court admitted the recording as an excited utterance.  *Id.*  On appeal, the defendant argued that neither hearsay exception applied due to the time lapse between the shooting and the call.  *Id.* at 36-45.  The Appellate Division rejected the People's position that these arguments were unpreserved, reaching both aspects of the hearsay claim on the merits—even though the defendant apparently never specifically tied his objections about the time lapse to either exception.  *Dockery*, 107 A.D.3d at 914.

Petitioner's case is indistinguishable from *Dockery* in terms of preservation.  Just like Dockery's attorney, petitioner's counsel made the same factual arguments to the trial court and the Appellate Division as to why the 911 call was inadmissible.  Although petitioner's counsel did not specifically mention "present sense impression" during his

protests, the Appellate Division did not require such precision from Dockery's attorney. The *Dockery* decision, rather than petitioner's, is how the New York preservation rule is regularly applied.

*People v. Floyd*, 21 N.Y.3d 892 (2013), illustrates the general principle. There, the New York Court of Appeals reversed the Appellate Division's holding that the defendant had not preserved his claim that temporary exclusion of his mother from jury selection violated his right to a public trial since courtroom overcrowding did not justify excluding her and the trial court considered no other alternatives. The Court of Appeals held that defense counsel "'unquestionably apprised' the trial judge of the constitutional rights at issue and the obligation to consider reasonable alternatives," *id.* at 893-94. All counsel had articulated was that it was a public proceeding at which the mother had a right to be present and he did not want there to be "any constitutional impediment." *People v. Floyd*, Brief for Defendant-Appellant, 2012 WL 13105067 (2d Dep't) at 14.

In sum, although New York requires that argument be "specifically directed at the alleged error," *Gray*, 86 N.Y.2d at 19 (citation and internal quotation marks omitted), it does not require an attorney to be particularly articulate, provide supporting legal authority, or even cite to the precise legal doctrine upon which counsel's arguments rest. The question is whether the lower court understood, or should have understood, the nature of the error claimed on appeal. *E.g.*, *People v. Jagdharry*, 118 A.D.3d 722, 723 (2d Dep't 2014) (claim that counts were multiplicitous was preserved despite counsel's

incorrect framing of the issue as duplicitousness; his meaning was "apparent from the substance of his arguments and their context"). Defense counsel for petitioner argued, among other things, "[w]e don't know what [the call] refers to, whether it refers to this incident or something else," and pointed out that there could have been "intervening event[s]" especially since petitioner's statements placed the stabbing hours later (JS. 167-68, 170). After hearing oral argument from both sides, the court expressly ruled on the present sense issue (JS. 170). Petitioner made the same arguments on appeal as to why the call did not fit that hearsay exception. Accordingly, the Appellate Division's preservation ruling was not consistent with New York law, and does not bar habeas relief.

<div style="margin-left: 2em;">

c.  <u>Because Petitioner was Actually Innocent if Justified, and the 911 Call was Central to the People's Efforts to Disprove Justification, Which the Court Implicitly Endorsed, Denial of this Petition on the Basis of Procedural Default Would Be a Miscarriage of Justice.</u>

</div>

If this Court finds that petitioner's due process claim is procedurally defaulted, it should nevertheless excuse the default because refusing to consider the claim would result in a "fundamental miscarriage of justice." *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992); *Coleman*, 501 U.S. at 750. "[T]he principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982); *see* Randy Herz & James S. Leibman,

Federal Habeas Corpus Practice and Procedure, § 26.4 at 1519-20 (Sixth Ed., Mathew
Bender, 2011).

In *Schlup v. Delo*, 513, U.S. 298, 321-22 (1995), the Supreme Court explained that
a miscarriage of justice results when a defendant who is "actually innocen[t]" has been
wrongfully convicted. The standard to be applied is whether the alleged constitutional
violation "has probably resulted in the conviction of one who is actually innocent."
*Carrier*, 477 U.S. at 496. The prisoner must "show a fair probability that, in light of all
the evidence, including that alleged to have been illegally admitted . . . the trier of fact
would have entertained a reasonable doubt of his guilt." *Kuhlmann v. Wilson*, 477 U.S.
436, 455 n. 17 (1986).

