*To be argued by*
TAMMY E. LINN
*(20 minutes)*

# New York Supreme Court

### APPELLATE DIVISION -- SECOND DEPARTMENT

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*– against –*

ATARA WISDOM,

*Defendant-Appellant.*

**TO BE HEARD ON THE ORIGINAL RECORD**

Kings County
Ind. No. 6615/12
A.D. No. 14-09908

## BRIEF FOR DEFENDANT-APPELLANT

LYNN W. L. FAHEY
Attorney for
Defendant-Appellant
111 John Street, 9th Floor
New York, N.Y. 10038
(212) 693-0085

TAMMY E. LINN
*Of Counsel*



# TABLE OF CONTENTS

5531 STATEMENT ......................................................................................... 1

PRELIMINARY STATEMENT ...................................................................... 2

QUESTIONS PRESENTED .......................................................................... 2

STATEMENT OF FACTS ............................................................................. 3

    Introduction ............................................................................................... 3

    The *Huntley* Hearing ............................................................................... 5

        Testimony ............................................................................................ 5

        Legal Arguments ................................................................................ 7

        Ruling Denying Suppression ............................................................. 8

    Pre-Trial Ruling Granting the People's Motion to Admit a 911 Call ................. 8

    Opening Statements ................................................................................. 9

    The People's Case at Trial ...................................................................... 10

        Appellant's Statements Asserting Justification ......................... 10

        The Outcry to Matthew Shepard, Whom Defense Counsel is
        Precluded from Interviewing Unless the Prosecutor is Present ............ 16

        The Crime Scene and Forensic Evidence ...................................... 19

        The Court's Refusal to Allow Evidence of Wilson's Documented
        Mental Illness, Substance Abuse, and Domestic Violence Allegations . 21

        The Testimony of Wilson's Sister and Friend, and the Court's
        Limiting of Their Cross-Examination ...................................... 23

        Evidence Admitted Over Defense Objection ......................... 25

    The Motion to Dismiss ......................................................................... 28

    Defense Counsel's Closing Arguments .......................................... 30

    The People's Closing Arguments .................................................... 31

The Charge, Verdict, and Sentence ....................................................... 37

ARGUMENT ........................................................................................ 38

POINT I

APPELLANT'S JUSTIFICATION DEFENSE WAS CORROBORATED BY A DISINTERESTED WITNESS AND CONSISTENT WITH OBJECTIVE EVIDENCE, AND THE PEOPLE'S CIRCUMSTANTIAL CASE WAS LEGALLY INSUFFICIENT TO DISPROVE JUSTIFICATION BEYOND A REASONABLE DOUBT, ALSO MAKING THE VERDICT AGAINST THE WEIGHT OF THE EVIDENCE. ............................................................ 38

POINT II

THE COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS, TO PRESENT A DEFENSE, AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY REQUIRING DEFENSE COUNSEL TO INTERVIEW AN AMENABLE KEY PROSECUTION WITNESS IN THE PRESENCE OF THE PROSECUTOR. ....................................... 49

POINT III

THE COURT VIOLATED APPELLANT'S RIGHT TO PRESENT A DEFENSE BY PRECLUDING HER FROM: USING MEDICAL RECORDS TO SHOW THE DECEASED'S HISTORY OF PSYCHOSIS AND LONGTIME SUBSTANCE ABUSE; EXPLORING WHETHER HE WAS MORE LIKELY TO EXPERIENCE VIOLENT HALLUCINATIONS WHEN INTOXICATED AND OFF HIS MEDICATION, AS ON THE NIGHT OF THE STABBING; CROSS-EXAMINING PROSECUTION WITNESSES ABOUT HIS SUBSTANCE ABUSE; AND ADDUCING EVIDENCE OF SPECIFIC ACTS OF DOMESTIC VIOLENCE. ............................................................... 56

A.     Preclusion of Wilson's Psychiatric and Substance Abuse History ........................................................................... 57

B.     Specific Acts of Violence ................................................. 63

POINT IV

IT WAS IMPROPER TO ADMIT THE DECEASED'S 911 CALL COMPLAINING ABOUT "A GIRL" "ACTING ALL CRAZY" AS A PRESENT SENSE IMPRESSION WHEN THERE WAS NO EVIDENCE OF CONTEMPORANEITY WITH HIS OBSERVATIONS OR ANY CORROBORATION. ........................... 66

POINT V

THE COURT ERRED BY (A) REFUSING TO SUPPRESS APPELLANT'S STATEMENT TO POLICE WHO QUESTIONED HER AFTER SHE INVOKED HER RIGHT TO REMAIN SILENT; AND (B) ADMITTING RELATED UNCHARGED CRIME EVIDENCE THAT HAD NO PROBATIVE VALUE AND PAINTED HER A LIAR. .................................................. 72

POINT VI

THE PROSECUTOR VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL IN SUMMATION BY BASELESSLY ASSERTING THAT APPELLANT HAD A SEXUAL "ARRANGEMENT" WITH THE DECEASED AND JUST BECAUSE APPELLANT "DIDN'T FEEL LIKE" HAVING SEX "DOESN'T MEAN IT'S RAPE"; MAKING UP FACTS TO DIMINISH APPELLANT'S OUTCRY; FALSELY PUTTING WORDS INTO APPELLANT'S MOUTH THAT WENT TO INTENT TO KILL AND CONSCIOUSNESS OF GUILT; SPECULATING AS TO MOTIVE; AND MISSTATING THE LAW ON JUSTIFICATION. ...................................................................... 83

CONCLUSION ............................................................................. 93

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,          :

                           Respondent,          :

               -against-          :

ATARA WISDOM,          :

                      Defendant-Appellant.          :
------------------------------------------------------------------------x

## STATEMENT PURSUANT TO RULE 5531

1.     The indictment in the court below was 6615/12.

2.     The full names of the original parties were People of the State of New York against Atara Wisdom.

3.     This action was commenced in the Supreme Court, Kings County.

4.     This action was commenced by the filing of an indictment on July 31, 2012.

5.     This appeal is from a judgment convicting appellant, following a jury trial, of second-degree murder.

6.     This is an appeal from a judgment of conviction rendered October 8, 2014.

7.     Appellant has been granted permission to appeal as a poor person on the original record.  The appendix method is not being used.

PRELIMINARY STATEMENT

Appellant Atara Wisdom appeals from a judgment of the Supreme Court, Kings County, rendered October 8, 2014, convicting her, after a jury trial, of second-degree murder [P.L. § 125.25(1)], and sentencing her to 18 years to life in prison (Tomei, J.).

Appellant filed a notice of appeal and, on June 16, 2015, this Court granted her leave to appeal as a poor person and assigned Lynn W. L. Fahey as counsel.

Appellant is incarcerated pursuant to the judgment.  No stay was sought.

QUESTIONS PRESENTED

1) Given that appellant's justification defense was corroborated by a disinterested witness and consistent with objective evidence, was the People's circumstantial case legally insufficient to disprove justification beyond a reasonable doubt, also making the verdict against the weight of the evidence?

2) Did the court violate appellant's rights to due process, to present a defense, and to the effective assistance of counsel by requiring defense counsel to interview an amenable key prosecution witness in the presence of the prosecutor?

3) Did the court violate appellant's right to present a defense by precluding her from: using medical records to show the deceased's history of psychosis and longtime substance abuse; exploring whether he was more likely to experience violent hallucinations when intoxicated and off his medication, as on the night of the stabbing; cross-examining prosecution witnesses about his substance abuse; and adducing evidence of specific acts of domestic violence?

4) Was it improper to admit the deceased's 911 call complaining about "a girl" "acting all crazy" as a present sense impression when there was no evidence of contemporaneity with his observations or any corroboration?

5) Did the court err by (A) refusing to suppress appellant's statement to police who questioned her after she invoked her right to remain silent; and (B) admitting related uncharged crime evidence that had no probative value and painted her a liar?

6) Did the prosecutor violate appellant's right to a fair trial in summation by baselessly asserting that appellant had a sexual "arrangement" with the deceased and just because appellant "didn't feel like" having sex "doesn't mean it's rape"; making up facts to diminish appellant's outcry; falsely putting words into appellant's mouth that went to intent to kill and consciousness of guilt; speculating as to motive; and misstating the law on justification?

## STATEMENT OF FACTS

### Introduction

Charged with second-degree murder for the 2011 death of Anthony Wilson, appellant admitted stabbing him to police and an assistant district attorney and explained that it was to prevent Wilson from raping her. Wilson—twice appellant's age, 40 pounds heavier, and with a .20% blood alcohol content—blocked appellant's attempt to leave his apartment while saying he was going to "get some pussy tonight," punched her in the face and back, and held onto her even as she stabbed him, trying to get away. The People introduced appellant's oral and written statements, as well as a videotaped interview in which appellant was distraught while recounting the incident.

3

The People also presented Matthew Shepard, who testified on direct that appellant told him that night she had stabbed Wilson because she did not want to pay rent and have sex with him.  Before Shepard testified, the court ruled that defense counsel could interview him only with the prosecutor present.  After refusing an interview supervised by his adversary, counsel sought to impeach Shepard's credibility, only to unexpectedly elicit from Shepard appellant's specific outcry that Wilson tried to forcibly rape her.

The jury also heard of a custodial statement taken from appellant after she had said she no longer wanted to talk, *Molineux* evidence concerning the theft of Wilson's property, a 911 call that the People failed to link to the stabbing, and the prosecutor's inflammatory and baseless summation arguments that appellant and Wilson had a sexual "arrangement" and just because she "didn't feel like" having sex that night "doesn't mean it's rape," and that appellant had admitted intent to kill and a "cover up."

Precluded from learning that Wilson had a history of psychosis that included hallucinations of harming others and was noncompliant with psychiatric medication, and had a documented history of abusing alcohol and cocaine, the jury convicted appellant and she was sentenced to 18 years to life in prison.

The *Huntley* Hearing

Testimony

On January 3, 2012, Detective Christopher Scandole joined the investigation into the death of Anthony Wilson, who had been found in his apartment (H. 4-5).[1]  Scandole began searching for appellant in March of 2012 after a DNA hit (H. 5, 17).   He ultimately picked her up from a Brooklyn shelter on July 25, 2012, at about 9:45 a.m. (H. 5-6, 13, 17; 209, 211).

Around 11:00 a.m., at the precinct, Scandole began a two-to-three-hour interview with appellant, who waived her *Miranda* rights (H. 7-9; 209-10, 212; Hrg. Ex. 1). Appellant verbally admitted stabbing Wilson, explained that she had believed he was going to rape her, and described what happened that night as well as a prior incident when "she woke up to find [Wilson] touching her underneath her shirt," which led to a heated argument because their relationship was "not like that" (H. 10-12).  After the stabbing, appellant went to see her friend Ebony (H. 12).

At about 7:30 p.m., appellant signed a written statement (drafted by Scandole outside her presence) (H. 12-13; 210, 213-14; Hrg. Ex. 2).   Appellant was in the interview room for the entire day, except for a 15-minute period in which Detective Deborah Batanjay conducted a lineup (H. Scandole: 18-19; Batanjay: 22-30; 212).

---

[1]  Parenthetical numbers preceded by "H" refer to minutes of the *Huntley* hearing, which was reopened during trial (150-52).   Parenthetical numbers preceded by "JS" refer to minutes of jury selection, and numbers without prefix refer to the trial.

Scandole did not bring her any food; he thought another officer had done so but could not "say for sure" (H. 18).  Appellant was arrested after the lineup (214-15).

Around 9:00 p.m., Assistant District Attorney Ed Purce conducted a videotaped half-hour interview with appellant (H. 15-16; 210-11, 214; Hrg. Ex. 3).  On the video, appellant is visibly distraught (217; Hrg. Ex. 3).[2]  She becomes more upset as the interview goes on until she says at around 9:30, "I need a little--" while making a hand gesture and bending over to cry; appellant agrees she wants a break and to "stop for a second," and then says "yeah" when Purce asks if she wants to "stop right now" (218-19; Hrg. Ex. 3).  Ending the interview, Purce states that "There will be no further questions until we resume the tape" (219-20).  Scandole repeatedly testified that appellant said that night, "I don't want to talk about it anymore" (214-16; emphasis added).  Appellant did not request a lawyer (216).

Appellant remained at the precinct overnight.  The following morning, at about 10:00 a.m., Scandole resumed questioning her (205-06, 211, 215).  Scandole told her he had a couple more questions and "reminded her that [the police had] read her rights yesterday," but he did not administer fresh *Miranda* warnings (206, 211, 215-16).

Scandole asked appellant "about [Wilson's] property," and appellant admitted taking his phone, wallet, and keys when she left (206-07).  Appellant threw away the

---

[2] This description is based on appellate counsel's review of the video, which was admitted at trial and is provided under separate cover for the court's convenience.

keys, admitted to using the phone "for a while," and specifically denied using the benefit card in Wilson's wallet (206-08).  Appellant also said she went to her friend Tiffany's house after the stabbing (207-08).  This follow-up interview was not recorded.

Legal Arguments

The People contended that appellant's statements on the morning of July 26, 2012, were admissible because she was not "forced" to answer Scandole's follow-up questions (217).  They acknowledged that appellant "stopped and did not want to continue speaking to Mr. Purce on the video," but emphasized that "she never indicated she wanted a lawyer," and repeatedly claimed that she had never said "I don't want to talk to anybody[ or about this] anymore" (217).  The People said that Purce "allowed her to stop the interview" because she was upset and maintained that appellant merely said she did not "want to talk anymore right now" (217).

Defense counsel responded that "this is somebody who's arrested at 5:30 in the afternoon, does give a video statement, is clearly upset, says I don't want to talk anymore" (218; emphasis added).  Thus, Scandole "should have gone through her rights again in their entirety."  And, not only was it unreasonable to hold appellant overnight rather than send her to Central Booking for arrest processing, "especially after [she] said I don't want to talk anymore," but the overnight delay "softened [her] up" (220).

<u>Ruling Denying Suppression</u>

The court agreed that appellant "wanted to stop" (220).  It nevertheless concluded that the police were permitted to resume questioning, noting that Scandole had "reminded her . . . of the fact that he had given her rights and if she wanted to continue" (220).  The court rejected counsel's argument that Scandole had to re-administer the *Miranda* warnings, ruling that this was "not required.  Once she's informed, she's been warned.  She doesn't have to be re-advised" (220).  Although counsel's arguments about delay went to the voluntariness of appellant's statement, the court did not address that issue, seemingly believing the issue was about unreasonable delay before arraignment (220-21).  Accordingly, the court denied suppression of appellant's July 26 statement (222).

<u>Pre-Trial Ruling Granting the People's Motion to Admit a 911 Call</u>

Shortly after midnight on November 29, 2011, Wilson called 911 and stated, "I got this girl in my house and I don't know what's wrong with her, she's acting all crazy and I want her out of my house" (JS. 166-67).  Noting that time of death was not clear, defense counsel objected to admitting the recording as a present sense impression:

> We don't know what [the call] refers to, whether it refers to this incident or something else, and so absent any background or testimony, it is just this man calling.  We don't know if there's an upsetment [sic], an intervening event, things calm down and something happened.  It's significant, there's nothing on the call like look out or ouch or hearing anything . . ." (JS. 167-68).

The People responded that phone records showed that, after the call, appellant used Wilson's phone; that setting time of death as the night of the call was consistent with forensic evidence; that appellant admitted stabbing Wilson to stop him from raping her; and that Wilson's relatives last saw him before the call was made (JS. 168-69). Defense counsel again protested that the call consisted of "just a bald statement, we have nothing else, and there is nothing else on this," adding that "intervening actions . . . could have been occurring" between whatever Wilson was referring to and the stabbing, which appellant had said took place at about 2:00 or 3:00 a.m. (JS. 170).

Without elaboration, the court deemed the call admissible as a present sense impression (JS. 170).

Opening Statements

The prosecutor told the jury it was "going to actually hear the final words that were said by Mr. Wilson presumably before he is murdered by the defendant" and described his 911 call (JS. 304). The prosecutor also previewed appellant's July 26 statement that she took Wilson's phone, keys, and wallet, and used the phone but not anything in the wallet. The prosecutor highlighted that appellant initially told police she went to her friend Ebony's house but, in her statement the following morning, "now there was a Tiffany" (JS. 307-08). Specifically with respect to Wilson's welfare benefits card, the prosecutor said:

> . . . she denied ever using it.

9

> You are going to actually hear from the . . . Human
> Resources Administration responsible for Welfare benefits
> cards, there actually is activity on Mr. Wilson's benefit card
> after the date of November 29, 2011 and it shows consistent
> areas with where the defendant used to use her benefits card
> (JS. 309).

Before addressing appellant's statements, the prosecutor said that appellant met with

Matthew Shepard around Thanksgiving and told him <u>only</u>, "I was paying [Wilson] rent

and he wanted to have sex with me and I wasn't having that so I poked him" (303-04).

