To be argued by:
THOMAS M. ROSS
(10 Minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

                  -against-

ATARA WISDOM,

                              Defendant-Appellant.

Appellate Division
Docket Number
2014-09908

Kings County
Indictment Number
6615/2012

RESPONDENT'S BRIEF

LEONARD JOBLOVE
THOMAS M. ROSS
Assistant District Attorneys
      of Counsel

September 29, 2017

# ERIC GONZALEZ
## ACTING DISTRICT ATTORNEY KINGS COUNTY
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................... 1

STATEMENT OF FACTS ............................................... 2
    Introduction ................................................ 2
    The Huntley/Wade Hearing .................................... 2
        The People's Case ...................................... 2
        Defendant's Case ....................................... 5
    The Court's Decision ....................................... 5
    The Trial .................................................. 5
        The People's Case ...................................... 5
        Defendant's Case ...................................... 21
        Summations ............................................ 21
    The Verdict and the Sentence .............................. 25

POINT I -
    THE  EVIDENCE  DISPROVING  JUSTIFICATION  WAS  LEGALLY
    SUFFICIENT, AND THE VERDICT WAS NOT AGAINST THE WEIGHT
    OF THE EVIDENCE THAT DISPROVED JUSTIFICATION ............. 27

POINT II -
    DEFENDANT FAILS TO SHOW THAT THE PEOPLE'S CONDITION FOR
    DEFENDANT'S ACCESS TO MATTHEW SHEPARD PREJUDICED HER ...... 36

POINT III -
    PART OF DEFENDANT'S CLAIM THAT HIS RIGHT TO PRESENT A
    DEFENSE  WAS  VIOLATED  IS  UNPRESERVED  FOR  APPELLATE
    REVIEW.   FURTHERMORE,  THIS  RIGHT  WAS  NOT  VIOLATED
    BECAUSE  THE  TRIAL  COURT'S  EXCLUSION  OF  THE  MEDICAL
    RECORDS AND THE DOMESTIC INCIDENT REPORTS FROM EVIDENCE
    WAS PROPER ............................................... 41

    A.    The  Trial  Court's  Exclusion  of  Anthony  Wilson's
          Medical Records or Any Expert Testimony about Those
          Records  Was  Proper  Because  There  Was  No  Evidence
          that  Wilson  Was  Psychotic  When  He  Allegedly
          Attempted to Rape Defendant or that Defendant Knew
          that  Wilson  Had  Been  Prescribed  Seroquel  for  any
          Alleged Violent Psychosis ........................... 41

TABLE OF CONTENT (cont'd)

Page

B.  Defendant's Claim as to the Purported Domestic
Incident Report ("DIR") Is Unpreserved for
Appellate Review. Furthermore, the Trial Court's
Exclusion of any DIRs Was Proper Because There Was
No Evidence that Defendant Was Knowledgeable of the
Contents of any DIR ................................. 52

POINT IV -
THE ADMISSION OF ANTHONY WILSON'S CALL TO 911 INTO
EVIDENCE WAS PROPER UNDER THE PRESENT SENSE IMPRESSION
EXCEPTION TO THE HEARSAY RULE ........................... 58

POINT V -
DEFENDANT'S THIRD STATEMENT ABOUT THE ITEMS SHE TOOK
FROM ANTHONY WILSON WAS PROPERLY ADMITTED INTO EVIDENCE.
FURTHERMORE, THE REFERENCE IN THAT STATEMENT TO WILSON'S
BENEFIT CARD AND THE OTHER EVIDENCE OF THE USE OF THAT
CARD WAS PROPERLY ADMITTED TO HELP SHOW THE TIME OF THE
KILLING .................................................. 64

A.  The Record Supports the Trial Court's Finding that
Defendant Did Not Unambiguously and Unequivocally
Assert Her Right to Silence, and so Detective
Scandole Was Not Required to Give the full *Miranda*
Warnings again Before Taking Defendant's Third
Statement .......................................... 64

B.  The Evidence of the Use of Anthony Wilson's Benefit
Card Was Admissible to Help Establish When Wilson
Was Killed ......................................... 71

POINT VI -
MUCH OF DEFENDANT'S CLAIM OF IMPROPER SUMMATION IS
UNPRESERVED FOR APPELLATE REVIEW. ALL OF THE CLAIM IS
WITHOUT MERIT, AND NONE OF THE ALLEGED IMPROPER COMMENTS
DENIED DEFENDANT A FAIR TRIAL ........................... 76

CONCLUSION -
THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED ............ 85

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                            Respondent,

          -against-

ATARA WISDOM,

              Defendant-Appellant.

Appellate Division
Docket Number
2014-09908

Kings County
Indictment Number
6615/2012

RESPONDENT'S BRIEF

PRELIMINARY STATEMENT

Defendant, Atara Wisdom, appeals from a judgment of the Supreme Court, Kings County, rendered October 8, 2014, convicting her of Murder in the Second Degree (P.L. § 125.25[1]) and sentencing her to a prison term of eighteen years to life (Marrus, J., at Huntley/Wade hearing; Tomei, J., at supplemental Huntley hearing, trial, and sentence).

Defendant is incarcerated pursuant to this judgment of conviction.  Defendant had no co-defendants.

## STATEMENT OF FACTS

### Introduction

On November 29, 2011, shortly after midnight, defendant killed Anthony Wilson, who had allowed defendant to stay in his apartment, by stabbing him seven times with a knife in Wilson's studio apartment at 832 Bushwick Avenue in Brooklyn. For this act, defendant was charged under Kings County Indictment Number with 6615/12 with Murder in the Second Degree (P.L. § 125.25[1]).

### The Huntley/Wade Hearing[1]

#### The People's Case

On January 3, 2012, Detective CHRISTOPHER SCANDOLE investigated the death of Anthony Wilson whose dead body was found in an apartment at 832 Bushwick Avenue in Brooklyn (Scandole: H. 4-5).[2] In March 2012, DNA from evidence at the scene was found to match the DNA profile of defendant Atara Wisdom, so Detective Scandole began to look for her (Scandole: H. 5). In July 2012, Detective Scandole learned that defendant was at a women's homeless shelter on Herkimer Street (Scandole: H. 5-6, 17).

---

[1] Because defendant does not challenge the Wade ruling, the evidence pertaining to the identification is not summarized.

[2] Unprefixed numbers in parentheses refer to pages of the trial transcript, including the supplemental Huntley hearing that was held during the trial. Numbers in parentheses prefixed with an "H." a "J." or an "S." refer to pages to the pre-trial Huntley/Wade hearing transcript, the jury selection transcript, and sentencing transcript respectively. Names in parentheses refer to the witnesses whose testimony is summarized.

At 9:45 a.m., Detectives Scandole and Collins found defendant at the shelter and took her to the interview room at the 83rd Precinct (Scandole: H. 5-7, 17-18; 208-09, 211).   At 11:00 a.m., the detectives sat down with defendant, and Detective Scandole gave her the Miranda warnings.   Defendant waived the Miranda rights and agreed to speak (Scandole: H. 7-9, 17; 209, 211-12).

Detective Scandole told defendant that a deceased person had been found, told her where the person had been found, and told her that her name had come up during the investigation.   Detective Scandole then asked defendant is she knew anything about the person (Scandole: H. 9).   Defendant gave an oral statement that lasted for two to three hours (Scandole: H. 10-12; 210, 212).

Detective Scandole left the interview room and to write out defendant's statement (Scandole: H. 12-13; 213).   At 5:00 p.m., defendant was put in a lineup (Scandole: H. 19; 212).   At 7:30 p.m., when he was finished writing the statement, Detective Scandole returned to the interview room, read the statement back to defendant, and gave defendant a chance to read it (Scandole: H. 13, 19; 213).   Defendant, Detective Scandole, and Detective Collins all signed the statement (Scandole: H. 13; 213).

Detective Scandole then asked defendant if she wanted to give a statement to the district attorney's office, and defendant said that she did (Scandole: H. 14).   At 9:00 p.m., Assistant District

3

Attorney Ed Purce arrived and took a video-recorded statement from defendant with Detective Scandole present that lasted one-half hour (Scandole: H. 15; 210-11, 214).[3]

On July 26, 2012, at 10:00 a.m., Detective Scandole spoke to defendant again in the interview room at the 83rd Precinct "to clear up some things" and to ask a few more questions (Scandole: 205-06, 211). He did not know where defendant had been held overnight (Scandole: 215). Detective Scandole reminded defendant that she had been given her Miranda warnings and had agreed to speak the previous day (Scandole: 211). He told her that he wanted to ask her a few more questions if she was agreeable (Scandole: 206). Defendant said that she was and never said anything about not wanting to talk (Scandole: 216).

Detective Scandole asked about Wilson's property, specifically what she did after she came out of the bathroom. Defendant gave her statement that answered the question (Scandole: 206-08). When she finished, Detective Scandole asked if she used

---

[3] Midway through the trial, the People announced that defendant had made a statement the day after she was arrested, that pre-trial notice had been given for this statement, but that this statement had not been litigated at the pre-trial Huntley hearing (150-52). The People pointed out that both parties had referred to this statement in their opening statements at trial (151-52). The court interrupted the trial to hold a supplemental Huntley hearing to consider the admissibility of this statement (152).

Wilson's benefit card.    Defendant said, "Absolutely not"
(Scandole: 208).

### Defendant's Case

Defendant rested without presenting any evidence (H. 33).

### The Court's Decision

The court found that defendant knowingly and voluntarily
waived her <u>Miranda</u> rights and that, because the written and video-
recorded statements were largely exculpatory, defendant was not
coerced into making the statements (H. 33-34).   The court denied
defendant's motion to suppress the statements (H. 35).

At the supplemental hearing for the statement made on July
26, 2012, the court found that defendant had not cut off any
further questioning at the end of her video-recorded statement the
night before, the delay in arraigning defendant was not
unreasonable and that the People proved beyond a reasonable doubt
that the statement was knowing, voluntary, and intelligent (218-
22).   Defendant's motion to suppress this statement was denied
(222).

### The Trial

#### The People's Case

VICTORIA WILSON ("Victoria") was the sister of Anthony Wilson
("Wilson"), who lived at 832 Bushwick Avenue in Brooklyn (Wilson:
67).   Victoria typically saw Wilson on holidays and saw him for

the last time at her mother's house on Thanksgiving 2011 (Wilson: 68-70). For Christmas 2011, because Wilson did not even call her on the phone, Victoria went to defendant's apartment, which she had been to four times, and knocked on the door. There was no answer (Wilson: 68, 70-71).

SHAKEEMA FORTUNE saw Wilson about four to five times per week from 2009 through 2011 and had been to his apartment a few times (Fortune: 133-34, 139, 141). Wilson and Fortune considered themselves to be like brother and sister, and Wilson baby sat for her children (Fortune: 133, 141).

Sometime before Thanksgiving 2011, between 9:00 and 10:00 p.m., Fortune saw Wilson at his apartment because Fortune and Wilson were going to go out to play pool that night (Fortune: 134-35, 144-45). Wilson was with someone he introduced as his girlfriend by saying, "This is Renee I was talking about." (Fortune: 135-36, 143). Renee said that they were not going out, and so Fortune left Wilson's apartment by herself (Fortune: 136, 143).[4] Fortune never saw Wilson again (Fortune: 137).

In the fall of 2011, MATTHEW SHEPARD, who lived on Cedar Street in Brooklyn, knew a "Tony," who was a panhandler that Shepard occasionally saw on Broadway (Shepard: 344-45). Shepard

---

[4] Fortune did not identify defendant in court as Renee.

had no relationship with Tony, but eventually learned that he lived near Bushwick Avenue and Kosciusko Street (Shepard: 345-46).

In "one of the warmer months," Shepard met "Renee," who was defendant, through a friend (Shepard: 346, 348-49). Shepard found defendant attractive (Shepard: 350). During a brief conversation, defendant said that she was staying with Tony because she had nowhere else to stay (Shepard: 346-47). Defendant and Shepard exchanged phone numbers. Because Shepard did not want his girlfriend to know that he was talking with another woman, he had defendant use Tony's phone number (Shepard: 347, 351). Shepard was almost sure that his phone was in his name, but did not remember the number for the phone (Shepard: 347-48).

Within a couple days of Thanksgiving 2011, in the early morning, defendant called Shepard, who recognized the phone number of the incoming call as Tony's phone number (Shepard: 350-51, 364-65). Defendant asked Shepard what he was doing and if she could come by. Shepard thought that they would have sex and arranged to meet defendant on DeKalb Avenue (Shepard: 350-51, 365-66).

