COPY

*To be argued by*
TAMMY E. LINN
*(20 minutes)*

# New York Supreme Court

APPELLATE DIVISION -- SECOND DEPARTMENT

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*– against –*

ATARA WISDOM,

*Defendant-Appellant.*

*TO BE HEARD ON THE ORIGINAL RECORD*

Kings County
Ind. No. 6615/12
A.D. No. 14-09908

## REPLY BRIEF
## FOR DEFENDANT-APPELLANT

PAUL SKIP LAISURE
Attorney for
Defendant-Appellant
111 John Street, 9th Floor
New York, N.Y. 10038
(212) 693-0085



TAMMY E. LINN
*Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.......................................................................... 1

ARGUMENT........................................................................................................1

POINT I

    THE PEOPLE'S RESPONSE TO APPELLANT'S INDISPUTABLY PRESERVED SUFFICIENCY CLAIM RESTS ON "INFERENCES" THAT CAN ONLY BE REACHED BY SPECULATION AND BY IGNORING OR DISTORTING NUMEROUS PIECES OF THEIR OWN EVIDENCE.........................................................................1

POINT II

    THE CONCEDED ERROR OF INTERFERING WITH DEFENSE COUNSEL'S ACCESS TO A KEY PROSECUTION WITNESS PREJUDICED APPELLANT AND WAS NOT HARMLESS BEYOND A REASONABLE DOUBT. ........................................................8

POINT III

    THAT THE COURT IMPROPERLY PRECLUDED APPELLANT FROM REVEALING AND FURTHER EXPLORING WILSON'S MENTAL ILLNESS, SUBSTANCE ABUSE, AND ALLEGED DOMESTIC VIOLENCE HISTORY, IS A PRESERVED CLAIM IN EVERY ASPECT SAVE ONE, AND THE ERROR WAS NOT HARMLESS.......................................................11

POINT IV

    THE PEOPLE'S CONCLUSORY AND SPECULATIVE RESPONSE FAILS TO SHOW THE DECEASED'S 911 CALL WAS ADMISSIBLE AS A PRESENT SENSE IMPRESSION, AND THEIR CONTENTION THAT ANY ERROR WAS HARMLESS IS INCONSISTENT WITH THEIR POSITION THAT THE CALL DISPROVED JUSTFICATION "BY ITSELF." ...................................19

POINT V

(A) THE PEOPLE IGNORE THEIR OWN EVIDENCE ESTABLISHING THAT POLICE CONTINUED QUESTIONING APPELLANT AFTER SHE UNEQUIVOCALLY INVOKED HER RIGHT TO REMAIN SILENT; (B) THE PEOPLE'S *MOLINEUX* ARGUMENTS ILLUSTRATE THAT THE BENEFITS CARD EVIDENCE WAS CUMULATIVE AT BEST, AND SO ITS VALUE COULD NOT POSSIBLY OUTWEIGH ITS PREJUDICIAL IMPACT; AND THE SUPPRESSION AND *MOLINEUX* ERRORS WORKED IN TANDEM TO PAINT APPELLANT A LIAR WHEN HER JUSTIFICATION DEFENSE TURNED ON HER CREDIBILITY. .........................................................................22

POINT VI

THE PROSECUTOR'S SUMMATION REMARKS WERE NOT FAIR COMMENT OR RESPONSE, AND THIS COURT SHOULD REVIEW THEM IN THE INTEREST OF JUSTICE BECAUSE THEY UNFAIRLY ATTACKED APPELLANT'S JUSTIFICATION DEFENSE IN A WEAK CIRCUMSTANTIAL CASE. ........................26

CONCLUSION ..............................................................................................32

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,       :

                         Respondent,           :

            -against-                :

ATARA WISDOM,                      :

                  Defendant-Appellant.    :
------------------------------------------------------------------------x

PRELIMINARY STATEMENT

This Reply addresses certain arguments made in Respondent's Brief, dated September 29, 2017, and served by regular mail on that date. This Court extended appellant's time to reply to November 30, 2017.

ARGUMENT

POINT I

THE PEOPLE'S RESPONSE TO APPELLANT'S INDISPUTABLY PRESERVED SUFFICIENCY CLAIM RESTS ON "INFERENCES" THAT CAN ONLY BE REACHED BY SPECULATION AND BY IGNORING OR DISTORTING NUMEROUS PIECES OF THEIR OWN EVIDENCE.

In Point I of her brief, appellant argues that the People failed to prove beyond a reasonable doubt that appellant did not justifiably stab Wilson to prevent him from raping her (App. Br. at 39-49). Specifically, appellant argues that the People's only direct evidence consisted of her emotional written and video-recorded statements describing

1

the attempted rape, and because the People's circumstantial evidence—including a corroborating prompt outcry—was consistent with innocence, it could not disprove justification beyond a reasonable doubt (*id.*).

Although appellant's own statements were the key evidence against her, the People barely discuss them.[1] The People's sufficiency argument treats identity as a given (and they expressly argue this later, Resp. Br. at 49), but it was established solely through appellant's admissions to police and Shepard—admissions describing justification. The only other evidence linking appellant to Wilson was her DNA in his apartment and use of his phone, which clearly did not prove she stabbed him. Wilson's 911 call that night was not only inadmissible, but his hearsay statements that a woman was acting crazy were completely unreliable given silence in the background; that he was extremely intoxicated and possibly high on cocaine; and the unfair preclusion of his history of violent hallucinations and any exploration into whether substance abuse increased the chances of having a psychotic episode (Points III-IV, *post*). Thus, appellant's admissions to stabbing Wilson were necessary to prove identity.

