# APPELLATE ADVOCATES

111 JOHN STREET - 9TH FLOOR, NEW YORK, NEW YORK 10038
PHONE: (212) 693-0085   FAX: (212) 693-0878

*ATTORNEY-IN-CHARGE*
PAUL SKIP LAISURE

*ASSISTANT ATTORNEY-IN-CHARGE*
DAVID P. GREENBERG

*SUPERVISING ATTORNEYS*
ERICA HORWITZ
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON
LEILA HULL
A. ALEXANDER DONN
PATRICIA PAZNER
MARK W. VORKINK
ALEXIS A. ASCHER

*DIRECTOR OF INNOCENCE INVESTIGATIONS*
DE NICE POWELL

*SENIOR STAFF ATTORNEYS*
DENISE A. CORSI
JOSHUA M. LEVINE

*SENIOR COUNSEL*
LYNN W. L. FAHEY
MELISSA S. HORLICK

*STAFF ATTORNEYS*
MICHAEL ARTHUS
SAMUEL BARR
ANJALI BIALA
CHARITY L. BRADY
CYNTHIA COLT
ALICE R. B. CULLINA
*GRACE DILAURA
SAMUEL R. FELDMAN
DAVID L. GOODWIN
ISKUHI GRIGORYEV
CAITLIN HALPERN
MEREDITH S. HOLT
LAURA B. INDELLICATI
LAUREN E. JONES
ANNA KOU
MELISSA LEE
TAMMY E. LINN
BENJAMIN S. LITMAN
SEAN H. MURRAY
ANDERS NELSON
SEAN NUTTALL
AVA C. PAGE
MARTIN B. SAWYER
JONATHAN SCHOEPP-WONG
YVONNE SHIVERS
ANGAD SINGH
STEPHANIE SONSINO
NAO TERAI
SARAH VENDZULES
BENJAMIN WELIKSON
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
HANNAH ZHAO
DINA ZLOCZOWER

*AWAITING ADMISSION

November 13, 2018

Hon. Jenny Rivera
Judge of the Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, New York 12207

Re:   *People v. Atara Wisdom*
      Kings Co. Ind. No. 6615/12
      A.D. No. 2014-09908

Your Honor:

This letter supplements Ms. Wisdom's leave application, which is pending before your Honor. Ms. Wisdom was tried in 2014 for second-degree murder involving the death of Anthony Wilson. The People's case rose and fell on Ms. Wisdom's emotional statements to the police. These statements – the only direct evidence of what happened – established that Ms. Wisdom acted justifiably in defending herself when Wilson attempted to rape her. Wilson was twice her age and 40 pounds heavier, and his toxicology showed alcohol intoxication and cocaine byproducts. At the time, Ms. Wisdom, 25 years old, was homeless, and had been staying in his apartment temporarily. Corroborating her account, a witness who saw her later that night both saw a visible injury to her face and also testified that appellant outcried to him about the attempted rape.

A number of serious, prejudicial errors occurred at trial. These errors had the effect of skewing the trial in the People's favor by shoring up gaps in their case while simultaneously gutting appellant's defense. Ms. Wisdom ultimately was convicted of murder and is serving an 18-years-to-life sentence. Because four such errors present duly-protested, leaveworthy issues of statewide importance, and because an innocent woman may be serving a life sentence due to the cumulative impact of the trial errors, this Court should grant leave to appeal.

Background

### The Statements Obtained After Appellant Invoked Her Right to Remain Silent

The *Huntley* hearing established that, after appellant was arrested and brought to the precinct, she waived her *Miranda* rights around 11:00 a.m. During the two-to-three-hour interview with the detective that followed, she verbally admitted stabbing Wilson and explained that she had believed he was going to rape her. After the stabbing, Ms. Wisdom went to see her friend Ebony.

Around 9:00 p.m. that night, an A.D.A. conducted a videotaped half-hour interview with appellant (People's Trial Exhibit 56). On the video, appellant appears visibly distraught. She becomes more upset as the interview goes on until she says at around 9:30, "I need a little--" while making a hand gesture and bending over to cry; appellant agrees she wants a break and to "stop for a second," and then says "yeah" when the A.D.A. asked, "You want us to stop right now." Ending the videotaped interview, the A.D.A. states that "There will be no further questions until we resume the tape." During cross-examination, counsel repeatedly elicited the detective's agreement, "Correct," to the question, "then she stopped speaking, she didn't want to speak anymore, correct," and "She said, I don't want to speak anymore."

Appellant remained at the precinct overnight and the detective resumed questioning her at about 10:00 a.m. the next morning. Although the detective reminded her that her rights had been read the day before, he did not readminister *Miranda* warnings. After she was asked about the decedent's property, appellant admitted taking his phone, wallet, and keys when she left the apartment. She threw away the keys, admitted to using the phone, and specifically denied using the benefit card in the wallet. Appellant also said she went to her friend Tiffany's house after the stabbing. This follow-up interview was not recorded.

Defense counsel argued that readministration of *Miranda* was necessary the next morning for the second set of statements to be admissible because, *inter alia*, appellant had said, "I don't want to talk anymore." The People acknowledged that appellant "stopped and did not want to continue speaking to [the A.D.A.] on the video," but maintained that she only expressed a desire to not talk anymore "right now." The court agreed that appellant "wanted to stop" but ruled the second statements admissible, reasoning that readministration of *Miranda* was not required (216-22).

### The Trial Evidence

### The Statements Establishing Justification

The People's case rested almost entirely on appellant's emotional written and video statements asserting justification. In them, as discussed, appellant explained she fatally stabbed Anthony Wilson because she believed he was going to rape her. Appellant moved in with Wilson after she became homeless and would give him money from time to time for rent. She described him as a crack user and said that when he smoked crack he became a "completely different person." One night in 2011, she woke up to find him touching her underneath her shirt, told him, "we are not like that, that is not why I'm here," and left the apartment after a heated argument. She returned after calming down, but left again following another loud and heated argument around Thanksgiving and stayed with her sister for a few days.

