UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ATARA WISDOM,

                                        Petitioner,

                    -against-

ADA PEREZ, Superintendent, Bedford Hills
Correctional Facility, Department of Corrections and
Community Supervision,

                                        Respondent.

AFFIDAVIT IN OPPOSITION TO
PETITION FOR A WRIT OF
HABEAS CORPUS

20-CV-02196 (KAM)

STATE OF NEW YORK    )
                     )   SS:
COUNTY OF KINGS      )

       KEITH DOLAN, an Assistant District Attorney in the County of Kings and an attorney

admitted to practice in this Court, being duly sworn, deposes and states as follows:

       1.     This affidavit and memorandum of law are submitted in opposition to the application

of petitioner, Atara Wilson (hereinafter "defendant"), dated May 14, 2020, submitted on her behalf

by counsel (Paul Skip Laisure, Esq. [Appellate Advocates], by Tammy E. Linn, Esq.), for a writ of

habeas corpus.  The following statements are made on information and belief, based upon the records

and files of the Kings County District Attorney's Office, including the transcript of defendant's trial.

Unless otherwise indicated, respondent expressly rejects the factual allegations and representations

made by defendant.  Respondent relies upon and respectfully refers this Court to the state's brief

filed in the New York Supreme Court, Appellate Division, Second Department, for a full

discussion of the facts and legal issues in this case.

2.      By agreement with the Attorney General of the State of New York, the District Attorney of Kings County will represent respondent in this matter.

3.      Pursuant to this Court's scheduling order, an electronic PDF copy of the trial transcript is being filed with this response.[1]  Because of the emergency procedures and restrictions imposed due to the COVID-19 virus, a hard/paper courtesy copy of the trial transcript cannot be provided to Chambers at this time.  Respondent will do so once it is practicable.  Counsel for defendant states in her petition that she has provided this Court, as part of the petition, with "Copies of the Brief for Defendant-Appellant, the Brief for Respondent, and the Reply Brief for Defendant-Appellant" and that those documents "are attached as Exhibits B, C, and D" to defendant's petition (Defendant's Petition at 3, ¶6c).  Thus, respondent is not providing duplicative copies of those briefs.

The Incident

4.      On November 29, 2011, shortly after midnight, defendant killed Anthony Wilson, who had allowed defendant to stay in his residence, by stabbing him seven times with a knife in Wilson's studio apartment at 832 Bushwick Avenue in Brooklyn.  For this crime, defendant was charged under Kings County Indictment Number 6615/2012 with Murder in the Second Degree (New York Penal Law ["N.Y.P.L. ] § 125.25[1]).  Defendant admitted that she stabbed Wilson, but claimed that she had acted in self-defense when he allegedly tried to rape her.   Thus, the trial defense was based upon justification  (N.Y. P.L. § 35.15[2] : use of deadly physical force upon another).

---

[1] During the voir dire, some of the prospective jurors revealed information on the record that they or their family members had been the victims of sexual crimes.  Therefore, the voir dire minutes have been redacted to delete such information. Defendant raises no issues regarding the jury selection.

5.      Defendant was tried before a jury in the New York Supreme Court, Kings County (Marrus, J., at <u>Huntley/Wade</u> pre-trial suppression hearing; Tomei, J., at supplemental <u>Huntley</u> hearing, trial, and sentence).  Defendant was represented at trial by David Walensky, Esq. and Joshua Povill, Esq., who were  appointed to represent defendant pursuant to New York County Law 18-B.

i)      <u>The Huntley/Wade Suppression Hearing</u>[2]

<u>The People's Case</u>

A)      On January 3, 2012, Detective CHRISTOPHER SCANDOLE investigated the death of Anthony Wilson, whose body was found in an apartment at 832 Bushwick Avenue in Brooklyn (Scandole: H. 4-5).[3]  In March 2012, DNA recovered from evidence at the scene was found to match the DNA profile of defendant Atara Wisdom.   Thus, Detective Scandole began to look for her (Scandole: H. 5).  In July 2012, Detective Scandole learned that defendant was at a women's homeless shelter on Herkimer Street (Scandole: H.  5-6, 17).

B)      On July 25, 2012, at about 9:45 a.m., Detectives Scandole and Collins found defendant at the shelter and took her to the interview room at the 83rd Precinct (Scandole: H. 5-7, 17-18; 208-09, 211).  At 11:00 a.m., the detectives sat down with defendant, and Detective Scandole gave her the <u>Miranda</u> warnings.

---

[2] Because defendant does not challenge the <u>Wade</u> ruling, the evidence pertaining to the identification procedure is not summarized.

[3] Unprefixed numbers in parentheses refer to pages of the trial transcript, including the supplemental <u>Huntley</u> hearing that was held during the trial.  Numbers in parentheses prefixed with an "H." a "J." or an "S." refer to pages to the pre-trial <u>Huntley/Wade</u> hearing transcript, the jury selection transcript, and sentencing transcript respectively.  Names in parentheses refer to the witnesses whose testimony is summarized.

Defendant waived the <u>Miranda</u> rights and agreed to speak to the detectives (Scandole: H. 7-9, 17; 209, 211-12).[4]

      C)     Detective Scandole told defendant that a deceased person had been found, as well as where the person had been found, and that her name had come up during the investigation. Detective Scandole asked defendant if she knew anything about the person (Scandole: H. 9). Defendant then gave an oral statement that lasted for about two to three hours (Scandole: H. 10-12; 210, 212).

      D)     Defendant stated, in sum and substance, that after she lost her place to live, she had to move in with an individual she met at a doctor's office near Broadway. Defendant would sometimes give him money for rent when she could. According to defendant, the man was a crack-user, and he was completely different when he smoked it (Scandole: H. 9-10).

      E)     Defendant continued that she awoke one night to find that the man was touching her under her shirt; defendant stopped him, and told him that was not the way it is and that was not why she was there. Defendant left to call her friend and calm down (Scandole: H. 10).

      F)     Later, around Thanksgiving, defendant and the man had a heated argument, after which she left to stay with her sister for a couple of days. Defendant remained in contact with the man via phone. Defendant had to return to the

---

[4] The hearing court noted that it had read the <u>Miranda</u> warnings for itself (H. 8-9).

apartment because she had an upcoming interview, and she needed access to her clothes  (Scandole: H.10-11).

G)      Upon her return, things were peaceful, but later that night, while defendant was sitting on the couch getting her clothes ready, the man told her that he was going to get "some pussy tonight."  Defendant, thinking that the man had someone coming over, told him she would leave.  However, defendant claimed, the man blocked the door, prevented her from leaving, and picked up a belt, which he wrapped around his hand.  Defendant picked up a knife and put it in her sweater (Scandole: H. 11).

H)      Defendant told the detective that she got up, and she said that the man then punched her in the face; he also pulled her sweater over her head. Defendant maintained that he started beating her in her shoulders and back.  The man was also pushing her down, and defendant said that she believed she would be dead if her head hit the ground (Scandole: H. 11).

I)      At that point, defendant pulled the knife and started stabbing the man.  She then went to the bathroom: she had a large knot on her head and bruises on her shoulders.  Defendant collected her things into a duffel bag and left for a friend's house.  Defendant did not tell anyone what happened (Scandole: H.12).

J)      Detective Scandole left the interview room to write out defendant's statement (Scandole: H. 12-13; 213).  At 5:00 p.m., defendant was placed in a lineup (Scandole: H. 19; 212).  At 7:30 p.m., when Detective Scandole was finished writing the statement, he returned to the interview room, read the statement back to

5

defendant, and gave defendant a chance to read it (Scandole: H. 13, 19; 213).

Defendant, Detective Scandole, and Detective Collins all signed the statement

(Scandole: H. 13; 213).[5]

        K)      Detective Scandole then asked defendant if she wanted to give a

statement to the district attorney's office, and defendant said that she did (Scandole:

H. 14).  At 9:00 p.m., Assistant District Attorney Ed Purce arrived at the precinct

and took a video-recorded statement from defendant, with Detective Scandole

present, that lasted one-half hour (Scandole: H. 15; 210-11, 214).[6]

        L)      On July 26, 2012, at 10:00 a.m., Detective Scandole spoke to

defendant again in the interview room at the 83rd Precinct "to clear up some things"

and to ask a few more questions (Scandole: 205-06, 211).  He did not know where

defendant had been held overnight (Scandole: 215).  Detective Scandole reminded

defendant that she had been given her <u>Miranda</u> warnings and had agreed to speak

the previous day (Scandole: 211).  The detective told defendant that he wanted to

---

[5]  The signed statement was admitted into evidence at the hearing, without objection, as People's Exhibit Number 2.  The hearing court read the statement for itself, and thus it was not read into the record (H.13-14).

[6] The videotaped statement was admitted into evidence at the hearing without objection, but the hearing court directed that it would not be played yet (H. 15-16).  Midway through the trial, the state announced that defendant had made a statement the day after she was arrested, that pre-trial notice had been given for this statement, but that this statement had not been litigated at the pre-trial <u>Huntley</u> hearing (150-52).  The state observed that both parties had referred to this statement in their opening statements at trial (151-52).  The court interrupted the trial to conduct a supplemental <u>Huntley</u> hearing to consider the admissibility of this statement (152).  Defendant states that she has provided a copy of the video statement to this Court as Defendant's Exhibit G to the instant <u>habeas</u> petition (Defendant's Petition at 7, n.2).

ask her a few more questions if she was agreeable (Scandole: 206).  Defendant said

that she was and never said anything about not wanting to talk (Scandole: 216).

 M) Detective Scandole asked defendant about Wilson's property,

specifically what defendant did after she came out of the bathroom.  Defendant

gave her statement that answered the question (Scandole: 206-08).  When defendant

finished, Detective Scandole asked if she used Wilson's benefit card.  Defendant

said, "Absolutely not" (Scandole: 208).

Defendant's Case

 N) Defendant rested without presenting any evidence (H. 33).

The Hearing Court's Decision

 O) The hearing court found that defendant knowingly and voluntarily

waived her Miranda rights and that, because the written and video-recorded

statements were largely exculpatory, defendant was not coerced into making the

statements (H. 33-34).  The hearing court denied defendant's motion to suppress

these statements (H. 35) (Marrus, J.).

 P) At the subsequent, supplemental hearing for the post-video

statement defendant made on July 26, 2012, the court found that defendant had not

cut-off any further questioning at the end of her video-recorded statement the night

before, the delay in arraigning defendant was not unreasonable, and that the state

proved beyond a reasonable doubt that the statement was knowing, voluntary, and

intelligent (218-22).  The trial court denied defendant's motion to suppress this

statement (222) (Tomei, J.).

ii)    <u>The Trial</u>

<u>The People's Case</u>

A)    VICTORIA WILSON ("Victoria") was the sister of Anthony Wilson ("Wilson"), who lived at 832 Bushwick Avenue in Brooklyn (Wilson: 67). Victoria typically saw Wilson on holidays and saw her brother for the last time at her mother's house on Thanksgiving 2011 (Wilson: 68-70). For Christmas 2011, because Wilson did not even call her on the phone, Victoria went to defendant's apartment, which she had been to four times, and knocked on the door. There was no answer (Wilson: 68, 70-71).

B)    SHAKEEMA FORTUNE saw Wilson about four to five times per week from 2009 through 2011 and had been to his apartment a few times (Fortune: 133-34, 139, 141). Wilson and Fortune considered themselves to be like brother and sister, and Wilson baby sat for her children (Fortune: 133, 141).

C)    Sometime before Thanksgiving 2011, between 9:00 and 10:00 p.m., Fortune saw Wilson at his apartment because Fortune and Wilson were planning to go out and play pool that night (Fortune: 134-35, 144-45). Wilson was with someone he introduced as his girlfriend by saying, "This is Renee I was talking about." (Fortune: 135-36, 143). "Renee" said that they were not going out, and so Fortune left Wilson's apartment by herself (Fortune: 136, 143).[7] Fortune never saw Wilson again (Fortune: 137).

---

[7] Fortune did not make an in-court identification of defendant as "Renee."

D)      In the fall of 2011, MATTHEW SHEPARD, who lived on Cedar Street in Brooklyn, knew someone named Tony.  Shepard described Tony as a "panhandl[er]" who Shepard occasionally saw on Broadway (Shepard: 344-45).[8] Shepard had no relationship with Tony, but eventually learned that he lived near Bushwick Avenue and Kosciusko Street (Shepard: 345-46).

E)      In "one of the warmer months," Shepard met "Renee" – defendant – through a friend (Shepard: 346, 348-49).[9]  Shepard found defendant attractive (Shepard: 350).  During a brief conversation, defendant said that she was staying with Tony because she had nowhere else to stay (Shepard: 346-47).  Defendant and Shepard exchanged phone numbers.  Because Shepard did not want his girlfriend to know that he was talking with another woman, he had defendant use Tony's phone number (Shepard: 347, 351).  Shepard was almost sure that his phone was in his name, but did not remember the number for the phone (Shepard: 347-48).

F)      Within a couple days of Thanksgiving 2011, in the early morning, defendant called Shepard; Shepard recognized the phone number of the incoming call as Tony's phone number (Shepard: 350-51, 364-65).  Defendant asked Shepard what he was doing and if she could come by.  Shepard thought that they would have sex and arranged to meet defendant on DeKalb Avenue (Shepard: 350-51, 365-66).

---

[8] The police brought Shepard to court to testify (Shepard: 360).  Shepard had a criminal record in Pennsylvania and New Jersey for drug-related offenses (Shepard: 343-44, 362-63).

[9] Shepard testified that he thought defendant was "Renee," but he was "not sure" because she now "looked different," possibly because of the passage of time and because she may have gained weight (Shepard: 348-49, 369).

9

G)      When Shepard met defendant there, defendant had three or four bags with her.  Shepard joked about her being a "bag lady" (Shepard: 351-52, 359, 365). Defendant said that she had had an altercation with a friend (Shepard: 352-53). Defendant said, "I'm not paying rent and fucking him.  I am not going to pay rent and fuck him, too."   Defendant added that she "poked him" (Shepard: 353). Defendant had a little swelling on the face, but no blood on her (Shepard: 355, 366).

H)      Defendant stayed at Shepard's home for a few hours (Shepard: 354). While there, Shepard asked defendant what was wrong with her.  Defendant said, "This guy is crazy.  I'm not going to pay rent and fuck him."  As remembered by Shepard, defendant said that he "tried to take it, tried to force his self" on her (Shepard: 367-68).  Shepard thought that defendant had suggested that they go check on "Anthony," but Shepard refused to go (Shepard: 368).

I)      Defendant could not stay at Shepard's house because Shepard had to go to Manhattan (Shepard: 356).  Shepard thought that a "gentleman" came and got defendant (Shepard: 356).  That was the last time Shepard saw defendant before her arrest (Shepard 356, 359).

J)      DONET ROBINSON lived at 832 Bushwick Avenue with his wife, who owned the building (Robinson: 77-78).  Robinson knew Wilson as a tenant, who had lived there for one to one and one-half years (Robinson: 78-79).  Wilson's rent came from "section eight" and from public assistance; it was sent by the government directly to the landlord (Wilson: 67; Robinson: 79).  Robinson would collect Wilson's mail and put it under Wilson's door (Robinson: 80).

10

K)      On January 3, 2012, Robinson entered Wilson's apartment with a key because Wilson had not been picking up his mail and because Robinson had not seen Wilson for about two months (Robinson: 81-82, 85).  Robinson knew, as did Victoria and Fortune, that Wilson kept a neat apartment (Wilson: 68; Robinson: 81; Fortune 134).  When Robinson entered, however, he saw "red stuff" all over the floor (Robinson: 82).  He also saw Wilson lying on the bed (Robinson: 82-83).

