```
 1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS:  CRIMINAL TERM:  PART 2
 2  -------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
 3                                      Indictment No.:
                     -against-             6615/2012
 4                                         (Trial)
    ATARA WISDOM,
 5
                        Defendant.
 6  -------------------------------------------X

 7
                             Supreme Courthouse
 8                           320 Jay Street
                             Brooklyn, New York 11201
 9                           June 25, 2014

10
    B E F O R E:
11
               THE HONORABLE ALBERT TOMEI, JUSTICE
12

13  A P P E A R A N C E S:

14          HON. KENNETH P. THOMPSON, ESQ.
                District Attorney - Kings County
15              350 Jay Street
                Brooklyn, New York  11201
16          BY:  PHYLLIS CHU, ESQ.
                Assistant District Attorney
17

18          DAVID WALENSKY, ESQ.
                Attorney for Defendant
19              910 Stuart Avenue
                Mamaroneck, New York
20          BY:  DAVID WALENSKY, ESQ.
                     - and -
21              JOSHUA POVILL, ESQ.

22

23

24
                         MARLIN CASSIDY
25                       Senior Court Reporter
```

Proceeding

2

1      (Whereupon, the following took place in open
2  court:)
3      THE CLERK:   This is calendar number one,
4  Indictment 6625 of 2012, People versus Atara Wisdom.
5  Defendant is incarcerated, produced before the Court,
6  present with her attorney.
7      Appearances for the record, please.
8      MR. WALENSKY:   David Walensky, 910 Stewart
9  Avenue, Mamaroneck.
10      MS. CHU:   Office of the District Attorney,
11  Phyllis Chu.
12      Good morning.
13      THE COURT:   Good morning.
14      THE CLERK:   Counsel, put your appearance.
15      MR. POVILL:   Joshua Povill on behalf of the
16  defendant.
17      THE COURT:   All right.
18      Let's have a Sandoval hearing first and then
19  the Antommarchi.
20      MS. CHU:   Yes, your Honor.
21      Based upon my review of the defendant's rap
22  sheet, there doesn't appear to be any crimes for which
23  she was convicted.  I have a harassment charge in 2011
24  and then I also have -- well, there's an assault three
25  but the People would not be inclined to ask her any

Proceeding

1    questions about that conviction or the facts.

2              THE COURT:  Okay.  All right.

3              You want to advise your client of the

4    Antommarchi?

5              MR. WALENSKY:  Yes.

6              (Whereupon, there was a brief pause in the

7    proceedings.)

8              MR. WALENSKY:  We are ready, your Honor.

9    Thank you.

10             THE COURT:  Ms. Wisdom, you have an absolute

11   right to be present at any sidebar or bench conference

12   where a potential juror in this matter expresses any

13   prejudice, bias or any other predisposition regarding

14   this matter.  Do you understand that?

15             THE DEFENDANT:  Yes.

16             THE COURT:  And you would have the right at

17   that sidebar or bench conference, through your attorney,

18   to question that potential juror about any prejudice,

19   bias or other predisposition.  Do you understand?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Now, have you had an opportunity

22   to speak to your attorney about this?

23             THE DEFENDANT:  Yes.

24             THE COURT:  And after speaking to your

25   attorney, what do you wish to do?

4

Proceeding

 1                THE DEFENDANT:  Waive.

 2                THE COURT:  Waive your right to be present at

 3      sidebar or bench conference?

 4                THE DEFENDANT:  Yes.

 5                THE COURT:  Are you doing so voluntarily and

 6      of your own free will?

 7                THE DEFENDANT:  Yes.

 8                THE COURT:  Anybody force you or coerce you to

 9      do that?

10                THE DEFENDANT:  No.

11                THE COURT:  I notice that you were given a

12      waiver of your right to be present during all jury

13      selection proceedings and I would assume that you did go

14      over this with your attorney.

15                THE DEFENDANT:  Yes.

16                THE COURT:  And you read it?

17                THE DEFENDANT:  Yes.

18                THE COURT:  And you signed it?

19                THE DEFENDANT:  Yes.

20                THE COURT:  After reading and signing it, you

21      do so voluntarily and of your own free will?

22                THE DEFENDANT:  Yes.

23                THE COURT:  Anybody force you to give up your

24      right?

25                THE DEFENDANT:  No.

mc

Proceeding

1            THE COURT:  Okay.

2            Now, additionally, you have a right to be

3    present at all of the court proceedings relating to this

4    matter, including your trial, and it behooves you to be

5    present during these proceedings.

6            Do you understand that?

7            THE DEFENDANT:  Yes.

8            THE COURT:  If you voluntarily give up your

9    right to be present at these proceedings, the Court will

10   proceed in your absence, and should you be convicted,

11   sentence you in your absence.

12           Do you understand?

13           THE DEFENDANT:  Yes.

14           THE COURT:  So, you have been given this

15   Parker warning in a written form, is that correct?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Have you read and discussed this

18   with your attorney?

19           THE DEFENDANT:  Yes.

20           THE COURT:  And have you signed your waiver?

21           THE DEFENDANT:  Yes.

22           THE COURT:  All right.

23           And I should say, has anybody compelled you to

24   sign this?

25           THE DEFENDANT:  No.

Proceeding

1          THE COURT:  Did you sign it voluntarily?

2          THE DEFENDANT:  Yes.

3          THE COURT:  All right.

4          And you understand --

5          THE DEFENDANT:  Yes, I do.

6          THE COURT:  -- what is contained in this

7    warning?

8          THE DEFENDANT:  Uh-huh.

9          THE COURT:  Okay.  All right.

10         So what we are going to do, we are going to

11   proceed tomorrow with the selection of the jury in this

12   matter and we'll continue tomorrow at ten o'clock.

13   Okay?

14         THE DEFENDANT:  Okay.

15         THE COURT:  All right.  Thank you very much.

16         See you tomorrow.

17         MS. CHU:  See you tomorrow.

18         THE COURT:  Mr. Walensky?

19         MR. WALENSKY:  Yes, sir.

20         THE COURT:  I would suggest, as I did at

21   the bench, that if you're entertaining putting on an

22   expert as you have explained at the bench, that you

23   submit a memorandum supporting your position regarding

24   this.

25         MR. WALENSKY:  I will be conferring with my

Proceeding

1    expert a little bit later.  I actually ultimately don't

2    think we will be.  I have had some preliminary

3    discussion with him so I want to find out exactly what

4    he could add on this.

5              THE COURT:  Okay.

6              MS. CHU:  Are you asking for the minutes

7    pursuant to 18-B?

8              THE COURT:  See you tomorrow.

9              MR. WALENSKY:  Your Honor, may I have the

10   minutes pursuant to 18-B?

11             THE COURT:  Yes.

12             LAW SECRETARY:  The psyche records you can get

13   to us this afternoon?

14             MS. CHU:  Yes.

15             (Whereupon, the trial was adjourned to June

16   26, 2014.)

          ********************************
17   CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
     THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS
18   PROCEEDING.

19

20

21

22   *Marlin Cassidy*
     MARLIN CASSIDY
     Senior Court Reporter

23

24

25

```
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL - PART 35
--------------------------------------x
PEOPLE OF THE STATE OF NEW YORK      :    INDICTMENT NO.
                                              6615-12
              -against-              :

                                     :

WISDOM, ATARA                             HERAINGS

                                     :

              Defendant.      :
--------------------------------------x
                     320 Jay Street
                     Brooklyn, NY 11201
                     October 30, 2013


B E F O R E:   HONORABLE ALAN MARRUS, JUSTICE



A P P E A R A N C E S:


              FOR THE PEOPLE:

              CHARLES J. HYNES, ESQ.
              District Attorney, County of Kings
              350 Jay Street
              Brooklyn, NY 11201
         BY:  Ms. Phyllis Chu, Esq.


              FOR THE DEFENDANT:

              DAVID M. WALENSKY, ESQ.
              (18-B Panel)
              910 Stuart Avenue
              Mamaroneck, NY 10543
         BY:  Mr. David M. Walensky, Esq.




                           Michael Capuano
                           Senior Court Reporter
```

Colloquy                                       2

1    THE CLERK:  Added onto the calendar,

2    Indictment 6615 of 2012, Atara Wisdom.

3        Appearances, please.

4        MR. WALENSKY:  David Walensky, 910 Stuart

5    Avenue, Mamaroneck, New York.

6        MS. CHU:  Phyllis Chu for the Office of the

7    District Attorney.

8        THE COURT:  Good afternoon.

9        The case was sent to me for a Huntley/Wade

10   hearing.  Are the People ready?

11       MS. CHU:  Yes.

12       THE COURT:  Is the defense ready?

13       MR. WALENSKY:  Yes.

14       THE COURT:  Have you turned over your

15   Rosario material for the hearing, Ms. Chu?

16       MS. CHU:  I did, your Honor.  Last night I

17   faxed over a copy of the indictment, the VDF, the

18   Grand Jury minutes for Detective Scandole and

19   Detective Batanjany; and this morning I turned over

20   copies of the Lineup Reports, a copy of the Miranda

21   sheet and a copy of the written statement that was

22   signed by the defendant; in addition to the spiral

23   notes of Detective Scandole regarding the statements

24   that the defendant -- one of the statements that the

25   defendant made to him.

1     THE COURT:  All right.  Are you ready to

2     proceed with your first witness?

3          MS. CHU:  I am, your Honor.

4          THE COURT:  Call that witness.

5          MS. CHU:  The People call Detective

6     Chrisopher Scandole.

7          COURT OFFICER:  Ready for the witness,

8     Judge?

9          THE COURT:  Ready.

10          COURT OFFICER:  Witness entering.

11          (Witness enters the courtroom.)

12          THE CLERK:  Raise your right hand.

13     Do you solemnly swear or affirm that the

14     testimony you are about to give shall be the truth,

15     the whole truth, and nothing but the truth, so help

16     you God?

17          THE WITNESS:  Yes, I do.

18          THE CLERK:  Please be seated.

19     For the record, in a loud voice, can I have your

20     name.

21          THE WITNESS:  Detective Christopher

22     Scandole, S-C-A-N-D-O-L-E.

23          THE CLERK:  Shield number.

24          THE WITNESS:  It's 5735.

25          THE CLERK:  Command.

```
                              People - Direct - Det. Scandole        4
 1                    THE WITNESS:  Brooklyn North Homicide Squad.

 2                    THE CLERK:  Thank you.

 3                    THE COURT:  You may examine the witness, Ms.

 4       Chu.

 5                    MS. CHU:  Thank you.

 6       DIRECT EXAMINATION

 7       BY MS. CHU:

 8          Q.    Good morning, Detective?

 9          A.    Good morning.

10          Q.    How many years have you been a member of the New

11       York City Police Department?

12          A.    Approximately, 26 years.

13          Q.    You said you are currently assigned to Brooklyn

14       North Homicide?

15          A.    Yes.

16          Q.    I want to direct your attention to January 3,

17       2012.  Did there come a time that day that you became

18       involved in an investigation into a body that was found at

19       832 Bushwick Avenue?

20          A.    Yes.

21          Q.    Can you tell me how it was that you became

22       involved in the case?

23          A.    I was to assist detectives from the 83rd

24       Precinct in the handling of the investigation.

25          Q.    Who was the detective at the 83rd you were
```

1   assigned to assist?

2       A.   Detective Jeffrey Hernandez.

3       Q.   Did you find out the name of the individual

4   whose body was found at 832 Bushwick?

5       A.   Yes.  That was Anthony Wilson.

6       Q.   During the course of your investigation, did

7   there come a time when you began to look for anyone in

8   particular?

9       A.   Yes.

10      Q.   Who was that?

11      A.   Atara Wisdom.

12      Q.   How was it that you came to be looking for Mr.

13   Wisdom?

14      A.   We were notified of a DNA hit.

15      Q.   Of evidence that had been recovered?

16      A.   Yes, from the scene of the incident.

17      Q.   Okay.

18   Do you recall about when that was during the course of

19   the investigation?

20      A.   I believe that was in March of 2012.

21      Q.   Now, I want to direct your attention to July of

22   2012.  Did there come a time when that you learned the

23   whereabouts of Atara Wisdom?

24      A.   Yes, I did.

25      Q.   Where did you locate her?

People - Direct - Det. Scandole                          6

1    A.    At the women's shelter on Herkimer Street.

2    Q.    In Brooklyn?

3    A.    Yes.

4    Q.    Did there come a time when you actually got

5    Atara Wisdom from the women's shelter.

6    A.    Yes.

7    Q.    Where did you take her?

8    A.    Back to the 83rd Precinct.

9    Q.    Did you say to her anything at the time you

10   apprehended her about what was going on?

11   A.    No, we just asked her to accompany us back to

12   the precinct.

13   Q.    I would ask you to take a look around the

14   courtroom and see if you see Ms. Wisdom here?

15   A.    Yes.

16   Q.    Can you please point to her and tell us

17   something that she is wearing?

18   A.    Gray shirt (Indicating).

19           THE COURT:    Indicating the defendant, Ms.

20   Wisdom.

21           MS. CHU:    Thank you.

22   Q.    About what time was it that you got Ms. Wisdom

23   and took her back to the 83rd Precinct?

24   A.    About 9:45 A.M.

25   Q.    And who was present with you when you did this?

People - Direct - Det. Scandole                    7

1        A.    Myself and Detective Collins.

2        Q.    And Detective Collins, which command is he from?

3        A.    Homicide squad as well.

4        Q.    Once you got to the 83rd Precinct, what did you

5    do with Ms. Wisdom?

6        A.    She was placed in an interview room.

7        Q.    Is that on the 2nd floor inside of the precinct?

8        A.    Yes, inside of the detective squad.

9        Q.    Did there come a time when you actually sat down

10   to speak to Ms. Wisdom that morning?

11       A.    Yes.

12       Q.    At about what time was it that you spoke with

13   her?

14       A.    About 11 A.M.

15       Q.    When you spoke to Ms. Wisdom, did you read her

16   her Miranda rights?

17       A.    Yes, I did.

18       Q.    How was it that you were able to read her the

19   Miranda rights?

20       A.    From a preprinted form.

21       Q.    Do you have that form with you today?

22       A.    I do.

23             MS. CHU:  Your Honor, if I could have that

24       deemed People's No. 1 for identification.

25             THE COURT:  All right.  It will be deemed 1

People - Direct - Det. Scandole                    8

1    for identification.

2         Please show it to Mr. Walensky.

3         (Exhibit published to the defendant and defense

4    counsel.)

5              (Exhibit published to the witness.)

6    Q.    Detective Scandole, is that the actual sheet

7    that you read Ms. Wisdom her Miranda rights from on July

8    25, 2012?

9    A.    Yes, it is.

10   Q.    And did you make any markings on the sheet at

11   the time that you read her the rights?

12   A.    I did.

13   Q.    What markings did you make on that?

14   A.    The date, time and notated the answers to her

15   questions.

16   Q.    Did you also sign the form?

17   A.    I did.

18         MS. CHU:  At this time, I would offer it

19   into evidence as People's No. 1.

20         MR. WALENSKY:  No objection.

21         THE COURT:  People's 1 will be deemed in

22   evidence.

23         May I see it, please.

24              (Exhibit published to the Court.)

25              (Exhibit returned to the witness.)

People - Direct - Det. Scandole                    9

1          THE COURT:  I have looked at the exhibit.  I

2      don't think it's necessary for him to read everything

3      that is on there since I have already read it.

4          MS. CHU:  Okay.

5      Q.    Detective, after you read Ms. Wisdom her Miranda

6      rights, did she begin to speak with you?

7      A.    Yes, she did.

8      Q.    How did the form of the conversation happen

9      between you and Ms. Wisdom, was it question-and-answer or

10     more of a narrative on her part?

11     A.    It was back-and-forth until we got to a

12     narrative.

13     Q.    And can you tell me how did you begin the

14     conversation with her?

15     A.    Just explaining the incident that we were

16     investigating.

17     Q.    What did you say?

18     A.    We told her that the incident we were

19     investigating was that a man had been found deceased where

20     the incident happened, the location, and that eventually

21     that her name came up during the investigation.

22     Q.    And did you ask her -- what did you ask her?

23     A.    Eventually, we asked if she knew anything about

24     it.

25     Q.    What did she tell you?

                    People - Direct - Det. Scandole          10

1          THE WITNESS:  Can I refer to my DD-5, your

2     Honor?

3          THE COURT:  Yes.

4                    (Pause)

5     A.    She had told us that she had lost her place to

6     live and that she had to move in with a guy that she had

7     met over at a doctor's office on Broadway.

8          She said that she had given him money, from time to

9     time, when she had it for rent.

10    Q.    She gave him money?

11    A.    From time to time for rent, when she had it.

12    Q.    Okay.

13    A.    She told us that this guy was a crack user and

14    that he was completely a different person when he smoked

15    crack.

16         One night, she told us that she woke up to find him

17    touching her underneath her shirt.  She stopped him and

18    told him, 'Listen, we are not like that.  That's not why I

19    am here.'  At that point, she got into an argument, it was

20    kind of heated and loud.  She left.  She went outside to

21    calm down and called her friend, and calmed down on the

22    phone.

23         A couple of days later -- a little while later, maybe

24    around Thanksgiving time, she got into another argument

25    with him.  It got heated and loud again.  This time she

1    left and went to her sister; s house for a couple of days.

2        She called him on the phone a couple of times and had

3    to go back because she had set up an interview and she

4    needed to get clothes from the apartment where she was

5    staying.

6        She said, when she got back to the apartment,

7    everything was good.  It was nice.  It was like when she

8    first met him, and it was okay.

9        She was in the apartment, sitting on the couch that

10   night, getting her clothes together; and that he tells

11   her, 'I am going to get some pussy tonight,' so she said,

12   'Well, okay, then I will get out of here.'  He stands up

13   in front of the door and says, 'Uh-uh.'

14       Q.    Meaning, no?

15       A.    Meaning, no, you are not leaving.

16       At that point, he picked up a belt and wrapped it

17   around his hand, and when she saw him do that she picked

18   up a knife and put it in her sweater.

19       She went to get up off the couch.  She said at that

20   point he punched her in the face.  He grabbed her sweater,

21   pulled her sweater over her head, and started beating her,

22   punching her in her shoulders and back.

23       As he was punching her, he was also pushing her to the

24   ground, she is telling us; and she says, 'I am thinking to

25   myself, if my head hits the ground, I am dead.'

Q.   They are in the apartment, though?

A.   Yes.

She said, it was at that point, when she was thinking,
'If my head hits the ground, I am dead,' where she pulls
out the knife and starts stabbing at him.

After that, she goes back to the bathroom.  She
notices that she has a big knot on her head and she is all
bruised up on the shoulders, and as soon as she collects
her stuff, puts it in a duffle bag, she leaves the
apartment and goes to see her friend Ebony.

She stays with her but doesn't tell her anything about
what happened, and she doesn't tell anybody else what
happened.

Q.   After Ms. Wisdom gave you the statement, what
did you do?

A.   I wrote it down.

Q.   Did you write it in her presence?

A.   No.

Q.   So, I am sorry, when you were speaking with her
who was present with you, if anyone?

A.   Myself and Detective Collins.

Q.   And at that time, did you and Detective Collins
leave the room?

A.   Yes, we did.

Q.   Once you left the room, where was it that you

1     actually wrote down what she had just told you?

2          A.    In the office of the 83rd Precinct squad.

3          Q.    Did there come a time when you finished writing

4     what it is that Ms. Wisdom had told you?

5          A.    Yes, there did.

6          Q.    Did you go back into the room with her?

7          A.    Yes.

8          Q.    Do you recall at about what time it was that you

9     went back into the room?

10         A.    About 7:30 P.M.

11         Q.    The same day?

12         A.    Correct.

13         Q.    So, you actually wrote what it is that she told

14    you?

15         A.    I did.

16         Q.    When you went back in, what did you say to her?

17         A.    I read it to her, gave her a chance to read it,

18    then myself and Detective Collins and Ms. Wisdom all

19    signed it.

20         Q.    Now, do you actually have the sheet of paper or

21    the sheets of paper that you may have written of what she

22    told you on July 25, 2012?

23         A.    I do.

24              MS. CHU:   Your Honor, if I could have that

25         deemed People's No. 2.

People - Direct - Det. Scandole                  14

1              THE COURT:  All right.  Let's show it to Mr.

2       Walensky.

3              MR. WALENSKY:  I have seen it.  Thank you.

4       I have no objection to it being admitted.

5              THE COURT:  Then it will be deemed in

6       evidence as People's 2.

7              (Exhibit published to the Court.)

8              THE COURT:  I am looking at it.

9                       (Pause)

10             THE COURT:  I have read the exhibit.

11             MS. CHU:  You don't require me to read it?

12             THE COURT:  It's not necessary for him to

13      read it.  The exhibit is in evidence and I have read

14      and looked at it.

15      Q.     Detective, after the defendant signed what you

16      have written out as far as what she had told you just

17      before, did you then make arrangements with the District

18      Attorney's Office -- I am sorry, withdrawn.

19      Did you ask Ms. Wisdom whether or not she would be

20      willing to speak with the District Attorney's Office?

21      A.     I did.

22      Q.     What was her answer?

23      A.     Yes, she would.

24      Q.     Did you then make arrangements for someone from

25      the District Attorney's Office to come out to speak with

People - Direct - Det. Scandole                    15

3   1    her?

    2         A.   Yes.

    3         Q.   Did there come a time when someone from our

    4    office arrived there?

    5         A.   Yes.

    6         Q.   Who was that?

    7         A.   District Attorney Purce.

    8         Q.   Ed Purce?

    9         A.   Yes.

   10         Q.   Now, at about 2100, or 9 o'clock P.M., on July

   11    25, 2012, did Mr. Purce have a conversation with Ms.

   12    Wisdom?

   13         A.   Yes.

   14         Q.   Was that conversation recorded in any way?

   15         A.   Yes.

   16         Q.   How was it recorded?

   17         A.   It was videotaped.

   18         Q.   Were you present during this conversation?

   19         A.   I was.

   20              MS. CHU:   At this time, your Honor, if I can

   21         play what I opened earlier before?

   22              THE COURT:   My suggestion is that you want

   23         to move the exhibit into evidence, validate it, and

   24         then let's complete the testimony; then we will see

   25         about time of playing the video.  I want to make sure

People - Direct - Det. Scandole          16

3    1          we want to get through the witnesses that are here.

     2                    MS. CHU:  He is done with his portion.  I

     3          just have the other witness.  I don't have any other

     4          questions.

     5                    THE COURT:  So, do you want to move the

     6          video into evidence at this time?

     7                    MS. CHU:  Yes.

     8                    THE COURT:  You have seen it, Detective,

     9          it's an accurate recording of what took place?

    10                    THE WITNESS:  Yes.

    11                    THE COURT:  Is there any objection to the

    12          video coming into evidence?

    13                    MR. WALENSKY:  No.

    14                    THE COURT:  Would you be willing to

    15          cross-examine without the video being played first or

    16          do you want to play it first?

    17                    MR. WALENSKY:  I would be willing to

    18          cross-examine first.

    19                    THE COURT:  Let's do it that way.

    20               There is nothing on the video that you want to

    21          cross-examine him about?

    22                    MR. WALENSKY:  Actually, there isn't, and

    23          that's why.

    24          CROSS-EXAMINATION

    25          BY MR. WALENSKY:

1      Q.   Good afternoon, Detective.

2      A.   Good afternoon.

3      Q.   How did Ms. Wisdom come into custody?

4      A.   I had asked her to escort us to the 83rd

5   Precinct.

6      Q.   Where did you find her?

7      A.   At the women's shelter on 1444 Herkimer Street,

8   I believe.

9      Q.   How did you come to look for her?

10      A.   I had contacted the Department of Homeland

11   Services and conducted a check if she was a client of

12   theirs.

13      Q.   How did you come to suspect her to even bring

14   her in?

15      A.   Prior to that, we had received a DNA match for

16   Ms. Wisdom from the evidence recovered at the scene.

17      Q.   When you brought her in, at what time you bring

18   her into the 8-3?

19      A.   About 9:45.

20      Q.   In the morning?

21      A.   Yes.

22      Q.   You spoke to her shortly thereafter?

23      A.   Yes.

24      Q.   At 10, 10:30, 11 -- around there?

25      A.   Yes.

People - Cross - Det. Scandole                    18

3

4

1        Q.    I am not trying to pin you down exactly.

2        A.    Yes.

3        Q.    Then, was she in the interview room?

4        A.    Yes, she was.

5        Q.    After you spoke to her the first time, did you

6    leave her there until 7:30 that evening?

7        A.    Yes.  She was in the interview room, yes.

8        Q.    Did you get her anything to eat?

9        A.    I personally did not.  I believe that another

10   detective did.  I can't say for sure.

11       Q.    I'm assuming there were bathroom breaks because

12   you weren't around?

13       A.    Correct.

14       Q.    Did you go off duty at some point?

15       A.    No, I was still present.

16       Q.    Why did you keep her in that room from 9:45 in

17   the morning until 7:30?