Here, petitioner claims not just that her due process rights were violated, but that
the violation resulted in a wrongful conviction. She unequivocally and repeatedly told
the police that she stabbed Wilson to prevent him from raping her. As discussed
extensively throughout this petition, the People presented only circumstantial and
equivocal evidence to support their theory that petitioner was not justified. Even the
witness whom they called to purportedly establish that petitioner had confessed to
intentional murder ended up corroborating her justification claim by, inter alia,
revealing that she told him on the night of the crime that Wilson had "tried to force his
self" on her.

The prejudicial impact of the 911 call cannot be overstated. In order to convict
petitioner, the jury had to decide that she was lying about what had happened, and/or

that her fear of rape was not objectively reasonable. The 911 call provided a clear path to reach either conclusion, especially in light of the prosecutor's emphasis on the call's import. Again and again, the prosecutor argued that the call, in which Wilson said he wanted a girl who was acting "crazy" to leave his home, proved that petitioner had a motive to murder Wilson and that she was the one who became violent and "crazy" (450-54, 467-70, 481-82; *see* Point IV, *ante*). Even on appeal, the People viewed the 911 call as pivotal to their case, repeatedly asserting that the call, "by itself," disproved justification (see Ex. C at 29, 40, 49).

Any reasonable juror would have acquitted petitioner but for the 911 call, the prosecutor's heavy handed arguments about it, and the court's implicit endorsement of the prosecutor's theory that the call proved petitioner had an independent motive to kill Wilson. Refusing to consider petitioner's due process claim would, therefore, amount to a classic miscarriage of justice.

In sum, given that the state trial court was well aware of the claim petitioner has raised in her petition, that the Appellate Division's finding of procedural default was a hyper-technical application of state preservation doctrine, and that petitioner would have been acquitted but for the introduction of the 911 call, this Court should proceed to consider the merits of her due process claim.

B.    Timeliness

Since petitioner's original petition was filed within 1 year and 90 days of the date

his state appeal became final when leave to appeal to the New York Court of Appeals

was denied on February 14, 2019, it was timely (*see* Exhibit F). *Jiminez v. Quarterman*,

555 U.S. 113 (2009); *Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998).

C.    AEDPA Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies

to habeas review of "any claim that was adjudicated on the merits in State court

proceedings," and relief may not be granted unless that adjudication

> resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1).

"A state-court decision is 'contrary' to established federal law within the meaning

of § 2254(d)(1) if it is 'diametrically different' from, 'opposite in character or nature' to,

or 'mutually opposed' to the relevant Supreme Court precedent." *Henry*, 409 F.3d at 68

(quoting *Williams*, 529 U.S. at 405). To be "contrary to" clearly established federal law,

a state court's conclusion of law must be opposite to a conclusion reached by the

Supreme Court or resolved differently on a materially indistinguishable set of facts.

*Williams*, 529 U.S. at 413.

A state court makes an unreasonable application of federal law when it "'correctly identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case,' or refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." *Hoi Man Yung v. Walker*, 468 F.3d 169, 176 (2d Cir. 2006) (quoting *Williams*, 529 U.S. at 413). The issue is not whether all reasonable jurists would agree that there was error, but rather that there was "'some increment of incorrectness beyond'" mere error, *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (quoting *Williams*, 529 U.S. at 411), which "need not be great." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000); *see Jimenez*, 458 F.3d at 147.

A separate basis for granting habeas relief is when the state's adjudication of the claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1). When a state court "plainly misapprehend[s] or misstate[s] the record . . . [as] to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable. *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004). *See Wiggins v. Smith*, 539 U.S. 510, 528 (2003) ("reliance on an erroneous factual finding further highlight[ed] the unreasonableness of the state court's decision").

The Appellate Division's ruling on petitioner's *Miranda* claim was both contrary to and an unreasonable application of established federal law, and rested upon an

unreasonable determination of the facts. Its rulings on the remainder of petitioner's claims unreasonably applied federal law.

     1.    *Miranda* Claim (Point I)

The Appellate Division's conclusion that the admission of petitioner's custodial statements did not violate *Miranda*, 384 U.S. 436, or *Mosley*, 423 U.S. 96, *see Wisdom*, 164 A.D.3d at 929-30, was contrary to clearly established federal law. Long before petitioner's trial, New York acknowledged that the United States Supreme Court requires police to administer fresh *Miranda* warnings before continuing to question a suspect who has invoked the right to remain silent. *See Ferro*, 63 N.Y.2d at 322 (citing *Mosley*, 423 U.S. at 106). Although the Appellate Division recognized that this was the controlling precedent in petitioner's case, it failed to apply the correct legal standard for assessing whether petitioner invoked her right, as set forth in *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010).