Defense counsel opened by arguing that appellant was upset when she called

Shepard and her statement was "shorthand [for] the man was trying to rape me"—to

which the court sustained an objection—and that the evidence would show "that she

in fact said that . . . the decedent tried to rape her.  That's what she said to the police"

(315-17).

<u>The People's Case at Trial</u>

<u>Appellant's Statements Asserting Justification</u>

As appellant later told detectives and an assistant district attorney, in late

November 2011, she fatally stabbed Anthony Wilson because she believed he was going

to rape her (Police Officer <u>Garrett Marsden</u>: 113-16; Detective <u>Christopher</u>

<u>Scandole</u>: 274-76; <u>Matthew Shepard</u>: 352-53, 355, 366-68; Peo. Exs. 55 [appellant's

written statement], 56 [appellant's videotaped statement]).  Wilson's landlord found him

and called the police on January 3, 2012 (<u>Donet Robinson</u>: 77-78, 80-83, 85).  Twenty-

five-year-old appellant was 5'6" and weighed 115 pounds in July 2012 (Detective

Deborah Batanjay: 388, 390-91).   Fifty-year-old Wilson was 5'9" and weighed 155 pounds when he died (Medical Examiner Irini Scordi-Bello: 230).

Police began looking for appellant in late March after speaking to "witnesses," and blood samples from Wilson's bathtub and bathroom wall later led to a DNA profile which matched appellant (Detective Stephen Markowski: 9, 12-13, 15-16, 23-25, 33-37; Scandole: 267-68;  Criminalist Sarah Phillips: 322-23;  Stipulation 3: 394-95 [buccal swab]; Peo. Exs. 14-18, 36-41 [bathroom photos], 57 [DNA case file]).

On July 25, 2012, Scandole picked up appellant from a homeless shelter shortly before 10:00 a.m., isolated her for 45 minutes, and then elicited several statements during a three-hour interrogation that began around 11:00 a.m. (Scandole: 283-86). Explaining her connection to Wilson, appellant told Scandole that she "had lost her place to live and . . . moved in with this man she had met by the doctor's office on Broadway."  She "would give him money from time to time for rent, when she had [it]." Appellant described Wilson as "a crack user and [said] that when he smoked crack he became a completely different person."  One night in 2011, she "woke up to find him touching her underneath her shirt," told him, "we are not like that, that is not why I'm here," and left the apartment after a "rather heated" argument.  She returned after "calm[ing] down" but left again following another "loud and heated" argument around Thanksgiving.  She then "stay[ed] with her sister for a couple days" (Scandole: 274-75).

Appellant spoke to Wilson by phone a couple times and "had to go back" on the night of the incident, "because she had set up an interview[ and] needed to get some

clothes out of the apartment." Initially, "everything was okay, he was nice . . . like when they had first met, [and] there was no problem[]." Scandole recounted appellant's description of what ultimately happened as follows:

> Later that night, the same day, she was sitting on the couch getting her clothes and he says to her, I am going to get some pussy tonight. She says, well, okay, then I'll get out of here. And he steps in front of the doorway and says, uh-uh. At that point she tells us that he picks up a belt and starts wrapping the belt around his hand. At that point she said, I picked up a knife and I put it inside my sweater.
>
> She went to get up off the couch, then he punched her in the face. After he punched her in the face, he grabbed her sweater and she says he pulled the sweater over her head and started punching her in the shoulders and in the back.
>
> While he was punching her, she said he was pushing her head towards the ground. As he is pushing her head toward the ground, if my head hits the ground, thinking to herself, I'm dead, and I stabbed at him.
>
> She said she then ran into the bathroom, she saw she had a big knot on her head and some bruises on her shoulders. She came out, gathered her stuff into a duffle bag and then she left and went to her friend Ebony's house (275-76).

Around 7:30 p.m., appellant signed a written statement prepared by Scandole which was virtually identical to the oral statement except for a line at the end indicating that appellant "didn't tell Ebony . . . or anyone else what happened" (Scandole: 277-81; Peo. Ex. 55). Appellant made no corrections to the statement, which Scandole wrote solely from memory since he took no notes during the interrogation (276-78, 289-90).

Appellant made consistent and additional statements to Assistant District Attorney Ed Purce in a videotaped interview between 9:00 and 9:30 p.m. (Purce: 299-303; Peo. Ex. 56).  In the video, appellant speaks softly and, at times, haltingly, and readily answers all questions asked of her.  Appellant could not remember dates but believed she stayed with Wilson for about a month, first meeting him after Halloween.  Appellant received public assistance and acknowledged she was not contributing enough money to be considered rent, but she gave Wilson money for food, his transportation, and other miscellaneous expenses.  Because she paid him different amounts at different times, she was unsure how much she gave overall but estimated it was $50 to $60 (Peo. Ex. 56).

Wilson was unemployed and spent his time attending a drug program and seeing his daughter.  Wilson's drug use was a problem for appellant; they argued because she refused to give him money to buy drugs (Peo. Ex. 56).

Appellant was not Wilson's girlfriend and they never had any sexual contact, even though Wilson had indicated he wanted to have sex with her.  Appellant had been temporarily staying with her sister leading up to the incident after a recent argument with Wilson about him wanting to sleep with her.  She had ignored this in the past but left that time because of "crazy" insults he hurled at her, including calling her a "bitch" and a "whore."  Of this, appellant explained: "I never gave him any reason to say anything like that.  I never slept with him, we had no type of intercourse, no nothing."

13

During the two days that appellant was at her sister's house, Wilson kept calling her to ask if she was coming back (Peo. Ex. 56).

Appellant did not want to return but she had an interview the next morning, her clothes were still at Wilson's, and his apartment was more convenient than her sister's for the interview.  She also had nowhere else to live so she felt she had no choice.  She got to Wilson's around 9:00 p.m. and he let her inside when he got to the building. Appellant soon went to sleep on the couch, where she had always slept (Peo. Ex. 56).

On the video, when the prosecutor directs her to the incident itself, appellant begins to weep, her voice becomes even softer, and her answers more halting. Appellant explained that she woke up at around 3:00 a.m., she believed, to feel Wilson rubbing her stomach.  She told him to stop and started putting her sneakers on, and Wilson began arguing with her, asking why she won't "give him some pussy," to which she replied "we already discussed that."  Wilson picked up a pink belt and wrapped it around his hand, and did not respond when appellant asked, "Are you going to hit me?" Wilson kept saying he was going to "get some pussy tonight" and appellant said she might as well leave.  Wilson again called her a "bitch" and a "fucking whore" and said other "crazy shit."  Appellant remained on the couch and Wilson paced back and forth from the door to the TV for ten to fifteen minutes while they continued to argue (Peo. Ex.  56).

Appellant knew he would assault her so when she put on a sweater from one of her bags near the couch, she put a folding knife from the bag in its right pocket.  When

she got up to pass Wilson for her jacket, he began punching her in the face (no longer holding the belt).  When the A.D.A. asks appellant where, she uses her hands to demonstrate that she was hit in the left cheekbone and eye socket area.  Wilson then pulled appellant's hood over her head, entrapping it, and started hitting her in the back. She was standing but he pushed her down toward the floor—she demonstrates this— and she struggled to push him off but could not free herself.  Appellant then stabbed him but was not sure how many times or where on his body.  She remembered being close to the floor and believed she "must have caught him in his legs or something." She also remembered pushing her body up and pushing him away "a little bit" but he kept fighting her even after she stabbed him and tried to free herself (Peo. Ex. 56).

On the video, when appellant admits to the stabbing, her voice is barely a whisper, and Purce makes her repeat herself.  She is still crying, and now begins sighing and holding her head (around 9:28).  She soon asks to stop.  She spends two to three minutes crying while hunched over before Purce ends the interview around 9:33 p.m. (Peo. Ex. 56).

Phone records corroborated appellant's statement that Wilson called her repeatedly during the two days before the incident—he called her phone 25 times (Sprint Records Custodian Norman Ray Clark: 154-55, 160-61, 173-81; Peo. Ex. 45 at 3-6; Peo. Ex. 46 at 32-35).  Wilson's phone records began on October 1, 2011, and he first called appellant's phone on November 24, 2011.  Appellant used her phone heavily but never called Wilson from it (Peo. Exs. 45-46).  At 12:37 a.m. on November 29,

15

2011, Wilson called 911, and his phone began calling appellant's contacts at 12:57 a.m. (Clark: 154-55, 160-61, 173-81; Peo. Exs. 45-51).   Estimating that Wilson's death occurred around November 29th was consistent with his state of decomposition (Scordi-Bello: 240-41).

<u>The Outcry to Matthew Shepard, Whom Defense Counsel is Precluded from Interviewing Unless the Prosecutor is Present</u>

The only witness who saw appellant on the night of the incident was <u>Matthew Shepard</u>.  Around January 3, 2012, Shepard spoke with police and gave an audiotaped statement to an Assistant District Attorney (357-58).  He later identified appellant in a lineup and testified before the grand jury (Shepard: 358-59; Batanjay: 375-86, 391; Peo. Exs. 58A-D [lineup]).

The People obtained a material witness order to compel Shepard's testimony at trial (335-41).  Before he was called to the stand, the court granted defense counsel's request to personally confirm with Shepard the prosecutor's representation that Shepard did not wish to speak with counsel (335). Shepard then told defense counsel he would speak to counsel, but the detectives and the prosecutor refused to allow counsel to close the door for a private conversation (337-38).  When counsel asked the court to direct them to do so, the prosecutor objected that she had a right to be present during counsel's conversation with Shepard because Shepard was "her" witness and counsel was "not his lawyer" (336-38).  Defense counsel protested that the prosecutor's position was baseless:

16

> Your Honor, the rules allow the People to speak to any of my witnesses, they can go privately . . . without me and they are allowed to talk without me.
>
> There is no requirement that I am with a witness and the . . . People know what I am saying to their witness.  I am an officer of the Court, I am not going to say anything unethical (338-39).

Counsel, who had already noted that it was "intimidating to have an A.D.A. there, have a detective there" (336), added that the prosecutor "would be free to . . . ask [Shepard] what [counsel] said in that room" (339).

After the court ruled that the prosecutor "ha[d] a right to be there," counsel told Shepard he did not want to speak with him under observation, objected again, and moved for a mistrial (339-40).  The court asked "what principle or rule" supported counsel's argument that he was "allowed to speak to [Shepard] privately without anybody there," and counsel replied that "Witnesses are available to either side and there is no rule that requires that a prosecutor or a defense attorney needs to be there. I think that's the common law" (340).  Although the court remarked, "You may be right," it did not change its ruling (340-41).

Following this, the prosecutor called Shepard to the stand and elicited that he met appellant when he asked a mutual friend to introduce him because he was attracted to her; Shepard did not recall when they met (346-50).  During their brief conversation, appellant told him she was staying with Wilson, whom Shepard knew as a neighborhood "panhandl[er]" (344-45, 347).  Appellant said she had no other place to stay (347).

Shepard and appellant exchanged phone numbers, although appellant gave Wilson's number instead of her own because Shepard "didn't want [his] girl to find out another girl was talking to [him]" (347, 351).

Around Thanksgiving 2011, appellant called Shepard (from Wilson's phone) sometime between 2:00 and 5:00 a.m., "sound[ing] stressed" (Shepard: 350-51, 364-65). Shepard agreed to meet her on DeKalb Avenue, expecting to have sex with her (350-52, 365-66). When Shepard got there, appellant had three or four bags and Shepard asked her "what was going on, you know, because she seemed a little bit" (sic) (351-52). Appellant told him that she and Wilson "had an altercation," that she was "not going to pay rent and fuck him too," and she had "poked" him (352-53). Appellant said Wilson had hit her, and Shepard noticed she had "a swelling up on her face" (355, 366). She had no blood on her clothes, and Shepard could not say whether she "was acting unusual" because he did not know "her norm" (355-56). Shepard did not take what she said seriously, was "not paying attention" because he was focused on the possibility of sex, and agreed that she could come to his place for a short time (353-54, 365-66). Someone, possibly a man, picked up appellant a few hours after Shepard took her home (356). Shepard had no further contact with her (356).

The prosecutor cursorily elicited that Shepard had several New York and out-of-state drug convictions for which he spent time in jail (343-44). Defense counsel began cross-examination by highlighting Shepard's conviction, eliciting how many years he served, and his drug problem which required treatment (362-64). Shepard refused to

answer counsel's question, "When was the last time you got high" (364).  Counsel elicited that Shepard had "very possibly" been "up the whole night" before meeting appellant, and that he had stated in his audiotaped interview with an assistant district attorney that he was "bad fucked up" when he met with appellant (364-66).

Then, discussing what happened when Shepard brought appellant home, defense counsel asked, "Did she tell you that Anthony tried to rape her at that time?"  Shepard replied, "He tried to force his self on her, she did say that" (366-67).  Evidently surprised by this revelation, the court interrupted counsel's follow-up question to ask a series of its own regarding the context of appellant's statement.  Shepard explained that he had again asked appellant "what was wrong" and she had responded, "this guy is crazy, I'm not going to pay rent and fuck him[,  he tried to take it, tried to force his self on her"; Shepard added, "That is where I got that from, out of her mouth" (367-68).  When counsel resumed cross, Shepard agreed he had suggested that appellant go back to check on Wilson but refused her request that he go with her (368).  Counsel asked no further questions.

### The Crime Scene and Forensic Evidence

Wilson lived in an "extremely small" studio apartment, and Section 8 and Welfare paid his entire rent directly to the landlord (Markowski: 8-9; Robinson: 78-79).  When police responded to the apartment, the room temperature was 28 degrees and it was in disarray, with blood stains on a nightstand and kitchen cabinet and smears of blood and

feces on the floor (Markowski: 7, 12-13, 18-20, 25, 27, 29-30, 32; Peo. Exs. 4-9, 12-13, 17-19, 23-25, 31-32, 34-35).   Serious injuries can cause a person to defecate (Scordi-Bello: 257).   Wilson's landlord, younger sister <u>Victoria Wilson</u>, and longtime friend <u>Shakeema Fortune</u> all agreed that Wilson's apartment was "neat" on the few occasions they were inside and not in the condition the photos displayed (Wilson: 67-68, 73; Robinson: 81-82, 87; Fortune: 133-34, 138-39).

Wilson had seven stab wounds of varying depths but no defensive wounds (Scordi-Bello: 231-38, 241, 248-50; Peo. Exs. 52 [autopsy report], 53 [diagram]).   There was a single wound about 2 ½ inches deep on his upper back, and appellant could have inflicted it when standing in front of Wilson (237-38, 243, 250).   A wound on Wilson's right side was ½ an inch deep (232-33, 249).   The remaining five wounds were on his left side, with four in a cluster; two of these wounds were about 2 inches deep and three were about 5-6 inches deep (233-37, 250).   The deeper ones that injured the heart and left lung were fatal but not "instantaneously lethal," and Wilson could have lived for another 20 minutes (238-39, 250, 257-58).   The sequence of the wounds was undetermined but the clustered ones likely occurred in close succession, and suggested Wilson was not "actively moving" (231, 241-43).   Scordi-Bello could not tell how appellant and Wilson were positioned; her opinion was based on the directional paths of the wounds (252-54).

When he died, Wilson's blood alcohol content was .20 percent and he tested positive for an antidepressant (Fluoxetine), a cocaine byproduct (Benzoylecgonine), and

a common cocaine contaminant (Levamisole) (Scordi-Bello: 246-47, 255-56).  Wilson's Seroquel prescription bottle was found open, 39 pills were on the floor, and his DNA was on the cap, but his toxicology exam did not detect Seroquel (Markowski: 12, 26-27, 29; Scordi-Bello: 255-56; Phillips: 316-19, 321; Stipulation 2: 393-94 [DNA collection]; Peo. Exs. 1, 18-19, 28-29).  Because there was no Seroquel in Wilson's body, the court sustained an objection when counsel attempted to ask the medical examiner about the use of Seroquel (Scordi-Bello: 255-56, 262-63).

Wilson was naked when discovered and a penile swab tested positive for semen but not saliva or vaginal secretions (Phillips: 318-19, 324-25; Peo. Exs. 7, 9-11, 18). Clothing, a towel, and a washcloth were vouchered and tested for DNA due to possible bloodstains, but neither the items nor the test results were admitted into evidence (Markowski: 9, 11-12, 15-16, 26-28; Stipulation 1: 392-93 [DNA collection]; Peo. Exs. 1, 20, 22-27).