When they met there, defendant had three or four bags with her. Shepard joked about her being a bag lady (Shepard: 351-52, 359, 365). Defendant said that she had had an altercation with a friend (Shepard: 352-53). She said, "I'm not paying rent and fucking him. I am not going to pay rent and fuck him, too."

Defendant added that she "poked him" (Shepard: 353).   Defendant had a little swelling on the face, but no blood on her (Shepard: 355, 366).

Defendant stayed at Shepard's home for a few hours (Shepard: 354).   While there, Shepard asked defendant what was wrong with her.   Defendant said, "This guy is crazy.   I'm not going to pay rent and fuck him."   As remembered by Shepard, defendant said that he "tried to take it, tried to force his self" on her (Shepard: 367-68).   Shepard thought that defendant suggested that they go check on "Anthony," but Shepard refused to go (Shepard: 368).

Defendant could not stay at Shepard's house because Shepard had to go to Manhattan (Shepard: 356).   Shepard thought that a "gentleman" came and got defendant (Shepard: 356).   That was the last time Shepard saw defendant before her arrest (Shepard: 356, 359).[5]

DONET ROBINSON lived at 832 Bushwick Avenue with his wife, who owned the building (Robinson: 77-78).   Robinson knew Wilson as a tenant, who had lived there for one to one and one-half years (Robinson: 78-79).   Wilson's rent came from "section eight" and from public assistance and was sent by the government directly to

---

[5] The police brought Shepard in to testify (Shepard: 360). Shepard had a criminal record in Pennsylvania and New Jersey for drugs (Shepard: 343-44, 362-63).

the landlord (Wilson: 67; Robinson: 79).  Robinson would collect Wilson's mail and put it under Wilson's door (Robinson: 80).

On January 3, 2012, Robinson went into Wilson's apartment with a key because Wilson had not been picking up his mail and because Robinson had not seen Wilson for about two months (Robinson: 81-82. 85).  Robinson knew, as did Victoria and Fortune, that Wilson kept a neat apartment (Wilson: 68; Robinson: 81; Fortune 134).  When Robinson entered, however, he saw "red stuff" all over the floor (Robinson: 82).  He also saw Wilson lying on the bed (Robinson: 82-83).

The apartment did not appear as if it had been forcibly entered.  Robinson noticed that the apartment, which had steam heat controlled by the tenant, was cool (Robinson: 83-84).  Not going any further into the apartment, Robinson stepped out and then called his wife and the police (Robinson: 85).

At 10:58 a.m., Police Officer GARRETT MARSDEN responded to the apartment (Marsden: 111-12).  After the landlord opened the door for him, which was on the Kosciusko Street side of the building, Officer Marsden went inside and saw a dead body, which he later learned to be that of Wilson, on the bed (Marsden: 113).  The apartment had a foul odor and clothes and a towel were strewn about (Marsden: 113-14).  Officer Marsden secured the crime scene (Marsden: 115).

On January 3, 2012, Detective STEPHEN MARKOSKI of the Crime Scene Unit was called to 832 Bushwick Avenue, arriving at 2:42 p.m. (Markoski: 2-5). He found the ground-floor studio apartment there to be cold, bloody, and in disarray, but without any signs of forced entry (Markoski: 7-8). The apartment's temperature was only 28° (Markoski: 32). A body in an advance state of decomposition was on the bed. Maggots were throughout most of the body (Markoski: 8). The apartment itself had only a place to sleep, a kitchen, and a bathroom (Markoski: 9).

Detective Markoski recovered a black sock with bloodstains, a pair of blue jeans with a black belt and with bloodstains, a brown long-sleeved shirt with bloodstains, a white towel with bloodstains, and two prescription pill bottles, which were underneath the bed (Markoski: 9, 11-12, 27). Detective Markoski took four swabs from bloodstains on the nightstand, the kitchen cabinet, inside the bathtub, and from the bathroom wall (Markoski: 12-13, 15; stipulation: 392-93). Later, Amy Dorsey from the New York City Police Department laboratory took swabs from bloodstains from the exterior and the caps of the two prescription pill bottles, which were for Seroquel and Fluoxetine (stipulation: 393-94).

IRINI SCORDI-BELLO was a medical examiner II with the Office of the Chief Medical Examiner of the City of New York and an

expert in forensic pathology (Scordi-Bello: 227-28). She was present at the autopsy of Wilson, which was conducted on January 4, 2012 by Frede Frederic, and reviewed the report (Scordi-Bello: 229-30, 251).

The autopsy found that Wilson was 5'9" tall, 150 pounds, and was fifty years old (Scordi-Bello: 230). The autopsy also found that Wilson had seven stab wounds and that his body was in a state of morbid putrefaction (Scordi-Bello: 230-31). Under the conditions, the decomposition was consistent with the death being on November 29 (Scordi-Bello: 240-41).

The sequence of the stab wounds could not be determined and so they were arbitrarily numbered one through seven (Scordi-Bello: 231). Number one was on the right side of the chest, was one-half-inch deep, was just below the clavicle, and had a right to left, front to back, and downward direction (Scordi-Bello: 232-33, 249). Numbers two through five were clustered on the left side of the chest and all cut through the fourth rib, which required much more force to cut through than the force needed to cut through soft tissue (Scordi-Bello: 233, 239-42). The clustering was indicative of the wounds being made in close succession and suggestive of Wilson not actively moving during the stabbing (Scordi-Bello: 242-43). Those four wounds were from front to back, left to right, and downward (Scordi-Bello: 234). Numbers

11

two and three, which were two inches deep, did not enter the chest cavity, but number four, which was five inches deep, pierced the heart, and number five, which was six inches deep, pierced the lung (Scordi-Bello: 234-35, 238-39, 249-50). Number six was to the lower chest, was five to six inches deep, and had a front to back, left to right, and upward direction (Scordi-Bello: 236-37, 245, 250). Number seven was to the left upper back on the opposite side of the shoulder and was two and one-half inches deep (Scordi-Bello: 237-38, 250).

None of the wounds was a slash wound (Scordi-Bello: 241). Although none of the wounds was instantaneously lethal, the wounds would have impeded Wilson's ability to move around (Scordi-Bello: 257-59). When someone is grievously wounded, as Wilson was, he might urinate or defecate (Scordi-Bello: 257, 260). Showed the photograph of Wilson's pants, Doctor Scordi-Bello stated that the staining on the pants was too light to be blood (Scordi-Bello: 260-61). Also, more wounds means more blood loss and a quicker loss of consciousness (Scordi-Bello: 259-60). The stab wounds to the trunk with the heart, lung, and musculoskeletal injuries were the cause of death (Scordi-Bello: 238).

Wilson had no injuries to his hands or arms (Scordi-Bello: 241). Because of the decomposition of the body, the only fluids available for analysis were blood and brain tissue (Scordi-Bello:

12

246).  Analysis of those fluids showed that Wilson had in his system alcohol with a concentrate of .20% of the blood, Fluoxetine, which is an anti-depressant, Benzoylecgonine, which is a breakdown product of cocaine, and Levamisole, which is a cocaine cutting agent (Scordi-Bello: 246-47, 255-56).  Seroquel, which is an anti-psychotic and anti-depressant, was not detected (Scordi-Bello: 255).

SARAH PHILLPS was a criminalist level four with the Department of Forensic Biology in the Office of the Chief Medical Examiner and was an expert in forensic biology (Phillips: 309, 312).  On January 6, 2012, she received items from the autopsy of Wilson and items collected by Detective Markoski (Phillips: 314, 316).  Phillips tested some of the samples for human blood (Phillips: 316-18).

Blood that had a DNA profile matching Wilson's DNA profile was found in samples from the exterior the Fluoxetine bottle, from the nightstand, and from the kitchen cabinet (Phillips: 317-19, 323-24).  Blood that had a mixture of DNA profiles that could have included Wilson's DNA profile was found on the cap of the Seroquel bottle (Phillips: 321).  The penile swab from Wilson showed the presence of semen with a DNA profile that matched Wilson's DNA profile (Phillips: 318-19).

Blood that had a DNA profile that matched the DNA profile of an Atara Wisdom that had been uploaded on the CODIS database was found in samples from the bathroom wall and the bathtub (Phillips: 322).   On May 9, 2013, an oral swab was taken from defendant to obtain her DNA profile (Phillips: 323; stipulation: 394-95). Defendant's DNA profile from the oral swab matched the profile from the blood samples from the bathtub and the bathroom wall (Phillips: 323-24).

Detective CHRISTOPHER SCANDOLE's testimony at trial was substantially consistent with his testimony at the <u>Huntley</u> hearing (Scandole: 266-95).   Defendant's written statement was as follows:

> I had lost my place to stay and I moved in with this guy that I met over by the Doctor's office on Broadway.   I was giving him some money when I could.   He's a crack user and when he smokes crack he's like a different person.
>
> One night when I was sleeping I woke up and I found him touching me under my shirt.   I told him we aren't like that and that's not why I'm here.   We argued and it got real heated. I left out and I called one of my friends on the phone and I calmed down.   A little while later right around Thanksgiving time we got into another argument that got real heated and loud.   I left and I went to my sister's house for a couple of days.   I talked to him on the phone a couple of times and I went back to get my clothes because I had an interview set up for the next day.
>
> When I got there he was OK, nice like when I first met him.   Later that night I'm on the couch getting my clothes and he tells me "I'm

14

getting some pussy tonight." I tell him OK then I'll get out of here. He stands in front of the door and says "uh-uh." Then he picks up a pink belt and he wraps it around his hand. When he did that I picked up the knife and I put it in my sweater. When I got up he punch me in the face. Then he pulled the sweater over my head and he started punching me in the shoulder and back. As he's punching me he is pushing my head to the ground and I'm thinking if my head hits the ground I'm dead. That's when I took out the knife and I stabbed at him.

I ran into the bathroom and I see I have a big knot on my head and my shoulder is all bruised. I got all my stuff together in a duffel bag and I left out to go to Ebony's house. I didn't tell Ebony what happened and I didn't tell anyone else what happened.

(Scandole: 274-76, 279-81; People's Exhibit 55).

Detective DEBORAH BATANJANY put defendant in a lineup (Batanjany: 376). Shepard viewed the lineup and immediately identified defendant as "Renee" (Shepard: 359-60, 369-70; Batanjany: 385-86). He was certain of his identification (Shepard: 370).[6] During arrest processing, defendant gave her age as twenty-five, her height as 5'6", and her weight as 115 pounds (Batanjany: 388, 391). On July 25, 2012, Assistant District Attorney ED PURCE was notified to go to the 83rd Precinct, arriving between 9:00 and 9:15 p.m. (Purce: 297-300).

---

[6] Shepard was not certain of his in-court identification of defendant as Renee, because defendant, having gained weight, appeared to be different (Shepard: 361-62, 369).

Defendant's video-recorded statement was essentially the same as her written statement. A difference in the video-recorded statement was that, after returning to defendant's apartment from her sister's apartment, defendant went to sleep while Wilson watched television (People's Exhibit 56 at 9:16:12 - :36). The alleged attempted rape began when defendant was sleeping on the couch and Wilson touched her inappropriately (Id. at 9:17:26 - 18:33).

Otherwise, in the video-recorded statement, defendant added the following to what she had said in her written statement: Her relationship with Wilson was just "friends" (Id. at 9:08:16). She did not pay rent to Wilson, but gave him as much as $50 to $60 to make sure food was in the house (Id. at 9:08:50 - :09:00). She did not know if Wilson worked, but knew that he was in a drug program (Id. at 9:10:06 - :25). She had problems with Wilson bringing in drugs and wanting to sleep with her (Id. at 9:10:38 - 11:10). She slept on the couch, and Wilson slept on the bed (Id. at 9:16:22). She went to her sister's place after the first argument over Wilson wanting to sleep with her in which Wilson called her names (Id. at 9:12:06 - :13:24). The events that lead to the stabbing began at 3:00 a.m. (Id. at 9:17:04). She got the knife from one of her bags next to the couch where she was sitting (Id. at 9:21:58 - :22:16). The knife was a folding knife (Id. at

16

9:23:44).   She tried to push herself up while trying to push Wilson off of her (Id. at 9:27:42 - :28:05).   Because she was bent over, she believes that she stabbed Wilson in the legs (Id. at 9:29:10).   She does not remember how often she stabbed Wilson (Id. at 9:29:50 - :52).

The recording showed that, after describing the stabbing, defendant bent over in her chair with her face in her hands and no longer spoke (Id. at 9:30:39).   After the recording was off, A.D.A. Purce did not speak again with defendant (Purce: 302-03).