On appeal, the People assert they were free to urge the jury to credit the incriminating portions and discredit "self-serving, exculpatory" portions (Resp. Br. at 79), and implicitly ask this Court to do the same. While this may be true in other

---

[1] The People excise the statements from their sufficiency arguments but they were admitted on the People's case-in-chief and clearly must be considered in a sufficiency analysis, not just in weight-of-the-evidence review (*see* Resp. Br. at 29-33).

cases, here, attacking appellant's admissions in "almost every facet . . . save one"—that she stabbed Wilson—runs afoul of the rule limiting the People's reliance on evidence they maintain "is an unbelievable story." *See People v. Reed*, 40 N.Y.2d 204, 206-09 (1976). In *Reed*, the Court of Appeals reversed a manslaughter conviction because, in attacking the believability of the sole eyewitness's justification description with circumstantial physical evidence, the People failed to prove guilt since there was no basis other than speculation for the jury to accept that she saw the defendant commit the shooting at all. *Id.* Notably, the Court found circumstantial proof of the defendant's presence that night insufficient to support the People's reliance on only the incriminating portion of the eyewitness's account. *Id.* at 206, 209. Here, circumstantial proof of appellant's presence in Wilson's apartment similarly does not provide a rational basis to conclude, beyond a reasonable doubt, that she truthfully admitted stabbing him but lied about everything else.

Moreover, the People cannot disprove justification without resorting to sheer speculation, which is not part of viewing the circumstantial evidence in the light most favorable to them. At a minimum, a different verdict would have been reasonable and the weight of the conflicting inferences balances in appellant's favor. In weight review, "[e]ven if all the elements and necessary findings are supported by some credible evidence, the [appellate] court must examine the evidence further. If based on all the credible evidence a different finding would not have been unreasonable," then the appellate court "must, like the trier of fact below, 'weigh the relative probative force of

conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony.'" *People v. Cahill*, 2 N.Y.3d 14, 57-58 (2003); *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987).

First, the People try in vain to downplay appellant's prompt outcry to Matthew Shepard, which corroborated the attempted rape.  Asked whether appellant told him Wilson "tried to rape her," Shepard said, "He <u>tried to force his self on her</u>, she did say that," and he "tried to take it, tried to <u>force his self on her</u>" (366-68; emphasis added). This was in no way ambiguous (Resp. Br. at 30-31, 50).  And, the record does not support the People's claim that the outcry occurred hours after Shepard picked up appellant, making it not prompt enough to be credible (*id.* at 31, 50, 80).  Shepard lived on Cedar Street in Brooklyn, less than a mile from Wilson's apartment at 832 Bushwick Avenue (Victoria Wilson: 67; Shepard: 344).[2]  It could not have taken more than a few minutes to drive to Shepard's home, where the outcry occurred, and there was no evidence as to how soon afterward her outcry came.  In any event, even a few hours is well within the parameters of what constitutes "prompt" outcry.  *E.g.*, *People v. Rosario*, 17 N.Y.3d 501, 513, 515 (2011) (weeks after abuse started deemed prompt, noting other examples include morning after sexual assault and within 12 hours).

---

[2]  We respectfully request judicial notice of this distance, which is based on a Google Maps calculation. *See Carreiro v. Colbert*, 45 Misc.3d 1221(A), *1 (Sup. Ct., Tompkins Cty. 2014) (taking judicial notice of distance between two residences based on Google Maps while noting, "[c]ourts commonly use internet mapping tools to take judicial notice of distance and geography") (citations omitted).

Appellant also told Shepard that Wilson hit her, and Shepard observed facial swelling. That he saw no blood does not prove there was no violence toward her (Resp. Br. at 34-35), but only that she cleaned up, which is consistent with her telling police she ran into the bathroom and with finding her blood there. Finally, there is a strong likelihood the jury discredited Shepard's corroborating testimony solely because defense counsel impeached his credibility due to the improper interference with counsel's right to interview him (Point III, *post*)), and because the prosecutor's summation mischaracterized the outcry testimony (Point VI, *post*).

Second, the physical evidence did not contradict appellant's statements, and the People may not distort their proof under the guise of viewing it in the light most favorable to them. Thus, the medical examiner's equivocal testimony that Wilson's wounds <u>could</u> have impaired his mobility within minutes, giving no indication of how likely this was, does not support the People's assertion that it was impossible he removed his own clothes and caused the blood and fecal smears in the apartment after having been stabbed (Resp. Br. at 31-32). The People also cherry-pick appellant's statement to claim that the location and number of wounds contradicted her (*id.* at 30). Appellant said that Wilson bent her over and hit her back as she faced the floor; she eventually struggled upright but could not push him away; and she stabbed Wilson as he continued to hold her. So, while she thought she "must have" stabbed Wilson's legs, the People ignore both her uncertainty and the fact that her description of stabbing

Wilson after she was upright, as he would not let go, was consistent with his wounds and lack of defensive wounds.

Similarly, the surrounding circumstances show it is not reasonable to infer that appellant was lying about the attempted rape and having no sexual relationship with Wilson simply because she referred to sleeping on Wilson's couch when, in fact, he had only a recliner (*id.* at 33-34). Appellant spoke to police eight months later, having stayed with Wilson for only about a month. And, it is both speculative and misleading to suggest there must have been a sexual relationship because there was nowhere to sleep except the bed. Appellant obviously could have meant that she slept in the recliner, and it makes sense that both she and Wilson would have agreed to that sleeping arrangement—he got $50 to $60 from her to cover some expenses while he was unemployed and struggling with a drug habit, and she desperately needed somewhere to stay while unable to afford rent. Indeed, she was in a homeless shelter when arrested.

There were myriad problems with the 911 call, which the People claim disproved justification "[b]y itself" (*id.* at 29, 40, 49), even setting aside that the jury should never have heard it (Point IV, *post*). The People assume Wilson made the call as a rational actor—thus, his statement on it about a woman acting crazy must be true—even though he had a .20 percent blood alcohol content and was possibly high on cocaine. Supposedly, viewing the 911 call in the People's favor requires ignoring these facts, simply because Wilson did not slur his words. But even medical professionals struggle to discern intoxication levels from outward behavior such as slurred speech, especially

in chronic drinkers like Wilson because tolerance masks outward symptoms; there is no evidence that tolerance minimizes alcohol's effect on judgment, however. *See* Kalen N. Olson et. al., *Relationship Between Blood Alcohol Concentration and Observable Symptoms of Intoxication in Patients Presenting to an Emergency Department*, 48 ALCOHOL AND ALCOHOLISM 4, 386-89 (2013), *available at* https://academic.oup.com/alcalc/article/48/4/386/534528/Relationship-Between-Blood-Alcohol-Concentration.   The risk that Wilson was hallucinating or hearing voices at the time, unknown to the jury (Point III, *post*), further undermined the weight owed the 911 call and increased the likelihood that Wilson attacked appellant.