Appellant spoke to Wilson by phone a couple times afterward and "had to go back" on the night of the incident, because she had an interview the next morning and needed clothes in the apartment. Initially, everything was fine, but, as the detective recounted she told him:

> Later that night, the same day, she was sitting on the couch getting her clothes and he says to her, I am going to get some pussy tonight. She says, well, okay, then I'll get out of here. And he steps in front of the doorway and says, uh-uh. At that point she tells us that he picks up a belt and starts wrapping the belt around his hand. At that point she said, I picked up a knife and I put it inside my sweater.
>
> She went to get up off the couch, then he punched her in the face. After he punched her in the face, he grabbed her sweater and she says he pulled the sweater over her head and started punching her in the shoulders and in the back.
>
> While he was punching her, she said he was pushing her head towards the ground. As he is pushing her head toward the ground, if my head hits the ground, thinking to herself, I'm dead, and I stabbed at him.
>
> She said she then ran into the bathroom, she saw she had a big knot on her head and some bruises on her shoulders. She came out, gathered her stuff into a duffle bag and then she left and went to her friend Ebony's house.

Appellant later signed a written statement prepared by the detective which was virtually identical to the oral statement except for a line at the end indicating that appellant did not tell Ebony or anyone else what happened.

Appellant made consistent and additional statements to an Assistant District Attorney in a videotaped interview that night (People's Trial Ex. 56). In the video, appellant speaks softly and, at times, haltingly, and readily answers all questions asked of her. Appellant could not remember dates but believed she stayed with Wilson for about a month, first meeting him after Halloween. Appellant received public assistance and acknowledged she was not contributing enough money to be considered rent, but she gave Wilson money for food, his transportation, and other miscellaneous expenses. Because she paid him different amounts at different times, she was unsure how much she gave overall but estimated it was $50 to $60.

Wilson was unemployed and spent his time attending a drug program and seeing his daughter. Wilson's drug use was a problem for appellant; they argued because she refused to give him money to buy drugs.

Appellant was not Wilson's girlfriend and they never had any sexual contact, even though Wilson had indicated he wanted to have sex with her. Appellant had been temporarily staying with her sister leading up to the incident after a recent argument with Wilson about him wanting to sleep

with her. She had ignored this in the past but left that time because of "crazy" insults he hurled at her, including calling her a "bitch" and a "whore." Of this, appellant explained: "I never gave him any reason to say anything like that. I never slept with him, we had no type of intercourse, no nothing." During the two days that appellant was at her sister's house, Wilson kept calling her to ask if she was coming back. The night that appellant came back because of the interview, she got to Wilson's around 9:00 p.m. and soon went to sleep on the couch, where she had always slept.

On the video, when the prosecutor directs her to the incident itself, appellant begins to weep, her voice becomes even softer, and her answers more halting. Appellant explained that she woke up at around 3:00 a.m., she believed, to feel Wilson rubbing her stomach. She told him to stop and started putting her sneakers on, and Wilson began arguing with her, asking why she won't "give him some pussy," to which she replied "we already discussed that." Wilson picked up a pink belt and wrapped it around his hand, and did not respond when appellant asked, "Are you going to hit me?" Wilson kept saying he was going to "get some pussy tonight" and appellant said she might as well leave. Wilson again called her a "bitch" and a "fucking whore" and said other "crazy shit." Appellant remained on the couch and Wilson paced back and forth from the door to the TV for ten to fifteen minutes while they continued to argue.

Appellant knew he would assault her so when she put on a sweater from one of her bags near the couch, she put a folding knife from the bag in its right pocket. When she got up to pass Wilson for her jacket, he began punching her in the face (no longer holding the belt). When the A.D.A. asks appellant where, she uses her hands to demonstrate that she was hit in the left cheekbone and eye socket area. Wilson then pulled appellant's hood over her head, entrapping it, and started hitting her in the back. She was standing but he pushed her down toward the floor – she demonstrates this – and she struggled to push him off but could not free herself. Appellant then stabbed him but was not sure how many times or where on his body. She remembered being close to the floor and believed she "must have caught him in his legs or something." She also remembered pushing her body up and pushing him away "a little bit" but he kept fighting her even after she stabbed him and tried to free herself.

On the video, when appellant admits to the stabbing, her voice is barely a whisper, and the A.D.A. makes her repeat herself. She is still crying, and now begins sighing and holding her head (around 9:28). She soon asks to stop. She spends two to three minutes crying while hunched over before the A.D.A. ends the interview around 9:33 p.m.

Phone records corroborated appellant's statement that Wilson called her repeatedly – 25 times – during the two days before the incident. Wilson's phone records began on October 1, 2011, and he first called appellant's phone on November 24, 2011. Appellant used her phone heavily but never called Wilson from it. At 12:37 a.m. on November 29, 2011, Wilson called 911, and his phone began calling appellant's contacts at 12:57 a.m. Estimating that Wilson's death occurred around November 29th was consistent with his state of decomposition when he was found on January 3, 2012. Twenty-five-year-old appellant was 5'6" and weighed 115 pounds in July 2012. Fifty-year-old Wilson was 5'9" and weighed 155 pounds when he died.

Hon. Jenny Rivera
November 13, 2018
Page 5

### The Outcry to Mathew Shepard, Whom Counsel Was Precluded From Interviewing Without the Prosecutor Present

Matthew Shepard, testifying pursuant to a material witness order, was the only witness who saw appellant that night. Before he was called to the stand, the court granted counsel's request to personally confirm with Shepard the prosecutor's representation that Shepard did not wish to speak with counsel. Shepard then told defense counsel he would speak to counsel, but the detectives and the prosecutor refused to allow counsel to close the door for a private conversation. When counsel asked the court to direct them to do so, the prosecutor objected that she had a right to be present during counsel's conversation with Shepard because Shepard was "her" witness and counsel was "not his lawyer." Defense counsel objected to the prosecutor's position, and when the court ruled that the prosecutor "ha[d] a right to be there" when counsel spoke to Shepard, he moved for a mistrial, noting that the common law rule was that "[w]itnesses are available to either side and there is no rule that requires that a prosecutor or a defense attorney needs to be there." The court adhered to its ruling, and counsel did not interview Shepard (335-40).