L)      The apartment did not appear as if it had been forcibly entered. Robinson noticed that the apartment, which had steam heat controlled by the tenant, was cool (Robinson: 83-84).  Not going any further into the apartment, Robinson stepped out and then called his wife and the police (Robinson: 85).

M)      At 10:58 a.m. that morning, Police Officer GARRETT MARSDEN responded to the apartment (Marsden: 111-12).  After the landlord opened the door for him, which was on the Kosciusko Street side of the building, Officer Marsden went inside and saw a dead body, which he later learned to be that of Wilson, on the bed (Marsden: 113).  The apartment had a foul odor and clothes and a towel were strewn about (Marsden: 113-14).  Officer Marsden secured the crime scene (Marsden: 115).

N)      On January 3, 2012, at 2:42 p.m. Detective STEPHEN MARKOSKI of the Crime Scene Unit arrived at 832 Bushwick Avenue (Markoski: 2-5).  The detective found the ground-floor studio apartment there to be cold, bloody, and in disarray, but without any signs of a forced entry (Markoski: 7-8).  The apartment temperature was only 28° (Markoski: 32).  A body in an advance state of

decomposition, with maggots were throughout most of the body, was on the bed (Markoski: 8). The apartment itself had only a place to sleep, a kitchen, and a bathroom (Markoski: 9).

O)     Detective Markoski recovered a black sock with bloodstains, a pair of blue jeans with a black belt and with bloodstains, a brown long-sleeved shirt with bloodstains, a white towel with bloodstains, and two prescription pill bottles, which were underneath the bed (Markoski: 9, 11-12, 27). Detective Markoski took four swabs from bloodstains on the nightstand, the kitchen cabinet, inside the bathtub, and from the bathroom wall (Markoski: 12-13, 15; Stipulation: 392-93). Later, Amy Dorsey from the New York City Police Department laboratory took swabs from bloodstains from the exterior and the caps of the two prescription pill bottles, which were for Seroquel and Fluoxetine (Stipulation: 393-94).

P)     Doctor IRINI SCORDI-BELLO, a "medical examiner two" with the Office of the Chief Medical Examiner of the City of New York and an expert in forensic pathology, was present at the autopsy of Wilson, which was conducted on January 4, 2012 by Dr. Frede Frederic.[10] Dr. Scordi-Bello reviewed the autopsy report and photographs (Scordi-Bello: 227-30, 251).

Q)     The autopsy determined that Wilson was 5'9" tall, 150 pounds, and was fifty years old (Scordi-Bello: 230). The autopsy also found that Wilson had seven stab wounds and that his body was in a state of morbid putrefaction (Scordi-

---

[10] Dr. Frederic had retired by the time of the trial (Scordi-Bello: 229).

Bello: 230-31).  Under the conditions, the decomposition was consistent with the death being on November 29 (Scordi-Bello: 240-41).

R)      The sequence of the stab wounds could not be determined and so they were arbitrarily numbered one through seven (Scordi-Bello: 231).  Number one was on the right side of the chest, was one-half-inch deep, was just below the clavicle, and had a right to left, front to back, and downward direction (Scordi-Bello: 232-33, 249).  Numbers two through five were clustered on the left side of the chest and all cut through the fourth rib, which required much more force to cut through than the force needed to cut through soft tissue (Scordi-Bello: 233, 239-42).  The clustering was indicative of the wounds being made in close succession and suggestive of Wilson not actively moving during the stabbing (Scordi-Bello: 242-43).  Those four wounds were from front to back, left to right, and downward (Scordi-Bello: 234).  Numbers two and three, which were two inches deep, did not enter the chest cavity, but number four, which was five inches deep, pierced the heart, and number five, which was six inches deep, pierced the lung (Scordi-Bello: 234-35, 238-39, 249-50).  Number six was to the lower chest, was five to six inches deep, and had a front to back, left to right, and upward direction (Scordi-Bello: 236-37, 245, 250).  Number seven was to the left upper back on the opposite side of the shoulder and was two and one-half inches deep (Scordi-Bello: 237-38, 250).

S)      None of the wounds was a slash wound (Scordi-Bello: 241).  Although none of the wounds was instantaneously lethal, the wounds would have impeded Wilson's ability to move around (Scordi-Bello: 257-59).  When someone

is grievously wounded, as Wilson was, he might urinate or defecate (Scordi-Bello: 257, 260).  Showed the photograph of Wilson's pants, Doctor Scordi-Bello stated that the staining on the pants was too light to be blood (Scordi-Bello:  260-61).  Also, more wounds means more blood loss and a quicker loss of consciousness (Scordi-Bello: 259-60).  The cause of death was "stab wounds to the trunk with heart, lung, and musculoskeletal injuries" (Scordi-Bello: 238).

T)    Wilson had no injuries to his hands or arms (Scordi-Bello: 241).  Because of the decomposition of the body, the only fluids available for analysis were blood and brain tissue (Scordi-Bello: 246).  Analysis of those fluids showed that Wilson had in his system alcohol with a concentrate of .20%, Fluoxetine, which is an anti-depressant, Benzoylecgonine, which is a breakdown product of cocaine, and Levamisole, which is a cocaine cutting agent (Scordi-Bello: 246-47, 255-56).  Seroquel, which is an anti-psychotic and anti-depressant, was not detected (Scordi-Bello: 255).

U)    SARAH PHILLPS was a criminalist level four with the Department of Forensic Biology in the Office of the Chief Medical Examiner and was an expert in forensic biology (Phillips: 309, 312).  On January 6, 2012, she received items from Wilson's autopsy and items collected by Detective Markoski (Phillips: 314, 316).  Phillips tested some of the samples for the presence of human blood (Phillips: 316-18).

V)    Blood that had a DNA profile matching Wilson's DNA profile was found in samples from the exterior the Fluoxetine bottle, from the nightstand, and

from the kitchen cabinet (Phillips: 317-19, 323-24).  Blood that had a mixture of DNA profiles that could have included Wilson's DNA profile was found on the cap of the Seroquel bottle (Phillips: 321).  The penile swab from Wilson showed the presence of semen with a DNA profile that matched Wilson's DNA profile (Phillips: 318-19).

W)      Blood that had a DNA profile that matched the DNA profile of Atara Wisdom (that had been uploaded on the CODIS database) was found in samples from the bathroom wall and the bathtub (Phillips: 322).  On May 9, 2013, an oral swab was taken from defendant to obtain her DNA profile (Phillips: 323; Stipulation: 394-95).  Defendant's DNA profile from the oral swab matched the profile from the blood samples from the bathtub and the bathroom wall (Phillips: 323-24).

X)      Detective CHRISTOPHER SCANDOLE's testimony at trial was substantially consistent with his testimony at the Huntley hearing (Scandole: 266-95).  Defendant's written statement was as follows:

> I had lost my place to stay and I moved in with this guy that I met over by the Doctor's office on Broadway.  I was giving him some money when I could.  He's a crack user and when he smokes crack he's like a different person.
>
> One night when I was sleeping I woke up and I found him touching me under my shirt.  I told him we aren't like that and that's not why I'm here.  We argued and it got real heated.  I left out and I called one of my friends on the phone and I calmed down.  A little while later right around Thanksgiving time we got into another argument that got real heated and loud.  I left and I went to my sister's house for a couple of days.  I talked to him on the phone a couple of times and I went back to get my clothes because I had an interview set up

for the next day.

When I got there he was OK, nice like when I first met him.  Later that night I'm on the couch getting my clothes and he tells me "I'm getting some pussy tonight."  I tell him OK then I'll get out of here.  He stands in front of the door and says "uh-uh."  Then he picks up a pink belt and he wraps it around his hand.  When he did that I picked up the knife and I put it in my sweater.  When I got up he punch me in the face.  Then he pulled the sweater over my head and he started punching me in the shoulder and back.  As he's punching me he is pushing my head to the ground and I'm thinking if my head hits the ground I'm dead.  That's when I took out the knife and I stabbed at him.

I ran into the bathroom and I see I have a big knot on my head and my shoulder is all bruised.  I got all my stuff together in a duffel bag and I left out to go to Ebony's house.  I didn't tell Ebony what happened and I didn't tell anyone else what happened.

(Scandole: 274-76, 279-81; People's Exhibit 55).

Y)   Detective DEBORAH BATANJANY placed defendant in a lineup (Batanjany: 376).  Shepard viewed the lineup and immediately identified defendant as "Renee" (Shepard: 359-60, 369-70; Batanjany: 385-86).  At the lineup, Shepard was certain of his identification (Shepard: 370).[11]  During the arrest processing, defendant gave her age as twenty-five, her height as 5'6", and her weight as 115 pounds (Batanjany: 388, 391).  On July 25, 2012, Assistant District Attorney ED PURCE was notified to go to the 83rd Precinct, and he arrived between 9:00 and 9:15 p.m. (Purce: 297-300).

---

[11] Shepard was not certain of his in-court identification of defendant as Renee, because of the passage of time and because defendant, having appeared to gain weight, looked different (Shepard: 361-62, 369).

Z)      Defendant's video-recorded statement was essentially the same as her written statement.  However, there was a difference in the video-recorded statement:  defendant said that, after returning to Wilson's apartment from her sister's apartment, defendant went to sleep while Wilson watched television (People's Exhibit 56 at 9:16:12 - :36).  The alleged attempted rape began when defendant was sleeping on the couch and Wilson touched her inappropriately (Id. at 9:17:26 - 18:33).

AA)    In the video-recorded statement, defendant also added the following to what she had said previously in her written statement:  Her relationship with Wilson was just "friends" (Id. at 9:08:16).  Defendant did not pay rent to Wilson, but gave him as much as $50 to $60 to make sure food was in the house (Id. at 9:08:50 - :09:00).  She did not know if Wilson worked, but knew that he was in a drug program (Id. at 9:10:06 - :25).  Defendant had problems with Wilson bringing in drugs and wanting to sleep with her (Id. at  9:10:38 - 11:10).  She slept on the couch, and Wilson slept on the bed (Id. at 9:16:22).  Defendant went to her sister's place after the first argument over Wilson wanting to sleep with her in which Wilson called her names (Id. at  9:12:06 - :13:24).  The events that lead to the stabbing began at 3:00 a.m. (Id. at 9:17:04).  Defendant got the knife from one of her bags next to the couch where she was sitting (Id. at 9:21:58 - :22:16).  The knife was a folding knife (Id. at 9:23:44).  Defendant tried to push herself up while trying to push Wilson off of her (Id. at 9:27:42 - :28:05).  Because defendant was bent over, she believed that she stabbed Wilson in the legs (Id. at  9:29:10).  Defendant

said that she did not remember how many times she stabbed Wilson (Id. at 9:29:50 - :52).

BB)     The video recording showed that, after describing the stabbing, defendant bent over in her chair with her face in her hands and no longer spoke (Id. at 9:30:39).  After the recording was off, A.D.A. Purce did not speak again with defendant (Purce: 302-03).

CC)     The next day, July 26, 2012, at 10:00 a.m., defendant gave her third statement (Scandole: 281).  In response to Detective Scandole's question about what she did with Wilson's property, defendant said:

> After I stabbed him, I came out of the bathroom and I saw him laying on the bed, I picked up his phone, his keys and his wallet.  When I left, I was on the phone talking to somebody but I was in a bit of a fog, I don't remember who I was talking to.
>
> As I was walking, I threw away his keys but I kept his wallet and I didn't use it.  I went over to my friend Tiffany's house, which was by East 93rd and Rutland Road and I stayed there for a couple of days.
>
> I continued to use the phone for a little while but then I threw that away also.

(Scandole: 282-83).  When Detective Scandole asked if she had used Wilson's benefit card, defendant said, "Absolutely not" (Scandole: 283).

DD)     NORMAN RAY CLARK III was the custodian of records for Sprint, and testified as to subscriber information for several telephone numbers (Clark: 154-59).  According to those records, Wilson was the subscriber for the

phone number (347) 793-1940 ("Wilson's phone"), which was for a prepaid phone that included both voice calls and text messaging (Clark: 160-62, 164). The records showed that the last phone call from Wilson's phone to phone number (347) 546-9337, the number subscribed to by defendant ("defendant's phone"), was on November 28 at 8:17 a.m. and the last text message from Wilson's phone to defendant's phone was at 12:41 p.m. that day (Clark: 179-81, 190-91).

EE)     The records showed that on November 29, 2011, Wilson's phone made two calls at 12:37 a.m.: one call was to the number 8-send, which could have been a misdial, and the other call was to 911 for a call that lasted 26 seconds (Clark: 171-72). In reviewing the records, Clark discerned that the phone numbers in communication with Wilson's phone after the 911 call were different from the phone numbers in communication with Wilson's phone before the 911 call (Clark: 176-77).

FF)     After the call to 911, the next calls from Wilson's phone that day were all outbound calls and were made at 12:57 a.m. for 40 seconds to phone number (347) 231-8819, a number subscribed to by a Paul Gerard; at 12:59 a.m. for 58 seconds to phone number (347) 889-3277, a number subscribed to by a Layton Bora ("Bora's phone"); at 1:00 a.m. to Bora's phone again (Clark: 173-76); at 5:00 a.m. for 122 to 131 seconds to phone number (347) 231-3340

("Theo/Shepard's phone")[12]; and at 5:14 or 5:15 a.m. for 33 seconds to Theo/Shepard's phone (Clark: 181-82, 186-88, 196-97, 199). The former call to Theo/Shepard's phone was routed with no indication that it want to voicemail, and the latter call to that phone went to voicemail (Clark: 182-83, 187-88). At 5:13 a.m. and 5:14 a.m., attempted calls were made from Theo/Shepard's phone to Wilson's phone that were 15 and 11 seconds in duration and went to voicemail (Clark: 197-99).

GG)    Additional records showed that on November 29, at 12:03 a.m., a call was made from Bora's phone to defendant's phone (Clark: 192-93). At 3:33 p.m., defendant's phone received a text message from Bora's phone (Clark: 193). At 3:35 p.m., defendant's phone sent a text message to Bora's phone (Clark: 194).

HH)    RICHARD LeBLOND of the New York City Human Resources Administration (HRA) investigated welfare fraud (LeBlond: 90-91). LeBlond explained that someone on public assistance, which consists of cash, Medicaid, and SNAP (otherwise known as food stamps), is issued a benefits card that works like a bank card with a "PIN." HRA keeps record of its clients' spending (LeBlond: 92-93).

---

[12] The number for Theo/Shepard's phone was subscribed to by a "Theo Theo," with no address given for the subscriber (Clark: 184-85). Sprint does not require an identification to verify the name of the subscriber for a prepaid phone, and so the subscriber could use a false name (Clark: 185). Sprint's records showed that Theo/Shepard's phone was listed as the account contact phone for Matthew Shepard (Clark: 184-87, 194-95). Sprint requires an account contact phone number for subscribers in order to reach them if they cannot be reached at their subscribed phone numbers (Clark: 185-86).

II)      In May 2012, at Detective Scandole's request, LeBlond provided the records for Wilson and defendant from September 1, 2011 to May 31, 2012 (LeBlond: 93-96).  Those records showed that Wilson had cash benefits and SNAP (LeBlond: 100).  For September through November 22, 2011, Wilson's card was used mostly at addresses on or near Broadway in Brooklyn (LeBlond: 100-01).  Beginning on December 6, 2011, the card was used at addresses on Rockaway Avenue, East 98th Street, East 93rd Street, Rutland Road, and Ralph Avenue (LeBlond: 100-02).

JJ)      The records showed that defendant also received cash benefits and SNAP (LeBlond: 104).  For September 2011, her card was used at addresses on Gates Avenue, Broadway, Sutter Avenue, Mother Gaston Boulevard, and Rutland Road (LeBlond: 103).  For December 2011, her card was used at addresses on Flatlands Avenue and Rutland Road (LeBlond: 104).  From December 17, 2011 through April 20, 2012, defendant's card was used in Pennsylvania and New Jersey as well as in Brooklyn and the Bronx  (LeBlond: 106-07; People's Exhibit 44).