18                 MS. CHU:  Objection.

19                 THE COURT:  How long was she in the room, if

20       you know?

21                 THE WITNESS:  She was there the whole time.

22                 THE COURT:  How long is that?

23                 THE WITNESS:  From that night, until 7:30.

24       They had conducted lineups in between.

25                 THE COURT:  Go ahead.

People - Cross - Det. Scandole                    19

1    Q.    Was a lineup conducted during that period of

2    time?

3    A.    Yes, there was.

4    Q.    She was in that room for well -- when you

5    brought her in at 9:45 until about 7:30?

6    A.    Yes.

7    Q.    Do you know at what time the lineup was

8    conducted?

9    A.    I believe, around 5 P.M.

10    Q.    So, she was left in that room from the time you

11    spoke to her around 10 o'clock, say, until the lineup was

12    conducted, right?

13    A.    Yes.

14    Q.    That didn't take very long, it took about 15

15    minutes?

16    A.    Approximately, I would say.

17    Q.    And then she was brought back to the room?

18    A.    Yes.

19    Q.    Subsequently, you spoke to her again about 7:30?

20    A.    Yes.

21          MR. WALENSKY:  I have no further questions.

22          THE COURT:  Do you have any redirect, Ms.

23    Chu?

24          MS. CHU:  No.

25          THE COURT:  Thank you, Detective.  You are

People - Direct - Det. Batanjany                    20

1    excused.  You can leave the exhibits with my Officer

2    over here right now.

3              COURT OFFICER:  Thank you.

4              (Witness exits the courtroom.)

5              THE COURT:  You may proceed, Ms. Chu.

6              MS. CHU:  The People call Detective

7    Batanjany.

8              COURT OFFICER:  Ready for the witness,

9    Judge?

10             THE COURT:  Ready.

11             (Witness enters the courtroom.)

12             THE CLERK:  Raise your right hand.

13        Do you solemnly swear or affirm that the

14   testimony you are about to give shall be the truth,

15   the whole truth, and nothing but the truth, so help

16   you God?

17             THE WITNESS:  Yes, I do.

18             THE CLERK:  Please be seated.

19        In a loud, clear voice, for the record, can I

20   have your name.

21             THE WITNESS:  Detective Batanjany,

22   B-A-T-A-N-J-A-N-Y, first name, Deborah, D-E-B-O-R-A-H.

23             THE CLERK:  Shield number.

24             THE WITNESS:  #1480.

25             THE CLERK:  Command.

People - Direct - Det. Batanjany                 21

1    THE WITNESS:  The 8-3 squad.

2    THE COURT:  You may question the witness,

3    Ms. Chu.

4    MS. CHU:  Thank you.

5    DIRECT EXAMINATION

6    BY MS. CHU:

7    Q.   Good afternoon, Detective.

8    A.   Good afternoon.

9    Q.   How long have you been with the New York City

10   Police Department?

11   A.   A little over 14 years.

12   Q.   You said you are currently assigned to the 83rd

13   Precinct?

14   A.   Yes, 8-3 Detective Squad.

15   Q.   I just want to ask you, at some time in April of

16   2012, did there come a time when you became involved in an

17   investigation into the death of a person by the name of

18   Anthony Wilson?

19   A.   Yes.

20   Q.   Can you tell me how it was that you became

21   involved in the case?

22   A.   The original investigating case detective was

23   transferred so I was assigned the case.

24   Q.   Who was the original case detective?

25   A.   Detective Hernandez.

People - Direct - Det. Batanjany                22

1    Q.    Detective Jeffrey Hernandez?

2    A.    Yes.

3    Q.    Now, during the course of your investigation, on

4    July 25 of 2012, did there come a time when a person by

5    the name of Atara Wisdom was brought to your precinct?

6    A.    Yes.

7    Q.    Can you tell me, did you arrange for lineups to

8    be conducted in connection with this case?

9    A.    Yes.

10   Q.    Now, did you contact a witness that I would like

11   to identify as Confidential Witness No. 1?

12   A.    Yes.

13   Q.    How was it that you contacted this witness?

14   A.    By telephone.

15   Q.    And did you advise the witness what it was or

16   what you needed of them?

17   A.    Yes.

18   Q.    What did you tell the witness?

19   A.    Just that the lineup was going to be conducted.

20   Q.    Did you make arrangements for the witness to

21   come to the precinct?

22   A.    Yes.

23   Q.    How did the witness get to the precinct?

24   A.    Myself and Detective Hernandez transported the

25   witness.

                        People - Direct - Det. Batanjany          23

1       Q.    To the precinct?

2       A.    Yes.

3       Q.    Once the witness was brought to the precinct,

4    can you tell me where was Ms. Wisdom?

5       A.    She was inside the squad interview room.

6       Q.    Was that door to that squad interview room

7    closed?

8       A.    Yes, it was.

9       Q.    Once you brought the witness into the precinct

10   where did you place this witness?

11      A.    He was in the BRAM interview room, which is a

12   separate office.

13      Q.    From where your squad is?

14      A.    Yes.

15      Q.    So, you didn't have to go anywhere near the room

16   where the defendant was being held?

17      A.    No, I didn't.

18      Q.    I would like you to take a look around the

19   courtroom and see if you see Atara Wisdom in the

20   courtroom?

21      A.    Yes.

22      Q.    Can you tell us something that she is wearing

23   and point to her?

24      A.    Gray sweat shirt (Indicating).

25            THE COURT:   Indicating Ms. Wisdom, the

People - Direct - Det. Batanjany                24

4
5

1    defendant.

2         Q.   Now, Detective Batanjany, did you make

3    arrangements for any police officers to assist you with

4    this lineup?

5         A.   Yes, I did.

6         Q.   Can you tell me, did you have to get any police

7    officers to assist you as far as fillers were concerned?

8         A.   Yes, I did.

9         Q.   What arrangements did you make?

10        A.   We had one female officer.  Prior to the lineup,

11   she was informed that we were going to have one, and she

12   would be used as a filler.

13        Q.   Did you give her any instructions with regard to

14   whether she could move around the precinct at all before

15   the lineups were actually conducted?

16        A.   Yes.  She knew to stay inside of her office.

17        Q.   Where is her office located?

18        A.   It's on the 2nd floor down the hall from the

19   squad.

20             MR. WALENSKY:  Objection to what the person

21        knows.  I think that is a stretch.  There may be

22        procedures, but as to what an individual knows of what

23        is proper and what somebody should do on a particular

24        instance, in a particular case, that, I think, the

25        Officer is not really qualified to testify about, this

People - Direct - Det. Batanjany                25

1    particular instance.

2              THE COURT:  I will only allow the testimony

3    for what she knew.

4         Did you know where this female officer was at the

5    time you arranged the lineup?

6              THE WITNESS:  Yes.

7              THE COURT:  Where was she?

8              THE WITNESS:  She was in her office.

9              THE COURT:  Go ahead.

10    Q.    Her office is on the 2nd floor.  Is it anywhere

11    near where the squad is where defendant was being held in

12    the interview room?

13    A.    It's on one end of the hallway, and the squad is

14    on the opposite end of the hallway.

15    Q.    Did you make arrangements for that police

16    officer to stay in their office and not wander the

17    precinct?

18    A.    Yes.

19    Q.    This is before you went to get the witness?

20    A.    Yes.

21    Q.    Once you took the witness into the precinct did

22    you have to go anywhere near where that officer was in

23    their office?

24    A.    No.

25    Q.    Once you got the witness into the precinct did

1     you then make arrangements to get other fillers for your

2     lineup?

3          A.    Yes.

4          Q.    Where did you go for those fillers?

5          A.    The fillers were picked up from a women's

6     shelter.

7          Q.    Did you actually go to get the fillers?

8          A.    No, I did not.

9          Q.    Do you know who it was that went to get them?

10         A.    Detective Jeffrey Hernandez.

11         Q.    He went and got them?

12         A.    Yes.

13         Q.    Did there come a time that Detective Jeffrey

14    Hernandez came back to the precinct with four other

15    fillers for your lineup?

16         A.    Yes.

17         Q.    What was done with the fillers once they were

18    brought back to the precinct?

19         A.    Originally, they were held in a hallway, just

20    for a brief moment, and then brought into the same room

21    that the subject was brought into.

22         Q.    The defendant, Ms. Wisdom?

23         A.    Yes.

24         Q.    Can you tell me, when did you get the officer

25    who was participating in the lineup?

People - Direct - Det. Batanjany                    27

1        A.    Once the fillers were brought in, the officer

2   was also brought in.

3        Q.    Now, can you tell me, at that time was the

4   witness in the same room that you had brought them into

5   when you first brought them to the precinct?

6        A.    Yes, he was still in the same room.

7        Q.    Were you or did you have any other officers with

8   the witness to make sure that the witness didn't wander

9   around the precinct?

10       A.    Yes, another detective.

11       Q.    What position did Ms. Wisdom end up in the

12  lineup?

13       A.    No. 2.

14       Q.    How did she come to be in Position No. 2?

15       A.    She chose that number.

16       Q.    For the other fillers, were there any

17  instructions as far as who was to be sitting next to her,

18  anything like that, or they were just randomly sat?

19       A.    As far as I know, they were randomly sat.

20       Q.    Do you know whether or not any photographs were

21  taken of the lineup?

22       A.    Yes.

23       Q.    Can you tell me, do you have them with you?

24       A.    Yes, I do.

25       Q.    Who actually took the photos?

People - Direct - Det. Batanjany                    28

1    A.   I believe, Detective Hernandez did.

2    Q.   Detective Hernandez?

3    A.   Yes.

4    Q.   Can you tell me if you have them with you?

5    A.   Yes, I do.

6              MS. CHU:  If I can have them deemed People's

7    No. 4 collectively.

8              THE COURT:  How many are there -- two?

9              MS. CHU:  No.

10             THE WITNESS:  No, there are two sets of the

11   same -- eight.

12             THE COURT:  We will deem them collectively

13   as People's 4 for identification.  They are being

14   shown to Mr. Walensky.

15             MR. WALENSKY:  Yes.

16        (Exhibits published to the defense attorney and

17   defendant.)

18             RIGHT1:  Any objection to the photos of the

19   lineup being deemed in evidence?

20             MR. WALENSKY:  No.

21             THE COURT:  Then I will deem them in

22   evidence, and I will look at them right now.

23        (Exhibit published to the Court.)

24        (Exhibits published to the witness.)

25             THE COURT:  I have looked at the exhibits.

People - Direct - Det. Batanjany                    29

1     Q.     Detective, after the lineup was composed, can

2   you tell me, did you then go get Witness No. 1?

3     A.     Excuse me.

4     Q.     After the lineup had been set up --

5     A.     Yes, I did.

6     Q.     Can you tell me, what did you tell the witness

7   when you went to get them?

8     A.     I had to read the witness the Lineup Instruction

9   Form, and once that was completed, the witness was taken

10  out of the room and brought over to the viewing area.

11    Q.     Can you tell me, what was it that you read to

12  the witness, or what did you tell the witness, what was

13  going to happen?

14    A.     I explained to the witness that the witness

15  would be looking through a two-way viewing glass; that

16  there would be six people inside the room; that each

17  person would be holding a number; that to not assume that

18  I knew who the subject was, and not to look to me or

19  anyone else in the room for guidance.

20    I also explained to the witness that I would ask the

21  witness two questions.  One being, 'Do you recognize

22  anyone?' and then if the witness said a number, then I

23  would state, 'Where do you recognize that person from?'

24  then the lineup would be concluded after that.

25    Q.     Did you then bring Witness No. 1 to view the

1      lineup?

2          A.    Yes, I did.

3          Q.    Did Witness No. 1 view the lineup?

4          A.    Yes.

5          Q.    Did Witness No. 1 recognize anyone in the

6      lineup?

7          A.    Yes.

8          Q.    What position did they recognize?

9          A.    No. 2.

10         Q.    Who was in Position No. 2?

11         A.    The defendant, Atara Wisdom.

12         Q.    And did the witness indicate where they

13     recognized the defendant from?

14         A.    Yes.

15         Q.    What did they say?

16         A.    That's Rene (Phon.).

17         Q.    Once the lineup was conducted, what did you do

18     with the witness?

19         A.    The witness was brought back into the program

20     interview room where the witness signed the lineup

21     paperwork.

22         Q.    And after the lineup paperwork was signed and

23     completed, did you then make arrangements for the witness

24     to leave the precinct?

25         A.    Yes.

People - Cross - Det. Batanjany                    31

6    1              MS. CHU:  Thank you very much.  I have no

     2        further questions.

     3              THE COURT:  Cross-examination, Mr. Walensky?

     4              MR. WALENSKY:  Yes.

     5    CROSS-EXAMINATION

     6    BY MR. WALENSKY:

     7        Q.    Detective, the witness was not a witness to the

     8    incident; isn't that correct?

     9        A.    Correct.

    10        Q.    So, the witness was brought in, essentially, to

    11    identify, to see if the witness knew which of the people

    12    was Ms. Wisdom?

    13        A.    Correct.

    14        Q.    To identify just her identity?

    15        A.    Yes.

    16        Q.    Because you had reason to belief that she knew

    17    the deceased?

    18        A.    I am sorry.

    19        Q.    That reasonably, she knew the decedent?

    20        A.    Yes.

    21        Q.    And this witness had seen the decedent and Ms.

    22    Wisdom together at an earlier time?

    23              MS. CHU:  Objection.

    24              THE COURT:  Overruled.  You may answer.

    25        A.    I was not originally a part of the investigation

1    so I would -- so you would have to ask Detective Hernandez

2    that.  I cannot answer for him.

3         Q.   Was this a blind lineup -- did you know what the

4    subject matter of this case was when you held the lineup?

5         A.   Yes, I did.

6         Q.   So, you know what a sequential lineup is?

7         A.   Yes.

8         Q.   This is not a sequential lineup?

9         A.   No.

10        Q.   And it wasn't a blind lineup?

11        A.   It was not a blind lineup.

12        Q.   You knew who the suspect was?

13        A.   Yes, I did.

14             MR. WALENSKY:  Thank you.  No further

15   questions.

16             THE COURT:  Any redirect?

17             MS. CHU:  No.

18             THE COURT:  Thank you, Detective Batanjany.

19   You are excused.  You may step down.

20             THE WITNESS:  Thank you.

21             (Witness exits the courtroom.)

22             THE COURT:  Do you want to play the video

23   now?

24             MS. CHU:  Yes.

25             (Whereupon, the video is played in open Court.)

Colloquy                                    33

1          THE COURT:  The tape has been played.

2    Anything further from the People?

3          MS. CHU:  No.

4          THE COURT:  The People rest?

5          MS. CHU:  Yes.

6          THE COURT:  Mr. Walensky, do you wish to put

7    on any case at the hearing?

8          MR. WALENSKY:  No, your Honor.

9          THE COURT:  Are you ready to be heard on the

10   motion?

11         MR. WALENSKY:  Your Honor, I will rely on

12   the record.

13         THE COURT:  Ms. Chu, do you wish to be

14   heard?

15         MS. CHU:  No, I would also rely on the

16   record.

17         THE COURT:  I wish I could rely on the

18   record, but I have to make the record.

19      There were two issues at the hearing:  One, is

20   whether or not the identification was unduly

21   suggestive in this case.  I have looked at the lineup

22   photos, I have listened to the testimony as to how the

23   lineup was conducted.  There really is no serious

24   issue that there is any suggestiveness regarding the

25   lineup.

1          Although it was not a sequential or double-blind

2      lineup, the detective that conducted the lineup was

3      not the original case detective, didn't even know

4      firsthand who this witness was that was coming in, and

5      it was merely, apparently, to confirm that the witness

6      knew the defendant.

7          The fillers in the lineup were very close in

8      resemblance to the defendant.  There was nothing

9      distinctive about anybody that would jump out, that

10     would make it a suggestive lineup, and the detective

11     took scrupulous measures to preserve the lineup.

12         So, there is no reason for me to suppress the

13     identification testimony in this case.

14         As far as the statements are concerned, we have

15     documented Miranda warnings in a form, and in a form

16     signed by the defendant, where a written statement was

17     read to her when she signed it; and a video statement

18     where Miranda warnings were given again.

19         I would note, the contents of the statements were

20     pretty much exculpatory, the account that she gave;

21     and there didn't seem to be any coercion by the police

22     to get her to change the story, to make it sound like

23     she did something wrong.

24         So, I believe that the defendant knowingly and

25     voluntarily waived her rights to speak to the police,

Colloquy                                            35

1          and the statements were voluntarily made; and I am

2          denying the motion to suppress them as well.

3                    THE COURT:  December 13, Part 7.

4               The defendant is continue on remand.

5               I am authorizing the minutes pursuant to 18-B.

6                    MR. WALENSKY:  Thank you very much.

7

8          (Whereupon, the case is adjourned to 12-13-13.)

9

10

11    C E R T I F I E D     to be a true and accurate transcript.

12

13

14

15                                   Michael Capuano

16

17

18

19

20

21

22

23

24

25

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS:  CRIMINAL TERM:   PART 2
 2  --------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
 3                                        Indictment No.:
                    -against-            6615/2012
 4                                        (Trial)
    ATARA WISDOM,
 5
                        Defendant.
 6  --------------------------------------------X

 7
                            Supreme Courthouse
 8                          320 Jay Street
                            Brooklyn, New York 11201
 9                          June 26, 2014

10
    B E F O R E:
11
                    THE HONORABLE ALBERT TOMEI, JUSTICE
12

13  A P P E A R A N C E S:

14          HON. KENNETH P. THOMPSON, ESQ.
                District Attorney - Kings County
15              350 Jay Street
                Brooklyn, New York  11201
16          BY: PHYLLIS CHU, ESQ.
                Assistant District Attorney
17

18          DAVID WALENSKY, ESQ.
                Attorney for Defendant
19              910 Stuart Avenue
                Mamaroneck, New York
20          BY: DAVID WALENSKY, ESQ.
                    - and -
21              JOSHUA POVILL, ESQ.

22

23

24                      MARLIN CASSIDY
25                      Senior Court Reporter
```

mc

Voir Dire

1            (Whereupon, the following took place in open

2       court:)

3            THE CLERK:  Your Honor, this is calendar

4       number one, case on trial, Indictment 6615 of 2012,

5       People versus Atara Wisdom.  Defendant is incarcerated,

6       produced before the Court, present with attorney.

7            Appearances are the same.

8            THE COURT:  All right, bring in the jury.

9            MR. POVILL:  Your Honor, is it okay if I

10      approach the water?

11           THE COURT:  Yes,

12           (Whereupon, there was a brief pause in the

13      proceedings.)

14           COURT OFFICER:  Panel entering.

15           (Whereupon, the panel of prospective jurors

16      entered the courtroom.)

17           THE COURT:  All the way down.  Move all the

18      way down, sir, all the way down.

19           THE CLERK:  All rise, please, and raise your

20      right hand.

21           Do you and each of you sincerely and solemnly

22      swear or affirm that you will answer truthfully all

23      questions asked of you relating to your qualifications

24      to serve as jurors in this action?

25           What is your response?

3

Voir Dire

1          (Whereupon, the prospective jurors responded.)

2          THE CLERK:  Please be seated.

3          THE COURT:  Good morning, ladies and

4  gentlemen.  I want to welcome you to Part 2 of the State

5  Supreme Court, the Criminal Term.  I am Supreme Court

6  Justice Albert Tomei and I will be presiding over the

7  case of the People of the State of New York against Ms.

8  Atara Wisdom.

9          Ms. Wisdom has been charged in an indictment

10  with the crime of murder in the second degree, which

11  allegedly occurred on or between November 29th, 2011 and

12  January 3rd, 2012 inside of 832 Bushwick Avenue in the

13  Bushwick section of Brooklyn.

14          I would say now that that charge is merely an

15  allegation, an accusation.  It is evidence of nothing.

16  A little later on I will explain to you exactly what an

17  indictment is.

18          But before we proceed, what I would like to do

19  is introduce you to the principal parties involved in

20  this matter.

21          First of all, I'd like to introduce you to the

22  defendant, Ms. Atara Wisdom.  Would you please stand,

23  turn around and introduce yourself.

24          THE DEFENDANT:  Hi everyone.

25          THE COURT:  She's represented by her

mc

Voir Dire

1   attorneys, Mr. Joshua Povill and Mr. David Walensky.

2        MR. WALENSKY:  Good morning, ladies and

3   gentlemen.

4        THE COURT:  And representing the District

5   Attorney of Kings County is Ms. Phyllis Chu, Assistant

6   District Attorney.

7        MS. CHU:  Good morning, ladies and gentlemen.

8   Good morning.

9        THE COURT:  This process that we're going to

10  engage in is called the voir dire, it's the jury

11  selection process, and it has a French name, voir dire,

12  which means to see them say.  So, basically, what I'm

13  going to do, and the attorneys are going to do, is ask

14  you various questions regarding your background,

15  backgrounds, and your ability to be fair and impartial

16  in this matter.

17       A lot of these questions are very personal in

18  nature.  You should not be offended if we do ask these

19  questions because we're not asking them for a frivolous

20  reason.  It's very important that those who sit as

21  jurors be free of any biases or prejudices and make

22  their decision solely on the evidence or lack of

23  evidence.

24       So, if you do not wish to reveal your answer

25  to a particular question, or if you have something that

1    you feel should not be made public, just let the Court

2    know and you will be able to make your statement at the

3    bench in the presence of the attorneys and myself.

4           The first part of the selection process, with

5    respect to the first part of the selection process, I'm

6    going to make a general inquiry of you jurors, which

7    means that I'm going to ask you not to respond to my

8    questions or statements unless I ask you to do so.

9    Okay.

10           I will tell you now that, first of all, I'd

11    like to thank all of you for responding to jury service.

12    Serving on a jury is, I believe, one of the hallmarks of

13    citizenship and it's probably one of the most important

14    civic activities that one can participate in and it's

15    also a service which is highly prized in this country,

16    and outside of military service it's probably the

17    highest service that one can contribute to one's

18    country.

19           I don't suffer excuses very easily or very

20    gladly.  If you have a legitimate reason why you cannot

21    sit, then you will return to the Central Jury Room and

22    become part of another panel.

23           I also will tell you that this process is very

24    repetitious, it's extremely boring, but nevertheless

25    it's probably one of the most important aspects of the

1    whole trial procedure, so you have to listen very

2    carefully to all of these questions that are being asked

3    of the various jurors.

4              Also, we have a limited amount of time in

5    which to speak to you ladies and gentlemen, so if there

6    is something -- and of course you know yourselves better

7    than we do -- so if there is something that would

8    prevent you from sitting in this matter and we haven't

9    touched on it, please let us know because once you are

10   selected, it will be very difficult for the Court to

11   proceed under those circumstances and I will not be a

12   very happy camper.  Okay?

13             Also, be aware that I know -- I've been

14   doing this for close to thirty-six years, I've been a

15   Judge, so I know every excuse known to man or woman,

16   okay, except the one that you may give me today.  So,

17   please, if you think you're going to scoot out of here

18   because it's inconvenient, that's not going to happen,

19   okay.

20             I don't expect you to do so but I am just

21   telling you, if it's legitimate, you will be excused; if

22   not, you are going to remain.

23             I know you're all here at a great sacrifice

24   because you only get what is it, $40 a day now,

25   something like that.  At one time people used to get

Voir Dire

1    only $12 a day.  But nevertheless, that's still not a

2    substantial amount of money for your service.

3              So what I am going to do is --

4              Oh, what I am going to do right now --

5              By the way, how many of you have actually

6    served on a jury before, criminal jury?

7              About -- a few of you, okay.  So most of

8    you --

9              Do any of you ladies and gentlemen know any of

10   the parties -- I asked them to introduce themselves to

11   you -- or anyone else in the courtroom?

12             I see no hands, all right.

13             So this general inquiry will be limited to

14   questions that I will put to you.  If I ask for a

15   response, give me one but otherwise don't.

16             All right.

17             Once I have concluded my general inquiry, then

18   if you wish to make a statement, you may raise your

19   hand.

20             First of all, I'd like to know if any of you

21   ladies and gentlemen have any physical disabilities or

22   maladies that would prevent you from sitting for a

23   period of up to an hour, an hour and fifteen minutes.

24   If after ten minutes you need a break, it's reasonable,

25   we'll take a break.

mc

## Voir Dire

8

1    I would also like to know if any of you ladies

2    and gentlemen are taking any medication or drugs that

3    would prevent you from listening or cause you to be

4    upset and distract you from the proceedings themselves.

5    And I will be perfectly honest, ladies and

6    gentlemen, unless you're in horrible physical condition,

7    I'm not going to excuse you.  All right?

8    I would also like to know if any of you ladies

9    and gentlemen have any difficulty hearing or seeing or

10   communicating in the English language or understanding

11   the English language.  In order to be a juror you need

12   not have any particular education.  Basically what you

13   need is just your common sense and your lifetime of

14   experience.  So, if you're eighteen years or older and

15   you have common sense, you have no other issues, you

16   would probably be able to sit on this jury.

17   Are there any --

18   Are there any individuals here in this group

19   right now of potential jurors who do not understand the

20   English language or have or has difficulty communicating

21   or understanding the English language?

22   Just raise your hand if you do.

23   Ma'am, stand, give your name.

24   PROSPECTIVE JUROR:  My name is Irina Slobod.

25   THE CLERK:  Last name?

Voir Dire

1          PROSPECTIVE JUROR:  Slobod.

2          THE CLERK:  Spell it.

3          PROSPECTIVE JUROR:  S-L-O-B-O-D.

4          THE COURT:  Slobod?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  You have a problem understanding

7    the language?

8          PROSPECTIVE JUROR:  Maybe some terminologies.

9          THE COURT:  How long have you been in the

10   country?

11         PROSPECTIVE JUROR:  It's a long time.

12         THE COURT:  Where are you from?

13         PROSPECTIVE JUROR:  From Ukraine.

14         THE COURT:  You will be able to sit,

15   understand?

16         Are there any students in the audience who are

17   now attending school?

18         Yes, ma'am?

19         Stand, give me your name.

20         PROSPECTIVE JUROR:  Isabell.

21         THE COURT:  I'm sorry?

22         PROSPECTIVE JUROR:  Isabell.

23         THE COURT:  That is your last name?

24         PROSPECTIVE JUROR:  My first name.  My first

25   name.

Voir Dire

```
1              THE COURT:  What is your last name, ma'am?