Affirming the denial of suppression, the Appellate Division held that petitioner had not "unequivocally and unqualifiedly invoked her right to remain silent." In so doing, however, it did not cite *Berghuis*. Nor did it even cite any case applying the "unambiguous and unequivocal" standard in *Miranda* right-to-counsel cases. Instead, the Appellate Division relied on two pre-*Berghuis* intermediate appellate decisions, *People v. Horton*, 46 A.D.3d 1225 (3d Dep't 2007), and *People v. Caruso*, 34 A.D.3d 860, 862 (3d Dep't 2006). In *Horton*, the defendant's response of "I think I'll wait" or "I think I'll

wait a minute" was held to be "'temporally qualified' and, in fact, implied that he might speak at a later time," and thus was not "unequivocal and unqualified." And in *Caruso*, the defendant's response of "Not right now" also was "temporally qualified" and not an "unequivocal and unqualified" invocation of the right to remain silent.

Even if the Appellate Division could have reasonably treated such language as ambiguous under *Berghuis*, the cases it cited were inapposite to petitioner's, because petitioner was not the one who framed her desire to stop the interrogation. While Purce may have intended only a temporary break, Scandole's consistent and uncontradicted testimony revealed that petitioner simply did not want to discuss the incident further. To properly apply *Berghuis*, the Appellate Division was required to view the record as a whole and determine whether a reasonable officer under the circumstances would have understood that petitioner wanted to stop talking. *Berghuis*, 381-82 (*Davis*, 512 U.S. 452, applies to invocation of right to silence); *Davis*, 512 U.S. at 459 (inquiry is whether "reasonable police officer in the circumstances" would have understood the invocation); *Plugh*, 648 F.3d at 124 (court must consider suspect's "conduct, on the whole").

That petitioner wanted to stop talking is <u>exactly</u> what Scandole understood, and the trial court credited his testimony that she "wanted to stop," denying suppression solely because it wrongly believed that a mere reminder of petitioner's *Miranda* rights was sufficient for Scandole to resume interrogation (220). On appeal, however, the Appellate Division considered only the video, inexplicably deciding that Scandole's

testimony, "She said I don't want to talk about it anymore" (214-16), must have been referring to something that did not occur on the video:

> The suggestion that the detective's answers refer instead to an unrecorded communication by the defendant, despite the colloquy on the videotape that there would be no further questioning until the tape is resumed, is mere speculation and conjecture that reads into the record information that simply is not present, and provides no basis for concluding that the defendant's 10:00 a.m. statement should have been suppressed.

*Wisdom*, 164 A.D.3d at 929-30. The Appellate Division completely ignored that Scandole's testimony—establishing a clear invocation—was corroborated by the fact that Purce never resumed the video interview as planned.

The Appellate Division's treatment of the video as entirely dispositive of the invocation issue, when testimony from a witness credited by the lower court substantiated petitioner's invocation claim, was at odds with governing Supreme Court precedent. At the very least, it was an unreasonable application of that precedent. *Sessoms*, 776 F.3d at 629-30 (state's failure to look at the evidence as a whole, rather than viewing the habeas petitioner's statements in isolation to deny his *Miranda*-invocation claim, was unreasonable application of established federal law); *cf. Fuentes*, 829 F.3d at 250-52 (New York Court of Appeals unreasonably applied federal law by ignoring key facts from psychiatric report that could have been relevant to the jury, in holding that report's nondisclosure pursuant to *Brady* was immaterial).

Furthermore, the Appellate Division's unreasonable determination of the facts provides a separate basis for permitting habeas relief pursuant to 28 U.S.C. § 2254(d)(2). At no point did the People establish at the hearing that petitioner's statement that she did not want to talk anymore was merely a request for a break in the questioning. Given that Scandole clearly understood her statement as a demand that the interrogation end, it was unreasonable to assume that Scandole must have been exaggerating what petitioner actually said that night.  *See Taylor*, 366 F.3d 992 (habeas relief permitted because state courts unreasonably ignored the testimony of a credible witness who corroborated the petitioner's claim that police unlawfully obtained his confession while continuing to question him after he invoked his right to counsel); *Salts v. Epps*, 676 F.3d 468, 475-76 (5th Cir. 2012) (state courts' rulings that habeas petitioners had waived their right to conflict-free representation was unreasonable determination of the facts, pursuant to 28 U.S.C. § 2254(d)(2), "[g]iven the lack of <u>any</u> supporting evidence in the record").