### The Court's Refusal to Allow Evidence of Wilson's Documented Mental Illness, Substance Abuse, and Domestic Violence Allegations

After the People's first witness, defense counsel sought to introduce a certified copy of Wilson's medical records disclosed by the People (54-55).  In these records, counsel explained, "Wilson noted hallucinations, to harm himself or others," and reported hearing "voices"; was "diagnosed with major depressive disorder with psychotic features"; and was prescribed "Prozac for his depression," Benadryl for allergies and sleeplessness, and Seroquel, "which is an antipsychotic" (53).  Wilson also

had reported that "half his stomach [was] removed because of alcoholic ulcers" and he had "giv[en] up alcohol" and cocaine (53-54, 59). The records comport with counsel's representation of their contents (*see* pp. 2-4, 7-8, 11-14, 17-23).[3]

Counsel requested introduction of the records based on Wilson's toxicology report showing a high blood alcohol content, cocaine byproducts, and no Seroquel, as well as appellant's statements about Wilson's behavior that night. Counsel also wanted to call Wilson's treating physician to ask whether Seroquel was prescribed to "control [his] hallucinations," about the effect of noncompliance, and whether "alcohol abuse exacerbate[d] the hallucinations" (53-57).

Although the People did not contest that the records contained this information, the court baselessly opined that Wilson's hallucinations were not violent, he was not hearing voices, and he was treated solely for depression rather than psychosis (54-58). Admonishing counsel for trying to "dirty the victim," the court denied his requests, because appellant had not said that Wilson was hallucinating and, in its view, there was "no evidence" that Seroquel was for hallucinations or that noncompliance caused violent tendencies (57-61). The court refused counsel's plea to "bring in the doctor for an in camera inspection" as to the "reason that [Wilson] was prescribed the Seroquel." The court remarked, without record support, "if anything, it's the alcohol in his system that in all probability caused him to do what she alleged," if true (61).

---

[3] Wilson's records are provided under separate cover.

Although the court itself asked if there was "any evidence of violence in [Wilson's] past," it ignored counsel's request for disclosure of Domestic Incident Reports based on the medical records' references to allegations of domestic violence by Wilson against his baby's mother (59).

### The Testimony of Wilson's Sister and Friend, and the Court's Limiting of Their Cross-Examination

Wilson's sister testified that she saw him monthly and visited his apartment after his daughter was born (Wilson: 68, 73-74). Wilson's daughter and her mother lived with him sometime during the year or so he spent at that apartment, and he was "mad" when they left (Robinson: 79-80; Fortune: 143). After defense counsel elicited from Wilson's sister that he was seeking custody, the court sustained objections to counsel asking her whether "he'd been accused of being physically abusive to the daughter's mother," "had a long-standing problem with --," or "abuse[d] alcohol" (Wilson: 74-75). Wilson's sister was unaware that he had undergone stomach surgery (74).

Fortune had known Wilson for twelve or thirteen years; they were supposedly "like brother and sister" (133, 141). Fortune claimed she never drank alcohol with Wilson and never saw him drunk or "stoned" (142). The People elicited from Fortune that Wilson had introduced a woman named Renee as his girlfriend when Fortune went to the apartment four days before Thanksgiving, and that Renee stopped Wilson from

23

going to play pool with Fortune and her boyfriend (134-37).[4]  On cross, Fortune said that this happened about two weeks before Thanksgiving, after backtracking from a claim that she saw Wilson four or five times a week between 2009 and 2011 (141, 143-44).  Fortune did not recall seeing Wilson at all in October, and clarified that they had been "going out [in]" May and June of 2011 (144-45).  Fortune also did not remember Wilson's age, ultimately agreeing that he was in his early forties (144-45).  The court sustained objections to counsel asking Fortune whether Wilson ever spoke about "health issues he might have" (142, 145-46).

After Fortune's testimony, counsel asked the court to reconsider letting him use Wilson's medical records, arguing that he "ought to be allowed to go into certain personal aspects of the decedent's life," that the "records show that he had lost half his stomach due to alcohol abuse and people who know him well and see him regularly would know that he drinks a lot" (146-47).  He added that the toxicology report made Wilson's drinking habits important, and that he was "trying to establish whether [Wilson] became aggressive if he drank" (147).  When the court responded that Fortune had answered counsel's questions, counsel explained that her testimony that she had known Wilson for twelve or thirteen years and never saw him drink "ma[de] the medical records more relevant in terms of rebuttal" (147-48).  The court adhered to its prior

---

[4]  Fortune did not identify appellant as Renee.  Shepard knew appellant as Renee (346-47), and Fortune agreed that she knew Shepard (134).

ruling, remarking that Wilson's blood alcohol level was in evidence and counsel could "explore that in whatever fashion [he] wish[ed]" (148).

### Evidence Admitted Over Defense Objection

Wilson's 911 call was admitted over renewed objection and played for the jury (Wilson: 71-72; NYPD Technician Richard Schoen: 125-31; Peo. Ex. 42).

Appellant's July 26, 2012 statement to Scandole also was admitted.  In it, she said that she had taken Wilson's phone, wallet, and keys when she left the apartment.  She threw away the keys, "kept his wallet and[ ]didn't use it," but used the phone "for a little while" before also discarding that.   She remembered "talking to somebody" when she left the apartment, "but [she] was in a bit of a fog" and could not remember who.  She then went to her friend Tiffany's house where she stayed for a couple days.  Asked if she used Wilson's benefits card, appellant "said absolutely not."  (Scandole: 281-83).

After the prosecutor referred in her opening statement to Wilson's and appellant's benefits cards (JS. 309), defense counsel requested a *Molineux* instruction regarding the uncharged theft (39-40).  The prosecutor repeatedly maintained that she was not accusing appellant of this but records would show that Wilson's card was "used in areas where [appellant] used to frequent" (40-41, 48).   Counsel objected, "It's prejudicial.  It's the only stores in the neighborhood," "invit[ing] speculation" that appellant used Wilson's card, even though she had denied it and left the wallet at a friend's house (45-48, 51).

Counsel also objected that proposed testimony about the use of Wilson's benefits card had "no probative value" to "outweigh the prejudice" (43-48). The People contended that it was admissible under *Molineux* to establish a timeframe since the pattern of activity changed after November 29, 2011, and defense counsel responded that appellant admitted stabbing Wilson at the end of November and taking his things, that the People planned to call Shepard, and that the proposed evidence "doesn't add anything" given that the issue was justification (45-47). The People then fell back on the "complete the narrative" exception to *Molineux*, arguing that Wilson's card activity combined with the out-of-state activity on appellant's card showed "all that she did after she killed this person" (49-50). Counsel disagreed, "it doesn't complete any narrative," because appellant "sa[id] it happen[ed] around Thanksgiving time[ and] she took this stuff," and it was "irrelevant that [Wilson's card] was used or who used it" (50-52). Counsel also noted that the fact that appellant had taken Wilson's wallet was already "out there for someone to use," and reiterated that the proposed testimony was "really to show these are bad acts and she's done this" (51).

The court agreed to instruct the jury that "the testimony regarding those items . . . have no bearing on her guilt or innocence" (41). Over counsel's continued protest to the evidence coming in at all, the court gave the following *Molineux* instruction regarding the People's opening statement (52-53, 64):

> there's evidence that after the defendant allegedly stabbed
> the victim in this case she took some items off the bureau, a
> wallet of the defendant [sic], keys and benefit card. That

26

evidence -- those are uncharged crimes and they are not offered to show a propensity on the part of the defendant to commit the crime in question.  They are only being -- that evidence is only offered to complete the narrative, complete the narrative, that's all (65).

Subsequently, the People called <u>Richard LeBlond</u>, welfare fraud investigator from the Human Resources Administration (LeBlond: 90-91).  Defense counsel objected and requested a sidebar with the court reporter, which the court denied while summarily ruling, "I'll let it go in" (91-92).  Counsel also objected to admission of records showing Wilson's and appellant's benefit cards' transactions between September 2011 and May 2012 (94-97; Peo. Exs. 43-44).  The court denied counsel's request for "another curative instruction" (96).

LeBlond testified that Wilson typically used his card at certain locations on Broadway Avenue in Brooklyn from September through November 2011 (100-01; Peo. Ex. 43).  Beginning on December 6, the card was used on Rockaway Avenue, East 98th Street, Ralph Avenue, and Rutland Road in Brooklyn (101-02; Peo. Ex. 43).  Appellant typically used her card at various locations, including Rutland Road (103-04; Peo. Ex. 44).  Appellant also used her card in Pennsylvania and New Jersey (106-07).  Anyone with Wilson's PIN could have used his card (93, 107-08).  Over counsel's objection that it was "far afield of the narrative essence," LeBlond explained that Wilson's benefits card could directly obtain cash (105-06).

Counsel subsequently moved for a mistrial, or "at least another attempt at a curative instruction," because LeBlond's testimony and the benefit records "far

exceeded the narrative" that Wilson's card activity changed after his death by "comparing the usage" to activity on appellant's card (120-23). Counsel elaborated that this did not "show the narrative"; "all it does is support the fact that the People are trying to get across she took the card, she used it illegally and she's bad for that reason and it is used far in excess" (122). The court denied counsel's application, stating that it would give another *Molineux* instruction in its final charge (123).

The Motion to Dismiss

Once the People rested, defense counsel moved for a trial order of dismissal, arguing that they "failed to prove a prima facie case" (397). Counsel summarized the People's evidence, which consisted of the seven stab wounds, the location of Wilson's and appellant's blood in the disheveled apartment, and the 911 recording. "[A]bsent" the 911 recording, "the only testimony" was appellant's statement "that she was being attacked, [Wilson] said I'm going to get some pussy tonight, hit her several times and she defended herself." Although the People called Shepard to elicit appellant's "admission" to him, Shepard in fact revealed appellant's outcry of attempted rape and testified that appellant had "swelling around the eye, which is consistent with having been hit in the face." Shepard also recalled that appellant "was upset and that she asked to return to check []on [Wilson]." The People's theory was "entirely speculative" rather than based on "circumstances . . . so strong as to flow into pretty much one

conclusion," and even if there was sufficient proof of intent to kill, the evidence showed that appellant was justified to prevent rape (397-99).

The People responded that appellant's outcry to Shepard, "during her stay with him or trying to convince him to allow her to stay in his apartment is of no consequence." Given her admission to stabbing Wilson "because she wasn't going to pay him rent and have sex with him," "the 911 tape and the fact that the forensic evidence doesn't support what her claim is," the People argued that they had made out a prima facie case (399-400).

Without ruling, the court prompted counsel to make his motion at the close of the case since he planned to rest. Accordingly, counsel renewed "[f]or the same reasons" and added that "the forensic evidence does not support the People's contention." The evidence showed that "there was a scuffle on one side," that Wilson's blood showed that he moved, "he pulled down his pants because there wouldn't be excrement on the floor, there wouldn't be what appeared to be urine stains to the ME on the pants." Counsel continued, "something happened and we don't know what and it . . . certainly cannot support any verdict of guilt beyond a reasonable doubt." He concluded that "[t]his is all speculative" (400-01).

Making no new arguments, the People opposed counsel's motion and the court implicitly denied it (401).

Defense Counsel's Closing Arguments

Defense counsel argued in summation that the evidence was consistent with justification and that any conclusion to the contrary could only stem from speculation (410-15, 426, 431, 440-42). Counsel highlighted the toxicology results, appellant's outcry to Shepard, and Shepard's testimony that appellant's face was swollen when he saw her, urged the jury to request the video of appellant's statement, and suggested that appellant's written statement was less accurate because police wrote it and she signed it without making a single correction after having been interrogated all day (416-22, 427-31, 435-39). Counsel suggested that appellant did not initially go to police because she was afraid, and the court sustained an objection that this "was not the testimony" (427). Counsel accurately recounted Shepard's testimony that appellant sounded "stressed" when she called him and wanted to go back and check on Wilson, but the court sustained objections that Shepard "didn't say" those things (435-36, 439-40).

Counsel reminded the jury of the medical examiner's testimony that the stab wounds likely happened in quick succession and that Wilson had no defensive wounds, and counsel explained why the stab wounds were consistent with appellant's description of how events unfolded (421-23, 433). The court sustained an objection that counsel's argument that the actual stabbing "probably took less than a minute" "calls for speculation" (432-33). The reason that appellant stabbed Wilson so many times, counsel argued, was because he "wasn't feeling it" in his extremely intoxicated state and would not let her go (422, 434). Counsel suggested that Wilson urinated in his jeans

and took off his clothes while appellant was in the bathroom, and that Wilson, who did not die immediately, may have called 911 during this time but was so drunk he did not realize he was seriously injured and, thus, did not report the stabbing (414, 423-25, 433-34). The court sustained an objection to "speculation" that Wilson was stabbed before he called 911, and a general objection to the jury considering their own experiences to understand that a drunk person might not feel pain (414, 422). Addressing the blood smears around the apartment, counsel believed that Wilson must have been "walking around or grabbing at something" after the stabbing occurred (425-26). The court sustained a general objection to counsel's argument that appellant may have cut herself to explain her blood in the bathroom, and sustained an objection to counsel saying it was not menstrual blood because "That was not the testimony" (424).

Counsel concluded by pointing out that the People had not proven intent to kill, and that their evidence on lack of justification was circumstantial and insufficient (440-42). When counsel noted that "the definition of circumstantial evidence . . . holds the People to a very high standard," the court sustained a general objection (441).

The Prosecutor's Closing Arguments

The prosecutor argued that 25-year-old appellant and 50-year-old Wilson had an "arrangement" that appellant would "give him some sex" in exchange for a place to stay, given that she "had other places to go," "or that they may have been even boyfriend and girlfriend" based on Fortune's testimony (451-52, 461-62, 468, 472-73).

Under any of these scenarios, the prosecutor repeatedly maintained that Wilson's attempt to have sex with appellant against her will was not rape:

> Maybe he tried to have sex with her.  I am not saying he didn't try to have sex with her.  Just because you don't want to have sex with someone doesn't mean that they are trying to rape you, okay.  One is totally different from another (452).

> \*       \*       \*

> She wanted him dead because he had the nerve to not only try and maybe change the arrangements that she had for her living there, or maybe he was trying to have sex with her, she just didn't feel like it . . . (468)

> \*       \*       \*

> . . . she was consensually having sex with him and maybe on November 29th he wanted to have sex, she didn't.  That doesn't mean it's rape, that just means I didn't want to have sex with him, okay (473).

The court overruled defense counsel's objection that the reference to a sexual arrangement was "Well beyond the evidence, speculation" (451).  It also overruled his objection that there was "no testimony as to where [appellant] could have stayed for the long term" when the prosecutor stated that appellant chose to return to Wilson instead of going to her sister, Ebony, or Tiffany "when she was supposedly mad at Mr. Wilson for [previously] trying to have his way with her" (461-62).

Dismissing appellant's outcry, the prosecutor asserted that appellant told Shepard that Wilson had tried to force himself on her only because Shepard was "not going to let her stay[ with him and] she needs him."  The prosecutor also claimed that

appellant's statement that Wilson used force came "a couple of hours" after she initially told Shepard that she "wasn't going to give [Wilson] sex and pay him rent." The court overruled counsel's protest that "There is absolutely no evidence regarding any of this. It's speculation" (455). The prosecutor twice reiterated that appellant "was trying to make excuses" so that Shepard would let her stay, and accused appellant of implicitly threatening Shepard, "don't you try and have sex with me because I'm telling you what happened to Anthony Wilson, I'll do the same thing" (456, 479). The prosecutor maintained that appellant initially confessed murder to Shepard—"she [first] said, I wasn't going to pay him rent and fuck him, so I poked him up" (447); "the 911 call[ and] what she said to Matthew Shepard . . . [showed] that she stabbed [Wilson] because he wanted . . . to kick [her] out now because [she would not] give [him] sex" (481).

Throughout her summation, the prosecutor maintained that Wilson's 911 call revealed "the motive for why [appellant] stabbed him"—it was purportedly proof that he kicked her out and that she was angry her "free ride" was ending (451-52):

> . . . she was pissed that not only was he going to try and have sex with her, but now he is going to kick her out because he says [on the call] I want her out.

> No doubt he told her, look, if you are not going to have sex with me, you gotta get out, and then that's what put her over the edge and that is what made her stab him (453).

> *        *        *

> . . . she was mad because he had the nerve to call the cops, that when he calls the cops he says I want her out, he was kicking her out. . . . He was terminating her ability to stay

33

where she was and give $20 whenever she could to pay for food.  He was going to stop that free trade that she had (468).

\*        \*        \*

. . . it wasn't until after [the 911 call] . . . that she committed this murder, it's because he was trying to kick her out of that house.  The free ride that she was getting all of November was going to end and she killed him (470).

\*        \*        \*

. . . she stabbed him because he wanted her out of the apartment, that's the reason why that flipped her head like, oh, you trying to renegotiate our deal and you want to kick me out now because I won't give you sex, I'm going to kill you now, okay. . . . He doesn't mention anything of [the knife or stabbing on the 911 call] because, I submit to you, that knife wasn't taken out until after she got proof from Anthony Wilson that he was going to try and get her out because he calls 911 and that is what set her off, that is what made her . . . stab him (481-82).

The court overruled counsel's objections that the prosecutor's arguments about the 911 call and motive were based on "absolutely no evidence," and "sheer speculation" (452, 481).