The next day, July 26, 2012, at 10:00 a.m., defendant gave her third statement (Scandole: 281).   In response to Detective Scandole's question about what was done with the victim's property, defendant said:

> After I stabbed him, I came out of the bathroom and I saw him laying on the bed, I picked up his phone, his keys and his wallet. When I left, I was on the phone talking to somebody but I was in a bit of a fog, I don't remember who I was talking to.
> As I was walking, I threw away his keys but I kept his wallet and I didn't use it.   I went over to my friend Tiffany's house, which was by East 93rd and Rutland Road and I stayed there for a couple of days.
> I continued to use the phone for a little while but then I threw that away also.

(Scandole: 282-83).   When Detective Scandole asked if she had used Wilson's benefit card, defendant said, "Absolutely not" (Scandole: 283).

NORMAN RAY CLARK III was the custodian of records for Sprint who provided subscriber information for several telephone numbers (Clark: 154-59). According to those records, Wilson was the subscriber for the phone number (347) 793-1940 ("Wilson's phone"), which was for a prepaid phone that included both voice calls and text messaging (Clark: 160-62, 164). The records showed that the last phone call from Wilson's phone to phone number (347) 546-9337, the number subscribed to by defendant ("defendant's phone"), was on November 28 at 8:17 a.m. and the last text message from Wilson's phone to defendant's phone was at 12:41 p.m. that day (Clark: 179-81, 190-91).

The records showed that on November 29, 2011, Wilson's phone made two calls at 12:37 a.m.: one call was to the number 8-send, which could have been a misdial, and the other call was to 911 for a call that lasted 26 seconds (Clark: 171-72). In reviewing the records, Clark discerned that the phone numbers in communication with Wilson's phone after the 911 call were different from the phone numbers in communication with Wilson's phone before the 911 call (Clark: 176-77).

After the call to 911, the next calls from Wilson's phone that day were all outbound calls and were made at 12:57 a.m. for 40 seconds to phone number (347) 231-8819, a number subscribed to by a Paul Gerard; at 12:59 a.m. for 58 seconds to phone number

(347) 889-3277, a number subscribed to by a Layton Bora ("Bora's phone"); at 1:00 a.m. to Bora's phone again (Clark: 173-76); at 5:00 a.m. for 122 to 131 seconds to phone number (347) 231-3340 ("Theo/Shepard's phone")[7]; and at 5:14 or 5:15 a.m. for 33 seconds to Theo/Shepard's phone (Clark: 181-82, 186-88, 196-97, 199).  The former call to Theo/Shepard's phone was routed with no indication that it want to voicemail, and the latter call to that phone went to voicemail (Clark: 182-83, 187-88).  At 5:13 a.m. and 5:14 a.m., attempted calls were made from Theo/Shepard's phone to Wilson's phone that were 15 and 11 seconds in duration and went to voicemail (Clark: 197-99).

Additional records showed that on November 29, at 12:03 a.m., a call was made from Bora's phone to defendant's phone (Clark: 192-93).  At 3:33 p.m., defendant's phone received a text message from Bora's phone (Clark: 193).  At 3:35 p.m., defendant's phone sent a text message to Bora's phone (Clark: 194).

RICHARD LeBLOND of the New York City Human Resources Administration (HRA) investigated welfare fraud (LeBlond: 90-91).

---

[7] The number for Theo/Shepard's phone was subscribed to by a "Theo Theo," with no address given for the subscriber (Clark: 184-85).  Sprint does not require an identification to verify the name of the subscriber for a prepaid phone, and so the subscriber could use a false name (Clark: 185).  Sprint's records showed that Theo/Shepard's phone was listed as the account contact phone for Matthew Shepard (Clark: 184-87, 194-95).  Sprint requires an account contact phone number for subscribers in order to reach them if they cannot be reached at their subscribed phone numbers (Clark: 185-86).

LeBlond explained that someone on public assistance, which consists of cash, Medicaid, and SNAP (otherwise known as food stamps), is issued a benefits card that works like a bank card with a "PIN." HRA keeps record of its clients' spending (LeBlond: 92-93).

In May 2012, at Detective Scandole's request, LeBlond provided the records for Wilson and defendant from September 1, 2011 to May 31, 2012 (LeBlond: 93-96). Those records showed that Wilson had cash benefits and SNAP (LeBlond: 100). For September through November 22, 2011, Wilson's card was used mostly at addresses on or near Broadway in Brooklyn (LeBlond: 100-01). Beginning on December 6, 2011, the card was used at addresses on Rockaway Avenue, East 98th Street, East 93rd Street, Rutland Road, and Ralph Avenue (LeBlond: 100-02).

The records showed that defendant also received cash benefits and SNAP (LeBlond: 104). For September 2011, her card was used at addresses on Gates Avenue, Broadway, Sutter Avenue, Mother Gaston Boulevard, and Rutland Road (LeBlond: 103). For December 2011, her card was used at addresses on Flatlands Avenue and Rutland Road (LeBlond: 104). From December 17, 2011 through April 20, 2012, defendant's card was used in Pennsylvania and New Jersey as well as in Brooklyn and the Bronx (LeBlond: 106-07; People's Exhibit 44).

RICHARD SCHOEN, a police communications technician with the New York City Police Department, retrieved a 911 call from Wilson's phone number made on November 29, 2011, between 12:20 and 12:40 a.m. (Schoen: 125-27, 131). The caller said, "I've got this girl in my house. I don't know what's wrong with her. She's acting all crazy, and I want her out of my house." The call ends abruptly with no response to the inquiry from the 911 operator (People's Exhibit 42). Victoria identified the voice on the call as Wilson's voice (Wilson: 71-72).

### Defendant's Case

Defendant rested without calling any witnesses or introducing any other evidence (400).

### Summations

Defendant argued that she was justified because Wilson allegedly tried to rape her (410-11). Defendant began by asserting the People's case was based on speculation (413-15). Defendant then theorized that Wilson, who was a decent man when sober, came home drunk or high and tried to force himself on her (415-17).

Defendant argued that the lack of defensive wounds on Wilson was because his intoxication meant that he "was not feeling things as much" (419-23). Defendant posited that Wilson had already been stabbed when he called 911 (424). As for her statements,

defendant claimed that the detectives "were grilling her and breaking her down," yet she did not confess (428-31).

Turning to the physical evidence at the crime scene, defendant pointed out that, because some of the blood was not tested, what happened in the apartment was uncertain (432). Defendant theorized, based on the medical examiner's testimony, that Wilson was not killed instantly, but that Wilson supposedly did not know that he had been stabbed because he was in shock (434). Defendant added that she left the apartment without knowing Wilson's condition (440). Defendant told the jury that the case was not about who used Wilson's benefit card, but was about justification (435).

Defendant tried to downplay her initial statement to Matthew Shepard about poking Wilson by attributing the statement to her being upset and angry (437-38). Defendant went on to say that the later statement to Shepard about Wilson forcing himself on her was consistent with her claim of rape and was made when she supposedly was more relaxed (438). Defendant concluded that there were too many uncertainties to find guilt beyond a reasonable doubt (439-42).

After stating the undisputed facts of the case, the People said that defendant admitted her intent to kill even if for the alleged purpose of preventing rape (445-48). The People added

that the number and location of the stab wounds was further
evidence of intent to kill (448). Thus, according to the People,
justification was the only issue the jury had to decide (448-49).

As for justification, the People argued that Wilson did not
attempt to rape defendant, because Wilson would have been unable
to call 911 if defendant was stabbing him while he was trying to
rape her, and because the call was not about a stabbing, but about
defendant acting crazy (449-51). Indeed, the People noted that
Wilson had no reason to call 911 and draw the police to his
apartment if he was in fact raping defendant (453-54, 467-69).

The People pointed to the 911 call itself as the reason why
defendant stabbed Wilson, because the call showed that "whatever
arrangements they had" -- whether a "50-year-old man" would expect
to have sex from a "25-year-old girl" living with him -- was
coming to an end (451-53, 461-62, 468, 470, 481-82). The People
said that Wilson held defendant out to Shakeema Fortune as his
girlfriend, and that defendant showed herself to be possessive of
Wilson by cancelling Wilson's plans to play pool with Fortune
(472). The People added that her statement to Matthew Shepard was
further proof that she "poked" Wilson because he now wanted to
have sex instead of or in addition to what little money she was
paying him (451-52). Thus, the People did not deny that Wilson
"tried to have sex" with defendant, but that "just because you

23

don't want to have sex with someone doesn't mean that they are
trying to rape you" (452, 473). Specifically, the People said,
"No doubt [Wilson] told [defendant], look if you are not going to
have sex with me, you gotta get out, and then that's what put her
over the edge and that is what made her stab him" (453). The
People pinpointed the time of the murder as between the 12:37 a.m.
call to 911 and the 12:50 a.m. next call from Wilson's phone (452-
53, 470).

As for defendant's second statement to Shepard, the People
presented the inference that defendant's speaking of Wilson trying
to force himself upon her was an attempt to make the stabbing more
justifiable so that Shepard would not be afraid to let her stay
with him (455-56, 479). The People also presented the inference
that the second statement was a warning to Shepard not to try to
have sex with her (456).

Other evidence that disproved rape, as listed by the People,
was that defendant took Wilson's property; that she locked the
door of the apartment when she left; that the heat in the
apartment was turned off; that she fled, as shown by her usage of
her welfare benefits card, to Pennsylvania and New Jersey; that
she variously said in her statements that she went to her sister,
to Tiffany, and to Ebony; that defendant did not call 911, go to
the police, or seek medical treatment for the supposed attempted

24

rape; that the stab wounds were not consistent with defendant being bent over and stabbing Wilson in the legs as described in her videotaped statement; and that the soiling of Wilson's jeans and the jeans being inside-out when off of Wilson showed that the jeans were on him when he was being stabbed (456-67, 474-76, 479-81).  As for Wilson's welfare benefits card, the People said, "I am not suggesting to you that it was used by her, but I am suggesting to you that it was used by someone that wasn't Anthony Wilson" (459-60).

The People further argued that the same evidence that disproved justification proved intent to kill (469).  Additional evidence of intent was that the photographs of the crime scene showed that someone had tried to wipe up the blood and the feces (471-72, 476).

The People invited the jury to ask why Wilson was naked and why he was on the bed (477).  The answer the People provided was that defendant was already concocting the rape to excuse her stabbing of Wilson -- that she "staged that scene" to make it "look like there was some sort of melee" (477, 482).

The Verdict and the Sentence

On July 10, 2014, defendant was convicted of Murder in the Second Degree (P.L. § 125.25[1]) (524-26).  On October 8, 2014,

defendant was sentenced to eighteen years to life imprisonment (S. 13).

POINT I

THE EVIDENCE DISPROVING JUSTIFICATION WAS
LEGALLY SUFFICIENT, AND THE VERDICT WAS NOT
AGAINST THE WEIGHT OF THE EVIDENCE THAT
DISPROVED JUSTIFICATION.

The evidence was legally sufficient because the 911 call, the clustering of the stab wounds, the condition of the apartment, and the People's other evidence disproved justification. Additionally, the verdict was not against the weight of the evidence because the main evidence of justification was defendant's self-serving statements, which the physical evidence largely contradicted.

Because the People prevailed at trial, on review of legal sufficiency, the evidence must be viewed in the light most favorable to the People. People v. Hampton, 21 N.Y.3d 277, 287 (2013); People v. Bailey, 13 N.Y.3d 67, 70-71 (2009); People v. Contes, 60 N.Y.2d 620, 621 (1983). The People are entitled to every reasonable inference that can be drawn from the evidence. Hampton, 21 N.Y.3d at 287; Bailey, 13 N.Y.3d at 70-71; People v. Ford, 66 N.Y.2d 428, 437 (1985). Consequently, a challenge to the legal sufficiency of the evidence must be rejected if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Contes, 60 N.Y.2d at 621 (quoting Jackson v. Virginia, 433 U.S. 307, 319 [1979]) (emphasis in Jackson).

In weight of the evidence review, the court should first determine "whether an acquittal would not have been unreasonable." People v. Danielson, 9 N.Y.3d 342, 348 (2007) (citing People v. Romero, 7 N.Y.3d 633, 636 [2006]). "If so, the court must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions." Id. The court should accord "[g]reat deference . . . to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor." People v. Kancharla, 23 N.Y.2d 294, 303 (2014) (quoting People v. Bleakley, 69 N.Y.2d 490, 495 [1987]) (alterations in original). This weighing should be done in light of the elements of the crime as charged to the jury. People v. Johnson, 10 N.Y.3d 875, 878 (2008); Danielson, 9 N.Y.3d at 349.