The 911 call also did not describe any violence or threats by appellant, and it is sheer speculation, not reasonable inference, that the timing of the call and when appellant used Wilson's phone proved she lied about the time of the stabbing (Resp. Br. at 31-32).   As the People later concede when it suits their purposes, appellant's use of Wilson's phone did <u>not</u> prove she had already stabbed him (Resp. Br. at 73).   There is simply no way to establish the sequence of events without speculating (App. Br. at 45-46).   The People ignore that the phone records corroborate appellant's report of temporarily leaving Wilson's apartment a few days earlier after a prior incident of unwanted sexual touching; appellant said Wilson called her incessantly and, sure enough, the records showed he called her 25 times between November 26th and 28th.

Finally, the People conveniently ignore appellant's distraught demeanor in her video-recorded interview, and Shepard's testimony that he kept asking her what was

wrong, to claim that her "callousness"—based on using slang to describe what happened and leaving the city—disproved justification (Resp. Br. at 31). Not only is flight of "little weight" since fear of not being believed is an obvious innocent explanation (*see* App. Br. at 48 (providing cases)), but the related argument that appellant demonstrated consciousness of guilt by staging the scene in the apartment requires, as already noted, sheer speculation rather than logical inferences in the People's favor. The People also ignore that the jury could have discredited appellant and voted guilty simply because of the prosecutor's argument that she lied about an irrelevant uncharged theft (Point V, *post*).

In short, this Court should reverse, on the law and in the interest of justice, and dismiss the indictment because: (1) if appellant's admissions were completely unreliable, the People could not possibly prove beyond a reasonable doubt that she stabbed Wilson; and (2) the circumstantial evidence corroborated rather than contradicted her justification statement.

## POINT II

THE CONCEDED ERROR OF INTERFERING WITH DEFENSE COUNSEL'S ACCESS TO A KEY PROSECUTION WITNESS PREJUDICED APPELLANT AND WAS NOT HARMLESS BEYOND A REASONABLE DOUBT.

In Point II of her brief, appellant argues that the court's ruling that the prosecutor could insist on being present when defense counsel interviewed Shepard,

who was willing to speak to counsel but detained as a material witness, violated appellant's rights to due process, to present a defense, and to the effective assistance of counsel (App. Br. at 50-56).

The People concede the error and do not dispute it is preserved, arguing only lack of prejudice and harmlessness (Resp. Br. at 36-40). But they fail to recognize that there is more than a "reasonable possibility" that Shepard's testimony corroborating justification "might" have had greater impact with the jury if counsel had not focused solely on impeaching Shepard leading up to his unexpected corroboration. *People v. Crimmins*, 36 N.Y.2d 230, 237 (1975).

The People's lack of prejudice argument is twofold: (1) counsel's cross-examination of Shepard was "quite thorough," making it speculative to suggest counsel could have uncovered additional exculpatory information had he been permitted a private interview; and (2) counsel could have spoken to Shepard previously since he was not a surprise witness (Resp. Br. at 37-39). True, counsel's cross-examination was vigorous—in making every effort to impeach Shepard, including by asking whether he was sleep-deprived and "bad fucked up" when he picked up appellant. It would have been completely illogical for counsel to aggressively attack Shepard's credibility and memory had he known Shepard would corroborate appellant, and this was far more damaging than the People preemptively eliciting the mere fact of Shepard's prior convictions. Regarding the possibility of additional exculpatory information, counsel would have been able to explore whether appellant had also disclosed the attempted

9

rape before arriving at Shepard's home, her demeanor, whether she provided any details about how Wilson attacked her, and who knows what else. The People are correct that this is speculative but that is exactly the point; appellant was entitled to have her attorney investigate whatever issues he wanted with Shepard, and it is unfair to expect him to have done so in front of the jury risking that Shepard would strengthen the People's case. That counsel ended cross-examination so quickly following the surprise outcry testimony demonstrates his reluctance to delve deeper in front of the jury, as does the fact that it was the judge who solicited more detail about the outcry.

Given that the People needed a material witness order to get Shepard to cooperate, it makes no sense to argue that counsel could have spoken to Shepard previously. It is both speculative and illogical to assume Shepard might have been more willing to speak to counsel before trial, based on his having a criminal record and having been attracted to appellant years earlier. Notably, he and appellant barely knew each other and never spoke again after the night of the incident.

The undisputed standard for reviewing witness-interference error is whether there is a "reasonable possibility [it] might have contributed" to the verdict. *Crimmins*, 36 N.Y.2d at 237 (emphasis added). Appellant's statements were the People's only direct evidence, the case completely turned on her credibility about the attempted rape, and there is more than a reasonable possibility that unimpeached corroboration from Shepard might have outweighed the circumstantial evidence pointed to by the People, especially since the jury had to speculate about what that evidence meant.

<u>POINT III</u>

THAT THE COURT IMPROPERLY PRECLUDED
APPELLANT FROM REVEALING AND FURTHER
EXPLORING WILSON'S MENTAL ILLNESS,
SUBSTANCE ABUSE, AND ALLEGED DOMESTIC
VIOLENCE HISTORY, IS A PRESERVED CLAIM IN
EVERY ASPECT SAVE ONE, AND THE ERROR WAS
NOT HARMLESS.

Appellant argues in Point III of her brief that the court misunderstood Wilson's

medical records to conclude he had no history of psychosis, and then violated

appellant's right to present a defense by: precluding her from "explor[ing], through

Wilson's medical records, doctor, or an expert, whether Wilson's Seroquel

noncompliance and extreme intoxication increased the likelihood of experiencing

hallucinations and/or acting aggressively"; refusing to at least "conduct an in camera

interview of Wilson's doctor to ascertain the purpose of the Seroquel prescription";

restricting cross-examination about Wilson's psychiatric prescription and substance

abuse; and preventing exploration of Wilson's domestic violence through cross-

examination or disclosure of relevant DIRs (App. Br. at 57-67).