Shepard testified he had met appellant while she said she was staying with Wilson, whom he knew as a neighborhood panhandler, because she had no other place to stay. Around Thanksgiving 2011, appellant called Shepard (from Wilson's phone) sometime between 2:00 and 5:00 a.m., sounding "stressed." Shepard agreed to meet her on DeKalb Avenue, expecting to have sex with her. When Shepard got there, appellant had three or four bags and Shepard asked her "what was going on, you know, because she seemed a little bit" (sic).

On direct examination, Shepard testified that appellant told him that she and Wilson "had an altercation," that she was "not going to pay rent and fuck him too," and she had "poked" him. Appellant said Wilson had hit her, and Shepard noticed she had "a swelling up on her face." Shepard did not take what she said seriously and agreed that she could come to his place for a short time. Someone, possibly a man, picked up appellant a few hours after Shepard took her home.

During cross-examination, counsel made numerous attempts to attack his credibility based on his drug use and convictions. Then, discussing what happened when Shepard brought appellant home, defense counsel asked, "Did she tell you that Anthony tried to rape her at that time?" Shepard suddenly replied, "He tried to force his self on her, she did say that." Evidently surprised by this revelation, the court interrupted counsel's follow-up question to ask a series of its own regarding the context of appellant's statement. Shepard explained that he had again asked appellant "what was wrong" and she had responded, "this guy is crazy, I'm not going to pay rent and fuck him, he tried to take it, tried to force his self on her"; Shepard added, "That is where I got that from, out of her mouth." When counsel resumed cross, Shepard agreed he had suggested that appellant go back to check on Wilson but refused her request that he go with her. Counsel asked no further questions.

### The Other Circumstantial Evidence

Over objection, the People admitted as a present sense impression a 911 call made by Wilson shortly after midnight on November 29, 2011, in which he stated "I got this girl in my house and I don't know what's wrong with her, she's acting all crazy and I want her out of my house."

Appellant's custodial statement from the second day, after she was not re-warned of her *Miranda* rights, also was admitted over objection. In it, appellant said that she had taken Wilson's phones, keys, and wallet when she left the apartment. She threw away the keys, kept the wallet for a little while but did not use it, and used the phone for a little while before discarding it. She denied using his EBT benefit card. The People presented a witness and testimony, over defense objection, that the pattern of activity on Wilson's benefit card changed after his death and his card was used at certain locations in Brooklyn near where appellant used her own EBT card. A longtime friend of Wilson testified that he had introduced a woman Renee as his girlfriend at his apartment four days before Thanksgiving, but did not identify appellant as this person.

Wilson lived in a small studio apartment that normally was neat. When his body was discovered, it was in disarray, with blood stains on the nightstand and kitchen cabinet and smears of blood and feces on the floor. Serious injuries can cause a person to defecate.

Wilson, who was discovered naked, had seven stab wounds of varying depths but no defensive wounds. There was a single wound about 2½ inches deep on his upper back, and appellant could have inflicted it when standing in front of Wilson. A wound on Wilson's right side was ½ an inch deep. The remaining five wounds were on his left side, with four in a cluster; two of these wounds were about 2 inches deep and three were about 5-6 inches deep. The deeper ones that injured the heart and left lung were fatal but not instantaneously lethal, and Wilson could have lived for another 20 minutes. The clustered ones likely occurred in close succession, and suggested Wilson was not actively moving.

When he died, Wilson's blood alcohol content was .20 percent and he tested positive for an antidepressant, a cocaine byproduct, and a common cocaine contaminant. His Seroquel prescription bottle was found open, 39 pills were on the floor, and his DNA was on the cap, but his toxicology exam did not detect Seroquel.

<u>The Court's Refusal to Allow Evidence of Wilson's Mental Illness, Substance Abuse, and Domestic Violence Allegations</u>

During cross-examination of the medical examiner, defense counsel attempted to ask about the use of Seroquel but the prosecutor's objection was sustained (255-56, 262-63). Mid-trial, counsel sought to introduce a certified copy of Wilson's medical records, in which Wilson had reported hallucinations to harm himself and others and reported hearing voices, was diagnosed with major depressive disorder with psychotic features, and was prescribed Prozac, Benadryl, and Seroquel, an antipsychotic. He also had reported that half his stomach was removed because of alcoholic ulcers and that he had previously used alcohol and cocaine but now claimed to have "given [it] up."

Counsel wished to admit the records based on Wilson's toxicology and appellant's reports of his behavior that night, and also wished to call Wilson's treating physician to ask whether Seroquel was prescribed to control his hallucinations, the effect of noncompliance, and whether alcohol intoxication exacerbated hallucinations. At a minimum, he asked for an in camera examination of the doctor about why Wilson was prescribed Seroquel.

During the colloquy that followed, after the court admonished counsel for trying to "dirty the victim" and denied the requests, it asked counsel whether there was any evidence of violence in Wilson's past. Counsel told the court that, the defense was "going to ask for DIR [Domestic

Incident Report] records because it was in Family Court where he's accused of . . . ," and was cut off by the court asking about the meaning of "DIR." The prosecutor noted that Wilson "had problems with his baby's mother" and was in Family Court seeking custody of the child. The court did not further address counsel's request (53-61).

Later, Wilson's sister testified that Wilson's daughter and her mother had lived with him prior to appellant living there, and that he was angry when they left. Counsel elicited from her that Wilson was seeking custody, but the court sustained objections to counsel asking her whether he had been accused of being psychically abusive to his daughter's mother or had a long-standing alcohol abuse problem (74-75).