KK)      RICHARD SCHOEN, a police communications technician with the New York City Police Department, retrieved a 911 call from Wilson's phone number,  made on November 29, 2011, between 12:20 and 12:40 a.m. (Schoen: 125-27, 131).  The caller said, "I've got this girl in my house.  I don't know what's wrong with her.  She's acting all crazy, and I want her out of my house."  The call ended abruptly with no response to the inquiry from the 911 operator (People's

Exhibit 42). Victoria identified the voice on the call as Wilson's voice (Wilson: 71-72).

Defendant's Case

LL)    Defendant did not present any witnesses (400).

Summations

MM)    Defense counsel argued that defendant had stabbed Wilson in self-defense, and defendant's actions were justified, because Wilson tried to rape her (410-11). Defendant asserted that the state's case was based on speculation (413-15). Defendant then theorized that Wilson, who defendant argued was a decent man when sober, came home drunk or high and tried to force himself on her (415-17).

NN)    Defendant argued that the lack of defensive wounds on Wilson was because his intoxication meant that he "was not feeling things as much" (419-23). Defendant posited that Wilson had already been stabbed when he called 911 (424). As for her statements, defendant claimed that the detectives "were grilling her and breaking her down," yet she did not confess (428-31).

OO)    Turning to the physical evidence at the crime scene, defendant pointed out that, because some of the blood was not tested, what happened in the apartment was uncertain (432). Defendant theorized, based on the medical examiner's testimony, that Wilson was not killed instantly, but that Wilson supposedly did not know that he had been stabbed because he was in shock (434). Defendant added that she left the apartment without knowing Wilson's condition

(440).  Defendant told the jury that the case was not about who used Wilson's benefit card, but was about justification (435).

PP)    Defendant tried to downplay her initial statement to Matthew Shepard about "poking" Wilson by attributing the statement to her being upset and angry (437-38).  Defendant went on to say that the later statement to Shepard about Wilson forcing himself on her was consistent with her claim of rape and was made when she supposedly was more relaxed (438).  Defendant concluded that there were too many uncertainties to find guilt beyond a reasonable doubt (439-42).

QQ)    In the state's summation, the prosecutor, after stating the undisputed facts of the case,  argued to the jury that defendant admitted her intent to kill even if for the alleged purpose of preventing  rape (445-48).  The state added that the number and location of the stab wounds was further evidence of her intent to kill (448).  Thus, according to the state, justification was the only issue the jury had to decide (448-49).

RR)    As for defendant's justification defense claim, the state argued that Wilson did not attempt to rape defendant, because Wilson would have been unable to call 911 if defendant was stabbing him while he was trying to rape her, and because the call was not about a stabbing, but about defendant acting "crazy" (449-51).  The state noted that Wilson had no reason to call 911 and draw the police to his apartment if he was in fact attempting to rape defendant (453-54, 467-69).

SS)    The state pointed to the 911 call itself as the reason why defendant stabbed Wilson, because the call showed that "whatever arrangements they had" --

whether a "50-year-old man" would expect to have sex from a "25-year-old girl" living with him -- was coming to an end (451-53, 461-62, 468, 470, 481-82). The state argued that Wilson held defendant out to Shakeema Fortune as his girlfriend, and that defendant showed herself to be possessive of Wilson by cancelling Wilson's plans to play pool with Fortune (472). The state added that defendant's statement to Shepard was further proof that she "poked" Wilson because he now wanted to have sex instead of or in addition to what she was paying him (451-52). Thus, the state did not deny that Wilson "tried to have sex" with defendant, but argued that "just because you don't want to have sex with someone doesn't mean that they are trying to rape you" (452, 473). Specifically, the state said, "No doubt [Wilson] told [defendant], look if you are not going to have sex with me, you gotta get out, and then that's what put her over the edge and that is what made her stab him" (453). The state argued that the time of the murder was between the 12:37 a.m. call to 911 and the 12:50 a.m. next call from Wilson's phone (452-53, 470).

TT)    As for defendant's second statement to Shepard, the state argued that the jury should draw the inference that defendant's speaking about Wilson trying to force himself upon her was an attempt to make the stabbing more justifiable so that Shepard would not be afraid to let her stay with him (455-56, 479). The state also argued that the second statement was a warning to Shepard not to try to have sex with her (456).

UU)    Other evidence that disproved rape, as argued by the state, was that defendant took Wilson's property; that she locked the apartment door when she left;

that the heat in the apartment was turned off; that she fled, as shown by her usage of her welfare benefits card, to Pennsylvania and New Jersey; that she variously said in her statements that she went to her sister, to Tiffany, and to Ebony; that defendant did not call 911, go to the police, or seek medical treatment for the supposed attempted rape; that the stab wounds were not consistent with defendant being bent over and stabbing Wilson in the legs as described in her videotaped statement; and that the soiling of Wilson's jeans and the jeans being inside-out showed that the jeans were on Wilson when he was being stabbed (456-67, 474-76, 479-81).  As for Wilson's welfare benefits card, the prosecutor said, "I am not suggesting to you that it was used by her, but I am suggesting to you that it was used by someone that wasn't Anthony Wilson" (459-60).

VV)   The state further argued that the same evidence that disproved justification also proved defendant's intent to kill (469).  The state continued that additional evidence of such an intent was provided by the photographs of the crime scene, which showed that someone had tried to wipe up the blood and the feces inside the apartment  (471-72, 476).

WW)   The state invited the jury to consider why Wilson was found naked and why he was on the bed (477).  The state suggested to the jury that defendant was already concocting the rape claim to excuse her stabbing of Wilson -- that she "staged that scene" to make it "look like there was some sort of melee" (477, 482).

The Verdict

XX)   On July 10, 2014, the jury rejected defendant's justification defense and convicted defendant of Murder in the Second Degree (N.Y.P.L. § 125.25[1]) (524-26).

### The Sentence

YY)   On October 8, 2014, the court sentenced defendant to eighteen years to life imprisonment (S. 13).

### The Appeal

6.   In June 2017, appellate counsel (Appellate Advocates, by Tammy E. Linn, Esq.), filed a brief on defendant's behalf in the New York Supreme Court, Appellate Division, Second Department ("Appellate Division").  Appellate counsel raised six substantive points:

POINT I:   Appellant's justification defense was corroborated by a disinterested witness and consistent with objective evidence, and the People's circumstantial case was legally insufficient to disprove justification beyond a reasonable doubt, also making the verdict against the weight of the evidence.

POINT II:   The court violated appellant's rights to due process, to present a defense, and to the effective assistance of counsel by requiring defense counsel to interview an amenable key prosecution witness in the presence of the prosecutor.

POINT III:   The court violated appellant's right to present a defense by precluding her from: using medical records to show the deceased's history of psychosis and longtime substance abuse; exploring whether he was more likely to experience violent hallucinations when intoxicated and off his medication, as on the night of the stabbing; cross-examining prosecution witnesses about his substance abuse; and adducing evidence of specific acts of domestic violence.

A. Preclusion of Wilson's Psychiatric and Substance Abuse History
B. Specific Acts of Violence

POINT IV:   It was improper to admit the deceased's 911 call complaining about "a girl" "acting all crazy" as a present sense impression when there was no evidence of contemporaneity with his observations or any corroboration.

POINT V:     The court erred by (a) refusing to suppress appellant's statement to police who questioned her after she invoked her right to remain silent; and (b) admitting related uncharged crime evidence that had no probative value and painted her a liar.

POINT VI:     The prosecutor violated appellant's right to a fair trial in summation by baselessly asserting that appellant had a sexual "arrangement" with the deceased and just because appellant "didn't feel like" having sex "doesn't mean it's rape"; making up facts to diminish appellant's outcry; falsely putting words into appellant's mouth that went to intent to kill and consciousness of guilt; speculating as to motive; and misstating the law on justification.

7.     On September 29, 2017, the state filed its brief in response to the claims raised by appellate counsel.

8.     In November 2017 appellate counsel filed a six-point reply brief addressing the arguments made in respondent's brief:

POINT I:     The People's response to appellant's indisputably preserved sufficiency claim rests on "inferences" that can only be reached by speculation and by ignoring or distorting numerous pieces of their own evidence.

POINT II: The conceded error of interfering with defense counsel's access to a key prosecution witness prejudiced appellant and was not harmless beyond a reasonable doubt.

POINT III:     That the court improperly precluded appellant from revealing and further exploring Wilson's mental illness, substance abuse, and alleged domestic violence history, is a preserved claim in every aspect save one, and the error was not harmless

POINT IV:     The people's conclusory and speculative response fails to show the deceased's 911 call was admissible as a present sense impression, and their contention that any error was harmless is inconsistent with their position that the call disproved justification "by itself."

POINT V:     (A) The People ignore their own evidence establishing that police continued questioning appellant after she unequivocally invoked her right to remain silent; (B) the People's Molineux arguments illustrate that the benefits card evidence was cumulative at best, and so its value could not possibly outweigh its

27

prejudicial impact; and the suppression and Molineux errors worked in tandem to paint appellant a liar when her justification defense turned on her credibility.

POINT VI:  The prosecutor's summation remarks were not fair comment or response, and this Court should review them in the interest of justice because they unfairly attacked appellant's justification defense in a weak circumstantial case.

9.      The appeal was argued before the Appellate Division on March 1, 2018.

10.     By decision and order dated August 29, 2018, the Appellate Division affirmed defendant's judgment of conviction.  People v. Wisdom, 164 A.D.3d 928  (2d Dep't 2018).

11.     First, the Appellate Division found that viewing the evidence in the light most favorable to the prosecution,  it was legally sufficient to disprove defendant's justification defense beyond a reasonable doubt and to establish defendant's guilt of Murder in the Second Degree beyond a reasonable doubt. Moreover, the Appellate Division found,  the verdict of guilt was not against the weight of the evidence  Id. at 928-29.

12.     Second, the Appellate Division found that the trial court had properly denied suppression of the oral statement that defendant made on the morning of July 26, 2012. The Appellate Division noted that defendant had waived her Miranda rights (Miranda v. Arizona, 384 U.S. 436 [1966]) and then freely and voluntarily made a videotaped statement at the police station on July 25, 2012, beginning at approximately 9:00 p.m. "The interview ended after approximately 30 minutes, not because defendant unequivocally invoked her right to remain silent, but rather, to allow her to compose herself." Additionally, the Appellate Division found,

The idea for ending the interview and stopping the videotape was that of the Assistant District Attorney (hereinafter ADA) conducting the interview. The ADA said, "Let's stop the tape for now," and "there will be no further questions until we resume the tape." Questioning resumed the following morning at approximately 10:00 a.m., at which time the defendant was reminded of the rights she had been read the previous day, and the defendant agreed to continue answering more questions.

Id. at 929.  The Appellate Division found that it was during that session that defendant stated that after she stabbed Wilson, she took his cell phone, keys, and wallet, which contained the victim's welfare benefit card, but defendant specifically denied ever using the card.  Id.

13.     Thus, the Appellate Division concluded, defendant's morning statement was properly admitted at trial. As the Appellate Division noted, had defendant  unequivocally and unqualifiedly invoked her right to remain silent the previous evening, the request would have had to be scrupulously honored. Under such circumstances, the Appellate Division continued, further inquiry could have been made, but only if a significant period of time had passed and the police reiterated the requisite warnings. However, since defendant had not unequivocally and unqualifiedly invoked her right to remain silent, and remained in continuous custody in the interim, the police and prosecutors were free to resume their questioning of defendant within a reasonable time, and to do so without repeating the Miranda warnings.  In addition, the Appellate Division found, "The further questioning at issue here was within a reasonable time under this Court's precedent." Id. at 929-30.

14.  The Appellate Division also noted that the suppression hearing testimony of the detective who, in response to questions by defense counsel that defendant did not want to talk anymore during the prior evening's videotaped interview, answered, "Right," and in another instance said, "Correct," was not to the contrary.  That is, the Appellate Division explained, the detective's testimony did not change the fact that there was no unequivocal invocation of defendant's right to remain silent at that time. The Appellate Division also rejected the suggestion that the detective's answers referred  to an unrecorded communication by defendant, despite the colloquy on the videotape that there would be no further questioning until the tape is resumed, as "mere speculation and conjecture that reads into

the record information that simply is not present, and provides no basis for concluding that the defendant's 10:00 a.m. statement should have been suppressed." Id. at 930.

15.     Third, the Appellate Division found proper the admission of evidence of a prior uncharged crime involving defendant's theft and use of certain property that belonged to Wilson, as it completed the narrative and provided circumstantial evidence of the date of  Wilson's death. Moreover, the Appellate Division found that the probative value of the evidence outweighed its prejudicial effect, and the trial court's limiting instruction to the jury was sufficient to avert any potential prejudice.  Id.

16.     Fourth,  the Appellate Division found that defendant had failed to preserve her claim that she was deprived of a fair trial by the admission into evidence of a recording of Wilson's 911 call.  Furthermore, the Appellate Division found, the claim was without merit, as the trial court properly admitted the 911 call "under the present sense impression exception to the hearsay rule." Id. at 930-31.

17.     Fifth, the Appellate Division found that defendant's claim that certain comments in the prosecutor's summation deprived her of a fair trial was "partially unpreserved for appellate review." but in any event, "to the extent that the prosecutor exceeded the bounds of permissible rhetorical comment or made other improper remarks during summation, the remarks were not so egregious as to have deprived the defendant of a fair trial, and any other error in this regard was harmless." Id. at 931.

18.     Sixth, the Appellate Division found that it was improper for the trial court to condition defendant's ability to interview a prosecution witness (Shepard) upon the interview occurring either in the presence of the prosecutor or a detective, but the error was harmless.  Id.

19.     Finally, the Appellate Division found that "defendant's remaining contention is without merit. Id.

20.     Appellate counsel then sought leave to appeal to the New York Court of Appeals. In a substantive, supplemental application dated November 13, 2018, appellate counsel asked the court to grant leave on "four" "preserved" errors (11/23/18 Letter at 9: "Reasons to Grant Leave": "The insufficiency of the evidence" (Id. at 9); "The statement obtained after invocation of appellant's right to remain silent" (Id. at 11); "The interference with counsel's interview of a witness" (Id. at 13); and "The curtailment of appellant's right to present a defense" (Id. at 14)). Appellate counsel also asked the court "to grant leave to appeal on all Federal constitutional issues presented by[defendant's] case" and cited Points I – VI of the brief.  Counsel also asked the court to consider whether defendant was denied the right to effective assistance of counsel based on trial counsel's failure to preserve all of these issues (Id. at 16).

21.     Respondent opposed defendant's application for leave to appeal to the New York Court of Appeals on or about November 28, 2018.

22.     On February 14, 2019, the New York Court of Appeals denied defendant's application for leave to appeal.  People v. Wisdom, 32 N.Y.3d 1211 (2019) (Rivera, J.).

23.     Defendant is incarcerated pursuant to this judgment of conviction.

WHEREFORE, and for the reasons set forth in respondent's accompanying memorandum of law, defendant's petition for a writ of <u>habeas corpus</u> should be summarily denied in all respects, including defendant's request for discharge from custody and/or a new trial.

I certify under penalty of perjury that the foregoing is true and correct.

Dated:  Brooklyn, New York
       November 12, 2020

                                            Keith Dolan
                                            Assistant District Attorney
                                            Office of the Kings County District Attorney
                                            350 Jay Street
                                            Brooklyn, NY  11201
                                            (dolank@brooklynda.org)

By ECF filing:  Tammy E. Linn, Esq.  (tlinn@appad.org)
                       Attorney for Habeas Petitioner
                       Appellate Advocates
                       111 John Street − 9th Floor
                       NY, NY 10038

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ATARA WISDOM,

                              Petitioner,

            -against-                                    20-CV-02196 (KAM)

ADA PEREZ, Superintendent, Bedford Hills
Correctional Facility, Department of Corrections and
Community Supervision,

                              Respondent.