2              PROSPECTIVE JUROR:  Isbell.

3              THE COURT:  Isbell?

4              PROSPECTIVE JUROR:  I-S-B-E-L-L.

5              THE COURT:  Oh, Isbell, I'm sorry.

6              What school do you attend?

7              PROSPECTIVE JUROR:  Queens Transition Center.

8              THE COURT:  When do you go to school?

9              PROSPECTIVE JUROR:  Every day.

10             THE COURT:  Every day?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  What kind of school is it?

13             PROSPECTIVE JUROR:  It's a high school.

14             THE COURT:  You are going to high school now?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Okay.  All right.

17             So it's summer school that you are going to,

18        is that what it is?

19             Why are you going in the summer to school?

20             PROSPECTIVE JUROR:  Because I need it.

21             THE COURT:  Huh?

22             PROSPECTIVE JUROR:  Because I need it.

23             THE COURT:  Okay.

24             So you will be excused.  You go downstairs to

25        the second floor.
```

Voir Dire

1           THE CLERK:  Back to the second floor, Central

2    Jury.

3           Who else raised their hand?

4           Yes, ma'am?

5           Your name?

6           PROSPECTIVE JUROR:  Samantha Walker.

7           THE COURT:  Yes, Ms. Walker?

8           PROSPECTIVE JUROR:  I am no in the summer

9    classes, but I do, like, go to school.

10          THE COURT:  Are you in school right now?

11          PROSPECTIVE JUROR:  Not in summer.

12          THE COURT:  Sit down.

13          Somebody on my left raised their hand.

14          Now, I would also like to know if any of you

15   ladies and gentlemen have any religious, moral or

16   ethical reasons why you cannot sit in judgment of Ms.

17   Wisdom.

18          I would also like to know if any of you were

19   called to jury service between the dates of June --

20   today is the 26th -- June 26th, 2012 and June 26th of

21   this year.

22          If you were called to serve either in the

23   state or federal court systems, be it the Federal

24   District Court or the state Supreme Court or you were

25   called to sit in the state or city courts or you were

Voir Dire

12

1   called to serve either in the federal -- on a federal

2   Grand Jury or a state Grand Jury, let me know.

3           You didn't have to -- actually, with respect

4   to jury service, a petit jury is a jury of twelve and a

5   number of alternates.

6           It doesn't mean that you had to actually

7   deliberate on a case, just that you were called to

8   serve.

9           All right.

10           I would like to also inform you, ladies and

11   gentlemen, that this trial should be completed in a

12   rather short period of time.  It's not a very

13   extensive matter.  We won't be meeting tomorrow, we

14   will meet on Monday, Tuesday and Wednesday, you will be

15   off for Thursday and Friday, and then we will return on

16   the...

17           MR. WALENSKY:  The 8th.

18           THE COURT:  The 8th, Tuesday the 8th, if it

19   goes that far.

20           Also, I will tell you that once this case goes

21   to the jury and the jury -- if the jury is unable to

22   reach a verdict, then the jury will be excused, you will

23   be allowed to go home and then return the next day.  In

24   the past what we used to do, if jurors could not reach a

25   verdict on a particular date, on that particular date,

mc

1    we would sequester them in a hotel.  We don't do that

2    any longer.

3            All right.

4            So, I'm going to --

5            Oh, I don't think I told you this, but maybe I

6    did, I'll indicate it again, as to where this allegedly

7    occurred.  The allegation here is that the defendant

8    stabbed to death the victim in this matter and it

9    occurred allegedly inside of 832 Bushwick Avenue in the

10   Bushwick section of Brooklyn.

11           All right.

12           So now if you have a question of the Court

13   regarding what I've said or something that is not known

14   to the Court or the attorneys, let me know, regarding

15   service.

16           I am going to start from my right.

17           Yes, ma'am?

18           PROSPECTIVE JUROR:  Sir, your Honor.

19           THE COURT:  Stand up, give your name.

20           PROSPECTIVE JUROR:  Tara.

21           THE CLERK:  Last name?

22           PROSPECTIVE JUROR:  Young.

23           My husband is scheduled for surgery on

24   Tuesday, July 1st, and we don't have anyone else to look

25   after our children so it would be a hardship for me to

Voir Dire

1       serve on that particular day.

2               THE COURT:  What kind of surgery?

3               PROSPECTIVE JUROR:  Foot surgery, your Honor.

4               THE COURT:  All right.

5               July 1st is what?

6               PROSPECTIVE JUROR:  It's Monday -- it's a

7       Tuesday.

8               THE COURT:  Oh, Tuesday.

9               All right, you are excused.  Go down to the

10      second floor.

11              Thank you.

12              THE CLERK:  Tara is your first name?

13              PROSPECTIVE JUROR:  Yes, sir.

14              THE COURT:  Yes, ma'am?

15              PROSPECTIVE JUROR:  My name Anita McCray

16      (phonetic).

17              THE COURT:  Yes?

18              PROSPECTIVE JUROR:  I'm a radical.

19              THE COURT:  Okay.

20              PROSPECTIVE JUROR:  I don't have a lot of

21      respect for the court or the officers.

22              THE COURT:  Okay.  Sit down.

23              Yes, ma'am?

24              Stand up.

25              PROSPECTIVE JUROR:  My name is Patricia Vega

mc

15
Voir Dire

```
 1        (phonetic).

 2                I think I heard you say I can come to the

 3        bench so I need --

 4                THE COURT:  You can.

 5                PROSPECTIVE JUROR:  May I come up?

 6                THE COURT:  Yes, come up with the attorneys,

 7        please.

 8                (Whereupon, the following took place at

 9        sidebar:)

10                PROSPECTIVE JUROR:  Yes.  My son, my

11        three-year-old son, was stabbed June 11th of 2000 -- of

12        1982.  To sit here just --

13                THE COURT:  He was stabbed?

14                PROSPECTIVE JUROR:  Yes.

15                THE COURT:  No talking, please.

16                PROSPECTIVE JUROR:  He was three.  In the

17        Bronx.

18                THE COURT:  Was the person who did it

19        apprehended?

20                PROSPECTIVE JUROR:  Yes, last I heard.

21                THE COURT:  So it would be too upsetting for

22        you to sit?

23                PROSPECTIVE JUROR:  Yes.

24                THE COURT:  You are excused.

25                (Whereupon, the following took place in open
```

Voir Dire

1    court:)

2              THE COURT:  Yes?

3              THE CLERK:  Your first name is Patricia?

4              PROSPECTIVE JUROR:  Yes.

5              THE CLERK:  Thank you.

6              PROSPECTIVE JUROR:  My name is Harris Edelman.

7         In contrast to my seat neighbor, I have

8    tremendous respect for the court system.  I am a small

9    business owner.  I am not too big to fail.  I am just

10   the right size to fail.  We survived the recession, or

11   just literally come out of the hole.

12             THE COURT:  What kind of business?

13             PROSPECTIVE JUROR:  Refurbish computers.  It's

14   a small business, you know, fifteen people that work

15   there full-time and we are in Sunset Park, Brooklyn.

16   You can come check us out.  But as a business owner we

17   don't have a staff of other responsible parties, for

18   lack of a better word.  I am not saying that I am

19   incapable, in fact I would love to be in the position to

20   be able to perform this civic duty.

21             I also employ fifteen people in Sunset Park,

22   Brooklyn.  I can't really keep both things going at the

23   same time.

24             THE COURT:  You can.

25             Sit down.

Voir Dire

1          PROSPECTIVE JUROR:  Okay.

2          THE COURT:  Thank you.

3          Yes?

4          Stand up.

5          PROSPECTIVE JUROR:  My name is Jawad

6      (phonetic) Ahmed.

7          I have two concerns.  First one, our holy day

8      of fasting begins on Sunday.  And the second concern

9      was, in my workplace I don't have any backups for my

10     work.

11         THE COURT:  What do you do?

12         PROSPECTIVE JUROR:  I'm a dietician.

13         THE COURT:  Sit down.  Sit down.

14         Yes?

15         Stand.

16         PROSPECTIVE JUROR:  My name is Edward Smith.

17         You said if we have a private matter come to

18     the bench.

19         THE COURT:  You want to come to the bench?

20         Come on up.

21         (Whereupon, the following took place at

22     sidebar:)

23         THE CLERK:  What is your name?

24         PROSPECTIVE JUROR:  Edward Smith.

25         THE CLERK:  Thank you.

Voir Dire

1           THE COURT:  Quiet, please.

2           Ma'am, no talking, please.

3           Say it again.

4           PROSPECTIVE JUROR:  I have a parent convicted

5   for murder years ago.  It's coming back.

6           THE COURT:  You are excused.

7           THE CLERK:  Second floor, Central Jury.

8           (Whereupon, the following took place in open

9   court:)

10          THE COURT:  Yes, ma'am?

11          Stand and give your name.

12          No, stand and give your name.

13          PROSPECTIVE JUROR:  My last name is Didino,

14  D-I-D-I-N-O.

15          THE COURT:  What is your problem?

16          PROSPECTIVE JUROR:  I am also a small business

17  owner and I'm in the process of opening a second

18  business that's scheduled to launch in two weeks.

19          THE COURT:  Sit down, ma'am.  Sit down.

20          Okay.

21          Yes?

22          PROSPECTIVE JUROR:  My name is Justin

23  Branstein (phonetic).  I need to provide child care to

24  my kids tomorrow and Monday.  My wife is out of town on

25  business.  The kids are in school for the summer.

Voir Dire

1              THE COURT:  So provide child care.

2              Sit down.

3              PROSPECTIVE JUROR:  I don't have another

4       option.

5              THE COURT:  Sit down, please.

6              Next?

7              Next?  Anybody?

8              Yes?

9              Stand up.

10             PROSPECTIVE JUROR:  Colleen Saul (phonetic).

11             THE CLERK:  Last name?

12             PROSPECTIVE JUROR:  Saul.

13             I had made previous travel plans and I won't

14      be in the state.  I'm leaving Sunday night and not back

15      until Wednesday.

16             THE COURT:  You are going out of town?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  And you have tickets?

19             PROSPECTIVE JUROR:  Yeah.

20             THE COURT:  Where are you going?

21             PROSPECTIVE JUROR:  Pittsburgh.

22             THE COURT:  Do you have the tickets with you

23      or...

24             PROSPECTIVE JUROR:  I mean, it's on my phone.

25             THE COURT:  All right, then you are excused.

1               THE COURT:  Yes, ma'am?

2               PROSPECTIVE JUROR:  Yeah.  My fasting starts

3     on Saturday.

4               THE COURT:  Your what?

5               PROSPECTIVE JUROR:  It's fasting, very, very

6     early in the morning and late night also and --

7               THE COURT:  We don't meet on Saturday.

8               PROSPECTIVE JUROR:  Pardon?

9               THE COURT:  We don't meet on Saturday.  We

10    only meet --

11              PROSPECTIVE JUROR:  It's for the whole month,

12    it's not just --

13              THE COURT:  I can't excuse you, ma'am.  Sit

14    down.

15              PROSPECTIVE JUROR:  Pardon me?

16              THE COURT:  I am not going to excuse you.  Sit

17    down.  You are going to be fasting, you are going to be

18    fasting here, you are going to be fasting at home.

19              PROSPECTIVE JUROR:  Yeah, but we get up early

20    in the morning.

21              THE COURT:  Anyone else?

22              All right.

23              Before we proceed with the voir dire I have to

24    to inform you of certain legal principles which, if

25    you're selected as a juror you must comply with, so

Voir Dire

1    listen very carefully to what these are.  And as I
2    indicated earlier, an indictment -- well, the defendant
3    has been indicted and charged with the crime of murder
4    in the second degree, but I did indicate and I will
5    indicate again that it's -- that charge is merely an
6    accusation and merely an allegation, it is not proof
7    of anything or probative of anything, it's not
8    evidence.

9          An indictment is simply a piece of paper that
10   charges someone with a crime.  It is a consequence, that
11   person is brought into court and then the People have
12   the burden of proving each and every element, material
13   element of the crime charged, in this case it's murder
14   in the second degree, and that burden never shifts to
15   the defendant.  The burden always remains with the
16   People.

17         If you are selected as a juror in this
18   matter you will become a judge for a number of days
19   but you will be a judge of a specific area of the law,
20   that is, the facts.  You will determine what the facts
21   are in this case based upon the evidence or lack of
22   evidence.

23         I will be the judge of the law.  I will tell
24   you what the law is and that will be my province, and I
25   will not interfere in any way with your duty or

1    obligation to find the facts.  I will tell you at the

2    close of this case what the law is and you will take the

3    facts, you will take the facts and the law together, you

4    know, the facts based upon the evidence, and the law and

5    then make a determination, which is called a verdict.

6    Your verdict will be guilty or not guilty, or you may

7    find the defendant guilty of some of the charges, if

8    there is another charge.

9                  Now, I have another role at the trial other

10   than telling you what the law is, and that is, I'm

11   going to be listening to the attorneys when they make

12   motions, whether they are making objections and whether

13   they make applications, and I will be ruling on them as

14   a matter of law.  None of my rulings should have any

15   bearing upon the defendant's guilt or non-guilt in

16   this case.  And none of my rulings should be taken by

17   you as any indication as to whether you should believe

18   all or a part of what is offered as evidence or that

19   defendant is guilty or not guilty.  That is solely your

20   function to determine.  But you must accept the law as I

21   give it.

22                 The defendant and the people want a fair trial

23   to which they are entitled.  You must follow the law as

24   I give it to you whether you agree with it or whether

25   you like it or not.

1        You all agree to accept the law as I give it

2    and not substitute your interpretation of the law? Can

3    you all do that?

4        I gotta hear from all of you in a loud and

5    clear voice.

6        (Whereupon, the prospective jurors responded.)

7        THE COURT: Now, most of the evidence in any

8    particular case comes in the form of sworn testimony. I

9    would say about maybe two to three percent of the

10   evidence may come in as scientific or forensic evidence,

11   but basically most cases that come through these halls

12   of justice are decided upon evidence that comes from

13   the mouths of witnesses, and you as a juror are going

14   to make a determination whether that particular witness

15   is: One, telling you the truth; two, not telling you

16   the truth, that is, lying; or three, is mistaken, okay.

17   And that's going to be your obligation and duty to do

18   that. And, of course, you're going to have to evaluate

19   any other evidence that comes before you.

20       I'm going to give you a list of names. Some

21   of these individuals may or may not be witnesses in the

22   case.

23       Anthony Wilson, he is the victim in this case,

24   the individual that was stabbed to death.

25       Victoria Wilson.

1              And what is EBT?

2              MS. CHU:  I believe it's the benefits.

3              THE COURT:  Benefits person.

4              Anyone know or familiar with any of the names

5       I mentioned?

6              Just let me know by raising your hand.

7              I don't see any hands being raised so I would

8       assume none of you know any of these individuals.

9              All right.

10             As jurors your verdict must be unanimous.

11      Twelve jurors seldom agree immediately and, therefore,

12      you are going to be called upon to deliberate.  Can you

13      promise the defendant and the People that you're willing

14      to participate in deliberations, express your views

15      based on the evidence in the case, keep an open mind and

16      listen to the views of other jurors?

17             Can you all do that, folks?

18             (Whereupon, the prospective jurors responded.)

19             THE COURT:  Thank you.

20             Now, as Ms. Wisdom sits here she's presumed

21      innocent like anyone else who's been charged with a

22      crime and she remains innocent up until the time a

23      verdict of guilty is rendered, if in fact such a verdict

24      is rendered.  Therefore, the People must rebut this

25      presumption, if they can, by presenting evidence which

1    convinces you beyond a reasonable doubt of the

2    defendant's guilt.

3         In a criminal case the burden of proof is on

4    the People and always remains on the People throughout

5    the course of the trial.  The defendant is not required

6    to produce any witnesses.  The defendant is not required

7    to produce any evidence.  And very importantly, the

8    defendant is not required to testify in this matter, and

9    if she should not testify, it may not be held against

10   her.

11        As I said, the burden is always on the People,

12   they have to prove her guilt beyond a reasonable doubt.

13        Can you all accord this defendant this

14   presumption of innocence?

15        Can you do that, folks?

16        (Whereupon, the prospective jurors responded.)

17        THE COURT:  Now, a criminal case is different

18   from a civil case in two important respects.  In a

19   criminal case all jurors must agree upon a verdict.  In

20   a civil case only five of the six must agree.  In a

21   criminal case the People must prove guilt their case

22   beyond a reasonable doubt.  In a civil case the

23   plaintiff must only prove his or her case by a fair

24   preponderance of the credible evidence.

25        Now, everybody, I'm sure, has heard the term

1   "reasonable doubt."  I am not going to go into detail or

2   exact detail regarding it, I will do that at the time I

3   charge the jury.  But nevertheless, you will be required

4   to acquit the defendant if, at the end of the case,

5   because of the evidence or lack of evidence presented to

6   you, you have a reasonable doubt as to her guilt.  If

7   you find guilt beyond a reasonable doubt, then you must

8   return a verdict of guilty.  On the other hand, if guilt

9   is not proven beyond a reasonable doubt, you must find

10   the defendant not guilty.

11       Now, you may be saying, well, I never

12   performed this duty before.  And as I indicated, there

13   is no school for jurors.  The only school for jurors is

14   the school of life, basically.

15       What do I do when I get into the jury room?

16       Well, number one, you are not permitted to

17   consider what the punishment may be with respect to or

18   what the sentence may be with respect to this matter.

19   You may not express any sympathy for the defendant or

20   any of the People's witnesses or the People's position

21   in this matter because they're all extraneous, all

22   right, they're all irrelevant.

23       What's important and what you must focus upon

24   is the evidence or lack of evidence, and if someone

25   should go off the beaten track and get into one of the

mc

Voir Dire

1           THE CLERK:  State your name.

2           PROSPECTIVE JUROR:  Anita McCray.

3           THE CLERK:  Thank you.

4           THE COURT:  What is your position?

5           PROSPECTIVE JUROR:  I hate the police.

6           THE COURT:  Okay.  All right.

7           PROSPECTIVE JUROR:  Period.

8           THE COURT:  Okay.  I am going to send you back

9     to the Central Jury Room.

10          Place Ms. McCray on a civil matter.

11          THE CLERK:  You got it.  I'll put "civil."

12          (Whereupon, the following took place in open

13    court:)

14          THE COURT:  Yes, sir?

15          PROSPECTIVE JUROR:  I will have to come up

16    too.

17          THE CLERK:  You can step out.

18          THE COURT:  You have to go around.

19          Yes, sir, come on up.

20          PROSPECTIVE JUROR:  Thanks.

21          (Whereupon, the following took place at

22    sidebar:)

23          THE CLERK:  State your name for the record.

24          PROSPECTIVE JUROR:  Dennis, last name McCoy.

25          THE COURT:  Yes, sir?

Voir Dire

1        PROSPECTIVE JUROR:  I'm an employee for the

2    Police Department and --

3        THE COURT:  What do you do?

4        PROSPECTIVE JUROR:  I am an employee for the

5    N.Y.P.D. and within the department they brought false

6    charges, departmental charges.

7        THE COURT:  What do you do?

8        PROSPECTIVE JUROR:  I am a maintenance

9    supervisor.

10       And our union failed to represent me.  They

11   won.  And I don't have the money to get me a lawyer or

12   I'd be suing the Police Department.  I don't have the

13   money.  Some of the lawyers I did go to didn't want to

14   challenge the Police Department.

15       THE COURT:  Okay.

16       So you can't be fair, then?

17       PROSPECTIVE JUROR:  No, I can't.

18       THE COURT:  I'm just going to put you on a

19   civil matter.

20       You can return to the second floor.

21       THE CLERK:  Second floor, Central Jury.

22       (Whereupon, the following took place in open

23   court:)

24       THE COURT:  Who else?  Who else?

25       Come on up.

Voir Dire

1              (Whereupon, the following took place at

2         sidebar:)

3              THE COURT:  Give your name.

4              PROSPECTIVE JUROR:  Ludmila (phonetic)

5         Malibayeva.

6              THE CLERK:  Spell your last name.

7              PROSPECTIVE JUROR:  M-A-L-I-B-A-Y-E-V-A.

8              THE COURT:  Yes, ma'am?

9              PROSPECTIVE JUROR:  Hello.

10             Many years ago my relative was killed, nobody

11        find who did it.  And, also, if something to do, my four

12        friends, they were stabbed with a knife but they

13        survived.  And again, it happened in my country.

14             THE COURT:  Where?

15             PROSPECTIVE JUROR:  Ukraine.

16             THE COURT:  That has nothing to do with the

17        police.  What is your problem, though?

18             PROSPECTIVE JUROR:  I am not sure it has

19        something to do.  Because somebody was killed, nobody

20        find the murderer.

21             THE COURT:  Where was he killed?

22             PROSPECTIVE JUROR:  Where?

23             THE COURT:  Yes.

24             PROSPECTIVE JUROR:  In my country.

25             THE COURT:  What happened in your country is

Voir Dire

1        one thing.  My question to you is, the fact that a

2        relative is killed, is that going to prevent you from

3        being fair and impartial?

4                    PROSPECTIVE JUROR:  I don't know.

5                    THE COURT:  All right, you are excused.  Go

6        downstairs.

7                    THE CLERK:  What is your first name?

8                    MS. CHU:  Ludmila Malibayeva.

9                    THE CLERK:  Second floor.

10                   THE COURT:  Civil.

11                   THE CLERK:  Civil case.

12                   (Whereupon, the following took place in open

13       court:)

14                   THE COURT:  All right, before we go any

15       further we are going to take a ten-minute recess.

16                   Ladies and gentlemen, I am going to ask you

17       not to discuss the case amongst yourselves or with

18       anyone else and, of course, step outside and just remain

19       there for a few minutes.  No more than ten minutes and

20       then we'll call you back in.

21                   COURT OFFICER:  Step outside.  Take all your

22       belongings with you.

23                   Do not leave the floor.

24                   (Whereupon, the panel of prospective jurors

25       exited the courtroom.)

34
Voir Dire

1           THE COURT:  All right, ten minutes.

2           (Whereupon, a brief recess was held.)

3           THE COURT:  Let's get the jury.

4           THE CLERK:  Case back on trial.  Case on trial

5    continues back and trial continues.  Defendant is

6    present with her attorneys.

7           (Whereupon, there was a brief pause in the

8    proceedings.)

9           COURT OFFICER:  Panel entering.

10          (Whereupon, the panel of prospective jurors

11   entered the courtroom.)

12          THE COURT:  Hats off.

13          COURT OFFICER:  Take your hat off, sir.

14          THE COURT:  Hats off.

15          Ladies and gentlemen, do me a favor, move all

16   the way down.  Don't sit at the end.  I mean, there is

17   no reason to do that.

18          Miss, move all the way down.

19          Squeeze in, ma'am.  Move down, all the way

20   down.

21          Hats off, please.

22          We can squeeze in.  Let's go.  Come on.

23          Your name is going to be called, ladies and

24   gentlemen.  Please respond "here" or "present".

25          Also, if we mispronounce your name, tell us

Voir Dire

1    what the correct pronunciation is.  You will enter from

2    my right, your left, into the well of the court then

3    take a seat.  There will be twenty potential jurors

4    seated within the jury box.

5            Proceed.

6            THE CLERK:  Seat number one will be Avelon

7    Ramnath.

8            You have to say "here" or "present" when

9    you're called.

10           PROSPECTIVE JUROR:  I'm sorry.

11           THE CLERK:  You have to state "here" or

12   "present" when you hear your name.

13           PROSPECTIVE JUROR:  Present.

14           THE COURT:  Last name is spelled

15   R-A-M-N-A-T-H.

16           Seat number one.

17           THE COURT:  R-A-M...

18           THE CLERK:  ...N-A-T-H.

19           MS. CHU:  What is the first name?

20           THE CLERK:  A-V-E-L-O-N.

21           Seat number two, Nicholas Derziotis.

22           How do you pronounce your last name?

23           PROSPECTIVE JUROR:  Derziotis.

24           PROSPECTIVE JUROR:  D-E-R-Z-I-O-T-I-S.

25           THE COURT:  T-E-R --

mc

Voir Dire

1          PROSPECTIVE JUROR:  Here.

2          THE CLERK:  J-E-N-K-I-N-S.

3          Seat eleven, Francisco Martinez.

4          PROSPECTIVE JUROR:  Here.

5          THE CLERK:  M-A-R-T-I-N-E-Z.

6          Seat twelve is Lucian Volcy.

7          PROSPECTIVE JUROR:  Yes.

8          THE CLERK:  V-O-L-C-Y.

9          Seat thirteen is Anastasia Vincent,

10    V-I-N-C-E-N-T.

11          Seat fourteen is Samantha Valenzuela.

12          PROSPECTIVE JUROR:  Here.

13          THE CLERK:  V-A-L-E-N-Z-U-E-L-A.

14          Seat fifteen is Maleek (phonetic) Sutton.

15          PROSPECTIVE JUROR:  Here.

16          THE CLERK:  S-U-T-T-O-N.

17          Seat sixteen is Hal Duncan.

18          PROSPECTIVE JUROR:  Here.

19          THE CLERK:  D-U-N-C-A-N.

20          Seat seventeen is Michael Smargiassi.

21          How do you pronounce it?

22          PROSPECTIVE JUROR:  Smargiassi.

23          THE CLERK:  Smargiassi, S-M-A-R-G-I-A-S-S-I.

24          Seat eighteen, Henderson (phonetic) Lynch.

25          You have to say "here" or "present."

Voir Dire

1           PROSPECTIVE JUROR:  Present.

2           THE CLERK:  L-Y-N-C-H.

3           PROSPECTIVE JUROR:  Present.

4           THE CLERK:  Seat nineteen is Samantha Walker.

5           PROSPECTIVE JUROR:  Present.

6           THE CLERK:  W-A-L-K-E-R.

7           Seat twenty is Israel Santiago.

8           PROSPECTIVE JUROR:  Present.

9           THE CLERK:  S-A-N-T-I-A-G-O.

10          THE COURT:  All right.

11          Ms. Ramnath, your neighborhood?

12          PROSPECTIVE JUROR:  Flatbush.

13          THE COURT:  Flatbush.

14          And Mr. Derziotis?

15          PROSPECTIVE JUROR:  Bensonhurst.

16          THE COURT:  Bensonhurst.

17          What's that noise?

18          THE CLERK:  It's the printer.

19          THE COURT:  Why is that going off?

20          Ms. Lackan, your neighborhood?

21          PROSPECTIVE JUROR:  Canarsie.

22          THE COURT:  Canarsie.

23          Ms. Williams.

24          PROSPECTIVE JUROR:  East Flatbush.

25          THE COURT:  East Flatbush.

mc

Voir Dire

| | |
|---|---|
| 1 | Ms. Joseph. |
| 2 | PROSPECTIVE JUROR:  Canarsie.  Canarsie. |
| 3 | THE COURT:  Canarsie. |
| 4 | Ms. Hunter? |
| 5 | PROSPECTIVE JUROR:  East New York. |
| 6 | THE COURT:  Ms. Valenzuela? |
| 7 | PROSPECTIVE JUROR:  Mill Basin. |
| 8 | THE COURT:  And Mr. Duncan? |
| 9 | PROSPECTIVE JUROR:  Flatbush. |
| 10 | THE COURT:  Mr. Lynch? |
| 11 | PROSPECTIVE JUROR:  East New York. |
| 12 | THE COURT:  And Mr. Santiago? |
| 13 | PROSPECTIVE JUROR:  East New York. |
| 14 | THE COURT:  Ms. Walker or Walkin? |
| 15 | PROSPECTIVE JUROR:  Walker. |
| 16 | THE COURT:  Walker. |
| 17 | Where do you reside, neighborhood? |
| 18 | PROSPECTIVE JUROR:  Marine Park. |
| 19 | THE COURT:  Marine Park. |
| 20 | Mr. Smargiassi? |
| 21 | PROSPECTIVE JUROR:  Bay Ridge. |
| 22 | THE COURT:  Mr. Sutton? |
| 23 | PROSPECTIVE JUROR:  Flatbush. |
| 24 | THE COURT:  Ms. Vincent? |
| 25 | PROSPECTIVE JUROR:  Bedford-Stuyvesant. |

Voir Dire