## 2.   <u>Witness-Interference Claim (Point II)</u>

Because the Appellate Division agreed that it was error to interfere with petitioner's access to Shepard, the only question is whether the Appellate Division unreasonably found the error harmless.  *Ayala*, 135 S.Ct. at 2198-99 (harmlessness determination is subject to AEDPA deference).  A harmlessness determination is not

objectively unreasonable if "fairminded jurists could disagree on its correctness." *Id.* at 2199 (omitting citation and internal quotation marks and alteration)

As an initial matter, the Appellate Division did not specify whether it determined that restricting petitioner's access to Shepard was a constitutional error that had to have been harmless beyond a reasonable doubt in order to avoid reversal. It merely cited to *People v. Crimmins*, 36 N.Y.2d 230 (1975), which discusses how to review both constitutional and non-constitutional errors for harmless error. *Wisdom*, 164 A.D.3d at 931. If the Appellate Division applied the standard for non-constitutional error, this was undoubtedly incorrect because the error implicated multiple constitutional rights, as illustrated by well settled federal and New York State law (*see* Point II).

Assuming, *arguendo*, that the Appellate Division applied the correct standard, no fairminded jurist could have concluded that the error here was harmless because it went straight to the heart of the case. The record makes it abundantly clear that counsel's efforts to defend petitioner were actually impaired by his inability to interview Shepard. Based on the prosecutor's opening statement, defense counsel obviously expected Shepard, a prosecution witness, to testify that petitioner had admitted stabbing Wilson merely because she no longer wished to pay rent. Accordingly, counsel's goal during cross-examination was to undermine Shepard's credibility, as well as the accuracy of his memory that night given that he was on drugs and sleep-deprived. Had counsel been permitted a meaningful interview with Shepard and learned of petitioner's outcry, he could have explored the surrounding circumstances for details that would have

supported justification, such as the timing of the outcry, petitioner's demeanor, and whether she elaborated about how Wilson attacked her.  Instead, he abruptly ended his cross-examination once Shepard delivered the surprise outcry testimony, obviously reluctant to delve deeper in front of the jury and risk the possibility of strengthening the People's case.  Indeed, it was the trial judge rather than counsel who solicited additional details from Shepard about the outcry.

In summation, the prosecutor successfully objected to defense counsel's accurate statements about why Shepard's testimony supported justification, and went on to mischaracterize his testimony while portraying the outcry as either an excuse to make Shepard feel sorry for and help her, or a threat that he should not attempt to have sex with her.  Notably, the prosecutor jumped on the scant level of detail about when the outcry occurred, asserting that it was hours after the crime.  It is impossible to know how much stronger petitioner's justification claim could have been if the court had allowed counsel to properly interview him.  What is clear, however, is that the refusal of that interview had a demonstrable impact on petitioner's ability to defend herself at trial.  *See Schulz*, 528 F. Supp. 2d at 99 (state courts unreasonably determined that counsel was not ineffective for failing to interview prosecution witness who, it turned out, had "critical evidence that would have completely undermined the prosecution's case").

Especially when viewing this error in conjunction with the evidentiary errors, and in the context of the trial as a whole, it was objectively unreasonable to find it harmless.

Not only did the court impede petitioner's ability to challenge the evidence presented against her, but it unfairly prevented her from presenting her own evidence that would have supported justification. By contrast, the court gave the People every latitude, permitting them to link the inadmissible custodial statement to uncharged crime evidence, and to argue that Wilson's unreliable hearsay statements from the 911 call proved motive to kill and that it was petitioner who became violent that night. *Cf. id.* ("state court's failure to consider [counsel's multiple errors] as a whole in the context of the evidence at trial" was unreasonable application of *Strickland*).

> 3.   Right to Present a Defense (Point III)

The state courts' preclusion of Wilson's history of psychiatric issues and substance abuse records also was an unreasonable application of clearly established federal law. Although a defendant's rights to present a defense and to cross-examination are not unfettered, it is well settled that the court may not put limitations on those rights that leave the defendant "without any means of supporting his defense theory. *Alvarez*, 763 F.3d at 231; *see Olden v. Kentucky*, 488 U.S. 227, 232 (1988) (per curiam) ("the limitation [on cross-examining key witness] was beyond reason").