After the court had sustained her objection to defense counsel's "speculati[ve]" suggestion that the stabbing occurred before the 911 call, the prosecutor questioned why Wilson would have called 911 at all if he had tried to rape appellant or was "the one that is being aggressive" (450, 453-54, 467-70).  To the contrary, the prosecutor argued, "What the 911 [call] proves is the only one that was angry here was her.  She is the only one that's acting crazy . . . [and] in an arousal state like that" (454, 467-69).

Next, the prosecutor argued that appellant's admission to taking Wilson's keys, wallet, and phone, and her efforts to "cover up what she did" proved that this was an intentional murder (458-59, 471-72).  The prosecutor suggested that appellant turned off the heat in Wilson's apartment and repeatedly accused appellant of intentionally locking the apartment door with his key when she left "so no one can find him" (458-59, 471).  Again, the court overruled counsel's objections that there was "no testimony the heat was on at any time" and that this was all "a tale of speculation" (458-59).  The prosecutor then told the jury that appellant "says in her statement," "I lock the door, make sure no one can discover what happened--" and, referring to the out-of-state activity on her benefit card, that appellant "admits [i]n her statement that she went to different places because she is not trying to get caught up in what happened there" (460; emphasis added).  The court overruled counsel's repeated objections that this was "not the testimony" (460-61).  In the midst of this argument, the prosecutor referred to appellant's denial of using Wilson's benefit card and remarked, "I am not suggesting to you that it was used by her, but I am suggesting that it was used by someone that wasn't Anthony Wilson because it's going to all different places" after November 29, 2011 (459-60).

Persistently, the prosecutor claimed that appellant had expressly admitted intent to kill, and had implicitly done so by raising self-defense:

> We also know that she intended to kill him, okay, because she, according to her defense, is saying that he was

trying to rape her.  I had to kill him because he was trying to rape her (447).

\*     \*     \*

And we know she wanted to kill him.  According to her defense she is saying he is trying to rape me so I had to kill him, right.  She wants that self-defense, justification because he was trying or allegedly trying to rape her.

So the only thing that you have to decide here, ladies and gentlemen, is whether or not she was acting in self-defense that day.  That is all you have to decide.  Because if she wasn't acting in self-defense, then she's guilty of murder (448-49).

\*     \*     \*

We know at the time she stabbed him she was not being raped.  Forget about that.

So if you are not preventing a rape, then that means the only other thing it could be is you intentionally murdered him (468).

\*     \*     \*

So if it's not self-defense, meaning that she was not being or he wasn't trying to  rape her at the time she actually stabbed him, then it's -- the only thing it could be is murder, intentional murder, that she stabbed him because he wanted her out of the apartment . . . (481).

The court overruled counsel's objection that the express admission was "not really what was said" (447-48).  The prosecutor contended that the justification issue turned on whether the jury believed that Wilson actually attempted to rape appellant, and argued that appellant was "not entitled to that defense," which was "available in very limited circumstances" if a defendant met "very specific" criteria, because the attempted rape

"couldn't possibly be true" (449, 468, 480-81, 483). The court overruled counsel's objections that it was appellant's state of mind that mattered and that the prosecutor should not be "instructing the jury" (449, 483).

Defense counsel lodged 24 objections and the court sustained only one (445-84), when the prosecutor argued that appellant's failure to call the police or 911, or seek medical attention, proved she was hiding something (462-63). The court had sustained 14 of the prosecutor's 19 objections to defense counsel's summation (410-43).

The Charge, Verdict, and Sentence

The People unsuccessfully requested submission of first-degree manslaughter as a lesser included offense on the basis that "there is a reasonable view of the evidence that could support that although she was acting in self defense, she didn't really intend to kill" (401-02).

To convict appellant of second-degree murder, the court instructed the jury that the People had to prove beyond a reasonable doubt that appellant was not justified in stabbing Wilson; that she was justified in using deadly force if she actually and reasonably believed that he was going to rape her; and that the jury could consider whether her outcry to Shepard tended to support her believability (499-500, 504-08). The court also instructed that, to infer guilt from circumstantial evidence, "that inference must be the only one that can be fairly and reasonably drawn from the facts" (492-95). Finally, the court gave a *Molineux* instruction that appellant was not "charged

with any crime" for taking Wilson's property, and that the jury could not consider "[t]hat evidence" as proof of appellant's "propensity or predisposition to commit the crime charged" but only for the "limited purpose" of "complet[ing] the narrative of what happened on the night of the incident" (495-96).

The jury convicted appellant of second-degree murder (524; Ct. Ex. 6).  The court sentenced her to 18 years to life in prison (S. 12).

ARGUMENT

POINT I

> APPELLANT'S JUSTIFICATION DEFENSE WAS
> CORROBORATED BY A DISINTERESTED WITNESS
> AND CONSISTENT WITH OBJECTIVE EVIDENCE,
> AND THE PEOPLE'S CIRCUMSTANTIAL CASE WAS
> LEGALLY         INSUFFICIENT         TO        DISPROVE
> JUSTIFICATION BEYOND A REASONABLE DOUBT,
> ALSO  MAKING  THE  VERDICT  AGAINST  THE
> WEIGHT OF THE EVIDENCE.

The People's case rested on a series of emotional statements appellant made to police when arrested, in which she admitted stabbing Wilson, and which illustrated appellant's reasonable fear that Wilson was about to rape her.  Appellant repeatedly and consistently explained that she had no romantic relationship with Wilson and stayed with him out of desperation after losing her previous place to live.  A couple days before the stabbing, appellant woke up one night to find him touching her inappropriately and she left the apartment with no intention of sleeping there again.  But when she got an interview near the apartment, she decided to spend the night since her clothes were still

there and Wilson, who had called her 25 times in the interim, was being nice.  Any kindness he showed did not last long—appellant described him once again waking her up by touching her stomach under her shirt, and then turning physically and verbally abusive when she told him to stop and tried to leave as he kept saying he was going to "get some pussy tonight."  She ultimately stabbed him after he had punched her in the face, was holding her toward the floor while restraining her head with her hood, and would not let her go despite her effort to get up.

Appellant's statements were the only direct evidence introduced by the People and wholly proved justification.  The only witness who saw appellant that night corroborated that she said Wilson tried to rape her.  Wilson's autopsy report revealing extreme intoxication and cocaine byproducts corroborated appellant's description of him as a drug user and made her fear all the more reasonable.  And none of the People's circumstantial evidence showed that appellant was not justified: the forensic evidence, phone records, and 911 call either corroborated or did not contradict her; the sole witness who did contradict her (merely about her relationship with Wilson) was unbelievable; and purported consciousness of guilt evidence via flight and theft of Wilson's phone and wallet was understandable and, in any event, the weakest sort of evidence.  Because the People failed to disprove justification beyond a reasonable doubt, appellant's conviction should be reversed and the indictment dismissed.  U.S. Const., Amend. XIV; N.Y. Const., Art. I, § 6; *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358, 364 (1970).  At the very least, the verdict was against the

weight of the credible evidence.  C.P.L. § 470.15(5); *People v. Romero*, 7 N.Y.3d 633, 643 (2006); *People v. Bleakley*, 69 N.Y.2d 490 (1987).

To sustain appellant's conviction for second-degree murder, the People had to prove beyond a reasonable doubt both that she intended to kill Wilson, P.L. § 125.25(1), and that she was not justified.  *People v. McManus*, 67 N.Y.2d 541, 545-47, 549 (1986). Appellant was justified in using deadly force if she actually and reasonably believed that Wilson was trying to rape her.  P.L. § 35.15(2)(b); *People v. Goetz*, 68 N.Y.2d 96, 105-15 (1986); *McManus*, 67 N.Y.2d at 549.

The only direct evidence of what happened between Wilson and appellant was her explanation, which established justification.  She said that she stabbed Wilson because he told her he was going to "get some pussy" and then blocked her from leaving his apartment and physically attacked her.  He wrapped a belt around his hand and would not answer when she asked, "Are you going to hit me?"; punched her cheekbone near her eye; and pulled her sweater hood over her head and bent her over so she was facing the ground while he continued to hit her in the back.  She struggled to get up but was unable to push Wilson off.  Only then did she stab him, and even then he did not release her immediately.  Appellant gave the same detailed explanation to both the police and A.D.A. Purce about Wilson's previous attempt to initiate sex and the way the stabbing unfolded.  And in her videotaped interview, appellant became so distressed when discussing the attempted rape and stabbing that Purce offered her a break and

then ended the interview after she said that she wanted to stop talking and spent several minutes weeping.

In contrast to this powerful direct evidence of justification, the People's theory of the case, that appellant stabbed Wilson because he kicked her out of his apartment when she refused his mere request to have sex (451-52, 468, 470, 473, 481-82), was based on sheer speculation, from circumstantial evidence that fell far short of proving appellant's guilt beyond a reasonable doubt.  Circumstantial evidence is that which "never proves directly the fact in question." *People v. Bretagna*, 298 N.Y. 323, 325 (1949) (quotation omitted).  Although circumstantial evidence is evaluated the same on appeal as any other evidence, it still "may not be based upon conjecture, supposition, suggestion, speculation or upon other inferences." *People v. Leyra*, 1 N.Y.2d 199, 206 (1956) (quotation omitted).  Here, the People even acknowledged that "there is a reasonable view of the evidence that could support that . . . [appellant] was acting in self defense" (401-02), and their circumstantial evidence was entirely consistent with that. Thus, the jury could not have rationally excluded justification beyond a reasonable doubt, even when viewing the evidence in the light most favorable to the People. *Marin*, 65 N.Y.2d at 742.

First, Shepard—the only witness from the evening at issue—corroborated appellant's explanation, testifying that she called him for help from Wilson's phone, which the phone records confirmed.  Appellant "sounded stressed" when she called and told Shepard in person that she stabbed Wilson because he "tried to force his self

on her" (350-51, 364-65, 367-68). She also told Shepard that Wilson hit her during an "altercation," and Shepard saw swelling on appellant's face (352-53, 355, 366). Shepard could tell that appellant was upset, repeatedly asking her "what was going on" and "what was wrong" (351-52, 367-68).[5]

The presence of appellant's blood in Wilson's bathroom further corroborated her statements, as she told police that she ran into the bathroom after the stabbing. Wilson's toxicology report showing a blood alcohol content of .20 percent and residue of a cocaine byproduct and a cocaine contaminant corroborated appellant's description of him as a crack user. It also showed the reasonableness of appellant's belief that deadly force was necessary to prevent him from raping her, especially considering he was taller than her, twice her age, and outweighed her by 40 pounds. Further supporting that conclusion was Wilson's psychiatric history of violent hallucinations, substance abuse, noncompliance with prescribed psychiatric medication, and history of domestic violence, which the court unfairly precluded defense counsel from exploring (Point III, *post*). *Cf. People v. Reed*, 40 N.Y.2d 204, 209-10 (1976) (dismissing for People's failure to disprove justification and noting it was "quite significant" that court precluded defendant's doctor from testifying she suffered from amnesia).

---

[5] It is possible that the jury could not fully appreciate the corroborative aspect of Shepard's testimony after counsel impeached his credibility, not knowing that Shepard would reveal a detailed rape outcry supporting justification because the court unfairly limited counsel's opportunity to speak with Shepard before he testified (Point II, *post*).

The remaining evidence simply did not exclude justification. Wilson had no defensive wounds and most wounds likely were inflicted in rapid succession according to the medical examiner. This was consistent with appellant's statement that, after saying he would "get some pussy" that night and acting "crazy," Wilson held her while she stabbed him and would not let go. The jury could only speculate about Wilson's nudity and the blood and fecal smears on the apartment floor, since no evidence shed light on these facts. Indeed, the prosecutor urged the jury to engage in such speculation, arguing that appellant had removed Wilson's clothing to "support[] her story" of rape and tried to clean up the blood and feces that fell out of his jeans (471-77). But the medical examiner's testimony showed innocent explanations: none of the wounds were "instantaneously lethal" (257-58) and Wilson could have lived for twenty minutes, and while serious injuries could cause someone to defecate, the staining on Wilson's jeans could have been diluted feces or urine. Thus, it was equally plausible that Wilson soiled himself, took his own jeans off and tried himself to clean up the mess. Critically, there was no reason to expect Wilson to behave typically when he was so intoxicated and possibly under the influence of cocaine.

Wilson's 911 call, aside from being inadmissible hearsay (Point IV, *post*), actually added little to the People's case despite their unfair reliance upon it. The prosecutor urged the jury to believe that the fact Wilson wanted police to come to his apartment proved he was not trying to rape appellant, that she "was the only one that[ was] acting crazy," and that the call showed appellant had motive to kill Wilson because he kicked

her out (450-54, 467-70, 481-82).  First, it is not a given that Wilson's statement was true.  On the recording, with no background noises, Wilson said, "I got this girl in my house and I don't know what's wrong with her, she's acting all crazy and I want her out of my house" (Peo. Ex. 42).  As Wilson's blood alcohol content was two-and-a-half times the legal limit and he could have been high on cocaine, there is no reason to presume that his statement was trustworthy.  This likelihood becomes even slimmer when considering his psychiatric history of hallucinations and hearing voices along with the knowledge that he was not compliant with medication that may well have been prescribed to treat psychosis—facts improperly withheld from the jury (Point III, *post*).  *E.g.*, *People v. Baranek*, 287 A.D.2d 74, 80 (2d Dep't 2001) (complainant's history of delusions relevant to believability).

Assuming that Wilson was referring to something real rather than a hallucination while in an alcohol- and drug-fueled rage, the 911 recording did not contradict appellant's statement and merely invited more speculation.[6]  Wilson never described what appellant purportedly was doing, did not sound afraid, never said she threatened him or acted violently, and evidently changed his mind about wanting police to remove her since he hung up without saying where he lived.  According to appellant, Wilson insulted her and said other "crazy shit" while pacing for ten to fifteen minutes before

---

[6]  It also made no sense.  If appellant was so desperate to stay, killing Wilson certainly did not accomplish that goal.

he actually attacked her.  He may well have called 911 during that time, which would be consistent with the phone records showing that appellant began using Wilson's phone twenty minutes after the call.  Alternatively, he could have called after being stabbed as defense counsel suggested.  Or, he could have let appellant use his phone after whatever (if anything) led to the 911 call, and the stabbing could have happened hours later like appellant guessed in her statement.  The point is, there is no way to know what exactly happened without speculating.

Shakeema Fortune's inconsistent testimony did not contradict appellant's statement that she and Wilson had no sexual relationship.  Fortune claimed Wilson introduced a woman named Renee, ostensibly appellant, as his girlfriend a week or two before Thanksgiving.  The phone records undermined Fortune's claim.  Despite being a heavy user of her phone, appellant never once used it to call Wilson, and he first called her phone four days before his death.  That he called her 25 times between November 26th and 28th corroborated her statement that he kept calling her after she left his apartment to stay with her sister.  Additionally, appellant gave Shepard Wilson's phone number instead of her own, so that Shepard's girlfriend would not know he was talking to another woman.  This would make no sense if appellant and Wilson had a romantic relationship.  In any event, being Wilson's girlfriend was a far cry from the People's closing argument that appellant was essentially a prostitute who accepted a place to sleep in lieu of cash (451-52, 461-62, 468, 472-73).  And even if she were, contrary to the prosecutor's offensive and outrageous comments, appellant could still be raped.

45

Additionally, Fortune's foggy memory was unreliable because she forgot or did not know things that she had more reason to remember than how Wilson introduced a woman she met in passing years earlier. She and Wilson were friends for over a decade and "like brother and sister," and yet she did not remember his age. Nor could she remember how often they saw each other, differing vastly on direct and cross-examination from seeing him four to five times a week during the two years preceding his November 2011 death, to "going out" with him in May and June of 2011, five to six months before he died. Fortune also claimed that she never saw Wilson drunk or "stoned" in the history of their long friendship. This was patently unbelievable given the toxicology report corroborating appellant's statements about his drug problem and ongoing treatment. Fortune either lied about Wilson's substance abuse, forgot, or did not know Wilson as well as she maintained. Whatever the reason for Fortune's implausible testimony, it did not outweigh appellant's otherwise uncontradicted statements.

The last vestiges of the People's case were appellant's admission that she fled with Wilson's cell phone, wallet, and keys, and their baseless closing argument that she tried to "cover up" what she had done by locking Wilson in his apartment with no heat so that no one could find him (458-59, 471). There was not a shred of evidence that appellant locked Wilson's door and, in fact, prosecution witness Shepard testified that appellant wanted to go back to check on Wilson. But Shepard refused to accompany her, and appellant's reluctance to go alone is unsurprising after such a traumatic

46

altercation.  That appellant was traumatized is apparent from her distraught affect in the video, her statement that she left in a fog, and Shepard's testimony that she sounded stressed on the phone and his compulsion to keep asking her what was wrong.