In addition to proving a defendant's guilt of the charged crimes beyond a reasonable doubt, when justification is raised as a defense, the People have to disprove the defense beyond a reasonable doubt. See P.L. § 25.00(1); People v. Craig, 78 N.Y.2d 616, 619, n.1 (1991); People v. McManus, 67 N.Y.2d 541, 546 (1986). The defense of justification allows a defendant to use deadly physical force against someone, when the defendant "reasonably believes that such other person is committing or attempting to commit a . . . forcible rape." P.L. § 35.15(2)(b).

28

By itself, Anthony Wilson's call to 911 disproved justification. After all, someone committing a rape is not going to call the police to come to the scene.

There was much more evidence disproving justification than just Wilson's call to 911. The purpose of that call was to have defendant removed from the apartment because she was "acting all crazy." Wilson would not have wanted defendant out of his apartment if he was hopeful of having sex with her, whether against her will or not. Also, the abrupt end to the call without any response from Wilson to the 911 operator's inquiries was indicative that he, not defendant, was being attacked.

Defendant argues that Wilson's intoxication, the possibility that Wilson was high, and the possibility that Wilson was hallucinating made his call to 911 untrustworthy and that the abrupt end of the call could have been because Wilson "changed his mind about wanting police to remove her" (Defendant's Brief at 44-45). However, defendant's articulation of his words on the call is clear and not slurred. The determination in his voice to have defendant removed from his apartment was such that he would not have suddenly changed his mind about having defendant removed without telling the 911 operator. Thus, defendant's arguments are speculative and based on a view of the facts in the light most

favorable to the defendant, which is contrary to the proper standard of review for legal sufficiency.

The nature of the wounds, particularly when contrasted with defendant's statements, also disproved justification. The testimony of Doctor Scordi-Bello that the clustering of four of the wounds on the left side of the chest was indicative of Wilson not actively moving when those wounds were made and the lack of defensive wounds on Wilson meant that he was unable to resist defendant's onslaught with the knife. If defendant was trying to resist Wilson's alleged advance on her in his rape attempt, the number and the severity of the wounds went beyond what was necessary to stop the advance. Furthermore, in her videotaped statement, defendant demonstrated how she was bent over and unable to push herself up so that she was able to stab only at Wilson's legs. However, all seven of the wounds were to the upper chest or to the back of the shoulder and six of the wounds were in a downward direction. Thus, the stabs wounds could not possibly have been made as defendant described and demonstrated in her video-recorded statement.

When defendant first met Shepard after the murder, defendant never mentioned the alleged rape. She said only that she "poked him" because she was "not going to pay rent and fuck him, too." If the alleged rape was why she "poked" Wilson, then she had no

reason not to mention it.  The motive of the alleged rape would have been a more understandable and sympathetic reason for the stabbing rather than the motive of the thinking that consensual sex and paying rent was too much to ask of her.

Even when she later told Shepard that Wilson allegedly tried to force himself on her, she did not describe what she meant by force.  Defendant could have meant that Wilson was being particularly insistent on having sex, but that Wilson could have stopped short of where the sex would have been non-consensual.

Lastly, her use of the term "pok[ing]" to describe the stabbing and the use of Wilson's phone after he was dead showed her callousness.  It showed how she trivialized Wilson's life to the extent that she would kill him if he would no longer provide a nearly free place for her to live.  Her fleeing the jurisdiction after the murder demonstrated her consciousness of guilt.

The stripping of Wilson's body and the attempted wiping up of Wilson's blood and feces, which could only have been done by defendant since Wilson was dead or dying, was an unsuccessful attempt to make the scene appear as if an attempted rape had occurred and also demonstrated defendant's consciousness of guilt. The blood and the feces or urine on Wilson's jeans and the inside-out condition of the jeans when found show that Wilson was wearing the jeans when he was stabbed.  If Wilson was sexually advancing

against the sleeping defendant in the middle of the night, he likely would not have had jeans on and those jeans would not have been turned inside-out with blood and feces staining them.

Defendant argues that Wilson could have lived for as long as twenty minutes after the stabbing and so could have taken off his jeans and tried to clean up the blood himself (Defendant's Brief at 44). Defendant fails to explain why Wilson, with stab wounds to his lungs and heart, would be more interested in taking off his soiled jeans and cleaning his apartment instead of seeking help for his failing condition.

Nevertheless, defendant's argument about the twenty minutes ignores the standard of review that the evidence has to be viewed in the light most favorable to the People. Doctor Scordi-Bello did not testify that Wilson could have lived for twenty minutes after the stabbing; rather, she testified that, although none of the wounds was instantaneously fatal, she did not have a way of knowing specifically how long defendant could have lived after the stabbing and did not commit to any of defendant's suggested possibilities that Wilson could have lived for five, ten, or twenty minutes (Scordi-Bello: 257-58). Doctor Scordi-Bello further testified that the wounds to the heart and lungs "would have impaired him at some level," could have affected "his ability to move around," and could have led to unconsciousness in seconds

or minutes, without being specific as to the exact time (Scordi-Bello: 259). Doctor Scordi-Bello added that "the more injuries, the more blood loss, the quicker someone will lose consciousness" (Scordi-Bello: 260). Thus, defendant's argument that Wilson, rather than defendant, could have taken off the jeans and tried to clean the apartment is without merit.

Under all of these circumstances, in the light most favorable to the People, a rational jury could find that justification was disproven beyond a reasonable doubt. The evidence of guilt, therefore, was legally sufficient.

The verdict was not against the weight of the evidence. Defendant presented no evidence. Accordingly, her defense was based primarily on her statements to law enforcement. Those statements were largely self-serving and unsupported by the physical evidence. Not only did the physical evidence of the stab wounds contradict the videotaped statement's description of the stabbing, but the evidence of when defendant used Wilson's phone and when Wilson made the 911 call was made contradicted defendant's statements that the stabbing happened at 3:00 a.m.

In defendant's video-recorded statement, she said that, while she was living in Wilson's apartment, she slept on the couch, and Wilson slept on the bed. She also said that she was sitting on the couch when defendant attempted to rape her. The crime scene

evidence, however, showed no couch. The only furniture in the apartment to lie down on was a queen-sized bed. The only furniture to even sit on was two kitchen chairs and a cushioned chair. This evidence of the furniture also undermined defendant's assertion in her statements that she did not have a sexual relationship with Wilson, because the only place in that tiny apartment for defendant to sleep was alongside Wilson on the queen-sized mattress.

Defendant argues that Shepard's testimony corroborated her statements about the alleged attempted rape because Shepard testified that defendant sounded "stressed" when she called him and that defendant had swelling to her face (Defendant's Brief at 42). The stress defendant apparently felt did not necessarily corroborate her statements about the alleged rape because the stress could have been attributable to knowledge that she had just killed someone and could now be criminally liable for the murder. The stress could also have been attributable to her facing the prospect of homelessness. Although Shepard noticed "a little bit" of swelling on defendant, he also testified that defendant had no blood on her, adding that "[s]he would never got to [his] house if she had that on her" (Shepard: 355). This testimony of Shepard corroborates the People's evidence as to the lack of an attempted rape because it shows that defendant's blood found in the bathroom

34

was there for a reason unrelated to Wilson's supposed striking her during the alleged attempted rape.   Because of the incredibility of defendant's statements, and because of the strong inference disproving justification from the People's evidence, the verdict was not against the weight of the evidence.

POINT II

DEFENDANT FAILS TO SHOW THAT THE PEOPLE'S
CONDITION FOR DEFENDANT'S ACCESS TO MATTHEW
SHEPARD PREJUDICED HER.

To obtain reversal of a conviction, "a defendant, when claiming improper denial of access to a potential witness on due process grounds, must make a showing of more than merely the witness' inaccessibility." Kines v. Butterworth, 669 F.2d 6, 9 (1st Cir. 1981) (citing United States v. Scott, 518 F.2d 261, 268 [6th Cir. 1975]); see United States v. Cook, 608 F.2d 1175, 1182 (9th Cir. 1979); Salemme v. Ristaino, 587 F.2d 81, 87-88 (1st Cir. 1978). Here, the People did not completely deny defendant's counsel access to Matthew Shepard; the People conditioned his access on having the prosecutor or a detective investigator present when defendant's counsel spoke with Shepard. Although this condition was improper, defendant cannot show that she was prejudiced.

The record showed that Shepard was willing to speak with defendant's counsel even if someone else was present. The People never instructed Shepard not to talk to defendant's counsel unless someone from the prosecution was present and never said anything to dissuade him from speaking with defendant's counsel. See United States v. White, 454 F.2d 435, 439 (7th Cir. 1971) ("reversal on this ground requires a clear showing that the

government instructed the witness not to cooperate with the defendant"); United States v. Kemp, 379 F.Supp.2d 690, 714 (E.D. Pa. 2005) (no new trial because defendant did not "allege that the prosecution told [the witness] not to talk to [defendant]'s counsel or in any other way denied [defendant] access to witnesses"), aff'd, 500 F.3d 257 (3d Dir. 2007). Although defendant's counsel complained generally about the condition, he failed to specify what subjects he wished to discuss with Shepard that would have revealed any defense strategy to the prosecution or otherwise would have needed privacy. Indeed, defendant's counsel said that he wanted to ask Shepard only "a few questions" (336).

It is difficult to fathom what defendant's counsel could have discussed with Shepard that would have made a difference in the trial. Shepard was not a surprise witness. He testified in the grand jury and was listed as one of the People's potential witness at the beginning of trial (J. 25). The People disclosed Shepard's grand jury testimony under C.P.L. § 240.20(1)(a) and People v. Rosario, 9 N.Y.2d 286 (1961). Thus, defendant knew what Shepard's trial testimony was expected to be. See Kines, 669 F.2d at 10 ("Discovery proceedings had produced for the defense the grand jury minutes"); United States v. Lynch, 529 F.2d 518 (4th Cir. 1975) (pre-trial restriction of defense access to a witness was

not improper because the defense "had access to his statements and were able fully to cross-examine and impeach him").

Furthermore, the evidence at trial showed that defendant called Shepard on the phone and went to his home on the night of the stabbing.  Thus, defendant had both Shepard's phone number and Shepard's address by which defendant's counsel could have attempted to contact him before trial.  See Kemp, 379 F.Supp.2d at 714 (defendant does not "allege that the Court in any way prevented or limited his access to [the witness] before or during trial, except at the moment she was arriving to testify") (emphasis added).  Although the People needed a material witness warrant to bring Shepard to court, it does not follow that Shepard would have been uncooperative with the defense if defendant's counsel had reached out to him before trial, especially when Shepard had a criminal record and had been physically attracted to defendant.

Additionally, Shepard's testimony was uncomplicated.  He testified to two short encounters he had with defendant.  The first encounter was when he met her and they exchanged phone numbers.  The second encounter was when she went to Shepard after the stabbing.  The relevance of the latter encounter was that defendant made a statement to Shepard about stabbing Anthony Wilson because she did not want both to have sex with him and to

pay him rent.   The relevance was also that defendant did not appear to Shepard to be bleeding or to have any injuries.

Defendant argues that, even without an interview of Shepard, her counsel elicited unexpected and favorable testimony that defendant told Shepard that Wilson had "tried to take it, tried to force his self on her" (367-68), and so, with an interview of Shepard, her counsel "may have been able to elicit additional exculpatory evidence" (Defendant's Brief at 56).   However, defendant's counsel cross-examination of Shepard was quite thorough, and so the argument that an interview of Shepard could have uncovered even more exculpatory testimony is entirely speculative.

Defendant also suggests that, if her counsel had known that he would elicit the allegedly favorable testimony about Wilson forcing himself on defendant, then her counsel would not have tried to impeach Shepard with his prior convictions and drug problems (Defendant's Brief at 56).   However, the People had already elicited Shepard's criminal and drug background on direct examination.   Thus, if defendant's counsel had refrained from cross-examining Shepard about his criminal and drug histories, the evidence of Shepard's background would still have been before the jury.

39

Lastly, the condition on defendant's counsel's access to Shepard was harmless, because even if defendant's counsel could have cross-examined Shepard so that his testimony would have been fully supportive of defendant's justification defense, the verdict would not have been different. The main issue the jury had to decide was whether the stabbing was justified in defense against an attempted rape. The evidence of Wilson's call to 911, by itself, disproved justification. If Wilson was truly trying to rape defendant, he would not have tried to call the police to the scene. Additionally, the physical evidence at the scene and the evidence of the stab wounds contradicted defendant's statements about the attempted rape in many ways (see infra at 50-51). Because of this overwhelming evidence of guilt, and because of all the other circumstances, the alleged condition on defendant's counsel's access to Shepard is not grounds for reversal of the conviction.