The People do not dispute that the court should have granted counsel's request

for *in camera* questioning of Wilson's doctor to determine the Seroquel prescription's

purpose (*see* Resp. Br. at 41-49). This error alone requires reversal. If Seroquel was

prescribed to treat Wilson's violent hallucinations and hearing voices, this would have

gutted the premise of several court rulings. It could not possibly be said that counsel

would be calling for speculation by revealing information from Wilson's own doctor to

the jury, and counsel would have had an even stronger argument for exploring through either Wilson's doctor or an expert how alcohol and drug use would likely affect him in light of his mental illness and Seroquel noncompliance.

A.     Wilson's Psychiatric and Substance Abuse History

Absent the *in camera* interview the People concede should have been granted, they argue the court properly precluded Wilson's records, related expert testimony, and cross-examination about his mental illness and substance abuse, for several reasons. They first contend that it would have invited unfair speculation because there was "no evidence he was hallucinating," "psychotic," "irrational," or exhibited a "loss of mental control" "when he allegedly attempted to rape defendant" (Resp. Br. at 42-43). Beyond suggesting that rape is a rational and controlled response to a woman saying no to sex, there <u>was</u> evidence that Wilson may have been having a psychotic episode. Angrily pacing back and forth, violently preventing appellant from leaving his apartment, and engaging in "vulgar and abusive" name-calling (*id.* at 42), all out of the blue, is not normal behavior. The 911 call was just as indicative of a hallucination as the truth of its contents given the silence in the background and lack of corroboration that a "crazy" woman was doing anything at all. And, had counsel been permitted to determine the Seroquel prescription's purpose and the effect of noncompliance, especially combined with substance abuse, the toxicology report could have further suggested Wilson was having a psychotic episode. The People's authority for precluding medical records are

completely inapposite, involving records that were either remote and contained no evidence of hallucinations, or about a witness whose behavior at the time of the crime was not in dispute (*id.* at 42-43).   Here, Wilson's records were recent, <u>did</u> contain evidence of hallucinations, and his behavior <u>was</u> in dispute.

Next, the People argue that, unless appellant knew Seroquel noncompliance could make Wilson violent, it was "not probative of the reasonableness of [her] supposed fear" (*id.* at 43-45).   But this confuses prior violent acts with objective medical evidence tending to show the victim may have been acting "crazy"—a view the Court of Appeals rejected decades ago when it unanimously endorsed the following reasoning for allowing proof of a victim's drug use unknown to the defendant:

> we see no legal barrier to . . . evidence of contemporaneous drug usage to support a justification defense where a defendant, though ignorant of drug use, reports crazed behavior consistent with such evidence. The report of the victim's physical condition at the time of death bears little resemblance to the character or reputation evidence at issue in *People v. Miller,* 39 N.Y.2d 543, 384 N.Y.S.2d 741, 349 N.E.2d 841 [1976] and its progeny, and is far more scientifically reliable as a basis for gauging the victim's behavior at the time of the incident.

*People v. Chevalier*, 20 A.D.2d 114, 116-18 (1st Dep't 1996), *aff'd.* 89 N.Y.2d. 1050, 1053 (1997).   Here too, evidence that Wilson required psychiatric medication to control violent hallucinations and hearing voices, and was not taking that medication, was consistent with appellant's description of his violent behavior while saying "crazy shit." Thus, it provided a scientifically reliable basis for gauging his behavior, which was

relevant to the likelihood he tried to rape appellant, regardless of what she knew about Seroquel.

The People's claim that the reasonableness of appellant's fear was never at issue (Resp. Br. at 45-46, 55) is quite confusing: the prosecutor conceded Wilson tried to have sex with appellant (452, 468, 473), the entire defense was that appellant reasonably feared rape, and the reasonableness of her belief was an element the People had to disprove. The People seem to believe, as the trial prosecutor argued to the jury, that their position that appellant was lying about the attempted rape meant the jury did not have to even consider whether it was reasonable for her to fear Wilson. This is simply not true. The court determined that appellant's statements interposed justification, and the People therefore had the burden to disprove it beyond a reasonable doubt, which requires more than merely calling appellant a liar.

Another puzzling argument is that appellant failed to make an adequate record that Seroquel treated a condition that made Wilson potentially violent (*id.* at 46-47). In fact, defense counsel discussed the records in detail when seeking to use them, saying: "Wilson noted hallucinations, to harm himself or others," and reported hearing "voices"; was "diagnosed with major depressive disorder with psychotic features"; and was prescribed "Prozac for his depression," Benadryl for allergies and sleeplessness, and Seroquel, "which is an antipsychotic." Accordingly, counsel wanted to introduce the records and to call Wilson's treating physician to ask whether Seroquel was prescribed to "control [his] hallucinations," about the effect of noncompliance as

14

shown by the toxicology report, and whether "alcohol abuse exacerbate[d] the hallucinations" (53-57). Since the court denied counsel's request for an *in camera* interview with Wilson's doctor to determine whether Seroquel was for psychosis, which the People do not dispute was error, it is difficult to see what more counsel could have possibly said to explain why this evidence was relevant.

Notably, the People never disputed counsel's representations of Wilson's records, which they provided, and it is completely disingenuous to now suggest the court correctly determined from the records that Wilson was being treated only for depression (*id.* at 46-47). Knowing full well that defense counsel was right, the People ask this Court to ignore the records, submitted with appellant's brief, because they were not made a court exhibit below. This procedural oversight should not bar this Court from reviewing the records. Appellant could potentially spend the rest of her life wrongfully in prison for this conviction, and the People make no claim that the records appellant provided to this Court are not a true copy of the ones the trial court reviewed.