Following another witness's subsequent testimony that she had never seen Wilson intoxicated on alcohol or drugs, counsel renewed his request that the court allow him to use Wilson's medical records, arguing that they showed he had had major surgery due to alcoholism, the toxicology results made his drinking habits important, and that counsel was trying to establish that Wilson became aggressive if he drank. The court adhered to its prior rulings (146-48).

### The Motions to Dismiss

Counsel moved for a trial order of dismissal at the end of the People's and whole case on the basis that the evidence — appellant's statements, the forensic and crime scene evidence, 911 call, appellant's outcry to Shepard and her injuries that night — failed to make out a prima facie case or disprove that appellant acted justifiably in defending herself from Wilson's attempted rape. To find appellant guilty on this evidence, he contended, would be speculative. The People argued that appellant's outcry to Shepard was not relevant but her earlier statement to him was, and that the 911 call and forensic evidence disproved her claim. The court did not grant the motion (397-401).

### The Summations

Defense counsel argued that the evidence was consistent with justification and that any contrary conclusion could only stem from speculation.

As set forth in appellant's brief more fully on pp. 32-37, the prosecutor baselessly argued, *inter alia,* that 25-year-old appellant and 50-year-old Wilson had an arrangement whereby appellant would engage in sex for a place to live. She repeatedly maintained that, even if Wilson tried to have sex with her and appellant did not want to, that "doesn't mean that they are trying to rape you" and "[t]hat doesn't mean it's rape." She discounted appellant's outcry to Shepard as "trying to make excuses," and accused appellant of implicitly threatening Shepard.

At length, she speculated that Wilson's 911 call showed that he had evicted appellant from the apartment after she refused to have sex with him, thereby providing her motive to kill him: *i.e.,* "No doubt he told her, look, if you are not going to have sex with me, you gotta get out, and then that's what put her over the edge and that is what made her stab him. . . . He was going to stop that free trade that she had . . . The free ride that she was getting all of November was going to end and she killed him." Also without basis she argued that appellant staged the crime scene so as to prevent the discovery of Wilson's body — by turning off the heat and locking the door behind her — which proved intentional murder.

Regarding appellant's justification defense, she repeatedly argued that appellant in her statements had admitted an intent to kill and that "We know at the time she stabbed him she was not being raped. Forget about that." She also argued that appellant was "not entitled to that defense" because the attempted rape "couldn't possibly be true."

<u>The Verdict and Appeal</u>

The court charged that the jury had to find that the People disproved justification beyond a reasonable doubt, and that appellant was justified in using deadly force if she actually and reasonably believed Wilson was going to rape her. After it found her guilty of second-degree murder, appellant was sentenced to 18 years to life in prison.

As is relevant to the instant application, on appeal, appellant argued: (1) the evidence was legally insufficient to disprove justification beyond a reasonable doubt and the verdict was against the weight of evidence; (2) suppression of the second day's statement should have been granted because appellant was questioned after she invoked her right to silence; (3) the court violated appellant's right to present a defense and to the effective assistance of counsel by requiring counsel to interview a key witness in the prosecutor's presence; and (4) further violated her right to present a defense by precluding her from introducing evidence and cross-examining witnesses about Wilson's psychiatric history, including violent hallucinations, his substance abuse, and his specific acts of domestic violence.

The Appellate Division, Second Department, affirmed. Without discussing the facts, it found the evidence legally sufficient and the verdict not against the weight of evidence (Dec. at 1). As to the custodial statement, it held that suppression was properly denied:

> . . . <u>Had the defendant unequivocally and unqualifiedly invoked her right to remain silent the previous evening, the request would have had to be scrupulously honored</u> (*see id.* at 479; *People v Ferro*, 63 NY2d 316, 322), and further interrogation would have had to cease (*see People v Gray*, 31 NY2d 68, 70). Under such circumstances, further inquiry can be made, but only if a significant period of time has passed and the police reiterate the requisite warnings (*see Michigan v Mosley*, 423 US 96, 103-104; *People v Brown*, 266 AD2d 838). However, since the defendant in this case had not unequivocally and unqualifiedly invoked her right to remain silent (*see People v Horton*, 46 AD3d 1225, 1226; *People v Caruso*, 34 AD3d 860, 862; *cf. People v Legere*, 81 AD3d 746, 749) and remained in continuous custody in the interim, police and prosecutors were free to resume their questioning of the defendant within a reasonable time, and to do so without repeating the *Miranda* warnings (*see People v Legere*, 81 AD3d at 748; *People v Santalis*, 302 AD2d 614; *People v Holland*, 268 AD2d 536, 537; *People v Baker*, 208 AD2d 758; *People v Glinsman*, 107 AD2d 710). The further questioning at issue here was within a reasonable time under this Court's precedent (*see People v Holland*, 268 AD2d at 536; *People v Thomas*, 233 AD2d 347; *People v Baker*, 208 AD2d at 758). <u>The suppression hearing testimony of a detective who, in response to questions by defense counsel that the defendant did not want to talk</u>

<u>anymore during the prior evening's videotaped interview, answered, "Right," and in another instance said, "Correct," does not require [suppression]. This testimony does not change the fact that there was no unequivocal invocation of the defendant's right to remain silent at that time</u>. The suggestion that the detective's answers refer instead to an unrecorded communication by the defendant, despite the colloquy on the videotape that there would be no further questioning until the tape is resumed, is mere speculation and conjecture that reads into the record information that simply is not present, and provides no basis for concluding that the defendant's 10:00 a.m. statement should have been suppressed (Dec. at 2; emphasis added).

It agreed that it was error for the court to condition counsel's interview of Shepard on the prosecutor being present, but held the error harmless, citing *People v. Crimmins*, 36 N.Y.2d 230 (1975) (Dec. at 3). Without elaboration, it held that appellant's right-to-present-a-defense claims premised on the medical records and the preclusion of cross-examination were "without merit" (Dec. at 3).[1]

Reasons to Grant Leave

In this disturbing case, appellant, a young homeless woman, is serving an 18-years-to-life sentence for murder even though her emotional statements – the only direct evidence of what occurred – proved that she was defending herself during an attempted rape by a larger, intoxicated man twice her age, and even though a prosecution witness testified that she outcried to him that night and had a visible injury.