## TABLE OF CONTENTS

1.      Introduction                                                                      1

2.      The habeas corpus standard of review                                              2

3.      Defendant's claim challenging the admissibility of her third statement,
        regarding the items she took from Wilson after killing him, which
        defendant alleges was made after she invoked her right to silence.
         (Responding to Defendant's Petition, Point One and pp. 96-98)                    5

4.      Defendant's claim that trial counsel was denied the right to interview
        Matthew Shepard  without the prosecutor being present.
         (Responding to Defendant's Petition, Point Two and pp. 98-102)                  19

5.      The trial court's exclusion of Wilson's medical records or any expert
        testimony about those records and defendant's cross-examination claim.
        (Responding to Defendant's Point Three and pp. 102-03)                           24

6.      Defendant's claim regarding the admission of Wilson's 911 call as a
        present sense exception to the state hearsay rule.
        (Responding to Defendant's Petition, Point Four and pp. 103-04)                  37

7.      Conclusion                                                                       46

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ATARA WISDOM,

                              Petitioner,

              -against-

ADA PEREZ, Superintendent, Bedford Hills
Correctional Facility, Department of Corrections and
Community Supervision,

                              Respondent.

20-CV-02196 (KAM)

MEMORANDUM OF LAW

DEFENDANT IS NOT ENTITLED TO HABEAS CORPUS
RELIEF ON ANY OF HER CLAIMS AND THUS THE PETITION
SHOULD BE SUMMARILY DENIED.

1.    Introduction

Defendant bases her petition for a writ of habeas corpus on four grounds: (Point I) the hearing court should have suppressed defendant's final, post-videotaped statement, because she had allegedly invoked her right to silence; (Point II) the trial court violated defendant's right to due process, to present a defense, and to the effective assistance of counsel when it ruled that the prosecutor could be present during defense counsel's interview of a witness, Matthew Shepard; (Point III) the trial court violated defendant's right to present a defense when it precluded defense counsel from presenting evidence regarding Wilson's mental health and substance abuse history; and (Point IV) the trial court erroneously ruled that Wilson's 911 call was admissible as a present sense impression under state evidentiary rules. Defendant also argues that none of these errors, individually or in combination, may be deemed harmless.

Defendant has failed to demonstrate that she is entitled to relief on any of these grounds.  Thus, her petition for a writ of  habeas corpus should be summarily denied.

2.      The habeas corpus standard of review

A District Court's review of a petition for a writ of habeas corpus is governed by The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 (see Mancuso v. Herbert, 166 F.3d 97, 99 n.1, 101 [2d Cir. 1999]), which requires federal courts to apply a "highly deferential standard" when conducting habeas corpus review of state court decisions.  Renico v. Lett, 559 U.S. 766, 773 (2010). This limitation on relief, which narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits, is referred to as "AEDPA deference." See Berghuis v. Thompkins, 560 U.S. 370, 390 (2010); Miller-El v. Cockrell, 537 U.S. 322, 341 (2003); Jimenez v. Walker, 458 F.3d 130, 135 & n.2 (2d Cir. 2006); see also Stultz v. Artus, No. 04-CV-3170 (RRM), 2013 U.S. Dist. LEXIS 32835, at *15 (E.D.N.Y. Mar. 8, 2013 [Mauskopf, U.S.D.J.]) ("AEDPA requires that federal courts treat state court adjudications with great deference") (citation omitted).[13]

---

[13] In order for a state court judgment to receive AEDPA deference, "A state court need not analyze each individual claim or cite federal law in order to adjudicate a claim,  so long as it states it is disposing of the claim on the merits, and it issues a judgment." Ryan v. Miller, 303 F.3d 231, 246 (2d Cir. 2002).  AEDPA deference also applies to a state court's summary ruling. See Sexton v. Beaudreaux, 138 S. Ct. 2555, 2558 (2018) (AEDPA deference applies to summary denial of relief); see also Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (decision need not address a claim "in detail" to constitute merits ruling).  In addition, "a determination of a factual issue made by a State court [is] presumed to be correct" in habeas proceedings, and a petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"[H]abeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (internal quotation marks and citation omitted); see Burt v. Titlow, 571 U.S. 12, 20 (2013) ("We will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy.") (citation, alteration, and internal quotation marks omitted).  Pursuant to 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See Leath v. Smith, 14-CV-2804(WFK), 2015 U.S. Dist. LEXIS 131469, at *5-7 (E.D.N.Y. Sept. 28, 2015 [Kuntz, II, U.S.D.J.]).

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (internal quotation marks and citation omitted). Under AEDPA, federal law is "clearly established" only when embodied in a United States Supreme Court holding (rather than, e.g., dicta or federal Court of Appeals' decisions). Thaler v. Haynes, 559 U.S. 43, 47 (2010); see also Glebe v. Frost, 574 U.S. 21, 24 (2014); Williams v. Taylor, 529 U.S. 362, 412 (2000);  DeJesus v. Perez, 19-2245pr, 813 Fed. Appx. 631, 633 (2d Cir. May 13, 2020).

Upon <u>habeas</u> review, the question is "not whether the state court was incorrect or erroneous in rejecting petitioner's claim, but whether it was objectively unreasonable in doing so." <u>Ryan v. Miller</u>, 303 F.3d at 245 (citing <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 315[(2d Cir. 2001]) (internal quotation marks, alterations, and emphases omitted).  The "objectively unreasonable" requirement "creates a substantially higher threshold for obtaining relief than <u>de novo</u> review." <u>Renico</u>, 559 at 773 (citation omitted).  The petition may be granted only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." <u>Harrington</u>, 562 U.S. at 101-02; <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004); <u>Garrison v. Lee</u>, No. 19-1588, 2020 U.S. App. LEXIS 33284, at *3 (2d Cir. Oct. 20, 2020); <u>see also Woods v. Donald,</u> 135 S. Ct. 1372, 1376 (2015) (federal <u>habeas</u> court may overturn state-court ruling "only when there could be no reasonable dispute that [the state court was] wrong").

As the Supreme Court has observed in this context,

> In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice.  In other words, a litigant must show that the state court's ruling … was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. This is meant to be a difficult standard to meet.

<u>Virginia v. LeBlanc</u>, 137 S. Ct. 1726, 1728 (2017) (citations and quotation marks omitted). Therefore, for a state court's ruling to be contrary to federal law, the ruling must be "diametrically different" from, "opposite in character or nature" to, or "mutually opposed" to, Supreme Court holdings, <u>see Williams</u>, 529 U.S. at 405, and those holdings should be read "narrowly." <u>Rodriguez v. Miller</u>, 537 F.3d 102, 107 (2d Cir. 2007).

Moreover, because <u>habeas</u> relief can only be granted based upon "clearly established Federal law, as determined by the Supreme Court of the United States" 28 U.S.C. § 2254(d), claims

4

founded on violations of state law cannot serve as a basis for <u>habeas</u> relief.  <u>See Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) ( "[I]t is not the province of a federal <u>habeas</u> court to reexamine state-court determinations on state-law questions."); <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984) (federal court on <u>habeas</u> review "may not issue the writ on the basis of a perceived error of state law); <u>Howard v. Walker</u>, 406 F.3d 114, 121 (2d Cir. 2005) (claim that a conviction was in violation of state law is not cognizable in federal court).  Furthermore, as the Second Circuit has stated, "not 'every error of state law can be transmogrified by artful argumentation into a constitutional violation.'" <u>Ponnapula v. Spitzer</u>, 297 F.3d 172, 182 (2d Cir. 2002) (citation omitted); <u>see also</u> <u>DiGuglielmo v. Smith</u>, 366 F.3d 130, 136 (2d Cir. 2004) (alleged errors of state law "cannot be repackaged as federal errors simply by citing the due process clause") (citation omitted). Thus, <u>habeas</u> review may not be based on a claim that the state court failed to follow state law.

3.    <u>Defendant's claim challenging the admissibility of her final statement, regarding the items she took from Wilson after killing him, which defendant alleges was made after she invoked her right to silence.</u>
 (Responding to Defendant's Petition, Point One and 96-98)

The Appellate Division properly rejected on the merits defendant's claim that the hearing court should have suppressed the final, post-video statement she made on July 26, 2012, in which defendant discussed the property she took from Wilson after killing him.  <u>People v. Wisdom</u>, 164 A.D.3d 928, 929-30 (2d Dep't 2018).  This decision is entitled to AEDEPA deference, as noted above (<u>see</u> §2, <u>supra</u>).[14]  Moreover, contrary to defendant's assertions, the decision was not an unreasonable

---

[14] While the voluntariness of a confession involves a mixed question of fact and law, the factual findings which underlie a determination of voluntariness are entitled to a presumption of correctness under AEDPA. <u>Boyette v. Lefevre</u>, 246 F.3d 76, 88 (2d Cir. 2001).

application of clearly established federal law as determined by the Supreme Court. The state court record fully supports the state court's determination that defendant did not unambiguously and unequivocally assert her right to silence, and thus the detective was not required to re-administer the full Miranda warnings before taking the statement. Therefore, defendant is not entitled to habeas relief.

The Appellate Division determined that defendant had waived her Miranda rights (Miranda v. Arizona, 384 U.S. 436 [1966]) and then freely and voluntarily made the videotaped statement in question. Wisdom, 164 A.D.3d at 929. The Appellate Division explained, "The interview ended after approximately 30 minutes, not because defendant unequivocally invoked her right to remain silent, but rather, to allow her to compose herself." Id. Indeed, as the Appellate Division found, "The idea for ending the interview and stopping the videotape was that of the Assistant District Attorney (hereinafter ADA) conducting the interview. The ADA said, 'Let's stop the tape for now,' and 'there will be no further questions until we resume the tape.'" Id.[15] Thus, the Appellate Division concluded, this statement was admissible, and because defendant had not unequivocally and unqualifiedly invoked her right to remain silent, and remained in continuous custody in the interim, the police were

_____

[15] Defendant was questioned the following morning and was reminded of the rights she had been read the previous day; defendant agreed to continue answering more questions. It was during that session that defendant stated that after she stabbed Wilson, she took his property, including his welfare benefit card, but defendant specifically denied ever using the card. Id. In addition, the Appellate Division also noted that the detective's cross-examination testimony that defendant did not want to talk anymore during the prior evening's videotaped interview was not to the contrary, as the testimony did not change the fact that defendant did not make an unequivocal invocation of her right to remain silent at that time. The Appellate Division also rejected the suggestion that the detective was referring to any unrecorded communication by defendant, despite the colloquy on the videotape that there would be no further questioning until the tape wa2s resumed, as "mere speculation and conjecture that reads into the record information that simply is not present, and provides no basis for concluding that the defendant's 10:00 a.m. statement should have been suppressed." Id. at 930.

free to resume their questioning within a reasonable time, and to do so without repeating the Miranda warnings.  Id. at 929-30.

The Appellate Division correctly applied the relevant clearly established Supreme Court precedents.  In Miranda v. Arizona, 384 U.S. 436, 469-73 (1966), the Supreme Court held that a suspect subject to custodial interrogation must be advised of certain rights prior to any questioning, including the right to remain silent and the right to have counsel present during questioning. Id. at 444.  An interrogation must cease if the suspect clearly, unambiguously, and unequivocally invokes either the right to remain silent or the right to counsel. Berghuis v. Thompkins, 560 U.S. 370, 381-82  (2010); see Michigan v. Mosley, 423 U.S. 96, 103 (1975).

However, the Fifth Amendment privilege against self-incrimination or the right to silence, "generally is not self-executing," and a defendant "who desires its protection 'must claim it.'" Salinas v. Texas, 133 S. Ct. 2174, 2178 (2013) (plurality opinion) (quoting Minnesota v. Murphy, 465 U.S. 420, 425 [1984]).  Thus, a defendant's assertion of her Fifth Amendment right to silence must be unambiguous and unequivocal to be effective.  Berghuis v. Thompkins, 560 U.S. at 381-82 (2010); see United States v. Plugh, 648 F.3d 118, 128 (2d Cir. 2011).

That is, to invoke either the right to counsel or the right to remain silent, the suspect must do so "unambiguously," meaning that the suspect "must articulate [her] desire . . . sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [an invocation of the right]." See Davis v. United States, 512 U.S. 452, 459 (1994).  But if the suspect's invocation of her rights is ambiguous or equivocal (or she makes no statement), "the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke [the] Miranda rights." Id. at 461-62; see United States v. Dawes, 495 Fed. Appx.

117, 119-20 (2d Cir. 2012).  Moreover, silence, no matter how long it lasts, or unresponsiveness to questions after Miranda warnings have been given, does not constitute an assertion of the Fifth Amendment right to silence.  Berghuis v. Thompkins, 560 U.S. at 380-81.

In this case, based on the controlling clearly established Supreme Court law and the trial record, the Appellate Division correctly found that defendant did not unambiguously and unequivocally invoke her right to silence when the video-recorded statement ended.  Rather, the Appellate Division reasonably determined that defendant merely wanted to stop the statement temporarily, even though that statement did not resume during the same session.

Defendant herself was not the one who suggested that they temporarily stop the video-recorded statement, and defendant acknowledges that the pause was suggested by Assistant District Attorney (ADA) Purce (Defendant's Petition at 45).  ADA Purce asked defendant, "You okay?  You want to take a minute?  You want to stop for a second or do you want to continue?  You want to stop for a second?"  Defendant merely replied, "All right" (219).  A.D.A. Purce followed up by announcing, "We're just going to hold out here for a little bit.  You take your time, all right?"  Defendant said, "All right" (219).  A.D.A. Purce prefaced his last question by saying that they were going to stop and that if defendant wanted to continue, then they would "talk in a second" and then asked, "You want us to stop right now?"  Defendant answered, "Yeah" (219).  A.D.A. Purce said to "just stop the tape for now" and that there would be "no further questions" until they resumed the tape (219-20).

Thus, the colloquy between ADA Purce and defendant establishes that any desire not to speak on defendant's part was not an unequivocal and unambiguous invocation of her right to silence going forward, but was only meant to be a temporary pause in her statement until she could

8

compose herself.  The fact that the statement did not resume meant simply that defendant was not ready to resume before A.D.A. Purce left the precinct.  Defendant's supposition that the videotape interview did not resume because ADA Purce and/or the police understood that defendant was invoking her right to silence is based on pure speculation and is devoid of record support (Defendant's Petition a 45).

It was at 10:00 a.m. the next morning, twelve and one-half hours after the video-recorded statement ended, that Detective Scandole approached defendant about making another statement, which he explained would be a response to just "a couple more questions," and reminded her of her Miranda waivers from the previous day (211).  Defendant mentioned nothing about her supposed invocation of her right to silence from the previous evening.  Therefore, defendant did not unambiguously and unequivocally invoke her right to silence when the video-recorded statement ended.