```
1              THE COURT:  Mr. Volcy?

2              PROSPECTIVE JUROR:  Bed-Stuy.

3              THE COURT:  Bed-Stuy.

4              Mr. Martinez?

5              PROSPECTIVE JUROR:  Bensonhurst.

6              THE COURT:  Mr. Jenkins?

7              PROSPECTIVE JUROR:  Flatbush.

8              THE COURT:  Ms. Didino?

9              PROSPECTIVE JUROR:  Bay Ridge.

10             THE COURT:  Ms. Webster?

11             PROSPECTIVE JUROR:  Crown Heights.

12             THE COURT:  And Mr. Dolan?

13             PROSPECTIVE JUROR:  Flatbush.

14             THE COURT:  All right.

15             First of all, any of you ladies and gentlemen

16   familiar with the crime scene area, which is 832

17   Bushwick Avenue?  Anybody familiar, first row?

18             Second row, anyone familiar with that area?

19             No, okay.

20             Ms. Ramnath, you married, single, separated

21   divorced?

22             PROSPECTIVE JUROR:  Married.

23             THE COURT:  And your occupation?

24             PROSPECTIVE JUROR:  Supervisor.

25             THE COURT:  Of what?
```

41

Voir Dire

1          PROSPECTIVE JUROR:  Of musicians union, Local

2     802, musician publishing department.

3          THE COURT:  Supervisor musicians union, okay.

4          And your spouse?

5          PROSPECTIVE JUROR:  He's not working right

6     now.

7          THE COURT:  Is he retired?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  What did he do before?

10         PROSPECTIVE JUROR:  He was a paper cutter.

11         THE COURT:  Okay.

12         Thank you.

13         PROSPECTIVE JUROR:  You're welcome.

14         THE COURT:  Mr. Derziotis?

15         PROSPECTIVE JUROR:  Married.

16         THE COURT:  Your occupation?

17         PROSPECTIVE JUROR:  Manager of a restaurant.

18         THE COURT:  And your spouse?

19         PROSPECTIVE JUROR:  She works.  She's a para

20    for a school.

21         THE COURT:  What kind of school?

22         PROSPECTIVE JUROR:  Public school.

23         THE COURT:  Grade school?

24         PROSPECTIVE JUROR:  Elementary school.

25         THE CCURT:  Elementary, okay.

42

Voir Dire

1              Ms. Lackan, married, single, separated,
2     divorced?
3              PROSPECTIVE JUROR:  Single.
4              THE COURT:  Occupation?
5              PROSPECTIVE JUROR:  Registered nurse.
6              THE COURT:  Okay.
7              And Ms. Williams?
8              PROSPECTIVE JUROR:  Single, timekeeper for the
9     N.Y.P.D.
10              THE COURT:  You're a timekeeper for the
11     N.Y.P.D.?
12              PROSPECTIVE JUROR:  Yes.
13              THE COURT:  Where do you work, at One Police
14     Plaza?
15              PROSPECTIVE JUROR:  No, Internal Affairs
16     Bureau.
17              THE COURT:  Where?
18              PROSPECTIVE JUROR:  Internal Affairs Bureau,
19     315 Hudson Street.
20              MS. CHU:  IAB.
21              THE COURT:  Oh, Internal Affairs bureau.
22              THE COURT:  Ms. Joseph?
23              PROSPECTIVE JUROR:  Single.
24              THE COURT:  Your occupation?
25              PROSPECTIVE JUROR:  Customer service for

mc

Voir Dire

1               PROSPECTIVE JUROR:  Yes, sir.

2               THE COURT:  Married, single, separated,

3       divorced?

4               PROSPECTIVE JUROR:  Married.

5               THE COURT:  Your occupation?

6               PROSPECTIVE JUROR:  Window mechanic.  Window

7       mechanic.

8               THE COURT:  What kind of mechanic?

9               PROSPECTIVE JUROR:  Windows.

10              THE COURT:  Windows?

11              PROSPECTIVE JUROR:  Yes.

12              THE COURT:  And your spouse?

13              PROSPECTIVE JUROR:  She works for the Supreme

14      Court in Manhattan.

15              THE COURT:  Doing what?

16              PROSPECTIVE JUROR:  Data entry.

17              THE COURT:  And Mr. Santiago?

18              PROSPECTIVE JUROR:  Married, retired.

19              THE COURT:  What did you do when you worked?

20              PROSPECTIVE JUROR:  Union rep for 32BJ.

21              THE COURT:  What is 32BJ?

22              PROSPECTIVE JUROR:  32BJ is the service

23      employees union.

24              THE COURT:  And your spouse?

25              PROSPECTIVE JUROR:  She's a seamstress for a

Voir Dire

1     large designer company in Manhattan.

2               THE COURT:  Okay.

3               Ms. Walker?

4               PROSPECTIVE JUROR:  I'm single.

5               I'm a full-time student and I work in a

6     cardiologist's office, file rep.

7               THE COURT:  And Mr. Smargiassi?

8               PROSPECTIVE JUROR:  I'm married ten years

9     today.

10              THE COURT:  Congratulations.

11              PROSPECTIVE JUROR:  Information technology

12    operations and security for a software firm in the

13    city.

14              THE COURT:  An IT person?

15              PROSPECTIVE JUROR:  Information technology,

16    yes.

17              THE COURT:  And your spouse?

18              PROSPECTIVE JUROR:  High school teacher, New

19    York City Department of Ed.

20              THE COURT:  What does she teach?

21              PROSPECTIVE JUROR:  She -- special ed and ELA,

22    English language arts.

23              THE COURT:  Okay.

24              Mr. Sutton?

25              PROSPECTIVE JUROR:  Single.

mc

Voir Dire

1           THE COURT:  And your occupation?

2           PROSPECTIVE JUROR:  Interning at the moment at

3     City & State Magazine.

4           THE COURT:  You're an intern at what?

5           PROSPECTIVE JUROR:  City & State Magazine.

6           THE COURT:  Who puts that out, the state?

7           PROSPECTIVE JUROR:  Yeah.  it's a small,

8     little company.

9           THE COURT:  And Ms. Vincent?

10          PROSPECTIVE JUROR:  Single.

11          THE COURT:  Your occupation?

12          PROSPECTIVE JUROR:  Assistant manager for

13    membership ticketing at a theatre.

14          THE COURT:  What kind of theatre?

15          PROSPECTIVE JUROR:  Off Broadway theatre.

16          THE COURT:  Off Broadway.

17          And Mr. Volcy?

18          PROSPECTIVE JUROR:  Married.

19          THE COURT:  Occupation?

20          PROSPECTIVE JUROR:  Cab driver.

21          THE COURT:  Truck driver, you said?

22          PROSPECTIVE JUROR:  Cab driver.

23          THE COURT:  Cab driver?

24          PROSPECTIVE JUROR:  Cab driver.

25          THE COURT:  Cab driver, I'm sorry.

Voir Dire

1              And your spouse, she work?

2              PROSPECTIVE JUROR:  She's -- we be separated

3      right now.

4              THE COURT:  Oh, you're separated?

5              PROSPECTIVE JUROR:  Yeah, separated.

6              THE COURT:  All right.

7              Mr. Martinez?

8              PROSPECTIVE JUROR:  Single, and server at a

9      restaurant.

10             THE COURT:  And Mr. Jenkins?

11             PROSPECTIVE JUROR:  I'm single and I do direct

12     care work.

13             THE COURT:  What was that?

14             PROSPECTIVE JUROR:  Like with adults with

15     disabilities.

16             THE COURT:  Ms. Didino.

17             PROSPECTIVE JUROR:  I'm single and I have a

18     kickboxing gym in Brooklyn and opening up a second

19     one.

20             THE COURT:  You own a kickboxing gym, okay.

21             And Ms. Webster?

22             PROSPECTIVE JUROR:  Separated.  I am a

23     controller for a hotel.

24             THE COURT:  Is that in Manhattan?

25             PROSPECTIVE JUROR:  Yes.

```
1            THE COURT:  And Mr. Dolan?
2            PROSPECTIVE JUROR:  Divorced.
3            Retired structural ironworker.
4            THE COURT:  All right.
5            First row, any of you ladies and gentlemen
6    ever serve on a jury before, at a criminal or civil
7    trial, first row?
8            Mr. Martinez -- I mean, I'm sorry, Santiago.
9            PROSPECTIVE JUROR:  Yes.
10           THE COURT:  What kind of jury were you on?
11           PROSPECTIVE JUROR:  It was a criminal.
12           THE COURT:  And what was the subject matter?
13   What was the crime?
14           PROSPECTIVE JUROR:  It was stabbing of an
15   employee in McDonald's.
16           THE COURT:  Without telling me what the
17   verdict was, was there a verdict?
18           PROSPECTIVE JUROR:  Yes, there was.
19           THE COURT:  How long ago was this?
20           PROSPECTIVE JUROR:  About ten years ago.
21           THE COURT:  Same question for those in the
22   rear, any of you ladies and gentlemen ever sit on a
23   jury, be it a civil or a criminal matter?
24           No, okay.
25           First row, any of you ladies and gentlemen
```

mc

Voir Dire

1            THE COURT:  All right.

2            Was that person ever apprehended, you know,

3      arrested?

4            PROSPECTIVE JUROR:  No.

5            THE COURT:  No, okay.

6            Anyone else, first row?

7            Second row, same question.

8            Ms. Webster?

9            PROSPECTIVE JUROR:  It was a long time ago, I

10     was robbed at knifepoint.

11           THE COURT:  You were robbed at knifepoint?

12           PROSPECTIVE JUROR:  Yeah.

13           THE COURT:  Was that person ever apprehended?

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  Anyone else?

16           Ms. Vincent?

17           PROSPECTIVE JUROR:  I was robbed.

18           THE COURT:  Was a weapon involved?

19           PROSPECTIVE JUROR:  Yes, a gun.

20           THE COURT:  Did you report it?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  One person?

23           PROSPECTIVE JUROR:  One, yes.

24           THE COURT:  Was the perpetrator ever

25     apprehended?

52
Voir Dire

```
1              PROSPECTIVE JUROR:  No.

2              THE COURT:  Do you have any feelings with

3         regard to the way the police handled it?

4              PROSPECTIVE JUROR:  No, they handled it very

5         well.

6              THE COURT:  Who else?

7              Mr. Sutton?

8              PROSPECTIVE JUROR:  My cousin was shot.

9              THE COURT:  Cousin was shot?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Was that person ever arrested?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Was that in Brooklyn?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Did you report that to the police?

16        Was that reported to the police?

17             PROSPECTIVE JUROR:  It was reported.

18             THE COURT:  Did he survive the shooting?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  Sorry.

21             Who else?  Anyone else?

22             All right.

23             First row, any of you ladies and gentlemen

24        ever accused of, arrested for, or convicted of a crime,

25        or someone close to you?
```

Voir Dire

1            First row.

2            PROSPECTIVE JUROR:  My brother.

3            THE COURT:  Ms. Ramnath?

4            PROSPECTIVE JUROR:  Yes, my brother and my

5       sister.

6            THE COURT:  What happened?

7            PROSPECTIVE JUROR:  One for drugs and the

8       other for stealing.  They were deported.

9            THE COURT:  So your brother was arrested for

10      what, drugs?

11           PROSPECTIVE JUROR:  Drugs.

12           THE COURT:  And your sister for stealing?

13           PROSPECTIVE JUROR:  Yes.  Also drugs.

14           THE COURT:  And she was deported also?

15           PROSPECTIVE JUROR:  Both deported.

16           THE COURT:  Both deported?

17           PROSPECTIVE JUROR:  Yes.

18           THE COURT:  Where are you from, again?

19           PROSPECTIVE JUROR:  Trinidad.

20           THE COURT:  Anyone else?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Yes?  That is Mr. Lynch?

23           PROSPECTIVE JUROR:  Lynch.

24           I had a DWI twelve years ago.

25           THE COURT:  Excuse me?

Voir Dire

1          PROSPECTIVE JUROR:  I had a DWI twelve years

2      ago.

3          THE COURT:  Okay.

4          Did they give you a program?

5          PROSPECTIVE JUROR:  Yeah.

6          THE COURT:  Do you hold that against the

7      police or the People because you were arrested for a

8      DWI?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Anyone else, first row?

11         Second row?

12         Mr. Volcy?

13         PROSPECTIVE JUROR:  Yeah, my house was robbed.

14         THE COURT:  What?

15         PROSPECTIVE JUROR:  I got robbed in my house.

16         THE COURT:  They robbed your house?

17         PROSPECTIVE JUROR:  Yeah.

18         THE COURT:  You mean your house was

19     burglarized?

20         PROSPECTIVE JUROR:  Yeah.

21         THE COURT:  Were you home at the time?

22         PROSPECTIVE JUROR:  Yeah -- no, I wasn't.

23         THE COURT:  All right.

24         Did you report it to the police?

25         PROSPECTIVE JUROR:  I did.

mc

55
                              Voir Dire

 1                THE COURT:  Okay.

 2                Anyone else?

 3                Mr. Martinez?

 4                PROSPECTIVE JUROR:  I was arrested, I think

 5       like three, four years ago for graffiti.

 6                THE COURT:  For what, graffiti?

 7                PROSPECTIVE JUROR:  Yeah.

 8                THE COURT:  They give you an ACD?

 9                PROSPECTIVE JUROR:  No, I was reprimanded and

10       I was let go.

11                THE COURT:  You were what?

12                PROSPECTIVE JUROR:  I was reprimanded and let

13       go.

14                THE COURT:  You paid a fine?

15                PROSPECTIVE JUROR:  Yes.

16                THE COURT:  Who else?

17                Mr. Sutton?

18                PROSPECTIVE JUROR:  My cousin was arrested.

19                THE COURT:  Cousin was arrested.

20                Your cousin was arrested for what?

21                PROSPECTIVE JUROR:  I believe it was gang

22       related.

23                MS. CHU:  I can't hear.

24                THE COURT:  He was arrested.

25                PROSPECTIVE JUROR:  I don't know the exact

                                                              mc

Voir Dire

1       details but I believe it was gang related.

2                    THE COURT:  Oh, gang related.

3                    Did he do any time?  Do you know?

4                    PROSPECTIVE JUROR:  He went to Rikers.

5                    THE COURT:  He went to Rikers.

6                    Did he go to trial or do you know what

7       happened to the case?

8                    PROSPECTIVE JUROR:  No, I'm not sure.

9                    THE COURT:  Are you close to your cousin?

10                   PROSPECTIVE JUROR:  He's the one that was

11      shot.

12                   THE COURT:  He's the same one that was shot

13      and died, okay.

14                   Anybody else?

15                   All right.

16                   Any of you ladies and gentlemen related to,

17      friendly with, associated with, interact with any law

18      enforcement agents or attorneys?

19                   First row?

20                   That's Mr. Derziotis?

21                   PROSPECTIVE JUROR:  My brother-in-law's an

22      attorney and --

23                   THE COURT:  What kind of law does he practice?

24                   PROSPECTIVE JUROR:  Personal injury.

25                   And I have a lot of friends that are in the

Voir Dire

1    police force.

2             THE COURT:  You have a lot of friends in t

3    police force?

4             PROSPECTIVE JUROR:  Correct.

5             My other brother-in-law is also.

6             THE COURT:  Your who?

7             PROSPECTIVE JUROR:  My brother-in-law is i

8    the police force also.

9             THE COURT:  Do you know where he is

10   stationed?

11            PROSPECTIVE JUROR:  62nd Precinct.

12            THE COURT:  Anyone else?

13            Ms. Joseph?

14            PROSPECTIVE JUROR:  Yes.

15            I have a cousin that's a lawyer for crimin

16   justice and also a cousin that's a judge for crimina

17   well.

18            THE COURT:  Your cousin is a defense lawye

19            PROSPECTIVE JUROR:  Yes.

20            THE COURT:  And where's he practice?

21            PROSPECTIVE JUROR:  It's a she.

22            THE COURT:  She, I'm sorry.

23            PROSPECTIVE JUROR:  North Carolina.

24            THE COURT:  And you have another cousin wh

25   a judge?

Voir Dire

1           PROSPECTIVE JUROR:  Yeah.  He's male.

2           THE COURT:  Where?

3           PROSPECTIVE JUROR:  North Carolina also.

4           THE COURT:  Who else raised their hand?

5           Ms. Valenzuela?

6           PROSPECTIVE JUROR:  My uncle's a detective

7           THE COURT:  Where?

8           PROSPECTIVE JUROR:  The 72nd Precinct, I

9    believe.

10          THE COURT:  72nd Precinct?  In Manhattan?

11          PROSPECTIVE JUROR:  Yeah.

12          THE COURT:  Who else raised their hand in

13   rear?

14          That's Ms. Walker?

15          PROSPECTIVE JUROR:  My uncle's a detective

16   sergeant in Suffolk County.

17          THE COURT:  And that's Mr. Smargiassi?

18          PROSPECTIVE JUROR:  My brother and

19   brother-in-law are attorneys, my father-in-law is a

20   retired attorney.

21          THE COURT:  Your brother and your

22   brother-in-law are attorneys?  What kind of law do t

23   practice?

24          PROSPECTIVE JUROR:  My brother is mostly

25   matrimonial and commercial and my brother-in-law I

Voir Dire

1    believe is labor, labor.

2              THE COURT:  Your father is retired?

3              PROSPECTIVE JUROR:  Father-in-law.  He did

4    lead cases.

5              THE COURT:  What kind of cases?

6              PROSPECTIVE JUROR:  Lead, lead poisoning.

7              THE COURT:  Personal injury.

8              He is retired, though?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Anyone else?

11             Mr. Martinez?

12             PROSPECTIVE JUROR:  My aunt is an immigrat

13   lawyer in Pennsylvania.

14             THE COURT:  Your mother?

15             PROSPECTIVE JUROR:  Aunt.

16             THE COURT:  Your aunt.

17             Who else?  Anyone else?

18             Okay.

19             Ms. Ramnath, can you be fair and impartial

20   this case?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Your answer, yes or no?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Thank you.

25             Mr. Derziotis?

Voir Dire

```
1         THE COURT:  Mr. Volcy?
2         PROSPECTIVE JUROR:  Yes.
3         THE COURT:  Mr. Martinez?
4         PROSPECTIVE JUROR:  Yes.
5         THE COURT:  Mr. Jenkins?
6         PROSPECTIVE JUROR:  Yes.
7         THE COURT:  Ms. Didino?
8         PROSPECTIVE JUROR:  Yes.
9         THE COURT:  Ms. Webster?
10        PROSPECTIVE JUROR:  Yes.
11        THE COURT:  And Mr. Dolan?
12        PROSPECTIVE JUROR:  Yes.
13        THE COURT:  All right.
14            Since it's almost the luncheon hour, we ar
15    going to adjourn till 2:00 P.M.  You are not to
16    discuss the case amongst yourselves or with anyone
17    else.  You are not to visit the place where the alle
18    crimes occurred.  You are not to have any contact wi
19    any of the parties involved in this matter, includir
20    the Court.  If you see us, do not acknowledge us, ju
21    pass us by.  We know the drill.  It may be uncomfort
22    for you, but don't worry about it, I will explain la
23    on why you are not to have any contact, even eye
24    contact.  You may see us, just pass us by, all right
25            And you are not to resort to utilizing any
```

Voir Dire

1       your digital devices, electronic devices, for the

2       purpose of obtaining any information about this matt

3       or contacting anyone about this matter, okay.

4                   So, those of you in the jury --

5                   And that applies to you ladies and gentlem

6       who are out in the audience.

7                   So those who are in the jury box will be

8       excused first and then the rest will follow.

9                   Return back at two o'clock in front of the

10      door, remain out there until you're called in by a C

11      Officer.  Have a very good lunch.  Take all your

12      belongings with you.

13                  THE CLERK:  Sir.  Sir, have a seat.

14                  SERGEANT:  Exit on your right.

15                  (Whereupon, the panel of prospective juror

16      exited the courtroom.)

17                  THE COURT:  All right, those in the audier

18      may follow.

19                  Two o'clock.

20                  (Whereupon, the panel of prospective juror

21      exited the courtroom.)

22                  THE COURT:  All right, 2:00.  The Court's

23      adjourned.

24                  (Whereupon, a lunch recess was held.)

25              *                   *                   *

Voir Dire