That is precisely what the trial court did here, and its reasoning stemmed from a misunderstanding of the contents of Wilson's medical records. Defense counsel highlighted the psychiatric issues and illicit substance use to the court, but the court insisted that Wilson merely suggested that he suffered from depression and that his violent behavior, if true, was due to his intoxication on the night in question (53-61).

The Appellate Division gave no explanation whatsoever for cursorily rejecting petitioner's claim of error as "without merit." *Wisdom*, 164 A.D.3d at 931.

No reasonable explanation can be imagined. Contrary to the trial court's complaint, counsel was not simply trying to "dirty the victim." As explained in detail in Point III, the evidence that counsel wished to present, or at least explore through a doctor or expert, and on cross-examination, was admissible under New York and federal law to establish that petitioner's fear of being raped was reasonable. It was also extremely relevant to the reliability of Wilson's statements on the 911 call.

The rights to present a defense and cross-examination are, at their core, about fundamental fairness. When petitioner's trial is viewed through the lens of fundamental fairness, the limitations placed on her right to present evidence and cross-examine the People's witnesses were particularly unreasonable. Even if, in general, a court might reasonably limit the scope of a decedent's psychiatric history despite justification being in play, doing so here was extraordinarily unfair when the court also diminished the impact of outcry evidence through a separate and patently wrong ruling. These rulings completely gutted petitioner's defense, *Alvarez*, 763 F.3d at 231, while the other errors raised in this petition gave the prosecution a windfall.

### 4.    Hearsay Claim (Point IV)

Although the Appellate Division did not address the due process aspect of petitioner's hearsay claim, this Court must nevertheless "presume that the federal claim was adjudicated on the merits" when the Appellate Division ruled that the 911 call

admissible as a present sense impression. *McCall v. Capra*, 102 F. Supp. 3d 427, 443 (E.D.N.Y. 2015) (quoting *Johnson v. Williams*, —— U.S. ——, 133 S.Ct. 1088, 1096 (2013)). This ruling was also an unreasonable application of clearly established federal law.

In the course of objecting to the People's application to admit the call as either an excited utterance or present sense impression, counsel repeatedly argued that the call's prejudicial impact outweighed the probative value. This should have been obvious to the trial judge, especially since he was given records that called into question Wilson's mental capacity that night but decided that the jury should not hear that evidence. On balance, the judge should have realized how unfair it was to admit the call, which the People clearly intended to suggest was related to Wilson's death, while precluding evidence that Wilson's statements on the call were even more unreliable than it appeared at face value. The court also should have realized that the vagueness of Wilson's statements drastically limited the call's probative value. Instead, the court allowed the People to inflate the call's import in summation in ways unsupported by the other evidence, even seeming to agree with the People's view about why the call mattered, thereby compounding the prejudicial effect of the erroneous hearsay ruling.

Petitioner's case is a far cry from *Collins*, 755 F.2d at 20, in which the hearsay error was "hardly significant." Rather, as discussed in more detail in Point IV, this could be fairly seen as the key error in a "trial that was decidedly skewed in the People's favor." *Hudy*, 73 N.Y.2d at 58.

5.    <u>Cumulative Impact</u>

It is an understatement to say that the court's erroneous suppression and evidentiary rulings stacked the deck in the People's favor.  Each ruling objected to herein, on its own, was unreasonable and each was directly related to the key issues in the case—petitioner's credibility and whether the People disproved her justification defense.  While it may be possible to rationalize why an individual error does not meet the strict standards of AEDPA in order to warrant relief, there is no doubt that the state courts should have taken into account the cumulative impact of its rulings.  This Court should do so now, especially given that the essence of petitioner's claims is that she is actually innocent and serving a sentence of 18 years to life in prison even though she justifiably defended herself from a violent attack by an intoxicated man who was much older and larger than her.

## RELIEF REQUESTED

Petitioner requests that this Court:

(1)  Issue a writ of habeas corpus, and

(2)  Order respondent to discharge petitioner from her unconstitutional confinement unless, within a reasonable time, petitioner is afforded a new trial, and

(3)  Grant petitioner such other and further relief as may be just and proper.

Respectfully submitted,

Paul Skip Laisure (PL 5560)
Attorney for Petitioner

_____

By: Tammy E. Linn (TL 4059)
Appellate Advocates
111 John Street – 9th Floor
New York, New York 10038

May 14, 2020