Moreover, all of the circumstances show that appellant was financially desperate—from the fact that she went back to Wilson's apartment at all to her calling Shepard, whom she barely knew, and her previous statement to Shepard that she stayed with Wilson out of necessity (347).  Taking Wilson's property was merely a crime of opportunity and, indeed, the People never suggested that theft was appellant's motive. Fear of not being believed easily explains why appellant fled.  *See People v. Moses*, 63 N.Y.2d 299, 308 (1984) ("an innocent person may attempt to extricate himself from a situation by denying incriminating evidence even though he knows it can be truthfully explained or by fleeing . . . because of fear of wrongful conviction").

At most, appellant's disappearance and theft amounted to consciousness of guilt, which cannot sustain this conviction because there was no tangible evidence of guilt. *See Leyra*, 1 N.Y.2d at 208-10; *People v. Fortunato*, 70 A.D.3d 851, 853 (2d Dep't 2010) (defendant's flight and lies about whereabouts on night of crime were entitled to "little weight").  The jury may have given such evidence undue weight, however, since the People inflated its importance by engaging in a mini trial and producing a welfare fraud investigator and records that suggested appellant used Wilson's benefit card and proved appellant left the state, and falsely argued in summation that she admitted doing so to avoid "get[ting] caught up in what happened" (460).  Notably, the court never told the

jury that evidence of flight may be "only of slight value" and cannot be the sole basis of guilt. *See* C.J.I. 2d (N.Y.) (Consciousness of Guilt). The benefit evidence also impugned appellant's credibility by inviting the jury to infer that she had lied to police about not using Wilson's card. To let the jury speculate about this was particularly unfair because the uncharged theft had no probative value, and the court should have suppressed appellant's statement about Wilson's property and deviating about going to Tiffany instead of Ebony (Point V, *post*).

Defense counsel preserved appellant's sufficiency claim by his detailed, factual motion to dismiss, arguing that her statements showed that she was justified in stabbing Wilson to prevent rape, and any contrary conclusion was "entirely speculative" (397-401).

In sum, as counsel argued, appellant's statements established justification and none of the People's circumstantial evidence demanded a contrary conclusion. Accordingly, because "conjecture has filled the gaps left open by the evidence, and the presumption of innocence has yielded to a presumption of guilt," this Court should reverse appellant's conviction and dismiss the indictment. *Leyra*, 1 N.Y.2d at 210.

<u>POINT II</u>

THE COURT VIOLATED APPELLANT'S RIGHTS TO
DUE PROCESS, TO PRESENT A DEFENSE, AND TO
THE EFFECTIVE ASSISTANCE OF COUNSEL BY
REQUIRING DEFENSE COUNSEL TO INTERVIEW
AN AMENABLE KEY PROSECUTION WITNESS IN
THE PRESENCE OF THE PROSECUTOR.

Matthew Shepard was produced and detained in the courthouse as a material
witness for the People, who opened by introducing him as a key witness who would
testify that appellant admitted stabbing Wilson because he wanted to have sex with her.
Although the court properly granted defense counsel's request to speak to Shepard
before the People called him to the stand, and Shepard agreed to an interview, the court
refused to allow defense counsel to interview him alone and ruled that the prosecutor
could insist on being present.  Rightfully unwilling to conduct a witness interview under
the watchful eye of his adversary, defense counsel was unable to effectively prepare to
defend appellant.  The interference with counsel's attempt to interview Shepard violated
appellant's rights to due process, to present a defense, and to the effective assistance of
counsel.  U.S. Const., Amends. V, VI, XIV; N.Y. Const., Art. I, § 6.

A defendant, through his attorney, has a due process right to speak with a willing
prosecution witness as part of investigating potential defenses.  *People v. Eanes*, 43
A.D.2d 744, 744 (2d Dep't 1973) ("We know of no rule or law which prohibits defense
counsel from interviewing a person who has appeared at the request of the
prosecutor"); *Schulz v. Marshall*, 528 F. Supp. 2d 77, 98 (E.D.N.Y. 2007), *aff'd*, 345 Fed.

Appx. 627 (2d Cir. 2009) ("New York State courts have consistently held that prosecutors may not refuse defense counsel requests for interviews with prosecution witnesses, and that courts will enable these interviews if necessary"); *see also Washington v. Texas*, 388 U.S. 14, 17-19, 23 (1967) (defendant has Sixth Amendment right to "compulsory process for obtaining witnesses in his favor"; reversing when state statutes prevented defendant from calling charged accomplice).    As the American Bar Association ("ABA") has long recognized, "A prosecutor should not discourage or obstruct communication between prospective witnesses and defense counsel[, or] advise any person or cause any person to be advised to decline to give to the defense information which such person has the right to give."  ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION 47, § 3-3.1(d) (3d ed. 1993), *available online at* https://www.americanbar.org/content/dam/aba/public cations/criminal_justice_standards/prosecution_defense_function.authcheckdam.pdf. In commentary explaining its position, the ABA remarked that witnesses are not partisan and "do not 'belong' to either party."  *Id.* at 50.

Indeed, as defense counsel argued, New York courts have acknowledged <u>each</u> side's equal common law right to access to the other's witnesses.  *See People v. Harris*, 84 A.D.2d 63, 102-03 (2d Dep't 1981) ("not only was the prosecutor entitled to attempt to speak to a defense witness, but any effort by defense counsel to prevent [this] . . . might well have constituted an ethical violation"); *People v. Doe*, 178 Misc. 2d 534, 536 (Sup. Ct., Monroe Cty. 1998) ("the prosecutor possesses the right to interview witnesses

for the defendant just as witnesses for the prosecution must be made available for the defendant's counsel to interview") (citations omitted); *People v. Paskowitz*, 151 Misc. 171, 171-72 (Cty. Ct., Bronx Cty. 1934) ("[n]o authority . . . why [detained material] witnesses should be held incommunicado" from defense counsel, and "there can be no question but that the defendant's counsel would have the opportunity of approaching them and interrogating them" if they were not in custody).

Here, defense counsel's legitimate procurement of an interview with an amenable Shepard became a hollow victory once the court ruled that the prosecutor had a right to be present during that interview. No New York State law supports this, it is at odds with the longstanding prosecution ethical norms prohibiting obstruction of defense access to prosecution witnesses—i.e., that a prosecutor "may not make his or her presence a condition of holding the interview," ABA STANDARDS, *supra*, at 50—and has been condemned by courts including the Second Circuit. In *Int'l Bus. Machines Corp. v. Edelstein* ("*IBM*"), the Second Circuit granted defendant IBM's petition for a writ of mandamus for relief from the district judge's pre-trial ruling that interviews with adverse witnesses had to be in the presence of opposing counsel or a court stenographer who would provide the transcript to the judge. 526 F.2d 37, 41-44 (2d Cir. 1975). The Court held that the judge's ruling was "contrary to time-honored and decision-honored principles, namely, that counsel for all parties have a right to interview an adverse party's witnesses (the witness willing) <u>in private, without the presence or consent of opposing counsel</u> and without a transcript being made." *Id.* at 42 (emphasis added). Following

51

the Supreme Court's lead, the Second Circuit explained that the "legitimate need for confidentiality" serves "the goals of maximizing unhampered access to information and insuring the presentation of the best possible case at trial." *Id.* at 42-43 (discussing *Hickman v. Taylor*, 329 U.S. 495 (1947)).  The Second Circuit also "wholeheartedly" endorsed the view espoused in *Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966), that a prosecutor's insistence that witnesses not speak with defense counsel unless in his presence unfairly "interfere[d] with the preparation of the defense." *IBM*, 526 F.2d at 43-44.

The weight of authority against the prosecutor's position in appellant's case is based on sound principles.  Like counsel said, it is "intimidating" to have a prosecutor stand guard (336).  Her presence could have affected Shepard's candor since he could have feared, especially as an unwilling witness appearing by court order, that the prosecutor had the power to penalize him if he changed or even supplemented his account in ways the prosecutor did not like. *Cf. People v. Earle*, 17 Misc. 2d 157, 157 (Ct. Gen. Sess., N.Y. Cty. 1957) (People's request to instruct their witnesses that they need not speak with defense counsel, "if carried out, would be fraught with much danger in that it could deprive a defendant of his basic constitutional rights to freely and fully prepare his defense"); *see Webb v. Texas*, 409 U.S. 95, 95-98 (1972) (reversing because lengthy judicial admonishment about perjury likely contributed to defense witness's change of heart about testifying).  Moreover, counsel should have been able to fully explore Shepard's recollection without worrying about providing additional fodder for

the People's case.  As counsel noted, affording privacy posed no unfairness to the prosecutor, who "would be free" to ask Shepard what they discussed (339).  Notably, this was not a situation in which defense counsel wished to privately interview someone who was represented by his or her own attorney on a pending/potential criminal matter.

While no New York State precedent addresses the precise scenario at issue in this case, the Court of Appeals has analogously held that "suppressing" or "withholding" of a witness's exculpatory testimony violates an accused's constitutional right to due process.  *People v. Sapia*, 41 N.Y.2d 160, 165 (1976) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)) (affirming prosecutor's refusal to grant immunity to defense witness "inasmuch as defendant was apprised of the identity of the informer and afforded an opportunity to interview him").  *See also People v. Turner*, 45 A.D.2d 749, 750 (2d Dep't 1974).  Other New York courts have recognized that similar prosecutorial obstruction impairs the right to present a defense.  *See People v. Martinez*, 15 Misc. 2d 821, 823-24 (Cty. Ct., Sullivan Cty. 1959) (granting defendant's motion to interview detained material witnesses, supported by "weight of authority," in order to "fully, freely and properly prepare his defense"); *Earle*, 17 Misc. 2d at 157; *Paskowitz*, 151 Misc. at 171-72 (no reason why defense counsel, "desirous of ascertaining the truth," could not interview detained material witnesses).

It also interferes with the right to counsel.  *IBM*, 526 F.2d at 43-44 (agreeing that impeding defense counsel's ability to "search for the truth" by freely interviewing adverse witnesses violates right to effective assistance); *Schulz*, 528 F. Supp. 2d at 95-

99, *aff'd*, 345 Fed. Appx. at 627-30 (defendant received ineffective assistance because counsel did not request court's help to permit interview of key witness when prosecutor obstructed access); *see also Herring v. New York*, 422 U.S. 853, 857-65 (1975) (right to effective assistance of counsel requires "that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process").

Thus, the court's error here was of constitutional dimensions, and inexcusable as it both prejudiced the defense and it cannot be said that "there is no reasonable possibility [it] might have contributed to [the] conviction and . . . was thus harmless beyond a reasonable doubt." *People v. Crimmins*, 36 N.Y.2d 230, 237 (1975). The evidence that appellant was <u>not</u> justified was far from "overwhelming." *Id.* The key issue was justification, and Shepard was the only witness who saw appellant following the incident and would either contradict or corroborate her statements setting forth justification. Shepard's direct testimony was that appellant told him she was not going to pay rent and have sex with Wilson, which the People spun in their opening statement as meaning that Wilson merely "wanted" to have sex with appellant, but did not attempt to rape her (JS. 303-04). On cross, however, defense counsel elicited—clearly unexpectedly, based on his and the court's reaction—that appellant actually told Shepard, Wilson "tried to take it, tried to force his self on her" (367-68). Counsel may have been able to elicit additional exculpatory evidence given a fair and meaningful opportunity to interview Shepard, rather than having to avoid asking questions to which

he did not know the answers for the first time in front of the jury.  Moreover, counsel initially sought to impeach Shepard's credibility by highlighting his convictions and drug problems (362-66).  Had counsel known that Shepard would fully support appellant's account of being the victim of a violent, forcible, attempted rape, he surely would have done things differently.  Since Shepard's testimony went straight to the heart of the case and the court's ruling prevented counsel from adequately preparing to cross-examine him, the ruling was not harmless beyond a reasonable doubt.

Counsel amply preserved this claim by his specific arguments and motion for a mistrial after the court expressly ruled that the prosecutor had a right to be present (335-41).  C.P.L. § 470.05(2); *People v. Prado*, 4 N.Y.3d 725, 726 (2004).

Thus, appellant's conviction should be reversed and a new trial ordered.

<u>POINT III</u>

THE COURT VIOLATED APPELLANT'S RIGHT TO
PRESENT A DEFENSE BY PRECLUDING HER
FROM: USING MEDICAL RECORDS TO SHOW THE
DECEASED'S HISTORY OF PSYCHOSIS AND
LONGTIME SUBSTANCE ABUSE; EXPLORING
WHETHER HE WAS MORE LIKELY TO
EXPERIENCE VIOLENT HALLUCINATIONS WHEN
INTOXICATED AND OFF HIS MEDICATION, AS
ON THE NIGHT OF THE STABBING; CROSS-
EXAMINING PROSECUTION WITNESSES ABOUT
HIS SUBSTANCE ABUSE; AND ADDUCING
EVIDENCE OF SPECIFIC ACTS OF DOMESTIC
VIOLENCE.

Appellant confessed to stabbing Wilson, but set forth a justification defense,

explaining that she did so to prevent him from forcibly raping her.  That night, she said,

he was saying "crazy" things and became violent.  Medical records showed Wilson

suffered from depression "with psychotic features," heard voices and had violent

hallucinations of harming others, and had a prescription for Seroquel—a drug often

used as an antipsychotic.  Wilson's toxicology report detected alcohol and cocaine, but

not Seroquel.  Inexplicably, however, the court opined that Wilson had no psychosis

and precluded counsel from exploring whether Wilson's mental illness, Seroquel

noncompliance, and substance abuse cumulatively made it more likely that Wilson

attacked appellant.  The court also precluded counsel from asking Wilson's sister about

his alcohol abuse, or using the medical records' details of Wilson's substance abuse

problem to "rebut" Fortune's claim that, during their long friendship, she never drank

with Wilson or saw him drunk or "stoned."  Finally, the court denied counsel's request

for disclosure of the details of allegations that Wilson physically abused the mother of his child and precluded cross-examination on this subject.  By hamstringing appellant's justification defense, and restricting her right to question the weight and credibility of Wilson's sister and friend who essentially testified about his good character, the court deprived appellant of a fair trial, and her rights to present a defense and confrontation. U.S. Const., Amends. VI, XIV; N.Y. Const., Art. I, § 6.

A.    <u>Preclusion of Wilson's Psychiatric and Substance Abuse History</u>

The right to present a defense is "among the minimum essentials of a fair trial," *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (internal citations omitted), and "an essential component of procedural fairness."  *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). *See also People v. Hudy*, 73 N.Y.2d 40, 56-58 (1988), *abrogated on other grounds by Carmell v. Texas*, 529 U.S. 513 (2000); *People v. Gibian*, 76 A.D.3d 583, 585 (2d Dep't 2010).  This includes the right to "present the defendant's version of the facts," as contrasted with the prosecution's, which is critical for the defense to do because the jury's ultimate job is to "decide where the truth lies."  *Washington*, 388 U.S. at 19; *see also People v. Carroll*, 95 N.Y.2d 375, 385 (2000) ("Just as the People are allowed to rebut key assertions of the defense . . . the defendant also is allowed to attempt to disprove the People's theory and rebut their key assertions").  Significantly, the right to present a defense is so central to our criminal justice system that "a defense witness's testimony should never be prospectively excluded as irrelevant unless the offer of proof reveals that the evidence

is offered in palpable bad faith." *People v. Rouff*, 163 A.D.2d 338, 339 (2d Dep't 1990). *See also People v. Gilliam*, 37 N.Y.2d 722 (1975), *rev'g on dissenting mem. below*, 45 A.D.2d 744 (2d Dep't 1974).

A defendant charged with homicide, in particular, may introduce evidence that the deceased was a "quarrelsome, vindictive, or violent" person. *People v. Miller*, 39 N.Y.2d 543, 548-49 (1976) (quotations omitted). Such evidence "enables [the accused] to judge of the danger and aids the jury in deciding whether [she] acted in good faith." *Id.* at 549. In other words, "it shows the state of [her] mind as to the necessity of defending [her]self." *Id.*

Objective evidence that demonstrates the deceased was "exhibiting aberrant behavior sufficient to cause fear and warrant a forceful response" is also admissible, even if unknown to the defendant, as this helps the jury to "better judge the reasonableness of the defendant's conduct." *People v. Chevalier*, 220 A.D.2d 114, 116-18 (1st Dep't 1996), *aff'd.* 89 N.Y.2d. 1050, 1053 (1997); *see also People v. Frazier*, 6 A.D.3d 455, 456 (2d Dep't 2004). A defendant is not limited to live testimony but, rather, may submit documentary proof of a victim's character pertaining to justification. *Miller*, 39 N.Y.2d at 551-53. "A basic sense of fairness mandates that the defendant be permitted to substantiate his claim." *Id.*

Here, defense counsel had medical records demonstrating that Wilson suffered from psychiatric problems including violent hallucinations of harming others, heard voices, was diagnosed with depression "with psychotic features," and was prescribed

Seroquel, a drug commonly used as an antipsychotic, which he was not taking at the time of his death.  The records also showed a significant history of abusing alcohol and cocaine.  The court's ruling that counsel could not use the records, because they would "dirty the victim" and, "if anything, it's the alcohol" that affected Wilson's behavior that night (59-61), unfairly restricted appellant's right to present a defense.