POINT III

PART OF DEFENDANT'S CLAIM THAT HIS RIGHT TO
PRESENT A DEFENSE WAS VIOLATED IS UNPRESERVED
FOR APPELLATE REVIEW. FURTHERMORE, THIS
RIGHT WAS NOT VIOLATED BECAUSE THE TRIAL
COURT'S EXCLUSION OF THE MEDICAL RECORDS AND
THE DOMESTIC INCIDENT REPORTS FROM EVIDENCE
WAS PROPER.

A.    The Trial Court's Exclusion of Anthony Wilson's Medical
Records or Any Expert Testimony about Those Records Was
Proper Because There Was No Evidence that Wilson Was
Psychotic When He Allegedly Attempted to Rape Defendant
or that Defendant Knew that Wilson Had Been Prescribed
Seroquel for any Alleged Violent Psychosis.

When a defendant raises a justification defense in a homicide

prosecution, evidence of "prior violent acts of the deceased,

known to the defendant" is admissible on the issue of "whether the

defendant's asserted fear of the deceased was reasonable." People

v. Miller, 39 N.Y.2d 543, 550 (1976) (emphasis added); see also

People v. Reynoso, 73 N.Y.2d 816, 819 (1988) (evidence of the

"presence of a controlled substance in the victim's body" was

properly excluded "since there is no indication in the record that

defendant knew that the victim was acting under the influence of

drugs").    Included in what is considered evidence of "prior

violent acts" is a decedent's medical records when those records

help to explain a decedent's "bizarre behavior." People v.

Trivette, 175 A.D.2d 330, 331-32 (3d Dep't 1991) (citing Miller,

39 N.Y.2d at 548-49); see People v. Frazier, 6 A.D.3d 455, 456 (2d

Dep't 2004); People v. Adams, 272 A.D.2d 953 (4th Dep't 2000).

41

Here, the trial court's exclusion of Anthony Wilson's medical records or any expert witness's testimony explaining those records was proper for several reasons.  First, there was no evidence that Wilson was hallucinating or was psychotic when he allegedly attempted to rape defendant.  In her written statement, defendant said that she was on the couch gathering her clothes when defendant said, "I'm getting some pussy tonight" (People's Exhibit 55).  In her video-recorded statement, defendant said that defendant touched her when she was sleeping and then said that he would get "pussy" that night.  In both statements, Wilson then argues with defendant about whether they will have sex.  Defendant never alleged that Wilson was incoherent or unresponsive in the argument or that Wilson acted in any way suggestive of a loss of mental control.  Much of what Wilson was alleged to have said to defendant, such as his demands for sex and his name calling of defendant, might have been vulgar and abusive, but it was not irrational or otherwise indicative of hallucinations or loss of mental control.  Thus, Wilson's medical records were not admissible because, in the absence of an inference that Wilson's alleged attempted rape of defendant was hallucinatory or psychotic, the records were irrelevant and would have invited the jury to speculate about Wilson's mental condition.  See People v. Washington, 221 A.D.2d 391, 392 (2d Dep't 1995) (records of

42

defendant's alcoholism properly excluded from evidence because records "would force the jury to engage in gross speculation as to whether or not the witness suffered from this condition on the day of the incident"); People v. Smith, 192 A.D.2d 806, 808 (2d Dep't 1993) ("Supreme Court, after reviewing the [complainant's psychiatric records] in question, quite properly excluded them because of their remoteness in time and the absence therein of any evidence of hallucinations, fantasies or false claims of sexual attack on the complainant's part"); People v. Graham, 117 A.D.2d 832, 834 (3d Dep't 1986) ("trial court's refusal of defendant's request for [the complainant's psychiatric records] was not an abuse of discretion, since the records contained no evidence of hallucinations, fantasies or false claims of sexual attack").

Second, even if defendant's statements had created an inference that defendant was not fully in control of himself, Wilson's medical records were still inadmissible, because the evidence did not show that defendant knew Wilson had been prescribed Seroquel, as reflected in the medical records, or why Seroquel had been prescribed.  In other words, unless defendant knew that, at the time of the alleged attempted rape, Wilson could be violent because he had not taken his Seroquel, then the evidence that defendant had not taken it was not probative of the reasonableness of defendant's supposed fear of Wilson.  See Adams,

272 A.D.2d at 953 ("Defendant failed, however, to present evidence that he was aware of the victim's psychiatric history at the time of the incident and thus failed to establish that the records were relevant to defendant's state of mind"); People v. Nickerson, 175 A.D.2d 74, 77 (1st Dep't 1991) (evidence of the decedent's drug addiction was properly precluded because defendant had no prior knowledge of the decedent).

Defendant asserts that she "undoubtedly was aware of Wilson's psychiatric issues, given that she had been living with him for about a month and his prescription bottles were in plain view" (Defendant's Brief at 60). To the contrary, it is very doubtful that defendant was aware of Wilson's alleged "psychiatric issues."

The prescription bottles, which included the bottle of Seroquel, were not in plain view, but were, as found by the crime scene detective, underneath the bed. If Wilson had kept his Seroquel bottle underneath the bed, then defendant might never have seen the bottle. Even if the Seroquel bottle had ever been in defendant's view, there is no evidence that defendant had ever looked at the label to see what was in the bottle. Even if defendant had looked at the label to see what was in the bottle, there is no evidence that defendant had known what conditions the Seroquel was intended to treat -- at least two different conditions were mentioned in Wilson's medical record,

hallucinations/psychosis and depression.   Even if defendant had known that the Seroquel was intended to treat a condition that could potentially make Wilson violent, there is no evidence that defendant had known that Wilson had not taken the Seroquel at the time of the alleged attempted rape.

Moreover, defendant never stated that, in the one-month period in which she lived with Wilson, he exhibited any psychotic or hallucinatory behavior.   She also never stated that Wilson behaved differently when he was on Seroquel from when he was not on Seroquel.   She stated only that Wilson becomes "like a different person" when he smokes crack cocaine (People's Exhibit 55).   Because defendant could not establish that she knew Wilson had been prescribed Seroquel to treat a condition that made him potentially violent and that she knew he had not taken Seroquel at the time of the alleged attempted rape, she could not establish that the evidence of his not taking it was probative of the reasonableness of her purported fear that Wilson would rape her or otherwise be violent toward her.

In any event, the reasonableness of defendant's purported fear of Wilson was never an issue at trial.   The People never argued that defendant's use of deadly physical force to resist an alleged rape was unreasonable.   Rather, on the issue of justification, the People argued only that defendant's statements

45

about the alleged attempted rape was a fabrication to evade criminal liability for Wilson's death.  Under these circumstances, the trial court's exclusion of the evidence of defendant's medical records, specifically his use or non-use of Seroquel, was not an abuse of discretion because defendant's reasonableness in her use of deadly physical force for justification was not contested.  See People v. Washington, 221 A.D.2d 391, 392 (2d Dep't 1995) (medical records properly excluded because, in part, "the witness's alcoholism was not in dispute").

Third, because defendant failed to show that the Seroquel was intended to treat a condition that made Wilson potentially violent, defendant failed to make an adequate record to show that the trial court's exclusion of this evidence was supposedly erroneous.  The trial court reviewed Wilson's medical records and stated on the record that Wilson "wasn't being treated for hallucinations" or for being "psychotic," but "was being treated because he was depressive" (55-56).  See People v. Fish, 235 A.D.2d 578, 580 (3d Dep't 1997) (psychiatric records properly excluded from evidence because, after in camera review, court found "no evidence that the victim has a history of hallucinations, sexual fantasies or false reports of sexual attacks").  Defendant disagreed with the trial court and said that the prescription was to treat "hallucinations, to harm himself or

others," and "psychosis" (53-58).   Wilson's medical records were not made part of the trial record, and so defendant cannot establish that she was right and the trial court was wrong about the reason why Seroquel was prescribed for Wilson.[8]   Consequently, defendant fails to make an adequate record to establish the merits of her claim.

Defendant further argues that Wilson's medical records should have been admitted on the ground that they were probative of Wilson's credibility, which the People supposedly put into issue through Wilson's 911 call (Defendant's Brief at 62).   This argument is unpreserved for appellate review because, in the trial court, defendant never sought admission of Wilson's psychiatric records as impeachment for his credibility on the 911 call.   See C.P.L. § 470.05(2).

This argument is also without merit because, when a hearsay declarant does not testify at trial, "evidence tending to impair the declarant's credibility is admissible to the extent that such evidence would have been admissible had the declarant been a witness on the trial."   Prince, Richardson on Evidence, § 8-111 (2008); see Fed. R. Evid. 806.   None of the possible conditions

---

[8] Defendant submitted defendant's medical records, which were records of his participation in a drug treatment program, to this Court with her brief.   These medical records, however, were not part of the trial record.   Although the records were submitted to the trial court for the review, they were not made an exhibit and were not put in the court's file.

for which Wilson was taking Seroquel was probative of his truthfulness about wanting defendant out of his apartment when he called 911. Thus, Wilson's medical records were inadmissible just as they would have been inadmissible if Wilson had survived to testify at trial.

Defendant also argues that the trial court restricted her cross-examination of the medical examiner about the use of Seroquel, her cross-examination of Victoria Wilson about Anthony Wilson's abuse of alcohol, and her cross-examination of Shakeema Fortune about Wilson's health problems (Defendant's Brief at 63-64). The trial court properly sustained the People's objections to defendant's questions of the medical examiner about Seroquel, because defendant was trying get through the back door what she was not able to get through the front door -- the inference that Wilson became violent because he had not taken Seroquel (255-56, 263-64). The trial court properly sustained the People's objection to the cross-examination of Victoria for several reasons:  the question of whether alcohol was "abused" was vague; no foundation was established that Wilson ever drank alcohol in Victoria's presence; and the only time that Wilson's state of alcohol intoxication was relevant was at the time of the murder, which Victoria did not witness. For the same reason, the trial court properly sustained the People's objection to the cross-

examination of Fortune about Wilson's "health issues" (142). Therefore, the trial court's preclusion of Wilson's medical record and his allege curtailment of cross-examination did not violate defendant's right to present a defense.

In any event, if the preclusion of Wilson's medical records or the alleged curtailment of cross-examination was error, the error was harmless. See People v. Donati, 169 A.D.2d 837, 838 (2d Dep't 1991); People v. Morris, 153 A.D.2d 984, 985-86 (3d Dep't 1989). Although the jury might not have known about defendant's alleged failure to take the Seroquel, the jury already knew from the autopsy report that Wilson had a breakdown product and a cutting agent of cocaine in his system and had a .20% blood alcohol content. Thus, the jury knew that Wilson was not sober and had been abusing recreational drugs at the time of his death.

Furthermore, the evidence of guilt was overwhelming. The main issue the jury had to decide was whether the stabbing was justified in defense against an attempted rape. Defendant's identity as the person who stabbed Wilson was not in dispute, and there was no evidence that even hinted that anyone else would have committed the stabbing.

The evidence of Wilson's call to 911, by itself, overwhelmingly disproved justification. If Wilson was truly trying to rape defendant, he would not have tried to call the

police to the scene.  Even though Wilson did not speak of a threat during the 911 call, defendant nevertheless was behaving in a way that was so disturbing that a mature man felt the need to seek the police to remove a young woman from his apartment.

Matthew Shepard's testimony that defendant admitted "poking" Wilson because she did not want to have sex with him and pay rent simultaneously was further evidence that the killing was unjustified.  Shepard's testimony that defendant later said that Wilson had tried to force himself on her was vague and did not necessarily mean that Wilson was trying to rape defendant.  It could have meant that he was simply being insistent in wanting sex.  In any event, defendant's statement to Shepard about force was made after she reiterated her earlier statement about not wanting to have sex and pay rent simultaneously.  If the real reason for the stabbing of Wilson was an attempted rape, defendant would have portrayed herself much more sympathetically to Shepard if she had told him that the purpose of the stabbing was to fend off a rape rather than to avoid both having to have consensual sex with Wilson and to pay him rent.  Thus, Shepard's testimony was further evidence that overwhelmingly disproved justification.

Additionally, the physical evidence at the scene contradicted defendant's statements to law enforcement about the attempted rape.  Most notably, defendant claimed in her statements that, in

attempting to rape her, Wilson was pushing her down so that she could only stab at his legs. The stab wounds to Wilson, however, were all in his upper chest and upper body. The seven stab wounds, especially the four wounds that were clustered on the left side of the chest, showed that, according to the medical examiner, Wilson was stabbed while he was unable to resist.

Defendant also claimed in her statements to law enforcement that Wilson approached her about having sex when she was on the couch, where she had supposedly slept for a month without having sex with him. The crime scene evidence showed that there was no couch in the apartment. There was not even room in the apartment to fit a couch. The only piece of furniture on which anyone could lie down and sleep was the queen-sized bed. It strains credulity that if Wilson had wanted to have sex with defendant, he would have slept together with her on that bed for one month before asking her for sex.