The Court should also consider, in the interest of justice, whether Wilson's records were admissible to assess his credibility, which the People put in issue by arguing that his 911 call statements were truthful and proved appellant was the one who became violent (App. Br. at 62). The People contend that none of Wilson's documented mental illness symptoms were probative of his statements' truthfulness (Resp. Br. at 47-48), but fail to acknowledge his history of hallucinations and hearing voices, and ignore that this Court has held that such evidence is probative of credibility,

and that barring psychiatric history of a key prosecution witness violates the right to present a defense (*see* App. Br. at 62 (providing cases)).  *See also People v. Rensing*, 14 N.Y.2d 210 (1964) (newly discovered evidence of testifying codefendant's psychiatric history, which included hallucinations, might have impacted jury's assessment of his testimony).

Finally, contrary to the People's arguments (Resp. Br. at 48), it was extremely relevant to know whether Wilson "became aggressive if he drank" in light of the toxicology report showing his blood alcohol content was .20 percent (147).  This went both to the likelihood of appellant's version of events and reasonableness of her fear. *Fuentes v. T. Griffin*, 829 F.3d. 233, 252-53 (2d Cir. 2016) (granting habeas relief when People failed to turn over psychiatric records which "would have revealed a disorder that both provided a basis for questioning [the complainant's] credibility and provided further support for [defendant's] version of the events").  Thus, it was not improper (or "vague) to ask Wilson's sister if she knew about his history of alcohol abuse, or to use Wilson's records to "rebut[]" Shakeema Fortune, who claimed she had known Wilson for 12 to 13 years, they were "like brother and sister" and saw each other regularly, and she <u>never</u> saw him drunk or "stoned"; as counsel argued, "people who know him well and see him regularly would know that he drinks a lot," as the records illustrated (Victoria Wilson: 74-75; Fortune: 133, 141-45; Colloquy: 146-48; Resp. Br. at 48).

B.     Specific Acts of Violence

Appellant clearly preserved her claim that the court improperly refused defense counsel's request for DIRs relating to Wilson's domestic violence against his child's mother, discussed in his medical records.  That counsel said he was "going to ask" for them was more than enough to convey he wanted them; the court made it equally clear that it would not allow counsel to "dirty the victim" with allegations of past abuse and record proof he lied to medical professionals about no longer drinking or doing drugs (59-60).   Counsel's subsequent emphasis on the Seroquel issue did not negate his request for the DIRs (*see* Resp. Br. at 52-53).

Responding to the merits of the DIR-disclosure claim, the People argue that they were not admissible (Resp. Br. at 54).  Appellant agrees, but they still should have been disclosed because the medical records gave counsel a good-faith basis to investigate whether there was a relevant witness to the alleged domestic violence incidents, who could testify to personal observations rather than hearsay.  Indeed, one of the People's own witnesses might have been present.  To the extent the People attempt to distinguish appellant's case law authorizing disclosure/inquiry into bad acts, they do not explain why there should be a different rule for a witness's own conduct versus a deceased victim's in a justification case.

As for precluding appellant from using Wilson's medical records or cross-examination to prove prior domestic violence (App. Br. at 63-64), the People respond that it was proper because appellant did not establish she knew about it.  Appellant

relies on the national trend of allowing evidence of a victim's prior violence on the issue of whether he was the initial aggressor, regardless of the defendant's knowledge about his prior violence, and the People's argument that the Court of Appeals declined to revisit the New York rule requiring knowledge omits that the Court did so because, in that case, it was impossible that the victim actually was the initial aggressor.  *People v. Watson*, 20 N.Y.3d 1018, 1019-20 (2013).  The Court pointedly left open the possibility that the New York rule could "be reconsidered in a case properly present[ing] th[e] issue."  *Id.* at 1020.

*     *     *

Wilson's failure to take Seroquel was not "alleged," but proven by the toxicology report, and restricting appellant's right to present a defense by not letting her establish the importance of this fact was not harmless beyond a reasonable doubt (Resp. Br. at 49-51).  While the jury knew Wilson was drunk and used cocaine somewhat recently before death (*id.* at 49), that is not the same as the possibility he was having violent hallucinations and hearing voices that night.  Had appellant been permitted to explore and establish this, it would have supported her account and undercut the People's trial and appellate arguments that Wilson's 911 call "by itself" disproved justification.  Wilson's records also would have impeached Fortune, who claimed appellant was Wilson's girlfriend, and evidence of Wilson's acts of domestic violence, if true, would have further supported appellant's version of events.  And, as discussed, appellant's outcry was both prompt and unambiguous; appellant described pushing herself upright

before stabbing Wilson, making it clear she did not stab his legs despite thinking she "must have"; the absence of a couch did not prove Wilson and appellant were sleeping together because she could have easily slept in the recliner and generically referred to it as a couch eight months later; and the mess in the apartment had no probative value whatsoever because it was equally possible that Wilson caused it (Point I, *ante*).

Thus, the People's cases are inapplicable except for *People v. Thompson*, 111 A.D.3d 56, 65-68 (2d Dep't 2013), in which this Court held it was <u>not</u> harmless to preclude defense evidence that the victim identified someone else, because the "People's carefully controlled and abbreviated presentation" of that evidence through their own witnesses "did not render the [defense] evidence . . . repetitive" or "satisfy his right to present his own defense," and the precluded defense evidence undermined the conclusions that could be drawn from legally sufficient evidence.

<u>POINT IV</u>

THE PEOPLE'S CONCLUSORY AND SPECULATIVE RESPONSE FAILS TO SHOW THE DECEASED'S 911 CALL WAS ADMISSIBLE AS A PRESENT SENSE IMPRESSION, AND THEIR CONTENTION THAT ANY ERROR WAS HARMLESS IS INCONSISTENT WITH THEIR POSITION THAT THE CALL DISPROVED JUSTFICATION "BY ITSELF."

In Point IV of appellant's brief, she argues that the court improperly admitted Wilson's 911 call under the present sense impression hearsay exception (App. Br. at 67-73). This Court should reject the People's claim that appellant's argument is meritless

and any error was harmless (Resp. Br. at 58-63), because the first is conclusory, requiring speculation and ignoring the relevant case law; and the second contradicts the People's trial and appellate emphasis on the 911 call's importance to their case.