The only way this evidence of appellant's innocence could have led to a guilty verdict was because, at trial, a series of highly prejudicial errors occurred that had the effect of shoring up the gaps in the People's case while simultaneously gutting the defense. In this fundamentally unfair case, we ask the Court to grant leave to appeal on four such errors, which present issues that are leaveworthy, preserved, and of statewide importance. We also ask the Court to grant leave because the cumulative effect of the serious errors that occurred grossly skewed appellant's trial in the People's favor, making further review warranted to determine whether a wrongfully convicted woman is spending the rest of her life in prison due to a tainted verdict.

The Insufficiency of the Evidence

This Court should grant leave to determine whether the evidence in this case is legally sufficient when the only direct evidence of appellant's guilt was her statements, which established justification, and the People sought to disprove every aspect of the statements they themselves introduced, save for appellant's admission to stabbing the deceased, with purely circumstantial evidence. Because the Court's seminal, controlling case on this issue, *People v. Reed*, 40 N.Y.2d 204

---

[1] Appellant also argued that: Wilson's 911 call was improperly admitted when there was no evidence that it was contemporaneous with his observations or evidence of corroboration; the second day's statements and EBT testimony and records were inadmissible uncharged crimes evidence; and the prosecutor violated appellant's right to a fair trial with her persistent summation misconduct (*see* App. Brief). The Appellate Division found the claims unpreserved, meritless, or harmless.

Hon. Jenny Rivera
November 13, 2018
Page 10

(1976), is more than four decades old, appellant's case would be an ideal vehicle to decide whether it is still controlling.

    To sustain appellant's conviction of second-degree murder, the People had to adduce legally sufficient evidence that she intended to kill Wilson, P.L. § 125.25(1), and that she was not justified. *People v. McManus*, 67 N.Y.2d 541, 545-47, 549 (1986). Appellant was justified in using deadly force if she actually and reasonably believed that Wilson was trying to rape her. P.L. § 35.15(2)(b); *People v. Goetz*, 68 N.Y.2d 96, 105-15 (1986); *McManus*, 67 N.Y.2d at 549. In assessing legal sufficiency, the evidence must be viewed in the light most favorable to the People. *People v. Hampton*, 11 N.Y.3d 277, 287 (2013).

    Here, appellant's emotional series of statements were the only direct evidence of her guilt. Even in the light most favorable to the People, these statements established that appellant justifiably defended herself. She said that she stabbed Wilson because he told her he was going to "get some pussy" and then blocked her from leaving and physically attacked her. He wrapped a belt around his hand, punched her in the face, bent her down while restraining her with her clothing, and hit her in the back. She struggled to escape, but was unable to. Only then did she stab him, and even then he did not immediately cease. During the hours she spent in police custody, her story remained consistent, and the videotape entered into evidence clearly displayed her distress at having to recall the event.

    Moreover, appellant's account was corroborated, albeit unexpectedly, *see post*, by prosecution witness Shepard. Appellant was "stressed" when she called him for a ride, and told him that she had stabbed Wilson because he "tried to force his self on her." Shepard saw visible swelling on her face, consistent with Wilson hitting her, which she also told Shepard about. Further corroborating her description of his bizarre and violent behavior, toxicology showed Wilson had a .20 BAC and the presence of a cocaine byproduct and contaminant in his system upon death.

    Relying wholly on circumstantial evidence – the 911 call, the crime scene, the wounds, and Shepard's testimony on direct examination – the People posited an alternative sequence of events to disprove justification: that appellant became enraged and murderous after Wilson peaceably asked for sex, rather than attacking and attempting to rape her (*see* Resp. Brief at 30-33). First, the inference of lack of justification they urged from this circumstantial evidence was "based upon conjecture, supposition, suggestion, [and] speculation." *People v. Leyra*, 1 N.Y.2d 199, 206 (1956). What Wilson said during the 911 call was unreliable because he was intoxicated at the time of death and possibly high on cocaine; while the crime scene concededly was gruesome, it did not shed light on what actually happened during the struggle; the wounds did not exclude justification; and Shepard's direct testimony that appellant "poked" Wilson because she did not want to have sex with him was not inconsistent with his cross-examination testimony that merely expanded upon this to add that appellant also said Wilson attempted to rape her. This evidence, therefore, was insufficient to give rise to the speculative theory advanced by the People and disprove the justification defense.

    Even more critically, however, what the People actually sought to do with their alternative theory was cherry-pick those parts of appellant's statements they wanted the fact-finder to credit, and discard the rest. In other words, they wanted the jury to believe appellant when she said she stabbed Wilson, but disbelieve <u>every other aspect</u> of her story.

More than four decades ago, this Court reversed a homicide conviction in virtually identical circumstances. In *People v. Reed*, 40 N.Y.2d 204, 206-09 (1976), this Court found the proof insufficient to sustain a manslaughter conviction because, in attacking the believability of the sole eyewitness's justification description with circumstantial physical evidence, the People failed to prove guilt since there was no basis other than speculation for the jury to accept that she saw the defendant commit the shooting at all. *Id.* Notably, the Court found circumstantial proof of the defendant's presence that night insufficient to support the People's reliance on only the incriminating portion of the eyewitness's account. *Id.* at 206, 209. Here, circumstantial proof of appellant's presence in Wilson's apartment similarly does not provide a rational basis to conclude, beyond a reasonable doubt, that she truthfully admitted stabbing him but lied about everything else.

Under these circumstances, *Reed* and appellant's case appear legally indistinguishable. *Reed* even involved the preclusion of relevant defense evidence, like appellant's case, which this Court found "quite significant" to its analysis. *Id.* at 209-10. Nevertheless, and notwithstanding that appellant called *Reed* to its attention (Reply Brief at 2-3), the Appellate Division, without factual elaboration, found the evidence legally sufficient.