Defendant's responses must be considered in context, under the totality of the circumstances (see generally Moran v. Burbine, 475 U.S. 412, 421 [1986] (reviewing the totality of the circumstances to show if waiver was knowing, voluntary, and intelligent); United States v. Gonzalez, 764 F.3d 159, 166 [2d Cir. 2014] (suspect's responses must be taken in context)), and that context demonstrates that defendant was not invoking her right to silence, but was merely accepting ADA Purce's suggestion to temporarily pause the interview in order for her to regain her composure.  Thus, "the entire statement in its totality is far from the unambiguous invocation of Miranda rights that the law requires."  Folkes v. Lee, 10cv5416(BMC),  2011 U.S. Dist. LEXIS 71279, at *14-15 (E.D.N.Y. June 30, 2011 [Cogan, U.S.D.J.]).  See U.S. v. Sherrod, 445 U.S. 980, 982 (7th Cir. 2006) (suspect's statement, "I'm not going to talk about nothin'," was ambiguous)

(internal quotation marks omitted); Thomas v. Lamarque, 121 Fed. Appx. 220, 222 (9th Cir. 2005) ("we're done" in response to questioning "was not an unambiguous and unequivocal invocation of [petitioner's] right to terminate questioning"); Burket v. Angelone, 208 F.3d 172, 200 (4th Cir. 2000) (holding that "I just don't think that I should say anything" was not a clear request to remain silent) (internal quotation marks omitted);  Bradley v. Meachum, 918 F.2d 338, 342-43 (2d Cir. 1990) (defendant's initial statement that he would not say whether or not he had been involved was "art of an ongoing stream of speech" that was neither "an invocation of the right to remain silent . . . no[r] the functional equivalent of silence"); United States v. Coronado, No. 12-CR-83S, 2017 U.S. Dist. LEXIS 106165, at *64 (W.D.N.Y. July 10, 2017 [Scott, U.S.M.J.]) (finding that "I can't say anything more" was an unambiguous invocation); Williams v. Brandt, 10-cv-3910(DLI), 2016 U.S. Dist. LEXIS 42783, at *66-67, 70-71 (E.D.NY. 2016 [Irizarry, U.S.D.J.]) (court construed petitioner's conflicting claims as meaning that police elicited statements after an invocation of the right to silence without re-administering new Miranda warnings; petitioner's demand to speak to the District Attorney, "and his subsequent request for a break evinced an understanding of the circumstances, and further demonstrated that petitioner, when so moved, was perfectly capable of asserting his interests" and his equivocal statements were insufficient to invoke right to silence); see also People v. Horton, 46 A.D.3d 1225, 1226 (3d Dep't 2007) (where defendant responded to Miranda warnings by stating that he understood the rights and said, "I think I'll wait," or "I think I'll wait a minute," before giving a statement, Appellate Division held that defendant did not unambiguously and unequivocally assert his right to silence because that alleged assertion was "'temporally qualified' and, in fact, implied that he might speak at a later time," which defendant did a few minutes later); People v. Caruso, 34 A.D.3d 860, 862-63 (3d

Dep't 2006) ("Defendant's first response to the question of whether he wished to speak ((i.e., 'Not right now')) was temporally qualified, it did not clearly communicate a desire to cease all questioning indefinitely and, in fact, connoted that speaking could be considered at a later time").

In addition, defendant's arguments based on Detective Scandole's responses to defendant's cross-examination questions are without merit (Defendant's Petition at 44-45). As the Appellate Division found, Detective Scandole's responses to defendant's cross-examination questions did not support defendant's claim, because the detective's testimony "did not change the fact" that there was no unequivocal invocation of defendant's right to remain silent at the time of the pause suggested by ADA Purce. People v. Wisdom, 164 A.D.3d 928, 929-30 (2d Dep't 2018). See Gonzalez, 764 F.3d at 166 (petitioner's challenges take statements out of context and emphasize various phrases used by the officers without viewing their testimony as a whole).

Finally, contrary to defendant's arguments (Defendant's Petition at 46-52), even if the state court was incorrect, and defendant's final statement should not have been admitted, any error was harmless beyond a reasonable doubt. The erroneous admission of a defendant's statements in violation of Miranda is subject to harmless error review. See Jackson v. Conway, 763 F.3d 115, 140-41 (2d Cir. 2014); Perkins v. Herbert, 596 F.3d 161, 174 (2d Cir. 2010). "'[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the substantial and injurious effect standard set forth in [Brecht v. Abrahamson].'" Wood v. Ercole, 644 F.3d 83, 93-94 (2d Cir. 2011) (quoting Fry v. Pliler, 551 U.S. 112, 121-22 [2007]) (additional internal quotation marks removed); see also Brecht v. Abrahamson, 507 U.S. 619, 635-37 (1993). Under Brecht, a federal court may overturn a state conviction "only when the constitutional violation 'had

a substantial and injurious effect or influence in determining the jury's verdict.'" Wood, 644 F.3d at 93 (quoting Brecht, 507 U.S. at 637).

To make this determination, the habeas court will "'consider the importance of the wrongly admitted evidence, and the overall strength of the prosecution's case.'" Id. at  94 (quoting Wray v. Johnson , 202 F.3d 515, 526 [2d Cir. 2000]) (brackets and ellipsis omitted). The strength of the prosecution's case without the erroneously admitted evidence "'is probably the single most critical factor in determining whether the error was harmless. Id. (quoting Latine v. Mann, 25 F.3d 1162, 1167-68 [2d Cir. 1994]).   A federal court on habeas review will assess the importance of the wrongly admitted evidence by considering (1) the "prosecutor's conduct with respect to the evidence," (2) whether the evidence "bore on an issue plainly critical to the jury's decision," and (3) whether the evidence "was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative." Id. (internal citations, quotation marks, and ellipses omitted); see Jackson v. Conway, 763 F.3d at 140-41.

In this case, the allegedly improper admission of the statement had no "substantial and injurious effect" on the jury's verdict.  First, the statement at issue, which spoke mainly to the property defendant took after she killed Wilson, was only a limited part of the total of defendant's statements. Defendant's other, previous statements, which are not subject to the instant claim of error, presented her self-defense account – an account which, when evaluated in light of the state's other evidence, was patently false and unworthy of  belief.

Second, the state's other evidence constituted overwhelming proof of defendant's guilt without the final statement.  The state presented Wilson's 911 call, the crime scene and medical examiner's testimony, and the statements defendant made to Shepard after the incident.  The state

12

also adduced proof that defendant evinced a consciousness of guilt by her flight for months following the stabbing.[16]

Third, because the jury was presented with a narrow question – there was no issue of identity, as defendant asserted self-defense, by which she necessarily admitted the stabbing but claimed that she was justified to stop an attempted rape by Wilson – the limited amount of information contained in the challenged, final statement could not have had a "substantial and injurious effect" on the ultimate question for the jury.

The evidence of Wilson's call to 911 disproved defendant's justification defense.[17]  If Wilson was the attacking party, and was trying to rape defendant, it strains reason to conclude that he would call 911 and summon the police to the scene of his "crime."[18]  Moreover,  while Wilson did not speak of a threat during the 911 call, defendant nevertheless was behaving in a way that was so disturbing that Wilson felt the need to seek the police to remove her from his apartment.  Wilson called for police help because, as he told the 911 operator,  "I've got this girl in my house.  I don't know what's wrong with her.  She's acting all crazy, and I want her out of my house."  And, as the state argued in summation, the jury could consider that Wilson's 911 call indicated that he was apparently

---

[16] Defendant says that her self-defense account was credible, and the state's evidence weak, because, inter alia, Wilson had violent hallucinations and was non-compliant about taking his psychiatric medications.  Defendant concedes that this "evidence" was never before the jury, and also argues in this petition that the state trial court's evidentiary rulings were erroneous.  Defendant cannot now be heard to argue persuasively that the state's evidence was not overwhelming because of "evidence" that the trial court properly excluded and which the jury did not hear (Defendant's Petition at 48).

[17]  Contrary to defendant's claims (Defendant's Petition at 48), the 911 call was properly admitted under state evidentiary rules.  Moreover, defendant's  arguments that Wilson may have been hallucinating or was under the influence of intoxicants are wholly speculative.

[18] The state's evidence definitively proved that Wilson was the 911 caller.

ending defendant's ability to live in his apartment, and thereby established a significant motive for defendant to want to kill him (451-52).

Matthew Shepard's testimony also disproved defendant's justification claim, independent of the challenged statement.  Defendant did not initially tell Shepard that she stabbed Wilson because he had tried to rape her; defendant admitted to "poking" Wilson because she did not want to have sex with him and pay rent simultaneously  It was only hours later that defendant indicated to Shepard that Wilson had tried to "force himself upon her."  Defendant now argues that there is nothing inconsistent about these two versions (Defendant's Petition at 49).  However, defendant's initial description of the stabbing, as testified to by Shepard, curiously omitted her most important reason for "poking" Wilson: her self-defense claim based on the alleged rape attempt.  Such an important omission undermines defendant's later claim of self-defense. In this context, the jury could consider that defendant's omission and subsequent inconsistency belied her self-defense claim.  That is, if defendant had stabbed Wilson to stop an attempted rape, defendant would have presumably told Shepard that was her reason, rather than saying that she wanted to avoid both having sex with Wilson and paying him rent.  Thus, Shepard's testimony was further evidence that overwhelmingly disproved justification.

Furthermore, the medical evidence regarding the stab wounds sustained by Wilson flatly contradicted defendant's statements about the attempted rape in many ways.   As established by the medical examiner, Wilson had seven stab wounds, with five to the upper left chest, one to the right chest, and one to the back left shoulder.  In her videotaped statement – not the statement defendant is challenging – defendant claimed that she was bent-over as she stabbed Wilson, as he punched her in the face and pulled her sweater over her head.  According to that statement, defendant thought that she had probably stabbed Wilson in the legs.

Defendant's arguments that this evidence was not compelling is devoid of merit (Defendant's Petition at 49) because defendant's description of the incident did not match the wounds: if defendant was bent forward as she claimed, her stabs would not have struck Wilson squarely in the chest – and with five of the seven wounds clustered together. Moreover, the medical testimony established that all of the wounds were deep stab injuries; they were not slash wounds. Significantly, the medical evidence indicated that the wounds on Wilson's body were neither defensive in nature, nor were they inflicted while Wilson was moving around – contrary to defendant's story that Wilson was attacking her when she stabbed him. Instead, the wounds were consistent with being inflicted while the victim was stationary and unable to resist, which is utterly inconsistent with defendant's self-defense claims. Thus, the medical evidence, separate and independent of the challenged statement, refuted defendant's justification claim.

Additionally, the physical evidence at the scene contradicted defendant's assertion about an attempted rape, and defendant's assertion that this evidence "shed[s] no light on what actually happened" (Defendant's Petition at 49) is unpersuasive. That is, defendant's videotaped statement claiming self-defense was inconsistent with the crime scene; such inconsistency "sheds light" on what actually happened in that it belies defendant's justification claim, and indicates that she fabricated her account to avoid culpability for murdering Wilson.

In her videotaped statement, defendant told ADA Purce that Wilson was wearing jeans and a t-shirt when he supposedly tried to rape her, and she stabbed him in self-defense. However, the crime scene photos established that Wilson was found naked on the bed. Wilson's feces-stained jeans that had been pulled off of him inside-out, and the blood smeared all over the apartment, were all inconsistent with defendant's statements asserting justification. Moreover, the crime scene

photographs indicated that someone had tried to clean up the bloodstains and fecal matter.  No one but defendant was in the apartment, and the notion that the mortally-wounded Wilson would have engaged in such activities shortly before succumbing to his wounds, strains reason.  However, the scenario of defendant trying to stage the crime scene to conform to her story of an attempted rape was indeed the most plausible inference to be drawn from the crime scene evidence.

Defendant's actions immediately after the stabbing are also inconsistent with a self-defense stabbing.  Defendant did not report that she had been the victim of an attempted crime, nor did defendant seek any kind of medical care for the bruising she said she received from Wilson.  And defendant fled the scene, remaining at large for approximately eight months.  Defendant acknowledges that her flight constituted consciousness of guilt evidence, but claims that she had an innocent explanation – fear of not being believed (Defendant's Petition at 50).  Notwithstanding defendant's attempt to minimize her flight, "[it]  is well-settled that flight can, in some circumstances, evidence consciousness of guilt." United States v. Al-Sadawi, 432 F.3d 419, 424 (2d Cir. 2005).  And, in any event, defendant's argument fails to consider that her flight was not the sole evidence the state relied upon, but was a component in what was, cumulatively and without the challenged statement evidence, overwhelming proof of guilt.

Defendant's argument that the prosecutor conceded that there as a reasonable view of the evidence that defendant had acted in self-defense (Defendant's Petition at 50-51, citing 401-02) does not mean that the state's evidence was weak.  The prosecutor's statement, made in the context of requesting that the court charge Manslaughter in the First Degree, a lesser include offense, after defendant declined to make such a request, merely reflected two state law principles.  First, under state law, a defendant is entitled to a justification charge if there is any reasonable view of the evidence

to support the charge, when viewed in the light most favorable to the defendant.  See e.g., People v. Vega, 33 N.Y.3d 1002, 1005 n.1 (2019).  Under such a standard, defendant was entitled to the jury charge – but that does not mean that the stabbing was in fact justified.  Second, the prosecutor's request for submission of a lesser offense did not mean that the state's evidence was weak; rather, it reflected the state's strategic decision that if the jury was uncertain about defendant's precise intent when she stabbed Wilson – without justification – then the jury could have two counts to consider, as opposed to just one count and the possibility of being unable to unanimously agree. Compare Murder in the Second Degree (N.Y.P.L  § 125.25[1]) (intent to cause death) and Manslaughter in the  First Degree (N.Y.P.L § 125.20[1]) (intent to cause serious physical injury).[19]

Defendant's assertion that the prosecutor relied excessively upon the final statement for "ammunition" is without merit (Defendant's Petition at 51).  First, the final statement was not the prosecutor's sole evidentiary basis for attacking defendant's credibility.  As noted above, defendant's prior, unchallenged statements, as well as the 911 call, crime scene/medical evidence, and Shepard's testimony, all provided ample evidence for the state to argue that defendant's self-defense claim was unworthy of belief.

Defendant argues that the prosecutor used the statement to argue that defendant took Wilson's keys, locked the door, and turned off the heat to conceal her crime (Defendant's Petition at 51, citing 458-61, 471-72). However, even without defendant's statement that she took Wilson's keys, the other evidence supported the prosecutor's argument:  the jury heard that Robinson used his key to enter Wilson's locked apartment, and that the apartment did not appear as if it had been forcibly entered

---

[19] The court denied the state's application to charge Manslaughter in the First Degree, noting the number of stab wounds (402).

into (Robinson: 81-82).  Based on this testimony, as well as evidence that defendant was the only one who lived with Wilson, the prosecutor could reasonably argue – independent of defendant's statement about taking his keys – that defendant locked the door after leaving.  Moreover, the jury also heard from Robinson that the apartment, which had steam heat controlled by the tenant, was cool when Robinson entered (Robinson: 83-84).  This evidence, independent of the statement, also supported the prosecutor's summation remarks that defendant turned-off the heat.  Thus, even without the statement in question, the other evidence would have permitted the prosecutor to make substantially the same summation arguments.

Defendant next claims that the prosecutor used the statement to argue that defendant had friends she could turn to instead of killing Wilson, and that she was inconsistent about who she said she went to see after the incident (Defendant's Petition at 52, citing 461-62).  However, in her prior statements, defendant indicated that she had her sister and friend Ebony to visit, and thus the challenged statement was not the sole source of information about individuals who defendant could have turned to.  Moreover, the jury already heard a far more significant inconsistency than the name of the person defendant went to see afterwards:  it heard Shepard's testimony about defendant's inconsistent accounts of why she stabbed Wilson.

Defendant's contention that the prosecutor used the statement to imply at great length that defendant used Wilson's EBT card as an uncharged crime – despite defendant's denial in the challenged statement that she had used it – is unpersuasive (Defendant's Petition at 52).  First, the prosecutor acknowledged to the jury that defendant had denied using the card, and expressly stated that "I am not suggesting to you that it was used by her…" (460).  Second, the trial court twice gave limiting instructions on the use of the evident that defendant took Wilson's property; first,

following the state's opening statement (65: "that evidence is only offered to complete the narrative, complete the narrative, that's all"), and second, in its final charge (495-96: evidence that defendant took Wilson's property could not be considered by jury for the purpose of proving defendant had a propensity or predisposition to commit the crime charged, and it was offered only "to complete the narrative of what happened on the night of the incident") (495-96).  See United States v. Gramins, 939 F.3d 429, 453 (2d Cir. 2019) (recognizing the "strong presumption" that jurors will follow the instructions they are given) (citation omitted).