```
 1              A F T E R N O O N     S E S S I O N
 2              *                *                *
 3              THE CLERK:  Case back on trial continues.
 4    parties are present.  Defendant is present with her
 5    attorney.
 6              THE COURT:  Is your assistant here?
 7              MR. WALENSKY:  Yes.  I don't know where he
 8    just went.  He's coming.
 9              THE COURT:  He's coming back.
10              Let's get those in the box first and then
11    rest.
12              (Whereupon, there was a brief pause in the
13    proceedings.)
14              COURT OFFICER:  Ready for the panel, your
15    Honor?
16              THE COURT:  Yes.
17              COURT OFFICER:  Panel entering.
18              (Whereupon, the panel of prospective juror
19    entered the courtroom.)
20              COURT OFFICER:  Make sure your electronic
21    phones and electronic devices are turned off, please
22              THE COURT:  Call the case in.
23              THE CLERK:  All right.
24              Case on trial continues.  All parties pre
25              THE COURT:  All right, Ms. Chu.
```

65

Voir Dire - People/Ms. Chu

1    are going to affect your ability to be fair in this

2    trial?

3              Everybody okay with that?

4              Do you understand what I'm asking you?

5              Yes?

6              Everybody's good?

7              All right.

8              Whatever your experiences are, that you are

9    not going to let it affect you in deciding what the

10   evidence is in this case.

11             Now, talking about evidence, the Judge said in

12   most trials the majority of the evidence that you hear

13   is the spoken word, meaning someone gets up on the stand

14   and says on this particular day I did this, I saw this,

15   and what happened, okay.

16             Now, can everyone understand that the spoken

17   word is evidence, just like if you can hold it in your

18   hand, that someone's testimony is the same as if it were

19   physical evidence, it is considered evidence?  Can you

20   all appreciate that and accept that premise?

21             Okay.

22             Now, I know that at least one of you guys

23   watches some sort of crime show on TV.

24             PROSPECTIVE JUROR:  Yeah, Law & Order.

25             THE COURT:  Law & Order.

mc

Voir Dire - People/Ms. Chu

1        In these crime shows they never show you this

2    part.  They never show you about the jury selection.

3    They never show it because it's a very tedious process,

4    but it's very important.

5        And what you're going to see in this case is

6    real life, meaning you are not going to have actors get

7    up there and say, oh, on this particular day I saw this.

8    We are not going to have paid actors, nobody's going to

9    be looking at a script, reading from a script.  You're

10   certainly not going to have any commercials.

11       Can you all appreciate that it's not going to

12   be like TV, this is real life?

13       Can you all understand that?

14       Now, I am really bad with names but I think

15   your name is Duncan.

16       Mr. Duncan, how do you feel?  You watch those

17   crime shows, --

18       PROSPECTIVE JUROR:  Yes, I do.

19       MS. CHU:  -- you know, where they see

20   something with the naked eye across the room in the

21   carpet fibers, something different there, right?  They

22   are pretty good at that sometimes.  That's not going to

23   happen here, all right.

24       In fact, a lot of the evidence that you are

25   going to hear with regard to the defendant's guilt is

Voir Dire - People/Ms. Chu

1  going to come from words that she said, meaning she made

2  statements.

3          Now, is there anyone here that thinks that

4  because there was no eyewitness to what actually

5  happened to the victim in this case, it was just her and

6  him, okay, so much of the evidence that you're going to

7  hear has to do with statements that she makes to both

8  the police and to other people, now, how many of you --

9  let me ask you, can you accept the premise that if

10  someone is suspected of a crime, that they might want to

11  talk to the police?

12          Can you accept that?

13          PROSPECTIVE JUROR:  No.

14          MS. CHU:  Who said "no?"

15          PROSPECTIVE JUROR:  Me.

16          MS. CHU:  Ms. Webster, why do you say that?

17          PROSPECTIVE JUROR:  Whether they might want to

18  talk to the police, I don't know that -- I find it

19  difficult to believe that someone suspected of a crime,

20  you're just going --

21          MS. CHU:  That they'll want to talk?

22          PROSPECTIVE JUROR:  Yeah.

23          MS. CHU:  I'm sorry, Mr. Dolan, you raised

24  your hand?

25          PROSPECTIVE JUROR:  Of course.  Sometimes they

Voir Dire - People/Ms. Chu

1    might tell their story first.

2              MS. CHU:  You think --

3              PROSPECTIVE JUROR:  Of course it's possible.

4              MS. CHU:  My question only to you, Ms.

5    Webster, is just that, is that going to prevent you from

6    listening to the evidence, you are going to say, you

7    know, what, I wouldn't have talked to the cops, I'm not

8    going to believe anything the cops say, if she made a

9    statement?

10             PROSPECTIVE JUROR:  You have to take

11   everything based on what's there, the reality in front

12   of you.  I don't think that that would -- I don't think

13   that that would -- I personally don't think it's going

14   to affect my judgment because my judgment is just based

15   on the facts.

16             MS. CHU:  You won't let your opinion about

17   whether or not you would do something affect what might

18   have happened?

19             PROSPECTIVE JUROR:  I don't think so.  I mean,

20   I don't plan to, let's put it that way.

21             MS. CHU:  If somebody is suspected of a crime

22   and talking to the police, do you think it's a

23   possibility they might say what Mr. Dolan says, you want

24   to speak first and say things in the best light for you?

25   You think that's a possibility, if someone is suspected

Vcir Dire - People/Ms. Chu

1    of a crime and speaks to the police?

2              They might say, oh, it happened this way,

3    because it sounds better?  Do you think that's a

4    possibility?  Yes?

5              Anybody here think it's not a possibility?

6              Do you think that sometimes someone, if they

7    are talking to the police and they know they are

8    suspected of a crime, they might say things, some things

9    are true, some things not so true, right, put the best

10   foot forward?  Do you think that's a possibility?

11             Yes?

12             Okay.

13             Now, let me ask you this.  What if the

14   statement was made to someone that's not the police, do

15   you think that that would affect your ability to --

16             MR. WALENSKY:  Objection, your Honor.

17             Can we approach?

18             THE COURT:  Come on up.

19             (Whereupon, a sidebar conference was held off

20   the record.)

21             THE COURT:  Objection sustained.  We'll go on

22   to another subject.

23             MS. CHU:  So the next thing I want to ask you

24   guys, that if you hear that kind of evidence, meaning

25   that the defendant made certain statements to various

Voir Dire - People/Ms. Chu

1   people, do you think you are the kind of people that can

2   listen to what they tell you and make a decision as to

3   whether that statement that the defendant made --

4           MR. WALENSKY:  Objection.  This was just

5   sustained.

6           THE COURT:  Ladies and gentlemen, whatever is

7   stated is in evidence, you will have to evaluate it, all

8   right.  That's going to be your job.

9           Go on.

10          MS. CHU:  You understand everything I am

11  talking to you about now, nothing -- none of the

12  evidence I am talking about, scenarios, these are like

13  hypotheticals.  If you heard from witnesses who tell you

14  that the defendant said something, do you think that you

15  can base your decision on whether or not what they're

16  telling you is reliable, whether that statement is

17  reliable by looking at everything, meaning that you

18  don't have to just look at one person's testimony in a

19  bubble, right?

20          You can use their testimony and compare and

21  contrast it to other evidence that you are going to hear

22  in this case.  Do you think that you are the kind of

23  people that can do that, that can say, you know what, I

24  heard evidence that this person said this but I also

25  heard evidence that, well, this part can be true, but

Voir Dire - People/Ms. Chu

1    this part's definitely not true, this part's true, this

2    part definitely can't be true?

3         Will you look at everything as a whole before

4    you make a decision as to whether or not you can find

5    that to be reliable or not?  Can you do that?

6         Now, we talked about that C.S.I. person who

7    spots something from across the way.  You will have kind

8    of scientific evidence but you're not going to have a

9    videotape of this crime, okay, you are going to have

10   some DNA because there was blood at the scene.  You're

11   not going to have -- in fact, the weapon was never

12   recovered so you are not going to actually see the

13   weapon that was used against the victim, but you'll hear

14   about his injuries from other sources, like a medical

15   examiner, like people who saw the wounds that were

16   inflicted on the victim.

17        So does anyone here think you are the kind of

18   person that, you know what, I need to have a videotape,

19   I need to have solid evidence with my own eyes that this

20   person did this?

21        Does anyone think you're the kind of juror

22   that requires that kind of information?  Because I am

23   telling you right up front we don't have that.  We don't

24   have a videotape, we don't even have the knife.

25        Can anyone here let me know one way or the

1    other whether or not you're okay with that?

2              PROSPECTIVE JUROR:  What do you have so --

3              MS. CHU:  Other stuff I have.

4              You're going to hear from witnesses who will

5    tell you about what happened before, sort of during and

6    then after.

7              PROSPECTIVE JUROR:  I am confused.  You said

8    there was no witnesses.

9              MS. CHU:  I told you that most of the evidence

10   that you are going to hear that points to the

11   defendant's guilt is coming from the defendant's own

12   mouth.

13             PROSPECTIVE JUROR:  How do we know that the

14   witnesses that are speaking against her are even

15   credible?

16             THE COURT:  That is your job.

17             PROSPECTIVE JUROR:  Most -- most people --

18             THE COURT:  Excuse me.  Don't say anything.

19             I will tell the jury what to say and not to

20   say and what the law is.

21             You are going to have to evaluate what people

22   say, that's what your job is, and it's clear as day.

23   That's evidence.  That's all.  That is what your job

24   is.

25             Go ahead.

Voir Dire - People/Ms. Chu

1          MS. CHU:  Mr. Jenkins, you work, you said, for

2     direct care, right?

3          PROSPECTIVE JUROR:  Uh-huh.

4          MS. CHU:  In your job you decide whether or

5     not someone talking to you is telling you the truth?

6          PROSPECTIVE JUROR:  Yes, sometimes.

7          MS. CHU:  In your everyday life, I would

8     imagine, that most of you have to do that on a daily

9     basis multiple times, all right.  You guys all came here

10    with the unique benefit of having life experiences,

11    right.  You all have to make those decisions every day.

12    We are just asking you to take that common sense that

13    you have, your life experiences that you have and use

14    that to decide whether or not a witness who testifies

15    before you is telling the truth, if what they say makes

16    sense in light of what you -- everything else you heard,

17    okay, then for you to say, you know, I don't believe

18    they are telling the truth, or they're mistaken.  I am

19    not asking you to accept whatever anybody says is the

20    truth.  You have to determine on your own whether or not

21    you believe them.

22          Do you understand the difference?

23          PROSPECTIVE JUROR:  Uh-huh.

24          MS. CHU:  Are you okay with that?

25          PROSPECTIVE JUROR:  A --

Voir Dire - People/Ms. Chu

1        MS. CHU:  You look --

2        PROSPECTIVE JUROR:  You say, like, if I do

3    that at my job, but like the most thing might be, yo,

4    somebody ate somebody's sandwich, but the aluminium foil

5    is on his desk, it's like you're guilty.

6        MS. CHU:  I am glad you brought that up.

7        You understand that your job is not to

8    consider anything about punishment or have any type of

9    sympathies in this case?

10        PROSPECTIVE JUROR:  I know.

11        MS. CHU:  You're just deciding what happened.

12    You are not passing judgment on anyone.

13        PROSPECTIVE JUROR:  No, no.

14        MS. CHU:  All you're doing is, you're deciding

15    this is what I think happened based on all the evidence

16    that I have.

17        Do you think you can do that?

18        PROSPECTIVE JUROR:  Sure.

19        MS. CHU:  Like --

20        PROSPECTIVE JUROR:  Fine.  I wanted to clear

21    that up, you know.

22        MS. CHU:  All right.

23        The next thing I want to talk to you about is

24    police witnesses.

25        We are going to have a number of police

Voir Dire - People/Ms. Chu

1    witnesses that testify before you and, you know, you had
2    to have lived under a rock the last ten years not to see
3    all kinds of stuff in the paper about police officers
4    doing wrongdoing and then something like page 40 will be
5    about something that they did right.

6         You understand, there's thirty, forty thousand
7    police officers in New York City alone.  Do you think
8    that it's possible that most of them do try to do their
9    best, some of them better than others, but they are all
10   individuals like you and I?

11        Whether or not you're a direct care worker or
12   you're a nurse, everybody is just trying to do what they
13   do the best that they can do, right, and they put their
14   pants on the same way we do, right, one leg at a time.

15        So, can you promise me that if you hear police
16   officers that testify in this case, that you're not
17   going to say automatically, I can't believe anything
18   they say?  But I also don't want you to say, you know
19   what, because they're police officers, they never lie.
20   I don't want that either.  I want you to wait, wait and
21   listen to what they have to say before you make your
22   judgment as to whether or not they're telling you the
23   truth.

24        Can you all promise me that you can do that?
25        PROSPECTIVE JUROR:  Yes.

Voir Dire - People/Ms. Chu

1          MS. CHJ:  All right.

2          Now, the last thing I want to talk about has

3  to do with sympathy.  And I told you, I said sympathy

4  really has no place in what you're deciding in this

5  case.

6          Can you all understand that?

7          Someone is dead, there's some sympathy, it's

8  natural to feel that way.  We wouldn't be human if we

9  don't feel that way.  In fact, some of you might have

10  sympathy for the defendant.  But do you understand, you

11  cannot allow that sympathy, whether you have it or not,

12  to affect what you decide in this case if you're

13  selected as a juror?

14          Ms. Joseph, right?

15          PROSPECTIVE JUROR:  Uh-huh.

16          MS. CHU:  And let's say you're in the jury

17  room, you heard all the evidence, and you believe that

18  I've proved my case that the defendant is guilty beyond

19  a reasonable doubt, are you the kind of person that is

20  going say, you know what, I know Ms. Chu proved her

21  case, she proved it with the evidence beyond a

22  reasonable doubt and I believe it, that that proves that

23  the defendant is guilty, are you going to go back and

24  say, you know, I just -- I feel bad for her and I can't

25  do it, I can't convict?

Voir Dire - People/Ms. Chu

1          Can you understand what I'm getting at here?

2          I want to know now because you understand how

3     it would be unfortunate for us to later, after you're

4     selected, whether or not that might affect your ability

5     to decide this case only on the evidence and that's it?

6          You'd be okay with that?

7          PROSPECTIVE JUROR:  Yeah.

8          MS. CHU:  Do you think you might have some

9     hesitation?

10          PROSPECTIVE JUROR:  No.

11          MS. CHU:  Do you all promise me that if you

12     have any sympathies one way or the other, that you not

13     allow that to affect your decision in this case about

14     what the evidence is?

15          Can you all promise me that?

16          You promise to hold me to my burden of proving

17     what the defendant -- all the things that she's supposed

18     to have done?  You promise to hold me to that burden?

19          And the same on the flip side, there's certain

20     things I don't have to prove, like I don't have to prove

21     what the weather was like for that period of time, I

22     don't have to prove who won the lottery for four, five

23     weeks, all right.

24          Can you all promise me, also, that you are not

25     going to hold me to a higher standard or to more of what

Voir Dire - Defendant/Mr. Walensky

1    the Judge wants me to prove?

2           He says she has to prove four things, you are

3    not going to say I want that fifth one?

4           Is everybody okay with that?

5           Yes?

6           Anybody have any questions for me before I sit

7    down?

8           Okay, thank you very much.

9           THE COURT:  Okay, Mr. Walensky.

10          MR. WALENSKY:  Thank you.

11          Good afternoon, ladies and gentlemen.

12          My name is David Walensky and I'm the attorney

13   for Ms. Wisdom, who's the accused.  Mr. Povill is going

14   to be talking to you at some point.

15          It's interesting that we have this system here

16   where we will take great pains to say a person is

17   innocent until there is a guilty verdict.  And if you

18   notice, juries are asked to provide a verdict of guilty

19   or not guilty, not guilty or innocent.  This is a great

20   mistake people make.

21          Now, I have -- we'll get back to that.  But I

22   have fifteen minutes to do an in-depth psychological

23   profile of twenty of you.  I'm not that smart or

24   perceptive, so we really do rely upon your honesty

25   because this is the one time in your life -- you might

Voir Dire - Defendant/Mr. Walensky

1    have another, but it's a certainty that you have no

2    bosses here over you.  So you can have prejudices, lay

3    them aside, you can recognize I don't like this, I don't

4    like that, whatever, lay it aside.  This is judged

5    solely by evidence.

6           Now, Ms. Chu and I will both have a chance to

7    open.  The People are required to tell you what they

8    have to prove and she will have an opening and tell you

9    how she will prove it.  Voir dire is not the place --

10   that is what we call this, jury selection -- to tell you

11   about the case so that you don't have preconceptions

12   before going in.

13          What we're interested in is people who have --

14   who can look at the evidence and listen to the

15   instructions of the Judge, of the Court, and decide

16   based on the evidence.  We talk about some of the facts.

17          You have preconceived notions, would you agree

18   that that could be true, Ms. Ramnath?

19          PROSPECTIVE JUROR:  Yes.

20          MR. WALENSKY:  So we really don't want that.

21          Now, Mr. Duncan?

22          PROSPECTIVE JUROR:  Yes.

23          MR. WALENSKY:  People want to hear -- the

24   Judge's told you my client doesn't have to testify,

25   but it's normal for people to want to hear someone

Voir Dire - Defendant/Mr. Walensky

1    testify.

2              PROSPECTIVE JUROR:  Yes.

3              MR. WALENSKY:  Because you want to hear both

4    sides.

5              PROSPECTIVE JUROR:  Yes.

6              MR. WALENSKY:  Do you know why we don't do

7    that, Ms. Williams?

8              One reason is, if that were the case, then we

9    don't have a system where the People have to prove their

10   case.  It's like let's see what you have, let's hear

11   what you have to say.  This is a one-sided situation.

12             Do you understand, Mr. Martinez, that it's

13   only about the People, Ms. Chu's ability to prove her

14   case beyond a reasonable doubt?

15             PROSPECTIVE JUROR:  Yes.

16             MR. WALENSKY:  I can sit there and take a nap,

17   say to Josh, let's take a nap and let her go on with

18   this, if they don't prove their case, if they don't have

19   the required evidence, then you must say not guilty.

20   You agree with that Mr. Derziotis?

21             PROSPECTIVE JUROR:  Yes.

22             MR. WALENSKY:  Did I pronounce it correctly?

23             PROSPECTIVE JUROR:  Close enough.

24             MR. WALENSKY:  Now, Mr. Santiago, people

25   testify and you have to decide whether or not they're

Voir Dire - Defendant/Mr. Walensky

1    telling the truth.  Sometimes people will tell the

2    entire truth, correct?

3              PROSPECTIVE JUROR:  Correct.

4              MR. WALENSKY:  Sometimes some of what they say

5    is true and some isn't, right?

6              PROSPECTIVE JUROR:  Yes.

7              MR. WALENSKY:  Sometimes they're not even

8    lying, necessarily, but they are making mistakes.  Would

9    you agree with that, Mr. Smargiassi?

10             PROSPECTIVE JUROR:  Yes.

11             MR. WALENSKY:  And it's a matter of perception

12   also, right?

13             Now, things affect a person's perception,

14   would you agree with that, Ms. Joseph, that something

15   can affect somebody's perception, how you listen to

16   somebody, how --

17             PROSPECTIVE JUROR:  Yes.

18             MR. WALENSKY:  If you had a few drinks, you

19   might not be listening as much.  If you smoked a little

20   crack, a person might be like a bit out of it, right?

21             Sometimes people lie because they have motives

22   to lie, right?

23             Now, I'm sure we all -- Mr. Dolan, you might

24   have had somebody -- I don't know -- you have somebody

25   and it's like, hey, you want to go get a beer?  No, man,

mc

Voir Dire - Defendant/Mr. Walensky

1    I have to do this, and you see them later.  They just

2    lied to you, bold faced lie, not a big lie.

3              Ever have something like that happen?

4              PROSPECTIVE JUROR:  You might mean I tell one

5    thing but they hear another.

6              MR. WALENSKY:  Join the club.  I think we've

7    all had that experience.

8              So the point is, sometimes they're important

9    reasons, sometimes they're unimportant reasons,

10   sometimes you talk about kids, kids will lie, they

11   don't -- often people don't, if they are not mature

12   enough, don't realize the implications if they lie.

13             Would you agree with that, Ms. Didino?

14             PROSPECTIVE JUROR:  Sure.

15             MR. WALENSKY:  Small lies can have great

16   consequences, can we agree?  Then as to big lies, who's

17   to know?  You are going to have to pick up what is true

18   and what is not true.

19             Now, we talked about policemen, police.  When

20   we have police officers -- look, people don't like cops.

21   I do like cops.  But when somebody mugs you, you call a

22   cop, right?

23             And police officers are human like anybody

24   else.  Generally they solve crimes.

25             Would you agree with that, Ms. Lackan?

mc

Voir Dire - Defendant/Mr. Walensky

1    PROSPECTIVE JUROR:  Yes.

2    MR. WALENSKY:  Sometimes they are wrong?

3    People can have a conclusion and an assumption and try

4    to make evidence fit that assumption?

5    Mr. Sutton, you agree with that?

6    PROSPECTIVE JUROR:  Yes.

7    MR. WALENSKY:  You have an assumption, you

8    have a theory, let's make the facts fit the theory.

9    That can happen, right?

10    And it does happen.  We read about the

11    wrongful convictions all the time, not saying that

12    here --

13    MS. CHU:  Objection.

14    THE COURT:  Objection sustained.

15    MR. WALENSKY:  All right.

16    Ms. Wisdom is charged with intentional murder.

17    The Judge will tell you the definition.  He is the

18    arbiter of the law, and the law is written down as to

19    what are the elements.  He will tell you, essentially,

20    it is intending to kill somebody, it's intentional

21    murder.  He will tell you specifically.

22    Now, is there anyone here who would have

23    trouble bringing a verdict of guilty if the evidence

24    were there?

25    Now, the other side of that coin is, as I

mc

Voir Dire - Defendant/Mr. Walensky

1      said, we don't have to prove anything, because one

2      example of it is the same, you're walking down the

3      street and somebody grabs you and tells the police

4      officers, that person robbed me, where you were alone,

5      you live alone, you were in bed asleep, you don't have

6      an explanation, you say I robbed you, you prove it,

7      physical evidence, testimonial evidence, however,

8      whatever legal evidence is necessary.

9              Can you accept that?

10             Do you understand why a person doesn't have to

11     testify and why you don't have to hear both sides?

12             Again, it's all one-sided.

13             Do you understand that, Ms. Valenzuela?  No?

14             PROSPECTIVE JUROR:  Yes.

15             MR. WALENSKY:  That's another thing.

16             Yes?

17             PROSPECTIVE JUROR:  The Judge is going to give

18     us the definition of murder?

19             MR. WALENSKY:  He absolutely will.

20             PROSPECTIVE JUROR:  Okay.

21             MR. WALENSKY:  He will give you what the

22     definition is, but it's killing someone.  He will tell

23     you the elements.

24             PROSPECTIVE JUROR:  Murder is planned killing

25     someone?

85

Voir Dire - Defendant/Mr. Walensky

1              MR. WALENSKY:  Don't --

2              THE COURT:  No, no.

3              MR. WALENSKY:  The Judge will give you the

4       absolute definition of how you will judge the particular

5       crime.

6              PROSPECTIVE JUROR:  The reason why I'm asking,

7       because there was an article in the paper about some guy

8       who punched some guy after a soccer game and and the guy

9       died.  Is that murder?

10             THE COURT:  Let me just say something, all

11      right.

12             Whatever the attorneys say insofar as what the

13      law is, just disregard that, all right, because I will

14      ultimately tell you what the elements of the crime are,

15      all right.  And whatever you've read about it in the

16      paper or might have read in the paper regarding murder

17      or something akin to murder, just forget about it, put

18      it out of your mind.  You have to take what I say is the

19      law and that will come at the close of the case.

20             MR. WALENSKY:  Every situation is different,

21      every fact situation.

22             As the Judge said, he will tell you, you know,

23      regarding this and whatever charges you must decide.

24      But, again, it's your ability to decide those.

25             Now, I was talking about the People's -- the

1    necessity for the  ople to prove their case.

2              Now, Mr. 'olcy --

3              PROSPECT 'E JUROR:  Volcy (pronunciation).

4              MR. WALE 3KY:  I'm sorry, Volcy.

5              You will ook at a case and you will hear the

6    evidence and you s y, well, I think he did it -- I am

7    not even talking a ut he did or she did it -- but they

8    haven't proven the  case, you'd have to say not guilty,

9    wouldn't you?

10             PROSPECT 'E JUROR:  True.

11             MR. WALE 3KY:  You may not be satisfied with

12   this, you may not  ve an answer.  This isn't about

13   answers, it's abou your ability to look at the law and

14   make a decision a  iven under the law.

15             They mi  t say, well, we think they did it, we

16   think they didn't  ove their case, we have to say not

17   guilty.

18             I can't  lk more, this isn't an opening, it's

19   not a summation, l 's really to try to bring things out.

20   I have a couple of asic questions while they're here.

21   Anyone have a prol m while they are serving?  I don't

22   mean the jury ser ce, I mean in terms of your own

23   living.  I mean, t se are considerations but, of

24   course, we know if elected you will do your duty.  What

25   we don't want is,  -- I think I can speak for all of

Voir Dire - Defendant/Mr. Walensky

1   us, is that we don't want -- if you're in the room and

2   it's a couple of days, and it's up to the Judge how long

3   a jury sits, if they're having a problem with a

4   decision, but it's been two days, you're looking and

5   saying I gotta get back to work, I am losing time and

6   something else is playing on your mind, I need to know

7   because we don't want someone to say, okay, I'll go

8   whichever way the wind blows, it's eleven to one, you

9   are the one, regardless whether it's an acquittal or

10  conviction, this is a murder case, it should be that way

11  for every case, but you understand we need people who

12  are totally committed.  You may not want to say it, but

13  if you are chosen, can you totally commit?  I need to

14  know that.

15          It's not a contest.  That's the thing, this

16  isn't a contest.  And if you don't think you can do it,

17  I really need to know.  I need to see the hands of the

18  people who can't.

19          Okay, thank you.

20          I am not even going to ask why, if you can't

21  do it.  That is what I mean by honesty, because this is

22  the one time you don't have any bosses.  Again I bring

23  that up.

24          So, there's no shame in it.  If you are not

25  selected for this, you might be selected for something

Voir Dire - Defendant/Mr. Walensky

1    else or may very well be selected for this, but we need

2    to know.

3           So, ladies and gentlemen, do I have your

4    promise, if you're selected you will just do your very

5    best to listen to all the evidence, listen to the law

6    and judge this on the law and the evidence, not your

7    emotion, not your gut feeling, not what you feel is

8    right, but what the law requires?

9           Can you do that?

10          Thank you very, very much.

11          THE COURT:  What's the problem?

12          PROSPECTIVE JUROR:  I start school on the 1st.

13          THE COURT:  What?

14          PROSPECTIVE JUROR:  I start school on the 1st.

15          MR. WALENSKY:  July 1st?

16          PROSPECTIVE JUROR:  July 1st.

17          THE COURT:  What school are you starting?

18          PROSPECTIVE JUROR:  Manhattan GED plus.

19          THE COURT:  I asked that before and you didn't

20    say anything.

21          PROSPECTIVE JUROR:  The officer said I might

22    not be selected so it might not be an issue.

23          THE COURT:  The officer said that to you?

24          PROSPECTIVE JUROR:  Yeah, in the front.

25          THE COURT:  Where?

Voir Dire - Defendant/Mr. Walensky

1      PROSPECTIVE JUROR:  Outside, by the elevators.

2      THE COURT:  All right.

3      I'm going to ask those jurors sitting in the

4      box to vacate their seats, step outside, remain there

5      until we call you back in.  Don't disappear.  Take all

6      of your belongings with you.

7      (Whereupon, the panel of prospective jurors

8      exited the courtroom.)

9      THE COURT:  Those of you in the audience,

10     again, do not discuss the case amongst yourselves or

11     with anyone else.  Remain outside until we call you in.

12     It will be a couple of minutes.

13     (Whereupon, the panel of prospective jurors

14     exited the courtroom.)

15     MS. CHU:  What was the last question you asked

16     with juror number two and juror number sixteen said yes,

17     they couldn't do it?

18     MR. WALENSKY:  I said, is there anyone who,

19     you know, if you're in there for a long time and

20     whatever, you are going to lose too much money, you are

21     going to -- to be afraid you are not getting paid and

22     whatever, basically that would influence what you're

23     doing in the jury room, they said yes.

24     MS. CHU:  That was sixteen, Duncan.

25     MR. WALENSKY:  That was two, and Duncan.

Voir Dire

1        (Whereupon, there was a brief pause in the

2    proceedings.)

3        THE COURT:  All right.

4        First twelve for cause, Ms. Chu?

5        MS. CHU:  I believe defense counsel asked Mr.

6    Derziotis --

7        THE COURT:  Yes.

8        MS. CHU:  -- whether or not they can separate,

9    whatever, he is not making money or whatever and keep

10   that separate from his deliberations.

11       MR. WALENSKY:  I would agree, your Honor.

12       MS. CHU:  He said he thought that would be a

13   factor.

14       I didn't actually hear what he said.

15       MR. WALENSKY:  If I may.

16       I would agree with that because when I was

17   giving the scenario if you're going to be thinking about

18   something else, you can't spend anymore time, would that

19   cause you to maybe change your vote whichever way the

20   wind was blowing.

21       THE COURT:  Call Mr. Derziotis.  Call him in.

22       COURT OFFICER:  Juror entering.

23       (Whereupon, the prospective juror entered the

24   courtroom.)

25       THE CLERK:  State your name for the record,

Voir Dire

1    please.

2              PROSPECTIVE JUROR:  Nicholas Derziotis.

3              THE CLERK:  Thank you.

4              THE COURT:  Mr. Derziotis?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  First of all, can you be fair and

7    impartial in this case?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Is there anything that would

10   prevent you from being fair and impartial in this case?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  You sure?

13             PROSPECTIVE JUROR:  Besides the fact that I

14   have a business to run.

15             THE COURT:  I know that you have a business to

16   run.  My question is, is that going to prevent you from

17   being fair and impartial?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  Are you going to rush to judgment

20   because of time considerations, in other words, change

21   your mind because --

22             PROSPECTIVE JUROR:  It's not going to rush me

23   to judgment but I have -- I'm manager of a restaurant.

24             THE COURT:  I understand that.  My point is,

25   if --

Voir Dire

1          PROSPECTIVE JUROR:  I'm not going to rush to

2     judgment, no.

3          THE COURT:  Would you stick to your

4     convictions notwithstanding, you know, your concerns

5     about the money?

6          PROSPECTIVE JUROR:  Absolutely.

7          THE COURT:  Okay.  Step out.

8          The cause is denied.

9          MR. WALENSKY:  Note my objection, your Honor,

10    because during -- I know -- I don't believe he's been

11    rehabilitated because here, even though he said it's

12    difficult for a person to say, yeah, it wouldn't change

13    my mind, but my business is going to be in my mind, I

14    have a restaurant to run.  So, he is speaking out of

15    both sides of his mouth.

16          I am essentially saying, out of caution, I

17    think he should be excluded at this  point.

18          THE COURT:  I think he said that he may have

19    concerns and he was honest that will, but he said that

20    notwithstanding that he wouldn't change his mind because

21    of it and he wouldn't rush to get back to work.  So,

22    that is denied.

23          MR. WALENSKY:  Note my objection.

24          THE COURT:  Any other cause?

25          MS. CHU:  I want to challenge juror number

Voir Dire