Appellant clearly was aware of Wilson's substance abuse.  She told police that Wilson was in a drug program, that they argued because she would not help feed his habit, and that "when he smoked crack he became a completely different person" (Scandole: 274; Peo. Ex. 56).  The medical records, meanwhile, showed that Wilson had abused alcohol so severely that "alcoholic ulcers" led to a major stomach surgery and had claimed to his doctor(s) that he "no longer" used cocaine, indicating he previously had (53-54, 59, 146-47).   Appellant undoubtedly was aware of Wilson's psychiatric issues, given that she had been living with him for about a month and his prescription bottles were in plain view.  Notably, appellant told police that he was saying "crazy shit" while pacing and blocking her from leaving (Peo. Ex. 56).

Aside from appellant's subjective awareness of it, Wilson's pattern of substance abuse and his psychiatric history were clearly "relevant on the issue of whether it was objectively reasonable for [appellant] to perceive him as dangerous." *Frazier*, 6 A.D.3d at 456 (court erred in precluding evidence that victim had PCP in blood at time of death) (emphasis added); *accord. Chevalier*, 220 A.D.2d at 114-16 (same); *see People v. Rivera*, 138 A.D.2d 169 (1st Dep't 1988) (denial of access to psychiatric records deprived

defendant opportunity to fully prepare case and present justification defense because victim's psychological history was relevant to whether he was initial aggressor).

Thus, counsel was wholly right to want to explore, through Wilson's medical records, doctor, or an expert, whether Wilson's Seroquel noncompliance and extreme intoxication increased the likelihood of experiencing hallucinations and/or acting aggressively. The court improperly curtailed counsel's investigation despite his good-faith basis. It summarily decided that the medical records were not probative, arguing with defense counsel about Wilson's diagnosis and symptoms—despite the medical records themselves and the People agreeing with counsel's representations—and baselessly opining that Seroquel was prescribed as an antidepressant instead of an antipsychotic (53-61). *See Baranek*, 287 A.D.2d at 80 (court "erred in precluding the defense from offering expert testimony regarding the complainant's psychiatric condition"); *Frazier*, 6 A.D.3d at 456 (same, as to "expert testimony concerning the effects of [PCP] on a person's behavior").

In the face of the court's ruling, counsel asked the court to, at a minimum, conduct an in camera interview of Wilson's doctor to ascertain the purpose of the Seroquel prescription. The court refused even this, when it was clearly the proper, minimal solution. *See People v. Knowell*, 127 A.D.2d 794, 794 (2d Dep't 1987) (court erred in refusing in camera inspection of psychiatric records of key prosecution witness when defendant's offer of proof, detailing history of psychiatric problems, established "a reasonable likelihood" that the records were material); *see also People v. Arnold*, 177

A.D.2d 633, 634-35 (2d Dep't 1991) (when defendant seeks access to witness's psychiatric records, after sufficient showing, "proper procedure is for the court . . . to order production of the records and to inspect them in camera").

Another basis for admitting Wilson's psychiatric history and potential reaction to alcohol and cocaine was that the People put his credibility in issue. They used his 911 call that a woman was "acting all crazy" and he wanted her out of his house (Peo. Ex. 42), to argue that it was appellant who suddenly became violent that night (454, 467-69). The Court of Appeals has long recognized the critical impact testimony regarding a witness's mental condition may have on the determination of guilt or innocence. In *People v. Rensing*, 14 N.Y.2d 210 (1964), the Court reversed a first-degree murder conviction when, after trial, the defense learned that the testifying codefendant suffered from an undisclosed, longstanding mental illness. The Court held that the jury should have been told of his paranoid schizophrenia in order to properly "assess and evaluate the testimony given by him." *Id.* at 213-14. *See Baranek*, 287 A.D.2d at 79-80 (barring introduction of complainant's history of delusions, which was relevant to her ability to perceive and recall events, violated right to present a defense); *Knowell*, 127 A.D.2d at 794 (court erred in barring cross-examination of key witness about his mental condition despite history of psychiatric problems).

Evidence of Wilson's substance abuse and psychiatric history would not have been cumulative. The jury knew nothing at all of Wilson's history of violent hallucinations and hearing voices, so they could not consider whether this supported

appellant's version of events, *i.e.* that Wilson was the one initiating violence and acting "crazy" that night.  If Wilson's drinking and using cocaine—especially while off his medication—did, in fact, risk triggering delusions or aggression, that was not before the jury either.  Even with respect to his substance abuse, the jury had only appellant's statements and was entitled to question her credibility as an interested witness (*see* Charge: 497-98).   And although the toxicology report corroborated appellant by proving that Wilson had at least used cocaine somewhat recently and showed that he was very drunk, his medical records would have fully supported appellant's description of Wilson as a drug user in a program, when her credibility was the most important issue. *See Fuentes v. T. Griffin*, 829 F.3d. 233, 252-53 (2d Cir. 2016) (granting habeas relief when People failed to turn over psychiatric records which "would have revealed a disorder that both provided a basis for questioning [the complainant's] credibility and provided further support for [defendant's] version of the events").

Further hampering appellant's defense, the court restricted defense counsel's cross-examination about Wilson's psychiatric prescription and his substance abuse. Cross-examination, critical to the right of confrontation, is improperly curtailed when relevant and important facts bearing on the trustworthiness of crucial testimony is kept from the jury.  *See Olden v. Kentucky*, 488 U.S. 227, 231 (1988); *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986); *see also People v. Ashner*, 190 A.D.2d 238, 246-247 (2d Dept. 1993).   Here, the court exceeded any legitimate discretion it had to limit cross-examination by precluding counsel from asking the medical examiner about the use of

Seroquel (255-56, 262-63), asking Wilson's sister if she was aware that he "abuse[d] alcohol" (74-75), and asking Fortune if Wilson ever told her about "health issues he might have" (142).

Moreover, the testimony that counsel <u>was</u> permitted to elicit was inadequate to explore how Wilson behaved when drunk, which went to the likelihood of appellant's version of events and reasonableness of her fear. Counsel knew that Wilson underwent stomach surgery due to alcoholic ulcers but Wilson's sister was unaware of the surgery, so counsel could not ask her about its cause. Fortune, meanwhile, claimed she had known Wilson for twelve to thirteen years and flatly denied ever seeing him drink alcohol. Counsel should have been able to use the records to show her testimony was incredible given his history and to ask her about his behavior when drunk, or to undermine her claim that they were like brother and sister.

B.    Specific Acts of Violence

The court also erred in summarily preventing counsel from proving specific acts of violence by Wilson, namely, that he had been physically abusive toward the mother of his child. A defendant raising a justification defense is not limited to general character evidence but may also show the deceased's specific violent acts. *Miller*, 39 N.Y.2d at 551; *People v. White*, 73 A.D.2d 865, 865 (2d Dep't 1980). Here, despite defense counsel's good-faith basis, the court prevented him from exploring allegations of Wilson's domestic violence, either in the records or through cross-examination, and

even refused to grant counsel's request for disclosure of relevant Domestic Incident Reports.

That the incidents involved allegations rather than convictions was no basis to preclude inquiry or deny disclosure. *See People v. Rocco*, 170 A.D.2d 626, 627 (2d Dep't 1991) (court committed reversible error by precluding cross-examination of complainant on pending charges); *People v. Thomas*, 130 A.D.2d 692, 693 (2d Dep't 1987) (People conceded that court erred by precluding defense counsel from inquiring into charges pending against complainant); *see also People v. Gissendanner*, 48 N.Y.2d 543, 547-50 (1979) ("access must be afforded to otherwise confidential data relevant and material to the determination of guilt or innocence").

Since appellant was living with Wilson, there was a good chance she knew about the underlying incidents under investigation. *See Miller*, 39 N.Y.2d at 551. But, in any event, there is no need to prove that she did because specific acts of violence would still be probative as to whether Wilson was the initial aggressor regardless of her knowledge. *See Commonwealth v. Adjutant*, 824 N.E.2d 1, 6-7 (Mass. 2005) (federal courts and nearly all states have adopted this rule); *see also People v. Watson*, 20 N.Y.3d 1018, 1019-20 (2013) (declining to revisit *Miller* and follow national trend because issue not properly presented by case; in shooting, defendant mistakenly believed victim had gun and jury could not possibly conclude that victim was initial aggressor regardless of propensity for violence).

\*     \*     \*

Preventing defense counsel from fully exploring these issues relevant to the justification defense was not harmless.  This case completely turned on Wilson's behavior on the night of his death and whether it was reasonable for appellant to believe he would rape her.  The information counsel wanted to admit would have given the jury several reasons to credit appellant's justification defense.  Evidence that he was prone to violent hallucinations of harming others and hearing voices was relevant to the likelihood that he was acting violently, and had Wilson's doctor said that Seroquel was prescribed to treat his psychosis and hallucinations, it was extremely relevant that he was not taking it.  And, if Wilson's doctor or an expert said that substance abuse exacerbated his symptoms, that made it all the more likely that he was having a psychotic episode at the time of his death.  Finally, if Wilson had previously harmed his daughter's mother, it would have been yet another valid reason for appellant's fear and probative of whether he was the initial aggressor.

The details of Wilson's substance abuse also would have corroborated appellant's statements that Wilson was a habitual crack user in a drug program, which was a source of conflict because he asked her for money to buy drugs.  Not only would this have supported appellant's credibility, but telling the jury about the extent of Wilson's substance abuse would have undermined the credibility of Fortune, a longtime close friend who would have been expected to know about this.

Counsel preserved appellant's claim through his detailed, specific requests to place the psychiatric and substance abuse evidence before the jury through the medical

records and either Wilson's doctor or an expert, for an in camera interview, and for disclosure of domestic violence details, along with the court's later sustaining of counsel's questions about the matters (53-61, 74-75, 142, 146-48, 255-56, 262-63). The court expressly rejected counsel's requests with respect to the psychiatric issues, based on its own view of the typical use of Seroquel and the contents of the records (54-61). C.P.L. § 470.05(2); *Prado*, 4 N.Y.3d at 726.

As discussed in Point I, the People could only ask the jury to speculate that appellant was not justified here. Since the court prevented appellant from introducing abundant evidence that further weakened the People's arguments as to lack of justification, appellant's conviction should be reversed and a new trial ordered. *See Carroll*, 95 N.Y.2d at 385-87; *Hudy*, 73 N.Y.2d at 56-58; *Reed*, 40 N.Y.2d at 209-10.

<u>POINT IV</u>

> IT WAS IMPROPER TO ADMIT THE DECEASED'S 911 CALL COMPLAINING ABOUT "A GIRL" "ACTING ALL CRAZY" AS A PRESENT SENSE IMPRESSION WHEN THERE WAS NO EVIDENCE OF CONTEMPORANEITY WITH HIS OBSERVATIONS OR ANY CORROBORATION.

Over objection, the court admitted Wilson's 911 call under the present sense impression hearsay exception. But under that exception, the hearsay's proponent must demonstrate "contemporaneity" and "corroboration." *People v. Brown*, 80 N.Y.2d 729, 736 (1993); *People v. Vasquez*, 88 N.Y.2d 561, 575 (1996); *Phoenix Ins. Co. v. Golanek*, 50 A.D.3d 1148, 1150 (2d Dep't 2008). These criteria were not met here, and because the

People's case revolved around the call, its admission violated appellant's rights to due process and a fair trial.  U.S. Const., Amend. XIV; N.Y. Const., Art. I, § 6.

New York law defines a "present sense impression" as a description of an event from a person perceiving it as it unfolds or immediately afterward.  *Vasquez*, 88 N.Y.2d at 574-575; *Brown*, 80 N.Y.2d at 732-733.  The present sense rule requires proof that the statement was made "substantially contemporaneously" with the person's observations, *Brown*, 80 N.Y.2d at 734, because "contemporaneity . . . minimizes the opportunity for calculated misstatement as well as the risk of inaccuracy from faulty memory."  *Vasquez*, 88 N.Y.2d at 574.  While a "marginal time lag" may occur, the statement must not be "a recalled or recast description of events that were observed in the recent past."  *Id.* at 575.  The passage of "a few" or "several minutes" is too long for a statement to qualify as a present sense impression of the event.  *Id.* at 578-80.

Here, there was no evidence of contemporaneity.  Wilson told the 911 operator, "I got this girl in my house and I don't know what's wrong with her, she's acting all crazy and I want her out" (JS. 166-67; Peo. Ex. 42).  Because Wilson did not describe anything she was doing, and there is no background noise, it is impossible to know whether he was referring to ongoing conduct or calling to complain about something that had happened earlier.  With it equally likely that the event(s) had ended, his statement was, thus, not admissible as a present sense impression.  *Vasquez*, 88 N.Y.2d at 578-80; *People v. Parchment*, 92 A.D.3d 699, 699 (2d Dep't 2012) ("the People failed to demonstrate that the delay between the conclusion of the event and the beginning of

67

the [911] call [did] not . . . destroy the indicia of reliability upon which the present sense impression rests"); *People v. Robinson*, 282 A.D.2d 75, 82 (1st Dep't 2001) ("it cannot be said . . . that [911 caller] did not have time to reflect on the [robbery]" when several minutes had passed and she had called employer first).

The present sense rule also requires corroboration. As the Court of Appeals explained the contrast with the excited utterance rule,

> a hearsay statement under any exception deprives the defendant of the right to test the accuracy and trustworthiness of the statement by cross-examination. The defendant's only protection against the admission of fabricated testimony or unfounded rumor is that there be sufficient safeguards to assure the statement's reliability. With the excited utterance exception, this assurance is found in the fact that the statement is made under the stress of nervous excitement from the event and before there has been time to contrive and misrepresent. <u>We think that when statements are admitted under the present sense exception without the assurance of reliability that excitement affords, it is reasonable and prudent to require some additional indicia of reliability.</u>

*Brown*, 80 N.Y.2d at 736 (emphasis added; citations omitted); *Vasquez*, 88 N.Y.2d at 574-75. Therefore, "the content of the communication must be corroborated by independent proof." *Vasquez*, 88 N.Y.2d at 575-76. *See also People v. Osbourne*, 69 A.D.3d 764, 765 (2d Dep't 2010) ("<u>substance of the call</u> [must be] sufficiently corroborated by other evidence") (emphasis added); *People v. Orth*, 201 A.D.2d 510, 510 (2d Dep't 1994) (lower court properly precluded 911 call offered as present sense impression "since there was insufficient corroboration <u>of the contents of the call</u>") (emphasis added).

This Court has explained that "independent proof" requires more than conclusory assumptions. In *People v. Watson*, the deceased was found beaten to death with a blunt instrument in her bathroom. Yet even the defendant-landlord's possession of bloodstained clothing, shoes, and vinyl-handled pliers was insufficient to demonstrate the reliability of the deceased's statement to a friend before her death that the defendant was entering her apartment to fix a bathtub leak. 100 A.D.2d 452, 453-59, 463-69 (2d Dep't 1984). In its decision, foreshadowing New York's adoption of the corroboration requirement, this Court deemed it significant that the friend had not observed the defendant's entrance and "there were no other indicia of the statement's reliability" since the friend had not heard a knock, doorbell, or any background noise during the statement to indicate someone had entered. *Id.* at 463-69. The Court of Appeals later endorsed much of this Court's reasoning in *Watson*. *See Brown*, 80 N.Y.2d at 735-37.

Here, as defense counsel argued, nothing Wilson said during the call alluded to him being stabbed, as opposed to something else entirely (JS. 167-68). He did not describe violent behavior or threats, or say he was afraid, and the fact that he hung up (without crying out) indicates he was not being attacked at that time. There is simply no way to know what prompted Wilson to call 911. Even if it was in reaction to something appellant did, it could have been as benign as appellant saying something Wilson did not like. Or, Wilson could have been the one "acting all crazy" and calling 911 for no reason whatsoever, given that his blood alcohol content was more than twice

the legal limit and he had cocaine in his system. *Cf. Watson*, 100 A.D.2d at 463-69;
*compare In re Odalis F.*, 85 A.D.3d 441, 442 (1st Dep't 2011) ("other than the recording
of the 911 call itself, there is no evidence of the existence of the allegedly startling event
that led to the alleged excited utterance"); *with People v. Johnson*, 280 A.D.2d 613, 613-14
(2d Dep't 2001) (court properly allowed victim's sister to testify to overhearing victim
say to defendant, "get off of me.  I can't breathe," as a present sense impression, since
sister immediately saw defendant on top of victim holding her throat).