Wilson's feces-stained jeans that had been pulled off of him inside-out, the blood smeared all over the apartment, and the other physical evidence there were all inconsistent with defendant's statements asserting justification. Because of this overwhelming evidence of guilt, any supposed error in the non-disclosure of Wilson's medical records was harmless.

B.    Defendant's Claim as to the Purported Domestic Incident
      Reports ("DIRs") Is Unpreserved for Appellate Review.
      Furthermore, the Trial Court's Exclusion of any DIRs Was
      Proper Because There Was No Evidence that Defendant Was
      Knowledgeable of the Contents of any DIR.

Defendant's claim about DIRs is unpreserved for appellate
review because she never actually requested any DIRs and, in any
event, never had the trial court rule on her purported request.   A
question of law is preserved for appellate review when a defendant
protests a court's ruling or when a defendant "without success has
either expressly or impliedly sought or requested a particular
ruling."   C.P.L. § 470.05(2).

Defendant,   through   her   counsel,   was   discussing   whether
Anthony Wilson's alleged attempted rape was the result of not
taking Seroquel, when the court asked, "Does he have any record or
any evidence of violence in his past?"   The People said, "No," but
then defendant said, "We are going to ask for DIR records because
it was in Family Court where he's accused of --" (59).   The trial
court interrupted defendant to learn that a DIR was a Domestic
Incident Report.   The People stated that Wilson "had problems with
his baby's mother" and was in Family Court seeking custody of the
child (59).

At this point, the discussion of the DIRs ended.   Defendant
shifted back to her argument about Wilson's medical records
showing that Wilson allegedly lied about no longer drinking or

taking drugs (59).  The trial court then remarked that defendant was trying to "dirty" Wilson.  Defendant responded to the trial court's remark by arguing the relevance of Wilson's not taking Seroquel and never returned to his supposed request for DIRs (59).

Thus, defendant did not explicitly request DIRs.  Defendant was only "going to ask" for them, but then ultimately never did. Specifically, defendant also never spoke of how she thought she should obtain them -- whether she was to subpoena the DIRs or have the court order the People to disclose them.  Defendant also never specified how many DIRs she was seeking, what the date or dates of the DIRs were, or what she expected the DIRs to show.

Moreover, the court's remark about "dirty[ing]" Wilson came after defendant spoke of the medical records showing that Wilson allegedly lied about his drinking and drug use.  Defendant's response to the court's remark about dirtying Wilson was to continue her argument about Seroquel.  Thus, the court's remark about dirtying Wilson was not a ruling that denied defendant's purported request for DIRs, and defendant's continued argument about the Seroquel showed that she was not seeking such a ruling. Therefore, defendant's claim regarding DIRs is unpreserved for appellate review, because defendant never requested the DIRs, and because defendant never had the trial court rule on her purported request for them.

In any event, for many of the reasons why Wilson's medical records were not admissible into evidence, the DIRs were not admissible into evidence. First, because the information in the DIRs was not shown to be the statements of any witnesses who testified at defendant's trial, the substance of the DIRs would have been inadmissible hearsay. See People v. Miller, 93 A.D.3d 1305, 1306 (4th Dep't 2012) (claim that the right to present a defense was violated when "hearsay testimony regarding the fact that children of the victim's mother were previously removed from her custody and placed in foster care" was precluded was "without merit inasmuch as defendant made no effort to establish such fact by a means other than inadmissible hearsay").

Second, defendant fails to show that she knew of the alleged instances of violence by Wilson supposedly described in the DIRs. See People v. Miller, 39 N.Y.2d 543, 550 (1976). Defendant argues that "[s]ince she was living with Wilson, there was a good chance she knew about the underlying incidents under investigation" (Defendant's Brief at 65). This argument is speculative. Wilson apparently lived alone when defendant moved in with him. There is no evidence that Wilson confided in her or had any reason to discuss his previous relationships with women with her. Without defendant's knowledge of the alleged incidents of violence

described in the DIRs, those alleged incidents were not relevant
to whether defendant's purported fear of Wilson was reasonable.

Defendant nevertheless argues that the DIRs were still
admissible even if she did not know of the alleged incidents
"because specific acts of violence would still be probative as to
whether Wilson was the initial aggressor" (Defendant's Brief at
65). Defendant is wrong. Evidence of a deceased's violent past
is inadmissible to show that the deceased was the initial
aggressor in a crime involving a justification defense. See
People v. Watson, 20 N.Y.3d 1018, 1020 (2013) (request by
defendant to "reconsider [Matter of] Robert S. [52 N.Y.2d 1046
(1981)] and Miller, and to hold that a defendant claiming
justification may offer evidence of an alleged victim's violent
acts, even those not known to the defendant, to establish that the
alleged victim had a propensity for violence" was denied).

Third and again, the reasonableness of defendant's purported
use of justification was not a contested issue at trial. The
issue the jury had to decide was whether defendant was telling the
truth that she stabbed Wilson to thwart his alleged attempt to
rape her or whether she stabbed him without justification.

Additionally, the court's preclusion of defendant's inquiry
of Valerie Wilson about whether Anthony Wilson had been
"physically abusive" to his daughter's mother was proper (74).

For the reasons stated above, evidence of any alleged instances of violence by Anthony Wilson were inadmissible unless it could be shown that defendant was aware of it.   Thus, whether Valerie Wilson knew or did not know of these alleged instances was irrelevant.

Moreover, the three cases on which defendant relies -- <u>People v. Rocco</u>, 170 A.D.2d 626, 627 (2d Dep't 1991), <u>People v. Thomas</u>, 130 A.D.2d 692 (2d Dep't 1987), and <u>People v. Gissendanner</u>, 48 N.Y.2d 543 (1979) (Defendant's Brief at 65) -- are distinguishable from his case because in those three cases, the court precluded cross-examination about a witnesses' own pending charges.   <u>Rocco</u>, 170 A.D.2d at 626; <u>Thomas</u>, 130 A.D.2d at 693; <u>Gissendanner</u>, 48 N.Y.2d at 550.   Here, the cross-examination of Valerie was about someone else's (Wilson's) alleged uncharged bad acts.   Therefore, <u>Rocco</u>, <u>Thomas</u>, and <u>Gissendanner</u> do not show any error by the trial court here.

The preclusion of the cross-examination of Valerie about Wilson's alleged long-standing abuse of alcohol was proper (75). Whether someone abuses alcohol is an opinion which a lay witness is not competent to give.   Moreover, defendant never established whether Valerie had ever seen Wilson drink or, if she did, whether he exhibited any signs of drunkenness.

Likewise, the preclusion of the cross-examination of Shakeema Fortune about whether Wilson was a "heavy drinker" was proper because that was an opinion (141). Defendant nevertheless was able to cross-examine her about whether she had ever seen him "drunk" or "stoned" (142). The preclusion of the question whether Wilson ever spoke to Fortune "about any health issues he might have" was proper, because what Wilson might have said, if he said anything at all, would have been inadmissible hearsay. Therefore, the trial court's preclusion of the DIRs and the preclusion of certain questions on cross-examination were proper and did not violate defendant's right to present a defense.

In any event, if the preclusion of the DIRs was error, the error was harmless beyond a reasonable doubt. See People v. Krut, 133 A.D.3d 781, 783 (2d Dep't 2015); People v. Thompson, 111 A.D.3d 56, 67 (2d Dep't 2013). This is because the evidence of guilt was overwhelming (see supra at 49-51).

POINT IV

THE ADMISSION OF ANTHONY WILSON'S CALL TO 911
INTO EVIDENCE WAS PROPER UNDER THE PRESENT
SENSE IMPRESSION EXCEPTION TO THE HEARSAY
RULE.

Under the present sense impression exception to the hearsay rule, a hearsay statement is admissible when it "describes or explains an event or condition and was 'made while the declarant was perceiving the event or condition.'" People v. Vasquez, 88 N.Y.2d 561, 574 (1996) (quoting People v. Brown, 80 N.Y.2d 729, 732 [1993]). Such a statement is considered reliable "because the contemporaneity of the communication minimizes the opportunity for calculated misstatement as well as the risk of inaccuracy from faulty memory. Id.; see Brown, 80 N.Y.2d at 732-33. To be admissible, the statement must be "sufficiently corroborated by other evidence." Brown 80 N.Y.2d at 734. The corroboration need not be from another witness who had an equal opportunity to observe the events described by the declarant, but should be evidence that shows "some additional indicia of reliability" of the statement. Id. at 736. Thus, "[b]ecause of the myriad of situations in which" the issue of corroboration arises, "the critical inquiry" is whether "the corroboration offered to support admission of the statement truly serves to support its substance and content." Vasquez, 88 N.Y.2d at 576.

Here, the 911 call met the criteria for a present sense impression. The statement in the call -- "I've got this girl in my house. I don't know what's wrong with her. She's acting all crazy, and I want her out of my house" -- was contemporaneous with the events being narrated. This is because Anthony Wilson used the present tense verb "acting" instead of using a past tense verb, and because Wilson presently wanted defendant out of his house.

Defendant argues that the statement was not contemporaneous because "Wilson did not describe anything [defendant] was doing, and [because] there is no background noise," and so it is equally likely that the event(s) had ended" (Defendant's Brief at 68-69). This argument makes no sense. If the event or events had ended, then Wilson would not have used the present tense verb and might have no longer wanted defendant removed from his apartment. As for the alleged lack of description, the amount of detail in the statement is unrelated to whether the statement is contemporaneous. Although Wilson did not elaborate on what he meant by defendant "acting all crazy," as long as she was "acting all crazy" when Wilson was speaking on the call, then the requirement of contemporaneity was met.

Under the circumstances, the corroboration requirement was also met. One of the circumstances was that there was no doubt

defendant stabbed Wilson to death. Thus, the only issue for the jury to decide was whether defendant was justified in stabbing him to prevent a rape. Accordingly, for the statement in the 911 call to be relevant, the corroboration need only show that it was more likely than not that the stabbing was unjustified.

The evidence that Wilson was found stabbed to death corroborated the substance of the statement in that, whatever defendant was doing that Wilson considered to be "all crazy," it was serious enough to warrant turning to the police to remove her from his apartment, where for a month, he had been allowing her to live. The evidence of the condition of Wilson and of his apartment when he was found was further corroboration of the "all crazy." The seven stab wounds, the location of five of the wounds being in the upper chest, the depth of some of the stab wounds being several inches deep, and the great force used to inflict the stab wounds that broke through the ribs showed that defendant was in acting in a frenzy of violence -- i.e., was acting "all crazy" -- against Wilson. The chaotic scene at the apartment, with overturned furniture and blood smeared all over, was even further evidence of the "all crazy."

Apart from what was found in the apartment, defendant's statement to Matthew Shepard -- that she was not going to have sex with Wilson and pay him rent at the same time and so she "poked"

him -- constituted further corroboration. Defendant's statement to Shepard showed that defendant and Wilson had a dispute over the terms of her subtenancy that was unresolved. The dispute corroborated the "all crazy," and the unresolved status of the dispute corroborated Wilson's desire to have her out of the apartment.

Defendant's arguments against corroboration are all speculative and without merit. Defendant argues that the statement in the call had no allusions to the stabbing, did not describe violent behavior or threats, and did not contain an expression of fear, and ended without any "crying out" (Defendant's Brief at 70-71). A reason that the statement included no references to violence is that defendant did not begin to stab Wilson while he was on the 911 call. The statement nevertheless showed that something was happening between defendant and Wilson that was serious enough to compel Wilson to try to call in the police to remove defendant. That serious something could not have been the alleged attempted rape because, if Wilson had been attempting a rape, he would not have called for the police to come to the scene. Thus, the lack any allusions to the stabbing or other references to violence in the statement does not mean that the statement in the 911 call was uncorroborated.

Defendant also argues that her statement was the only direct evidence of what happened and that "it contradicted Wilson's conclusory allegation" (Defendant's Brief at 71). Thus, according to defendant, Wilson could have been the one acting irrationally or there could have been intervening events between the 12:37 a.m. time of the 911 call and the 2:00 to 3:00 a.m. time of the alleged rape including Wilson allowing defendant to use his phone between those times (Defendant's Brief at 71-72). As explained above (see supra at 50-51), the evidence in the apartment and defendant's statements to Shepard failed to support defendant's attempted rape scenario. Defendant's assertions about Wilson acting irrationally or about intervening events are speculative and do not support her claim that the statements in the 911 call were uncorroborated. Therefore, the admission of the 911 call into evidence was proper because the statement in the call was contemporaneous with the events being described and because the other evidence sufficiently corroborated the statement to ensure its reliability.