The People point to no authority supporting their contemporaneity or corroboration arguments, and make no effort to distinguish the decisions from this Court and the Court of Appeals discussed in appellant's brief.  Instead, the People argue the call must have been contemporaneous because Wilson used a present tense verb— that a woman was "acting all crazy"—and they add that the background silence and lack of detail about what the woman was doing was irrelevant (*id.* at 59).  The problem is that without knowing what Wilson meant, it is impossible to know whether his statement was contemporaneous.  For example, if he called because appellant was yelling and throwing things, then the statement was <u>not</u> contemporaneous given the background silence, regardless of him using the word "acting."

In any event, even if it was contemporaneous, the call's contents were not corroborated.[3]  The People rely on the fact that Wilson was found stabbed in a messy apartment as corroboration that appellant was acting crazy, completely disregarding that the mess could not be attributed to her and that the fact of Wilson's death was not

---

[3]  The People's argument that the 911 call was relevant so long as the corroboration shows "it was more likely than not that the stabbing was unjustified" (Resp. Br. at 60), misses the point.  The present sense impression inquiry is not about relevance but whether a hearsay statement is sufficiently reliable to be admitted for its truth without the benefit of cross-examination.  *People v. Brown*, 80 N.Y.2d 729, 736 (1993).

sufficient corroboration (*id.* at 59-60; *see* App. Br. at 70-72 (providing cases)). *E.g.*, *People v. Watson*, 100 A.D.2d 452, 453-59, 463-69 (2d Dep't 1984) (deceased was beaten to death with blunt instrument in her bathroom and defendant-landlord's possession of bloody clothing, shoes, and pliers was insufficient to demonstrate reliability of deceased's statement during phone call with friend that defendant was entering apartment to fix a bathtub leak, since friend heard no background noise indicating someone actually entered); *see also Allstate Ins. Co. v. Stricklin*, 93 A.D.3d 717, 718-19 (2d Dep't 2012) (mere fact accident had occurred insufficient to corroborate bystander's report of hit-and-run driver's license plate).

Ironically, the People accuse appellant of "speculati[ng]" that Wilson may have been the one acting irrationally and that there may have been intervening events between the 911 call and the attempted rape and stabbing, while themselves speculating that "something was happening between defendant and Wilson that was serious enough to compel Wilson to try to call in the police to remove defendant" (Resp. Br. at 61-62; emphasis added). Of course, the People have no idea what that "something" was, and concede the call was not about the stabbing and did not describe violence, threats, or fear (*id.* at 61). After all, refusing Wilson's sexual advances is not corroboration that appellant was "acting all crazy." If anything, the People's theory supports appellant's description of Wilson acting crazy if he called 911 because she did not want to have sex with him. Essentially, the People's position is that they are allowed to speculate to help support their theory of the case, but the defense may not offer plausible alternatives

21

consistent with innocence.[4]  Notably, the People have no right in this context to view the evidence in the light most favorable to them.

Finally, the People's argument that there is no "substantial probability" the 911 call affected the verdict (Resp. Br. at 62-63), is at odds with their reliance on the call as proof of motive and their repeated insistence throughout their brief that the call, "by itself," disproved justification, the only issue for the jury (*see* Resp. Br. at 29, 40, 49).

POINT V

> (A) THE PEOPLE IGNORE THEIR OWN EVIDENCE ESTABLISHING THAT POLICE CONTINUED QUESTIONING APPELLANT AFTER SHE UNEQUIVOCALLY INVOKED HER RIGHT TO REMAIN SILENT; (B) THE PEOPLE'S *MOLINEUX* ARGUMENTS ILLUSTRATE THAT THE BENEFITS CARD EVIDENCE WAS CUMULATIVE AT BEST, AND SO ITS VALUE COULD NOT POSSIBLY OUTWEIGH ITS PREJUDICIAL IMPACT; AND THE SUPPRESSION AND *MOLINEUX* ERRORS WORKED IN TANDEM TO PAINT APPELLANT A LIAR WHEN HER JUSTIFICATION DEFENSE TURNED ON HER CREDIBILITY.

Appellant argues in Point V of her brief that the court allowed inadmissible evidence that undermined her credibility: (A) the court refused to suppress custodial statements, obtained after she invoked her right to remain silent, about taking Wilson's

---

[4]  In another example of this, they argue that appellant's use of Wilson's phone soon after the 911 call contradicted her statement that she thought the stabbing occurred around 3:00 a.m. (Resp. Br. at 33), and that it is speculative to suggest Wilson allowed appellant to use his phone between the 911 call and a stabbing hours later (*id.* at 62), only to later argue themselves that they needed the *Molineux* evidence because the timing of appellant's use of Wilson's phone was <u>not</u> proof she had already stabbed him (*id.* at 73).

property but denying use of his benefits card and naming a different friend she turned to after the incident; and (B) the court allowed the People to present *Molineux* evidence suggesting appellant <u>did</u> use Wilson's benefits card, which did not serve its proffered purpose of completing the narrative and was therefore unduly prejudicial (App. Br. at 74-84).

The People concede preservation, and respond that the record supported the hearing court's suppression ruling; that the probative value of the benefits evidence outweighed any prejudice; and that any error as to either was harmless (Resp. Br. at 64-75).  Once again, the People's arguments require ignoring facts unfavorable to them, and should therefore be rejected.

(A)

Conceding that appellant asked to stop her videotaped interview with A.D.A. Purce and that Detective Scandole did not re-administer *Miranda* warnings before taking another statement the next morning, the People maintain that the court nevertheless properly denied suppression because appellant requested only a temporary break in questioning (Resp. Br. at 65-71).  This entire argument is based on the videotaped interview, in which appellant agrees—while crying and holding her head in her hands— that she wants to "stop right now," and Purce states, "just stop the tape for now."  But Scandole, the People's only hearing witness to testify about appellant's interrogation, repeatedly testified that appellant said that night, "<u>I don't want to talk about it anymore</u>" (214-16; emphasis added).  So, even if appellant's videotaped statement could be

23

interpreted as merely requesting a break, the People's own evidence establishes that she <u>also</u> unambiguously and unequivocally invoked her right to remain silent, which requires fresh *Miranda* warnings before questioning resumes.  The People just ignore Scandole's testimony to argue otherwise.