Accordingly, the Court should grant leave to clarify whether 40-year-old *Reed*'s prohibition on the People relying on evidence they maintain "is an unbelievable story" and attacking their own direct proof in "almost every facet . . . save one" – the fact of the homicide – is still good law. *Id.* This issue is leaveworthy. While the Court has more recently addressed legal sufficiency in cases where the proof is premised on a single eyewitness who gives contradictory testimony, *see, e.g., People v. Delamota*, 18 N.Y.3d 107 (2011), it has never again had occasion since *Reed* to consider a case in which the People's only direct evidence establishes justification and they are required to disprove their own case with speculative circumstantial evidence. Appellant's case provides the court with the ideal opportunity to do so, as counsel fully preserved the legal sufficiency argument below (397-401) and it was well-litigated on appeal.

### The Statement Obtained After Appellant's Invocation of the Right to Remain Silent

Leave also is warranted in this case to decide whether appellant's invocation of the right to remain silent during her videotaped statement was unambiguous and unequivocal. This Court has never explicitly addressed what constitutes a valid invocation. Because the Supreme Court has done so relatively recently, in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), and because Appellate Division cases, including appellant's, apply an arguably erroneous legal standard without citing *Thompkins* or cases from this Court, clarification is necessary.

It is well-settled that when a defendant in custody "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966). This right to cut off questioning "must be scrupulously honored." *Id.* at 479; *Michigan v. Mosley*, 423 U.S. 96, 104 (1975); *People v. Ferro*, 63 N.Y.2d 316, 322 (1984). Once it is invoked, the suspect "may not within a short period thereafter and without a fresh set of warnings be importuned to speak about the same suspected crime." *Ferro*, 63 N.Y.2d at 322. *See also People v. Gary*, 31 N.Y.2d 68, 70 (1972).

In *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010), the Supreme Court held, as a matter of first impression, that a defendant's invocation of the *Miranda* right to remain silent – just as with the *Miranda* right to counsel – must be unambiguous and unequivocal. There, because the defendant

only remained silent and refused to speak for several hours, the Court held that this standard was not met. *Id.* at 383.

*Thompkins* and its holding have never been addressed by this Court. In fact, research discloses only four New York cases citing *Thompkins*, all without extended discussion. Moreover, although the Court has long acknowledged that invocations of the right to counsel under *Miranda* are subject to the "unambiguous and unequivocal" standard in order to be given effect, *e.g. People v. Glover*, 87 N.Y.2d 838, 839 (1995), it has never considered what constitutes an invocation of the *Miranda* right to silence at all, either before or since *Thompkins*.

Appellant's case squarely presents the Court with this opportunity. The *Huntley* hearing testimony established that, approaching her twelfth hour in custody, which included hours of interrogation, appellant was asked by the A.D.A., "You want us to stop right now," and answered, "yeah." The A.D.A. properly ended the interview, and stated on video that there would be no further questioning until the tape resumed. The detective, who was involved at each step of appellant's lengthy interrogation, explicitly agreed during cross-examination that "then she stopped speaking, she didn't want to speak anymore," and, "She said, I don't want to speak anymore." The next morning, however, without re-reading her *Miranda* rights, the detective questioned appellant and thereby elicited statements from her regarding her possession of Wilson's property following the incident.

Given this evidence, appellant argued on appeal that she had invoked her right to remain silent, the detective was required to but did not readminister *Miranda* before questioning her about the crime again, and her statements from the second day thus required suppression. Affirming the denial of suppression, the Appellate Division held that appellant had not "unequivocally and unqualifiedly invoked her right to remain silent." In so doing, however, it did not cite *Thompkins*. Nor did it even cite any case from this Court applying the "unambiguous and unequivocal" standard in *Miranda* right-to-counsel cases.

Rather, the Appellate Division relied on only two Third Department cases, *People v. Horton*, 46 A.D.3d 1225 (3d Dep't 2007) and *People v. Caruso*, 34 A.D.3d 860, 862 (3d Dep't 2006). In *Horton*, the defendant's response of "I think I'll wait" or "I think I'll wait a minute" was held to be "'temporally qualified' and, in fact, implied that he might speak at a later time," and thus was not "unequivocal and unqualified." And in *Caruso*, the defendant's response of "Not right now" also was "temporally qualified" and not an "unequivocal and unqualified" invocation of the right to remain silent.

The Appellate Division decision in appellant's case demonstrates the need for this Court to provide clarification. The court applied an incorrect legal standard, "unequivocally and unqualifiedly," rather than the "unambiguous and unequivocal" standard of *Thompkins* and this Court's invocation-of-the-right-to-counsel jurisprudence. And it cited other, remote Appellate Division cases also using the incorrect standard. Although it is possible that this is just a matter of semantics, it is equally possible that at least two Departments of the Appellate Division misunderstand the law and require guidance. Critically, the "unqualified" prong cited by the Appellate Division is analytically linked, in the Third Department cases, to those courts' conclusions that the defendants' invocation of the right to silence was "temporally qualified," *i.e.*, non-permanent and thus non-effectual. Whether that is sufficient to demonstrate an "ambiguous" assertion under *Thompkins* is for this Court, not the Appellate Division, to decide. The facts of appellant's case

present an ideal vehicle in which to address the proper standard, as the People argued below and on appeal that appellant's invocation of the right to silence was temporally limited: "Defendant merely wanted to stop the statement temporarily, even though that statement did not resume" (Resp. Brief at 66).