Thus, the record establishes that the prosecutor did not excessively rely upon, nor impermissibly use, the challenged statement in her summation.[20]  Even without the statement, the state's summation would have been largely the same based upon the other evidence before the jury.  Moreover, because of this overwhelming evidence of guilt, any error  in the admission of defendant's final statement did not have a "substantial and injurious effect" on the verdict,  and the alleged error was harmless.  See Jackson v. Conway, 763 F.3d at 140-41.

4.   Defendant's claim regarding the court's ruling that trial counsel could not interview Matthew Shepard without the prosecutor being present
 (Responding to Defendant's Petition, Point Two and 98-102)

---

[20]   To the extent that defendant argues that the prosecutor's summation included "offensive" comments (Defendant's Petition at 49), defendant raised a summation error claim in her brief  on direct appeal (Defendant's Brief to the Appellate Division , Point VI).  The Appellate Division rejected the claim, finding that "to the extent that the prosecutor exceeded the bounds of permissible rhetorical comment or made other improper remarks during summation, the remarks were not so egregious as to have deprived the defendant of a fair trial, and any other error in this regard was harmless."  People v. Wisdom, 164 A.D.3d 928, 931 (2d Dep't 2018).  Defendant does not include those substantive summation error claims in this habeas petition.

On appeal, the state acknowledged that the trial court's ruling, granting the prosecutor's application that defense counsel could not interview Matthew Shepard without having the prosecutor or a detective investigator present, was an improper condition. However, the state continued, the ruling did not completely deny defense counsel's access to Shepard, and defendant could not establish any prejudice. In affirming the judgment of conviction, the Appellate Division found, "We agree with the defendant that it was improper for the [trial court] to condition her ability to interview a prosecution witness upon the interview occurring either in the presence of the prosecutor or a detective. However, the error was harmless." People v. Wisdom, 164 A.D.3d 928, 931 (2d Dep't 2018) (citations omitted). This decision was a correct application of the applicable law, and is entitled to AEDPA deference.[21]

To obtain reversal of a conviction, "a defendant, when claiming improper denial of access to a potential witness on due process grounds, must make a showing of more than merely the witness' inaccessibility." Kines v. Butterworth, 669 F.2d 6, 9 (1st Cir. 1981) (citing United States v. Scott, 518 F.2d 261, 268 [6th Cir. 1975]); see Salemme v. Ristaino, 587 F.2d 81, 87-88 (1st Cir. 1978). In this case, while it was improper for the trial court to condition counsel's access on the presence of the prosecutor or a detective, there was no denial of defendant's rights to due process or to present a defense, nor was defendant denied her right to the effective assistance of counsel.[22]

---

[21] Defendant complains that the Appellate Division's decision was "cursory and unexplained" (Defendant's Petition at 57). However, AEDPA deference applies to a state court's summary rulings. See Sexton v. Beaudreaux, 138 S. Ct. 2555, 2558 (2018); see also Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005).

[22] While the state asked the court to impose this condition, it never instructed Shepard not to talk to defendant's counsel unless someone from the prosecution was present and never said anything to dissuade him from speaking with defendant's counsel. See United States v. White, 454 F.2d 435, 439 (7th Cir. 1971) ("reversal on this ground requires a clear showing that the government instructed the witness not to cooperate with the defendant"); United States v. Kemp,

Defendant's claims of prejudice are vague and speculative.  For example, defendant argues that the presence of the prosecutor could have affected Shepard's candor, as Shepard may have feared retaliation if he spoke candidly in the presence of the prosecutor (Defendant's Petition at 56). However, there is nothing in the record to support any such supposition.  Indeed, the record does not support defendant's suggestion that Shepard was in any way intimidated by the prosecutor: Shepard did not come to court voluntarily, and he had to be produced in court pursuant to a material witness order. Similarly, defendant's claims that he might have been able to adduce additional exculpatory information from Shepard in a private interview (Id. at 58) is both devoid of detail and purely speculative.[23]

Equally unavailing are defendant's claims that she was denied the right to present a defense and to the effective assistance of counsel.  Once again, defendant fails to elaborate with any record support what counsel would have done differently.  In any event, defendant's claims ring hollow in light of what her trial counsel said to the court after Shepard testified.  When the trial court inquired if defendant would present any witnesses, counsel stated that he had consulted defendant, and based upon the morning's testimony, she would not take the stand.  Counsel continued, "We felt that was a

---

379 F.Supp.2d 690, 714 (E.D. Pa. 2005) (no new trial because defendant did not "allege that the prosecution told [the witness] not to talk to [defendant]'s counsel or in any other way denied [defendant] access to witnesses").

[23] Defendant indicates that counsel might have been able to adduce the exact words as told by defendant to Shepard in a non-conditioned interview, or additional allegedly exculpatory information  (Id. at 58).  However, counsel's cross-examination of Shepard was quite thorough, and defendant's contention that an interview of Shepard could have revealed more favorable or additional exculpatory testimony is entirely speculative.  Contrary to defendant's claim, counsel's cross-examination does not indicate that he was trying to adduce defendant's exact words to Shepard. That is, during counsel's cross-examination of Shepard, after hearing Shepard describe defendant's claim that Wisdom tried to "force himself" on her, counsel did not pursue such a course of questioning related to adducing her exact words.

very strong witness for Ms. Wisdom."  Defendant herself confirmed to the court that she would not testify (396-97).  Counsel's affirmative representation to the court that Shepard was "a very strong witness" for his client belies defendant's claim that she was denied her right to present a defense. Indeed, defendant and her attorney concluded that Shepard was such a good witness for the defense that defendant would not testify.[24]

In addition, it is far from apparent what counsel could have discussed with Shepard in trial preparation that would have made a difference in the trial.  Shepard was not a surprise witness.  He testified in the grand jury and was listed as one of the state's potential witness at the beginning of trial (J. 25).  The People disclosed Shepard's grand jury testimony under N.Y.C.P.L. § 240.20(1)(a) and People v. Rosario, 9 N.Y.2d 286 (1961).  Thus, defendant knew what Shepard's trial testimony was expected to be.  See Kines, 669 F.2d at 10 ("Discovery proceedings had produced for the defense the grand jury minutes"); United States v. Lynch, 529 F.2d 518, 1975 U.S. App. LEXIS 14807, at *2 (4th Cir. 1975) (pre-trial restriction of defense access to a witness was not improper because the defense "had access to his statements and were able fully to cross-examine and impeach him").[25]

---

[24] While defense counsel objected to the imposition of the condition on interviewing Shepard, he failed to specify what subjects he wished to discuss with Shepard that would have revealed any defense strategy to the prosecution or otherwise would have needed privacy ( Defendant's Petition at 56-57). Instead, counsel only indicated that he wanted to ask Shepard only "a few questions" (336), which hardly supports his instant arguments that he was prevented from adequately preparing a defense (Defendant's Petition at 57).

[25] Defendant phoned Shepard and went to his home on the night of the stabbing.  Thus, defendant had Shepard's phone number and address, indicating that counsel could have attempted to contact him before trial.  See Kemp, 379 F.Supp.2d at 714 (defendant does not "allege that the Court in any way prevented or limited his access to [the witness] before or during trial, except at the moment she was arriving to testify") .  Moreover, while the state needed a material witness order to bring Shepard to court, it does not necessarily follow that Shepard would have been uncooperative with the defense if defendant's counsel had reached out to him before trial.

Furthermore, nothing about Shepard's testimony was complicated, such that counsel would find it difficult to prepare or to formulate an appropriate trial strategy involving this witness under the circumstances of the trial.[26]   Shepard testified to two short encounters he had with defendant. The first encounter was when he met her, and they exchanged phone numbers.   The second encounter was when she went to Shepard after the stabbing.   The relevance of the latter encounter was that defendant made a statement to Shepard about stabbing  Wilson because she did not want both to have sex with him and to pay him rent.   The relevance was also that defendant did not appear to Shepard to be bleeding or to have blood on her, although she appeared to have a little swelling on her face.   Defendant has not provided any meritorious arguments as to how her ability to cross-examine Shepard was impaired by the court's condition.   Accordingly, defendant has failed to demonstrate that she was prejudiced by the trial court's ruling, and thus defendant has failed to establish  a violation of her rights to due process, to present a defense, or to the effective assistance of counsel.

Finally, for the reasons set forth in §3, <u>supra</u>, the evidence of defendant's guilt was overwhelming.   Thus, the Appellate Division reasonably determined that while the trial court's

---

[26] Defendant claims that if counsel had been given a proper opportunity to interview Shepard, then counsel would have known that Shepard would give the allegedly favorable testimony about Wilson forcing himself on defendant, and counsel would not have tried to impeach Shepard with his prior convictions and drug problems (Defendant's Petition  at 59).  This claim is unavailing, as the state had already elicited Shepard's criminal and drug background on direct examination.   Thus, even if counsel had refrained from cross-examining Shepard about his criminal and drug histories, the evidence of Shepard's background would still have been before the jury.

ruling was incorrect, it was harmless.  Wisdom, 164 A.D.3d at 931.  For all the foregoing reasons, defendant is not entitled to habeas relief.

5.   The trial court's exclusion of Wilson's medical records or any expert testimony about those records, and defendant's cross-examination claims. (Responding to Defendant's Point Three and pp. 102-03)

Defendant is not entitled to habeas relief based on his claim that the trial court's exclusion of Wilson's medical records and/or any expert  testimony regarding those records impaired his right to present a defense. Contrary to defendant's characterization, this claim is a challenge to a state law evidentiary ruling, which is not subject to habeas review.  In any event, the state court's decision was correct, because there was no evidence that Wilson was psychotic or hallucinating or suffering the effects of not taking his prescribed medication when he allegedly attempted to rape defendant, or that defendant knew that Wilson had been prescribed Seroquel for any alleged violent psychosis.

The Appellate Division rejected this claim on the merits by specifically addressing all of defendant's other claims and then holding that defendant's "remaining contention is without merit."  People v. Wisdom, 164 A.D.3d 928, 931 (2d Dep't 2018).  This summary decision is entitled to AEDEPA deference.  See Sexton v. Beaudreaux, 138 S. Ct. 2555, 2558 (2018); see also Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005).

At trial, defense counsel sought to introduce Wilson's medical records (which counsel received as discovery material from the state), in support of a defense theory that Wilson suffered from various emotional health and substance abuse issues, was violent, and had attacked defendant (54-55).  According to counsel, the records indicated that Wilson had suffered from hallucinations, in which he wanted to hurt himself or others; he heard voices; he had a "major depressive disorder

24

with psychotic features"; and he was taking various prescription medications, including Prozac for depression, Benadryl for allergies, and Seroquel as an anti-psychotic (53).  Counsel also sought to introduce the records to show that Wilson had half of his stomach removed due to surgical treatment of alcoholic ulcers.  Counsel argued further that the records indicated that Wilson had switched from alcohol to cocaine (53-54, 59).  The defense theory was that the purported evidence was admissible based upon the toxicology report indicating Wilson's blood alcohol level, the presence of cocaine byproducts, and defendant's account of his actions (53-57).

Counsel also wanted to call a doctor to testify ("Dr. Siegel"), and ask him about the use of Seroquel to control hallucinations, the effects of not taking the prescribed medication (it was not found in the toxicology report), and whether alcohol aggravated the hallucinations (54-55).

The trial court examined the records and denied the application, observing that defendant was trying to create "an inference and then an inference upon an inference" (55).  The court found that the reported hallucinations were not violent, and Wilson was not hearing voices; he was only being treated for depression – not psychosis; moreover, there was no evidence that the Seroquel was for hallucinations.  Nor was there any evidence  - "simply none at all," as the court observed - that Wilson's failure to take the prescription caused violence (54-58, 60-61).

The court explained further that, according to the "DSM," Wilson was not psychotic, but was suffering from depression.  Thus, the court rejected defendant's theory that Wilson's treatment for mental health issues meant that he would then attack defendant, because he was supposedly not taking his medication (56).  The court found defendant's theory was nothing more than "perhaps" and  "speculation" (57).  The court also noted that defendant herself had not claimed to

the police that Wilson had been hallucinating (58, 60-61).  The court observed that defendant was trying to "dirty the victim" (59).

The court also denied defendant's application to call "Dr. Siegel" and hear in camera the doctor's proposed testimony on why Seroquel was prescribed to Wilson, on the grounds that it was too speculative (60-61).  The court reiterated that, based on the reports and defendant's own statements, there was nothing to suggest that Wilson had violent hallucinations, there was no evidence that a failure to take his medication caused him to be violent, defendant had described instead an attempted sexual assault, and if anything was a factor in the alleged sexual assault, it was the use of alcohol (58-61).[27]

Defendant requested the court to reconsider its ruling after Wilson's sister testified, in relevant part, that her brother had long-standing alcohol abuse problems, although she was unaware of his stomach surgery (Wilson: 74-75), and Wilson's long-term friend, Fortune, testified that she never drank with him and never saw him intoxicated or "stoned" (Fortune: 142). According to defense counsel, he wanted to introduce the medical records to explore "certain personal aspects of the decedent's life" and to try to establish whether Wilson became violent when he was drinking (146-47).  Counsel argued further that because Fortune testified that she never saw Wilson drink, he wanted to introduce the medical records in "rebuttal" (147-48).

The court denied defendant's renewed request, and noted further that the proposed evidence was not proper rebuttal (148).  The court observed that Wilson's blood alcohol level was

---

[27] While defendant says the court had no support for its determinations (Defendant's Petition at 25), the court had reviewed the records (55), referenced the "DSM" (56), and stated that "the report doesn't say that he's violent, all right, or he committed any violent acts and the report doesn't say the hallucinations were violent in nature" (58).  Thus, the court had a sufficient factual basis for its determinations.

in evidence, and that defense counsel could explore that evidence "in whatever fashion [he] wish[ed]" (148). When counsel cross-examined the medical expert, counsel adduced that Wilson's blood alcohol level was .20, and that figure was at the time of the toxicology report, 35 days after his death (255-56).

Defendant is not entitled to <u>habeas</u> relief based on this state court evidentiary ruling. Defendant would only be entitled to such review if the ruling denied her a fundamentally fair trial, which it did not. Thus, the petition should be denied.

Defendant's claim is premised upon the argument that the trial court committed an error of state evidentiary law in denying her application to admit Wilson's records, call an expert to comment on them, and cross-examine witnesses about Wilson's emotional health and substance-abuse issues. However, because <u>habeas</u> relief can only be granted based upon "clearly established Federal law, as determined by the Supreme Court of the United States" 28 U.S.C. § 2254(d), claims founded on violations of state law cannot serve as a basis for <u>habeas</u> relief. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal <u>habeas</u> court to reexamine state-court determinations on state-law questions."); <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984) (federal court on <u>habeas</u> review "may not issue the writ on the basis of a perceived error of state law). Furthermore, as the Second Circuit has stated, "not 'every error of state law can be transmogrified by artful argumentation into a constitutional violation.'" <u>Ponnapula v. Spitzer</u>, 297 F.3d 172, 182 (2d Cir. 2002) (citation omitted); <u>see also</u> <u>DiGuglielmo v. Smith</u>, 366 F.3d 130, 136 (2d Cir. 2004) (alleged errors of state law "cannot be repackaged as federal errors simply by citing the due process clause") (citation omitted).