```
 1    is low.  Either that, or a blood transfusion.
 2              THE COURT:  Is that going -- is it possible
 3    to reschedule?  We are not meeting on tomorrow.
 4              PROSPECTIVE JUROR:  No.  My appointment is
 5    Monday at eleven o'clock.
 6              THE COURT:  Is it possible to rearrange the
 7    appointment?
 8              PROSPECTIVE JUROR:  I don't know.
 9              THE COURT:  You don't know.
10              Well, if we could rearrange the appointment,
11    would that be all right?
12              PROSPECTIVE JUROR:  If I can rearrange it,
13    that is okay.
14              THE COURT:  Who's the doctor?
15              PROSPECTIVE JUROR:  I forgot his name.
16              THE COURT:  You forgot his name?
17              PROSPECTIVE JUROR:  I go to Brookdale.
18              THE COURT:  You go to the hospital?
19              PROSPECTIVE JUROR:  Uh-huh.
20              MS. CHU:  May I ask a question?
21              How long does the procedure take?

22              PROSPECTIVE JUROR:  It's an hour.
23              THE COURT:  When would you go?  When can you
24    go?
25              PROSPECTIVE JUROR:  I don't know.
```

Voir Dire

1          THE COURT:  What do you mean?  Are they going

2     to give you a time or what?

3          PROSPECTIVE JUROR:  They give you a set time.

4          THE COURT:  What's your set time?  What time

5     did they give you?

6          PROSPECTIVE JUROR:  They gave me eleven

7     o'clock Monday morning.

8          THE COURT:  Oh, eleven o'clock.

9          You may step outside.

10          Thank you.

11          PROSPECTIVE JUROR:  Thank you.

12          (Whereupon, there was a brief pause in the

13     proceedings.)

14          THE COURT:  She will be excused for cause.

15          Anything else for cause?

16          MS. CHU:  Not for the rest of the twelve.

17          THE COURT:  Defense, cause, first twelve?

18          MR. WALENSKY:  No, not for the first twelve,

19     your Honor.

20          THE COURT:  Perempt?

21          MS. CHU:  Juror number four -- I'm sorry --

22     five.

23          THE COURT:  Ms. Joseph.

24          MS. CHU:  Lorraine Joseph.

25          Juror number eight, Ms. Webster.

Voir Dire

1          Juror number ten, Mr. Jenkins.

2          And juror number twelve, Mr. Volcy.

3          THE COURT:  Defendant, perempt?

4          MR. WALENSKY:  Juror one -- I'm sorry, my

5     mistake.

6          Juror two.

7          THE COURT:  Derziotis?

8          MR. WALENSKY:  Yes.

9          Four.  Four.

10          THE COURT:  Hold on.

11          THE CLERK:  You said juror number four?

12          MR. WALENSKY:  Juror four.

13          Juror seven.

14          Juror nine.

15          Give me one moment, your Honor.

16          (Whereupon, there was a brief pause in the

17     proceedings.)

18          MR. WALENSKY:  All right, your Honor, that's

19     it.

20          THE CLERK:  Juror number one will be Avelon

21     Ramnath.

22          Juror number two will be Jean Lackan.

23          And juror three will be Francisco Martinez.

24          THE COURT:  All right, next up.

25          MR. WALENSKY:  Hold on a second.

Voir Dire

```
 1              (Whereupon, there was a brief pause in the
 2       proceedings.)
 3              MR. WALENSKY:  Your Honor, I am going to
 4       perempt number eleven also.
 5              THE COURT:  You just --
 6              THE CLERK:  It's too late.
 7              THE COURT:  You can't do that.
 8              MR. WALENSKY:  Fine.
 9              I realized he --
10              THE COURT:  You what?
11              MR. WALENSKY:  Well, I was trying to decide
12       because he had said that --
13              THE COURT:  You were deciding, then you made
14       the decision, then the Judge -- the Clerk began to read
15       those who were selected.
16              MR. WALENSKY:  They haven't been sworn, your
17       Honor.  We haven't started the rest.  We haven't started
18       thirteen through twenty.
19              THE COURT:  I understand that, counsel.
20              MR. WALENSKY:  All right.
21              THE COURT:  You know what, defendant --
22              MR. WALENSKY:  My co-counsel likes him.  Keep
23       him.  What the heck.
24              THE COURT:  What is your decision?  Do you
25       want to challenge him or not, or your client?
```

Voir Dire

1          (Whereupon, there was a brief pause in the

2     proceedings.)

3          MR. WALENSKY:  I am going to perempt him, your

4     Honor.

5          THE COURT:  All right.

6          The next six, for cause.

7          MS. CHU:  Your Honor, I will challenge juror

8     number sixteen.  I believe he starts school on July 1st.

9     That would make him unavailable to actually serve.

10          THE COURT:  Who's that?

11          MS. CHU:  Mr. Duncan.

12          THE COURT:  No, Duncan is -- I thought

13     Duncan's -- oh, Mr. Duncan, for cause, yeah.

14          All right.

15          THE CLERK:  He's out?

16          THE COURT:  He's out.

17          MS. CHU:  Those are all I have for cause.

18          That's thirteen through eighteen, right?

19          THE COURT:  Yes.

20          LAW SECRETARY:  We have two jurors.  It should

21     be the next ten.

22          THE COURT:  We have two jurors?

23          THE CLERK:  Yes.

24          THE COURT:  Yes.

25          LAW SECRETARY:  It should be everybody.

Voir Dire

1          MS. CHU:  I thought you said the first six.

2          THE COURT:  It's eight.  You're right, all

3     right.  I'm sorry.

4              It's six, that's right.

5          MS. CHU:  There's eight more jurors.

6          THE CLERK:  Eight left.

7          THE COURT:  All right.  The next eight, all

8     right.

9              You challenge Duncan?

10         MS. CHU:  I challenge Duncan.  I do not have

11    anymore cause challenges for the remainder.

12         THE COURT:  Do you have any challenges?

13         MR. WALENSKY:  No.

14         THE COURT:  Perempt?

15         MS. CHU:  Yes.  People challenge juror number

16    fourteen.

17         THE COURT:  Fourteen is Valenzuela.

18             Anyone else?

19         MS. CHU:  Excuse me, I'm sorry.

20             (Whereupon, there was a brief pause in the

21    proceedings.)

22         MS. CHU:  Juror number thirteen as well.

23         THE COURT:  Vincent?

24         MS. CHU:  Yes.

25             Juror number fifteen.

1          THE COURT:  Hold on.

2          Fifteen is Sutton.

3          MS. CHU:  Sutton.

4          THE COURT:  Any others?

5          MS. CHU:  And juror number nineteen, Ms.

6     Walker.

7          THE COURT:  All right.

8          Defense?

9          MR. WALENSKY:  Juror number seventeen.

10         THE COURT:  Smargiassi.

11         MR. WALENSKY:  And juror number --

12         THE COURT:  Hold on a minute.  Hold on.

13         (Whereupon, there was a brief pause in the

14    proceedings.)

15         THE COURT:  Who else?

16         MR. WALENSKY:  Twenty.

17         THE COURT:  Santiago?

18         MR. WALENSKY:  Yes.

19         MS. CHU:  I loved him.

20         THE CLERK:  Is that it, Mr. Walensky?

21         MR. WALENSKY:  That is it.

22         All we have left is Lynch, right?

23         I'm finished.

24         THE CLERK:  Juror number three will be

25    Henderson Lynch.

1           THE COURT:  People have exercised eight and

2      defendant...

3           THE CLERK:  Seven.

4           THE COURT:  I have six.

5           MS. SCHWARTZKOPF:  Seven.

6           THE CLERK:  Seven.

7           MS. SCHWARTZKOPF:  Two, four, seven, nine,

8      eleven, seventeen and twenty.

9           THE COURT:  Wait a minute.

10          Two, that's the first one.

11          MS. SCHWARTZKOPF:  Four.

12          THE COURT:  Four is second.

13          MS. SCHWARTZKOPF:  Seven and nine.

14          THE COURT:  Seven and nine is four.

15          The next one is five.

16          MS. SCHWARTZKOPF:  Yes.

17          THE COURT:  That's six and seven, you're

18     right.

19          Okay.

20          Bring the panel in, please.

21          COURT OFFICER:  Want the twenty in the box or

22     in the front row?

23          THE COURT:  In the front row.

24          COURT OFFICER:  Ready for the panel, your

25     Honor?

Voir Dire

1              THE COURT:  Bring them in.

2              COURT OFFICER:  Panel entering.

3              (Whereupon, the panel of prospective jurors

4       entered the courtroom.)

5              THE CLERK:  Hats off, please, in court.

6              Okay, ladies and gentlemen, if you hear your

7       name called, that means you have been selected to serve

8       as a juror.

9              If you do not hear your name called, you are

10      excused, go back to the second floor with the thanks of

11      the Court.

12             Okay, if you hear your name called please say

13      "here" or "present," remain in the courtroom.

14             Juror number one will be Avelon Ramnath.

15             Just say "here" or "present."

16             PROSPECTIVE JUROR:  Present.

17             THE CLERK:  Juror number two, Jean Lackan.

18             PROSPECTIVE JUROR:  Present.

19             THE CLERK:  And juror three, Henderson Lynch.

20             PROSPECTIVE JUROR:  Present.

21             THE CLERK:  The rest of you go back to the

22      second floor, Central Jury.

23             (Whereupon, the panel of prospective jurors

24      exited the courtroom.)

25             THE COURT:  Swear them in, please.

Voir Dire

1          THE CLERK:  Will the three of you rise and

2     raise your right hand.

3          Do you and each of you sincerely and solemnly

4     swear or affirm that you will try this case in a just

5     and impartial manner to the best of your judgment and

6     you will render a verdict according to the law and the

7     evidence?

8          What is your response?

9          Your response?

10         (Whereupon, the jurors responded.)

11         THE COURT:  Wait a minute.

12         Ladies and gentlemen, I'm going to direct you

13    to return on Monday at eleven o'clock in the jury room,

14    all right.  You'll go with the officer now and he will

15    explain to you what you have to do, all right, but you

16    be there on Monday at eleven o'clock.

17         COURT OFFICER:  Follow me.

18         THE COURT:  Do not discuss the case amongst

19    yourselves or with anyone else or visit the place where

20    the alleged crimes occurred.  Do not have any contact

21    with any of the parties involved in this matter.

22         (Whereupon, the sworn jurors exited the

23    courtroom.)

24         THE COURT:  Bring in the rest of the jurors.

25         (Whereupon, there was a brief pause in the

Voir Dire

1         PROSPECTIVE JUROR:  Shaffee.

2         THE COURT:  How do you spell the last name?

3         THE CLERK:  S-H-A-F-F-E-E.

4         PROSPECTIVE JUROR:  S-H-A-F-F-E-E, yeah.

5         THE CLERK:  Seat five, Elizabeth Sanchez.

6         PROSPECTIVE JUROR:  Here.

7         THE CLERK:  S-A-N-C-H-E-Z.

8         Seat six is Christian Hatcher.

9         You have to say "here" or "present."

10        PROSPECTIVE JUROR:  Here.

11        THE CLERK:  H-A-T-C-H-E-R.

12        Seat seven, Alexander Nuciforo.

13        PROSPECTIVE JUROR:  Nuciforo, N-U-C-I-F-O-R-O.

14        THE COURT:  What?

15        THE CLERK:  N-U-C-I-F-O-R-O.

16        Seat eight, Nicholas Healey.

17        PROSPECTIVE JUROR:  Here.

18        THE CLERK:  H-E-A-L-E-Y.

19        Seat nine, Rohan (phonetic) O'Connell.

20        PROSPECTIVE JUROR:  It's Rohan

21   (pronunciation).

22        THE CLERK:  Seat ten, Rosa Olibris.

23        PROSPECTIVE JUROR:  Here.

24        THE CLERK:  How do you pronounce it?

25        PROSPECTIVE JUROR:  Olibris.

Voir Dire

1      THE CLERK:  O-L-I-B-R-I-S.

2      THE COURT:  O-L...

3      THE CLERK:  O-L-I-B-R-I-S.

4      Seat eleven, Jay Perrier.

5      PROSPECTIVE JUROR:  Here.

6      THE CLERK:  P-E-R-R-I-E-R.

7      Seat twelve is Samuel Rossi.

8      PROSPECTIVE JUROR:  Here.

9      Rossi (pronunciation).

10     THE CLERK:  Rossi, R-O-S-S-I.

11     Seat thirteen, Joann Prezeau.

12     PROSPECTIVE JUROR:  Present.

13     THE CLERK:  Is it P-R-E-I-E-A-U?

14     PROSPECTIVE JUROR:  P-R-E-Z-E-A-U.

15     THE CLERK:  Z-E-A-U.

16     THE COURT:  P-R-E...

17     PROSPECTIVE JUROR:  Z-E-A-U.

18     THE CLERK:  P-R-E-Z-E-A-U.

19     Seat fourteen, Katie Dixon.

20     PROSPECTIVE JUROR:  Present.

21     THE CLERK:  D-I-X-O-N.

22     Seat fifteen is Shane O'Reilly.

23     PROSPECTIVE JUROR:  Here.

24     THE CLERK:  O-R-E-I-L-L-Y.

25     Seat sixteen, Eva (phonetic) Jablonska.

Voir Dire

1    Ms. Gray?

2    PROSPECTIVE JUROR:  Williamsburg.

3    THE COURT:  Ms. Slobod?

4    PROSPECTIVE JUROR:  Sheepshead Bay.

5    THE COURT:  Sheepshead Bay.

6    Ms. Shaffee?

7    PROSPECTIVE JUROR:  Coney Island.

8    THE COURT:  Ms. Sanchez?

9    PROSPECTIVE JUROR:  Bay Ridge.

10   THE COURT:  Mr. Hatcher?

11   PROSPECTIVE JUROR:  Bedford-Stuyvesant.

12   THE COURT:  Bed-Stuy.

13   Ms. Dixon?

14   PROSPECTIVE JUROR:  East New York.

15   THE COURT:  I'm sorry?

16   PROSPECTIVE JUROR:  East New York.

17   THE COURT:  Okay.

18   Ms. Jablonska?

19   PROSPECTIVE JUROR:  Bay Ridge.

20   THE COURT:  Bay Ridge.

21   Ms. Conigliaro?

22   PROSPECTIVE JUROR:  Bensonhurst.

23   THE COURT:  And Mr. Feinstein?

24   PROSPECTIVE JUROR:  Carroll Gardens.

25   MS. CHU:  I'm sorry?

Voir Dire

1          THE COURT:  Carroll Gardens.

2          Ms. Fadaka?

3          PROSPECTIVE JUROR:  Fort Green.

4          THE COURT:  Ms. Clements?

5          PROSPECTIVE JUROR:  Prospect Heights.

6          THE COURT:  Prospect Heights.

7          Mr. O'Reilly.

8          PROSPECTIVE JUROR:  Crown Heights.

9          THE COURT:  Crown Heights.

10         Ms. Prezeau?

11         PROSPECTIVE JUROR:  Flatbush.

12         THE COURT:  Mr. Rossi?

13         PROSPECTIVE JUROR:  Flatbush.

14         THE COURT:  Flatbush.

15         Mr. Perrier?

16         PROSPECTIVE JUROR:  Bay Ridge.

17         THE COURT:  Bay ridge.

18         Ms. Olibris?

19         PROSPECTIVE JUROR:  Crown Heights.

20         THE COURT:  Crown Heights?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Mr. O'Connell?

23         PROSPECTIVE JUROR:  Williamsburg.

24         THE COURT:  Williamsburg.

25         Mr. Healey?

Voir Dire

1              THE COURT:  I'm sorry, what?

2              PROSPECTIVE JUROR:  I am here a year and a

3     half, I am trying to get hired by MTA.

4              THE COURT:  Who do you work for now?

5              PROSPECTIVE JUROR:  I'm unemployed.

6              PROSPECTIVE JUROR:  Unemployed.

7              THE COURT:  Oh, you're unemployed?

8              PROSPECTIVE JUROR:  Yes, Judge.

9              THE COURT:  I'm sorry.

10             Presently unemployed, okay.

11             Ms. Gray, married, single, separated,

12    divorced?

13             PROSPECTIVE JUROR:  Single.

14             THE COURT:  And your occupation?

15             PROSPECTIVE JUROR:  I'm an actor.

16             THE COURT:  And Ms. Slobod?

17             PROSPECTIVE JUROR:  I'm married.

18             THE COURT:  Married.

19             PROSPECTIVE JUROR:  Home attendant.

20             THE COURT:  What do you do for a living?

21             PROSPECTIVE JUROR:  I do everything.

22             THE COURT:  You work or --

23             PROSPECTIVE JUROR:  Home attendant.

24             THE COURT:  You're a home attendant.

25             And your husband?

Voir Dire

1        PROSPECTIVE JUROR:  School bus driver.

2        THE COURT:  Okay.  All right.

3        Ms. Shaffee?

4        PROSPECTIVE JUROR:  Divorced.

5        And retired.

6        THE COURT:  What did you do before you

7    retired?  What kind of work did you?

8        PROSPECTIVE JUROR:  Accountant and

9    administrative duties.

10        THE COURT:  Ms. Sanchez?

11        PROSPECTIVE JUROR:  Married.

12        THE COURT:  Your occupation?

13        PROSPECTIVE JUROR:  Executive assistant for

14    Citibank.

15        THE COURT:  Executive assistant city what?

16        PROSPECTIVE JUROR:  Executive assistant.  The

17    company is Citibank.

18        THE COURT:  Oh, Citibank.

19        Who has -- all devices have to be turned off.

20        And your spouse?

21        PROSPECTIVE JUROR:  Analyst, anti money

22    laundering for the Citibank.

23        THE COURT:  Financial analysis?

24        PROSPECTIVE JUROR:  Yeah, anti money

25    laundering.

Voir Dire

1           THE COURT:  All right.

2           And Mr. Hatcher?

3           PROSPECTIVE JUROR:  Single.

4           THE COURT:  Your occupation?

5           PROSPECTIVE JUROR:  Cashier, security.

6           THE COURT:  You work as a cashier and also a

7      security guard?

8           PROSPECTIVE JUROR:  Sometimes.

9           THE COURT:  Ms. Dixon?

10           PROSPECTIVE JUROR:  Single.

11           Home health aide.

12           Ms. Jablonska?

13           PROSPECTIVE JUROR:  Divorced.

14           Housekeeper.

15           THE COURT:  Ms. Conigliaro?

16           PROSPECTIVE JUROR:  Divorced.

17           Finance coordinator for a charter school.

18           THE COURT:  Mr. Feinstein?

19           PROSPECTIVE JUROR:  Married.

20           Advertising creative director.

21           THE COURT:  And your spouse?

22           PROSPECTIVE JUROR:  Small business owner.

23           THE COURT:  What kind of business?

24           PROSPECTIVE JUROR:  Writing workshops.

25           THE COURT:  Ms. Fadaka?

Voir Dire

1       PROSPECTIVE JUROR:  Single, registered nurse.

2       THE COURT:  Ms. Clements?

3       PROSPECTIVE JUROR:  Digital marketing manager.

4       THE COURT:  You married, single?

5       PROSPECTIVE JUROR:  Divorced.

6       THE COURT:  What do you do?

7       PROSPECTIVE JUROR:  Digital marketing manager.

8       THE COURT:  Mr. O'Reilly?

9       PROSPECTIVE JUROR:  I'm single.

10      And beer salesman.

11      THE COURT:  A beer salesman?

12      PROSPECTIVE JUROR:  Yeah.

13      THE COURT:  And Ms. Prezeau?

14      PROSPECTIVE JUROR:  Divorced.

15      Home attendant.

16      THE COURT:  And Mr. Rossi?

17      PROSPECTIVE JUROR:  Married.

18      Retail manager.

19      THE COURT:  And your spouse?

20      PROSPECTIVE JUROR:  She's unemployed.

21      THE COURT:  What?

22      PROSPECTIVE JUROR:  Unemployed.

23      THE COURT:  Unemployed?

24      PROSPECTIVE JUROR:  Yes.

25      THE COURT:  Did she work before?

Voir Dire

1      PROSPECTIVE JUROR:  A while ago.

2      THE COURT:  Doing what?

3      PROSPECTIVE JUROR:  She was doing secretary

4  work.

5      THE COURT:  Mr. Perrier?

6      PROSPECTIVE JUROR:  Single.

7      Laboratory manager.

8      THE COURT:  What kind of lab?

9      PROSPECTIVE JUROR:  Biological and

10  radiological research.

11      THE COURT:  You're a laboratory assistant, you

12  said?

13      PROSPECTIVE JUROR:  Manager.

14      THE COURT:  Oh, manager, I'm sorry.

15      Ms. Olibris, married, single, separated?

16      PROSPECTIVE JUROR:  Divorced.

17      Social worker.

18      THE COURT:  And Mr. O'Connell?

19      PROSPECTIVE JUROR:  Single.

20      Graphic designer.

21      THE COURT:  And Mr. Healey?

22      PROSPECTIVE JUROR:  Divorced.

23      Law enforcement.

24      THE COURT:  What do you do?

25      PROSPECTIVE JUROR:  I'm a lieutenant at the

Voir Dire

1     New York City Taxi Limousine Commission.

2              THE COURT:  You're a lieutenant with whom?

3              PROSPECTIVE JUROR:  New York City Taxi

4     Limousine Commission.

5              THE COURT:  And Mr. Nuciforo?

6              PROSPECTIVE JUROR:  Single.

7              Full-time student and I coach soccer at a day

8     camp.

9              THE COURT:  What are you studying?

10             PROSPECTIVE JUROR:  Civil engineering.

11             THE COURT:  Civil engineering, all right.

12             First row, any of you ladies and gentlemen

13    ever serve on a jury before?

14             Just raise your hand if you did.

15             Ms. Shaffee, what kind of jury was it?  Civil?

16             PROSPECTIVE JUROR:  Civil.

17             THE COURT:  Civil, okay.

18             How long ago?

19             PROSPECTIVE JUROR:  A little over six years.

20             THE COURT:  Okay.

21             And, Mr. Feinstein, how long ago for you?

22    What kind of jury was it?

23             PROSPECTIVE JUROR:  Criminal, seven years.

24             THE COURT:  Criminal?

25             PROSPECTIVE JUROR:  Yes.

Voir Dire

1          THE COURT:  What was the charge?

2          PROSPECTIVE JUROR:  Arson.

3          THE COURT:  Was there a verdict, yes or no?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  How long ago was that?

6          PROSPECTIVE JUROR:  Seven years ago.

7          THE COURT:  Seven years ago.

8          Second row, same question, any of you ever sat

9     on a jury before, civil or criminal?

10          Okay.

11          First row, any of you ladies and gentlemen

12     ever been the victim of a crime, be it a petty crime or

13     a major crime, any crime, you, yourself, been the victim

14     or someone close to you or a relative?  Anyone in the

15     first row?

16          Mr. Feinstein?

17          PROSPECTIVE JUROR:  I've been robbed twice.

18          THE COURT:  Raise your hand then I'll respond

19     to you.

20          All right.

21          Ms. Shaffee, you have been robbed twice?

22          PROSPECTIVE JUROR:  Yeah.

23          THE COURT:  Were weapons involved?

24          PROSPECTIVE JUROR:  Once, at gunpoint, in the

25     office and then another time was in an apartment

Voir Dire

1    building, by the elevator.

2                THE COURT:  Was the office at gunpoint?

3                PROSPECTIVE JUROR:  The office was gunpoint,

4    yes.

5                THE COURT:  And the second one is where?

6                PROSPECTIVE JUROR:  In my building.

7                THE COURT:  In your apartment or in the

8    hallway?

9                PROSPECTIVE JUROR:  No, by the elevator.

10               THE COURT:  By the elevator?

11               PROSPECTIVE JUROR:  By the elevator.

12               THE COURT:  Was there a weapon there?

13               PROSPECTIVE JUROR:  No.

14               THE COURT:  Okay.

15               Did you report both?

16               PROSPECTIVE JUROR:  Yeah.  My apartment was

17   robbed once also.

18               THE COURT:  Your what?

19               PROSPECTIVE JUROR:  My apartment was robbed

20   also once.

21               THE COURT:  Also your apartment was

22   burglarized?

23               PROSPECTIVE JUROR:  Also, yeah.

24               THE COURT:  And you reported that?

25               PROSPECTIVE JUROR:  Yeah.

Voir Dire

1          THE COURT:  Oh, your nephew.  Sorry.

2          And how did that occur, shooting, stabbing?

3          PROSPECTIVE JUROR:  Shooting.

4          THE COURT:  How long ago?

5          PROSPECTIVE JUROR:  Three years.

6          THE COURT:  Did they ever find out who did it?

7          PROSPECTIVE JUROR:  Yes.  His girlfriend --

8    his wife.

9          THE COURT:  Which?  Wife?

10         PROSPECTIVE JUROR:  Girlfriend.

11         THE COURT:  Domestic violence?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Did she go to jail?  Was she

14   convicted?

15         PROSPECTIVE JUROR:  No.  We couldn't -- we

16   didn't have enough money to pursue it.  It was

17   Upstate -- in Connecticut, and we couldn't do anything

18   and they didn't want to do anything for us on our part.

19         THE COURT:  The police didn't want to do

20   anything?

21         PROSPECTIVE JUROR:  Well, the police said he

22   shot himself and when -- when we get somebody to

23   investigate, the bullet was in the back of his head so,

24   you know, then they -- we asked them if there was gun

25   residue on his hand and they couldn't give us an answer.

Voir Dire

1      THE COURT:  Sorry to hear that.

2      Anyone else?

3      Mr. Rossi?

4      PROSPECTIVE JUROR:  Robbed at gunpoint.

5      THE COURT:  You were robbed at gunpoint?

6      PROSPECTIVE JUROR:  Yes.

7      THE COURT:  When?  How long ago?

8      PROSPECTIVE JUROR:  Probably about fifteen,

9   sixteen years ago.

10      THE COURT:  Was that reported to the police?

11      PROSPECTIVE JUROR:  It was.

12      THE COURT:  Was the perpetrator ever

13   apprehended?

14      PROSPECTIVE JUROR:  No.

15      And I was also shot in my leg.

16      THE COURT:  You were shot in your leg?

17      PROSPECTIVE JUROR:  Yes.

18      THE COURT:  Was that person apprehended?

19      PROSPECTIVE JUROR:  No.

20      THE COURT:  Was it a drive-by or what was it?

21      PROSPECTIVE JUROR:  I was just caught in the

22   middle of, like, a shootout.

23      THE COURT:  Who else?

24      Ms. Olibris?

25      PROSPECTIVE JUROR:  Olibris (pronunciation).

mc

Voir Dire

1          (Whereupon, there was a brief pause in the

2      proceedings.)

3          THE COURT:  Ms. Olibris, you want to come up,

4      you said?

5          PROSPECTIVE JUROR:  My laptop, somebody stole

6      my laptop from my room.

7          THE COURT:  Somebody stole your laptop from

8      your room?

9          PROSPECTIVE JUROR:  My room.

10          THE COURT:  Who else?

11          Mr. O'Connell?

12          PROSPECTIVE JUROR:  My aunt got murdered by --

13      by a boyfriend.

14          THE COURT:  Was a weapon involved?

15          PROSPECTIVE JUROR:  I think just his hands.

16          THE COURT:  How long ago was that?

17          PROSPECTIVE JUROR:  Four years ago.

18          THE COURT:  He was arrested?

19          PROSPECTIVE JUROR:  Yeah.  He killed himself

20      so --

21          THE COURT:  Oh, he killed himself.  Sorry to

22      hear that.

23          Mr. Healey?

24          PROSPECTIVE JUROR:  I worked for a gas station

25      and we were robbed at gunpoint.

124

Voir Dire

1              THE COURT:  Okay.

2         You were working at the gas station?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  And anyone else?

5         That's it?

6              First row, any of you ladies and gentlemen

7    ever been accused of or arrested for or convicted for a

8    crime, either yourself or someone close to you or a

9    relative?  Anyone?

10             Mr. Hatcher?

11             PROSPECTIVE JUROR:  There was a brawl by the

12   police station, I was coming from the store and I guess

13   cops were everywhere and I was on my way home and I got

14   stopped by the police, you know, thrown to the car and

15   everything.  I wasn't even involved.  And they was

16   searching my pockets, everything, for I guess, like, a

17   gun or a weapon because they said I might have had it.

18             THE COURT:  There was a fight in front of a

19   police station you said?

20             PROSPECTIVE JUROR:  Yeah.

21             THE COURT:  On the street?

22             PROSPECTIVE JUROR:  Yeah.  There was also a

23   store there I was coming from.

24             THE COURT:  So they thought you were part of

25   this fight or brawl, you said?

mc

Voir Dire

1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  Were you taken in and booked or

3      not?

4              PROSPECTIVE JUROR:  No.  My mother came to get

5      me.

6              THE COURT:  How old were you at the time?

7              PROSPECTIVE JUROR:  It was before I left.  I

8      was about eighteen.

9              THE COURT:  Before you left for what?

10             PROSPECTIVE JUROR:  To Pennsylvania.  I was

11     about seventeen, eighteen.

12             THE COURT:  How long ago was that?

13             PROSPECTIVE JUROR:  About two years ago.

14             THE COURT:  Is that going to affect your

15     judgment in this case?

16             PROSPECTIVE JUROR:  It might 'cause there was

17     another incident that happened.

18             THE COURT:  What happened?

19             PROSPECTIVE JUROR:  I guess somebody called

20     the cops on my mother for something, and I wasn't aware

21     of that, just kind of like walked into it, and police

22     came to the door and there was a problem, and then the

23     cops just stopped me again because they thought I might

24     have been trying to do something.  They had me against

25     the wall, tried to handcuff me.

                                                          mc

Voir Dire

1          THE COURT:  Were you booked on that?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  And what happened?

4          PROSPECTIVE JUROR:  They kind of stopped once

5     they found out what was really going on.  There was a

6     big misunderstanding.

7          THE COURT:  It was a misunderstanding, you

8     said?

9          PROSPECTIVE JUROR:  I kind of just walked in.

10    I was in the hallway listening.

11         THE COURT:  So you say it is going to affect

12    you or not?

13         PROSPECTIVE JUROR:  It might, yeah.

14         THE COURT:  You are excused, Mr. Hatcher.

15         PROSPECTIVE JUROR:  Thank you.

16         THE CLERK:  Seat number six will be Margaret

17    Gabriel.

18         PROSPECTIVE JUROR:  Yes.

19         THE CLERK:  G-A-B-R-I-E-L.

20         THE COURT:  Do you have any problems sitting

21    on this, Ms. Gabriel?

22         PROSPECTIVE JUROR:  No, not at all.

23         THE COURT:  Okay.

24         Ms. Gabriel, your neighborhood?

25         PROSPECTIVE JUROR:  East Flatbush.

Voir Dire

1           THE COURT:  East Flatbush.

2           And you're familiar with the crime scene area?

3           PROSPECTIVE JUROR:  No, I'm not.

4           THE COURT:  Married, single, separated,

5      divorced?

6           PROSPECTIVE JUROR:  Divorced.

7           THE COURT:  Have you ever served on a jury

8      before?

9           PROSPECTIVE JUROR:  No.

10          THE COURT:  Okay.

11          Have you ever been the victim of a crime?

12          PROSPECTIVE JUROR:  Just recently, in

13     November, I was.  My home was burglarized.

14          THE COURT:  Home burglarized.

15          Have you ever been accused or arrested or

16     convicted of a crime, or someone close to you?

17          PROSPECTIVE JUROR:  No, not that I know of.

18          THE COURT:  Anyone else?

19          Thank you very much.

20          Anyone else?

21          First row?

22          Second row?

23          Anyone accused, arrested, convicted of a

24     crime, or someone close to you?

25          That's Mr. O'Connell?