That appellant ultimately killed Wilson that night is not corroboration that she
was "acting all crazy" (JS. 167), because she explained that she stabbed him when he
tried to rape her.  Her statement was the only direct evidence of what happened that
night and it contradicted Wilson's conclusory accusation.  Appellant's recollection that
the attempted rape happened around 2:00 or 3:00 a.m. was also direct evidence that
there were intervening events after the 911 call.  *See Vasquez*, 88 N.Y.2d at 569-71, 576
(evidence about shooting insufficient to corroborate 911 call describing shooter in same
area, when caller could have been referring to different person); *Allstate Ins. Co. v.
Stricklin*, 93 A.D.3d 717, 718-19 (2d Dep't 2012) (mere fact accident had occurred was
insufficient to corroborate bystander's report of hit-and-run driver's license plate);
*Phoenix Ins. Co.*, 50 A.D.3d at 1149-51 (insufficient corroboration of eyewitness's
statement that white pickup truck with certain license plate caused accident when owner
of white pickup truck with same license plate denied involvement); *see also Orth*, 201
A.D.2d at 510; *Osbourne*, 69 A.D.3d at 765.  The phone records, showing that Wilson's

70

phone called appellant's contacts twenty minutes after he called 911, do not prove that the call was about the stabbing.  It was equally possible that Wilson called 911 after a dispute with appellant, they resolved the problem, and he then let her use his phone, especially since appellant estimated that the attempted rape happened about two hours later.   Indeed, the People contended that the stabbing happened after the call.

In sum, the 911 call was improperly admitted because the People failed to show that Wilson made his statement as appellant actually was doing something he considered "crazy" (or immediately thereafter), and they also failed to point to any independent proof that appellant was, in fact, "acting all crazy."  *Vasquez*, 88 N.Y.2d at 575-76; *Phoenix Ins. Co.*, 50 A.D.3d at 1149-51; *Lee v. City of New York*, 40 A.D.3d 1048, 1049 (2d Dep't 2007) (coworker's statement inadmissible as present sense impression because there was "no evidence that the coworker was describing [event] as he was perceiving it and . . . no evidence corroborating his statement").

This error was not harmless, as the People used the 911 call in this weak case (Point I) both for intent and justification, arguing that the call revealed appellant's motive to kill Wilson because he had ended her "free ride," and that his description of her "acting all crazy" disproved appellant's version of what happened (450-54, 467-70, 481-82).  Aside from involving impermissible speculation (Point VI, *post*), the People essentially pitted appellant's credibility against Wilson's without showing his statement was reliable.  There is a strong likelihood that this tipped the scales, especially since the court allowed the People to use inadmissible evidence to undermine appellant's

71

credibility in other ways (Point V, *post*), while its restriction of appellant's right to present a defense left the jury ignorant of the possibility that Wilson was experiencing psychosis and hallucinations when he made the call (Point III, *ante*).

Defense counsel amply preserved appellant's claim. Among other things, he argued, "[w]e don't know what [the call] refers to, whether it refers to this incident or something else," and pointed out that there could have been "intervening event[s]" especially since appellant's statements placed the stabbing hours later (JS. 167-68, 170). The court also expressly ruled on the present sense issue (JS. 170). C.P.L. § 470.05(2); *Prado*, 4 N.Y.3d at 726.

Accordingly, appellant's conviction should be reversed and a new trial ordered.

### POINT V

THE COURT ERRED BY (A) REFUSING TO SUPPRESS APPELLANT'S STATEMENT TO POLICE WHO QUESTIONED HER AFTER SHE INVOKED HER RIGHT TO REMAIN SILENT; AND (B) ADMITTING RELATED UNCHARGED CRIME EVIDENCE THAT HAD NO PROBATIVE VALUE AND PAINTED HER A LIAR.

Over vehement protest, the court allowed the People to piggyback uncharged crime evidence onto an inadmissible statement. First, it refused to suppress appellant's statements that she took Wilson's property and went to Tiffany and not Ebony after the incident, even though police obtained them after appellant invoked her right to remain silent. In that admission, appellant denied using Wilson's benefits card. To

purportedly complete the narrative, the People then introduced evidence that the activity on Wilson's card changed after his death to overlap with activity on appellant's card, and that Wilson's card permitted cash withdrawals. These joint errors undermined appellant's credibility when her justification case depended upon it. Additionally, the prosecutor distorted the inadmissible statement to fabricate consciousness of guilt arguments. Under these circumstances, a new trial is warranted.

(A)

Appellant agreed during the A.D.A.'s videotaped interview about the stabbing that she wanted to "stop right now," the A.D.A. responded that there would be no further questioning, and Detective Scandole understood that appellant "[did not] want to talk about it anymore." And yet the following morning, having kept appellant in the precinct overnight, Scandole resumed questioning her. Because Scandole did not re-administer *Miranda* warnings, the court should have suppressed appellant's response. Her statements' prejudicial impact requires a new trial. U.S. Const., Amends. IV, V, XIV; N.Y. Const., Art. I, § 6.

When a defendant in custody "indicates <u>in any manner, at any time prior to or during questioning</u>, that he wishes to remain silent, <u>the interrogation must cease.</u>" *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966) (emphasis added). This right to cut off questioning "must be scrupulously honored." *Id.* at 479; *Michigan v. Mosley*, 423 U.S. 96, 104 (1975); *People v. Ferro*, 63 N.Y.2d 316, 322 (1984). Once it is invoked, the suspect "may not within a short period thereafter and <u>without a fresh set of warnings</u> be

73

importuned to speak about the same suspected crime." *Ferro*, 63 N.Y.2d at 322 (emphasis added). *See also People v. Gary*, 31 N.Y.2d 68, 70 (1972).

Scandole violated this well-settled rule when, without re-reading her rights, he questioned appellant after she unequivocally invoked her right to remain silent. Approaching her twelfth hour in custody, which included hours of interrogation, appellant told Purce during his videotaped interview that she wanted to "stop right now" (219; Hrg. Ex. 3). Purce properly ended the interview, and stated on video that there would be no further questioning until the tape resumed (219-20). Scandole, who was involved at each step of appellant's lengthy interrogation, explicitly agreed that she said, "I don't want to talk about it anymore" (214-16). Thus, appellant clearly invoked her right to remain silent, *cf. People v. Prater*, 258 A.D.2d 600 (2d Dep't 1999) ("equivocal silence" not enough), and Scandole was required to re-administer *Miranda* warnings. *Mosley*, 423 U.S. at 104; *Ferro*, 63 N.Y.2d at 322; *Gary*, 31 N.Y.2d at 70.

Scandole's reminder that he had previously explained her rights was insufficient, as this Court explained in *People v. Legere*, 81 A.D.3d 746 (2d Dep't 2011). The defendant in *Legere* waived his *Miranda* rights and spoke to police around midnight, and made additional statements three hours later. *Id.* at 747. But when an A.D.A. attempted a video interview after another hour-and-a-half, the defendant "wanted to speak to his mother, that's it," and when the A.D.A. asked if he wanted to continue the interview, he replied, "no," and "I'm not feeling too good." *Id.* About 15 hours later, detectives questioned the defendant again; they reminded him that "his rights still applied," he

declined to hear them again, and he made another statement. *Id.* The same thing happened the following morning. *Id.* at 747-48. This Court held that both statements taken after the defendant invoked his right to remain silent during the videotaped interview should have been suppressed because it was "undisputed that the police did not re-administer the *Miranda* warnings" first. *Id.* at 748-49.

Similarly, here, almost a full 24 hours had passed since Scandole read appellant's *Miranda* rights. Since then, she had undergone hours of interrogation and was in clear distress when she invoked her right to remain silent, as the parties acknowledged. Under such circumstances, it is unreasonable to expect that appellant remembered the details of her constitutional rights. And, even if a mere "reminder" that the rights had been read before were sufficient to apprise the accused of the rights themselves, which it is not, *Legere*, 81 A.D.3d at 7474-49, appellant's "lengthy interrogation [and periods of] incommunicado incarceration before [the] statement[s were] made is strong evidence that [she] did not validly waive [her] rights." *Miranda*, 384 U.S. at 476. *See People v. Thomas*, 22 N.Y.3d 629 (2014) (People must "prove beyond a reasonable doubt that statements of a defendant they intend to rely upon at trial are voluntary"; products of psychological coercion are not voluntary); *see also Rogers v. Richmond*, 365 U.S. 354 (1961).

In short, appellant unequivocally invoked her right to remain silent, Scandole clearly violated that right by continuing to question her, and the statements he then obtained must be suppressed. The hearing court's contrary decision was patently wrong

as it rested upon a misunderstanding of the law, that "[o]nce she's informed, she's been warned. She doesn't have to be re-advised," even after stopping interrogation (220).

Appellant's claim was fully preserved. Counsel expressly argued that after appellant stopped Purce's interview, Scandole "should have gone through her rights again in their entirety." As to voluntariness, counsel argued that holding appellant overnight, "especially after [she] said I don't want to talk anymore," "softened [her] up" (218-20). The court expressly rejected counsel's argument about re-reading appellant's rights. C.P.L. § 470.05(2); *Prado*, 4 N.Y.3d at 726.

(B)

The People called a welfare fraud investigator who testified that Wilson's card was used at different places after his death and there was overlap with where appellant used her own benefit card. The People also introduced records of this activity and elicited that Wilson's card could be used to withdraw cash. This uncharged crime evidence mini trial implying appellant stole Wilson's benefits bore no relevance to how or why she stabbed Wilson, whether she was justified, or even how the police later apprehended her. Because this evidence was also highly prejudicial, it deprived appellant of due process and a fair trial. U.S. Const., Amend. XIV; N.Y. Const., Art. I, § 6. *People v. Ventimiglia*, 52 N.Y.2d 350 (1981); *People v. Molineux*, 168 N.Y. 264 (1901).

Evidence of uncharged crimes or other bad acts is inadmissible if offered solely to show a defendant's bad character or criminal propensity. *People v. Dorm*, 12 N.Y.3d 16, 19 (2009); *People v. Blair*, 90 N.Y.2d 1003, 1004-1005 (1997). The rule was "meant

76

to eliminate the risk that a jury, not fully convinced of the defendant's guilt of the crime charged, may, nonetheless, find against him because his conduct generally merits punishment." *People v. Allweiss*, 48 N.Y.2d 40, 46 (1979). *See also Ventimiglia*, 52 N.Y.2d at 359. Such evidence is admissible only if probative of an element of the charged crime or relevant to motive, intent, lack of mistake or accident, identity, or a common scheme or plan. *Dorm*, 12 N.Y.3d at 19; *Blair*, 90 N.Y.2d at 1005. To a very limited extent, evidence of prior, uncharged criminality is also admissible as background to "complete the narrative" of a charged crime. *People v. Resek*, 3 N.Y.3d 385 (2004).

Even when relevant, such evidence must be excluded "if it is actually of slight value when compared to the possible prejudice to the accused." *People v. Leonard*, 29 N.Y.3d 1, 7 (2017) (quotation omitted); *Ventimiglia*, 52 N.Y.2d at 359-360. Admissibility of uncharged crimes or other bad acts, thus, turns on a two-part inquiry: whether the evidence is relevant to some issue other than propensity; and, whether the probative value of the evidence outweighs "its potential for mischief." *Hudy*, 73 N.Y.2d at 55. *See also Dorm*, 12 N.Y.3d at 19.

Here, the court improperly allowed the People to prove that someone used Wilson's benefits after his death in locations near where appellant used her own benefits card, supposedly in order to complete the narrative. Under the narrative exception, uncharged crime evidence may be admitted, coupled with proper limiting instructions, to "sort out ambiguous but material facts" or "explain how and why the police pursued and confronted the defendant." *Resek*, 3 N.Y.3d at 388-90; *People v. Tosca*, 98 N.Y.2d

77

660, 661 (2002); *People v. Till*, 87 N.Y.2d 835, 837 (1995); *see also People v. Cook*, 42 N.Y.2d 204, 208 (1977); *People v. Green*, 35 N.Y.2d 437, 441 (1974); *People v. Stanard*, 32 N.Y.2d 143, 147 (1973).

As defense counsel protested and the court recognized, proof that the pattern of activity on Wilson's benefits card after his death was similar to appellant's merely invited the jury to infer that she must have used his card and thereby stole money (40-41). Although the People claimed that it helped determine when Wilson died, defense counsel correctly pointed out that this fact was already established through appellant's statement. Moreover, the phone records, medical examiner, and Shepard all corroborated appellant's statement that the incident happened sometime after Thanksgiving, when Wilson's sister last saw him. Clearly, any uncertainty regarding time of death would "have been easily dealt with by far less prejudicial means." *Resek*, 3 N.Y.3d at 390; *see also People v. Wlasiuk*, 32 A.D.3d 674, 678 (3d Dep't 2006). The phone records in particular showed that the *Molineux* evidence was utterly cumulative; while these pinpointed the date of Wilson's death, the benefits records only narrowed the timeframe to one week.

There also was no merit to the People's alternative argument that this evidence was necessary to "complete the narrative of all that [appellant] did after she killed [Wilson]" (50). To the extent that the People could legitimately show that appellant visited other states, Wilson's card activity was irrelevant—it was relevant to appellant's actions only if she was complicit in its use, but her implied theft of Wilson's benefits

had no bearing on any material fact.  The key issue was whether appellant was justified in stabbing Wilson.  Even if appellant later used his card, which she denied and the People conceded they could not prove, this shed no light on how or why appellant stabbed Wilson.  Nor did Wilson's card activity explain how police apprehended appellant.  Accordingly, suggesting appellant stole Wilson's benefits was not necessary to fill any "gaps in the storyline," *Leonard*, 29 N.Y.3d at 7, about the charged crime.

Because the evidence about Wilson's card activity was cumulative at best to the timeline and not relevant to any other issue, it had no probative value to outweigh the prejudice of emphasizing appellant's uncharged theft of Wilson's wallet and suggesting she was a liar with respect to the theft of his benefits.  The prejudicial "trial within a trial" on this issue unfairly distracted the jury from the ultimate question of guilt or innocence.  *See People v. Robinson*, 68 N.Y.2d 541, 547-50 (1986).

Preserving this claim, counsel vehemently objected that the benefits evidence prejudicially "invite[d] speculation" that appellant "used [Wilson's card] illegally and she's bad for that reason," and it had "no probative value" because it was cumulative as to time of death and unnecessary to "complete any narrative."  Counsel also repeatedly requested curative instructions and moved for a mistrial because the welfare fraud investigator's "comparing the usage" of Wilson's and appellant's cards "far exceeded the narrative [purpose]" (39-41, 43, 45-47. 50-52, 105-06, 120-22).

*       *       *

79

This case turned on whether the jury believed appellant's statement about defending herself from Wilson's attempt to rape her.  The harm of depicting appellant as a fraud, thief, and liar cannot be overstated, especially considering that the prosecutor took full advantage of the constitutional and evidentiary errors to attack appellant's credibility and make consciousness of guilt arguments.  Based solely on appellant's July 26 admission that she took Wilson's key, the prosecutor speculatively argued that appellant locked Wilson inside his apartment so no one would find him (458-61, 471-72).  She also highlighted the discrepancy between appellant's initial and next-morning statements about going to Ebony versus Tiffany after the stabbing (JS. 308-09), and listed both as friends whom appellant could have gone to rather than stay with Wilson again (461-62).

In addition, from the outset, the prosecutor used appellant's July 26 admission as a springboard to introduce the additional *Molineux* evidence which begged the jury to conclude appellant had lied to police.  In her opening statement, the prosecutor said that while appellant "denied ever using" Wilson's card, "there actually is activity on Mr. Wilson's benefit card after the date of November 29, 2011 and it shows consistent areas with where the defendant used to use her benefits card" (JS. 309).  The fraud investigator's testimony about overlapping activity on both cards beginning after Wilson's death, and supporting records, strengthened the implication that appellant had lied.  In summation, the prosecutor referenced Wilson's card while arguing that appellant left the state, having previously established that Wilson's card could be used

80

to withdraw cash.  Although the prosecutor denied accusing appellant of using the card, it was the only logical inference for the jury to make since appellant admitted taking it and it was indisputably "used by someone that wasn't Anthony Wilson" (459-60). Indeed, the court agreed with counsel that the overlapping card activity suggested that Wilson's "[w]elfare benefits [were] being utilized by" appellant (40-41).

And while the court promised to instruct the jury that the benefits evidence in particular had "no bearing on [appellant's] guilt or innocence" (41), it did not: it merely said that this, along with her taking Wilson's property in general, "are not offered to show a propensity on the part of the defendant to commit the crime in question," but to "complete the narrative" (65).  Thereafter, the court denied counsel's numerous requests for additional curative instructions when the fraud investigator compared the cards' activity and testified that Wilson's card could be used to obtain cash.  And its final charge was worse than its first: not only did it leave the jury free to conclude that appellant in fact stole Wilson's benefits, but it affirmatively invited the jury to consider this in ways that actually went to guilt or innocence.  The court curtly instructed the jury not to consider that appellant took Wilson's phone, wallet, and keys as proof of a propensity or predisposition to commit the charged murder.  But by instructing the jury that it could consider this evidence to "complete the narrative <u>of what happened on the night of the incident</u>" (495-96; emphasis added), without ever explaining what that meant, the jury could consider appellant's admitted theft and the implicitly proven theft

81

exactly how the prosecutor urged in her opening and closing—both as proof that appellant lied to police and as consciousness of guilt.