In any event, if the admission on the 911 call was error, the error was harmless because there was no substantial probability that the error affected the verdict. People v. Kello, 96 N.Y.2d 740, 743-44 (2001). This is so because the evidence of guilt aside from the 911 call -- principally the testimony of Matthew

Shepard and the crime scene evidence -- was overwhelming (see supra at 49-51).

POINT V

DEFENDANT'S THIRD STATEMENT ABOUT THE ITEMS
SHE TOOK FROM ANTHONY WILSON WAS PROPERLY
ADMITTED INTO EVIDENCE. FURTHERMORE, THE
REFERENCE IN THAT STATEMENT TO WILSON'S
BENEFIT CARD AND THE OTHER EVIDENCE OF THE
USE OF THAT CARD WAS PROPERLY ADMITTED TO
HELP SHOW THE TIME OF THE KILLING.

A.   The Record Supports the Trial Court's Finding that
Defendant Did Not Unambiguously and Unequivocally Assert
Her Right to Silence, and so Detective Scandole Was Not
Required to Give the full *Miranda* Warnings again Before
Taking Defendant's Third Statement.

After receiving Miranda warnings and initially waiving the

right to silence, a defendant is free to assert that right during

the interrogation, and the police must cease the interrogation

upon that assertion.  Berghuis v. Thompkins, 560 U.S. 370, 382

(2010) (citing Michigan v. Mosley, 423 U.S. 96, 103 [1975]).  The

Fifth Amendment privilege against self-incrimination or the right

to silence, however, "generally is not self-executing," and a

defendant "who desires its protection 'must claim it.'"  Salinas

v. Texas, 133 S. Ct. 2174, 2178 (2013) (plurality opinion)

(quoting Minnesota v. Murphy, 465 U.S. 420, 425 [1984]).  Thus, a

defendant's assertion of his or her Fifth Amendment right to

silence must be unambiguous and unequivocal to be effective.

Thompkins, 560 U.S. at 381-82 (2010) (emphasis added).  Silence,

no matter how long it lasts, or unresponsiveness to questions

after Miranda warnings have been given does not constitute an assertion of the Fifth Amendment right to silence. Id. at 380-81.

The police must scrupulously honor a defendant's assertion of the right to silence. People v. Ferro, 63 N.Y.2d 316, 322 (1984). Accordingly, when such an assertion is made, a defendant "may not within a short period thereafter and without a fresh set of [Miranda] warnings be importuned to speak about the same suspected crime." Id. On the other hand, when no such assertion is made, "it is not necessary to repeat the warnings prior to subsequent questioning within a reasonable time thereafter, so long as the custody has remained continuous." People v. Petronio, 34 A.D.3d 602, 604 (2d Dep't 2006) (quoting People v. Glinsman, 107 A.D.2d 710 [2d Dep't 1985]).

Whether an assertion of the right to silence is "unequivocal is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request[,] including the defendant's demeanor, manner of expression and the particular words found to have been used by the defendant." People v. Zacher, 97 A.D.3d 1101 (4th Dep't 2012) (quoting People v Glover, 87 N.Y.2d 838, 839 [1995]) (alteration in Zacher); see also People v Dunbar, 104 A.D.3d 198, 210 (2d Dep't 2013) ("[T]he question of whether a defendant knowingly and intelligently waived his or her right[] to remain silent . . . is determined 'upon an

inquiry into the totality of the circumstances surrounding the interrogation' including an evaluation of the defendant's 'age, experience, education, background, and intelligence'") (quoting Fare v Michael C., 442 U.S. 707, 725 [1979]), aff'd, 24 N.Y.3d 304 (2014).   A trial court's determination that a defendant's assertion of the right to silence was equivocal is entitled to deference and will be upheld on appeal if supported by the record. People v. Smith, 140 A.D.3d 1774, 1775 (4th Dep't 2016); Zacher, 97 A.D.3d at 1101; see also People v. Prochilo, 41 N.Y.2d 759, 761 (1997) ("much weight must be accorded the determination of the suppression court with its peculiar advantages of having seen and heard the witnesses").

The record shows that defendant did not unambiguously and unequivocally invoke her right to silence when the video-recorded statement ended.   Defendant merely wanted to stop the statement temporarily, even though that statement did not resume.

Defendant was not the person who suggested that they temporarily stop the video-recorded statement; Assistant District Attorney Purce was the person.   He asked defendant, "You okay? You want to take a minute?   You want to stop for a second or do you want to continue?   You want to stop for a second?"   Defendant merely replied, "All right" (219) (emphasis added).   A.D.A. Purce followed up by saying, "We're just going to hold out here for a

<u>little bit</u>.  You take your time, all right?"  Defendant said, "All
right" (219).  A.D.A. Purce prefaced his last question by saying
that they were going to stop and that if defendant wanted to
continue they would "talk in a second" and then asked, "You want
us to stop right now?"  Defendant answered, "Yeah" (219).  A.D.A.
Purce said to "just stop the tape for now" and that there would be
"no further questions" until they resumed the tape (219-20).  The
emphasized parts of the quotations show that any desire not to
speak was not an invocation of her right to silence indefinitely,
but was meant to be a temporary pause in her statement until she
could compose herself.  The fact that the statement did not resume
meant only that defendant was not ready to resume before A.D.A.
Purce left the precinct.

At 10:00 a.m. the next morning, twelve and one-half hours
after the video-recorded statement ended, Detective Scandole
approached her about making another statement, which he explained
would be a response to just "a couple more questions," and
reminded her of her <u>Miranda</u> waivers from the previous day (211).
Defendant mentioned nothing about her supposed invocation of her
right to silence from the previous evening.  Therefore, defendant
did not unambiguously and unequivocally invoke her right to
silence when the video-recorded statement ended.

Defendant argues that the hearing court's decision "rested upon a misunderstanding of the law" when the court said, "Once she's informed, she's been warned. She doesn't have to be readvised" (Defendant's Brief at 77, citing record page 220). Defendant's argument is without merit because it takes what the court said out of context.

At the supplemental Huntley hearing, the People argued that defendant did not unequivocally invoke her right to silence because "she never says I don't want to talk to anybody anymore" (217). Defendant argued to the hearing court that the delay in bringing defendant to central booking was unreasonable "especially after somebody had said I don't want to talk anymore" (218). Faced with the issue the parties raised of whether defendant's choice not to talk was temporary until she could be composed or was permanent and applied to all of law enforcement, the court replied, "She said she didn't want to talk anymore with the A.D.A." (218). The court then read the transcript of A.D.A. Purce's exchange with defendant over stopping the recording to determine whether defendant wanted to stop speaking until she became composed or whether defendant wanted to stop speaking entirely with anyone (219-20). The court concluded, "She wanted to stop. That doesn't mean they couldn't the next day --" (220). In other words, the court concluded that defendant's decision to

stop speaking applied only for that moment when her emotions were overcoming her.   Thus, the court was not saying, as defendant argues, that once defendant had been given the Miranda warnings, she did not have to be given them again.   If defendant's argument was correct, then the court had no need to examine the exchange between A.D.A. Purce and defendant.

Furthermore, defendant's reliance upon People v. Legere, 81 A.D.3d 746 (2d Dep't 2011), is misplaced because Legere is factually distinguishable from defendant's case.   The defendant in Legere asserted his right to silence by telling the A.D.A., who sought to take a statement and gave him the Miranda warnings, "I just want to speak to my mother, that's it." Id. at 747.   When The A.D.A. asked again if defendant wanted to speak, the defendant said "No," and said, "I'm not feeling too good." Id.   Thus, the defendant there unambiguously and unequivocally said that he did not want to speak to anyone except his mother.   By contrast, defendant here never said that she did not want to speak to anyone; rather, she at all times was agreeable to continuing the statement after she composed herself.

Instead of being analogous to Legere, defendant's case is analogous to People v. Horton, 46 A.D.3d 1225, 1226 (3d Dep't 2007), where the defendant responded to the Miranda warnings by stating that he understood the rights and said, "I think I'll

wait," or "I think I'll wait a minute," before giving a statement. The Appellate Division there held that the defendant did not unambiguously and unequivocally assert his right silence because that alleged assertion was "'temporally qualified' and, in fact, implied that he might speak at a later time," which the defendant did a few minutes later.   Id.   Defendant's alleged assertion of her right to silence was similarly qualified in that she agreed with A.D.A. Purce that they would "stop for a second" or would "talk in a second" whenever defendant could compose herself (219). See also People v. Caruso, 34 A.D.3d 860, 862-63 (3d Dep't 2006) ("Defendant's first response to the question of whether he wished to speak ((i.e., 'Not right now')) was temporally qualified, it did not clearly communicate a desire to cease all questioning indefinitely and, in fact, connoted that speaking could be considered at a later time").

Defendant's case is also analogous to People v. Lowin, 36 A.D.3d 1153, 1155 (3d Dep't 2007), in which it was held that, when a detective disputed the defendant's version of events, the defendant's statement, "Then I'm done talking, okay, because that's what happened," in context, was not an unequivocal and unambiguous assertion of his right to silence.   This is because defendant's statement "merely reflected defendant's unwillingness to change his story."   Id.   Here, defendant's wanting to "stop"

her statement was, in context, an unwillingness to talk until she could compose herself.   Therefore, because defendant here did not unequivocally and unambiguously assert her right to silence, Detective Scandole could properly take defendant's third statement from her the next morning without readministering the complete Miranda warnings.

In any event, if the admission of the third statement was error, the error was harmless because there was no reasonable possibility that the error affected the verdict.   See People v. Pearson, 20 A.D.3d 575, 577 (2d Dep't 2005); People v. Nisbett, 225 A.D.2d 801, 802 (2d Dep't 1996;) People v. Brown, 266 A.D.2d 838, 838-39 (4th Dep't 1999). There was no reasonable possibility because the statement at issue, which spoke only of the property defendant took, was only a minor part of the total of defendant's statements.   Furthermore, the evidence of guilt was overwhelming (see supra at 49-51).

B.   The Evidence of the Use of Anthony Wilson's Benefit Card Was Admissible to Help Establish When Wilson Was Killed.

Evidence of a defendant's uncharged crimes or bad acts may be admitted, notwithstanding incidental prejudice to a defendant, where it is offered for some purpose other than to show a defendant's criminal disposition.   See People v. Morris, 21 N.Y.3d 588, 594 (2013); People v. Alvino, 71 N.Y.2d 233, 241 (1987);

People v. Vails, 43 N.Y.2d 364, 368 (1977); see also People v. Molineux, 168 N.Y. 264, 293 (1901).  Among the grounds for admission is to complete the narrative of the events.  Morris, 21 N.Y.3d at 594; see Molineux, 168 N.Y. at 293.  Furthermore, the probative value of the uncharged crime must outweigh any prejudice.  Morris, 21 N.Y.3d at 595; People v. Dorm, 12 N.Y.3d 16, 19 (2009).  Because the determination "whether the probity of such evidence exceeds the prejudice to the defendant is 'a delicate business,'" and because the trial court is "in the best position to evaluate [such] evidence," the trial court's decision to admit evidence of uncharged crimes or other bad acts is reviewed for an abuse of discretion.  Morris, 21 N.Y.3d at 597 (quoting People v. Resek, 3 N.Y.3d 385, 389 [2004]).

Here, the trial court did not abuse its discretion in admitting the evidence of Anthony Wilson's benefit card because that evidence helped to complete the narrative.  Specifically, it helped to establish when Wilson was killed.

The witness who last saw Wilson alive was Victoria Wilson, who testified that she last saw him on Thanksgiving (November 24) 2011.  The evidence of the 911 call showed that Wilson was still alive as of the time of the call, 12:37 a.m. on November 29, 2011.  Donet Robinson discovered that Anthony Wilson was dead on January 3, 2012, when he entered Wilson's apartment because mail was

piling up by the door. Victoria's testimony, Robinson's testimony, and the 911 call provided only a broad period -- from November 29, 2011 to sometime before January 3, 2012 -- in which Wilson was killed.

Other evidence circumstantially, but did not definitively, narrowed that period. The medical examiner, who examined the decomposition, could not state exactly when Wilson died, but could only state that the decomposition was consistent with death in late November (240-41). Defendant's statements and Shepard's testimony put the killing only as sometime around Thanksgiving. The cell phone records showed that death likely occurred between 12:37 a.m., the time of the 911 call, and 12:57 a.m., the next outgoing call from Wilson's phone, which went to a number that Wilson's phone had not called before. Although the evidence of the cell phone records was strongly suggestive that defendant made the calls from Wilson's phone after the 911 call, that evidence was not conclusive proof that defendant, and not Wilson or anyone else, was using the phone. Even if defendant was using Wilson's phone at that time, it was not conclusive proof that defendant had killed Wilson at that point.