(B)

The only basis the People now proffer for admitting benefit records and a welfare fraud investigator's testimony that someone used Wilson's benefits card after his death in locations near where appellant used her own, and that Wilson's card permitted cash withdrawals, is that this helped "complete the narrative" to establish time of death (Resp. Br. at 72-74).  But their discussion of ample other evidence of this fact illustrates why the *Molineux* evidence was cumulative at best: his sister last saw him on Thanksgiving (November 24); appellant's statement and Shepard's testimony placed the incident "around Thanksgiving"; phone records showed that Wilson's phone started calling appellant's contacts on November 29 (the same date of the 911 call, assuming, *arguendo*, its admissibility); and the medical examiner testified that Wilson's decomposition was consistent with a late November death.  The "additional circumstantial" benefits evidence showed that his activity changed between November 22 and December 6, 2011, which was <u>less</u> helpful in pinpointing time of death. Comparing Wilson's and appellant's card activity suggested only that she used his card and had nothing to do with time of death.

24

Given its cumulative nature, the benefits evidence could not possibly have been more probative than prejudicial (Resp. Br. at 74-75). The People claim that, because they never argued appellant was guilty of an uncharged theft by using Wilson's card, there was no risk the jury would view it as motive or propensity evidence. But appellant's guilt of the uncharged theft was the only reasonable inference from the benefits evidence and her admission to taking Wilson's card, as the court recognized (40-41), and it made her look like a thief <u>and</u> a liar given that she told police she never used the card.

*     *     *

The People refuse to consider these intertwined errors together in claiming that neither caused any harm. While true that the *Miranda*-violating statement was "a minor part of the total of [appellant's] statements," it was undoubtedly significant to her credibility, especially combined with the *Molineux* evidence, and the suppression error was, thus, not harmless beyond a reasonable doubt (Resp. Br. at 71). Indeed, the People fail to acknowledge that, using the statement at issue, the trial prosecutor's opening argument and summation attacked appellant's credibility, including by explicitly making the connection for the jury that the benefits evidence proved appellant lied to police about not using Wilson's card (JS. 308-09; 458-62, 471-72).

The court's charge could not have ameliorated any prejudice from the *Molineux* error as the People suggest (Resp. Br. at 74-75), because the charge allowed the jury to consider that appellant did, in fact, steal Wilson's benefits, which proved she lied to

25

police and clearly hurt her credibility—the key issue in this justification case (App. Br. at 81-83). The People's cases, again, are inapposite. *See People v. Jackson*, 8 N.Y.3d 869, 870-71 (2007) (any *Molineux* error in admitting defendant's statement and testimony about rape during which it was made was harmless, because no significant probability jury would have acquitted defendant given victim's prompt outcry, defendant's access to her home, medical evidence, and expert testimony explaining victim's inconsistencies); *cf. People v. Rodriguez*, 111 A.D.3d 856, 858 (2d Dep't 2013) (harmless error to admit hearsay testimony about complainant's motive under state-of-mind hearsay exception).

The People the unfairness of restricting defense evidence (Point III, *ante*) while allowing the People to use a statement that should have been suppressed, and uncharged crime evidence that had no probative value, plus inadmissible hearsay (Point IV, *ante*), all of which "resulted in a trial that was decidedly skewed in the People's favor." *People v. Hudy*, 73 N.Y.2d 40, 58 (1988).

## POINT VI

**THE PROSECUTOR'S SUMMATION REMARKS WERE NOT FAIR COMMENT OR RESPONSE, AND THIS COURT SHOULD REVIEW THEM IN THE INTEREST OF JUSTICE BECAUSE THEY UNFAIRLY ATTACKED APPELLANT'S JUSTIFICATION DEFENSE IN A WEAK CIRCUMSTANTIAL CASE.**

Appellant's final claim, in Point VI of her brief, is that the prosecutor's summation violated her rights to due process and a fair trial by: baselessly and

offensively arguing appellant had a sexual "arrangement" with Wilson which somehow proved he did not try to rape her; misrepresenting appellant's outcry to Shepard; falsely stating appellant admitted intent to kill and admitted trying to "cover up" the stabbing to evade capture; inventing an illogical motive; and misstating the law on justification (App. Br. at 85-95). Because the People fail to show that the remarks were fair comment on the evidence or fair response to defense arguments, or harmless in this weak circumstantial case with substantial proof of justification, this Court should order a new trial.

The People concede that the prosecutor argued that appellant and Wilson had a sexual arrangement (Resp. Br. at 78-80). They defend this as a proper, though "not certain," inference from Fortune's testimony that appellant was Wilson's girlfriend; that appellant said they were strangers and he let her live in his apartment rent-free, that the apartment had only one bed and no couch; and that Wilson was twice appellant's age. First, the phone records completely undermined Fortune's testimony, which the People essentially abandon on appeal except to support the prosecutor's remark. In any event, since a girlfriend is not a prostitute, Fortune's testimony did not support the suggestion that appellant provided sex instead of rent money. Moreover, the remark is belied by the record as a whole. Appellant did give Wilson $50 to $60 to help with miscellaneous expenses during the one month she stayed with him and, again, there was somewhere other than the bed for appellant to sleep. Wilson's willingness to accept whatever she could provide is unsurprising given he was an unemployed drug addict and not

27

responsible for his own rent, and her willingness to sleep in a recliner was unsurprising given she was homeless and could not afford real rent.   Finally, the People accuse appellant of overheated hyperbole by describing the prosecutor's summation as misogynistic and highly offensive, but it is easy to see how suggesting appellant was a prostitute could have tainted the jury's perception of her, even if the prosecutor never intended the remarks to be misogynistic or offensive.

Appellant does not "misunderstand[]" the prosecutor's suggestion that Wilson's attempt to have sex with appellant against her will was not attempted rape because of their purported sexual relationship (Resp. Br. at 79):

> Maybe the deal got renegotiated.  Maybe he tried to have sex with her.  I am not saying he didn't try to have sex with her.  Just because you don't want to have sex with someone doesn't mean that they are trying to rape you, okay. One is totally different from another (452).