Ordinarily, whether the assertion of a *Miranda* right is unequivocal and unambiguous is a mixed question of law and fact. *Glover*, 87 N.Y.2d at 839. However, as discussed, the Appellate Division here cited an erroneous legal standard. *People v. Morales*, 65 N.Y.2d 997, 998 (1985) (lower court's "determination rests upon an erroneous legal standard, thus presenting a question of law within this court's power of review"). Moreover, in reaching its determination, the Appellate Division relied <u>only</u> on the videotaped statements made by the A.D.A. and explicitly dismissed as "speculation and conjecture" the detective's hearing testimony that appellant "stopped speaking, she didn't want to speak anymore," and, "She said, I don't want to speak anymore" (Dec. at 2). But even the hearing court acknowledged that appellant "wanted to stop" (220). Thus, because the Appellate Division also applied an incorrect legal standard in excising a critical portion of the hearing record, and because the record therefore did not support its finding, this Court has further basis to review the issue on the law. *People v. Schreiner*, 77 N.Y.2d 733, 738 (1991) ("Whether evidence is legally sufficient to sustain the findings of a trial court concerning the admissibility of a confession presents a question of law for this Court's review"); *Morales*, 65 N.Y.2d at 998.

This issue was fully preserved by counsel's arguments and the hearing court's decision (216-22).

<u>The Interference with Counsel's Interview of a Witness</u>

This Court should also grant leave to join the weight of authority in holding that witness availability for interviewing may not be premised on opposing counsel's presence, and also to consider when, and under what circumstances, such an error can be considered harmless.

Lower courts of this State have long recognized the common law right of each party to have access to the other side's witnesses. *See People v. Harris*, 84 A.D.2d 63, 102-03 (2d Dep't 1981) ("not only was the prosecutor entitled to attempt to speak to a defense witness, but any effort by defense counsel to prevent [this] . . . might well have constituted an ethical violation"); *People v. Eanes*, 43 A.D.2d 744, 744 (2d Dep't 1973) ("We know of no rule or law which prohibits defense counsel from interviewing a person who has appeared at the request of the prosecutor"); *People v. Doe*, 178 Misc. 2d 534, 536 (Sup. Ct., Monroe Cty. 1998) ("the prosecutor possesses the right to interview witnesses for the defendant just as witnesses for the prosecution must be made available for the defendant's counsel to interview") (citations omitted); *see also People v. Paskowitz*, 151 Misc. 171, 171-72 (Cty. Ct., Bronx Cty. 1934). For a criminal defendant, this rule is of constitutional dimension. *Washington v. Texas*, 388 U.S. 14, 17-19, 23 (1967) (defendant has Sixth Amendment right to "compulsory process for obtaining witnesses in his favor"; reversing when state statutes prevented defendant from calling charged accomplice); *Int'l Bus. Machines Corp. v. Edelstein* ("I.B.M."), 526 F.2d 37, 43-44 (2d Cir. 1975) (impeding defense counsel's ability to "search for the truth" by freely interviewing adverse witnesses violates right to effective assistance).

Moreover, longstanding prosecution ethical norms prohibit obstruction of defense access to prosecution witnesses. The ABA Standards state that that a prosecutor "may not make his or her presence a condition of holding the interview." Commentary to ABA Standards for Criminal Justice:

Prosecution Function and Defense Function, § 3-3.1(d), at 50 (3d ed. 1993). And as the Second Circuit has held, a district court may not condition interviews with adverse witnesses on the presence of opposing counsel, as such a requirement is "contrary to time-honored and decision-honored principles, namely, that counsel for all parties have a right to interview an adverse party's witnesses (the witness willing) in private, without the presence or consent of opposing counsel . . . ." *I.B.M.*, 526 F.2d at 42.

Nevertheless, this Court has never addressed the issue. Granting leave in appellant's case would give it the opportunity to do so, as the trial court here explicitly precluded defense counsel from interviewing Shepard without the prosecutor present, in spite of Shepard's willingness and counsel's repeated invocation of the rule.

Moreover, granting leave would also permit the Court to consider the doctrine of harmless error in this context. Whether an error is harmless. *People v. Reddick*, 65 N.Y.2d 835 (1985) (Court has power to review harmless error determinations). On appeal, the People conceded that the trial court's ruling was erroneous but countered that it was harmless. The Appellate Division agreed and affirmed the conviction. But Shepard was a critical witness, for he was the only person to see appellant the night of the incident. Give the weakness of the People's attempt to disprove justification, as discussed *ante*, it is doubtful that any error undermining the rights to present a defense and to effective assistance of counsel could be harmless as to such a witness beyond a reasonable doubt. *People v. Crimmins*, 36 N.Y.2d 230, 237 (1975).

In this case, it also was clear that counsel's efforts to defend appellant were impaired by his inability to interview Shepard. Shepard was a prosecution witness, yet, during cross-examination, he unexpectedly turned out to have extraordinarily powerful exculpatory evidence – appellant told him she defended herself from Wilson because he "tried to force his self on her." But counsel had no way of knowing this until Shepard suddenly expanded upon the answers he had given during direct testimony. Counsel may have been able to elicit additional exculpatory evidence given a fair and meaningful opportunity to interview Shepard, rather than having to avoid asking questions to which he did not know the answers for the first time in front of the jury. Moreover, counsel initially sought to impeach Shepard's credibility by highlighting his convictions and drug problems. Had counsel known that Shepard would fully support appellant's account of being the victim of a violent, forcible, attempted rape, he surely would have done things differently. Since Shepard's testimony went straight to the heart of the case and the court's ruling prevented counsel from adequately preparing to cross-examine him, the ruling was not harmless beyond a reasonable doubt for this reason, as well.

This error was fully preserved by counsel's detailed objections (335-40).

The Curtailment of Appellant's Right to Present a Defense

Finally, appellant's case also presents a compelling issue concerning the curtailment of her right to present a defense. Counsel here had a good faith basis to believe that Wilson suffered from psychosis and hallucinations, had a longstanding substance abuse problem, and had engaged in specific acts of violence against his child's mother. Nevertheless, the court prevented him from adducing this relevant evidence before the jury. Particularly since appellant's case would allow the Court to revisit an issue it explicitly declined to reach in *People v. Watson*, 20 N.Y.3d 1018 (2013) – *i.e.*,

Hon. Jenny Rivera
November 13, 2018
Page 15

whether a defendant must have knowledge of the specific acts of violence she seeks to introduce – it should grant leave to appeal.