Therefore, because a federal court is limited on habeas review to a determination of whether a state court's evidentiary ruling involved an error of constitutional magnitude, see Estelle, 502 U.S. at 67, a petitioner seeking habeas relief on the basis of an allegedly erroneous state law evidentiary ruling must establish that the trial court's error "deprived [him] of a fundamentally fair trial." Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) (quoting Rosario v. Kuhlman, 839 F.2d 918, 925 [2d Cir. 1988]).  Whether the exclusion of defense-requested evidence violated a defendant's right to present a defense depends upon whether the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt that did not otherwise exist. United States v. Maddiwar, 809 Fed. Appx. 49, 51-52 (2d Cir. June 17, 2020) (quoting Jones v. Stinson, 229 F.3d 112, 120 [2d Cir. 2000]); See United States v. Agurs, 427 U.S. 97, 112  (1976);  see also Sims v. Stinson, 101 F. Supp. 2d 187, 194 [S.D.N.Y. 2000]) (for an evidentiary error to reach constitutional magnitude, "it must have been 'crucial, critical, highly significant'") (quoting Collins v. Scully, 755 F.2d 16, 19 [2d Cir. 1985]), aff'd, 8 Fed. Appx. 14 (2d Cir. Mar. 28, 2001). A federal habeas court reviews the evidentiary error "objectively in light of the entire record before the jury." Collins, 755 F.2d at 19.

In addition, while a criminal defendant "has the right to confront the prosecution's witnesses . . .[and] the right to present his own witnesses to establish a defense," Washington v. Texas, 388 U.S. 14, 19 (1967); see also Chambers v. Mississippi, 410 U.S. 284, 294  (1973) ("[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusation"), "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988). States have broad latitude under the

Constitution to establish rules which subject a defendant's right to present relevant evidence to "reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308 (1998). "Central among these restrictions are state and federal rules of procedure and evidence 'designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" See Wade v. Mantello, 333 F.3d 51, 58 (2d Cir. 2003) (quoting Chambers, 410 U.S. at 302). Thus, the Supreme Court is "traditionally reluctant to impose constitutional constraints" on "ordinary evidentiary rulings by state trial courts" concerning the admissibility of evidence. Wade, 333 F.3d at 60 (quoting Crane v. Kentucky, 476 U.S. 683, 689 [1986]). "Restrictions on a defendant's presentation of evidence are constitutional if they serve 'legitimate interests in the criminal trial process,' and are not 'arbitrary or disproportionate to the purposes they are designed to serve.'" United States v. Almonte, 956 F.2d 27, 30 (2d Cir. 1992) (quoting Rock v. Arkansas, 483 U.S. 44, 55-56 [1987]). The exclusion of evidence is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." Scheffer, 523 U.S. at 308.

Similarly, the Constitution "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985). "[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); see also Howard v. Walker, 406 F.3d 114, 129 (2d Cir. 2005) ("Limitations on cross-examination may be lawful and legitimate if they are harmonious with the goal of ensuring the legitimacy of the truthfinding process.").

As an initial matter, this Court must determine whether a state evidentiary rule was in fact violated. See Wade, 333 F.3d at 59 n.7 (courts should first consider the propriety of the state court's evidentiary ruling before considering constitutional error); Washington v. Schriver, 255 F.3d 45, 57 (2d Cir. 2001) (a court must examine the stated reasons for exclusion of evidence and "'inquire into possible state evidentiary law errors' that may have deprived the petitioner of a fair trial") (quoting Jones, 229 F.3d at 120).   "Although a focus on the materiality of excluded testimony in the context of the entire record is ultimately necessary before it may be determined that a trial court's exclusion of evidence amounts to constitutional error warranting habeas relief, that inquiry may be premature if the trial court's ruling was proper." Wade, 333 F.3d at 59. Furthermore, even if the omission of evidence was clear error, a habeas court could only grant relief if the state trial court's decision was unreasonable. See Jones 229 F.3d at 120-21.

The trial court's rulings were correct applications of state law. Pursuant to New York state law, when a defendant raises a justification defense in a homicide prosecution (see N.Y.P.L. Art. 35), evidence of "prior violent acts of the deceased, known to the defendant" is admissible on the issue of "whether the defendant's asserted fear of the deceased was reasonable." People v. Miller, 39 N.Y.2d 543, 550 (1976); see also People v. Reynoso, 73 N.Y.2d 816, 819 (1988) (evidence of the "presence of a controlled substance in the victim's body" was properly excluded "since there is no indication in the record that defendant knew that the victim was acting under the influence of drugs").  Evidence of "prior violent acts" may include a decedent's medical records when those records help to explain a decedent's "bizarre behavior." People v. Trivette, 175 A.D.2d 330, 331-32 (3d Dep't 1991) (citing Miller, 39 N.Y.2d at 548-49); see People v. Frazier, 6 A.D.3d 455, 456 (2d Dep't 2004); People v. Adams, 272 A.D.2d 953 (4th Dep't 2000).

30

In this case, the trial court's exclusion of Wilson's medical records or any expert witness testimony explaining those records was proper under state law for several reasons. First, there was no evidence that Wilson was hallucinating or was psychotic when he allegedly attempted to rape defendant. Indeed, in her written statement, defendant said that she was on the couch gathering her clothes when defendant said, "I'm getting some pussy tonight" (People's Exhibit 55). In her video-recorded statement, defendant said that defendant touched her when she was sleeping and then said that he would get "pussy" that night. In both statements, defendant claimed that Wilson then argued with her about sex. Significantly, while defendant described Wilson's vile sexual references, defendant never alleged that Wilson was incoherent, hallucinating, or acting in any way suggestive of a loss of mental control. Much of what Wilson was alleged to have said to defendant, such as his demands for sex, and his "crazy" name calling of defendant (as defendant stated in her videotaped statement), might have been vulgar, despicable, and abusive, but it did not demonstrate irrational behavior, nor was it otherwise indicative of hallucinations or a loss of mental control. Thus, Wilson's medical records were not admissible under state law because, in the absence of an inference that Wilson's alleged attempted rape of defendant was hallucinatory or psychotic, the records were irrelevant and would have invited the jury to speculate about Wilson's mental condition. See People v. Washington, 221 A.D.2d 391, 392 (2d Dep't 1995) (records of defendant's alcoholism properly excluded from evidence because records "would force the jury to engage in gross speculation as to whether or not the witness suffered from this condition on the day of the incident"); People v. Smith, 192 A.D.2d 806, 808 (3d Dep't 1993) ("[trial court], after reviewing the [complainant's psychiatric records] in question, quite properly excluded them because of their remoteness in time and the absence therein of any evidence of hallucinations,

fantasies or false claims of sexual attack on the complainant's part"); People v. Graham, 117 A.D.2d 832, 834 (3d Dep't 1986) ("trial court's refusal of defendant's request for [the complainant's psychiatric records] was not an abuse of discretion, since the records contained no evidence of hallucinations, fantasies or false claims of sexual attack").

Furthermore, even if defendant's statements had created an inference that Wilson was not fully in control of himself, Wilson's medical records were still inadmissible, because the evidence did not show that defendant knew that Wilson had been prescribed Seroquel, as reflected in the medical records, or why Seroquel had been prescribed.  In other words, unless defendant knew that, at the time of the alleged attempted rape, Wilson could be violent because he had not taken his Seroquel, then the evidence that defendant had not taken it was not probative of the reasonableness of defendant's supposed fear of Wilson.  See Adams, 272 A.D.2d at 953 ("Defendant failed, however, to present evidence that he was aware of the victim's psychiatric history at the time of the incident and thus failed to establish that the records were relevant to defendant's state of mind"); People v. Nickerson, 175 A.D.2d 74, 77 (1st Dep't 1991) (evidence of the decedent's drug addiction was properly precluded because defendant had no prior knowledge of the decedent).

Defendant asserts that she "undoubtedly was also aware of Wilson's psychiatric issues, given that she had been living with him for about a month and his prescription bottles were in plain view" (Defendant's Petition at 63). Defendant assumes too much.  It is highly doubtful that defendant was aware of Wilson's alleged "psychiatric issues."  Moreover, the prescription bottles, which included the bottle of Seroquel, were not in plain view, but were, as found by the crime scene detective, underneath the bed.  If Wilson had kept his Seroquel bottle underneath the bed,

then defendant might never have seen the bottle.  Even if the Seroquel bottle had ever been in defendant's view, there is no evidence that defendant had ever looked at the label to see what was in the bottle.  And even if defendant had looked at the label to see what was in the bottle, there is absolutely no evidence in the record to suggest that defendant had the particular pharmaceutical knowledge to know what conditions this medication could be prescribed for, and there were different conditions listed in Wilson's medical records (that is, hallucinations/psychosis and depression).[28] Finally, even if defendant had known that the Seroquel was intended to treat a condition that could potentially make Wilson violent, once again, there is no evidence that defendant had known that Wilson had not taken the Seroquel at the time of the alleged attempted rape.

In addition, defendant never said, in any of her statements to the police, that in the one-month period in which she lived with Wilson, he exhibited any psychotic or hallucinatory behavior.  Defendant also never stated that Wilson behaved differently when he was on Seroquel from when he was not on Seroquel.  She stated only that Wilson acted "like a different person" when he smoked crack cocaine (People's Exhibit 55). As the trial court observed, alcohol may have been a contributing factor to the incident as described by defendant (61).  But nothing in defendant's account remotely suggested that Wilson became a "different person" due to his apparent failure to take the Seroquel – or that defendant even knew he had been prescribed the medication, or what it was for.

---

[28] Dr. Scordi-Bello testified on cross-examination that Seroquel could be used as an antidepressant and for sleeplessness (Scordi-Bello: 255-56).

Accordingly, because defendant could not establish that she knew that Wilson had been prescribed Seroquel to treat a condition that made him potentially violent and that she knew he had not taken Seroquel at the time of the alleged attempted rape, defendant could not establish that the evidence of his not taking his medication was probative of the reasonableness of her purported fear that Wilson would rape her or otherwise be violent toward her. Thus, the purported evidence was not relevant to defendant's justification claim, and the trial court properly denied its admission under state law evidentiary rules.

In any event, the reasonableness of defendant's purported fear of Wilson was never an issue at trial. The state never argued that defendant's use of deadly physical force to resist an alleged rape was unreasonable. Rather, on the issue of justification, the state argued only that defendant's statements about the alleged attempted rape was a fabrication to evade criminal liability for killing Wilson. Under these circumstances, the trial court's exclusion of the evidence of defendant's medical records, specifically his use or non-use of Seroquel, was not an abuse of discretion because defendant's reasonableness in her use of deadly physical force for justification was not contested. See Washington, 221 A.D.2d at 392 (medical records properly excluded because, in part, "the witness's alcoholism was not in dispute").

Moreover, because defendant failed to show that the Seroquel was intended to treat a condition that made Wilson potentially violent, defendant failed to make an adequate record to show that the trial court's exclusion of this evidence was supposedly erroneous. The trial court reviewed Wilson's medical records and stated on the record that Wilson "wasn't being treated for hallucinations" or for being "psychotic," but "was being treated because he was depressive" (55-56). See People v. Fish, 235 A.D.2d 578, 580 (3d Dep't 1997) (psychiatric records properly

34

excluded from evidence because, after in camera review, court found "no evidence that the victim has a history of hallucinations, sexual fantasies or false reports of sexual attacks").  Defendant disagreed with the trial court and said that the prescription was to treat "hallucinations, to harm himself or others," and "psychosis" (53-58).  Wilson's medical records were not made part of the trial record, and, consequently, defendant cannot establish that she was correct, and the trial court was wrong, about why Seroquel was prescribed for Wilson.[29]

Defendant further argues that Wilson's medical records should have been admitted on the ground that they were probative of Wilson's credibility, which the state supposedly put into issue through Wilson's call to 911 (Defendant's Petition at 65-67).  This argument should not now be considered by this Court:  at trial, defendant never sought admission of Wilson's psychiatric records as impeachment for his credibility on the 911 call. In addition, while the jury might not have known about defendant's alleged failure to take the Seroquel, the jury already knew from the autopsy report that Wilson had a breakdown product and a cutting agent of cocaine in his system and had a .20% blood alcohol content.  Thus, the jury knew that Wilson was not sober and had been abusing drugs at the time of his death – which the state argued was his close to the time of his 911 call.

In any event, this argument is also without merit because, in New York, when a hearsay declarant does not testify at trial, "evidence tending to impair the declarant's credibility is

_____

[29] Defendant notes that "Wilson's records were provided to the Appellate Division and will be provided to this Court as Exhibit H." (Defendant's Petition at 25, n.3).  However, these medical records were not part of the trial record.  Although the records were submitted to the trial court for its review, and the court noted that it had examined them (55), they were not made an exhibit and were not put in the state court's file. Thus, they are not part of the state court record, and should not now be considered by this Court.  See Jackson v. Conway, 763 F.3d 115, 135 (2d Cir. 2014) (habeas court generally prohibited from relying on evidence beyond the state court record).

admissible to the extent that such evidence would have been admissible had the declarant been a witness on the trial." Prince, Richardson on Evidence, § 8-111 (2008). None of the possible conditions for which Wilson was taking Seroquel was probative of his truthfulness about wanting defendant out of his apartment when he called 911. Thus, Wilson's medical records were inadmissible to "impeach" the credibility of his call to 911, just as they would have been inadmissible if Wilson had survived being stabbed by defendant to testify at trial.

Defendant also argues that the trial court restricted her cross-examination of the medical examiner about the use of Seroquel, her cross-examination of Victoria Wilson about Anthony Wilson's abuse of alcohol, and her cross-examination of Shakeema Fortune about Wilson's health problems (Defendant's Petition at 67-68).[30] The trial court properly sustained the state's objections to defendant's questions to the medical examiner about Seroquel, because defendant was trying get through the back door what she was not able to get through the front door -- the inference that Wilson became violent because he had not taken Seroquel (255-56, 263-64). Indeed, the trial court had already rejected defendant's efforts to bootstrap what it found to be an inference upon an inference upon an inference (55).

The trial court properly sustained the state's objection to the cross-examination of Victoria Wilson for several reasons: the question of whether Wilson "abused" alcohol was vague; no

---

[30]   It is well-settled under New York law that "the nature and extent of cross-examination are matters that are entrusted to the sound discretion of the trial court." People v. Walker, 83 N.Y.2d 455, 462 (1994) (citing People v. Schwartzman, 24 N.Y.2d 241, 244 [1969]). "A trial court has broad discretion to limit cross-examination when questions are not relevant to the case or concern collateral issues, and pose a danger of misleading the jury." People v. Magrigor, 281 A.D.2d 561, 562 (2d Dep't 2001).

foundation was established that Wilson ever drank alcohol in Victoria's presence; and the only time that Wilson's state of alcohol intoxication was relevant was at the time of the murder, which Victoria did not witness (and his blood alcohol level was already before the jury).  For the same reason, the trial court properly sustained the state's objection to the cross-examination of Fortune about Wilson's "health issues" (142).  Therefore, the trial court's preclusion of Wilson's medical record and its alleged curtailment of the defense cross-examination of these two witnesses did not violate defendant's right to present a defense.

Finally, for the reasons discussed in §3, supra, if the preclusion of evidence regarding Wilson's medical  records and proposed expert witness, and/or the alleged curtailment of cross-examination, was error, the error was harmless. See Fry v. Pliler, 551 U.S. 112, 121-22 (2007); Brecht v. Abrahamson, 507 U.S. 619, 635-37 (1993); Orlando v. Nassau Cty. Dist. Attorney's Office, 915 F.3d 113, 127 (2d Cir. 2019);  Spencer v. Capra, 788 Fed. Appx. 21, 23 (2d Cir. 2019); Alvarez v. Ercole, 763 F.3d 223, 233 (2d Cir. 2014).