```
 1              PROSPECTIVE JUROR:  Last year I --

 2              THE COURT:  What?

 3              PROSPECTIVE JUROR:  Last year I went into the

 4    wrong apartment coming back pretty drunk.

 5              THE COURT:  Start over, slowly.

 6              PROSPECTIVE JUROR:  Sorry, sorry.

 7              It was trespass.  I went into the wrong

 8    apartment by accident, so the cops came and started to

 9    arrest me then the apartment people realized I wasn't

10    really --

11              THE COURT:  You said you went into another

12    apartment, you thought it was your apartment?

13              PROSPECTIVE JUROR:  Yeah, yeah.  I had a few

14    drinks and I didn't get pressed charges, in the end.

15              THE COURT:  Did they drop the charges?

16              PROSPECTIVE JUROR:  Eventually.

17              THE COURT:  Were you booked on it?

18              PROSPECTIVE JUROR:  They gave me a ticket.  I

19    was handcuffed and stuff.

20              THE COURT:  So you were given a ticket for --

21              PROSPECTIVE JUROR:  Trespassing, but it

22    never --

23              THE COURT:  Where are you from?  Australia?

24              PROSPECTIVE JUROR:  England.

25              THE COURT:  England?
```

Voir Dire

1            PROSPECTIVE JUROR:  Yeah.

2            THE COURT:  How long ago was this?

3            PROSPECTIVE JUROR:  Last year.

4            THE COURT:  Anybody else?

5            All right.

6            First row, any of you ladies and gentlemen

7 related to, friendly with, interact with any law

8 enforcement agents or attorneys?

9            First row?

10           Ms. Gabriel?

11           PROSPECTIVE JUROR:  My son is a police

12 officer.

13           THE COURT:  Son's a police officer where?

14           PROSPECTIVE JUROR:  I think he just got

15 transferred to a precinct in Queens.  I'm not familiar

16 with it.

17           THE COURT:  Anyone else?

18           Yes, Mr. Feinstein?

19           PROSPECTIVE JUROR:  My father was a

20 prosecuting attorney for the Justice Department.

21           THE COURT:  Father works for the Attorney

22 General?

23           PROSPECTIVE JUROR:  Department of Justice in

24 Washington.

25           THE COURT:  U.S. Attorney.

1          How long ago did he work there?

2          PROSPECTIVE JUROR:  Fifteen years ago.

3          THE COURT:  Is he retired?

4          PROSPECTIVE JUROR:  He's a musician now as a

5     profession.

6          THE COURT:  He's probably happier.

7          PROSPECTIVE JUROR:  Much.

8          THE COURT:  Okay.

9          Anyone else, first row?

10          No attorneys, no law enforcement agents?

11          Second row, anyone friendly with --

12          Ms. -- let's see, that's Ms. Clements?

13          PROSPECTIVE JUROR:  Yes.

14          My sister is a paralegal.

15          THE COURT:  What?

16          PROSPECTIVE JUROR:  My sister's a paralegal.

17          THE COURT:  Oh, your sister's a paralegal.

18          She works for a law firm?

19          PROSPECTIVE JUROR:  Yes, in Atlanta.  I'm not

20     familiar with the name, I'm sorry.

21          THE COURT:  Paralegal in an Atlanta law firm.

22          Do you know what kind of work they do?

23          PROSPECTIVE JUROR:  I don't know.

24          THE COURT:  Okay.

25          Anyone else?

Voir Dire

 1            Mr. O'Connell?

 2            PROSPECTIVE JUROR:  My dad is an attorney.  He

 3    was a prosecutor for United States defense.

 4            THE COURT:  Your dad is an attorney in

 5    England?

 6            PROSPECTIVE JUROR:  He's over here.

 7            THE COURT:  Over here?

 8            PROSPECTIVE JUROR:  Yeah.

 9            THE COURT:  What kind of attorney?  Criminal

10    defense?

11            PROSPECTIVE JUROR:  Criminal defense.  He was

12    a prosecutor for --

13            THE COURT:  And who else raised their hand?

14            Mr. Healey, you're in law enforcement?

15            PROSPECTIVE JUROR:  I worked for law

16    enforcement.

17            THE COURT:  All right.

18            Anybody else?

19            Oh, yes, Mr. Nuciforo.

20            PROSPECTIVE JUROR:  My uncle was a detective

21    in the N.Y.P.D. and another uncle was a sergeant in the

22    L.A.P.D.

23            THE COURT:  So your uncle was a detective in

24    the N.Y.P.D. and you had another uncle?

25            PROSPECTIVE JUROR:  He was a sergeant in the

Voir Dire

1          THE COURT:  Ms. Conigliaro?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Mr. Feinstein?

4          PROSPECTIVE JUROR:  I can't say I could or

5    couldn't.

6          THE COURT:  What's the reason?

7          PROSPECTIVE JUROR:  Experience of serving as a

8    juror last time.

9          THE COURT:  You had some experience when you

10   were a juror last time?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  When was the last time you sat?

13         PROSPECTIVE JUROR:  About seven years ago.

14         THE COURT:  And there were problems with the

15   jury or what?

16         PROSPECTIVE JUROR:  The prosecutor shared

17   information with us after the verdict.

18         THE COURT:  That disturbed you?

19         PROSPECTIVE JUROR:  Yeah.  It made me --

20         THE COURT:  You are excused, Mr. Feinstein.

21         Fill the box.

22         THE CLERK:  Seat twenty will be Charles Curto,

23   C-U-R-T-O.

24         PROSPECTIVE JUROR:  Yes.

25         MR. WALENSKY:  Your Honor, may we approach for

mc

Voir Dire

1    a moment?

2              THE COURT:  Come up.

3              (Whereupon, a sidebar conference was held off

4    the record.)

5              THE COURT:  Mr. Curto, your neighborhood?

6              PROSPECTIVE JUROR:  Bensonhurst.

7              THE COURT:  And you're familiar with the crime

8    scene area?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Married, single, separated?

11             PROSPECTIVE JUROR:  Single.

12             THE COURT:  Your occupation?

13             PROSPECTIVE JUROR:  I'm a manager at a Rite

14   Aid Pharmacy.

15             THE COURT:  Okay.

16             And have you ever served on a jury before?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  No.

19             Have you ever been the victim of a crime, or

20   someone close to you?

21             PROSPECTIVE JUROR:  There was this little hit

22   and run, I was on a bike and a car -- I filled out an

23   incident report, never went to the hospital.  I was

24   okay.  That was last summer.

25             THE COURT:  You were hit and run?  You were

Voir Dire

1    hit on a bike?

2            PROSPECTIVE JUROR:  I was on a bike.

3            THE COURT:  And the car took off?

4            PROSPECTIVE JUROR:  Yeah.

5            THE COURT:  Okay.

6            Have you ever been accused, arrested or

7    convicted of a crime, or someone close to you?

8            PROSPECTIVE JUROR:  No, sir.

9            THE COURT:  And are you related to, interact

10   with, friendly with, any law enforcement agents or

11   attorneys?

12           PROSPECTIVE JUROR:  No.

13           THE COURT:  Can you be fair and impartial in

14   this case?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Thank you.

17           All right.

18           Ms. Fadaka, can you be fair and impartial in

19   this case?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  Ms. Clements?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  Mr. O'Reilly?

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  Ms. Prezeau?

Voir Dire

```
 1              PROSPECTIVE JUROR:  I'm not sure.

 2              THE COURT:  You are not sure?

 3              PROSPECTIVE JUROR:  No.

 4              THE COURT:  Why not?

 5              PROSPECTIVE JUROR:  I will be too emotional.

 6              THE COURT:  Is this related to your nephew?

 7              PROSPECTIVE JUROR:  Yeah.

 8              THE COURT:  You are excused.

 9              Ms. Prezeau?

10              I'm sorry.

11              THE CLERK:  Thirteen, she's excused.

12              THE COURT:  Fill the box.

13              THE CLERK:  Seat number thirteen will be

14      Jonathan Crockett.

15              Say "here" or "present."

16              C-R-O-C-K-E-T-T.

17              THE COURT:  Do you have any problem sitting on

18      this matter, Mr. Crockett?

19              PROSPECTIVE JUROR:  No.

20              THE COURT:  Mr. Crockett, your neighborhood?

21              PROSPECTIVE JUROR:  Greenpoint.

22              THE COURT:  And you are familiar with the

23      crime scene area?