Any reason to discount appellant's believability was no small thing because justification rested principally upon her statements, especially since another constitutional error rendered defense counsel unable to adequately support the defense with the corroboration provided by Shepard (Point II, *ante*).  Given how the People linked appellant's July 26 statement and the uncharged crime evidence, the inadequacy of the court's *Molineux* instructions, and the overall weakness of proof that appellant was not justified (Point I), the constitutional suppression error and the evidentiary *Molineux* error likely pushed the jury over the edge.  *Crimmins*, 36 N.Y.2d at 237, 241.

It also cannot be ignored that the court precluded appellant from using evidence that objectively supported the justification defense, impeached Fortune's credibility, and would have undermined the probative value of Wilson's 911 call, while allowing the People to put in that call without establishing its reliability and to use appellant's inadmissible statement and extrinsic benefit evidence to both undermine her credibility and highlight an uncharged crime.  The court's unbalanced rulings "resulted in a trial that was decidedly skewed in the People's favor."  *Hudy*, 73 N.Y.2d at 58.

Consequently, this Court should reverse and order a new trial.

<u>POINT VI</u>

THE PROSECUTOR VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL IN SUMMATION BY BASELESSLY ASSERTING THAT APPELLANT HAD A SEXUAL "ARRANGEMENT" WITH THE DECEASED AND JUST BECAUSE APPELLANT "DIDN'T FEEL LIKE" HAVING SEX "DOESN'T MEAN IT'S RAPE"; MAKING UP FACTS TO DIMINISH APPELLANT'S OUTCRY; FALSELY PUTTING WORDS INTO APPELLANT'S MOUTH THAT WENT TO INTENT TO KILL AND CONSCIOUSNESS OF GUILT; SPECULATING AS TO MOTIVE; AND MISSTATING THE LAW ON JUSTIFICATION.

The prosecutor spent the vast majority of her 40-page summation misrepresenting the record and making unsupported, offensive arguments. Conceding that Wilson tried to have sex with appellant, the prosecutor repeatedly told the jury that they must have had a sexual "arrangement," so rape could not occur just because appellant "didn't feel like it." Falsely, the prosecutor claimed that appellant had admitted intent to kill, as well as taking steps to "cover up" the stabbing and evade capture. Additionally, the prosecutor concocted a motive out of thin air and called appellant a liar who "staged th[e] scene" in the apartment to support her attempted rape "story." Finally, the prosecutor shifted her burden on the justification element and misstated its legal definition. This rampant and misogynistic summation misconduct went to the heart of the case, violating appellant's rights to due process and a fair trial, and requiring reversal. U.S. Const. Amend. XIV; N.Y. Const. Art. I, § 6.

A prosecutor "must stay within 'the four corners of the evidence.'" *People v. Ashwal*, 39 N.Y.2d 105, 109 (1976). Because jurors trust "that the[] obligations [to seek justice], which so plainly rest upon the prosecuting attorney, will be faithfully observed . . . improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88-89 (1935); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1976) (misrepresenting facts in evidence "may profoundly impress a jury and may have a significant impact on the jury's deliberations").

Here, the prosecutor repeatedly violated this rule. With no record basis, she maintained that appellant and Wilson must have had some sort of "arrangement" that she would "give him some sex" in lieu of rent money (451-52, 461-62, 472-73). Defense counsel correctly objected that this was "Well beyond the evidence, speculation" (451), and that there was "no testimony" to support the prosecutor's related argument that appellant could have stayed with her sister, Ebony, or Tiffany, instead of Wilson whom she was "supposedly mad at" (462). The "arrangement" theory laid the groundwork for the prosecutor's oft-repeated and outrageous argument that Wilson may well have "tried to have sex" that night but the fact that appellant did not want to "doesn't mean it's rape" (452, 468, 473). Aside from the highly offensive notion that appellant had no right to say no having previously agreed to have sex—in other words, that appellant could <u>never</u> be raped—the only evidence about Wilson's attempt to have sex was her statement, which described him violently punching and restraining her and using force.

Nothing whatsoever suggested he benignly attempted to initiate sex and accepted appellant's refusal.  *See People v. Scheidelman*, 125 A.D.3d 1426, 1429 (4th Dep't 2015) (prosecutor's misconduct included "comment[] that wrestling with the victim 'could be a form of foreplay,' without any evidence supporting that suggestive and emotionally charged statement").

To undercut the impact of appellant's outcry to Shepard, which strongly supported justification, the prosecutor again relied on facts that did not exist.  She asserted that, after initially confessing to an intentional murder by saying she did not want to have sex in addition to giving Wilson money, appellant only told Shepard that Wilson tried to rape her "a couple of hours" later as an "excuse," to persuade Shepard to let her stay at his home (455-56, 479).  The prosecutor also claimed that appellant implicitly threatened to kill Shepard, too, if <u>he</u> tried to have sex with her (456).  As defense counsel objected when the prosecutor first made up the timing and reason for appellant's statement that Wilson used force, "[t]here [was] absolutely no evidence regarding any of this.  It's speculation" (455).  *People v. Spann*, 82 A.D.3d 1013, 1015-16 (2d Dep't 2011) (when evidence was that police found gun beneath car's "front seat," prosecutor repeatedly misstated that it was beneath defendant's seat).

Unsatisfied with creating her own facts, the prosecutor also distorted the evidence.  She baldly asserted that appellant had admitted intent to kill when she had not, as counsel protested (447-49, 468, 481) after having just disputed this element in his own summation (440-42).  *People v. Mehmood*, 112 A.D.3d 850, 853 (2d Dep't 2013)

(reversing when prosecutor mischaracterized defendant's statements as admissions he never made); *People v. Pauli*, 130 A.D.2d 389, 391-93 (1st Dep't 1987) (prosecutor "repeatedly and unfairly capitalized on [defendant's testimony] as purportedly constituting binding admissions as to [his] intent, thus foreclosing [this issue] from the jury's consideration").  The prosecutor's remark was especially egregious because she <u>knew</u> it was false—it came on the heels of her request for first-degree manslaughter as a lesser included offense because, she explicitly said, "there is a reasonable view of the evidence that could support that although she was acting in self defense, she didn't really intend to kill" (401-02).  *People v. Vielman*, 31 A.D.3d 674, 675 (2d Dep't 2006) (because "[t]he prosecutor knew that her argument here rested on a false premise," it "was a blatant attempt to mislead the jury, and thus violated her responsibilities and the trust placed in her as a prosecutor"); *People v. Rose*, 307 A.D.2d 270, 271 (2d Dep't 2003) (prosecutor "plainly aware of the falsity of his statement based on other evidence in the record").

Appellant's prosecutor seems to have a troubling habit of mischaracterizing defendants' statements as admissions—she did the same thing in *People v. Thomas*, 143 A.D.3d 923, 923-24 (2d Dep't 2016),[7] causing this Court to order a new trial in the interest of justice—and here she fabricated additional admissions by appellant as

---

[7] Appellate counsel relies on her examination of the briefs in *Thomas*, which will be made available to the Court upon request.

consciousness of guilt evidence. *Spann*, 82 A.D.3d at 1015-16 (argument that defendant's sweating and rapid heart rate showed consciousness of guilt, and medical evidence about his hypertension was a "distraction," contributed to reversible summation misconduct).  Capitalizing on appellant's erroneously admitted July 26 statement that she took Wilson's key (Point V(A)), the prosecutor claimed that appellant also admitted locking Wilson's door behind her to "make sure no one can discover what happened"; the prosecutor speculated in the midst of this theory that appellant turned the heat off to aid in her "cover up" efforts (458-59, 471-72).  Tying in the benefit evidence, the prosecutor said that appellant admitted she "went to different places because she is not trying to get caught up in what happened" (460).  Again, as counsel objected, the "cover up" argument was "a tale of speculation," there was "no testimony that the heat was on at any time," and the purported admission to locking Wilson's door and fleeing to avoid being linked to his death was "not the testimony" (458-61).

Perhaps realizing that it makes no sense to kill someone simply for wanting to have sex, the prosecutor invented another motive for the jury by engaging in precisely the type of argument to which she had successfully objected during defense counsel's summation, when he posited that appellant stabbed Wilson before the 911 call (which was consistent with the medical examiner's testimony) (414).  In her own summation, however, the prosecutor had free rein to argue that "it wasn't until after" the 911 call that appellant stabbed Wilson, because the 911 call purportedly proved that Wilson "was trying to kick her out," and she was so "pissed" about her "free ride" ending that

she decided to murder him (451-53, 468, 470, 481-82). Counsel immediately objected that "[t]here is absolutely no evidence" that the 911 call proved motive (452). When the prosecutor repeated her unfounded motive theory for the fourth time, counsel repeated, "[t]here is no evidence, it's sheer speculation" (481).

The pervasive motive arguments were especially problematic since the People's case on both elements they needed to prove—intent and lack of justification—was entirely circumstantial. As this Court has recognized, "in such a case . . . 'the motive often becomes not only material but controlling, and in such cases the facts from which it may be inferred must be proved. It cannot be imagined any more than any other circumstance in the case'." *People v. Schatz*, 37 A.D.2d 584, 585 (2d Dep't 1971) (quoting *People v. Lewis*, 275 N.Y. 33, 40 (1937). Here, the motive the prosecutor advanced was not a fair inference from the record. Even if Wilson did kick appellant out of the house, killing him was a completely disproportionate and illogical response. Wilson's statement on the 911 call that appellant was acting "crazy," with no further detail, was not enough to explain such an extreme overreaction to the situation. *People v. Marcus*, 101 A.D.3d 1046, 1048 (2d Dep't 2012) (noting impropriety of prosecutor "speculating" about comments in defendant's phone calls, including the identity of getaway driver). Notably, appellant gained nothing by killing Wilson and lost everything: a place to stay, the job interview she clearly needed, and her freedom. *People v. Richardson*, 55 A.D.3d 934, 937-38 (3d Dep't 2008) (People failed to prove defendant's

motive to commit arson since evidence showed he did not badly need insurance money, lost more than he gained, and had not removed personal belongings before fire).

In short, the prosecutor's campaign of speculation and misrepresentation, on its own, warrants reversal. *Ashwal*, 39 N.Y.2d at 109-10 (among the misconduct, prosecutor filled in gaps in the evidence, requiring reversal); *People v. Taylor*, 296 A.D.2d 512 (2d Dep't 2002) (reversing because the prosecutor's summation "distorted the facts in evidence and [contained] comments which were either inflammatory, speculative, or concerned matters not in evidence"); *People v. Mott*, 94 A.D.2d 415, 416 (4th Dep't 1983) (reversing due to misconduct which included arguing motive that did not exist in the record; this was "not only improper and highly prejudicial, it borders on the contemptuous and merits strong disciplinary action").

And, the prosecutor's misstatements extended beyond the facts to the law. In addition to falsely stating that appellant expressly admitted intent to kill, the prosecutor also argued that appellant had done so by virtue of raising self-defense. But intent to kill and lack of justification are separate and distinct elements, and it is well settled that appellant's reliance on justification did not satisfy, or even lower, the People's burden to prove intent. *See McManus*, 67 N.Y.2d at 548-49 ("[justification] defense must not be viewed as one that operates to negate or refute an aspect of the crime charged"); *cf. People v. Grant*, 94 A.D.3d 1139, 1141 (2d Dep't 2012) ("impermissibl[e to] shift[] the burden of proof to the defendant").

It was equally inappropriate to argue that appellant was "not entitled to th[e justification] defense" because Wilson did not actually try to rape her (483). First, the court had already decided that appellant had sufficiently interposed justification and it was the People's burden to disprove it. Moreover, as counsel correctly objected, the issue was whether appellant reasonably feared rape and not whether Wilson actually attempted it (449). *See People v. Butler*, 185 A.D.2d 141, 144-45 (1st Dep't 1992) (improper for prosecutor to misstate law on summation); *Pauli*, 130 A.D.2d at 393 (same). Although the court later supplied the correct charge, it did not timely correct the misstatement. The court also overruled an objection to the prosecutor "instructing the jury" that a defendant was "entitled" to a justification defense only "in very limited circumstances" based on "very specific" criteria (483), further diluting the People's burden. Under these circumstances, the court's charge did not ameliorate the damage. *See Pauli*, 130 A.D.2d at 393 (judge's admonition that jury should get law from court insufficient to undo prejudice from prosecutor's "inappropriate legal instructions").

The court's hands-off approach to the prosecutor's summation stood in stark contrast to how it restricted defense counsel's. On referring to legal principles, the court sustained a general objection when counsel told the jury, correctly, that "the definition of circumstantial evidence . . . holds the People to a very high standard" (441). Counsel accurately described details of appellant's outcry, but the court sustained an objection that counsel misrepresented Shepard's testimony (435-36, 439-40), before later allowing the prosecutor to supplement that testimony with imaginary facts. While

letting the prosecutor speculate about the stabbing's timing and circumstances, it sustained objections to "speculation" when counsel said that the stabbing possibly occurred before the 911 call and "probably took less than a minute" (414, 432-33). The court sanctioned prosecutorial speculation about a sexual arrangement between appellant and Wilson, but sustained general objections when counsel merely asked the jurors to draw upon their own experiences to consider whether Wilson did not feel his injuries due to intoxication, and suggested that appellant's blood was in the bathroom because she may have cut herself during the incident (422, 424). As for counsel's argument that this was not menstrual blood, and appellant may not have gone to police out of fear, the court sustained objections that this "was not the testimony" (424, 427), while letting the prosecutor make up that appellant admitted intent to kill and cover up efforts.

Seeing this, the jury could only conclude that the court agreed with the prosecutor's theory of the case. *People v. Lazartes*, 23 A.D.3d 400, 406 (2d Dep't 2005) (court sustained objection to defense counsel arguing in summation that driver of other car in accident case was alcohol- or drug-impaired, but overruled objection to prosecutor's response, "Where are the beer cans? Where is the crack?," and never explained divergent treatment of attorneys); *see People v. Steinhardt*, 9 N.Y.2d 267, 271 (1961) ("The court was mild in his reproofs and the jury may have gotten the impression that the Judge considered the prosecution's tactics to be necessary and proper"); *People v. Walters*, 251 A.D.2d 433, 435 (2d Dep't 1998) ("The prejudice to the defendant was

compounded, and the prosecutor's misconduct was not only condoned in the eyes of the jury, but perhaps also encouraged, by the court's improper overruling of defense counsel's objections to blatantly improper remarks and, at one point, berating the defendant's attorney for continually interrupting").

In total, the court sustained 14 of the prosecutor's 19 objections, and only 1 of defense counsel's 24 objections.  The court's uneven treatment of the parties was all the more unfair considering that it often sustained baseless objections by the prosecutor while overruling so many well-founded ones by the defense.

\*     \*     \*

The pervasive summation misconduct deprived appellant of her due process right to a fair trial.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (reversible error when comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process").   For the reasons discussed in Point I, the People had exceedingly weak proof that appellant lacked justification, the key issue in this case. What stands out as overwhelming is not appellant's guilt, *Crimmins*, 36 N.Y.2d at 241, but the unfairness of her trial from start to finish, leaving "no occasion to apply the harmless error doctrine." *Gibian*, 76 A.D.3d at 589.  Even considering harmless error, if the multitude of other errors did not doom appellant (Points II-V), there is a "significant probability" that the prosecutor's summation tainted the verdict on its own. At minimum, it certainly compounded the other errors.  *Gibian*, 76 A.D.3d at 589.

Insofar as defense counsel failed to move for a mistrial due to the prosecutor's remarks, this Court should reach the matter in the interest of justice. *See Thomas*, 143 A.D.3d at 923-24; *People v. Anderson*, 35 A.D.3d 871, 872 (2d Dep't 2006) (although unpreserved, egregious nature of prejudicial comments required reversal in the interest of justice); *People v. Smith*, 288 A.D.2d 496, 496 (2d Dep't 2001) (same).

Accordingly, the summation misconduct is another reason for a new trial.

## CONCLUSION

FOR THE ABOVE REASONS, THIS COURT SHOULD REVERSE APPELLANT'S CONVICTION AND DISMISS THE INDICTMENT (POINT I); AT A MINIMUM, IT SHOULD REVERSE AND ORDER A NEW TRIAL (POINTS II-VI).

Respectfully submitted,

Lynn W. L. Fahey
Attorney for Defendant-Appellant
Appellate Advocates
111 John Street – 9th Floor
New York, New York 10038

Tammy Linn
Of Counsel
June 2017