Because the decomposition, defendant's statements, Shepard's testimony, and the phone records were not conclusive proof of the time of death, the records of the usage of Wilson's benefit card

73

was necessary as additional circumstantial evidence that was probative of the time of death. Those records showed that up to November 22, 2011, Wilson's card had been used at addresses on or near Broadway in Brooklyn close to where Wilson lived. Beginning on December 6, 2011, Wilson's card began to be used at Brooklyn locations not in the vicinity of Broadway. Thus, when viewed along with the 911 call, the records of the benefit card show the time of the killing to be somewhere from November 29 to December 6, 2011.

The probative value of this evidence outweighed any prejudicial effect. The People did not accuse defendant of using Wilson's benefit card and, on summation, explicitly said, "I am not suggesting to you that it was used by her" (460). Defendant already admitted in her statement that she took Wilson's cell phone and keys. Wilson's benefit card was merely one more item she took. Moreover, theft was not the motive for the killing. Thus, the jury would not infer that defendant had a propensity to commit murder because she stole a benefit card. This is especially so in light of the court's charge, which was given early in the trial and in the final charge, that defendant was not charged with the theft of Wilson's cellphone, wallet, and keys, that the evidence of that theft could not be considered "for the purpose of proving defendant had a propensity or predisposition to

commit the crime charged, and that it was offered only "to complete the narrative of what happened on the night of the incident" (495-96). Therefore, the admission of the evidence of the records of the usage of Wilson's benefit card was proper.

In any event, if the admission of the evidence of this record was error, the error was harmless because there was no significant probability that the error affected the verdict. See People v. Jackson, 8 N.Y.3d 869, 871 (2007); People v. Rodriguez, 111 A.D.3d 856, 858 (2d Dep't 2013). This was because the evidence of guilt was overwhelming (see supra at 49-51).

POINT VI

MUCH OF DEFENDANT'S CLAIM OF IMPROPER
SUMMATION IS UNPRESERVED FOR APPELLATE
REVIEW. ALL OF THE CLAIM IS WITHOUT MERIT,
AND NONE OF THE ALLEGED IMPROPER COMMENTS
DENIED DEFENDANT A FAIR TRIAL.

Much of defendant's claim of improper summation is unpreserved for appellate review because defendant failed to object to many of the comments that he now complains about on appeal. In any event, the People's summation was proper in that, contrary to defendant's claim, it proposed proper inferences for the jury to find based upon the evidence. If any summation comments arguably were improper, the comments did not deny defendant a fair trial.

To preserve a claim of improper summation for appellate review, a defendant must object on specific grounds to the alleged improper comments. People v. Tonge, 93 N.Y.2d 838, 839-40 (1999); People v. Tehava, 84 N.Y.2d 879, 881 (1994). Here, defendant failed to object to the three of the comments about a sexual arrangement and a lack of a rape (461, 473, 483). One of the objections that defendant asserts was to a sexual-arrangement/lack-of-rape comment was actually to a comment that the motive for the stabbing was Anthony Wilson's 911 call for defendant to be removed from his apartment (452). Thus, defendant never objected to any of the sexual-arrangement/lack-of-rape

comments.  As for the comments that the 911 call was the motive, defendant failed to object to two of those comments (468, 470). Defendant also failed to object to the second comment about her telling Matthew Shepard that Wilson forced himself on her so that Shepard would allow her to stay with him (479) and to one of the comments about defendant attempting to cover up the crime (472). Lastly, defendant failed to object to the comments that justification was "available in very limited circumstances" or that defendant was not "entitled" to that defense (483). Defendant's failure to object to these comments renders his claim unpreserved for appellate review as to these comments.

In any event, the comments defendant complains of were proper, and no comment denied defendant a fair trial.  It is well-settled that a prosecutor is afforded the widest possible latitude, within the four corners of the evidence, to comment upon every pertinent matter of fact bearing upon the questions the jury must decide, and to request that the jury draw fair inferences. People v. Williams, 29 N.Y.3d 84, 88 (2017); People v. Ashwal, 39 N.Y.2d 105, 109-110 (1976).  To obtain a reversal of a conviction because of an improper summation, a defendant must show that the summation comments substantially prejudiced him and deprived him of a fair trial.  People v. Romero, 7 N.Y.3d 911, 912-13 (2007); People v. Roopshand, 65 N.Y.2d 837 (1985); People v. Galloway, 54

N.Y.2d 396, 401 (1981).  To do this, the defendant needs to show that the summation comments were "flagrant or pervasive."  People v. Dunbar, 74 A.D.3d 1227, 1229 (2d Dep't 2010); People v. Almonte, 23 A.D.3d 392, 394 (2d Dep't 2005).  Moreover, a defendant must show a significant probability that the verdict would have been different but for the improper comments.  People v. Morgan, 66 N.Y.2d 255, 259 (1985) (citing People v. Crimmins, 36 N.Y.2d 230 [1975]); People v. Henderson, 83 A.D.3d 864, 865 (2d Dep't 2011).  Accordingly, when the evidence of guilt is strong, a defendant must show greater impropriety in the comments to establish prejudice.  People v. Brosnan, 32 N.Y.2d 254, 262 (1973); People v. Mairena, 150 A.D.3d 1267, 1268 (2d Dep't 2017); People v. Prince, 36 A.D.3d 833, 834 (2d Dep't 2007).

The People's argument that defendant and Wilson might have had a sexual arrangement was a proper inference based on the evidence.  According to the testimony of Shakeema Fortune, Wilson held out defendant as his girlfriend.  Defendant's statements showed that she and Wilson were strangers until they met at a time when defendant needed a place to live and that defendant did not pay rent.  The apartment itself was only a small studio with room for only one queen-sized bed and no couch.  Under all of these circumstances, the inference that Wilson, who was twice defendant's age, allowed defendant to stay at his apartment in

exchange for sex -- an inference that the People also argued was not certain (451, 462, 473) -- was proper and based upon the evidence.

This inference did not lead to what defendant considers to be an "outrageous argument," "highly offensive notion," and "rampant and misogynistic summation misconduct" that defendant could not be raped because she had previously had sex with Wilson (Defendant's Brief at 85-87). Defendant misunderstands what the People were arguing. The People argued:

> Maybe the deal got renegotiated. Maybe he tried to have sex with her. I am not saying he didn't try to have sex with her. Just because you don't want to have sex with someone doesn't mean that they are trying to rape you, okay. One is totally different from one another"

(452). The People went on to argue that "[n]o doubt he told her, look, if you're not going to have sex with me, you gotta get out" (453). In other words, what the People were arguing was that, if defendant no longer wanted to have sex with Wilson, then Wilson no longer wanted her in the apartment and called 911 to remove her.

What defendant fails to understand is that the People could urge the jury to credit some parts of defendant's statements, most notably the incriminatory parts, and to discredit other parts of those statements, most notably the self-serving, exculpatory parts such as the supposed attempted rape. Accordingly, the People were

not arguing that, just because defendant and Wilson might have had sex in the past, defendant no longer had the right to refuse to have sex with him.  The People were simply arguing that defendant could refuse to have sex with Wilson, but then defendant would have to leave the apartment.  Thus, defendant's labelling of the People's comments here as "outrageous," "highly offensive," and "misogynistic" is not only overheated and misguided hyperbole, it is without merit.

The People's comment that defendant's telling Shepard that Wilson tried to force himself on her was an "excuse" to persuade Shepard to take her into his home was a fair inference from the evidence (454-55, 479).  When defendant first spoke to Shepard after the murder, defendant said that she was not going to have sex with Wilson and pay rent, so she "poked" him.  Defendant said nothing about Wilson forcing himself on her until hours later when it was apparent that Shepard would not take her into his home. Moreover, having admitted to the stabbing of Wilson, defendant would want to reassure Shepard that she would not do the same to him if he took her into his home.  Thus, the People's comment that defendant's belated statement to Shepard about Wilson's alleged forcing himself on her was an excuse was a proper comment based on the evidence.

The People's comment that defendant admitted her intent to kill in her statements to the police also urged a proper inference based on the evidence. Defendant admitted that she stabbed Wilson to ward off his alleged attempt to rape her. Again, in making their argument, the People did not have to accept as true the part of defendant's statement that Wilson beat defendant to force her to have sex with him. Thus, the People's comment that defendant admitted her intent to kill, or at least an intent cause serious physical injury, when she admitted stabbing Wilson was a proper inference to draw.

The People's comments that defendant tried to cover up the murder and to evade capture by locking the door, turning off the heat, and going to New Jersey and Pennsylvania were fair inferences based on the evidence (458-59, 471-72). Defendant's locking of the door was a fair inference because defendant admitted in her statements that she took and discarded the key to the apartment and because Victoria Wilson and Donet Robinson testified that the apartment door was locked when they went there after the murder. Defendant's turning off the heat was a fair inference because Robinson testified that heat in the apartment was internally controlled. Because the date of the murder was November 29 or at least sometime after Thanksgiving, it is unlikely that defendant had the heat off, especially when he

apparently did not pay for the heat.  Defendant's leaving New York to evade capture for the murder was a fair inference because the record of the usage of defendant's benefit card showed that some of its use was in New Jersey and Pennsylvania between the date of the murder and the date of defendant's arrest.  Thus, none of these comments about defendant's cover up of the murder or her evasion of capture were improper.

The People's comments that the motive for the murder being the 911 call to have her removed from the apartment was a fair inference.  According to defendant, this was "a completely disproportionate and illogical response" and that she "gained nothing" from the murder (Defendant's Brief at 90).  Defendant, however, was facing homelessness.  Since she was being evicted from Wilson's apartment whether she killed him or not, she lost nothing by killing him.  As shown by Shepard's refusal to allow her into his home, defendant apparently had nowhere permanent to move at that time.  Thus, defendant had reason to be angry enough at Wilson to kill him.  The People's comments as to defendant's motive urged a proper inference for the jury to find.

Lastly, the People did not misstate the law of justification. The comment that defendant was "not entitled to that defense," in context, meant that unless the facts showed that she believed that she was being raped or was about to be raped, then defendant could

not be justified (483).   The comments that justification was only in "very limited circumstances" and had "very specific" criteria were not misstatements of the law.   The court was to charge the jury on the elements of justification and so the jury could determine for itself whether the circumstances of the defense were "very limited" or whether the criteria of the defense were "very specific."   Therefore, the comments about the justification, as with all of the comments defendant complains about on appeal, were proper.

If any comments arguably were improper, the alleged improper comments did not deny defendant a fair trial.   This is because the evidence of guilt was overwhelming (see supra at 49-51).

Additionally, before the summations, the court charged the jury that summations were not evidence, that the attorneys would "be making arguments based on their memory of the evidence," but that the jury's memory of the evidence would control (409).   In the final charge, the court said that the jury was "not bound to accept the arguments of respective counsel," that the arguments could be accepted if "reasonable and logical and based on the evidence" as the jury recalled it, and that the arguments could be rejected if "unreasonable, illogical or inconsistent with the evidence" (488).   These charges alleviated any prejudice.   See People v. Armonte, 287 A.D.2d 645, 646 (2d Dep't 2001) ("any

possible prejudice as a result of the prosecutor's summation was averted by the court's limiting instructions that the comments of counsel were not evidence, followed by the court's curative instructions"); People v. Glod, 234 A.D.2d 384, 385 (2d Dep't 1996) ("the trial court's curative instructions and instruction that the attorneys' summations were not evidence were sufficient to ensure the defendant a fair trial").  This is particularly so when so many of defendant's objections were on the grounds of no evidentiary support or of misstating the evidence, and the court responded to those objections by instructing the jury that their memory of the evidence controlled (448, 451, 458-59, 460, 461, 466, 474, 475).  Therefore, any alleged improper comments in summation did not deny defendant a fair trial.

CONCLUSION

THE     JUDGMENT     OF     CONVICTION     SHOULD     BE
AFFIRMED.

Dated:  Brooklyn, New York
        September 29, 2017

                          Respectfully submitted,


                          ERIC GONZALEZ
                          Acting District Attorney
                          Kings County




LEONARD JOBLOVE
THOMAS M. ROSS
Assistant District Attorneys
      of Counsel

```
                    Certificate of Compliance
              Pursuant to 22 NYCRR § 670.10.3(f)
```

This brief was prepared on a computer.  A monospaced typeface was used, as follows:

```
        Name of typeface:    Courier New
        Point size:          12
        Line spacing:        Double
```

According to the word count of the word processing system used to prepare the brief, the total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is **18,186.**

```
                         Thomas M. Ross
                         Assistant District Attorney
```