* * *

> She wanted him dead because he had the nerve to not only try and maybe change the arrangements that she had for her living there, or maybe he was trying to have sex with her, she just didn't feel like it . . . (468)

* * *

> [Fortune's testimony that appellant was Wilson's] girlfriend, and a possessive one at that, . . . [is] how you know that there was some arrangement or that they may have been even boyfriend and girlfriend, that she was consensually having sex with him and maybe on November 29th he wanted to have sex, she didn't.  That doesn't mean it's rape, that just means I didn't want to have sex with him, okay (473).

It is true that the prosecutor followed the first of these two remarks with speculation that the sexual arrangement was relevant to motive (Resp. Br. at 79; *see post*, pp. 30), but the prosecutor's final remark clearly implied that the jury should not credit appellant's description of an attempted rape because of her purported sexual relationship with Wilson.  No preceding or subsequent remarks altered that.  Moreover, the People ignore that appellant's statements describing attempted rape were corroborated by the phone records showing that Wilson called her incessantly after he first subjected her to unwanted sexual touching, and Shepard's testimony about her outcry, facial swelling, and upset demeanor.  In contrast, the prosecutor's position that Wilson tried to have sex that night without force was purely speculative, and, thus, not fair comment (Resp. Br. at 79-80).

The People also disregard this Court's decisions refuting their claim that telling the jury that appellant admitted intent to kill—when she had not—was a "proper inference" because she admitted stabbing him as he tried to rape her (Resp. Br. at 81; *see* App. Br. at 87-89 (providing cases)).  Significantly, the prosecutor did not ask the jury to <u>infer</u> intent to kill, but expressly stated that appellant admitted it.  Similarly, the prosecutor did not merely argue that a "cover up" could be inferred from the evidence; she argued that appellant <u>admitted</u> locking Wilson's door and fleeing to engage in a cover up, and the People make no effort to explain why it was acceptable for the prosecutor to put these false admissions into appellant's mouth.

29

With respect to appellant's outcry, the prosecutor misstated the record to argue it was "a couple of hours" after Shepard picked her up, and merely an "excuse" to convince Shepard to let her stay with him, and a threat to kill Shepard, too, if he tried to have sex with her (455-56, 479; *see* App. Br. at 87).  Continuing to insist the outcry was "hours later when it was apparent that Shepard would not take her into his home," the People claim it was fair comment to label it an excuse "to persuade Shepard" to let her stay by reassuring him "she would not do the same to him" (Resp. Br. at 80).  But there was no evidence as to when the outcry occurred once Shepard brought appellant home, or that she disclosed the attempted rape after Shepard eventually told her she could not stay.  And, the People do acknowledge the inflammatory remark that the outcry was intended to convey to Shepard, "don't you try and have sex with me because I'm telling you what happened to Anthony Wilson, I'll do the same thing" (456).

Defending the prosecutor's fabrication of a motive as "fair inference" (Resp. Br. at 82), the People ignore that it was based on speculation of a sexual arrangement and that the 911 call occurred before the stabbing (after the prosecutor successfully objected to defense counsel's equally plausible theory that the call occurred afterward).  *E.g.*, *People v. Schatz*, 37 A.D.2d 584, 585 (2d Dep't 1971) ("the facts from which [motive] may be inferred must be proved," not "imagined").  Moreover, the People dispute appellant's argument that it made no sense for her to kill Wilson simply for kicking her out, by responding that "she lost nothing by killing him" (*id.*).  That, obviously, is untrue, since she lost her freedom.  Ironically, they now argue that she was angry

enough to kill because she had nowhere else to go, having told the jury without record support that she did have places to stay other than Wilson's apartment and this was why it was unbelievable that Wilson's previous sexual advances crossed the line.

The People's position that the prosecutor did not misstate the law on justification is unresponsive to appellant's claims, which are that the prosecutor argued appellant admitted intent to kill "by virtue of raising self-defense," flouting well-settled law that a justification defense does not dilute the People's burden to prove intent; and the prosecutor improperly told the jury that appellant was "not entitled" to her defense unless Wilson was <u>actually</u> trying to rape her, when the issue was whether appellant reasonably believed this ((App. Br. at 36-37 (quoting the remarks), 91-92 (providing cases)).  The People address only the claim that the court allowed the prosecutor to dilute her burden by stating that justification applies "in very limited circumstances" based on "very specific" criteria, over defense objection to her instructing the jury, arguing that the court's later charge cured any error.  The People do not dispute that the court sustained the prosecutor's objection when defense counsel accurately said the People had to meet "a very high standard" to prove guilt with circumstantial evidence.

Nor do the People dispute appellant's claim that the court treated the parties' arguments and objections unevenly in summation (App. Br. at 92-94).  They nevertheless maintain that the court's instructions that attorneys' arguments were not evidence, before and after summations, "alleviated any prejudice," but they cite cases in which the court also gave curative instructions (Resp. Br. at 83-84).  Here, any

purported curative instructions only made clear that the court agreed with the prosecutor's theory of the case.  The People point out that "so many of defendant's objections were on the grounds of no evidentiary support or of misstating the evidence, and the court responded to those objections by instructing the jury that their memory of the evidence controlled" (Resp. Br. at 83-84).  But the court's remarks were in the context of overruling the defense objections, after repeatedly sustaining similar objections by the prosecutor—even when defense counsel's remarks had record support (App. Br. at 92-94; *see* 414, 432-33, 435-36, 439-40).

Accordingly, this Court should reverse and order a new trial.

<u>CONCLUSION</u>

FOR THE REASONS SET FORTH IN APPELLANT'S MAIN BRIEF AND THIS REPLY, APPELLANT'S CONVICTION SHOULD BE REVERSED AND THE INDICTMENT DISMISSED (POINT I).   AT A MINIMUM, THERE MUST BE A NEW TRIAL (POINTS II-VI).

Respectfully submitted,


Paul Skip Laisure
Attorney for Defendant-Appellant
Appellate Advocates
111 John Street – 9th Floor
New York, New York 10038

Tammy Linn
Of Counsel
November 2017

32