The right to present a defense is "among the minimum essentials of a fair trial," *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (internal citations omitted), and "an essential component of procedural fairness." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). *See also People v. Hudy*, 73 N.Y.2d 40, 56-58 (1988), *abrogated on other grounds by Carmell v. Texas*, 529 U.S. 513 (2000). This includes the right to "present the defendant's version of the facts," as contrasted with the prosecution's. *Washington*, 388 U.S. at 19; *see also People v. Carroll*, 95 N.Y.2d 375, 385 (2000) ("Just as the People are allowed to rebut key assertions of the defense . . . the defendant also is allowed to attempt to disprove the People's theory and rebut their key assertions").

The court here severely curtailed appellant's right to present a defense in several different ways. First, it prevented counsel from introducing certified medical records showing that Wilson had a history of psychiatric illness including psychosis and hallucinations of harming himself and others, was prescribed Seroquel, an antipsychotic, and had a longstanding history of substance abuse. Second, it refused counsel's fallback request for an in camera examination of Wilson's doctor about his usage of Seroquel and the effects of non-compliance.

This evidence unquestionably was admissible at trial and relevant to appellant's defense. A defendant charged with homicide may introduce evidence that the deceased was a "quarrelsome, vindictive, or violent" person. *People v. Miller*, 39 N.Y.2d 543, 548-49 (1976) (quotations omitted). Moreover, objective evidence that demonstrates the deceased was "exhibiting aberrant behavior sufficient to cause fear and warrant a forceful response" is also admissible, even if unknown to the defendant, as this helps the jury to "better judge the reasonableness of the defendant's conduct." *People v. Chevalier*, 220 A.D.2d 114, 116-18 (1st Dep't 1996), *aff'd*. 89 N.Y.2d. 1050, 1053 (1997).

Third and finally, the court also prevented counsel's attempts to adduce evidence of Wilson's specific acts of violence. Counsel requested disclosure of Domestic Incident Reports that related to Wilson having "problems with his baby's mother," and then later asked Wilson's sister whether Wilson had ever been physically abusive toward his child's mother. But the court would not allow either avenue of exploration. This decision was erroneous: a defendant raising a justification defense is not limited to general character evidence but may also show the deceased's specific violent acts. *Miller*, 39 N.Y.2d at 551.

Relying on *Miller*, 39 N.Y.2d 543, the People argued on appeal that there was no evidence that appellant knew of Wilson's specific acts of violence (Resp. Brief at 54). But as appellant noted in Reply at pp.18, New York remains the exception to the national trend of allowing evidence of a victim's prior violence on the issue of whether he was the initial aggressor, regardless of the defendant's knowledge about his prior violence. *See Commonwealth v. Adjutant*, 824 N.E.2d 1, 6-7 (Mass. 2005) (federal courts and nearly all states have adopted this rule). In *People v. Watson*, 20 N.Y.3d 1018 (2013), the Court was asked to revisit its *Miller* rule requiring the defendant's knowledge, but it declined to do so on the ground that *Watson* "[did] not present the issue" because there was no view of the evidence that the decedent was the initial aggressor. *Id*. at 1020. Critically, however, the Court noted that it "express[ed] no opinion as to whether . . . *Miller* should be reconsidered in a case that properly presents that issue." *Id*.

In light of the briefing below, we respectfully submit that appellant's case "properly presents" the issue left unanswered in *Watson*: whether the defendant must prove her knowledge of the specific acts of violence sought to be elicited in order for them to be admissible at trial. A jury certainly could conclude here, based on appellant's statements and the other evidence, that Wilson was the initial aggressor inasmuch as he attempted to rape appellant.

These issues were preserved by counsel's repeated attempts to introduce the medical records, call the doctor for an in camera examination, obtain the Domestic Incident Reports, and cross-examine the witnesses (53-61, 74-75, 146-48, 255-56, 262-63).

* * *

In sum, appellant's troubling case presents a number of leaveworthy, preserved issues. It also cries out for further review in light of the sheer number of errors that occurred in a case where a life sentence was imposed upon a young woman whose defense was that she killed Wilson to protect herself from a forcible rape.

Accordingly, for all the reasons set forth above and in her briefs, Ms. Wisdom respectfully urges the Court to grant leave to appeal on all Federal constitutional issues presented by her case: whether her conviction was not proven with legally sufficient evidence beyond a reasonable doubt, in violation of due process, U.S. Const., Amend. XIV; *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 352 (1970) (Point I); whether her rights to due process, to present a defense, and to the effective assistance of counsel were violated by the court's refusal to allow him to interview a witness without the prosecutor presence, U.S. Const., Amends. V, VI, XIV (Point II); whether her right to present a defense was violated by the preclusion of evidence concerning the decedent's history of psychosis, substance abuse, and domestic violence, U.S. Const., Amends. VI, XIV (Point III); whether her right to due process was violated by the admission of the 911 call and non-probative uncharged crime evidence, U.S. Const., Amend. XIV (Points IV, V); whether suppression was required because her *Miranda* rights were violated on the second day of interrogation, U.S. Const., Amends. IV, V, XIV (Point V); and whether she was deprived of due process by the prosecutor's persistent, flagrant summation misconduct, U.S. Const., Amends. V, XIV (Point VI); or, alternatively, deprived of the effective assistance of counsel due to counsel's failure to preserve all issues for appeal, U.S. Const., Amend. VI.

I have enclosed copies of the minutes referenced herein and appellant's videotaped statement, demonstrating preservation, and respectfully request a hearing on the application.

Respectfully yours,

Kendra L. Hutchinson
Tammy Linn
Counsel for Appellant
(212) 693-0085, ext. 233
khutchinson@appad.org

cc:    HON. ERIC GONZALEZ
District Attorney, Kings County
350 Jay Street
Brooklyn, New York 11201
Attn: ADA Thomas M. Ross

MS. ATARA WISDOM
No. 14-G-0936
Bedford Hills Correctional Facility
247 Harris Road
Bedford Hills, New York 10507-2400