6. Defendant's claim regarding the admission of Wilson's 911 call as a present sense exception to the state hearsay rule
   (Responding to Defendant's Petition, Point Four and pp. 103-04)

According to defendant, the trial court committed an error of state evidentiary law when it admitted Wilson's call to 911 as a present sense exception to the hearsay rule; defendant claims that, contrary to New York evidence requirements, the state failed to demonstrate both "contemporaneity" and "corroboration" (Defendant's Petition at 72).  The Appellate Division rejected this claim as being both "unpreserved" and without merit: "We agree with the Supreme Court's determination to admit the recording under the present sense impression exception to the

37

hearsay rule." People v. Wisdom, 164 A.D.3sd 928, 930 (2d Dep't 2018) (citations omitted). This merits-based decision is entitled to AEDPA deference.[31]

However, as discussed above (see §5, supra), a state court's evidentiary rulings, even if erroneous under state law, do not present constitutional issues cognizable in a habeas corpus petition. See Crane v. Kentucky, 476 U.S. 683, 689 (1986) ("[w]e . . . acknowledge our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts"); see also Jenkins v. Bara, 663 F. Supp. 891, 899 (E.D.N.Y. 1987 [Wexler, U.S.D.J.]). Moreover, as the Second Circuit has stated, "not 'every error of state law can be transmogrified by artful argumentation into a constitutional violation.'" Ponnapula v. Spitzer, 297 F.3d 172 (2d Cir. 2002) (quoting Sanna v. Dipaolo, 265 F.3d 1, 12 [1st Cir. 2001]); see also DiGuglielmo v. Smith, 366 F.3d 130 (2d Cir. 2004) (alleged errors of state law "cannot be repackaged as federal errors simply by citing the due process clause") (quoting Johnson v. Rosemeyer, 117 F.3d 104, 111 (3d Cir. 1997).

---

[31] The state did not argue before the Appellate Division that the claim was unpreserved, nor is that an argument now being raised in response to defendant's habeas petition. Thus, defendant's claim of actual innocence as a "gateway" to overcome the Appellate Division's procedural ruling is essentially academic (Defendant's Petition at 91c). In any event, even if the actual innocence claim had any relevance here, defendant falls far short of establishing the "extraordinarily high" standard of proof required for establishing an actual innocence claim. See Rivas v. Fischer, 687 F.3d 514, 541 (2d Cir. 2012)(quoting Schlup v. Delo, 513 U.S. 298, 316 [1995]); see also Hyman v. Brown, 927 F.3d 639, 657-60 (2d Cir. 2019) (discussing standard of proof for actual innocence as "gateway" to excuse procedural default). In addition, there is no freestanding, clearly established substantive right to habeas relief upon a showing of actual innocence. See Friedman v. Rehal, 618 F.3d 142, 159 (2d Cir. 2010); see also Djenasevic v. New York, 2019 U.S. Dist. LEXIS 25461, at *13 (E.D.N.Y. Feb. 15, 2019 [Brodie, U.S.D.J.]) (noting that the United States Supreme Court has yet to hold that there is a freestanding federal constitutional claim of actual innocence). Thus, defendant's actual innocence claim has no relevance to her instant habeas petition.

Therefore, "[i]n order to prevail on a claim that an evidentiary error deprived [a] defendant of due process . . . [s]he must show that the error was so pervasive as to have denied h[er] a fundamentally fair trial." Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985); see also Estelle v. McGuire, 502 U.S. 62, 72 (1991); Aponte v. Scully, 740 F. Supp. 153, 158 (E.D.N.Y. 1990 [McLaughlin, U.S.D.J.]) (petitioner seeking habeas relief based on a claim of erroneous admission of evidence "bears a heavy burden; mere evidentiary errors generally do not rise to constitutional magnitude"). In order to satisfy this standard, "erroneously admitted evidence must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." McCall v. Capra, 102 F. Supp. 3d 427, 443 (E.D.N.Y. 2015 [Kuntz II, U.S.D.J.]) (internal quotation marks and citation omitted); see Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992).

This analysis proceeds in two steps. First, the habeas court must determine "whether the trial court's evidentiary ruling was erroneous under New York law[.]" McCall, id. Second, if the ruling was erroneous under New York law, then the habeas court must evaluate "whether the error amounted to the denial of the constitutional right to a fundamentally fair trial." Id. (citing Davis v. Strack, 270 F.3d 111, 123-24 [2d Cir. 2001]). As the Appellate Division properly held here, the trial court's ruling was correct under state law. Furthermore, even if the trial court's ruling constituted terror – and it did not – the admission of the 911 call did not deprive defendant of a fundamentally fair trial.

The Appellate Division was correct that the trial court's ruling to admit Wilson's call to 911 as a present sense impression exception to the hearsay rule (170) was proper under New York law. Under the present sense impression exception to the state hearsay rule, a hearsay statement is

admissible when it "describes or explains an event or condition and was 'made while the declarant was perceiving the event or condition.'"  People v. Vasquez, 88 N.Y.2d 561, 574 (1996) (quoting People v. Brown, 80 N.Y.2d 729, 732 [1993]).  To qualify as a present sense impression, the out-of-court statement must be (1) made by a person perceiving the event as it is unfolding or immediately afterward, and (2) corroborated by independent evidence establishing the reliability of the contents of the statement.  See People v. Cantave, 21 N.Y.3d 374, 382 (2013);  Vasquez, 88 N.Y.2d at 574-75; Brown, 80 N.Y.2d at 732-33; People v Smith, 171 A.D.3d 1102, 1103 (2d Dep't 2019).

Moreover, a present sense impression  is considered reliable "because the contemporaneity of the communication minimizes the opportunity for calculated misstatement as well as the risk of inaccuracy from faulty memory.  Vasquez, 88 N.Y.2d at 574; see Brown, 80 N.Y.2d at 732-33. Furthermore, to be admissible, the statement must be "sufficiently corroborated by other evidence."  Brown, 80 N.Y.2d at 734; see Cantave, 21 N.Y.3d at 383.  The corroboration need not be from another witness who had an equal opportunity to observe the events described by the declarant, but should be evidence that shows "some additional indicia of reliability" of the statement.  Brown, 80 N.Y.2d at 736.  Thus, "[b]ecause of the myriad of situations in which" the issue of corroboration arises, "the critical inquiry" is whether "the corroboration offered to support admission of the statement truly serves to support its substance and content."  Vasquez, 88 N.Y.2d at 576.

In this case, Wilson's call to 911 satisfied the criteria for admission as a present sense impression.  The statement in the call -- "I've got this girl in my house.  I don't know what's wrong with her.  She's acting all crazy, and I want her out of my house" -- was contemporaneous with

the events being narrated.  This is because Wilson used the present tense verb "acting" instead of using a past tense verb, and because Wilson presently wanted defendant out of his house. See Cantave, 21 N.Y.3d at 382 (to qualify as a present sense impression, the out-of-court statement must be made by a person perceiving the event as it is unfolding or immediately afterward).

Defendant argues that the 911 call was not contemporaneous because "Wilson did not describe anything [defendant] was doing," and because "there is no background noise, it is impossible to know whether he was referring to ongoing conduct or calling to complain about something that had happened earlier…" Thus, defendant asserts, it is "equally likely" that the event(s) to which Wilson referred had ended (Defendant's Petition at 73-74).

Defendant's argument is unpersuasive.  If the event or events had ended, then Wilson would not have used the present tense verb and might have no longer wanted defendant removed from his apartment.  As for the alleged lack of description, the amount of detail in the statement is unrelated to whether the statement is contemporaneous.  Although Wilson did not elaborate on what he meant by defendant "acting all crazy," as long as she was "acting all crazy" when Wilson was speaking during the call, then the requirement of contemporaneity was met.

Furthermore, under the circumstances, the corroboration requirement was also met.  See Cantave, 21 N.Y.3d at 382 (to be admissible as present sense impression, statement must be corroborated by independent evidence establishing the reliability of the contents of the statement). Here, one of the pertinent circumstances was that there was no dispute that defendant stabbed Wilson to death.  Thus, the only issue for the jury to decide was whether defendant was justified in stabbing him to prevent a rape.  Accordingly, for the statement in the 911 call to be relevant, the corroboration need only show that it was more likely than not that the stabbing was unjustified.

Contrary to defendant's arguments (Defendant's Petition at 76), the evidence pertaining to how Wilson was found stabbed to death corroborated the substance of the statement to the 911 operator. That is, whatever defendant was doing that Wilson considered to be "all crazy," Wilson found it to be serious enough that it warranted a request for police assistance to remove her from his apartment, where for a month, he had been allowing her to live.

Moreover, the condition of Wilson's body and of his apartment when his body was found was further corroboration of the "all crazy" statement. The seven stab wounds, the location of five of the wounds being in the upper chest, the depth of some of the stab wounds being several inches deep, and the great force used to inflict the stab wounds that broke through Wilson's ribs, indicated that defendant was in fact acting in a frenzy of violence -- i.e., was acting "all crazy" -- against Wilson. Indeed, the chaotic scene at the apartment, with overturned furniture and blood smeared all over, was even further evidence of the "all crazy" actions of defendant that Wilson referenced in his call to 911.

In addition, apart from this evidence regarding Wilson's body and the condition of his apartment, defendant's statement to Matthew Shepard -- that she was not going to have sex with Wilson and pay him rent at the same time and so she "poked" him -- constituted further corroboration. Defendant's statement to Shepard showed that defendant and Wilson had a running dispute about her status in the apartment that defendant considered to be unresolved. The dispute corroborated the "all crazy" reference in the 911 call, and the unresolved status of the dispute corroborated Wilson's desire to have her out of the apartment.

Defendant's arguments against corroboration are all speculative and without merit (Defendant's Petition at 76-77). Defendant argues that Wilson's 911 call had no allusions to the

42

stabbing, did not describe violent behavior or threats, and did not contain an expression of fear, and ended without any "crying out" (Id. at 76). A reason that the statement included no references to violence is that defendant did not begin to stab Wilson while he was on the phone to 911. The statement nevertheless showed that something was happening between defendant and Wilson that was serious enough to compel Wilson to try to call in the police to remove defendant. That serious something could not have been the alleged attempted rape because, if Wilson had been attempting a rape, he would not have called for the police to come to the scene. Thus, the lack any allusions to the stabbing or other references to violence in the statement does not mean that the statement in the 911 call was uncorroborated.

Defendant also argues that her statement was the only direct evidence of what happened and that "it contradicted Wilson's conclusory 911 accusation" (Id.). Thus, according to defendant, Wilson could have been the one acting irrationally, or there could have been intervening events between the 12:37 a.m. time of the 911 call and the 2:00 to 3:00 a.m. time of the alleged rape, including Wilson allowing defendant to use his phone between those times (Id. at 75-76). As explained above (see §3, supra), the evidence in the apartment and defendant's statements to Shepard failed to support defendant's attempted rape scenario. Defendant's assertions about Wilson acting irrationally due to his blood alcohol level and/or cocaine in his system, or about unknown intervening events, are speculative, and fail to support her claim that the statements in the 911 call were uncorroborated. Therefore, the admission of the 911 call into evidence was proper under state law rules of evidence because the statement in the call was contemporaneous with the events being described and because the other evidence sufficiently corroborated the statement to ensure its reliability.

In any event, if admission of the 911 call was error, the error was harmless.  See McCall v. Capra, 102 F. Supp. 3d at  443. This is so because the evidence of guilt aside from the 911 call -- principally the testimony of Matthew Shepard and the crime scene evidence -- was overwhelming (see  §3, supra).  Moreover, this Court should reject defendant's contention that the alleged error could not be deemed harmless, because the state, in its brief to the Appellate Division, argued that the 911 call "by itself" disproved defendant's justification defense (Defendant's Petition at 78, 87, 88, 93, citing Respondent's Brief to the Appellate Division at 40).  Defendant misapprehends the state's argument, because the state did not argue that the 911 call was essential to establish defendant's guilt.  Rather, the state argued that it was indeed strong evidence – but that there was additional, separate, compelling evidence of guilt.  Indeed, the state expressly argued that the allegedly erroneous admission of the 911 call was harmless because of the overwhelming evidence of guilt provided by Shepard's testimony, as well as the crime scene and medical examiner evidence (see Respondent's Brief to the Appellate Division at 61).

Furthermore, this Court should also reject defendant's assertion that:

> Though beside the point of whether the call was admissible, it is worth noting that the prosecutor's motive argument was not a fair inference from the record. Even if Wilson did kick petitioner out of the house, killing him was a completely disproportionate and illogical response. Wilson's statement on the 911 call that petitioner was acting "crazy," with no further detail, was not insufficient to support the prosecutor's theory

(Defendant's Petition at 79).  First, defendant has not brought a substantive claim of summation error in his habeas petition.  Second, nothing in the prosecutor's summation amounted to a denial of due process.  See Smith v. Donelli, No. 03-CV-3464 (JG), 2004 U.S. Dist. LEXIS 13874, at *10 (E.D.N.Y. July 22, 2004 [Gleeson, U.S.D.J.]).  And, third, the prosecutor's summation

44

argument was a proper inference to draw from the evidence.[32] The credible evidence adduced by the state established that  Wilson and defendant had a dispute in which she intentionally killed him, and defendant then fabricated a false account of self-defense to avoid culpability.

Finally,  there is no merit to defendant's assertion that the trial court "nevertheless endorsed the prosecutor's theory in the jury's eyes, exacerbating the prejudicial impact of admitting the call," because it sustained the state's objections to defense counsel's "speculati[ve]" suggestion that the stabbing occurred before the 911 call (450), and the court then overruled defense counsel's objections that any argument by the state that the 911 call showed motive amounted to "sheer speculation" supported by "absolutely no evidence" (452, 481) (Defendant's Petition at 79).  The trial court's rulings on the objections were correct.  Moreover, the trial court made abundantly clear to the jury that absolutely nothing in its rulings or other actions could be considered as endorsing either side.  In its final charge, the court instructed the jury:

> Your own recollection, understanding and evaluation of the facts presented by evidence at this trial is what controls , regardless of what counsel for either side of the case may say about the facts, and even regardless of what the Court may say about the facts . I wish to advise you , also, at this time, that you are not to consider anything I said during the trial or any questions I've asked, nor anything that I may say to you during the course of this charge, as indicative that I have any opinion on this case one way or another.
>
> I have no opinion whatever .
>
> I have no power to tell you what the facts are or to tell you that one fact is more important than another fact, or what witness is truthful or what witness is untruthful. These are all matters within your own exclusive power as judges of the facts.

---

[32] The state relies upon its brief to the Appellate Division for any discussion of the summation claim.

(477-78).  Given these explicit instructions by the trial court, defendant cannot now be heard to argue persuasively that the jury would believe that the court had "endorsed" the state's theory. See United States v. Gramins, 939 F.3d 429, 453 (2d Cir. 2019) (recognizing the "strong presumption" that jurors will follow the instructions they are given) (citation omitted).

 

       7.    <u>Conclusion</u>

In sum, for the foregoing reasons, defendant's petition for a writ of <u>habeas</u> <u>corpus</u> should be summarily denied in its entirety.

Dated: Brooklyn, New York
       November 12, 2020

                    Respectfully submitted,


                    ERIC GONZALEZ
                    District Attorney
                    Kings County



LEONARD JOBLOVE
KEITH DOLAN
Assistant District Attorneys
     of Counsel

<u>Certificate of  Service</u>

I hereby certify that on November 12, 2020, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the follow party:

<u>Filed electronically via ECF</u>
Tammy E. Linn, Esq. (tlinn@appad.org)
Appellate Advocates
111 John Street – 9th Floor
NY, NY 10038

Keith Dolan
Assistant District Attorney
Office of the Kings County District Attorney
350 Jay Street
Brooklyn, NY  11201
(dolank@brooklynda.org)

47