24              PROSPECTIVE JUROR:  I don't think so.

25              THE COURT:  Okay.
```

mc

Voir Dire

1           Married, single, separated, divorced?

2           PROSPECTIVE JUROR:  Engaged.

3           THE COURT:  Engaged.

4           And your occupation?

5           PROSPECTIVE JUROR:  Web developer.

6           THE COURT:  A what?

7           PROSPECTIVE JUROR:  Web developer.

8           THE COURT:  Web developer, okay.

9           And your significant other?

10          PROSPECTIVE JUROR:  She's a project manager

11   but currently unemployed.

12          THE COURT:  Okay.

13          Have you ever sat on a jury, another jury?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Have you ever been the victim of a

16   crime, or someone close to you?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  What?

19          PROSPECTIVE JUROR:  Burglary.

20          THE COURT:  Your apartment or home?

21          PROSPECTIVE JUROR:  Apartment.  And --

22          THE COURT:  What else?

23          PROSPECTIVE JUROR:  My parents had their car

24   stolen and they had their house burglarized before.

25          THE COURT:  Have you ever been accused of,

138

Voir Dire

1    arrested for, or convicted of a crime?

2                    PROSPECTIVE JUROR:  Yes.  When I was a

3    teenager, like criminal mischief.

4                    THE COURT:  Did you go to Family Court?

5                    PROSPECTIVE JUROR:  Yes.

6                    THE COURT:  What did they do?  What happened

7    after you were arrested?

8                    PROSPECTIVE JUROR:  Well, I eventually got an

9    ACD.

10                   THE COURT:  Okay.

11                   Are you related to, friendly with, interact

12   with any law enforcement agents or attorneys?

13                   PROSPECTIVE JUROR:  Well, my uncle and my

14   cousin are both immigration lawyers.

15                   I have two second cousins that are both police

16   officers in New Jersey.

17                   THE COURT:  In New Jersey, two what?

18                   PROSPECTIVE JUROR:  Police officers.

19                   THE COURT:  What is their relationship?

20                   PROSPECTIVE JUROR:  Second cousins.  Cousins.

21                   THE COURT:  Okay.

22                   Can you be fair and impartial in this case?

23                   PROSPECTIVE JUROR:  Yes.

24                   THE COURT:  Thank you.

25                   Mr. Rossi?

Voir Dire

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Mr. Perrier?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Ms. Olibris?

5          PROSPECTIVE JUROR:  My job might be a problem.

6          THE COURT:  What do you do?

7          PROSPECTIVE JUROR:  I am on vacation now.  I

8     am supposed to be returning to my job on the 1st and I

9     haven't told my supervisor.

10          THE COURT:  You don't have to worry about that

11    because they can't do anything.  You are on jury service

12    or participating in jury service, you cannot -- your job

13    cannot be affected.

14          You understand?

15          And we will inform them of that fact, all

16    right?

17          PROSPECTIVE JUROR:  Okay.

18          THE COURT:  Who do you work for?

19          PROSPECTIVE JUROR:  SCO Family Services.  I

20    work with children and families.

21          THE COURT:  My question to you, can you be

22    fair and impartial in this case?

23          PROSPECTIVE JUROR:  Yeah.

24          THE COURT:  Okay.

25          Thank you.

1          Mr. O'Connell?

2          PROSPECTIVE JUROR:  Yep.

3          THE COURT:  Mr. Healey?

4          PROSPECTIVE JUROR:  Yes, sir.

5          THE COURT:  And Mr. Nuciforo?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Okay.

8          All right, proceed.

9          MR. POVILL:  Is this a good time to take a

10    quick break?  Before questioning I just need five

11    minutes, if I could.

12          THE COURT:  Now or --

13          MR. POVILL:  Before I question.  I didn't know

14    if now was a better time.

15          THE COURT:  We'll see.

16          Go ahead.

17          MS. CHU:  Good morning, ladies and

18    gentlemen -- good afternoon.  I'm sorry, good afternoon,

19    ladies and gentlemen.  How are you guys doing?

20          I hope you guys were paying attention because

21    we are kind of going to go over the same things we spoke

22    about with the other panel about now.

23          So, again, no right or wrong answers, I just

24    want honest answers because I don't want you to think,

25    oh, she wants me to say this, then you say something

Voir Dire - People/Ms. Chu

1    that is not actually what you feel, then we will run

2    into a problem.  Okay.

3            Now, we spoke about the different types of

4    evidence, that there's physical evidence, there's

5    pictures, there's stuff you can hold in your hands.  But

6    there is also evidence that comes in the form of

7    testimony, meaning that if someone talks to you about

8    what it is that they saw, the question and answer of

9    that person is considered evidence as well.

10           Can you all accept that proposition?

11           Now, I know with the last panel I was talking

12   about how there is -- there are no eyewitnesses to the

13   actual occurrence.  You are not going to hear from one

14   witness who's going to say that I was there and I saw

15   the defendant stabbing the victim in this case, okay.

16           And I just want to ask you, can you think of a

17   reason why there might not be a witness to see this

18   happen?

19           Anybody think of a reason?

20           Ms. --

21           MR. WALENSKY:  Objection, your Honor.

22           MS. CHU:  Miss Sanchez, --

23           THE COURT:  I will allow it.

24           MS. CHU:  -- can you think of a reason why

25   there might not be a reason to what happened?

Voir Dire - People/Ms. Chu

1      PROSPECTIVE JUROR:  No.  I mean, no one was

2   around and no one was around.

3      MS. CHU:  It was only them two, right?

4      PROSPECTIVE JUROR:  Right.

5      MS. CHU:  So keeping that in mind -- now, I am

6   not saying that you are not going to hear any evidence

7   that shows, that the defendant did it.  In fact, I told

8   the panel before that most of the evidence that's going

9   to prove that the defendant did this crime is going to

10   come from the words that she said to different people.

11   All right.

12      Now, we talked a little bit about the -- you

13   know, someone who would speak to police, someone who was

14   a suspect of a crime speaking to police and the suspect

15   of a crime might be talking to someone else that is not

16   in law enforcement.

17      Do you think the relationship that the person

18   has with who they are talking to would affect the

19   reliability of what they're saying?

20      Do you understand what I am talking about, Mr.

21   Nuciforo?

22      PROSPECTIVE JUROR:  You mean the perception

23   would affect how they see things?

24      MS. CHU:  The relationship that they have with

25   the person they are talking to.

Voir Dire - People/Ms. Chu

1        PROSPECTIVE JUROR:  Potentially.

2        MS. CHU:  Mr. O'Connell, you think that would

3    have something to do with it?

4        PROSPECTIVE JUROR:  Yes.

5        MS. CHU:  Why?

6        PROSPECTIVE JUROR:  Why?

7        MS. CHU:  Why do you think it would have

8    something to do with whether or not they are truthful or

9    not, to the person they're talking to?

10       PROSPECTIVE JUROR:  Because they are separate

11   conversations, usually you're truthful to people that

12   you are conversing with.

13       MS. CHU:  People you're closer with?

14       PROSPECTIVE JUROR:  Yes.

15       MS. CHU:  Now, we had Mr. -- I believe it was

16   Mr. Jenkins on the last panel, he said that, you know --

17   I'm sorry, it was Ms. Webster who said that she would

18   have a problem, she would have a problem accepting the

19   premise that someone who's suspected of a crime would

20   actually want to talk to the police.  I believe other

21   people said I can see why they might want to talk to the

22   police.

23           Anybody here of the opinion that there is no

24   way that someone would want to talk to the police if

25   they are a suspect in a crime?

mc

1           Anybody who says, you know what, that can't

2      possibly happen?

3           Can you all accept that that possibly could

4      happen?

5           Yes?

6           We talked about, depending on who you're

7      talking to, the best light for the -- you might say

8      things that may be some half truths, maybe some whole

9      truths, maybe some lies.  Do you think that is a

10     possibility?

11          Now, do you think you are the kind of persons

12     or jurors who would be able to distinguish between when

13     someone's talking and saying something and being able to

14     figure out what part of their statement might be true,

15     what part might be false and you can compare and

16     contrast that to other evidence?

17          Do you think that you can do that if you're

18     selected in this case?

19          Yes?

20          Anybody here think they can't do it?

21          Ms. Jablonska, how do you feel about that?

22          PROSPECTIVE JUROR:  I don't know it.

23          MS. CHU:  You don't know it?

24          PROSPECTIVE JUROR:  I don't know.

25          MS. CHU:  Did you understand?  Do you

1    understand what I am asking?

2              PROSPECTIVE JUROR:  Yes.

3              MS. CHU:  You don't know whether you would be

4    able --

5              PROSPECTIVE JUROR:  Yeah.

6              MS. CHU:  -- to distinguish?  You would have a

7    hard time?

8              PROSPECTIVE JUROR:  I don't know if I would

9    know if he is telling the truth, who's telling a lie, so

10   I would have to --

11             MS. CHU:  You would have to be in the

12   situation in order to decide?

13             PROSPECTIVE JUROR:  Yeah.

14             MS. CHU:  The only thing that I am asking you,

15   can you keep an open mind and wait and hear all the

16   evidence?

17             PROSPECTIVE JUROR:  Of course.

18             MS. CHU:  Then you can compare what you learn

19   from this witness proves that what they said here was

20   true, what I learned from this witness says maybe that

21   wasn't so true?  Can you do that in this case?

22             PROSPECTIVE JUROR:  Yes.

23             MS. CHU:  Now, I know, Ms. Slobod --

24             PROSPECTIVE JUROR:  I'm not sure.

25             MS. CHU:  I know you had mentioned earlier

Voir Dire - People/Ms. Chu

1    that you have somewhat of a language issue.  Have you

2    been able to understand what we are talking about here?

3            PROSPECTIVE JUROR:  It's problem.  Sometimes I

4    understand, sometimes no.

5            MS. CHU:  Sometimes no?

6            PROSPECTIVE JUROR:  Depends who's speaking.

7            MS. CHU:  Now, of everything that has been

8    discussed up to this time, that I am talking to you now,

9    what percentage do you think you understood?

10           PROSPECTIVE JUROR:  Depends.

11           MS. CHU:  Everything that you've heard so far?

12           PROSPECTIVE JUROR:  No.

13           MS. CHU:  So would it be like eighty percent,

14   seventy percent, ninety percent?

15           PROSPECTIVE JUROR:  Twenty, maybe, percent.

16           MS. CHU:  Twenty percent?

17           PROSPECTIVE JUROR:  I work with ethnic group.

18   I don't use English in my work.

19           MS. CHU:  So you think that your language

20   issues would make it so you wouldn't be a fair juror in

21   this case?  Is that what you are trying to say?

22           PROSPECTIVE JUROR:  I don't understand.

23           MS. CHU:  You don't understand, okay.

24           Thank you very much for being honest.

25           Is there anyone else here who hasn't

Voir Dire - People/Ms. Chu

1    type of evidence you would not be able to render a

2    decision in this case?

3              Everybody okay with the fact that we don't

4    have fingerprints, there's no knife, no knife was ever

5    recovered and no videotape of the actual crime?

6              With all the surveillance that goes on, you

7    hear about it on TV, we don't have that here, I am being

8    honest with you from the beginning.  I need to know

9    whether or not you would have a problem.  Like if you

10   are convinced from other evidence that the defendant was

11   guilty, would you be able to still vote them guilty even

12   though you might want something else?

13             Do you understand what I'm asking, Ms. Dixon?

14             PROSPECTIVE JUROR:  I understand.

15             MS. CHU:  Are you okay with that?

16             PROSPECTIVE JUROR:  Yes.

17             MS. CHU:  Anybody here have a problem with

18   what types of evidence you're going to see versus what

19   type you are not going to see in this case?

20             Mr. O'Reilly?

21             PROSPECTIVE JUROR:  I mean, it's tough, not

22   having been a juror before, not being in the situation.

23   I mean, I understand everything you are saying.  I guess

24   it's kind of a situational thing.

25             MS. CHU:  I appreciate that.

Voir Dire - People/Ms. Chu

1        What I am asking, I just don't want you to

2   close your mind, you know what, I couldn't, there wasn't

3   a video, there's no way of telling the truth or not.

4   Then or other people say, you know what, I don't need a

5   videotape, if someone tells me what happened there,

6   someone tells me what happens in the middle, someone

7   tells me what happens after, I take all of that into

8   consideration, you can do that, right?

9        Ms. Fadaka, you're nodding your head.  You

10  will be good with that?

11          PROSPECTIVE JUROR:  Yes.

12          MS. CHU:  How about you, Ms. Clements?

13          PROSPECTIVE JUROR:  Yes.

14          MS. CHU:  We talked a little about sympathy,

15  you kind of look at the defendant, she's a young woman.

16  Is there anyone here that feels, let's say you're

17  selected as jurors and you listen to all the evidence

18  and all the evidence in the case convinces you that I've

19  done my job and I've proven to you beyond a reasonable

20  doubt that the defendant is guilty.  Is there anyone

21  here that's going to go back into the jury room and say,

22  you know what, Ms. Chu did her job, she did what the

23  Judge requires her to but something about her, I feel

24  sorry for her, she reminds me of a friend, she reminds

25  me of a family member?

1          Anyone here that thinks that kind of feeling

2     would prevent you from rendering a decision, even if

3     you're convinced beyond a reasonable doubt that she is

4     guilty?

5          Is there anyone here that feels that way, that

6     thinks how they feel about the defendant might affect

7     their ability to render a decision according to the

8     evidence only?

9          Everybody.

10          All right.

11          THE COURT:  Thank you, Ms. Chu.

12          MS. CHU:  Okay.

13          THE COURT:  Go ahead.

14          You gotta go.  Come on.

15          MR. POVILL:  Good afternoon, ladies and

16     gentlemen.

17          My name is Josh Povill.

18          I apologize.  I was requesting five minutes

19     just to use the bathroom, but we'll do it.

20          THE COURT:  You want five minutes to go to the

21     bathroom?

22          MR. POVILL:  That was all.

23          THE COURT:  Go to the bathroom.  We'll take a

24     break.

25          MR. POVILL:  That's okay.

Voir Dire - Defendant/Mr. Povill

1          THE COURT:  Yes.

2          Ladies and gentlemen, at this time we are

3    going to take a recess, five minutes.  Step outside.

4    Bring all your belongings with you.

5          MR. POVILL:  Thank you, your Honor.

6          THE COURT:  Do not discuss the case amongst

7    yourselves or with anyone else.

8          (Whereupon, the panel of prospective jurors

9    exited the courtroom.)

10          THE COURT:  All right, same instructions for

11    the other jurors.  Take five minutes and we will be

12    right back, all right.

13          (Whereupon, the panel of prospective jurors

14    exited the courtroom.)

15          THE COURT:  You may leave.  Take your

16    belongings.

17          (Whereupon, a brief recess was held.)

18          COURT OFFICER:  Ready for the panel, your

19    Honor?

20          THE COURT:  Yes.

21          COURT OFFICER:  Panel entering.

22          (Whereupon, the panel of prospective jurors

23    entered the courtroom.)

24          COURT OFFICER:  Take the same seats that you

25    were seated in before.

Voir Dire - Defendant/Mr. Povill

1          THE COURT:  All right, we will proceed at this

2     time.

3          MR. POVILL:  Thank you, your Honor.

4          Good afternoon again, ladies and gentlemen.

5          We've spoken a little bit about burdens,

6     right.  The prosecutor spoke about what her burden is

7     here, that she needs to prove Ms. Wisdom guilty beyond a

8     reasonable doubt, and she asked that you not hold her to

9     any higher burden.  And I want to talk a little bit

10    about the burden, right, what that means, to prove the

11    guilt.

12         Of paramount concern in our system of justice

13    is the protection of the innocent.  That is why the

14    burden is so high.  So, we already talked about the fact

15    that the government always has the burden of proof,

16    right, it never shifts, it never moves.

17         Does everybody understand that?

18         Does anybody have a problem with that?

19         I won't be offended.

20         So you can feel free to speak the truth here,

21    that's the only way we get to the answers that we need.

22         And that burden, again, it's an exceedingly

23    high one.

24         MS. CHU:  Objection to it being exceedingly

25    high, your Honor.

1      MR. POVILL:  I won't characterize, your Honor.

2      THE COURT:  Do me a favor, don't.

3      MR. POVILL:  It's not a mere constitutional

4  formality, though.  This is how the system works.  This

5  is how we make sure that the innocent don't get

6  punished, and because we all know that's the greatest

7  travesty that can happen.  So that is why you must be

8  certain it must be beyond a reasonable doubt before you

9  can convict, okay?

10      It's weird, right, you'll be asked at the end

11  of this to render a verdict but you won't be asked is

12  Ms. Wisdom guilty or innocent.  That's not the question

13  that you're going to be asked.  You will be asked, is it

14  guilty or not guilty, meaning anything other than guilty

15  beyond any reasonable doubt.

16      Now, if the government hasn't made its case

17  beyond a reasonable doubt, then the system simply is too

18  concerned that she may be innocent to let you convict

19  her.

20      MS. CHU:  Objection.  Where is this going?

21      THE COURT:  Mr. Povill, go on to something

22  else, all right, because the law is something that I

23  will be instructing them on and this has been aired

24  already, so go on to something else.

25      MR. POVILL:  Yes, your Honor.

Voir Dire - Defendant/Mr. Povill

1          Let's talk about what you'll learn here.

2          We're all human, right?

3          We all want to know exactly what happened in

4     this instance.

5          Now, that's perfectly reasonable.  But know

6     this, you may not know exactly what happened.  You may

7     not know everything that you want to know at the end of

8     this trial.  I am going to apologize right now for that,

9     but there's nothing I can do about it.  It's

10    frustrating, I understand.  It's not my job, it's not

11    defense's job to tell you the whole story and I don't

12    have the ability or the resources to do that.

13          MS. CHU:  Objection, your Honor.  This sounds

14    like an opening.

15          MR. WALENSKY:  Mr. Povill.

16          (Whereupon, there was a brief pause in the

17    proceedings.)

18          THE COURT:  Objection sustained.

19          Proceed.

20          MR. POVILL:  The question that I want to ask

21    you is, can you all appreciate and understand that if

22    you have questions at the end, if you haven't been given

23    all the answers you need to reach your verdict, then you

24    must find the defendant not guilty?

25          MS. CHU:  Objection.  It's not their burden.

1      MR. POVILL:  I don't believe I

2   mischaracterized, your Honor.

3      MR. WALENSKY:  Mr. Povill.

4      THE COURT:  The fact is, ladies and gentlemen,

5   if you have a reasonable doubt, I will define for you,

6   as to the defendant's guilt, you must find him not

7   guilty.  If you find that the People have proven his

8   guilt beyond a reasonable doubt, then you must find him

9   guilty.  But the fact is, I'll explain to you at the

10   close of the case what reasonable doubt is, okay.

11      Proceed.

12      The next question I have of you, will you all

13   follow the law as I give it to you respecting reasonable

14   doubt?

15      Go on to something else.

16      MR. POVILL:  Does anybody have a problem

17   holding the People to that burden, knowing that they --

18   the answers don't come from the defense side

19   necessarily, they come from the government?

20      Does anybody have a problem with that or find

21   that difficult, they're troubled by that?

22      PROSPECTIVE JUROR:  I would think my -- I

23   understand it is a one-way system and you have to

24   defend.  I also think to myself that if I was put in

25   that situation and I didn't do something, I would have a

Voir Dire - Defendant/Mr. Povill

1     lot to say in that sense.  But I understand why you

2     wouldn't because you might say something wrong or

3     something could turn around against you.  But I see -- I

4     wouldn't -- I'm not one hundred percent but I would like

5     to see you saying something, defending yourself.

6          MR. POVILL:  I understand.

7          While you're sitting in this room and sitting

8     in those chairs the burden is on the government.  Ms.

9     Wisdom sits innocent over there, silent and innocent.

10          PROSPECTIVE JUROR:  I can see that.

11          THE COURT:  Mr. Povill, go on to something

12     else.  This has been explored ad nauseam.  Go ahead.  If

13     you got any questions of this jury, ask.

14          MR. POVILL:  Yes.

15          Let's talk about something else.

16          Let's talk about fear.

17          There's going to be a lot of evidence that

18     comes out in this case, I suspect, and one of the things

19     that you'll be asked, likely be asked to consider is

20     whether someone reacts reasonably when they're placed in

21     fear.

22          Now, has everybody in this box been placed in

23     fear at some time in their life?  Has anyone never felt

24     fear, real fear?

25          PROSPECTIVE JUROR:  Yes.

Voir Dire - Defendant/Mr. Povill

1          MR. POVILL:  I know there's a lot of people in

2     this box who have been the victim of crimes and you know

3     that, the fear that I'm talking about.

4          Now, when you feel that -- let's see.  Mr.

5     Rossi?

6          PROSPECTIVE JUROR:  Yes.

7          MR. POVILL:  You were robbed at gunpoint

8     fifteen years ago?

9          PROSPECTIVE JUROR:  Yes.

10          MR. POVILL:  Do you remember that?

11          PROSPECTIVE JUROR:  Yes, I do.

12          MR. POVILL:  I'm quite certain you do, yeah.

13          Do you remember how you felt?  Do you remember

14     the fear?

15          PROSPECTIVE JUROR:  Yes, I do.

16          MR. POVILL:  What I'm going to ask is, the

17     Judge will tell you that what you bring back into the

18     jury room is your common sense, it's your common

19     experience, that fear, that's part of it.  That's how

20     you judge what's reasonable, right?

21          MS. CHU:  Objection, your Honor.

22          THE COURT:  Sustained.

23          MR. POVILL:  Mr. Healey, you were robbed at

24     gunpoint?

25          PROSPECTIVE JUROR:  Yes.

Voir Dire - Defendant/Mr. Povill

1        MR. POVILL:  Ms. Shaffee?

2        PROSPECTIVE JUROR:  Yes, sir.

3        MR. POVILL:  You said you sat on a civil jury

4   previously, is that correct?

5        PROSPECTIVE JUROR:  It was robbery.  I don't

6   know if it's civil or not.  That's not considered civil,

7   right?

8        MR. POVILL:  That is probably a criminal

9   case.

10        PROSPECTIVE JUROR:  I made a mistake there.

11        MR. POVILL:  And did you reach a verdict?

12        PROSPECTIVE JUROR:  Yeah.

13        THE COURT:  Don't tell us what your verdict

14   was.

15        PROSPECTIVE JUROR:  Yeah, we did.

16        MR. POVILL:  Anything about that experience

17   that you feel affects you now today as you sit here?

18        PROSPECTIVE JUROR:  No.

19        MR. POVILL:  You feel okay about how the

20   system works?

21        PROSPECTIVE JUROR:  Sure.

22        MR. POVILL:  Thank you.

23        THE COURT:  Ms. Shaffee, you mentioned

24   something about the Ramadan fast, is that right?

25        PROSPECTIVE JUROR:  Yeah.

160

Voir Dire - Defendant/Mr. Povill

1              THE COURT:  Let me ask you this.

2              Are you still working now?

3              PROSPECTIVE JUROR:  No, I'm retired.

4              THE COURT:  When you were working, did you

5       fast?

6              PROSPECTIVE JUROR:  Yeah.

7              THE COURT:  For Ramadan?

8              PROSPECTIVE JUROR:  When I was younger.

9              THE COURT:  And did you go to work?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  So?

12             PROSPECTIVE JUROR:  When I was younger.

13             THE COURT:  So?

14             PROSPECTIVE JUROR:  Much.

15             THE COURT:  Are you saying --

16             PROSPECTIVE JUROR:  It's harder when you get

17      older.

18             THE COURT:  Fasting is hard to begin with.  I

19      understand.

20             The real question is, is the fasting while

21      being on jury going to interfere with your ability to be

22      fair and impartial?

23             That's the question.

24             PROSPECTIVE JUROR:  Well, I don't know.  The

25      reason why I ask, because we have to eat like before

Voir Dire - Defendant/Mr. Povill

1      sunrise.  It's like fourteen or sixteen hours and we

2      break the fast.  We don't eat or drink during the day.

3                THE COURT:  Right.

4                PROSPECTIVE JUROR:  During the day we are

5      supposed to pray.  Also, it's a holy month.

6                THE COURT:  I understand that.

7                PROSPECTIVE JUROR:  This is why.

8                THE COURT:  When you say you have to pray,

9      where would you pray?  Would you have to go to a temple,

10     or not?

11               PROSPECTIVE JUROR:  No, no, at home.  At home.

12               Sometimes you go to the temple but most of the

13     times at home.

14               THE COURT:  You understand that you are not

15     going to be --

16               PROSPECTIVE JUROR:  I can't fast and come

17     here.

18               THE COURT:  You can't fast?

19               PROSPECTIVE JUROR:  I can't do that, no.

20               THE COURT:  Okay.

21               PROSPECTIVE JUROR:  I can't.

22               THE COURT:  Do you have any other questions?

23               MR. POVILL:  Yes, just one, your Honor.

24               THE COURT:  Go ahead.

25               MR. POVILL:  Ms. Gabriel, do I have that

Voir Dire - Defendant/Mr. Povill

1    right?

2             PROSPECTIVE JUROR:  Yes.

3             MR. POVILL:  When you came in a little late, I

4    didn't know what you did for work, ma'am.

5             PROSPECTIVE JUROR:  What I did for work?  I am

6    a medical assistant.

7             MR. POVILL:  Are you still working?

8             PROSPECTIVE JUROR:  Yes, I am.

9             MR. POVILL:  That's wonderful.

10            Thank you.

11            THE COURT:  All right.

12            Thank you.

13            MR. POVILL:  Thank you everybody.

14            THE COURT:  You know what, ladies and

15   gentlemen, we are going to adjourn at this particular

16   time until Monday, all right, so do not discuss the case

17   amongst yourselves or with anyone else.

18            You don't have to appear tomorrow.  Monday be

19   here at ten o'clock, no later, and then at that time

20   we'll finish with the voir dire.  So, be here at ten

21   o'clock and do not discuss the case amongst yourselves

22   or with anyone else.  Do not visit the place where the

23   alleged crimes occurred.  Have no contact with any of

24   the parties involved in this matter.  Do not resort to

25   utilizing any digital electronic devices for the purpose

163

Proceeding

1    of obtaining any information about this case or talking

2    to anybody about this case.

3              So, you are excused.  Ten o'clock outside the

4    courtroom.  Ten o'clock.

5              Just wait for someone to -- the Court Officer

6    to let you in.

7              You are excused right now, so you can vacate.

8              (Whereupon, the panel of prospective jurors

9    exited the courtroom.)

10             THE COURT:  Now, those ladies and gentlemen

11   who are in the audience, you are to return here on

12   Monday at ten o'clock.

13             Do not discuss the case amongst yourselves or

14   with anyone else.  Do not visit the place where the

15   alleged crimes occurred.  Have no contact with any of

16   the parties involved in this matter.  And, again, do not

17   resort to utilizing any electronic digital devices.

18             Now I am going to tell you, I am going to be

19   quite frank with all of you, if you fail to show up on

20   Monday I'll send a marshal out to bring you in, okay.

21             So the fact that we have this delay should not

22   give you any right or excuse not to come here on Monday.

23             Okay.

24             I hope you enjoy the weekend and I hope you

25   are here on Monday.

mc

Proceeding

1              You are excused.

2              COURT OFFICER:  Step out.

3              THE COURT:  You can step out at this time.

4              THE CLERK:  She said you can step out.

5              THE COURT:  You can step out at this time.

6              THE CLERK:  Step out, sir.

7              SERGEANT:  Talk to the Officer outside,

8      please.

9              (Whereupon, the panel of prospective jurors

10     exited the courtroom.)

11             THE COURT:  All right, Monday, ten o'clock.

12             MS. CHU:  I should anticipate witnesses for

13     Monday afternoon?

14             THE COURT:  What?

15             MS. CHU:  I should anticipate having witnesses

16     available for Monday afternoon?

17             THE COURT:  If we can get the jury.  We only

18     got three.

19             (Whereupon, the trial was adjourned to June

20     30, 2014.)
       *********************************
21     CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
       THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS
22     PROCEEDING.

23

24

25     MARLIN CASSIDY
       Senior Court Reporter

                                                    mc