```
 1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS:  CRIMINAL TERM:  PART 2
 2  ------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
 3                                      Indictment No.:
                   -against-           6615/2012
 4                                      (Trial)
    ATARA WISDOM,
 5
                        Defendant.
 6  ------------------------------------------X

 7
                             Supreme Courthouse
 8                           320 Jay Street
                             Brooklyn, New York 11201
 9                           June 30, 2014

10
    B E F O R E:
11
                THE HONORABLE ALBERT TOMEI, JUSTICE
12

13  A P P E A R A N C E S:

14          HON. KENNETH P. THOMPSON, ESQ.
                District Attorney - Kings County
15              350 Jay Street
                Brooklyn, New York  11201
16          BY: PHYLLIS CHU, ESQ.
                Assistant District Attorney
17

18          DAVID WALENSKY, ESQ.
                Attorney for Defendant
19              910 Stuart Avenue
                Mamaroneck, New York
20          BY: DAVID WALENSKY, ESQ.
                   - and -
21              JOSHUA POVILL, ESQ.

22

23

24                      MARLIN CASSIDY
25                      Senior Court Reporter
```

mc

Proceeding

1          (Whereupon, the following took place in open

2     court:)

3          THE CLERK:  Your Honor, this is calendar

4     number one, case on trial, Indictment 6615 of 2012,

5     People versus Atara Wisdom.

6          Defendant is incarcerated, produced, before

7     the Court, present with his attorney, appearances are

8     the same -- with her attorney.

9          THE COURT:  There is an application here?

10          MS. CHU:  Yes, your Honor.

11          There is a 911 call that we have that was

12     placed by our deceased on November the 29th of 2011.

13     We'd like to have that deemed admissible on our direct

14     case to show --

15          THE COURT:  What year was that, 2000 and what?

16          MS. CHU:  2011.  November 29th, 2011.

17          It was about 12:00 something in the morning on

18     November 29th.  I have a memorandum of law that I

19     prepared.

20          THE COURT:  Well, what's the call?

21          MS. CHU:  The call, substance of the call,

22     is --

23          THE COURT:  Who is it from?

24          MS. CHU:  It's from the victim, I got this

25     girl in my house and I don't know what's wrong with her,

mc

Proceeding

1    she's acting all crazy and I want her out of my house.

2    The phone call gets disconnected.  Because it's not a

3    landline, it's an cellphone, they are not able to get

4    anything as far as location or where to go, so police

5    are unable to investigate it any further.

6             We have this on his phone records, saying he

7    called 911.  At this time we actually have the actual

8    tape, 911 tape, and the People would argue that it is

9    admissible under the present sense impression and the

10   excited utterance exception to the hearsay rule, and we

11   have the memorandum of law that is -- that supports the

12   People's position.

13             THE COURT:  What's the response?

14             MR. WALENSKY:  Your Honor, there are two

15   prongs to this one, is it admissible under the excited

16   utterance, does the prejudice far outweigh the probative

17   value.  During the evening of this call we actually

18   don't know when this man is killed.  Time of death was

19   never set, the date itself was never set.  We don't know

20   what it refers to, whether it refers to this incident or

21   something else, and so absent any background or

22   testimony, it is just this man calling.  We don't know

23   if there's an upsetment, an intervening event, things

24   calm down and something happened.

25             It's significant, there's nothing on the call

Proceeding

1   like look out or ouch or hearing anything, it

2   essentially just cuts off with that and --

3             THE COURT:  Do you have the records?

4             MS. CHU:  I do have the record.

5             THE COURT:  Do the records show --

6             MS. CHU:  The cellphone shows that he makes a

7   911 call at a little bit after midnight on November the

8   29th and subsequently, after he makes that 911 call, the

9   phone numbers that are called by my victim's phone are

10  consistent with the defendant's cellphone numbers that

11  she calls.  So, we know that there's a transition so --

12  'cause we have a witness that she makes third-party

13  admissions to who says she calls from the victim's phone

14  so when he answers the phone he thinks it's the victim,

15  it's actually the defendant calling him.  That is where

16  the third-party admission comes in.

17            We will have --

18            MR. WALENSKY:  No.

19            MS. CHU:  -- phone records that corroborate

20  that his phone called our witness's phone and then

21  subsequent to that the pattern of phones calls that are

22  made by my victim's phone mirror what the defendant's

23  pattern of phone calls are from her cellphone.

24            MR. WALENSKY:  What was said --

25            MS. CHU:  In addition to that, your Honor, I'm

Proceeding

1    sorry, the ME will be able to corroborate that the time

2    of death, although they can't pinpoint an exact time,

3    that it's consistent, that November 29th, 2011 is

4    consistent with the manner of death as far as the amount

5    of decay, that the deceased had been dead for quite some

6    time, there's mummification, part of th head and body,

7    he had maggots.  Everything is consistent.  He had

8    maggots in him.

9              THE COURT:  How long was he in the apartment

10   before they discovered him?

11             If we presume that the 911 call was on

12   November 29th, 2011, was when everything occurred, he

13   wasn't found until January 3rd, 2012, what is her

14   admission?

15             MS. CHU:  She was living with him and that she

16   was giving him money, he also wanted to have sex with

17   her, she wasn't going to do that, so she basically, in

18   her statements to the police, said that he tried to rape

19   her so she had to defend herself and she stabbed him and

20   then left.

21             THE COURT:  Does she give the time or date?

22             MS. CHU:  She doesn't say the time or the

23   date.  But I know we have family members and the last

24   time that they saw him was around Thanksgiving, that the

25   29th would have been right after that Thanksgiving.

Proceeding

1      MR. WALENSKY:  She tells the police in the

2   video statement, the Court will see that, she thinks she

3   woke up at about 2:00 or 3:00 and he's grabbing her,

4   he's trying -- this is when he is assaulting her, around

5   2:00 in the morning, she is not really sure, she's not

6   looking at a watch.  We believe that, again, the

7   prejudice far outweighs the probative value of this

8   because we have -- it's just a bald statement, we have

9   nothing else, and there is nothing else on this.

10      As I said, there is no notice of any

11   intervening actions that could have been occurring.  It

12   may have stopped, she may not have been crazy at 12:30,

13   stops, goes to sleep and picks up then.

14      THE COURT:  I am going to allow it under

15   present sense impression.

16      MR. WALENSKY:  Note my exception.

17      THE COURT:  Okay.

18      What else?  Is that it?  Is that it?

19      MS. CHU:  That is all for me.

20      THE CLERK:  I think we are up to the lawyers.

21      THE COURT:  Yes, the lawyers.

22      (Whereupon, there was a brief pause in the

23   proceedings.)

24      MR. WALENSKY:  Your Honor, if we have another

25   panel, could I request that you remind them, if there's

Voir Dire

1           THE COURT:  All right.

2           Perempt?

3           MS. CHU:  Up to nine?

4           THE COURT:  Well, it's not up to nine.

5    It's --

6           MS. SCHWARTZKOPF:  Yes.

7           THE COURT:  I'm sorry, yes.

8           MS. CHU:  No perempts by the People.

9           THE COURT:  Defense?

10          MR. WALENSKY:  Number seven.

11          THE COURT:  Nuciforo?

12          MR. WALENSKY:  Nuciforo, yes.

13          THE COURT:  Who else?

14          MR. WALENSKY:  Number eight, Mr. Healey.

15          And number nine, Mr. O'Connell.

16          THE CLERK:  Your Honor, juror number four is

17   Cleo Gray.

18          Juror five is Elizabeth Sanchez.

19          THE COURT:  Hold on one minute.  Hold on.

20          (Whereupon, there was a brief pause in the

21   proceedings.)

22          THE COURT:  Sanchez is five?

23          THE CLERK:  Yes.

24          THE COURT:  Okay.

25          Is that it?

Voir Dire

1       THE CLERK:  Juror number six is Margaret

2   Gabriel.

3       THE COURT:  She's number twelve.

4       THE CLERK:  Seat six is now juror six, Judge.

5       MS. SCHWARTZKOPF:  Margaret Gabriel is in seat

6   six.

7       THE CLERK:  She's also juror six.

8       THE COURT:  So she's selected.

9       THE CLERK:  So the next six, Olibris, Perrier,

10  Rossi, Crockett.

11      MS. CHU:  Dixon and O'Reilly.

12      THE COURT:  Dixon and O'Reilly.

13      Cause?

14      MS. CHU:  Your Honor, I would challenge number

15  ten for cause.  She said something about she's on

16  vacation right now, she has to return on the 1st.  She

17  said that she didn't -- she says she thought it would be

18  a problem for her to be out of work.

19      THE COURT:  Denied.

20      Cause?

21      MR. WALENSKY:  We're through sixteen?

22      MS. SCHWARTZKOPF:  Fifteen.

23      MR. WALENSKY:  Nothing for cause.

24      THE COURT:  Perempt?

25      MS. CHU:  People challenge juror number ten.

Voir Dire

1                    Juror number fourteen.

2                    THE COURT:  Dixon?

3                    MS. CHU:  Yes.

4                    And that's it.

5                    THE COURT:  Defendant?

6                    MR. WALENSKY:  Number eleven.

7                    Number --

8                    THE CLERK:  Whoa.

9                    THE COURT:  Go ahead.

10                   MR. WALENSKY:  Number fifteen.

11                   THE COURT:  Is that it?

12                   MR. WALENSKY:  One moment.

13                   (Whereupon, there was a brief pause in the

14        proceedings.)

15                   MR. WALENSKY:  That's it, your Honor.

16                   THE CLERK:  Juror number seven is Samuel

17        Rossi.

18                   Juror number eight is Jonathan Crockett.

19                   THE COURT:  All right.

20                   Sixteen -- sixteen, seventeen and nineteen,

21        cause?

22                   MS. CHU:  None for the People.

23                   THE COURT:  Cause?

24                   MR. WALENSKY:  I'm not sure about Ms.

25        Jablonska, language.

mc

Voir Dire

1              THE COURT:  Not sure why?

2              MR. WALENSKY:  I don't know that she has a

3      good enough facility of language.

4              THE COURT:  Denied.

5              Perempt?

6              MS. CHU:  People challenge juror number

7      twenty.

8              MS. SCHWARTZKOPF:  We are not up to twenty.

9              THE CLERK:  We are not up to twenty.

10             MS. CHU:  Oops.

11             THE CLERK:  Sixteen to nineteen.

12             MS. CHU:  Up to nineteen, no.

13             THE COURT:  Perempt?

14             MR. WALENSKY:  Number sixteen.

15             Number --

16             THE COURT:  Who?  Number sixteen?

17             MR. WALENSKY:  Yes.

18             Number eighteen.

19             That's all.

20             THE CLERK:  Juror number nine is Deanna

21     Clements.

22             Juror ten is Blessing Fadaka.

23             THE COURT:  Twenty, cause?

24             MS. CHU:  No.

25             THE COURT:  Cause?

1              MR. WALENSKY:  No.

2              THE COURT:  Perempt?

3              MS. CHU:  People challenge.

4              THE CLERK:  So far the People have used a

5     total of eleven perempts, the defense fourteen.

6              THE COURT:  How many did the D.A. use?

7              MS. CHU:  Just this round, Judge?

8              MS. SCHWARTZKOPF:  Three for the People, seven

9     for defense.

10             THE CLERK:  I'm doing it cumulatively.

11             THE COURT:  Seven for the defense?

12             MS. SCHWARTZKOPF:  Yes.

13             THE CLERK:  But I do it cumulatively.

14             THE COURT:  I am just asking, that's all.

15     Let's go bring them in.

16             (Whereupon, there was a brief pause in the

17     proceedings.)

18             (Whereupon, the panel of prospective jurors

19     entered the courtroom.)

20             THE COURT:  Have a seat in the first two rows,

21     please.

22             THE CLERK:  Did someone bring a child?

23             What is your name, ma'am?

24             PROSPECTIVE JUROR:  Blessing.

25             THE CLERK:  Is that your child?

Voir Dire

1          PROSPECTIVE JUROR:  My babysitter didn't show

2    up, she's out of town.

3          THE COURT:  Only those that were in the box.

4          Only those who were in the box, please.

5          (Whereupon, the panel of prospective jurors

6    exited the courtroom.)

7          THE CLERK:  Were you seated here?

8          PROSPECTIVE JUROR:  Cleo Gray.

9          THE CLERK:  Okay.

10         Ma'am, you can have a seat.

11         Okay, if you hear your name called, ladies and

12   gentlemen, that means you have been selected to serve as

13   a juror.  If do you not hear your name called, you are

14   excused with the thanks of the Court.  Go back down to

15   the second floor, Central Jury, if you don't hear your

16   name called.  If you hear your name called please say

17   "here" or "present."

18         Juror number four will be Cleo Gray.

19         Say "here" or "present."

20         PROSPECTIVE JUROR:  Here.

21         THE CLERK:  Juror number five, Elizabeth

22   Sanchez.

23         PROSPECTIVE JUROR:  Here.

24         THE CLERK:  Juror number six, Margaret

25   Gabriel.

Voir Dire

1          PROSPECTIVE JUROR:  Yes.

2          THE CLERK:  Juror number seven, Samuel Rossi.

3          PROSPECTIVE JUROR:  Here.

4          THE CLERK:  Juror number eight, Jonathan

5     Crockett.

6          PROSPECTIVE JUROR:  Here.

7          THE CLERK:  Juror number nine, Deanna

8     Clements.

9          PROSPECTIVE JUROR:  Here.

10          THE CLERK:  And juror number ten, Blessing

11     Fadaka.

12          PROSPECTIVE JUROR:  Here.

13          THE CLERK:  The rest of you can return to

14     Central Jury, if you didn't hear your name called.

15          (Whereupon, the panel of prospective jurors

16     exited the courtroom.)

17          THE COURT:  Come on up.

18          Ms. Blessing, you are excused.

19          How many?  We have nine now?

20          THE CLERK:  Yes.

21          (Whereupon, the prospective juror exited the

22     courtroom.)

23          THE CLERK:  All right.

24          Will the six of you please rise and raise your

25     right hand.

1          Do you and each of you sincerely and solemnly

2     swear or affirm that you will try this case in a just

3     and impartial manner, to the best of your judgment, and

4     you will render a verdict according to the law and

5     evidence?

6          What is your response?

7          (Whereupon, the jurors responded.)

8          THE CLERK:  Please see the Court Officer.

9          COURT OFFICER:  Step this way.

10         (Whereupon, the jurors exited the courtroom.)

11         THE COURT:  Get the rest of them.  Please have

12    them seated on the right.

13         COURT OFFICER:  Panel entering.

14         (Whereupon, the panel of prospective jurors

15    entered the courtroom.)

16         THE COURT:  Sit on the right side, please.

17         Thank you.

18         Who has a child?

19         What is your name, ma'am?

20         PROSPECTIVE JUROR:  Ann Osibodu,

21    O-S-I-B-O-D-U.

22         THE COURT:  Why did you bring your child?

23         PROSPECTIVE JUROR:  Because I have no

24    babysitter, nobody to watch him for me.

25         THE CLERK:  First name?

Voir Dire

1              PROSPECTIVE JUROR:  Ann.

2              THE COURT:  You are excused, ma'am.  Second

3      floor, Central Jury.

4              You are excused.  Take your child with you, go

5      down to the second floor.

6              PROSPECTIVE JUROR:  Thank you, sir.

7              THE COURT:  Fill the box.

8              THE CLERK:  Seat number one is Harris Edelman.

9              PROSPECTIVE JUROR:  Edelman (pronunciation).

10             THE CLERK:  E-D-E-L-M-A-N.

11             Seat two, is Tinnel (phonetic) Heraldo.

12             First name Tinnel, Heraldo, H-E-R-A-L-D-O, is

13     her last name.

14             Seat three is Adrian (phonetic) Yorker,

15     Y-O-R-K-E-R.

16             PROSPECTIVE JUROR:  Here.

17             Seat four is Ilia (phonetic) Yudin.

18             PROSPECTIVE JUROR:  Here.

19             THE CLERK:  Y-U-D-I-N.

20             Seat five is Brady Clark, C-L-A-R-K.

21             PROSPECTIVE JUROR:  Present.

22             THE CLERK:  Seat six is Rebecca Mamer.

23             PROSPECTIVE JUROR:  Here.

24             THE CLERK:  M-A-M-E-R.

25             Seat seven is Renee (phonetic) Hernandez.

Voir Dire

1           PROSPECTIVE JUROR:  Here.

2           THE CLERK:  H-E-R-N-A-N-D-E-Z.

3           Seat eight is Olusegun, O-L-U-S-E-G-U-N, last

4       name is Adedeji, A-D-E-D-E-J-I.

5           Seat nine is Elsie Comer, C-O-M-E-R.

6           PROSPECTIVE JUROR:  Here.

7           THE CLERK:  And seat ten is Jaweed (phonetic)

8       Ahmed.

9           PROSPECTIVE JUROR:  Here.

10          THE CLERK:  A-H-M-E-D.

11          THE COURT:  Mr. Edelman, your neighborhood?

12          PROSPECTIVE JUROR:  Edelman (pronunciation).

13          THE COURT:  Edelman, I'm sorry.

14          PROSPECTIVE JUROR:  Greenpoint, Brooklyn.

15          THE COURT:  Ms. Heraldo?

16          PROSPECTIVE JUROR:  East Flatbush.

17          THE COURT:  Mr. Yorker?

18          PROSPECTIVE JUROR:  Bay Ridge.

19          THE COURT:  Mr. Yudin?

20          PROSPECTIVE JUROR:  Homecrest.

21          THE COURT:  Homecrest.

22          And Mr. Clark?

23          PROSPECTIVE JUROR:  Prospect Heights.

24          THE COURT:  Ms. Mamer?

25          PROSPECTIVE JUROR:  Greenpoint.

```
 1              THE COURT:  Mr. Ahmed?

 2              PROSPECTIVE JUROR:  Sheepshead Bay.

 3              THE COURT:  And Ms. Comer?

 4              PROSPECTIVE JUROR:  East New York.

 5              THE COURT:  And Mr. Adedeji?

 6              PROSPECTIVE JUROR:  Bushwick.

 7              THE COURT:  Bushwick?

 8              PROSPECTIVE JUROR:  Yes.

 9              THE COURT:  And Mr. Hernandez?

10              PROSPECTIVE JUROR:  Bensonhurst.

11              THE COURT:  Bensonhurst, all right.

12              First row, any of you ladies and gentlemen

13    familiar with the crime scene area, 832 Bushwick Avenue?

14              Second row, anyone?

15              Mr. Edelman, married --

16              MS. CHU:  Your Honor, I'm sorry, juror five

17    raised their hand.

18              THE COURT:  Mr. Clark, you are familiar with

19    the area?

20              PROSPECTIVE JUROR:  Some friends lived out

21    that way, Stockholm, Bushwick.

22              THE COURT:  All right.

23              Thank you.

24              Mr. Edelman, married, single, separated,

25    divorced?
```

mc

Voir Dire

1          PROSPECTIVE JUROR:  Unmarried.

2          THE COURT:  You're married?

3          PROSPECTIVE JUROR:  Unmarried.

4          THE COURT:  You are not married?

5          PROSPECTIVE JUROR:  Not married.

6          THE COURT:  Single?

7          PROSPECTIVE JUROR:  Well, I'm not married.  We

8      have --

9          THE COURT:  You have a relationship?

10          PROSPECTIVE JUROR:  I have relations.

11          THE COURT:  Are you in a relationship now?

12      That's my question.

13          PROSPECTIVE JUROR:  How would that affect --

14          THE COURT:  Because if you're in a relation,

15      then I'd like to know what your partner does or doesn't

16      do or whatever.

17          PROSPECTIVE JUROR:  I'm in a relationship.

18          THE COURT:  Thank you.

19          So, okay.

20          And your occupation?

21          PROSPECTIVE JUROR:  Computer science.

22          THE COURT:  And your partner's?

23          PROSPECTIVE JUROR:  Merchandising.

24          THE COURT:  Thank you.

25          Ms. Heraldo?

Voir Dire

1              PROSPECTIVE JUROR:  I'm single.

2              THE COURT:  What kind of work do you do?

3              PROSPECTIVE JUROR:  I'm a file clerk.

4              THE COURT:  You have to speak up.

5              PROSPECTIVE JUROR:  File clerk.

6              THE COURT:  Thank you very much.

7              Mr. Yorker?

8              PROSPECTIVE JUROR:  Married.

9              THE COURT:  Your occupation?

10             PROSPECTIVE JUROR:  Unemployed.  Stay-at-home

11        dad.

12             THE COURT:  What did you do when you worked?

13             PROSPECTIVE JUROR:  I did -- I worked for

14        1-800-Got Junk.  I removed items from businesses and

15        homes.

16             THE COURT:  What exactly?

17             PROSPECTIVE JUROR:  I remove unwanted items.

18        Like a moving person, manual labor.

19             THE COURT:  And your spouse?

20             PROSPECTIVE JUROR:  She's a director for an ad

21        agency.

22             THE COURT:  Okay.

23             Mr. Yudin?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Married, single, separated,

1    divorced?

2            PROSPECTIVE JUROR:  Married.

3            THE COURT:  Your occupation?

4            PROSPECTIVE JUROR:  I work for the New York

5    Times.  I'm a computer person there.

6            THE COURT:  Okay.

7            And your spouse?

8            PROSPECTIVE JUROR:  She's not employed

9    currently.

10           THE COURT:  What did she do when she worked?

11           PROSPECTIVE JUROR:  Several -- various things,

12   including writing, reporting for a local newspaper,

13   doing computers.

14           THE COURT:  All right, thank you.

15           Mr. Clark?

16           PROSPECTIVE JUROR:  I had a relationship but

17   not married.

18           THE COURT:  And your occupation?

19           PROSPECTIVE JUROR:  I work in music publishing

20   and licensing.

21           THE COURT:  What do you do?

22           PROSPECTIVE JUROR:  AR guy, sign bands, help

23   them with their legal contracts, stuff like that.

24           THE COURT:  You sign bands, you said?

25           PROSPECTIVE JUROR:  Yeah, for a publishing

Voir Dire

1      company, music publishing.

2                  THE COURT:  Are you an agent?

3                  PROSPECTIVE JUROR:  AR guy.

4                  THE COURT:  Music agent?

5                  PROSPECTIVE JUROR:  Essentially.

6                  THE COURT:  Okay.

7                  And your partner?

8                  PROSPECTIVE JUROR:  She's a director for a

9      digital -- advertising digital media company.

10                 THE COURT:  She's in advertising, you said?

11                 PROSPECTIVE JUROR:  Yes.

12                 THE COURT:  Thank you.

13                 Ms. Mamer?

14                 PROSPECTIVE JUROR:  Engaged.

15                 THE COURT:  Okay.

16                 And your occupation?

17                 PROSPECTIVE JUROR:  I'm a bartender.

18                 THE COURT:  Okay.

19                 And you have a significant other?

20                 PROSPECTIVE JUROR:  He does film related

21     contract work, mainly screenwriting research.  He's

22     associate producing a film right now.

23                 THE COURT:  Indie?

24                 PROSPECTIVE JUROR:  It's an IMAX movie.

25                 THE COURT:  Oh.

1           Thank you.

2           Mr. Ahmed?

3           PROSPECTIVE JUROR:   Married.

4           THE COURT:   Occupation?

5           PROSPECTIVE JUROR:   Dietician.

6           THE COURT:   And your spouse?

7           PROSPECTIVE JUROR:   She's a stay-at-home mom

8    at this time.

9           THE COURT:   Okay.

10          Did she work at all?

11          PROSPECTIVE JUROR:   Yes, but not in this

12   country.   She just came a few years ago.

13          THE COURT:   Ms. Comer?

14          PROSPECTIVE JUROR:   I'm a nurse.

15          THE COURT:   Married, single?

16          PROSPECTIVE JUROR:   Single.

17          THE COURT:   Single.

18          You're an R.N.?

19          PROSPECTIVE JUROR:   LPN.

20          THE COURT:   Thank you very much.

21          And Mr. Adedeji.

22          PROSPECTIVE JUROR:   Adedeji (pronunciation.)

23          THE COURT:   Adedeji, okay.

24          Are you married?

25          PROSPECTIVE JUROR:   Married.

Voir Dire

```
 1              THE COURT:  And your occupation?

 2              PROSPECTIVE JUROR:  Attorney.

 3              THE COURT:  Excuse me?

 4              PROSPECTIVE JUROR:  Attorney.

 5              THE COURT:  You're an attorney?

 6              PROSPECTIVE JUROR:  Yes, your Honor.

 7              THE COURT:  What kind of law do you practice?

 8              PROSPECTIVE JUROR:  Essentially, civil.

 9              THE COURT:  Civil?

10              PROSPECTIVE JUROR:  Yes.

11              THE COURT:  And your spouse?

12              PROSPECTIVE JUROR:  Physical therapist.

13              MS. CHU:  I'm sorry?

14              PROSPECTIVE JUROR:  Physical therapist.

15              MS. CHU:  Physical therapist.

16              THE COURT:  Physical therapist, I'm sorry.

17              Mr. Hernandez?

18              PROSPECTIVE JUROR:  Engaged.

19              THE COURT:  Okay.

20              And your occupation?

21              PROSPECTIVE JUROR:  Handyman.

22              THE COURT:  All right.

23              And your significant other?

24              PROSPECTIVE JUROR:  Customer service.

25              THE COURT:  What?
```

1           PROSPECTIVE JUROR: She's customer service.

2           THE COURT: Customer service.

3           First row, any of you ladies and gentlemen

4     ever serve on a jury before?

5           Second row, anyone?

6           Yes, Ms. Comer?

7           PROSPECTIVE JUROR: Yes.

8           THE COURT: What kind of jury were you on?

9           PROSPECTIVE JUROR: Civil. I sat on a civil

10    case.

11          THE COURT: Okay.

12          First row, any of you ladies and gentlemen

13    ever been the victim of a crime, or someone close to

14    you?

15          All right, I will start with Mr. Edelman.

16          PROSPECTIVE JUROR: I was mugged at

17    knifepoint.

18          THE COURT: You were robbed when?

19          PROSPECTIVE JUROR: 1985, late '80s, New York

20    City.

21          THE COURT: You were robbed at knifepoint?

22          PROSPECTIVE JUROR: My motorcycle has been

23    stolen twice. Different motorcycles, not the same one.

24    Twice.

25          THE COURT: So you had two --

Voir Dire

1          PROSPECTIVE JUROR:  Two motorcycles, two

2    different motorcycles, two different occasions.

3                    THE COURT:  Okay.

4                    Anything else?

5          PROSPECTIVE JUROR:  My brother was mugged.

6                    THE COURT:  Your mother was robbed?

7          PROSPECTIVE JUROR:  Robbed.

8                    THE COURT:  Was that at knifepoint?

9          PROSPECTIVE JUROR:  I should differentiate.  I

10   don't know the difference between mugged and robbed.

11                   THE COURT:  There is no such legal term as

12   "mugged."

13         PROSPECTIVE JUROR:  I'm not a lawyer.

14                   THE COURT:  Property taken by force?

15         PROSPECTIVE JUROR:  Yes.

16                   THE COURT:  Then it's robbery.

17         PROSPECTIVE JUROR:  Then a robbery.  Property

18   taken from me by force, from my brother as well,

19   skateboard, I think, and bicycle.

20                   THE COURT:  Was a weapon involved?

21         PROSPECTIVE JUROR:  Yes, knife.  In every

22   occasion.

23                   THE COURT:  Anything else?

24         PROSPECTIVE JUROR:  My uncle was burglarized

25   for sure twice, as were my parents.

1              THE COURT:  They were home?

2              PROSPECTIVE JUROR:  They weren't home.  And

3       stuff was taken.

4              THE COURT:  Were all of these reported?

5              Were yours reported?

6              PROSPECTIVE JUROR:  Mine, the motorcycle

7       thefts, for sure.  It's the last five, ten years.  I was

8       robbed as a kid growing up in New York City.  I don't

9       even know, I mean --

10             THE COURT:  You were a kid?

11             PROSPECTIVE JUROR:  Yeah, yeah.

12             THE COURT:  How old?

13             PROSPECTIVE JUROR:  Like ten to thirteen.

14             THE COURT:  Probably didn't report it.

15             PROSPECTIVE JUROR:  I mean, I don't recall.

16      But for sure, I mean, it was in the '80s in New York

17      City.

18             THE COURT:  All right, thank you.

19             PROSPECTIVE JUROR:  You're welcome.

20             THE COURT:  Anyone else?

21             Just raise your hand.

22             Mr. Yorker?

23             PROSPECTIVE JUROR:  My stepbrother's son was

24      shaken to death by a non-family member.

25             THE COURT:  It's called shaken baby syndrome?

Voir Dire

1            PROSPECTIVE JUROR:  Yeah.

2            THE COURT:  What happened to your

3       stepbrother?

4            PROSPECTIVE JUROR:  The person who did it is

5       still in jail.

6            THE COURT:  I mean, the --

7            So he went to trial or pled guilty?

8            PROSPECTIVE JUROR:  My stepbrother didn't do

9       it.  He had broken up with the --

10           THE COURT:  The person that did.

11           PROSPECTIVE JUROR:  The person that did it is

12      currently in jail.

13           THE COURT:  Okay.

14           Who else raised their hand?

15           Mr. Clark?

16           PROSPECTIVE JUROR:  My father was robbed at

17      gunpoint in New York, late '80s.

18           THE COURT:  Anything else?

19           PROSPECTIVE JUROR:  And I had a close friend

20      who was a victim of a hate crime in Bushwick, actually.

21           THE COURT:  Assaulted or what?

22           PROSPECTIVE JUROR:  He was beaten close to

23      death.

24           THE COURT:  Was a weapon involved?

25           PROSPECTIVE JUROR:  Just hands.

Voir Dire

1        THE COURT:  Fists?

2        PROSPECTIVE JUROR:  Yes.

3        THE COURT:  More than one person?

4        PROSPECTIVE JUROR:  Yes.

5        THE COURT:  Okay.

6        Who else?

7        Ms. Mamer?

8        PROSPECTIVE JUROR:  My brother was jumped and

9    beaten pretty badly.

10        It was part of like a string of incidents in

11    Seattle.  I think they caught some of the guys but not

12    all of them.

13        THE COURT:  Was he injured seriously?

14        PROSPECTIVE JUROR:  Yeah.  They broke his eye

15    socket.  He was kind of unrecognizable.

16        THE COURT:  Sorry about that.

17        PROSPECTIVE JUROR:  Also, I was assaulted by

18    an ex-boyfriend about five years ago.

19        THE COURT:  Was he arrested?

20        PROSPECTIVE JUROR:  No.  I didn't report it.

21        THE COURT:  Why?

22        PROSPECTIVE JUROR:  We were alone in his

23    apartment, I didn't have proof, I didn't want to go

24    through it.

25        THE COURT:  Were you injured?

Voir Dire

```
 1              PROSPECTIVE JUROR:  Not seriously.  Pretty
 2     bruised.  I fought him off before it got pretty bad.
 3              THE COURT:  Did the police come?
 4              PROSPECTIVE JUROR:  I'm sorry?
 5              THE COURT:  Did the police come?
 6              PROSPECTIVE JUROR:  No.
 7              THE COURT:  Anyone else?
 8              Second row, been the victim of a crime or
 9     someone close to you?
10              Yes, Mr. Adedeji?
11              PROSPECTIVE JUROR:  Close family friend was
12     just recently the victim of a carjacking.
13              THE COURT:  Close friend of yours?
14              PROSPECTIVE JUROR:  Yes.
15              THE COURT:  He was the victim of a carjacking?
16              PROSPECTIVE JUROR:  Yes.
17              THE COURT:  Was he injured, or she?
18              PROSPECTIVE JUROR:  She wasn't injured.  She
19     managed to escape the perpetrator.
20              THE COURT:  Anyone else?
21              First row, any of you ladies and gentlemen
22     ever accused of, arrested for, or convicted of a crime,
23     or someone close to you?
24              Mr. Yorker?
25              PROSPECTIVE JUROR:  I was smoking weed on the
```

Voir Dire

1       Lower East Side and I was arrested.

2                THE COURT:  So you were arrested or were you

3       given a summons?

4                PROSPECTIVE JUROR:  I was arrested.  I did one

5       day community service.

6                THE COURT:  Thank you.

7                Anyone else?

8                Mr. Clark?

9                PROSPECTIVE JUROR:  I got an open container

10      and paid the ticket.

11               THE COURT:  Was that beer?

12               PROSPECTIVE JUROR:  Yeah.

13               THE COURT:  Anyone else?

14               Mr. Hernandez?

15               PROSPECTIVE JUROR:  My ex-wife sent me to

16      jail.

17               THE COURT:  Your ex-wife is what?

18               PROSPECTIVE JUROR:  Sent me to jail.

19               THE COURT:  She is in jail?

20               PROSPECTIVE JUROR:  No, she sent me to jail.

21               THE COURT:  Sent you to jail?

22               PROSPECTIVE JUROR:  Yes.

23               THE COURT:  Was it domestic violence?

24               PROSPECTIVE JUROR:  Yes.

25               THE COURT:  What happened?

Voir Dire

1          I mean, when she reported this to the police.

2          PROSPECTIVE JUROR:  She reported to the police

3     but --

4          THE COURT:  Then what happened?

5          PROSPECTIVE JUROR:  Obviously they believed

6     her, not me.

7          THE COURT:  So then what happened?  Did you --

8          PROSPECTIVE JUROR:  I went to court.

9          THE COURT:  How long did you go to jail for?

10         PROSPECTIVE JUROR:  Two days.  Then I did

11    anger management.

12         THE COURT:  Community service, anger

13    management?

14         PROSPECTIVE JUROR:  Yes, pay a fine.

15         THE COURT:  Okay.

16         You going to hold it against anybody in this

17    case, the police, D.A.?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Okay.

20         First row, any of you ladies and gentlemen

21    related to, friendly, interact with any attorneys or law

22    enforcement agents?

23         Mr. Edelman?

24         PROSPECTIVE JUROR:  I have close friends and

25    family that are attorneys, including a U.S. attorney,

mc

1    A.D.A. in Suffolk County, married to a police officer,

2    married to an attorney in New York City.  My cousin is

3    an attorney.  My uncle was a New York City police

4    officer, he's eighty-four years old now so he's retired

5    almost forty years but he was a New York City officer in

6    Brooklyn.  And I have friends, of course, that are

7    attorneys as well.

8            THE COURT:  Who else?

9            Ms. Heraldo?

10           PROSPECTIVE JUROR:  I work for a law firm.

11           THE COURT:  What kind of law firm?

12           PROSPECTIVE JUROR:  Corporate law.

13           THE COURT:  Okay.

14           Who else?

15           Mr. Yorker.

16           PROSPECTIVE JUROR:  I have a bunch of friends

17    that are either lawyers or police officers through the

18    dart leagues that I play in the City and Brooklyn, an

19    acquaintances that actually works right here on the

20    floor.

21           THE COURT:  As a Court Officer?

22           PROSPECTIVE JUROR:  Yeah.

23           THE COURT:  Okay.

24           Who else?

25           Mr. Clark?

Voir Dire

1          PROSPECTIVE JUROR:  I have various members of

2     my family in the Armed Forces.

3          THE COURT:  In the Armed Forces?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  I am talking about law

6     enforcement.

7          PROSPECTIVE JUROR:  As part of my job I work

8     with our legal team, contract law, licensing agreements,

9     signing bands.

10          THE COURT:  You socialize with any of these

11     attorneys?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Who else?

14          Ms. Mamer?

15          PROSPECTIVE JUROR:  I have a good friend who

16     was working with the 7th Precinct.  He is in Manhattan,

17     the detective squad.

18          My fiancee used to share an apartment with him

19     and --

20          THE COURT:  A good friend is in the Manhattan

21     detective squad and what was the last thing?

22          PROSPECTIVE JUROR:  My fiancee used to share

23     an apartment with him.

24          THE COURT:  Who?  Your fiancee?

25          PROSPECTIVE JUROR:  Yes.

Voir Dire

1                THE COURT:  Okay.

2                Who else?  Anyone else?

3                Mr. Adedeji?

4                PROSPECTIVE JUROR:  Aside from myself, I have

5     a close relationship with an attorney in general

6     practice.

7                THE COURT:  You have a general practice?

8                PROSPECTIVE JUROR:  I work with somebody also

9     in general practice.

10               THE COURT:  Okay.

11               Do you have a partner or you share an office?

12               PROSPECTIVE JUROR:  Personally I'm by myself,

13    solo.

14               THE COURT:  But you have a friend who's an

15    attorney?

16               PROSPECTIVE JUROR:  Yes.  General

17    practitioner.

18               THE COURT:  Okay.

19               First row, can you be fair and impartial in

20    this case?

21               Mr. Edelman?

22               PROSPECTIVE JUROR:  Yes.

23               THE COURT:  Ms. Heraldo?

24               PROSPECTIVE JUROR:  Yes.

25               THE COURT:  Mr. Yorker?

Voir Dire

1          PROSPECTIVE JUROR: Yes.

2          THE COURT: Mr. Yudin?

3          PROSPECTIVE JUROR: Yes.

4          THE COURT: Mr. Clark?

5          PROSPECTIVE JUROR: I'm not sure.

6          THE COURT: Why not?

7          PROSPECTIVE JUROR: I have some -- well, after

8     seeing last week, I have some issues with the lack of

9     evidence that the People talked about. We can talk

10    about that later.

11         THE COURT: You have to talk about it now.

12         There is no evidence yet.

13         PROSPECTIVE JUROR: Right.

14         THE COURT: There is no evidence in the sense

15    that you haven't heard anything.

16         PROSPECTIVE JUROR: Well, they -- they have

17    kind of been mentioning that there's no evidence.

18         THE COURT: There is evidence going to be

19    presented by the People but it's not necessarily in the

20    form that you might want. Like I don't know what you're

21    looking for, but the fact is that you don't know

22    anything about this case right now.

23         PROSPECTIVE JUROR: Okay.

24         THE COURT: Other than not knowing anything

25    about this case, how have you arrived at an opinion?

Voir Dire

1    PROSPECTIVE JUROR:  From viewing the

2  interviews last week.

3    THE COURT:  What are you expecting?  What

4  would you be expecting, scientific evidence, forensic

5  evidence?  What?

6    PROSPECTIVE JUROR:  As part of my work I do a

7  lot of disputes between publishing companies and, you

8  know, there's always contracts involved, signed

9  documents, and there's always proof of who's --

10    THE COURT:  That's something that -- and you

11  have to determine whether those documents meet your

12  requirements, is that right?

13    PROSPECTIVE JUROR:  That's correct.

14    THE COURT:  So that is what you would have to

15  do here in the same respect, you would have to determine

16  whether the People have proven beyond a reasonable doubt

17  the evidence that they presented.

18    PROSPECTIVE JUROR:  Okay.

19    THE COURT:  Can you do that?

20    PROSPECTIVE JUROR:  I think so, yes.

21    THE COURT:  Can you do it fairly and

22  impartially?

23    PROSPECTIVE JUROR:  Yes.

24    THE COURT:  That's the question.

25    Okay.

mc

Voir Dire - People/Ms. Chu

1    Ms. Mamer?

2    PROSPECTIVE JUROR:  Yes.

3    THE COURT:  Mr. Ahmed?

4    PROSPECTIVE JUROR:  Yes.

5    THE COURT:  And Ms. Comer?

6    PROSPECTIVE JUROR:  Yes.

7    THE COURT:  And Mr. Audige?

8    PROSPECTIVE JUROR:  Yes.

9    THE COURT:  And Mr. Hernandez?

10   PROSPECTIVE JUROR:  Yes.

11   THE COURT:  Go ahead, Ms. Chu.

12   MS. CHU:  Thank you.

13   Good morning, ladies and gentlemen.

14    I see that at least Mr. Clark was paying

15 attention last week when we were talking up here.  I

16 hope you kind of remember the things we spoke about.

17 The Judge said it perfectly, there is going to be other

18 kinds of evidence.  You are going to hear, for example,

19 Ms. Mamer, you said you had an incident with an

20 ex-boyfriend.  You said you didn't press charges because

21 you didn't have anybody that was there besides you and

22 the other person.

23    In this case there are other things, you just

24 won't have someone that says I saw this person do this

25 to this other person, okay.

Voir Dire - People/Ms. Chu

1          I know that, Mr. Clark, you said that you have

2     somewhat of a problem with that.

3          Let's say, for example, you're selected as a

4     juror, you heard all the evidence and the evidence that

5     I have, although there is no eyewitness, you have

6     evidence that proves that in fact the defendant is

7     guilty of what she's charged with.

8          Are you going to be, when you go back in the

9     jury room, you know, Ms. Chu proved her case and I

10     believe that she's proven beyond a reasonable doubt that

11     the defendant is guilty, but because I didn't have a

12     witness, I don't know if I can do that?

13          PROSPECTIVE JUROR:  Yeah.  I don't think I can

14     do that.

15          THE COURT:  That would be a problem for you?

16          PROSPECTIVE JUROR:  Yeah.

17          MS. CHU:  Anybody here think that might be a

18     problem?

19          There is really no right or wrong answer.  I

20     appreciate you being honest with me.  You realize how,

21     unfortunate it would be if you were selected as jurors,

22     you think you're not going to say, now you don't say

23     anything, we will pick you, then it will be too late,

24     then you're in the jury room, you might have some

25     issues.

mc

Voir Dire - People/Ms. Chu

1          Yes, sir?

2          PROSPECTIVE JUROR:  I believe I can be

3     impartial.  My problem is, as a business owner I get

4     distracted.  It's almost like my employees are part of

5     the family.  They work for me.  A dysfunctional family,

6     but a family.

7          MS. CHU:  They are not all dysfunctional.

8          PROSPECTIVE JUROR:  I want to be honest and

9     tell you, even when I'm out to dinner with friends, I

10    get distracted and my mind is somewhere else, I come

11    back because someone will bring me back to the

12    conversation.  But that really happens.  I don't

13    intentionally let my mind wander.  Physically I am here

14    and other things that could distract me that may

15    preclude me from being effective.  It might be, if I

16    didn't have the economic situation that I have.

17         MS. CHU:  Basically you're saying, because

18    what you do and your job, you would be distracted from

19    perhaps paying one hundred percent attention to what the

20    evidence would be?

21         PROSPECTIVE JUROR:  That is one hundred

22    percent accurate.

23         MS. CHU:  Thank you very much.

24         Anyone else that their work might consume

25    their thoughts, make them become distracted and not be

Voir Dire - People/Ms. Chu

1    able to listen to the evidence?

2              You raised your hand for another reason.

3              PROSPECTIVE JUROR:  I was thinking of

4    something else.

5              MS. CHU:  Okay.

6              PROSPECTIVE JUROR:  From what you were saying

7    Thursday, I fear that it will mostly be for us to decide

8    if a witness to this or that, to this or that statement

9    or behavior or whatever, is telling the truth or not.  I

10   have a serious problem with deciding if a person is

11   telling the truth, beyond my level of my personal --

12             MS. CHU:  You are saying that your level of

13   being convinced is higher than what you think the law

14   might be?

15             PROSPECTIVE JUROR:  I don't know what the law

16   might be but --

17             THE COURT:  The law is they have to prove the

18   defendant's guilt of the charge or charges beyond a

19   reasonable doubt.  That's the standard.  And it's not

20   beyond all possible doubt, but beyond a reasonable

21   doubt, and I will explain to you what a reasonable doubt

22   is and then you have to determine whether the People

23   have met their burden of proof.

24             Can you do that?

25             PROSPECTIVE JUROR:  I really doubt --

Voir Dire - People/Ms. Chu

1        THE COURT:  Excuse me?

2        PROSPECTIVE JUROR:  I really doubt that, your

3    Honor, 'cause for myself, I cannot understand what the

4    level of reasonable doubt might be.  If I know that I am

5    a bad judge of persons and I have to decide if that

6    person said the truth or lied to me and it affects --

7        THE COURT:  It's not only that person.  You

8    take everything together, including that person, and

9    you'll have to determine, taking everything together,

10   all the evidence, whether that person is telling the

11   truth or not, or whether the People have met their

12   burden.

13       It's not, you know, rocket science.  It's

14   very, very -- I can't think of the word right now, but

15   it's like we said, what you bring to this is your common

16   sense and your lifetime experience, that's all.

17       PROSPECTIVE JUROR:  I'm sorry, your Honor.  My

18   lifetime experience was twenty years of being a

19   scientist before I switched here to being a computer

20   programmer and I'm trained to doubt those things.

21       THE COURT:  Well, but I don't want --

22       PROSPECTIVE JUROR:  I really don't understand

23   how you can establish anything beyond a reasonable doubt

24   because there's always doubt.

25       THE COURT:  It's not what -- I am going to say

Voir Dire - People/Ms. Chu

1    this to everybody.  It's not whether he's possibly

2    guilty, that's not the standard.  All right?  Because if

3    it was just possible guilt, then he's not guilty, but if

4    he is guilty beyond a reasonable doubt.  And you're a

5    scientist, you use reason to determine equations and

6    scientific problems, you should be, really, one of the

7    better jurors in the sense that you have -- you think

8    rationally and reasonably.  That is what you are going

9    to have to do here.  But if you think you are going to

10    be prejudiced in some way or not, that's the question.

11              Can you be fair and impartial, yes or no?

12              PROSPECTIVE JUROR:  Certainly.  I can be fair

13    and impartial.  I am just saying right away that in this

14    case I already know that I will have to say not guilty.

15              THE COURT:  Let me just say something, with

16    people that say that, in this case no one knows

17    absolutely anything about this case, absolutely nothing

18    because you have not heard a shred of evidence, not a

19    shred.  Okay?

20              PROSPECTIVE JUROR:  Yes, sir.

21              THE COURT:  So all I'm saying is, when you do

22    hear the evidence, then you will have to ultimately, at

23    the close of the case, make a determination.  If you

24    can't do that because of your particular profession or

25    whatever, then you say that.  Can you do that or not?

Voir Dire - People/Ms. Chu

1          PROSPECTIVE JUROR:  Yes, I can.

2          THE COURT:  Okay.

3          MS. CHU:  Mr. Yudin, let me ask you, I know

4     you said you were twenty years a scientist before you

5     became a computer programmer for the New York Times,

6     right?

7          PROSPECTIVE JUROR:  Correct.

8          MS. CHU:  I am assuming that when you're doing

9     computers, there's programs and they have to be exact,

10    everything has to match perfectly, am I correct?

11         PROSPECTIVE JUROR:  Yes.

12         MS. CHU:  And do you understand that that

13    standard that you use in order to become a computer

14    technology person is different than the standard that

15    you have to use in this case?

16         Do you think that?

17         My question to you, only you will be able to

18    answer that, do you think that if you heard this case

19    you are going to hold to whatever standards you usually

20    use in your line of work or are you going to be able to

21    accept what the Judge tells you as far as that it's

22    beyond a reasonable doubt?  Are you even able to think

23    that way?

24         PROSPECTIVE JUROR:  I don't know until I try.

25         MS. CHU:  You seem to have some reservations

Voir Dire - People/Ms. Chu

1    as to whether or not you will be able to do that.

2              You understand it's not -- the proof is not

3    proof to a mathematical certainty, it doesn't plug into

4    a program and everything spits out exactly what the

5    answer is.

6              PROSPECTIVE JUROR:  I understand that, but it

7    doesn't mean that I for myself accept that.

8              MS. CHU:  It doesn't mean you accept that?

9              THE COURT:  Go on to something.

10             MS. CHU:  We talked about that most of the

11   evidence was from something defendant said.  Defendant

12   made certain statements to police, also made certain

13   statements to friends of hers, and I want to ask, are

14   you the kind of jurors that can analyze and determine

15   whether or not, from all the other evidence you are

16   going to hear in this case, whether or not what she said

17   at a particular time was maybe truthful, not so true?

18             You understand what I'm asking you?

19             Do you think that you are the kind of juror

20   that was able to process that type of information, to

21   make a determination as to whether or not maybe parts of

22   the statement are true, parts might be false?

23             Ms. Comer, how do you feel about that?

24             PROSPECTIVE JUROR:  I'm fine.

25             MS. CHU:  You fine with it?

Voir Dire - People/Ms. Chu

1              Ms. Heraldo?

2              PROSPECTIVE JUROR:  Yes.

3              MS. CHU:  Mr. Hernandez?

4              PROSPECTIVE JUROR:  Yes.

5              MS. CHU:  Mr. Adedeji, I wanted to ask you, I

6       know you're an attorney and I don't know the last time

7       you thought about the criminal law, probably not since

8       law school.

9              PROSPECTIVE JUROR:  I been working with

10      somebody in general practice so she does both civil and

11      criminal.

12             MS. CHU:  As far as you --

13             PROSPECTIVE JUROR:  Personally, no, I don't

14      really do criminal.

15             MS. CHU:  My question to you, because you're

16      an attorney, do you think that you have more or less

17      expertise in the law compared to the other members of

18      the jury?

19             PROSPECTIVE JUROR:  Sometimes lay people know

20      better than we do.

21             MS. CHU:  That is true.

22             Can you promise me -- can you all promise me

23      no matter what you think the law might be, that the

24      law -- that the only law that pertains to this case is

25      what this Judge tells you?

Voir Dire - Defendant/Mr. Walensky

1      So you might think it's a certain way before

2      you start this trial and then when the Judge tells you

3      what the law is, can you all promise me that you are

4      going to follow what he says despite what you might have

5      thought before, no matter what?

6              Can you all promise me you can do that?

7              THE COURT:  Thank you.  All right, thank you.

8              Defense.

9              MR. WALENSKY:  Your Honor, would you tell me

10     about a minute before you are going to cut me off, just

11     so I have an idea?

12             THE COURT:  Go ahead.

13             MR. WALENSKY:  I don't expect to be

14     longwinded.

15             Hello.

16             Hope you all remember me from last week.  I'm

17     David Walensky.  I'm the attorney for the accused.  And

18     if you recall, I said the person is accused because we

19     don't have to defend each other -- we don't have to

20     defend ourselves, I'm sorry.

21             Do you understand that?

22             And that everything has to be done by the

23     People?

24             Now, Mr. Clark, you had said from what you

25     heard you really don't know anything about the case,

1   right?

2           PROSPECTIVE JUROR: Of course not.

3           MR. WALENSKY: There's a defense attorney, it

4   sounds as though I should be able to convict if I hear

5   the evidence, but that's the People's problem. You

6   understand?

7           PROSPECTIVE JUROR: Yes.

8           MR. WALENSKY: Your problem is just hearing

9   the evidence, and if the Judge says, can you follow my

10   directions, following his directions, right?

11           PROSPECTIVE JUROR: Yes.

12           MR. WALENSKY: That's fair enough, isn't it?

13           If they prove their case, so be it, beyond a

14   reasonable doubt.

15           And the Judge will give you the legal

16   definition, Mr. Yudin, of what "beyond a reasonable

17   doubt" is. That's why they talk about analyzing it

18   within that criteria. We will look and see if they have

19   proven their case. If they haven't proven their case

20   beyond a reasonable doubt, you must say not guilty.

21           You understand?

22           It's not even innocent. It's not guilty or

23   innocent, it's guilty or not guilty.

24           It's all laid in their lap and maybe they have

25   enough evidence and maybe they don't.

Voir Dire - Defendant/Mr. Walensky

1        You don't have to say I'm going to believe

2   everything they say.  Understand?

3        It becomes their problem.

4        As I said, I worry about it because, you can

5   understand, Ms. Tinnel, because, heck, if they don't

6   prove their case, fine, it's not guilty.  But you don't

7   have to go in saying -- you have to go in and I can find

8   guilty, not I must find a person guilty.  You understand

9   that?  The Judge will tell you that in this case.

10       Ms. Mamer, you had a bad experience five years

11   ago and you fought somebody off, right?  That wasn't

12   about rape or anything, was it?

13            PROSPECTIVE JUROR:  It was attempted.

14       I'm sorry.

15            MR. WALENSKY:  But this is -- you can use your

16   personal experiences in judging things, you understand

17   that?

18            PROSPECTIVE JUROR:  Yeah.

19            MR. WALENSKY:  This isn't a contest that

20   brings this up again.  Sometimes people say I can do

21   this, I can do this.  This is a bad case, this

22   particular case.

23            PROSPECTIVE JUROR:  I thought I was okay, I'm

24   sorry.

25            MR. WALENSKY:  That is what I mean.  This is

mc

Voir Dire - Defendant/Mr. Walensky

1    the time to tell us.  People too often feel like they're

2    failing.  Another case might be perfectly fine, civil

3    case, another kind of criminal case, but it doesn't help

4    anyone if we're trying to do this.

5            Now, Mr. Edelman, intellectually I like to say

6    I can be fair.  You're a fair guy?

7            PROSPECTIVE JUROR:  I believe that.

8            MR. WALENSKY:  But on the other side you said

9    you are going to be distracted.

10           PROSPECTIVE JUROR:  For sure.

11           MR. WALENSKY:  It would really -- you couldn't

12   be the kind of juror you want to be?

13           PROSPECTIVE JUROR:  Correct.

14           MR. WALENSKY:  You might miss things if your

15   mind starts to wander.  It wanders all the time, right?

16   This is a very serious case.  My client's charged with

17   murder.  Is there anything more serious?  So --

18           PROSPECTIVE JUROR:  I am not suggesting that

19   it's not less than serious.  I'm not.

20           MR. WALENSKY:  You are being honest, you

21   wouldn't be able to give it the attention that you think

22   it deserves.

23           PROSPECTIVE JUROR:  I can be here and I

24   respect the Court, I listened to everything everyone

25   said.

Voir Dire - Defendant/Mr. Walensky

1      MR. WALENSKY:  You can't give it one hundred

2    percent?

3      PROSPECTIVE JUROR:  I don't believe that's the

4    case.

5      MR. WALENSKY:  Thank you.  That's fine.

6      Again, this isn't pass/fail.  This is an

7    expression of our citizenship, why everybody fights for

8    everything.  This is what it's about.  And you hate

9    getting this notice.  On the other hand, if you're here

10   and you can do it, fine.  If you can't do it, you're

11   doing a disservice to everything behind that.  I don't

12   mean that in a negative way.

13      You understand that?

14      Mr. Hernandez, you got arrested, it was a

15   domestic problem, an argument.  Were you treated fairly?

16      PROSPECTIVE JUROR:  Yes.

17      MR. WALENSKY:  Were you treated fairly?

18      PROSPECTIVE JUROR:  By the case?

19      MR. WALENSKY:  Yes.

20      PROSPECTIVE JUROR:  I guess.

21      MR. WALENSKY:  It doesn't sound like you think

22   you should have been arrested.

23      PROSPECTIVE JUROR:  No, sir.

24      MR. WALENSKY:  But police reacted because

25   somebody said something.  That is what the evidence is.

Voir Dire - Defendant/Mr. Walensky

1    Sometimes you can believe people, sometimes you don't

2    believe people.  You have to weigh everything.

3            Will you be able to do that, Mr. Ahmed?

4            PROSPECTIVE JUROR:  Yes.

5            MR. WALENSKY:  Ms. Comer, as an LPN you've

6    probably seen a lot of facets of life.

7            Is there anyone here who believes -- does

8    someone have a problem with the concept of defending

9    themselves?

10           Now, will you all be able to --

11           Mr. Yorker, will be you be able to accept the

12   Judge's definition of how far somebody can go -- rape

13   has its own -- attempted rape has its own set of

14   standards as to how someone can defend themselves.

15           THE COURT:  What?

16           I'm sorry.

17           That's not the law, all right.

18           The law of justification I will define for

19   you, all right, and please, whatever the attorneys say

20   is the law just disregard it, okay.

21           Thank you.

22           MR. WALENSKY:  You will be able to listen to

23   the Judge's instructions?  That's all we want.

24           So, I want to thank you for your attention.

25   If you're selected, please give it your all.  You have

Voir Dire

1        no bosses here.

2                Thank you very much.

3                THE COURT:  All right.

4                Ladies and gentlemen, will you step outside

5        for a moment, I'll call you back in a few minutes.  Take

6        all your belongings.

7                (Whereupon, the panel of prospective jurors

8        exited the courtroom.)

9                COURT OFFICER:  Judge, one of the jurors has a

10       question she needs to ask you.

11               (Whereupon, the following took place at

12       sidebar:)

13               PROSPECTIVE JUROR:  Thank you.

14               I just want to make sure that there is no

15       problem because I am a nurse, I work in a women's house.

16               THE COURT:  Of detention?

17               PROSPECTIVE JUROR:  Yes, sir.

18               I want to make sure that's not an issue.

19               MS. CHU:  Do you know the defendant?

20               PROSPECTIVE JUROR:  I'm sure.  I have been in

21       Rikers for twenty-one years.  If she's passed through --

22               THE COURT:  When you say you're sure, are you

23       sure now?

24               PROSPECTIVE JUROR:  I don't have a problem

25       sitting on the case but I just wanted to share that.

1      Just in case it was any type of conflict, I want you to

2      know.

3                     THE COURT:   That's understandable.

4                     My point is, is that going to affect your

5      ability to be fair and impartial?

6                     PROSPECTIVE JUROR:   No, sir.

7                     THE COURT:   All right.

8                     PROSPECTIVE JUROR:   Thank you.

9                     (Whereupon, the prospective juror exited the

10     courtroom.)

11                    (Whereupon, the following took place in open

12     court:)

13                    THE COURT:   First three, cause?

14                    MS. CHU:   Yes, your Honor.

15                    Juror number one.

16                    THE COURT:   Challenged for cause?

17                    MS. CHU:   You said the first three?

18                    THE COURT:   Just the next three.

19                    MS. CHU:   Okay.

20                    THE COURT:   That is just cause.

21                    MS. CHU:   Yes.

22                    THE COURT:   Defense, cause?

23                    MR. WALENSKY:   No.

24                    THE COURT:   Perempt?

25                    MS. CHU:   No.

Voir Dire

1        THE COURT:  Perempt?

2        MR. WALENSKY:  Number three.

3        THE COURT:  Okay.

4        How many jurors do we have now?

5        MR. POVILL:  That should be ten, your Honor.

6        THE CLERK:  You perempted number three?

7        MR. WALENSKY:  Yes, number three.

8        THE COURT:  Next two, cause?

9        MS. CHU:  Yes.  Mr. Yudin, I believe he stated

10   that because of the nature of how he does his work,

11   being a scientist as well as computers, it would be

12   extremely difficult for him to even try and figure out

13   what "beyond a reasonable doubt" is and I think that

14   would prevent him from being a fair juror.  Computers

15   and being a scientist, the way the fields are very

16   exact, I believe that he was very honest in his opinion

17   as to whether or not he'd be able to decide according to

18   what your standards would be, as far as beyond a

19   reasonable doubt.

20        THE COURT:  What is your position on that?

21        MR. WALENSKY:  I'll leave it up to the Court.

22   I think I will agree with that.

23        THE COURT:  He's out for cause.

24        THE CLERK:  Let me seat the juror.

25        Juror number ten is Tinnel Heraldo.

1              THE COURT:  I haven't finished.

2              Perempt?

3              MS. CHU:  I'm sorry, what numbers are we up

4       to?

5              THE COURT:  Four and five.

6              MS. CHU:  I'm sorry.

7              THE COURT:  You said cause for Yudin and --

8              MS. CHU:  I also want to challenge Mr. Clark

9       for cause, I believe.

10             THE COURT:  He's out.

11             MR. WALENSKY:  Your Honor, I thought I

12      rehabilitated him.

13             THE COURT:  Yeah, you did?

14             He's out for cause.

15             MS. CHU:  People also challenge Ms. Mamer.

16             THE COURT:  Wait a minute.  Wait a minute.

17             MS. CHU:  I'm sorry.  I thought we were

18      looking at the next three.

19             THE COURT:  The next two, Yudin and Clark.

20             MS. CHU:  Okay.  Sorry about that.

21             THE COURT:  You challenged Yudin and Clark for

22      cause.  I've granted them.

23             MS. CHU:  Yes.

24             THE COURT:  Next, Mamer and Hernandez.  Yeah,

25      Mamer and Hernandez.

Voir Dire

1       MS. CHU:  I challenge Ms. Mamer for cause.

2       MR. WALENSKY:  I agree.

3       THE COURT:  She's out for cause.

4       Hernandez, cause?

5       MS. CHU:  No.

6       THE COURT:  Cause?

7       MR. WALENSKY:  No.

8       THE COURT:  Perempt?

9       MS. CHU:  No.

10      THE COURT:  Perempt?

11      MR. WALENSKY:  Yes.

12      THE CLERK:  That is Hernandez.

13      MR. WALENSKY:  Yes, that's Hernandez.

14      THE COURT:  Adedeji?

15      MS. SCHWARTZKOPF:  Eight and nine.

16      THE COURT:  Eight and nine, yes.

17      MS. CHU:  None for cause.

18      THE COURT:  Cause?

19      MR. WALENSKY:  No.

20      THE COURT:  Perempt?

21      MS. CHU:  People challenge juror number nine.

22      THE COURT:  Comer?

23      MS. CHU:  Yes.

24      THE COURT:  Defense?

25      MR. WALENSKY:  Number eight.

1               THE COURT:  All right.

2               Ahmed, cause?

3               MS. CHU:  None for cause.

4               THE COURT:  Cause?

5               MR. WALENSKY:  No.

6               THE COURT:  Perempt?

7               MS. CHU:  No.

8               THE COURT:  Perempt?

9               MR. WALENSKY:  Yes.

10              THE CLERK:  Defense used four.

11              MS. SCHWARTZKOPF:  Yes.

12              And People used one.

13              THE COURT:  What is the total?

14              THE CLERK:  People used twelve, defense

15      eighteen.

16              THE COURT:  All right.

17              Get the jurors in, please.

18              MS. CHU:  How many challenges do I have left?

19      Eight?

20              MS. SCHWARTZKOPF:  Eight.

21              MS. CHU:  How many does the defense have?

22              MS. SCHWARTZKOPF:  Two.

23              COURT OFFICER:  Panel entering.

24              (Whereupon, the panel of prospective jurors

25      entered the courtroom.)

Voir Dire

1        THE CLERK:  Okay, ladies and gentlemen, if you

2   hear your name called that means you have been selected

3   to serve as a juror.  If you do not hear your name

4   called, you are excused, go back to the second floor,

5   Central Jury, with the thanks of the Court.

6        Juror number ten will be Tinnel Heraldo.

7        The rest of you go back to the second floor.

8        THE COURT:  Ms. Heraldo, sit down.  The rest

9   of you go back to the second floor, Central Jury.

10       Thank you.

11       (Whereupon, the panel of prospective jurors

12   exited the courtroom.)

13       THE COURT:  Swear her in.

14       THE CLERK:  Please rise, raise your right

15   hand.

16       Do you sincerely and solemnly swear or affirm

17   you will try this case in a just and impartial manner to

18   the best of your judgment and you will render a verdict

19   according to the law and the evidence?

20       Your response?

21       PROSPECTIVE JUROR:  Yes.

22       THE CLERK:  You may see the Court Officer.

23       (Whereupon, the sworn juror exited the

24   courtroom.)

25       THE COURT:  We have ten and --

1                    THE CLERK:  Ten sworn.

2                    THE COURT:  And they're bringing up the

3         supplemental panel?

4                    THE CLERK:  Yes.

5                    (Whereupon, there was a brief pause in the

6         proceedings.)

7                    THE COURT:  All right, we'll take a break.  We

8         will be back at a quarter after -- I mean, ten to.

9                    (Whereupon, a brief recess was held.)

10                    THE CLERK:  Case back on trial continues.  All

11        parties present.  Defendant is present with her

12        attorney.

13                    THE COURT:  Where are we now?

14                    MS. SCHWARTZKOPF:  We have the supplemental

15        panel.

16                    THE COURT:  Bring in the supplemental panel.

17                    (Whereupon, there was a brief pause in the

18        proceedings.)

19                    COURT OFFICER:  Jury panel entering.

20                    (Whereupon, the panel of prospective jurors

21        entered the courtroom.)

22                    THE CLERK:  All rise, please, and raise your

23        right hand.

24                    Do you and each of you sincerely and solemnly

25        swear or affirm that you will answer truthfully all

227

Voir Dire

1    questions asked of you relating to your qualifications

2    to serve as jurors in this action?

3              What is your response?

4              (Whereupon, the prospective jurors responded.)

5              THE CLERK:  Please be seated.

6              THE COURT:  All right.

7              Good afternoon, ladies and gentlemen.  I am

8    Supreme Court Justice Albert Tomei and I want to welcome

9    you to Part 2 of the State Supreme Court, the County of

10   Kings, the Criminal Term.

11             I will be presiding over the case of the

12   People of the State of New York against Ms. Atara

13   Wisdom.  She has been charged with the crime of murder

14   in the second degree and she's alleged to have stabbed

15   to death Mr. Anthony Wilson on -- sometime between

16   November 29th, 2011, and January 3rd of 2012 inside of

17   832 Bushwick Avenue in the Bushwick section of

18   Brooklyn.

19             I will tell you now, those charges -- that

20   charge is merely an allegation, merely an accusation,

21   it's not proof or evidence of anything.  A little later

22   on I will explain to you exactly what an indictment

23   represents.  However, before we proceed, what I'd like

24   to do is introduce the principal parties involved in

25   this matter.

mc

1           First of all I'd like to introduce you to

2   Atara Wisdom, the defendant in this case.

3           Please stand, turn around and introduce

4   yourself.

5           THE DEFENDANT:  Hi everyone.

6           THE COURT:  She is being represented by an

7   attorney, Mr. Joshua Povill.

8           MR. POVILL:  Good morning.

9           THE COURT:  And her principal attorney, Mr.

10  David Walensky.

11          MR. WALENSKY:  Good afternoon.

12          THE COURT:  And representing the People, the

13  District Attorney of Kings County, Assistant District

14  Attorney Phyllis Chu will be trying this matter.

15          MS. CHU:  Good morning, ladies and gentlemen.

16          THE COURT:  Do any of you ladies and gentlemen

17  know any of the parties I have introduced or anyone else

18  in the courtroom, including myself?

19          I don't see any hands so I would assume all of

20  you do not know any of the participants.

21          We are in the process of selecting a jury

22  right now.  Ladies and gentlemen, we have ten jurors, we

23  need two more to complete the petit jury -- a jury of

24  twelve plus alternates is called a petit jury -- and we

25  need a couple of alternates, so we should finish the

1   jury selection process hopefully if not by the end of

2   the morning session, certainly by the afternoon

3   session.

4            This jury selection process is known as the

5   voir dire.  It's a French term, to see them say.

6            Basically what we are concerned about is

7   getting, not only the Court, but the attorneys, both

8   defense and the people, they want jurors who are fair

9   and impartial and will make their determination solely

10  on the evidence or lack of evidence in the case.

11           So the process that we are engaging in is a

12  process which includes questioning you about your

13  background and your ability to be fair and to determine

14  whether you have any predisposition regarding this

15  matter and whether you can sit in this matter.

16           Fair and impartial, that is the hallmark of

17  jury selection and the selection of jurors.  So, please

18  do not be offended if we do ask some personal questions.

19  It's impossible to know all of you the way you know

20  yourselves, but we try to -- we try to eliminate any

21  infection, that is called prejudice, from the trial

22  process, so please indulge us while we do that.

23           The process is as follows:  I will make a

24  general inquiry of all of you jurors.  Do not respond

25  unless I ask for the response.  At the end of my general

Voir Dire

1    inquiry I will ask if any of the questions I've posed

2    affect you and you wish to make a statement.

3           Also, as I already stated, only you know

4    yourselves, not only you, you know yourselves better

5    than anyone else.  If there is something that would

6    prevent you from sitting, whatever it be or might be,

7    let the Court know because to have you selected as a

8    juror and then you come back after selection and say you

9    forgot this, you forgot that, I'm going to hear I got a

10   ticket for this, I can't do this, only makes me very

11   unhappy, and I don't like to be unhappy because it

12   really throws a wrench in the proceedings, all right.

13          And a lot of people come in here with the idea

14   I am not going to be selected.  You don't know if you're

15   going to be selected or not.  You may not, you may, but

16   to say later on, I forgot this just to get off jury

17   service -- not even to get off -- you gotta listen.

18          Now, this process is not an easy one to

19   participate in because it's very tedious, it's very

20   repetitious but very important.

21          So first I am going to do the general

22   inquiries.

23          Secondly, after I do that I am going to inform

24   you of certain principles of law that you must follow if

25   you're selected as a juror.

1          And thirdly, there will be an individual voir

2     dire where I will ask you personally certain questions,

3     then following my individual voir dire, the individual

4     voir dire or jury selection process by the attorneys.

5     That's how it goes.

6          First of all, I'd like to know if any of you

7     ladies and gentlemen have any physical disabilities or

8     maladies that would prevent you from sitting for an

9     hour, an hour and fifteen minutes, it's not fixed in

10    stone, after an hour and ten minutes if you need a

11    break, we will take a break, if it's legitimate.

12          Any of you ladies and gentlemen taking any

13    medication or drugs that would disorient you to the

14    extent that you could not follow these proceedings, you

15    become dizzy, or disoriented?

16          And you really have to be in horrible physical

17    shape for me to excuse you, ladies and gentlemen.  So,

18    you know, everybody has a little ailment here.  We all

19    take drugs today for anything.  You have a headache, you

20    take something, whatever.  It has to be real serious.

21          I would also like to know if any of you ladies

22    and gentlemen have any difficulty understanding the

23    English language or communicating in the English

24    language.  If you do, please let me know.

25          I also would like to know if any of you ladies

1    and gentlemen have difficulty seeing or hearing, because

2    obviously there's going to be evidence in the case and

3    you're going to have to observe and read it, see it,

4    whatever, hear it.

5              I would also like to know if there are any

6    students attending school right now.  Are there any

7    students attending school right now?

8              Give your name.

9              PROSPECTIVE JUROR:  Thomas Lay (phonetic).

10             THE COURT:  What do you do?

11             PROSPECTIVE JUROR:  I am a part-time student,

12   part-time graduate student.  I have an obligation for

13   class over the summer.

14             THE COURT:  Are you taking class now?

15             PROSPECTIVE JUROR:  I am not enrolled at the

16   moment but I have an incomplete class that I am working

17   on finishing.

18             THE COURT:  This case -- let me just say, this

19   case should be over by next week, the latest Tuesday.

20   That's my guesstimate, all right.  Okay.

21             Is that all right with you?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Sit down.

24             I would also like to know, is there anyone

25   here who doesn't understand English or has difficulty

1    with the English language?

2            Just raise your hand.

3            No?  Okay.

4            We are only going to meet, if you're selected,

5    we are going to meet today, tomorrow and Wednesday and

6    then we'll return on -- what is it? -- the 8th.  You

7    don't have to worry about the holiday, you will be able

8    to buy firecrackers, do whatever you want, watch the

9    Macy's parade or whatever it is.

10           Anyway, what else was I going to say?

11           Oh, I would like to know if any of you ladies

12   and gentlemen have any religious, moral or ethical

13   reason why you cannot sit in judgment of Ms. Wilson.

14           I would also like to know if any of you ladies

15   and gentlemen were called to jury service, whether it be

16   in the federal court system, state court system or city

17   court system, or called to serve on the Grand Jury,

18   which is an entirely different legal entity, within this

19   period of time.

20           What's today's date?

21           THE CLERK:  Today is June 30th.

22           THE COURT:  Between the date of June 30th,

23   2012 and June 30th, 2014, if you were called, you didn't

24   have to sit, if you were called, they sent you a notice

25   to come in and you go in, that is all I want to know.

1        What else?

2        MS. CHU:  Somebody raised their hand before.

3        THE COURT:  Who raised their hand?

4        Yes, ma'am?

5        PROSPECTIVE JUROR:  I am a Jehovah's Witness.

6        THE COURT:  That's okay.  I haven't gotten to

7    that part yet.

8        So right now I am going to go down row by row,

9    and if any of the questions I've posed affect you and

10   you want to speak to the Court, just stand and make your

11   statement.  Or if you have information that is known

12   only to you and it would prevent you from sitting, let

13   us know.

14       Also, like I said before, I don't suffer

15   excuses very easily or very gladly, ladies and

16   gentlemen, because if I accepted everybody's excuse, you

17   could never sit and listen to all the hundreds and

18   hundreds and hundreds of cases that go through the halls

19   of justice, so be aware of that.

20       All right.

21       So we are going row by row, and if you wish to

22   address the Court, just stand, give your name.  If it's

23   something very personal that you do not wish to reveal

24   before the rest of the jurors, let me know, you will be

25   able to make your statement at the bench.

Voir Dire

1          First row, anyone?

2          Second row?

3          Third row?

4          Fourth row?

5          Fifth row?

6          No one.

7          Miss, you said you were Jehovah's Witness?

8          PROSPECTIVE JUROR:  My name is Charlotte

9    Lindsay-Gibson (phonetic).

10          THE CLERK:  Last name?

11          PROSPECTIVE JUROR:  Gibson.  Lindsay-Gibson.

12   I have two last names.

13          THE CLERK:  What is the other one?

14          PROSPECTIVE JUROR:  Lindsay.

15          THE COURT:  You know what, Ms. Gibson, you can

16   go downstairs and go to -- can I see your card?

17          All right.

18          So I don't see any other hands so we're going

19   to proceed.  I am going to proceed and inform you with

20   respect to the legal principles that apply to this

21   criminal trial and all criminal trials.

22          First of all, as I indicated, the mere fact

23   that Ms. Wisdom has been charged in the indictment with

24   this crime of murder in the second degree means -- I

25   will start all over again.

mc

Voir Dire

1    The fact that she's been charged with these

2    crimes doesn't mean that there is any evidence that

3    she's committed these crimes or this crime.

4    The indictment really is a piece of paper that

5    reflects the charge and as a consequence that person is

6    brought into court and then the People have to prove

7    each and every material element of the crime charged

8    beyond a reasonable doubt.  That burden always remains

9    on the People, never shifts to the defendant.

10    It's merely an accusation, merely an

11    allegation and not proof of anything.

12    If you're selected as a juror, you are going

13    to be determining what the facts are in this case, and

14    after determining what the facts are, you will determine

15    what the evidence shows.  In other words, you'll

16    determine what the evidence is in this matter, or lack

17    of evidence, and then I will -- that will be your

18    province, you will be the judges, you are going to be

19    judges for a couple of days and you will determine what

20    the facts are in this matter.  I will not be able to

21    tell you what the facts are in this matter or what the

22    evidence is, all right.  But I will tell you at the

23    close of the case what the law is because that's my

24    province.

25    I am not allowed to interfere in your province

mc

Voir Dire

1    and you are not allowed to interfere in mine.  You have

2    to take the law as I give it to you.

3            So once the case is concluded, you will take

4    the evidence or the facts in the matter, determine what

5    the evidence is and then I will give you the law and

6    then you will make a determination, which is called a

7    verdict.  Your verdict may be guilty or not guilty.  You

8    may find defendant guilty of some charges and not guilty

9    of others.

10           During the course of the trial the attorneys

11   are going to be making motions, applications and

12   objections.  I am going to be ruling on them as a matter

13   of law.  None of my rulings should be taken by you as

14   any indication whether you should believe all or part of

15   what is offered in evidence or that the defendant is

16   guilty or not guilty.  That is solely your function to

17   determine but you must accept the law as I give it to

18   you.

19           If the defendant and the People are to have a

20   fair trial to which they are entitled, you must follow

21   the law as I give it to you, whether you agree with it

22   or not, whether you like it or not.  You will agree not

23   to substitute your interpretation of the law.

24           Can you all do that, folks?

25           Will you all agree?

1          You didn't have your coffee this morning?

2          I gotta hear in a loud and clear voice, yes or

3     no.

4          (Whereupon, the prospective jurors responded.)

5          THE COURT:  Thank you.

6          The reason I say that is because if I don't

7     hear from you, I don't know what you're thinking, I

8     don't know what you're feeling, all right.

9          Now, how many of you watch all these Law &

10    Order ridiculous shows?

11         Come on, everybody.  C.S.I., there's four

12    million of them right now.  How many states do we have,

13    fifty?  We have about fifty C.S.I.

14         You got all these forensic scientists coming

15    in and blah, blah, blah, it's all blah, blah.  By the

16    way, it's all entertainment, forget about them, okay.

17    Forget them.

18         Ninety-seven percent, in my opinion, of all of

19    the evidence comes in the form of what people say.

20    People get on the stand, they swear to tell the truth,

21    nothing but the truth, so help them God and they tell

22    you what they know, all right.

23         It's going to be up to you to determine

24    whether they are, one, telling the truth; two, lying;

25    three, mistaken.

1            Those are the three options, all right.

2            That's basically most of the evidence.

3            So, you may say, well, what am I supposed to

4       do?

5            What you're supposed to do is take your life

6       experience, which means if you're eighteen or over you

7       have a life experience, and your common sense, which you

8       have not left outside the door, and when you go in the

9       jury room and you take that and you apply it to the

10      facts and the law in this case.  That's what you do,

11      okay.

12           You don't have to be a rocket scientist to be

13      a juror.  You don't have to have any level of education

14      to be a juror.  There is no school for jurors, all

15      right.

16           So what I am going to do, I'm going to give

17      you the names of people that you may hear during the

18      course of the trial or who may be witnesses during the

19      course of the trial, so then you let me know if you know

20      any of them.

21           The alleged victim in this case is Mr. Anthony

22      Wilson.  It's alleged he was stabbed to death by Ms.

23      Wisdom.

24           Victoria Wilson.

25           Shakeema Fortune.

Voir Dire

1          Donet Robinson.

2          Matthew Shepard.

3          Linda Smith-Harris.

4          Detective Deborah Batanjani of the 83rd

5     Precinct.

6          Police Officer Garret Marsden of the 83rd

7     Precinct.

8          Police Officer Christian Carlin of the 83rd

9     Precinct.

10         Police Officer Juana Ortiz of the 83rd

11    Precinct.

12         Detective Geoffrey Hernandez of Brooklyn North

13    Homicide Squad.

14         And Detective Christopher Scandole of the

15    Brooklyn North Homicide Squad.

16         Detective Stephen Markoski of the N.Y.P.D.

17    Crime Scene Unit.

18         Dr. Frede Frederic or Scordi-Bello, it may be,

19    from the Medical Examiner's Office of the State of New

20    York.

21         Sarah Philipps of the Office of the Chief

22    Medical Examiner's DNA lab.

23         Ed Purce, P-U-R-C-E.

24         You will hear from a Sprint Nextel phone

25    representative.

Voir Dire

1          You will hear from a 911 representative and an

2     EBT representative.

3          What is that?

4          MS. CHU:  Welfare.

5          THE COURT:  Welfare representative.

6          Are any of you familiar with any of these

7     people, yes or no?

8          (Whereupon, the jurors responded.)

9          THE COURT:  Now, as jurors your verdict must

10    be unanimous.  Twelve jurors seldom agree immediately,

11    therefore you're called upon to deliberate.

12          Can you promise the defendant and the People

13    that you will be willing to participate in the

14    deliberations, express your views based on the evidence

15    in this case, keep an open mind and listen to the views

16    of other jurors?

17          Can you all do that?

18          Thank you.

19          Now, as Ms. Wisdom sits here she's cloaked

20    with this presumption of innocence.  That cloak can only

21    be removed if the jury finds her guilty beyond a

22    reasonable doubt.  So, she's presumed innocent at this

23    particular time, all right, and the People have the

24    burden of rebutting the presumption, if they can, by

25    presenting evidence which convinces you beyond a

Voir Dire

1    reasonable doubt of the defendant's guilt.

2              In a criminal case the burden of proof is on

3    always on the People and remains with the People

4    throughout the course of the trial, never shifts to the

5    defendant.  The defendant is not required to produce any

6    evidence, is not required to produce witnesses and is

7    not required to testify.  Should she not testify, you

8    cannot hold it against her, okay.

9              Outside of this courtroom, outside of this

10   venue, the laws are different.  Johnny and Joey get into

11   some dispute, you go to Johnny, you go to Joey, you ask

12   Johnny what happened, you ask Joey what happened, then

13   you make up your mind and determine what really

14   happened.

15             Ms. Wisdom doesn't have to do a single,

16   solitary thing.  She doesn't have to testify.  The

17   attorneys, they can go to sleep if they want with

18   respect to her defense.  They are not going to do that,

19   they are going to present a defense, but that's the

20   law.

21             Does anyone have any difficulty accepting that

22   law as I have explained it?

23             Yes or no?

24             (Whereupon, the prospective jurors responded.)

25             THE COURT:  I am losing some of you.

Voir Dire

1       Yes or no?

2              (Whereupon, the prospective jurors responded.)

3              THE COURT:  A criminal case is different than

4       a civil case.  In a criminal case all the jurors must

5       agree.  In a civil case only five of six need agree.  In

6       a criminal case the People will prove the case beyond a

7       reasonable doubt.  In a civil case the plaintiff must

8       only prove his or her case by a fair preponderance of

9       the credible evidence.

10             Now, everybody heard the term "reasonable

11      doubt."  I will not tell you what a reasonable doubt is

12      now but I will tell you, if you have a reasonable doubt

13      as to the defendant's guilt, then you must find her not

14      guilty.  In other words, if you are convinced of her

15      guilt beyond a reasonable doubt, then you must find her

16      guilty of the crime or crimes charged.

17             Now, you may say, what do I do when I get into

18      the jury room?

19             What I said is, you take your common sense,

20      your lifetime experience, you go into the jury room and

21      you focus.

22             What do you focus on?

23             The evidence or lack of evidence, not any

24      sympathy for Ms. Wisdom or the People's position in the

25      matter or witnesses.  You don't focus on what the

Voir Dire

1   punishment may be or what the sentence may be because

2   that's not your concern, all right.  It's irrelevant.

3   Those are irrelevant matters.

4           So, if someone was to bring up these matters,

5   you would have to say, madam, sir, Judge Tomei said we

6   have to do this, and let's get back on track.

7           Can you all do that, folks?

8           Now, there are going to be a number of police

9   officers testifying in this case.  I will tell you now,

10  they are to be treated like any other witness, they are

11  not to be given any greater believability or less

12  believability because they're police officers.  However,

13  if you feel, because of your own personal experience,

14  the experience of someone who's close to you or because

15  of what you have heard or seen or read in the media,

16  you feel you cannot be fair and impartial when it comes

17  to evaluating police officers' testimony, let me know

18  now.

19          Is there anyone who feels that way?

20          Okay.  All right.

21          So, the next step is, your name is going to be

22  called.  You will take a seat in the jury box.

23          We will seat sixteen jurors, all right, and

24  you will -- after you take a seat -- well, after you're

25  called, you say "present" or "here" so we know you are

Voir Dire

1    here, you'll come, enter from my right, your left, into

2    the well of the courtroom, take a seat, then we'll

3    proceed to fill the rest of the box.

4              So, we will proceed at this particular time.

5              Go ahead.

6              THE CLERK:  Seat number one will be Kingsley

7    McFarlane.

8              Say "here" or "present," please.

9              PROSPECTIVE JUROR:  Present.

10             THE COURT:  Spell the name.

11             THE CLERK:  M-C-F-A-R-L-A-N-E.

12             PROSPECTIVE JUROR:  Correct.

13             THE CLERK:  Seat two, William McNair.

14             PROSPECTIVE JUROR:  Present.

15             THE CLERK:  M-C-N-A-I-R.

16             Seat three, Yung (phonetic) Lee, L-E-E.

17             PROSPECTIVE JUROR:  Present.

18             THE CLERK:  Seat four, Marlon (phonetic)

19    Laing.

20             PROSPECTIVE JUROR:  Here.

21             THE CLERK:  L-A-I-N-G.

22             PROSPECTIVE JUROR:  That's correct.

23             THE CLERK:  That's seat four.

24             Seat five, Lorenzo Nolberto.

25             You have to say "here" or "present."

Voir Dire

1          PROSPECTIVE JUROR:  Present.

2          THE CLERK:  Lorenzo N-O-L-B-E-R-T-O.

3          THE COURT:  N-O-L --

4          THE CLERK:  N-O-L-B-E-R-T-O.

5          Seat six Marco (phonetic) Phillips.

6          PROSPECTIVE JUROR:  Here.

7          THE CLERK:  P-H-I-L-L-I-P-S.

8          Seat seven, Leslie Larson.

9          PROSPECTIVE JUROR:  Here.

10          THE CLERK:  L-A-R-S-O-N.

11          Seat eight, Jawan (phonetic) Lamont.

12          PROSPECTIVE JUROR:  Present.

13          THE CLERK:  L-A-M-O-N-T.

14          PROSPECTIVE JUROR:  Yes.

15          THE CLERK:  Seat nine, Jerlanie (phonetic)

16     Roberts.

17          PROSPECTIVE JUROR:  Present.

18          THE CLERK:  R-O-B-E-R-T-S.

19          Seat ten, Renee Scott.

20          PROSPECTIVE JUROR:  Present.

21          THE CLERK:  S-C-O-T-T.

22          THE CLERK:  Seat eleven, Sarah (phonetic)

23     Harris.

24          PROSPECTIVE JUROR:  Here.

25          THE CLERK:  H-A-R-R-I-S.

Voir Dire

1          Seat twelve is Jerry (phonetic) Audige.

2          PROSPECTIVE JUROR:  Present.

3          THE CLERK:  A-U-D-I-G-E.

4          THE COURT:  Just do fourteen.

5          THE CLERK:  Just to fourteen?

6          THE COURT:  Yes.

7          THE CLERK:  Seat thirteen, Salion (phonetic)

8    Seivwright.

9          PROSPECTIVE JUROR:  Seivwright.

10         THE CLERK:  S-E-I-V-W-R-I-G-H-T.

11         And seat fourteen, Denise (phonetic) Chung.

12         PROSPECTIVE JUROR:  Present.

13         THE CLERK:  C-H-U-N-G.

14         THE COURT:  All right.

15         Mr. McFarlane, your neighborhood?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  What is your neighborhood?  Where

18   do you live?

19         PROSPECTIVE JUROR:  Oh, East New York.

20         THE COURT:  Thank you.

21         Mr. McNair?

22         PROSPECTIVE JUROR:  Bed-Stuy.

23         THE COURT:  Mr. Lee?

24         PROSPECTIVE JUROR:  Bay Ridge.

25         THE COURT:  Ms. Laing?

Voir Dire

1      PROSPECTIVE JUROR:  Canarsie.

2      THE COURT:  Mr. Nolberto?

3      PROSPECTIVE JUROR:  Crown Heights.

4      THE COURT:  Where?

5      PROSPECTIVE JUROR:  Crown Heights.

6      THE COURT:  Crown Heights.

7      Mr. Phillips?

8      PROSPECTIVE JUROR:  Bed-Stuy.

9      THE COURT:  Bed-Stuy.

10     Ms. Chung?

11     PROSPECTIVE JUROR:  East Flatbush.

12     THE COURT:  East Flatbush.

13     Ms. Seivwright?

14     PROSPECTIVE JUROR:  Brooklyn.

15     THE COURT:  What part of Brooklyn?

16     PROSPECTIVE JUROR:  Church Avenue.

17     THE COURT:  And where?

18     PROSPECTIVE JUROR:  Linden.

19     THE COURT:  Do you live in East Flatbush?

20     PROSPECTIVE JUROR:  East Flatbush.

21     THE COURT:  Okay.

22     How do you say it, Audige?

23     PROSPECTIVE JUROR:  Audige.

24     THE COURT:  Mr. Audige?

25     PROSPECTIVE JUROR:  Brownsville.

Voir Dire

1       THE COURT:  Ms. Harris?

2       PROSPECTIVE JUROR:  Bed-Stuy.

3       THE COURT:  Bed-Stuy.

4       Ms. Scott?

5       PROSPECTIVE JUROR:  East New York.

6       THE COURT:  Ms. Roberts -- Mr. Roberts, I'm

7   sorry?

8       PROSPECTIVE JUROR:  East Flatbush.

9       THE COURT:  East Flatbush, okay.

10      Mr. Lamont?

11      PROSPECTIVE JUROR:  Canarsie.

12      THE COURT:  Canarsie.

13      And Ms. Larson?

14      PROSPECTIVE JUROR:  Ditmas Park.

15      THE COURT:  Ditmas, all right.

16      First row, any of you ladies and gentlemen

17  familiar with the crime scene area, 832 Bushwick Avenue?

18  Anyone?

19      Second row, anyone?

20      Mr. McFarlane, married, single, separated,

21  divorced?

22      PROSPECTIVE JUROR:  Married.

23      THE COURT:  Your occupation?

24      PROSPECTIVE JUROR:  Nursing assistant.

25      THE COURT:  A what?

Voir Dire

1      PROSPECTIVE JUROR:  A nursing assistant.

2      THE COURT:  Nursing assistant, I'm sorry.

3      And your spouse, your wife?

4      PROSPECTIVE JUROR:  Social worker.

5      THE COURT:  City or private?

6      PROSPECTIVE JUROR:  City.

7      THE COURT:  Okay.

8      Mr. McNair?

9      PROSPECTIVE JUROR:  Single.

10     THE COURT:  Occupation?

11     PROSPECTIVE JUROR:  Executive assistant.

12     THE COURT:  Who do you work for?

13     PROSPECTIVE JUROR:  Ann Taylor Corporation.

14     THE COURT:  Ann Taylor?

15     PROSPECTIVE JUROR:  Yes.

16     THE COURT:  Mr. Lee?

17     PROSPECTIVE JUROR:  Single.

18     THE COURT:  Occupation?

19     PROSPECTIVE JUROR:  System admin.  Tech,

20     technician.

21     THE COURT:  IT.

22     Ms. Laing?

23     PROSPECTIVE JUROR:  Care manager, community

24     based.

25     THE COURT:  I'm sorry.

1              Married, single?

2              PROSPECTIVE JUROR:  Married.

3              THE COURT:  You're married?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Your occupation?

6              PROSPECTIVE JUROR:  Care manager,

7      community-based organization in Brownsville.

8              THE COURT:  You're a care manager, that is for

9      a not-for-profit organization?

10             PROSPECTIVE JUROR:  Yeah.

11             THE COURT:  And your spouse?

12             PROSPECTIVE JUROR:  Retired.

13             THE COURT:  What did he do before he retired?

14             PROSPECTIVE JUROR:  Well, he was a factory

15     supervisor.

16             THE COURT:  I'm sorry?

17             PROSPECTIVE JUROR:  Factory supervisor.

18             THE COURT:  Oh, factory supervisor.

19             PROSPECTIVE JUROR:  Yes, sir.

20             THE COURT:  Thank you.

21             Mr. Nolberto?

22             PROSPECTIVE JUROR:  Single.

23             THE COURT:  Your occupation?

24             PROSPECTIVE JUROR:  Unemployed.

25             THE COURT:  What did you do before you were

252

Voir Dire

1      unemployed?

2                PROSPECTIVE JUROR:  I used to work at a

3      restaurant.

4                THE COURT:  Doing what?

5                PROSPECTIVE JUROR:  Like dishwashing.

6                THE COURT:  Okay.  Thank you.

7                Mr. Phillips?

8                PROSPECTIVE JUROR:  Single.

9                THE COURT:  Occupation?

10               PROSPECTIVE JUROR:  IT technician.

11               THE COURT:  Ms. Chung?

12               PROSPECTIVE JUROR:  Single.

13               Senior staff assistant.

14               THE COURT:  For what?  For whom?

15               PROSPECTIVE JUROR:  A hospital.  Hospital.

16               THE COURT:  Which hospital?

17               PROSPECTIVE JUROR:  Downstate Medical Center.

18               THE COURT:  Thank you.

19               Ms. Seivwright?

20               PROSPECTIVE JUROR:  Married.

21               THE COURT:  Occupation?

22               PROSPECTIVE JUROR:  Chef.

23               THE COURT:  Chef?

24               PROSPECTIVE JUROR:  Yes.

25               THE COURT:  And your spouse?

mc

Voir Dire

1          PROSPECTIVE JUROR:  Taxi driver.

2          THE COURT:  Taxi driver.

3          You must eat good.

4          PROSPECTIVE JUROR:  My throat is bad.

5          THE COURT:  Mr. Audige?

6          PROSPECTIVE JUROR:  Single.

7          THE COURT:  Occupation?

8          PROSPECTIVE JUROR:  Track worker.

9          THE COURT:  You work for MTA?

10         PROSPECTIVE JUROR:  Correct.

11         THE COURT:  Ms. Harris?

12         PROSPECTIVE JUROR:  Single.

13         THE COURT:  Occupation?

14         PROSPECTIVE JUROR:  Licensed social worker.

15         THE COURT:  Work for the City of New York?

16         PROSPECTIVE JUROR:  I work for a program that

17     is funded by organizations and partially nonprofit

18     funded.

19         THE COURT:  Okay.

20         Ms. Scott?

21         PROSPECTIVE JUROR:  Single.

22         THE COURT:  Occupation?

23         PROSPECTIVE JUROR:  I'm a student.

24         THE COURT:  What are you studying?

25         PROSPECTIVE JUROR:  Social work.

Voir Dire

1          THE COURT:  Okay.

2          Ms. Roberts -- Mr. Roberts, I'm sorry.

3          PROSPECTIVE JUROR:  Single.

4          THE COURT:  Single?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  And your occupation?

7          PROSPECTIVE JUROR:  I'm a teaching artist of

8   music.

9          THE COURT:  Are you doing that now?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  What instrument do you teach?

12   What do you teach?

13          PROSPECTIVE JUROR:  I teach how to play steel

14   band and drums.

15          THE COURT:  Okay.

16          Do you teach at a specific site?

17          PROSPECTIVE JUROR:  Well, it depends on the

18   school that employs me.

19          THE COURT:  Okay.

20          It's like you're an independent contractor, is

21   that what you do?  Are you certified by the Board of

22   Education or what?

23          PROSPECTIVE JUROR:  I have -- not by the Board

24   of Ed.  I work underneath the Department of Health,

25   actually.  I work with a company that is -- I don't

1      know -- in tandem with the Department of Health.

2                    THE COURT:  You go to different schools?

3                    PROSPECTIVE JUROR:  Yeah.

4                    THE COURT:  Mr. Lamont?

5                    PROSPECTIVE JUROR:  Single.

6                    THE COURT:  And occupation?

7                    PROSPECTIVE JUROR:  I'm a student.

8                    THE COURT:  What are you studying?

9                    PROSPECTIVE JUROR:  Biology.

10                    THE COURT:  Ms. Larson?

11                    PROSPECTIVE JUROR:  Married.

12                    THE COURT:  Occupation?

13                    PROSPECTIVE JUROR:  Flight attendant.

14                    THE COURT:  What?

15                    PROSPECTIVE JUROR:  Flight attendant.

16                    THE COURT:  Flight attendant.

17                    And your spouse?

18                    PROSPECTIVE JUROR:  Insurance agent.

19                    THE COURT:  All right.

20                    Any of you in the first row, any of you ladies

21      and gentlemen ever served on a jury before?

22                    Second row, anyone?

23                    All right.

24                    First row, any of you ladies and gentlemen

25      ever been the victim of a crime, or someone close to

Voir Dire

1    you?  Could have been a very serious crime, murder,

2    rape, whatever it might be, or even a simple chain

3    snatch?

4              Ever been the victim of a crime, anyone, or

5    someone close to you?

6              That is Mr. Phillips?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  What is it?

9              PROSPECTIVE JUROR:  I was hit by a car.

10              THE COURT:  It was a hit and run?

11              PROSPECTIVE JUROR:  It was kind of like -- not

12    hit and run.

13              THE COURT:  Was there an arrest made?

14              PROSPECTIVE JUROR:  Yes.

15              THE COURT:  And why --

16              PROSPECTIVE JUROR:  I was crossing.  I was

17    crossing.

18              THE COURT:  Why did they arrest the person who

19    hit you?

20              PROSPECTIVE JUROR:  Because he hit me and he

21    ran.  Basically, he was driving on the opposite side of

22    the street so --

23              THE COURT:  Reckless driving?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Okay.

Voir Dire

```
 1              Who else?

 2              First row, anyone?

 3              Mr. McNair?

 4              PROSPECTIVE JUROR:  Mugging in Harlem.

 5              THE COURT:  You were robbed in Harlem?

 6              PROSPECTIVE JUROR:  Uh-huh.

 7              THE COURT:  Was there a weapon involved?

 8              PROSPECTIVE JUROR:  A knife.

 9              THE COURT:  How long ago?

10              PROSPECTIVE JUROR:  Five years ago.

11              THE COURT:  Did you report it to the police?

12              PROSPECTIVE JUROR:  Yes.

13              THE COURT:  Was the perpetrator or

14      perpetrators ever apprehended?

15              PROSPECTIVE JUROR:  Nope.

16              THE COURT:  Anyone else, first row?

17              Second row?

18              Ms. Seivwright?

19              PROSPECTIVE JUROR:  My cousin.

20              THE COURT:  What about your cousin?

21              PROSPECTIVE JUROR:  Somebody killed her in the

22      house.

23              THE COURT:  He was murdered?

24              PROSPECTIVE JUROR:  She.

25              THE COURT:  She was murdered?
```

Voir Dire

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  It was a friend?

3          PROSPECTIVE JUROR:  My cousin.

4          THE COURT:  Cousin?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Sorry, I didn't hear that.

7          How long ago was that?

8          PROSPECTIVE JUROR:  Six years now.

9          THE COURT:  And they ever apprehend the person

10    or persons?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Was a weapon involved?

13          PROSPECTIVE JUROR:  Stabbed, knife.

14          THE COURT:  Stabbed?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Who else?

17          Ms. Harris?

18          PROSPECTIVE JUROR:  Robbed.

19          THE COURT:  Was a weapon involved?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  What happened?

22          PROSPECTIVE JUROR:  My phone was snatched out

23    of my hand while I was on it.

24          THE COURT:  Your cellphone?

25          PROSPECTIVE JUROR:  Uh-huh.

259

Voir Dire

1    THE COURT:  Okay.  Okay.

2    Who else?

3    Mr. Lamont?

4    PROSPECTIVE JUROR:  Close friend was killed as

5    a result of fraternity hazing.

6    THE COURT:  How did she die?

7    PROSPECTIVE JUROR:  It was a he.  It was

8    liquor hazing.  They tied him to a chair and asked him

9    questions and every question he got wrong, he took a

10   shot, and he passed out.

11   THE COURT:  Okay.

12   It was a fraternity?

13   PROSPECTIVE JUROR:  Yes.

14   THE COURT:  Okay.

15   Anyone else?

16   First row, any of you ladies and gentlemen

17   ever accused of or arrested or convicted of a crime or

18   someone close to you?

19   Anyone ever accused or convicted of a crime or

20   arrested, or someone close to you?

21   PROSPECTIVE JUROR:  Someone close to me.

22   THE COURT:  Mr. McNair?

23   PROSPECTIVE JUROR:  Friend of mine by the name

24   of Antonio --

25   THE COURT:  What happened?

mc

Voir Dire

1          PROSPECTIVE JUROR:  He was convicted for drug

2     sales.

3          THE COURT:  Of what?

4          PROSPECTIVE JUROR:  Drug sales.

5          THE COURT:  Okay.

6          Federal, state court?

7          PROSPECTIVE JUROR:  It was in St. Louis.  I

8     believe it was federal.

9          THE COURT:  Anyone else, first row?

10          Second row?

11          Mr. Lamont?

12          PROSPECTIVE JUROR:  Cousin, for assault.

13          THE COURT:  Cousin was convicted of assault?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Did he go to jail?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  How long -- is he still in jail or

18     out of jail?

19          PROSPECTIVE JUROR:  I think maybe four years.

20          THE COURT:  What kind of weapon, or was there

21     a weapon?

22          PROSPECTIVE JUROR:  I think it was with his

23     hands.

24          THE COURT:  Anyone else?

25          Mr. Audige?

1          PROSPECTIVE JUROR:  Yes.  Me, myself, as a

2   minor.

3          THE COURT:  What were you arrested for?

4          PROSPECTIVE JUROR:  Robbery.

5          THE COURT:  How old were you at the time?

6          PROSPECTIVE JUROR:  Seventeen.

7          THE COURT:  What happened to the case?

8          PROSPECTIVE JUROR:  It got sealed.

9          THE COURT:  You got a YO, youthful offender?

10         PROSPECTIVE JUROR:  I'm not sure what it was.

11  I know they sealed it.  When I got out of the military,

12  I had to come here and the case was reopened and

13  sealed.

14         THE COURT:  So you got arrested at seventeen

15  for robbery?

16         PROSPECTIVE JUROR:  Correct.

17         THE COURT:  Was there a trial or did you plead

18  guilty?

19         PROSPECTIVE JUROR:  I took a plea bargain.

20         THE COURT:  What?

21         PROSPECTIVE JUROR:  I took a plea bargain.

22         THE COURT:  You took a plea.

23         Was it a misdemeanor that you took?

24         PROSPECTIVE JUROR:  No, it was a felony.

25         THE COURT:  So did they give you youthful

1     offender, which means you would be treated as a minor,

2     not as an adult?

3                   PROSPECTIVE JUROR:  Correct.

4                   THE COURT:  You got a YO?  That is what that

5     is, youthful offender.

6                   That's sealed?

7                   PROSPECTIVE JUROR:  Correct.

8                   THE COURT:  Anyone else?

9                   All right.

10                  First row, any of you, ladies and gentlemen,

11    related to, friendly or interact with any law

12    enforcement agents or attorneys?

13                  Ms. Chung?

14                  PROSPECTIVE JUROR:  My nephew's a lieutenant.

15                  THE COURT:  Where?

16                  PROSPECTIVE JUROR:  73rd Precinct.

17                  THE COURT:  70...

18                  PROSPECTIVE JUROR:  73rd Precinct.

19                  THE COURT:  He's a lieutenant, right?

20                  PROSPECTIVE JUROR:  Yes.

21                  THE COURT:  Anybody else?

22                  Mr. McNair?

23                  PROSPECTIVE JUROR:  My sister practices family

24    law in California.  She's an attorney.

25                  THE COURT:  Okay.

1          Who else?

2          Mr. Lee?

3          PROSPECTIVE JUROR:  Brother-in-law's brother

4     is a retired lieutenant.

5          THE COURT:  Your brother-in-law is a retired

6     lieutenant?

7          PROSPECTIVE JUROR:  Brother-in-law's brother.

8          THE COURT:  Brother-in-law's brother?

9          PROSPECTIVE JUROR:  Yeah.

10          THE COURT:  Is a retired lieutenant N.Y.P.D.,

11     okay.

12          Who else?

13          Anyone else, first row?

14          Second row?

15          Ms. Harris?

16          PROSPECTIVE JUROR:  My uncle's a retired

17     police officer in Massachusetts.

18          THE COURT:  Anyone else?

19          Mr. McFarlane, can you be fair and impartial

20     in this case?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Mr. McNair?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Mr. Lee?

25          PROSPECTIVE JUROR:  Yeah.

Voir Dire

```
 1                THE COURT:  Ms. Laing?

 2                PROSPECTIVE JUROR:  Yes.

 3                THE COURT:  Mr. Nolberto?

 4                PROSPECTIVE JUROR:  Yeah.

 5                THE COURT:  Mr. Phillips?

 6                PROSPECTIVE JUROR:  Yes.

 7                THE COURT:  Ms. Chung?

 8                PROSPECTIVE JUROR:  Yes.

 9                THE COURT:  Ms. Seivwright?

10                PROSPECTIVE JUROR:  Yes.

11                THE COURT:  Mr. Audige?

12                PROSPECTIVE JUROR:  Yes.

13                THE COURT:  Ms. Harris?

14                PROSPECTIVE JUROR:  Yes.

15                THE COURT:  Ms. Scott?

16                PROSPECTIVE JUROR:  Yes.

17                THE COURT:  Ms. Roberts -- Mr. Roberts?

18                PROSPECTIVE JUROR:  Yes.

19                THE COURT:  And Mr. Lamont?

20                PROSPECTIVE JUROR:  Yes.

21                THE COURT:  And Ms. Larson?

22                PROSPECTIVE JUROR:  Yes.

23                THE COURT:  All right, it's almost the

24      luncheon hour so we are going to take a break for the

25      lunch hour.  Please do not discuss the case amongst
```

1    yourselves or with anyone else.  Please do not visit the

2    place where the alleged crimes occurred.

3            Have no contact with any of the parties

4    involved in this matter.  If you see us, ignore us.

5            Do not resort to utilizing any digital

6    electronic devices for the purpose of obtaining any

7    information about this case or talking to anybody about

8    this case.

9            Return here at two o'clock.

10           Do not enter until the Court Officers direct

11   you to so enter.

12           Take all your belongings.  You will exit

13   first, then those in the audience will follow.

14           Have a very good lunch.  You are being excused

15   for lunch.

16           (Whereupon, the panel of prospective jurors

17   exited the courtroom.)

18           THE COURT:  All right, those in the audience,

19   same instructions and return at two o'clock outside.

20           Do not enter unless Court Officers direct you

21   to enter.

22           Take all your belongings.

23           Thank you.

24           COURT OFFICER:  Judge, what would you like me

25   to tell the jurors in the room?

Voir Dire

1          THE COURT:  They're excused till 2:15.

2          Okay, two o'clock.

3          (Whereupon, a lunch recess was held.)

4          *                    *                    *

5          A F T E R N O O N     S E S S I O N

6          *                    *                    *

7          THE CLERK:  Case on trial continues.  All

8    parties present.  Defendant is present with her

9    attorney.  We are missing Walensky.

10         (Whereupon, there was a brief pause in the

11   proceedings.)

12         THE COURT:  Here he comes.  Just get those who

13   are in the jury box first and then the rest.

14         COURT OFFICER:  Jury panel entering.

15         (Whereupon, the panel of prospective jurors

16   entered the courtroom.)

17         THE COURT:  Take your seats in the jury box,

18   please.

19         THE CLERK:  Was anybody else seated in the

20   jury box that are seated in the audience?

21         THE COURT:  Who's that, Phillips?  Is it Ms.

22   Phillips?

23         See if she's outside.

24         MS. CHU:  Marco Phillips.

25         THE COURT:  A male, right, Mr. Phillips.

1          (Whereupon, there was a brief pause in the

2     proceedings.)

3          THE COURT:   There he is.

4          We'll proceed at this time.

5          Go ahead, Ms. Chu.

6          MS. CHU:   Thank you.

7          Good afternoon, ladies and gentlemen.

8          Oh, oh, you guys had a big lunch, huh?

9          Good afternoon, ladies and gentlemen.

10          My name is Phyllis Chu and I am the attorney

11     who will be prosecuting this case should you be selected

12     as jurors.

13          Now, one of the things that the Judge said is

14     that ninety-three percent of the cases that he's ever

15     tried, most of it has evidence that comes in the form of

16     testimony.   Now, you know what that means, right?

17          What does that mean, sir, testimony?

18          Can you accept that that's a form of evidence?

19          PROSPECTIVE JUROR:   Yes.

20          MS. CHU:   Anybody here?

21          Ms. Chung, how do you feel about that?

22          PROSPECTIVE JUROR:   Yes.

23          MS. CHU:   You okay with that?

24          PROSPECTIVE JUROR:   Yes.

25          MS. CHU:   What he said about C.S.I. and Law &

1     Order, and they never show this jury selection part on

2     those things and they have little commercials and it's

3     tied up with a bow in an hour.  If you want, you can

4     watch a marathon for the whole day, right.  This is not

5     going to be it, okay.

6           You understand that the people that are going

7     to come before you to talk are not actors, they are not

8     paid, they don't have scripts?

9           Can you all understand that?

10          Now, how many, when you were selected, to just

11    call your name to come up here, felt nervous?

12          No one was nervous?

13          Come on, you gotta be nervous.

14          Well, do you think that everybody shows how

15    nervous they are in the same way?

16          Why not?

17          PROSPECTIVE JUROR:  Different individuals,

18    different people.

19          MS. CHU:  Some people might cry when they are

20    nervous, some people laugh when they are nervous.

21          Can you all accept and keep an open mind

22    when you're listening to whoever testifies to see

23    whether or not what they say makes sense first, before

24    you make a determination as to whether or not they're

25    telling the truth or not telling the truth?  Can you

1     all do that?

2           Now, if you're selected as a juror in this

3     case, I can tell you that this case involved just two

4     people, Mr. Wilson and the defendant, there were no

5     other eyewitnesses or anybody else present at the time

6     that the murder occurred and I wanted to let you know

7     that the majority of the evidence you are going to hear,

8     that goes -- that proves my case is going to actually

9     come from what the defendant said to different people,

10    all right.

11          Now, can any of you think of some things that

12    would affect -- let me ask you this.

13          The first thing I want to say is, how many of

14    you have ever had any interaction at all with police in

15    the city here?

16          Pretty much everybody, right?

17          And I would imagine that the range of your

18    experiences would go from either very bad to very good,

19    right?

20          Would you all say that you kind of fell within

21    that parameter?

22          PROSPECTIVE JUROR:  Yes.

23          MS. CHU:  Now, do you think that if someone is

24    speaking to the police about something that they're

25    suspected of doing, or just speaking to the police in

Voir Dire - People/Ms. Chu

1    general, that they might want to talk to the police?  Do

2    you think that's a possibility?  Yes?

3              PROSPECTIVE JUROR:  Yes.

4              MS. CHU:  You said yes or no?

5              PROSPECTIVE JUROR:  Yes and no.

6              They might tailor what they say for gains.

7              MS. CHU:  You think when talking to the police

8    they would put things in a light that's most favorable

9    to them?

10              PROSPECTIVE JUROR:  Yes.

11              MS. CHU:  That's possible?

12              PROSPECTIVE JUROR:  Yes.

13              MS. CHU:  Did you think there's a possibility

14    there might be some half truths, some whole truths and

15    mix it up?  Do you think that's a possibility?

16              PROSPECTIVE JUROR:  That is a possibility.

17              MS. CHU:  Mr. Nolberto, too much lunch?

18              PROSPECTIVE JUROR:  I'm okay.

19              MS. CHU:  Now, what I want to ask you, do you

20    think that the relationship that the person has to who

21    they're talking to makes a difference in determining

22    whether or not they're telling the truth?

23              Why do you think that?

24              PROSPECTIVE JUROR:  I am more likely to tell

25    the truth to someone that I know really close than

1    someone --

2                MS. CHU:   Than like law enforcement?

3                PROSPECTIVE JUROR:   Yeah.

4                MS. CHU:   Are you the kind of people, do you

5    think you guys are -- let me back up.

6                You ever -- whether or not you're telling the

7    truth, right, from the moment you get up to the moment

8    you to go sleep, you're interacting with different

9    people, right?

10                Remember, the Judge says you take your life

11   experiences, you bring them with you.

12               PROSPECTIVE JUROR:   Yes.

13               MS. CHU:   Now, how many of you think that you

14   are able to, if you were given or selected as a juror in

15   this case, take a statement that was given by the

16   defendant and compare it and contrast it to other

17   evidence that you are going to hear in this case to make

18   your own determination as to what parts she said that

19   might be true, what parts that might be false?

20               So, you're going to have to do a little work

21   if you're selected as jurors.

22               Does everyone think they are up for that

23   challenge?

24               Yes?

25               Yes?

Voir Dire - People/Ms. Chu

1      PROSPECTIVE JUROR:  Yes.

2      MS. CHU:  Ms. Chung, you okay with that?

3      PROSPECTIVE JUROR:  It's difficult because I'm

4  not sure.  I don't know how to put yourself to have

5  control of another person's thing.  That's difficult for

6  me.  So, it's -- I'm not sure.

7      MS. CHU:  You're not sure if you can be a

8  juror in this case, is that what you're saying?

9      PROSPECTIVE JUROR:  To keep going with the

10  evidence, to put your life experiences, because you're

11  not -- your life experience is not the same as the

12  defendant so what --

13      MS. CHU:  What I meant by life experiences is

14  that if someone tells you something, someone gets on the

15  stand and says I heard the defendant say this, and what

16  they say matches with other evidence that you are going

17  to hear in this case, can you say, you know what, that

18  was supported by other evidence so I know that part was

19  true?

20      PROSPECTIVE JUROR:  If it's supported by other

21  evidence, then you have to take it at face value.

22      MS. CHU:  You have to take it at face value?

23      PROSPECTIVE JUROR:  Uh-huh.

24      MS. CHU:  Do you think kind of every person

25  can do that, like kind of resolve what someone's saying,

Voir Dire - People/Ms. Chu

1    what might be true and what parts might be false?

2           PROSPECTIVE JUROR:  It -- I guess, yes.

3           MS. CHU:  How about you, Ms. Seivwright, how

4    do you feel about that?

5           PROSPECTIVE JUROR:  It all depends.

6           MS. CHU:  All depends on what they say, if it

7    makes sense with all the other evidence, then you can

8    accept it, right?

9           Would you be able to do that?

10          PROSPECTIVE JUROR:  Depends what the person

11   says, if it's true or not.

12          MS. CHU:  I don't understand what you mean.

13          PROSPECTIVE JUROR:  Depends on what the

14   witness says.

15          MS. CHU:  If the witness tells you something

16   and what you hear from another witness supports what

17   that person says that the defendant said, would you be

18   able to say, okay, I know that part's true, or you have

19   to pick apart what they say to see what is true or not

20   true?  Can you do that?

21          PROSPECTIVE JUROR:  Maybe.

22          MS. CHU:  Maybe.

23          Are you the kind of person that says I'm not

24   so good at that?

25          PROSPECTIVE JUROR:  Yeah.

Voir Dire - People/Ms. Chu

1        MS. CHU:  You're more like that?

2        PROSPECTIVE JUROR:  Yes.

3        MS. CHU:  Obviously there's no jury school,

4    you guys don't go away for six weeks and learn to be

5    perfect jurors.  You guys use the same things that you

6    use every day, that is what you need to use when you're

7    here.  There is nc special ingredient.  Who could be

8    better a juror than another juror?

9        All you have to do is just keep an open mind.

10       Can you all promise me you can do that and not

11   make a decision before the person testifies, about

12   whether or not you believe them or not, just wait and

13   hear what they say, see if it makes sense and kind of

14   see the other evidence you are going to hear?  Can you

15   do that?

16       Now, the Judge told you that your job is to

17   be the determiners of the facts, meaning you have to

18   figure out what happened.  He's in charge of the law,

19   right.

20       Now, if the Judge tells you that the burden is

21   always on me, are you going to promise me that you are

22   going to hold me to my burden of proving what I have to

23   prove beyond a reasonable doubt?

24       Can you all promise me that?

25       Now, on the flip side of that, there's certain

Voir Dire - People/Ms. Chu

1    things I don't have to prove, like I don't have to prove

2    what the weather was like for that period of time, I

3    don't have to tell you who won the lottery.

4            Are you all going to promise me that in

5    addition to holding me to my proving what I have to

6    prove, you will also not hold me to a burden of proving

7    something that I don't have to prove?

8            Do you understand what I'm asking you?

9            Is everybody okay with doing the same thing?

10           The last thing I want to talk about has to do

11   with sympathy.  We can't -- I'm sorry.

12           If you all would just look at the defendant.

13   She's a young woman.  Is there anyone here that thinks

14   that you wouldn't be able set aside how she appears in

15   your deliberations, in deciding what happened in this

16   case?

17           Everybody okay with, you know -- I mean,

18   somebody might say, you know what, she reminds me of my

19   sister, she reminds me of my daughter, whatever, that is

20   going to affect my ability to listen to the evidence in

21   this case?

22           Yes, Ms. Seivwright?

23           PROSPECTIVE JUROR:  Yes.

24           MS. CHU:  Would you have a problem with that?

25   You would not be able to separate that?

Voir Dire - People/Ms. Chu

1          PROSPECTIVE JUROR:  No.

2              MS. CHU:  How about you, Ms. Chung?

3          PROSPECTIVE JUROR:  No, it's -- yes.

4              MS. CHU:  Yes, you would be able to

5      separate that?

6          PROSPECTIVE JUROR:  Uh-huh.

7              MS. CHU:  How about you, Ms. Scott?

8          PROSPECTIVE JUROR:  I will be able to.

9              MS. CHU:  Ms. Seivwright, thank you for being

10     so honest.

11             When we get to really talking, do you feel as

12     though you might be like Ms. Seivwright, you know, what

13     I don't know, if I can separate that?

14             Everybody else is okay?

15             THE COURT:  Thank you.

16             MS. CHU:  Thank you.

17             THE COURT:  Go ahead.

18             MR. WALENSKY:  Anybody here think I have to

19     prove anything, that I have to prove that my client is

20     innocent?

21             Now, you understand, Mr. McFarlane, that this

22     isn't about guilt or innocence?

23             PROSPECTIVE JUROR:  Yes.

24             MR. WALENSKY:  Really, it's just about what

25     Ms. Chu had said, that she has the burden of proof, it's

Voir Dire - Defendant/Mr. Walensky

1    really only about her ability to prove her case beyond a

2    reasonable doubt.

3              Do you have any problems with that, Ms. Laing?

4              PROSPECTIVE JUROR:  No, sir.

5              MR. WALENSKY:  Because if the People are

6    presenting their evidence, the Judge will tell you what

7    beyond a reasonable doubt is, what the criteria is.  If

8    they haven't proven the case, you would have to say not

9    guilty, wouldn't you, Ms. Harris?

10             PROSPECTIVE JUROR:  Yes.

11             MR. WALENSKY:  And Ms. Chu touched upon

12   police.  We all react differently.  Has anyone been

13   stopped and frisked?

14             Okay, Mr. Phillips.  You felt pretty helpless,

15   right?

16             PROSPECTIVE JUROR:  Pretty much.

17             MR. WALENSKY:  The police are holding all the

18   cards, so to peak?

19             PROSPECTIVE JUROR:  Pretty much.

20             MR. WALENSKY:  Did you feel nervous, like you

21   had to talk to them?

22             PROSPECTIVE JUROR:  Not really.  I mean, I

23   know like the procedures.  So I got stopped a few times,

24   I know the procedures.

25             MR. WALENSKY:  But you don't have to talk to

mc

1    them if they ask you questions?

2              PROSPECTIVE JUROR:  Sometimes.  It depends.

3              MR. WALENSKY:  Now, but they were essentially

4    controlling that entire situation, right?

5              PROSPECTIVE JUROR:  Uh-huh.

6              MR. WALENSKY:  You are not going to resist

7    because it would be foolish?

8              PROSPECTIVE JUROR:  Exactly.

9              MR. WALENSKY:  Now, people have -- we talk

10   about witnesses and being able to speak and listen and

11   evaluate a witness.

12             Now, Ms. Larson -- well, withdrawn.

13             Everybody --

14             Anybody here know somebody who abuses drugs or

15   alcohol?

16             Okay, Ms. Harris.  Now, that person might be

17   abusing -- I'm not asking who or anything -- that person

18   who abuses drugs or alcohol, they are not always lucid,

19   would you agree?

20             PROSPECTIVE JUROR:  Correct.

21             MR. WALENSKY:  And the longer that somebody

22   abuses a substance, the less lucid they are about

23   everyday events?

24             MS. CHU:  Objection.

25             THE COURT:  Objection sustained.

Voir Dire - Defendant/Mr. Walensky

1    MR. WALENSKY:  In your experience.

2    MS. CHU:  Objection.

3    THE COURT:  Sustained.

4    MR. WALENSKY:  All right.

5    THE COURT:  Sustained.

6    MR. WALENSKY:  Okay.

7    Now, there are -- you understand that in terms

8    of burden of proof, if I had to prove anything it would

9    change that burden.  Do you understand that concept, Mr.

10   Lamont?

11   PROSPECTIVE JUROR:  Yes.

12   MR. WALENSKY:  And the reason is you know we

13   are --

14   Where were you, Ms. Seivwright, three weeks

15   ago at 3:00 in the morning?  Don't know, right?

16   PROSPECTIVE JUROR:  Don't remember.

17   MR. WALENSKY:  Do you live alone?

18   PROSPECTIVE JUROR:  Yeah.

19   MR. WALENSKY:  So someone says, well, where

20   were you, you'd say I was home, I was a asleep.  Well,

21   prove it.

22   How can I prove it?

23   You understand?  Somebody is saying you're

24   guilty of something, that would change the burden.  You

25   see?

Voir Dire - Defendant/Mr. Walensky

1          THE COURT:  Let's get away from this.  Don't

2     go off on the burden.  Go on to something else, all

3     right.

4          MR. WALENSKY:  Anyone who has a problem

5     sitting on a case because of the subject matter?

6          PROSPECTIVE JUROR:  I probably would.

7          MR. WALENSKY:  You would, okay.

8          Because of the nature?

9          PROSPECTIVE JUROR:  This makes me really

10    uncomfortable.

11         THE COURT:  It makes you uncomfortable, but

12    can you sit if you're chosen and be fair and impartial?

13         PROSPECTIVE JUROR:  Yes, I can.

14         THE COURT:  A lot of things make people

15    uncomfortable.  That's life.

16         You understand that?

17         PROSPECTIVE JUROR:  Yeah.

18         THE COURT:  Proceed.

19         MR. WALENSKY:  Essentially, Mr. Lee, if you're

20    chosen will you be able to look at the evidence and if

21    called for give a verdict of guilty?

22         PROSPECTIVE JUROR:  Yes.

23         MR. WALENSKY:  If called for, to give a

24    verdict of not guilty?  Do you understand?

25         It's not a matter of a feeling.

Voir Dire - Defendant/Mr. Walensky

1          Ms. Scott, you might say, gee, I think that

2     the person is guilty but they haven't proven their case

3     beyond a reasonable doubt, you'd have to say not

4     guilty.

5          PROSPECTIVE JUROR:   Yes.

6          MR. WALENSKY:   They might not have proven the

7     case, I have all kinds of questions, if they haven't

8     proven their case beyond a reasonable doubt, you would

9     have to say not guilty, wouldn't you?

10          PROSPECTIVE JUROR:   No.

11          MR. WALENSKY:   I am going to --

12          There are no bosses here.   I ask you to take

13     the time, if you're selected, that would be necessary.

14     Is there anyone here who has a pressing schedule?

15          We all have things we have to do.   What I am

16     concerned about in the jury room, it's I can't sit here

17     any more, whether it's an eleven to one for conviction

18     or an eleven to one for acquittal, changing not because

19     of someone convincing you but because of time factors.

20     Is there anyone who wouldn't be able to sit on the jury

21     with the total commitment necessary?

22          PROSPECTIVE JUROR:   You mean the hours or

23     from --

24          MR. WALENSKY:   It could be days.   It takes

25     however long it takes, until the Judge --

Voir Dire - Defendant/Mr. Walensky

1      THE COURT:  The fact is, ladies and

2  gentlemen --

3      The question really is, if you have a

4  particular view of the evidence and a particular view of

5  guilt or non-guilt of the defendant, are you going to

6  change your opinion merely because of time

7  considerations?  Are you going to say, oh, I gotta get

8  out of here, I gotta go somewhere, or are you going to

9  have those time constraints affect your judgment?

10      In other words, is that going to affect your

11  ability --

12      PROSPECTIVE JUROR:  My only thing is if -- I

13  take a class on Tuesday and Thursday from 6:00 to 9:30

14  at night.

15      THE COURT:  I forgot to tell you, we don't

16  have sequestration so you will not be kept overnight.

17      PROSPECTIVE JUROR:  Okay.

18      THE COURT:  But if you're in a situation, like

19  the attorney said, where it's -- you're the lone person

20  holdout whether for guilt or non-guilt and you just

21  change your mind because it's convenient or because it's

22  a time consideration, are you going to do that?

23      PROSPECTIVE JUROR:  No, no, no.

24      THE COURT:  All right, go ahead.

25      Anybody going to do that?

Voir Dire - Defendant/Mr. Walensky

1      MR. WALENSKY:  Ms. Seivwright, you had some

2  question.  Were you going to raise your hand about

3  something?

4      PROSPECTIVE JUROR:  I think I don't feel

5  comfortable.

6      THE COURT:  You indicated that you are not

7  comfortable, right?

8      PROSPECTIVE JUROR:  No.

9      THE COURT:  All right.  Let's continue.

10      MR. WALENSKY:  Thank you.

11      I have no further questions.  Thank you,

12  ladies and gentlemen.

13      THE COURT:  Ladies and gentlemen, I am going

14  to ask you to step outside.  Do not discuss the case

15  amongst yourselves or anyone else.  Do not visit the

16  place or premise.  You don't have to do that.  Just step

17  outside and do not engage in any conversation.  We'll

18  call you back in, in a few minutes.

19      (Whereupon, the panel of prospective jurors

20  exited the courtroom.)

21      THE COURT:  All right, those ladies and

22  gentlemen in the audience, same instruction, we'll ask

23  you to vacate your seats and we'll call you back in a

24  few minutes.

25      Do not disappear.

 1                    (Whereupon, the panel of prospective jurors

 2          exited the courtroom.)

 3                    THE COURT:  All right, let's go.

 4                    First two, cause?

 5                    MS. CHU:  No.

 6                    THE COURT:  Cause?

 7                    MR. WALENSKY:  No.

 8                    THE COURT:  All right.

 9                    Perempt?

10                    MS. CHU:  None.

11                    THE COURT:  Perempt?

12                    MR. WALENSKY:  No.

13                    THE CLERK:  Kingsley McFarlane is juror number

14          eleven.

15                    THE COURT:  And McNair is number twelve, all

16          right.

17                    All right.

18                    First alternate, Lee, cause?

19                    MS. CHU:  No.

20                    THE COURT:  Cause?

21                    MR. WALENSKY:  No.

22                    THE COURT:  Perempt?

23                    MS. CHU:  No.

24                    THE COURT:  Perempt?

25                    MR. WALENSKY:  Yes.

285

Voir Dire

1            THE COURT:  Perempt defense.

2            Laing, cause?

3            MS. CHU:  No.

4            THE COURT:  Cause?

5            MR. WALENSKY:  No.

6            THE COURT:  Perempt?

7            MS. CHU:  No.

8            THE COURT:  Perempt?

9            MR. WALENSKY:  Yes.

10           THE COURT:  Then you're out.  I mean, you have

11    no further challenges except for --

12           THE CLERK:  You challenged Lee and Laing.

13           MR. WALENSKY:  Yes.

14           THE COURT:  Nolberto, cause?

15           MS. CHU:  No.

16           THE COURT:  Cause?

17           MR. WALENSKY:  No.

18           THE COURT:  Perempt?

19           MS. CHU:  Yes.

20           THE COURT:  That's it for the People.

21           MS. CHU:  Sorry, can you just give me one

22    moment?  My pen ran out of ink.

23           THE COURT:  Phillips, cause?

24           MS. CHU:  Phillips, no.

25           THE COURT:  Cause?

Voir Dire

1          MR. WALENSKY:  No.

2          THE COURT:  Perempt?

3          MS. CHU:  No.

4          THE COURT:  All right, that's alternate one.

5          All right, Larson, cause?

6          MS. CHU:  No.

7          THE COURT:  Cause?

8          MR. WALENSKY:  No.

9          THE COURT:  Perempt?

10          MS. CHU:  No.

11          THE COURT:  Perempt?

12          MR. WALENSKY:  No.

13          THE COURT:  All right, so she's alternate two.

14          I'll do one more.

15          Lamont, cause?

16          MR. WALENSKY:  No.

17          THE COURT:  Wait a minute.

18          People?

19          MS. CHU:  No.

20          THE COURT:  No, defense?

21          MR. WALENSKY:  No.

22          THE COURT:  Perempt?

23          MS. CHU:  No.

24          THE COURT:  Perempt?

25          MR. WALENSKY:  Yes.

Voir Dire

```
 1              THE COURT:  Roberts, cause?

 2              MS. CHU:  No.

 3              THE COURT:  Cause?

 4              MR. WALENSKY:  No.

 5              THE COURT:  Perempt?

 6              MS. CHU:  No.

 7              THE COURT:  Cause?

 8              MR. WALENSKY:  No.

 9              THE COURT:  Roberts is selected.

10              Alternate two -- three.

11              MS. CHU:  You want to do a fourth one, just in

12    case?

13              THE COURT:  No.

14              MS. CHU:  We are going to have four days off.

15              THE COURT:  You want a fourth one?

16              MS. CHU:  We're going to be out four days.

17    Thursday, Friday, Saturday, Sunday, Monday, five days,

18    actually.

19              THE COURT:  Scott, cause?  Cause, yes or no?

20              MR. WALENSKY:  No.

21              MS. CHU:  No.

22              THE COURT:  Perempt?

23              MS. CHU:  I perempt her.

24              THE COURT:  Let's see.

25              People, Harris, cause?
```

288

Voir Dire

1          MS. CHU:  No.

2          THE COURT:  Cause?

3          MR. WALENSKY:  No.

4          THE COURT:  Perempt?

5          MS. CHU:  No.

6          THE COURT:  Perempt?

7          MR. WALENSKY:  No.

8          THE COURT:  That's alternate four.

9          All right, let's go.

10          MS. CHU:  Thank you.

11          THE COURT:  Get the panel, put them in the

12     front.

13          COURT OFFICER:  All the jurors?

14          THE COURT:  No, just the panel.

15          MR. WALENSKY:  Before we open I would like to

16     use the restroom.

17          THE COURT:  You don't have any witnesses

18     today?

19          MS. CHU:  I do.  I have a Crime Scene guy.

20          COURT OFFICER:  Jury panel entering.

21          (Whereupon, the panel of prospective jurors

22     entered the courtroom.)

23          THE COURT:  All right, let's go.

24          COURT OFFICER:  We're missing one.

25          (Whereupon, there was a brief pause in the

289

Voir Dire

1    proceedings.)

2              COURT OFFICER:  He went to the restroom.

3              THE COURT:  All right, let's go.

4              THE CLERK:  All right, ladies and gentlemen,

5    if you hear your name called that means you have been

6    selected to serve as a juror.  If you do not hear your

7    name called, you're excused with the thanks of the

8    Court.  Go back to the second floor, Central Jury, if

9    you don't hear your name called.  If you hear your name

10   called, please say "here" or "present."

11             Juror number eleven will be Kingsley

12   McFarlane.

13             PROSPECTIVE JUROR:  Here.

14             THE CLERK:  Juror number twelve, William

15   McNair.

16             You have to say "here" or "present."

17             PROSPECTIVE JUROR:  Here.

18             THE CLERK:  Alternate one, Marco Phillips.

19             Alternate two, Leslie Larson.

20             PROSPECTIVE JUROR:  Here.

21             THE CLERK:  Alternate three, Jerlanie

22   (phonetic) Roberts.

23             PROSPECTIVE JUROR:  Here.

24             THE CLERK:  And alternate four, Sarah Harris.

25             PROSPECTIVE JUROR:  Here.

290

Proceeding

1        THE CLERK:  The rest of you can go back to

2   Central Jury, second floor.

3        THE COURT:  Line up the other jurors, please.

4        THE CLERK:  Will the six of you rise and raise

5   your right hand.

6        Do each of you sincerely and solemnly swear or

7   affirm that you will try this case in a just and

8   impartial manner to the best of your judgment and you

9   will render a verdict according to the law and evidence?

10        Your response?

11        (Whereupon, the jurors responded.)

12        THE CLERK:  Have a seat for right now.

13        The rest of the jurors can be excused.

14        COURT OFFICER:  Down to two?

15        THE CLERK:  Yes.

16        (Whereupon, there was a brief pause in the

17   proceedings.)

18        THE COURT:  All right, have the jurors seated.

19        COURT OFFICER:  One of them is using the

20   restroom.

21        THE COURT:  Okay.

22        (Whereupon, there was a brief pause in the

23   proceedings.)

24        COURT OFFICER:  Ready for the panel?

25        THE COURT:  They're lined up?

mc

291

Proceeding

1           COURT OFFICER:  Yes.

2           THE COURT:  Bring them in.

3           COURT OFFICER:  Jury entering.

4           (Whereupon, the Jury entered the courtroom.)

5           THE COURT:  All right, the rest of the jurors,

6      fill the box.

7           Come on guys, let's go.

8           THE CLERK:  Juror number eleven is Kingsley

9      McFarlane.

10          THE COURT:  Come on up, sir.  Come around.

11          THE CLERK:  Juror number twelve, William

12     McNair.

13          Alternate number one, Marco Phillips.

14          Alternate two, Leslie Larson.

15          Alternate three, Jerlanie Roberts.

16          And alternate four, Sarah Harris.

17          THE COURT:  Juror number one, your name?

18          PROSPECTIVE JUROR:  Avelon Ramnath.

19          THE COURT:  Ms. Ramnath, you are going to be

20     the foreperson of the jury.  In other words, you will

21     have no greater powers or less powers than any other

22     juror except at the close of the case you will read the

23     verdict.  You understand that's what your job will be,

24     okay?

25          PROSPECTIVE JUROR:  Okay.

Proceeding

292

1          THE COURT:  Okay.  Very good.

2          All right, madam forelady, ladies and

3     gentlemen of the jury, at this point I am required to

4     instruct you generally concerning your basic functions,

5     duties and conduct and to acquaint you in a general way

6     with the trial procedure and certain rules which apply

7     to every jury so that you will be better able to assess

8     and weigh the evidence as it is presented and reach a

9     proper verdict.

10          The trial commenced with the selection of the

11     jury.  The next step in the trial will be an opening

12     statement by the People, represented by the Assistant

13     District Attorney, during which she's required by law to

14     indicate to you what she intends to prove by way of

15     evidence to support the charges set forth against this

16     defendant.

17          Following that, defense counsel, if he

18     desires, may also make an opening statement, but what

19     counsel for either party says in an opening statement is

20     not evidence.  You may consider the opening statement as

21     merely a preview of what each side intends to show by

22     way of evidence in the case.

23          After the opening statement or statements, the

24     Assistant District Attorney will present a witness or

25     witnesses who will be questioned by her.  This is called

293

Proceeding

1    direct examination.  After the Assistant District

2    Attorney completes her questions, defense counsel will

3    be given an opportunity to question the witness.  This

4    is called cross-examination.  After the People have

5    concluded the calling of their witnesses and

6    introduction of any exhibits which are admissible into

7    evidence, the defendant may offer evidence in his

8    defense.

9           After the defendant rests and People rest, the

10   defendant may make a closing argument following which

11   the People may make a closing argument, then I will

12   charge you on the law, then you will retire to

13   deliberate for purpose of reaching a verdict.  That is a

14   general outline of trial procedure.

15          For the most part, evidence consists of

16   testimony of witnesses under oath and exhibits which are

17   introduced into evidence.  Questions in and of

18   themselves are not evidence.  Therefore, you cannot

19   infer any facts from the mere asking of a question.  It

20   is the answer coupled with the question that constitutes

21   evidence.

22          For example, if a witness was asked a

23   question, do you own an automobile, and the witness

24   answered no, you cannot and you may not infer from his

25   answer that he in fact owns an automobile.

Proceeding

1     During the course of the trial either

2 attorney, Assistant District Attorney or the defense

3 counsel, may object to a question or an answer on the

4 ground that somehow it is legally improper or

5 inadmissible.  If I sustain the objection, this means

6 that I believe that the question and the answer is in

7 some manner improper, therefore in the first instance

8 the question may not be asked, in the second instance,

9 if an answer has been given, I will say "strike it out,"

10 therefore the answer is no longer evidence in the case.

11 If I overrule the objection, that means that the

12 question is proper and I will permit it to be answered,

13 or if already answered, I will permit the answer to

14 stand as evidence in the case.

15     Please do not resent the fact that either

16 attorney makes objections, this is their duty, and do

17 not hold it against either attorney if I rule against

18 them.

19     As I have explained to you in detail in my

20 charge, as jurors in this case you are the sole judges

21 of the facts and I am the sole judge of the law.  You

22 must accept the law as I give it to you without

23 hesitation or reservation, even if you privately

24 disagree with me.

25     You must keep an open mind, you must not speak

mc

Proceeding

1    or talk among yourselves or with anyone else on any

2    subject connected with the trial.

3            You must not either offer nor express an

4    opinion as to the guilt or non-guilt of the defendant

5    until I finally give the case to you.

6            You must not read or listen to any account or

7    discussion of the case in the event that it's reported

8    in newspapers or other media.

9            Now, ladies and gentlemen, this admonition by

10   the Court that you are not to discuss the case amongst

11   yourselves or with anyone else is probably the most

12   difficult to comply with because it's counterintuitive,

13   it's counter to human nature.  When people are thrown

14   together for a short period of time, the natural thing

15   is if they hear or see something, one turns to the

16   other, did you hear that, did you see that, and they

17   start talking about it.  You are not to allowed to do

18   that while the case is in progress.  You are not allowed

19   to do that when you leave here.  You are not allowed to

20   do that when you go home.  And when you go home, it's

21   probably going to be even more difficult because

22   probably if you have somebody at home, they're going to

23   be saying, oh, you are on a trial, what kind of case is

24   it?  You say, I can't tell you.  Why?  Because the Judge

25   instructed us that we are not to discuss the matter till

Proceeding

1    the matter is over.  And the fact of the matter is,

2    ladies and gentlemen, I'm sure whoever is at home will

3    understand, you say this case is not going to be going

4    for a very long period of time, in fact we're only

5    meeting about three days this week, today and Tuesday

6    and Wednesday, then a couple of days maybe next week,

7    all right, after the holiday.  So, you gotta be

8    resolute, you say, listen, I will tell you all about it

9    once it's over with, all right.

10                You must not visit or view the premises or

11   places where the alleged crime was committed or any

12   other premise or places involved in the case.  Promptly

13   report any incident within your knowledge involving any

14   attempt by any person who seeks to improperly influence

15   any member of the jury.  Also, you are not to have any

16   contact with any of the parties involved in this matter.

17   You know, you come in the morning -- this, again, is

18   counterintuitive because people who are thrown together

19   for a period of time, they like to exchange normal civil

20   amenities, good morning, how are you, nice day, blah,

21   blah, you are on your way, right.  Let's assume Ms.

22   Ramnath comes in the morning and Ms. Chu is in the

23   hallway and she wants to say hello and, well, the fact

24   is that's not permitted.  Although her intentions are

25   very innocent, she just wants to be nice and friendly,

Proceeding

1    she is not allowed to do that.  You're not allowed to

2    even, when you pass me or anybody else involved here, go

3    "hi," anything like that.  Don't arch your eyebrow.  You

4    are not allowed to do that, all right.  Because, in

5    effect, it's a violation of a rule that we call the

6    appearance of impropriety.  You're not doing anything

7    wrong, you're trying to be nice and you're not allowed

8    to do that also, and until you are discharged from

9    service, then you can speak to anybody you wish or you

10   can have anybody you wish speak to you, and that will

11   rest within your discretion, okay.

12            Another thing I'm always asked, if they may

13   take notes.  I am going to permit you to take notes.

14   You will be provided with pens and a notebook so that

15   you may take these notes.  You are not required to take

16   notes.  Whether you choose to take notes, it's entirely

17   up to you.  Each individual must decide for yourselves

18   whether taking notes assist you in refreshing your

19   recollection of the proceedings.  Now, some people may

20   find it difficult to take notes and also pay attention

21   to the trial.  You should not feel any pressure to take

22   notes because some fellow jurors may choose to do so.

23   If you are note taking and you feel because of the note

24   taking you will not be able to concentrate on the

25   proceedings, then feel free not to take notes.  If you

Proceeding

1    do decide to take notes, you must be careful not to let

2    your note taking become a distraction from the

3    proceedings.

4           You must bear in mind that notes are merely an

5    aide to your memory, they are for your personal use

6    alone, to help you refresh your recollection of the

7    evidence, but they are not superior to any juror's

8    independent recollection of what took place during the

9    proceedings.  Most importantly, they are not a

10   substitute for the official record of the proceedings

11   which is assembled by the Court Reporter, this young

12   lady right here.  If you remember what occurred during

13   the proceedings is different than what you have written

14   in your notes, you should request a readback of the

15   transcript.  If there is a difference between your notes

16   and the official transcript of the proceedings, you must

17   rely on the official transcript and not the notes.

18          This rules applies not only to evidence but

19   also to any differences that might exist between your

20   notes and the official record of my instructions on the

21   principles of law that govern the case.

22          If you do not take notes, you should rely on

23   your own recollection of the evidence and my

24   instructions on the law and you must not be swayed by

25   the fact that another juror may have notes indicating

Proceeding

1    that the evidence or the Court's charge on the law was

2    different than you recall.

3            If there is a dispute about the evidence or

4    the Court's instructions, jurors can request a readback

5    of the transcript to resolve the dispute.  You must

6    rely on the official transcript.  The notebooks will be

7    collected during the lunch breaks and at the end of

8    the day during the trial.  The notes will be stored in

9    a secure place for safekeeping and no one will read

10   them.

11           All right, you may proceed with your opening.

12           THE CLERK:  Judge.

13           (Whereupon, there was a brief pause in the

14   proceedings.)

15           THE COURT:  Before we proceed, raise your hand

16   if you want the notebooks, we will distribute them and

17   the pens and pencils.

18           (Whereupon, there was a brief pause in the

19   proceedings.)

20           THE COURT:  If you don't have a pencil or pen,

21   we will go get you one.

22           (Whereupon, there was a brief pause in the

23   proceedings.)

24           THE COURT:  Okay, you may proceed.

25           MS. CHU:  Thank you.

Opening - People/Ms. Chu

1       Good afternoon, ladies and gentlemen.

2           On January 3rd, 2012 the body of Anthony

3   Wilson was found dead inside of his apartment at 832

4   Bushwick Avenue.  Through the course of this trial

5   you're going to learn how the evidence will lead you to

6   come to the same conclusion, beyond a reasonable doubt,

7   that it was Atara Wisdom who was responsible for his

8   intentional murder.

9           Now, the way this all gets started is that

10  the police get called by Mr. Wilson's landlord, Donet

11  Robinson, and Mr. Robinson tries to -- he hadn't seen

12  the victim in a while, he gets the key that he has to

13  the apartment, he goes inside -- this is January 3rd.

14  When he enters, he finds Mr. Wilson on his bed, dead,

15  naked, there's a wreck in the house, the apartment is

16  ransacked, it's got blood smears on the floor, there's

17  clothing on the floor, there's feces on the floor.

18  So, he immediately calls 911 and the police arrive.

19          Now, you are going to learn that Police

20  Officers Marsden and Ortiz, they come from the 83rd

21  Precinct, they get called by the 911 operator to go to

22  the location to check it out.  When they get there,

23  they confirm that Mr. Wilson is definitely in need of

24  assistance, they call for an ambulance and an ambulance

25  confirms that he's dead and has been dead for sometime.

mc

1          Now, the officers, Marsden and Ortiz, they

2     continue to secure the scene.  What this means, they

3     tried and preserve the apartment as close to how it was

4     when they initially got there, so they don't let anybody

5     go in and out.

6          Basically it's a studio apartment, there's a

7     bed in there, there's a TV, there's a kitchen area, then

8     there's a bathroom.  It's a very small apartment.  It's

9     about nineteen by fifteen, and that encompasses

10    everything.

11         So, what you will learn is that Detective

12    Markoski, along with his partner, are assigned from the

13    Crime Scene Unit.  When they first arrive, they'd seen

14    that everything has been secured by officers from the

15    83rd Precinct, they recover some of the clothing that

16    was on the floor inside the apartment next to where the

17    body was, they take photographs, they take measurements,

18    they actually take swabs of blood that's found

19    throughout the apartment and they arrange to have that

20    sent for testing.

21         Now, in the meantime, Mr. Wilson's body was

22    taken to the morgue.  He's pronounced by EMS people,

23    he's taken to the Medical Examiner's Office where Frede

24    Frederic, who used to be with the Medical Examiner's

25    Office, she's since retired, she actually conducted an

1    autopsy on Mr. Wilson's body.  What she finds is that he

2    has seven stab wounds to his body.  He's got six in the

3    front of him and one in the back, and the ones that

4    really did the most damage, because there is -- there

5    was one to the right chest that was maybe a half inch,

6    the one in the back went in about two inches but it

7    didn't puncture any of the major organs.  Mr. Wilson's

8    body, what you're going to learn, is that the five

9    wounds that were on the left side of Mr. Wilson's body

10   all went in about a depth of five to six inches.  What

11   it did was, all of those stab wounds, they perforated

12   one of the parts of his heart, they also perforated his

13   left lung, and that's what the cause of death was for

14   Mr. Wilson.

15          And they found various evidences that the body

16   had already started to decompose, had been there for

17   some time and that there was partial mummification of

18   parts of the body, and also there were like maggots and

19   stuff in the body, that shows how far along the

20   decomposition had taken place.

21          Now, from Detective Geoffrey Hernandez, he was

22   the assigned detective who was in charge of that

23   investigation, and he along with Detective Christopher

24   Scandole from Brooklyn North Homicide, began to

25   investigate to try to figure out what happened to Mr.

1   Wilson.  So one of the people that they spoke to was a

2   person by the name of Matthew Shepard.  And you are

3   going to learn that Matthew Shepard knew the victim but

4   he also knew the defendant, and he knew that she had

5   been staying with the victim.  When he got a phone call

6   from her around -- he didn't remember exactly the time,

7   it was a couple of weeks before, he wasn't really sure

8   of the time, but a couple of weeks before he actually --

9   I'm sorry -- they found the body of Mr. Wilson.  And he

10  said that sometime around Thanksgiving he had actually

11  met her and he had explained he was interested in her,

12  if she could get away from the guy, from Tony, who's the

13  victim, he was interested in dating her.  And what

14  happens is she calls him early in the morning and she

15  says, I'm in a -- I have a problem, I'm in a situation,

16  and she tells him, can I meet you.

17          And so he agrees to meet her and he meets her

18  in Bushwick.  When he meets her, she has four big bags

19  with her.

20          What are you, like a homeless lady, he goes?

21  What happened?  You with Anthony?

22          And she was like I was paying him rent and he

23  wanted to have sex with me and I wasn't having that so I

24  poked him.

25          What you'll learn, in street terms that means

mc

1    she stabbed him.  And Mr. Shepard goes, well, you can't

2    stay with me but you can hang out in my house until you

3    get -- somebody gets you, and he said that is all he

4    talked about with her, he didn't want to have any

5    further conversations.  That was the last time that he

6    had seen her.

7            Now, Mr. Shepard had been spoken to around

8    the time that Mr. Wilson's body was recovered.  Now,

9    from Mr. Shepard they find out what Mr. Wilson's

10   cellphone number was.  They begin to get phone records

11   for that number.  What you'll learn, and you're actually

12   going to hear from a representative from Sprint Nextel

13   who will give you and show you, these are the records

14   that are kept there, it shows you all the call details.

15   What they learned from those call details is that on

16   November 29th, 2011, at approximately 12:37 A.M. Anthony

17   Wilson's number calls 911.  And you're going to actually

18   hear that 911 call that was made by Mr. Wilson.  What he

19   said was, I got this girl in my house, I don't know

20   what's wrong with her, she's acting crazy and I want her

21   out.

22           You are going to actually hear the final words

23   that were said by Mr. Wilson presumably before he is

24   murdered by the defendant.

25           In the meantime, the blood samples that had

Opening - People/Ms. Chu

1    been sent to the lab from -- remember, Detective

2    Markoski gets the swabs from throughout the apartment

3    and sends them to the lab and has them tested.  You are

4    going to learn from Sarah Philipps, who's a criminalist

5    at the Office of the Chief Medical Examiner, in their

6    DNA department, that she had tested those samples and

7    she found some of the samples belonged to Mr. Wilson but

8    two of the samples that came from the bathroom belonged

9    to a female unknown donor.  And what happened was

10   they're able to get take an unknown sample, they label

11   it, they term it female donor A.  They have an unknown

12   sample, they can't figure out who it is, they upload it

13   into the system and when they get that back it comes

14   back with a DNA hit to Atara Wisdom.

15        So, they begin to look for her, and in July

16   2012 -- this is now -- if the 911 call was November

17   29th, 2011, we are talking about more than six months

18   later, July of 2012, they locate Ms. Atara Wisdom at a

19   homeless shelter and they bring her back to the 83rd

20   Precinct for questioning.

21        Now, what you're going to learn is by now

22   Detective Geoffrey Hernandez, who was with the 83rd

23   Precinct, he's now with Brooklyn North Homicide, so his

24   case has gotten transferred to a new detective by the

25   name of Deborah Batanjani and they -- they bring the

Opening - People/Ms. Chu

1    defendant back to the precinct, they read her Miranda

2    rights.  After she agrees to speak with them, what she

3    told the detectives is that she had needed a place to

4    stay and had moved in.  Wisdom's doctor's office was

5    over on Broadway and he met over there, he would give

6    her money, and when he used crack, when he smoked, he

7    would become a different person.

8            She said one night when she was sleeping she

9    woke up, he was touching her under her shirt and she

10   told him it's not like that and that's not why she was

11   there.  She got into an argument and she had left.

12           She then tells the detectives, then around

13   Thanksgiving they got into another argument, it got very

14   heated and loud, so she left and went to her sister's

15   house for a couple of days.  She tells the detectives

16   she spoke with the victim on the phone a couple of times

17   and had gone back to the apartment to get clothes

18   because she had an interview set up for the following

19   day.

20           She said when she arrived he was acting okay,

21   like how he was when she first met him, and later that

22   night she was on the couch getting her clothes and he

23   tells her, oh, I am going to get some -- excuse the

24   word -- pussy tonight.

25           And she said, oh, well, then let me get out

mc

Opening - People/Ms. Chu

1    the way.

2              She tries to get her stuff and get out.  What

3    he does, she says he stands in front of the exit of his

4    apartment and says, nah, nah, you're not going, and he

5    takes -- she says he takes something like a pink belt

6    and wrapped his hand.  He doesn't do anything with the

7    belt.  She then picks up a knife.  She says she puts it

8    under her sweater.  When he punches her in the face when

9    she stood up, he pulls the sweater up and starts

10   punching her on the shoulder and back, and over her

11   head, he started to push her head down to the floor.

12   She said she thought if it hits the floor, she's going

13   to be dead, so she takes out the knife and she stabbed

14   at him, then she ran into the bathroom, she saw she had

15   a big knot to her head, her shoulder was all bruised,

16   she got her stuff together and in a duffle bag and went

17   to Ebony's house.  That's the statement she initially

18   gives to the detectives.

19             After this she takes the statement -- the

20   detectives actually write what it is she said to them

21   and they read it to her, she then looks at it to make

22   sure it's accurate, then she signs it and the detective

23   signs.

24             You're actually going to see the written

25   statement that was written by the detective.

Opening - People/Ms. Chu

1          The detective then arranges to have a lineup

2     with Atara Wisdom and contacts Mr. Shepard to come to

3     the precinct, and when Mr. Shepard views the lineup, he

4     identifies the defendant in position number two as the

5     person he knew as Renee.  Now, he didn't know --

6     actually, he said her name Renee.  He identifies Atara

7     Wisdom as the same woman who called him early in the

8     morning and met with him and told him she poked Anthony

9     because he wanted sex and rent.

10          Now, the defendant was then asked if she wants

11     to talk to the District Attorney's Office, which she

12     agrees to do.  You are going to hear A.D.A. Ed Purce

13     then responds to the precinct, he actually speaks to

14     her.  You are going to see on video the conversation

15     that was had between the defendant, Atara Wisdom, and

16     A.D.A. Ed Purce.  And in essence she says something

17     along the same lines that she told the detective, now

18     she is not mentioning Ebony, now there was a Tiffany

19     that she had stayed with, she told Tiffany what had

20     happened to her.

21          Now, she also tells the detectives that some

22     time after she stabbed him, when she came out of the

23     bathroom she saw him lying on the bed, she picked up his

24     phone, his keys and his wallet when she left because she

25     was using his phone and called someone but she was in a

Opening - People/Ms. Chu

1    fog, she doesn't remember who it was she called.

2         She walked around for a while, she threw out

3    his keys, she kept his wallet but didn't use anything in

4    it and she had gone to Tiffany's house on Rutland and

5    East 93rd, stayed there for a couple of days and then

6    she kept using his phone but then threw it out, and she

7    said his benefits card, the Welfare benefits card, she

8    denied ever using it.

9         You are going to actually hear from the

10   Welfare, I guess it's Human Resources Administration

11   responsible for Welfare benefits cards, there actually

12   is activity on Mr. Wilson's benefit card after the

13   date of November 29th, 2011 and it shows consistent

14   areas with where the defendant used to use her benefits

15   card.

16        Now, that is what the case is all about,

17   ladies and gentlemen.  You are going to hear from

18   detectives and officers who responded and investigated

19   this case.  You are going to hear from the ME, or the ME

20   who's going to tell you what the injuries were to Mr.

21   Wilson and show what his cause of death was.  You're

22   going to hear from the crime scene detectives that

23   process the scene, see pictures of the actual apartment,

24   and after you hear all this evidence, I am going to come

25   back here before you and show you how the evidence

Opening - Defendant/Mr. Walensky

1    proves that the defendant, Atara Wisdom, intentionally

2    killed Anthony Wilson sometime between November 29th,

3    2011 and the day he was found, January 3rd, 2012, and

4    I'm going to ask you to return a verdict of guilty based

5    upon that evidence.

6              Thank you.

7              THE COURT:  Mr. Walensky.

8              MR. WALENSKY:  Thank you, your Honor.

9              Good afternoon, ladies and gentlemen.

10             The Grand Jury of the County of Kings by this

11   indictment accuses the defendant of the crime of murder

12   in the second degree committed as follows:  The

13   defendant, which would be Atara Wisdom, on or about

14   November 29th, 2011, in the County of Kings, with

15   intent to cause the death of Anthony Wilson, caused

16   the death of Anthony Wilson by means of stabbing him

17   thereby inflicting various wounds and injuries upon

18   Anthony Wilson and thereafter, and on or about November

19   29th, 2011, Anthony Wilson died of the wounds and

20   injuries.

21             Ms. Chu has just made a promise to you that

22   she will prove that charge.

23             I have to use a litany here, because as the

24   Judge told you, what we say here isn't evidence.  She

25   has recited what she plans to try to prove.

Opening - Defendant/Mr. Walensky

1    I submit to you that the evidence will show

2   People have a theory here, they're trying to fit it to

3   the fact that Anthony Wilson is dead.

4    Now, Anthony Wilson was not a bad man.  I will

5   show that he had problems with drugs, alcohol, generally

6   pretty decent, but that when he got drunk or smoked

7   crack, and he smoked crack, that he would change, as

8   some people do, would become abusive, he would become

9   forward, he would become somewhat other than the Anthony

10   Wilson that was sober Anthony Wilson.

11    You will discover, at the time of his death

12   Mr. Wilson had an alcohol content of above .2 in his

13   system.  He was intoxicated almost three times over the

14   legal limit of intoxication.

15    The evidence will also show that he had

16   residue of cocaine, that is, the byproduct of cocaine in

17   his system at the time of his death.  The expert will

18   tell you that, in fact, when someone dies, your body

19   ceases metabolizing the substance.  At the time of his

20   actual death that's what he had, and I submit to you,

21   the evidence will show that he did not immediately die.

22   You are going to see crime scene photos and you will

23   have to make up your mind, and what I submit to you,

24   it's not going to really show you exactly what happened,

25   it's not going to show you when he died, so that when

Opening - Defendant/Mr. Walensky

1   this assault upon Ms. Wisdom happened, he was that much

2   drunker and that much more stoned.

3       Now, Ms. Wisdom -- the evidence will show that

4   Ms. Wisdom was not his girlfriend, she would stay there,

5   she paid him money, sometimes one hundred bucks here, a

6   hundred bucks there.

7       She had recently become, quote, unquote,

8   homeless, but that she had actually had lost another

9   place recently, and she would sleep on -- you're going

10  to hear a statement it was a couch, but it was more like

11  a recliner, almost a futon that folded down.

12      She was not having sex with Anthony Wilson.

13  The evidence will show that in fact he previously had

14  tried to have sex with her but he hadn't been

15  particularly forceful, it's like get away from me or,

16  come on, knock it off, Tony, because he was known as

17  Tony and people in the neighborhood who knew Atara as

18  Renee.  And he would knock it off.  But this night he

19  said, I'm going to get me some pussy and he was pretty

20  drunk and he was pretty stoned, and when she wanted to

21  leave -- you will see a diagram of the apartment, if you

22  can call it that, really a room without a window in it,

23  and the entrance -- the exit was blocked.  And when he

24  wrapped a belt around his hand and Atara got nervous and

25  took out a knife, not holding it in -- but the testimony

Opening - Defendant/Mr. Walensky

1    will show she had a sweater kind of like with big

2    pockets -- the name escapes me, eludes me at the present

3    time -- but she put it in the pocket of the sweater, not

4    holding it here, not hidden in the folds, and that when

5    she got up -- you're going to see a diagram, and as

6    she's walking toward her stuff, she had a duffle bag,

7    she had clothing because she was going to leave the next

8    morning for a job interview, he punched her in the head

9    and she started going down.  And I submit to you, when

10   she said if I went down I was dead, it wasn't literally

11   thinking he was going to murder her, she was dead

12   because if she went on the ground he'd be able to get on

13   top of her and rape her.  That is really what "I was

14   dead" means.  We have to look at things within the

15   context.

16              MS. CHU:  Objection, your Honor.

17              THE COURT:  Sustained.

18              MR. WALENSKY:  I submit to you, look at the

19   evidence, and what you're going to hear are

20   circumstances that can be looked at two or -- two or

21   three different versions of the fact.

22              Now, when this occurred, she fought Mr. Wilson

23   and you're going to see there aren't defensive wounds on

24   his hand as though she was coming at him with a knife

25   and swatting at him and there's something on his arms or

Opening - Defendant/Mr. Walensky

1    hands.  What you're going to see are straight-on wounds.

2    I submit to you, the reason for this is because he was

3    on top of her, she took her knife and she started to

4    just stab him.

5          Now, the Judge at the end of the trial will

6    tell you what is justified, and I submit that when you

7    hear the charge of justification, when the Judge gives

8    that to you, you will find that you will have to acquit

9    Atara Wisdom.

10         But getting back to what had happened, there

11   are no defensive wounds.  She is stabbing him, he let's

12   her go, she gets up, runs into the bathroom and locks

13   herself in.

14         The evidence will show she said that he was at

15   least partially clothed, had his pants on, but you will

16   see --

17         MS. CHU:  Objection.  That's not -- he is

18   making argument to the jury.

19         MR. WALENSKY:  The evidence will show that he

20   was partially clothed.

21         THE COURT:  It's okay.

22         MR. WALENSKY:  And that when the police come

23   in, his landlord comes in and the police come in and

24   secure the scene, he is on the bed naked.

25         The evidence will show there's blood and feces

315

Opening - Defendant/Mr. Walensky

1    on the floor next to the bed.  You will see photos of

2    this.  There is blood in the bathroom in the sink,

3    there's some blood spatter.  The evidence will show

4    that -- and Ms. Wilson (phonetic) left the apartment

5    saying that he was on the bed when she left.

6            I submit to you, the evidence, the physical

7    evidence you are going to see will show that Anthony

8    Wilson wasn't dead when she left that apartment.  She

9    left, she scooped everything off the dresser, not just

10   his stuff, her stuff, just basically the telephones and,

11   you know, a wallet and her own stuff, just like scooping

12   something right off, everything left.  And she was very

13   upset.

14           The evidence will show that in fact Tony, Mr.

15   Wilson, didn't lay on that bed and die when she left.

16   You will see from the physical evidence that there is

17   blood all around and that he took his clothing off.  He

18   emptied himself, because at that point he was dying,

19   that's where the feces and the blood, I submit to you,

20   we will show, came on the floor, and he collapsed naked

21   on the bed.  He was trying to help himself and reach for

22   things and then he collapsed and died.

23           The evidence is also going to show that Atara

24   was very upset.  She called Matthew Shepard.

25           Now, he wasn't a close friend or a buddy.

Opening - Defendant/Mr. Walensky

1      You'll hear that they'd met perhaps twice before.  And

2      when she calls, Matthew Shepard will say when she called

3      she sounded upset, wanted to see him.  The evidence will

4      show that Matthew Shepard saw her and when she saw him

5      and met her in the early morning hours she told him what

6      happened, he tried to rape me, he tried to --

7                  MS. CHU:  Objection.

8                  MR. WALENSKY:  -- have sex with me.

9                  MS. CHU:  Objection.

10                 THE COURT:  Excuse me.

11                 I'll overrule it.

12                 MR. WALENSKY:  The evidence will show, right,

13     she said I am paying him rent, he tried to have sex with

14     me, I poked him, in the shorthand kind of thing.

15                 I submit to you that she ultimately makes a

16     statement saying in terms of the shorthand, the man was

17     trying to rape her.

18                 THE COURT:  Sustained.

19                 MR. WALENSKY:  And --

20                 THE COURT:  This is not the summation.

21                 MR. WALENSKY:  I understand.

22                 THE COURT:  This is the evidence.

23                 MR. WALENSKY:  This is what the evidence will

24     show, your Honor.

25                 THE COURT:  Show what?

Opening - Defendant/Mr. Walensky

1      MR. WALENSKY:  It will show that she in fact

2  said that she -- that the decedent tried to rape her.

3  That's what she said to the police.

4      THE COURT:  Go ahead.

5      MR. WALENSKY:  But regarding Matthew Shepard,

6  she asked Matthew Shepard -- she told him what happened,

7  come back with me, she wanted to go back there because

8  she didn't know, but she didn't want to go back alone.

9  And he said, no, no, I'm not.  With that -- and Matthew

10  Shepard's basically going to tell you he was essentially

11  seeing if he can have sex with Atara right at that point

12  and he didn't want to go back, and he left and that was

13  pretty much it.

14      So that Atara went to this, the -- her

15  friend's, she was in a bad state, she was upset, she

16  went to a friend's house, left -- was there for a while,

17  left Mr. Wilson's wallet there.

18      You'll find there is one store in the area --

19  I mean, if the benefit card is used, it could be used by

20  her, by someone else, but the evidence -- it's not just

21  the evidence -- the indictment doesn't contain any sort

22  of charge for larceny, robbery, anything like that.

23  This is -- she is just charged with one count of

24  intentionally wanting to murder Tony Wilson.

25      The evidence will show that she did not intend

mc

Opening - Defendant/Mr. Walensky

1    to murder Anthony Wilson.

2            Ladies and gentlemen, you are going to have a

3    difficult task.  Look at the evidence, look at the

4    witnesses.  What the evidence will show is there are no

5    eyewitnesses to this.  The evidence will show that it is

6    circumstantial evidence and the evidence will also show

7    that it is circumstance by which several different

8    theories of what happened can be applied, and at the end

9    the evidence will show that you will not have an answer

10   as to what actually happened.  No amount of wishing and

11   hoping can make that.  So, I ask you to take this task

12   very seriously and at the end of this endeavor come back

13   with a not guilty verdict.

14           Thank you.

15           THE COURT:  Come on up, please.

16           (Whereupon, a sidebar conference was held off

17   the record.)

18           (Whereupon, subsequent trial testimony was

19   stenographically recorded and transcribed separately.)

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS:  CRIMINAL TERM:  PART 2
 2   -----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3                                        Indictment No.:
                  -against-              6615/2012
 4                                        (Trial)
     ATARA WISDOM,
 5
                       Defendant.
 6   -----------------------------------------X

 7
                            Supreme Courthouse
 8                          320 Jay Street
                            Brooklyn, New York 11201
 9                          June 30, 2014

10
     B E F O R E:
11
                  THE HONORABLE ALBERT TOMEI, JUSTICE
12                (And a Jury)

13   A P P E A R A N C E S:

14         HON. KENNETH P. THOMPSON, ESQ.
                District Attorney - Kings County
15              350 Jay Street
                Brooklyn, New York  11201
16         BY:  PHYLLIS CHU, ESQ.
                Assistant District Attorney
17

18         DAVID WALENSKY, ESQ.
                Attorney for Defendant
19              910 Stuart Avenue
                Mamaroneck, New York
20         BY:  DAVID WALENSKY, ESQ.
                     - and -
21              JOSHUA POVILL, ESQ.

22

23

24                      MARLIN CASSIDY
25                      Senior Court Reporter
```

Det. Markoski - People - Direct/Ms. Chu

1          (Whereupon, the following took place in open

2     court:)

3          THE COURT:  All right, call your first witness

4     please.

5          MS. CHU:  The People call Detective Stephen

6     Markoski.

7          (Whereupon, there was a brief pause in the

8     proceedings.)

9          COURT OFFICER:  Witness entering.

10         (Whereupon, Detective Stephen Markoski entered

11    the courtroom and took the witness stand.)

12         THE CLERK:  Raise your right hand.

13         Do you solemnly swear or affirm the testimony

14    that you're about to give will be the truth, the whole

15    truth and nothing but the truth, so help you God?

16         THE WITNESS:  Yes, I do.

17         THE CLERK:  Can you state your name for the

18    record?

19         THE WITNESS:  Detective Stephen Markoski.

20         THE CLERK:  Spell your first and last name.

21         THE WITNESS:  S-T-E-P-H-E-N, M-A-R-K-O-S-K-I.

22         THE CLERK:  Give your shield number.

23         THE WITNESS:  66842.

24         THE CLERK:  And your command?

25         THE WITNESS:  Crime Scene Unit, New York City

Det. Markoski - People - Direct/Ms. Chu

1  Police Department.

2              THE CLERK:  Thank you.

3              THE COURT:  You may have a seat.

4              Pull your chair up to the microphone.  Place

5  your lips close to the microphone when responding to any

6  question.

7              Proceed.

8              MS. CHU:  Thank you.

9  S T E P H E N      M A R K O S K I, Detective, Shield No.

10             66842, Crime Scene Unit, New York City Police

11             Department, called as a witness by and on behalf of

12             the People of the State of New York, after having

13             been first duly sworn, was examined and testified

14             as follows:

15  DIRECT EXAMINATION

16  BY MS. CHU:

17     Q    Good afternoon, Detective.

18     A    Good afternoon.

19     Q    How long have you been with the New York City

20  Police Department?

21     A    Twenty-two years.

22     Q    You said you're currently assigned to the Crime

23  Scene Unit.  Can you tell me how long you have been with

24  them?

25     A    I have been with the Crime Scene Unit for six

Det. Markoski - People - Direct/Ms. Chu

1  years.

2      Q    Can you tell us about your career with the N.Y.P.D.
3  starting from when you got out of the Academy?

4      A    After the Academy I was assigned to the 84th
5  Precinct in downtown Brooklyn for twelve years.  After that I
6  went to Brooklyn North Evidence Collection for four years and
7  the last six years with Crime Scene Unit.

8      Q    Did you receive special training to become a member
9  of the Evidence Collection Team as well as the Crime Scene
10  Unit?

11      A    Most of the training that I received was on-the-job
12  training, such as photography, fingerprints, DNA extraction,
13  sketching.

14      Q    Now, what does the Crime Scene Unit do?  What are
15  your duties and responsibilities as a member of that unit?

16      A    The Crime Scene Unit's responsibility is to assist
17  the precinct detective squads in gathering evidence to assist
18  them in their investigations.

19      Q    What type of crimes are you responsible to respond
20  to as a member of the Crime Scene Unit?

21      A    Any major crime in the City of New York, such as
22  homicides, police involved shootings, rapes, sexual crimes.

23      Q    Now I want to direct your attention to January 3rd,
24  2012.  Were you working as a crime scene detective on that
25  date?

5

Det. Markoski - People - Direct/Ms. Chu

1      A     Yes, I was.

2      Q     Can you tell the members of the jury what your

3  hours were?

4      A     That day I believe I was working 7:00 in the

5  morning till 3:00 in the afternoon.

6      Q     Were you assigned to a partner?

7      A     Yes, I was.

8      Q     Who was that?

9      A     Detective Streichert.

10      Q     Now, on that date did you respond to 832 Bushwick

11  Avenue here in Brooklyn?

12      A     I did.

13      Q     Can you tell me approximately what time you

14  arrived?

15            THE WITNESS:  Do you mind if I look at my

16      notes, Judge?

17            THE COURT:  No, go ahead.

18      A     We arrived at 2:42 in the afternoon.

19      Q     Okay.

20            When you arrived, were there other police personnel

21  present?

22            THE COURT:  What date was this, January what?

23            MS. CHU:  January 3rd.

24            THE COURT:  What time did you arrive?

25            THE WITNESS:  2:42 P.M.

mc

6

Det. Markoski - People - Direct/Ms. Chu

1    Q    Now, when were you notified about this case?

2    A    Two o'clock P.M.

3    Q    Okay.

4         And were police personnel present when you arrived?

5    A    Yes.

6    Q    And can you tell me, was a crime scene established?

7    A    It was.

8    Q    What does that mean, to have a crime scene

9    established?

10   A    Crime scene established means you place -- the

11   location where the crime occurred was roped off with crime

12   scene tape and there was patrol there safeguarding the crime

13   scene to prevent anybody from entering.

14   Q    Okay.

15        Can you tell me, once you arrived, what did you

16   do?

17   A    First thing I did was I conferred with the precinct

18   detective, Hernandez, from the 83rd Precinct, find out the

19   information that he knew at that time and conferred with him

20   as to what kind of evidence he had and what he wanted

21   processed.

22   Q    Okay.

23        Did you then do something called a walkthrough?

24   A    I did.

25   Q    What is that?

Det. Markoski - People - Direct/Ms. Chu

1    A    Basically, it's to walk through the scene with the

2  detective, have him pointing out things that he's found out

3  about the investigation up until that point, and like I said,

4  he will dictate to me what he wants processed as far as the

5  crime scene.

6    Q    Can you tell me, how did the scene appear when you

7  arrived?

8    A    The scene was in disarray.  It was a cold apartment

9  and it was bloody, and there was a deceased gentleman on a

10  bed.

11    Q    Can you tell me, what was the condition of the --

12  I'm sorry, withdrawn.

13        Did you take photographs of the scene?

14    A    I did.

15    Q    Did you also take measurements?

16    A    I did.

17    Q    What is the purpose for measurements?

18    A    The measurement is just to give an idea of how big

19  the crime scene was, the apartment.

20    Q    Did you do a sketch of the actual crime scene?

21    A    Yes, I did.

22    Q    For what purpose is that?

23    A    It's to give a layout, a general layout for court

24  purposes, to show what the crime scene looked like as far as

25  an overhead view.

Det. Markoski - People - Direct/Ms. Chu

1    Q    You said you also took photos of the scene.   Did
2  you take photos of the actual victim?

3    A    I did.

4    Q    Did you have occasion to examine the body of the
5  victim with the medical-legal investigator?

6    A    Yes, I did.

7    Q    What was the state of the body?

8    A    The body was in a state of advanced decomposition,
9  the skin was peeling off, there were maggots throughout most
10  of the body.

11    Q    Now, can you tell me, could you see any obvious
12  injuries on the victim's body when you were there?

13    A    I was with the medical examiner and he's trained in
14  that type of thing more than I am, I'm led by his lead, and
15  we saw some injuries, but because of the advanced state of
16  the decomposition he could not make any determination what
17  injuries were at that time.

18    Q    Okay.

19         Now, was there any sign of forced entry into the
20  apartment itself?

21    A    Not that I saw.

22    Q    What kind of apartment was this?

23    A    It was a ground floor apartment, extremely small.
24  Basically, I guess you would call it a studio.

25    Q    Okay.

9

Det. Markoski - People - Direct/Ms. Chu

1       There was a place to sleep, a bathroom and a

2   kitchen?

3       A    That's about it, yeah.

4       Q    Okay.

5           Now, what type of evidence did you begin to collect

6   from the scene?

7       A    Well, when we first arrived, we weren't sure if a

8   crime had occurred.  The evidence that we took was just stuff

9   that would be sent to the Property Clerk for possibly future

10  recall.  So, it was basically some clothing, some soiled

11  clothing, and what appeared to be possible traces of blood at

12  various points of the apartment.

13      Q    Did you take what are known as DNA samples from the

14  areas where you saw blood in the apartment?

15      A    Yes.

16      Q    Can you tell me, did you -- I'm sorry, withdrawn.

17           MS. CHU:  At this time, your Honor, if I can

18       have this deemed marked People's Number 1 for

19       identification.

20              (Whereupon, the exhibit was shown to counsel.)

21              (Whereupon, the exhibit was shown to the

22       witness.)

23      Q    Detective Markoski, do you see what is being shown

24  to you as People's 1 for identification?

25      A    Yes, I do.

1    Q    What do you recognize -- I'm sorry.

2         Do you recognize what is deemed marked People's 1

3    for identification?

4    A    Yes.

5    Q    What do you recognize that to be?

6    A    That is a sketch I prepared on January 3rd, 2012,

7    of the -- an overhead view of the crime scene at 832

8    Bushwick.

9    Q    Is this diagram to scale?

10   A    No, it's not.

11   Q    What does that mean, that it's not to scale?

12   A    It means that the -- obviously this picture right

13   here is not the identical size of the apartment, it's just to

14   give an illustration about what it looked like.

15   Q    Where things are in relation to others?

16   A    Exactly.

17   Q    Did you make any markings on this with regards to

18   the evidence that you recovered in this case?

19   A    Yes, I did.

20        MS. CHU:  Now, at this time I'd like to offer

21   into evidence as -- I'm sorry.

22   Q    Is this diagram a fair and accurate depiction of

23   the scene and the evidence that you recovered as you

24   processed it on January 3rd, 2012?

25   A    Yes, it is.

Det. Markoski - People - Direct/Ms. Chu

1          MS. CHU:  At this time, your Honor, I would

2     offer it into evidence as People's 1.

3          THE COURT:  Any objection?

4          MR. WALENSKY:  No.

5          THE COURT:  In evidence.

6          (Whereupon, the diagram was marked as People's

7     Exhibit 1 in evidence.)

8     Q    Now, Detective, how many things did you recover

9  from this apartment?

10    A    I recovered eleven pieces of evidence.

11    Q    Okay.

12         Can you tell us what they were?

13    A    Yes.

14         THE WITNESS:  May I refer to my notes again,

15    Judge?

16         THE COURT:  Go ahead.

17         What are you referring to?

18         THE WITNESS:  Excuse me?

19         THE COURT:  What are you referring to?

20         THE WITNESS:  These are my scene photos that I

21    took on the day of the crime.

22         THE COURT:  Okay, go ahead.

23    A    Okay.  The first piece of evidence I recovered was

24  a black sock with possible bloodstains.

25         THE COURT:  A black sock?

Det. Markoski - People - Direct/Ms. Chu

1    THE WITNESS:  Yes, sir.

2    THE COURT:  Okay.

3    A    The second piece of evidence was a pair of blue

4 jeans with a black belt.

5    THE COURT:  Go ahead.

6    A    Third piece was a brown long-sleeved shirt with

7 possible bloodstains.

8    THE COURT:  Brown long-sleeved shirt?

9    THE WITNESS:  Yeah.

10   A    The jeans also had possible bloodstains, I'm sorry.

11   Fourth piece was a white towel with possible

12 bloodstains.

13   THE COURT:  Go ahead.

14   A    Number five and six were prescription pill bottles.

15   THE COURT:  Prescription...

16   THE WITNESS:  From the drugstore, the pill

17   bottles, the brown ones.

18   THE COURT:  Oh, pill bottles.

19   THE WITNESS:  Yeah.

20   A    Number seven was a washcloth with possible

21 bloodstains.

22   And numbers eight through eleven were swabs of

23 possible blood.

24   Q    Where were those swabs taken from?

25   A    Number eight was taken from a nightstand on the

Det. Markoski - People - Direct/Ms. Chu

1    west side of the bed.

2             Number nine was taken from a kitchen cabinet.

3             Number ten was taken inside the tub in the

4    bathroom.

5             And number eleven was taken from the eastern

6    bathroom wall.

7        Q    Now, did you indicate -- I'm sorry.

8             Did you label any of these items with any specific

9    label?

10       A    Yes, each item was labeled one through eleven, with

11   my initials in front of each number.

12       Q    So your initials are what?

13       A    S-M.

14       Q    Each of those pieces of items of evidence that you

15   just mentioned were SM1, SM2?

16       A    Through eleven, yes.

17       Q    Now, can you tell me, on the diagram that you

18   looked at, People's 1 in evidence, does it depict the areas

19   where you recovered each of those pieces of evidence, SM1

20   through 11?

21       A    Yes, it does.

22            MS. CHU:  At this time, your Honor, if I can

23        just have it posted.

24            THE COURT:  Post it.

25            (Whereupon, the exhibit was posted.)

Det. Markoski - People - Direct/Ms. Chu

1          THE COURT:  Put it up higher.

2     Q    Detective, --

3          MS. CHU:  Your Honor, may the witness step

4     down?

5          THE COURT:  You may step down.

6     Q    Walk us through, Detective, if you may.

7          THE COURT:  Go to the area where the Officer

8     is, okay.  Proceed.

9          (Whereupon, the witness stepped down from the

10    witness stand and approached the exhibit.)

11    Q    Just walk us through this scene that you have the

12 diagram for.

13    A    Sure.  This is the front door (indicating), the

14 front entrance door, the only door in the whole apartment

15 entering and exiting.

16         This is where the body was (indicating).

17         THE COURT:  Just move back a little.

18         Go ahead.

19    Q    Go ahead.

20    A    This is where the victim's body was, it's on top of

21 the bed here (indicating).

22         This is the living area, right here (indicating),

23 basically this whole area, with the kitchen located right

24 here (indicating).  And then through this doorway here

25 (indicating) is the bathroom.

Det. Markoski - People - Direct/Ms. Chu

1    Over here is the legend which tells you SM Number 1

2    was the sock, each piece of evidence, number 2 right here

3    (indicating) is the blue jeans, number 3 is the brown shirt,

4    number 4, is the towel.  Number 4 is here (indicating).

5    Number 5 and 6 are under the bed, the pill bottles.

6    Number 7 is the washcloth, which we found right

7    here (indicating) in the bathroom sink.

8    And numbers 8 through 11 were swabs of possible

9    blood, which were -- let's see, number 8 is here (indicating)

10   on the end table, number 9 is the kitchen cabinet, number

11   10 is in the tub, and number 11 is on the wall of the

12   bathroom.

13   Q    Now, as a detective from Crime Scene would you be

14   able to determine when that blood got on these articles that

15   you took swabs from?

16   A    No.

17   Q    Now you can have seat.

18        (Whereupon, the witness resumed the witness

19   stand.)

20   Q    What did you do with the actual pieces of

21   evidence?

22   A    I packaged -- well, I initially photographed

23   them, I measured them, as to where they were recovered, I

24   then packaged them and then I hand delivered them to a

25   police officer from the 83rd Precinct, Police Officer

Det. Markoski - People - Direct/Ms. Chu

1  Ortiz -- I'm sorry, Police Officer Carlin -- for vouchering

2  purposes.

3          THE COURT:  Police officer who?

4          THE WITNESS:  Carlin.

5          MS. CHU:  Christian Carlin.

6          THE COURT:  Okay.

7     Q    Now, did you --

8          How did you package each of the items?

9     A    Each of the items of clothing, any type of clothing

10  has to be packaged in paper, and the swabs are packaged in, I

11  guess we can say it's like a tube, it's a secure tube that is

12  taped up so it can be sent for DNA testing.

13    Q    Is that like a plastic tube?

14    A    Plastic, yeah.

15    Q    Now, did you process the scene at all for latent

16  prints?

17    A    No.

18    Q    Now, I want to show --

19         You said you had taken photos of the scene?

20    A    Yes.

21         MS. CHU:  Your Honor, I have People's -- I'd

22    like these deemed People's 1 through 41.

23         THE CLERK:  Two.

24         MS. CHU:  Two through 41 for identification.

25         THE COURT:  Two to 41?

Det. Markoski - People - Direct/Ms. Chu

1          MS. CHU:  Yes.

2          MR. WALENSKY:  I have no objection, your

3    Honor, to them being entered into evidence.

4          THE COURT:  All right.  You are offering them

5    into evidence?

6          MS. CHU:  Yes.

7          THE COURT:  They're in evidence.

8          (Whereupon, the photographs were marked as

9    People's Exhibits 2 through 41 in evidence.)

10          MR. WALENSKY:  Your Honor, if I can have --

11          THE COURT:  Bring down the screen.

12          (Whereupon, an exhibit was displayed.)

13    Q    Detective, can you just tell us, looking at

14    People's 2 in evidence, what is this a photograph of?

15    A    That's a photograph of the Crime Scene Unit

16    envelope, that is the cover sheet.

17    Q    Okay.

18          And did you prepare this?

19    A    I did.

20    Q    Is this your handwriting?

21    A    It is.

22    Q    Thank you.

23          (Whereupon, the exhibit was displayed.)

24    Q    People's 3 in evidence, what are we looking at

25    here?

mc

18

Det. Markoski - People - Direct/Ms. Chu

1    A    That's the entrance door to the apartment.

2    Q    Okay.

3          Looking at People's 4 in evidence.

4          (Whereupon, the exhibit was displayed.)

5    Q    What is this?

6    A    It's the same apartment door, just a closer view

7 into the kitchen.

8    Q    Where would the kitchen be, if you were looking at

9 this photograph?

10    A    Straight ahead.

11    Q    Straight ahead?

12    A    Uh-huh.

13    Q    Take a look at People's 5 in evidence.

14          (Whereupon, the exhibit was displayed.)

15    A    That's from the doorway towards the kitchen.

16    Q    Can you tell me, I see there's some things on the

17 floor.  What was that?

18    A    It appeared to be blood and it appeared to be human

19 feces on the floor, also looked like someone tried to wipe it

20 with some sort of piece of cloth of some sort.

21    Q    People's Number 6.

22          (Whereupon, the exhibit was displayed.)

23    Q    What is this a picture of?

24    A    That's from the kitchen into the living area.  I'm

25 sorry.  That is from the living area into the kitchen.  I'm

Det. Markoski - People - Direct/Ms. Chu

1   sorry.

2        Q    So where would the front door be in this

3   photograph?

4        A    To the right of the photo.

5        Q    So this door right here (indicating) is the front

6   door?

7        A    Yes, it is.

8        Q    Taking a look at People's 7 in evidence.

9                  (Whereupon, the exhibit was displayed.)

10       Q    What is this a picture of?

11       A    That's just an opposite view of the previous photo.

12   It shows the victim laying on the bed.

13       Q    Do you see the entrance door to this apartment in

14   the photograph?

15       A    I think you can see a little bit of it on the

16   bottom left.

17       Q    This is it here (indicating)?

18       A    Yes.

19       Q    If you could, which way would you turn to get this

20   view if you're --

21       A    If you walk into the apartment, you'd have to look

22   to your left.

23                  THE COURT:  He's facedown or face up in that

24        picture?

25                  THE WITNESS:  I believe he's face up.

Det. Markoski - People - Direct/Ms. Chu

1    Q    Okay.

2         That was People's 7, right.

3         Taking a look at People's 8 in evidence.

4              (Whereupon, the exhibit was displayed.)

5    Q    What is this a picture of?

6    A    That's the floor of the living area between the

7    kitchen and the living area, I should say, and on the left

8    side is the blue jeans that I vouchered.

9    Q    Okay.

10        You had mentioned there was feces that was smeared

11   on the floor.  Do you see that in this picture?

12   A    Yes, it's more toward the end of the photo.

13   Q    Right next to this shirt here (indicating)?

14   A    Yes.

15   Q    Or this article of clothing?

16   A    Yes.

17   Q    Now, would the kitchen be --

18        Do you see the cabinets of the kitchen in that

19   photograph?

20   A    I believe they are to the top, top right.

21   Q    So this right here (indicating)?

22   A    Yes.

23   Q    That would be where the kitchen cabinets are?

24   A    Yes.

25   Q    Thank you.

Det. Markoski - People - Direct/Ms. Chu

1          Taking a look at People's 9 in evidence.

2              (Whereupon, the exhibit was displayed.)

3     Q    What is this a picture of?

4     A    That is a photo of the victim laying on the bed in

5    a northbound photo.  The kitchen would be on the left-hand

6    side and the front door on the left top portion.

7              THE COURT:  He is facedown, isn't he?

8              THE WITNESS:  I believe that's face up.  He

9         was badly decomposed.

10    Q    Okay.

11             Taking a look at People's 10 in evidence.

12             (Whereupon, the exhibit was displayed.)

13    A    That's another view of the victim from the left

14   side of the bed.  That's kind of from the doorway area

15   towards the victim.

16    Q    Okay.

17             At this point, had you touched the victim at all?

18    A    Not yet, no.

19    Q    Taking a look at People's 11 in evidence, can you

20   tell me, what is this a picture of?

21    A    It's a close-up photo of his chest.  The right-hand

22   portion of the picture would be his neck.

23    Q    You were unable to make a determination based upon

24   the decomposition as to whether or not he had any injuries or

25   fresh injuries?

mc

Det. Markoski - People - Direct/Ms. Chu

1    A    It's usually the medical examiner's call but we

2  didn't make a determination at that time, no.

3    Q    Okay.

4         Taking a look at People's 12 in evidence.

5              (Whereupon, the exhibit was displayed.)

6    A    That is a photo of the bathroom from the living

7  area.

8    Q    Okay.

9         Where would the bed be if I were standing here

10 taking this picture?

11   A    It would be to your right.

12   Q    To the right of me?

13   A    Yes.

14   Q    Taking a look at People's 13 in evidence.

15              (Whereupon, the exhibit was displayed.)

16   A    Just an opposite view of the previous photograph.

17 It's the bathroom looking out into the living area.

18   Q    And this item right here, can you see

19 (indicating)?

20   A    No, not really.

21              MS. CHU:   That doesn't make it any better,

22   okay.

23   Q    Taking a look at People's 14 in evidence, what is

24 this a picture of?

25   A    That's the bathroom floor.

Det. Markoski - People - Direct/Ms. Chu

1    Q    And this area to the right top of the photograph,

2  what is that (indicating)?

3    A    That would be the tub.

4    Q    The tub?

5    A    Yeah.

6    Q    Where would the toilet be in relation to the tub?

7    A    Same side as the tub, just a little bit down in the

8  photograph.

9    Q    So off the picture?

10   A    Right.

11   Q    So on like the -- right on the bottom left?

12   A    Correct.

13   Q    Taking a look at People's 15 in evidence, what is

14  this a picture of?

15              (Whereupon, the exhibit was displayed.)

16   A    That's a photo of the sink with the washcloth in

17  the basin.

18   Q    Okay.

19              Taking a look at People's 16 in evidence.

20              (Whereupon, the exhibit was displayed.)

21   A    That's a view of the bathroom wall with the

22  possible bloodstains.

23   Q    If you can just -- there's --

24              There should be a remote control right in front.

25  If you push the red button, you will see it's a laser

24

Det. Markoski - People - Direct/Ms. Chu

1   pointer.

2        A      Right here (indicating).

3               THE COURT:  Possible what stains?

4               THE WITNESS:  Blood.

5        Q      So they were on the wall?  There are speckles on

6   the tile?

7        A      Yes.

8        Q      Okay.

9               Taking a look at People's 17 in evidence.

10              (Whereupon, the exhibit was displayed.)

11       A      That's also some possible bloodstains that were

12   located on the bathroom wall.

13       Q      Where --

14              Which wall would this be closest to in the

15   bathroom?

16       A      That would be the wall closest to the toilet.

17   That's the toilet on the bottom of the photo.  It would be

18   the right-hand side of the toilet.  If you were sitting on

19   the toilet, it would be the right-hand side right wall.

20       Q      So if you're sitting on the toilet, this bloodstain

21   (indicating) would be on your right-hand side?

22       A      Correct.

23       Q      Okay.

24              Taking a look at People's 18.

25              (Whereupon, the exhibit was displayed.)

mc

Det. Markoski - People - Direct/Ms. Chu

1      A     That would be possible bloodstains on the wall from
2 the bathroom near the doorway.

3      Q     So that would be on the left side of the toilet, if
4 you're sitting down?

5      A     That -- yes, I believe so.

6      Q     So that's -- I'm sorry.

7            This right here (indicating) on the photograph, is
8 that the tub?

9      A     Yes, it is.  It's hard to see.

10           That is the tub and that is the left side of the
11 toilet wall, yes.

12     Q     Taking a look at People's 18 in evidence.

13           (Whereupon, the exhibit was displayed.)

14           THE COURT:  I thought you did 18.

15           MR. WALENSKY:  That was 18.  This is 19.

16           MS. CHU:  Nineteen, I'm sorry.

17     Q     What is this a picture of?

18     A     That's a photograph of the end table to, I guess
19 you'd say, the left side of the bed.  If you were looking
20 from the bottom of the bed, that would be to the left
21 side.

22           THE COURT:  What are those stains?

23           THE WITNESS:  We took a swab thinking it might
24     possibly be some bloodstains.  It also appears it's like
25     fecal matter as well.

Det. Markoski - People - Direct/Ms. Chu

1    Q    This is where you had taken one of the samples from

2    blood that you had mentioned earlier?

3    A    Yes.

4    Q    Taking a look at People's 20 in evidence.

5                (Whereupon, the exhibit was displayed.)

6    A    Those markers indicate the pieces of evidence which

7    were recovered, if you're looking at the bed from the bottom,

8    the left side, and the same evidence which I previously

9    mentioned on the sketch.

10   Q    Who put those markers there?

11   A    I did.

12   Q    Did those correspond with the items of evidence

13   that you had recovered and processed?

14   A    Yes, they do.

15   Q    Can you walk us through?  It's 1 through 6, right?

16   A    Yes.

17               THE WITNESS:   Judge, I am going to refer to my

18       notes again.

19               THE COURT:   Go ahead.

20   A    Number 1 is the sock.

21        Number 2 is the blue jeans.

22               THE COURT:   Hold on.

23   A    Sorry.

24               THE COURT:   Go ahead.

25   A    Number 3 is the shirt.

27

Det. Markoski - People - Direct/Ms. Chu

1            THE COURT:  Brown shirt?

2            THE WITNESS:  Yes.

3    A    Number 4 is the white towel.

4         Numbers 5 and 6 are the pill bottles.

5    Q    Okay.

6         Looking at People's 21 in evidence, what is this?

7            (Whereupon, the exhibit was displayed.)

8    A    Number 5 and 6 are depicting the pill bottles which

9    are located underneath the bed.

10   Q    And these smears that are on the floor, is that the

11   fecal matter and blood that you had referred to earlier?

12   A    It appeared to be a mixture, yes.

13   Q    Taking a look at People's 22.

14           (Whereupon, the exhibit was displayed.)

15   Q    What is this?

16   A    It's a close-up view of number 1, which was the

17   sock.

18   Q    Okay.

19        Taking a look at People's Number 23.

20           (Whereupon, the exhibit was displayed.)

21   A    That is a close-up -- excuse me -- close-up view of

22   the jeans.

23   Q    Now, were you able to determine what size the jeans

24   were?

25   A    I think so.

mc

Det. Markoski - People - Direct/Ms. Chu

1        They were size 36, 32.  Thirty-six waist, 32

2   length.

3        Q    Taking a look at People's 24.

4             (Whereupon, the exhibit was displayed.)

5        A    It is a close-up view of the brown shirt.

6        Q    And that was what you had labeled SM3?

7        A    Yes.

8        Q    Taking a look at People's 25.

9             (Whereupon, the exhibit was displayed.)

10       A    That's a close-up view of number 4, which is the

11  towel, SM4.

12       Q    Okay.

13            Taking a look at People's 26.

14            (Whereupon, the exhibit was displayed.)

15       A    That's a close-up view of the washcloth in the

16  basin, which was SM7.

17       Q    Taking a look at People's Number 27.

18            (Whereupon, the exhibit was displayed.)

19       A    That's the same photo as the previous photograph

20  with a crime scene scale.

21       Q    What do you mean, a crime scene scale?

22       A    It's six inches long and gives a general idea how

23  long a piece of evidence was.

24       Q    So you can get perspective?

25       A    Yes.

Det. Markoski - People - Direct/Ms. Chu

1    Q    People's 28 in evidence.

2         (Whereupon, the exhibit was displayed.)

3    A    That's the two pill bottles that were recovered

4    from under the bed, close-up view, with the scales.

5    Q    Okay.

6         People's 29.

7         (Whereupon, the exhibit was displayed.)

8    A    That's number 5, close-up view of SM5 with a

9    scale.

10   Q    Okay.

11        Number 6 -- I'm sorry.

12        Number 30, I'm sorry.

13        (Whereupon, the exhibit was displayed.)

14   A    Close-up view of number 6 with a scale.

15   Q    Taking a look at People's 31.

16   A    That's the end table next to the bed where I

17   recovered the swab.  The scale indicates the area where I

18   took the swab from.

19   Q    This blue marker right here (indicating)?

20   A    Yes.

21   Q    Okay.

22        People's 32.

23        (Whereupon, the exhibit was displayed.)

24   A    That's just a close-up view of the previous

25   photograph.

Det. Markoski - People - Direct/Ms. Chu

1    Q    Okay.

2         People's 33 in evidence, what is this?

3              (Whereupon, the exhibit was displayed.)

4    A    That is a view of the kitchen cabinets with the

5    possible bloodstains on them.

6    Q    This would be in the kitchen area of the

7    apartment?

8    A    Yes.

9    Q    Okay.

10        Now, can you tell me, what is People's 34?

11             (Whereupon, the exhibit was displayed.)

12   A    That's the same photo as the previous photo.  The

13   scale is depicting the area where I recovered the blood swab,

14   the possible blood swab.

15   Q    Okay.

16        People's 35.

17             (Whereupon, the exhibit was displayed.)

18   A    Just a closer view of the previous photograph,

19   SM9.

20   Q    Do you know what this is on the left-hand side

21   (indicating)?

22   A    At first we didn't but then I think we thought it

23   might be just someone had thrown food around the apartment.

24   It appeared to be some sort of tomato sauce or something like

25   that.

31

Det. Markoski - People - Direct/Ms. Chu

1    Q    Okay.  That was 35.  Now we are on to 36.

2              (Whereupon, the exhibit was displayed.)

3    A    That's the bathroom wall with the possible

4    bloodstains.

5    Q    Exhibit 37.

6              (Whereupon, the exhibit was displayed.)

7    A    That's also a bathroom wall with the possible

8    bloodstains.

9    Q    People's 38.

10             (Whereupon, the exhibit was displayed.)

11   A    That's the bathroom wall with the possible

12   bloodstains.  The scale is depicting the area where the swab

13   was recovered.

14   Q    So that's the actual sample that you took it from?

15   A    Yes.

16             (Whereupon, the exhibit was displayed.)

17   Q    Taking a look at People's 39.

18   A    That's a view of the tub.

19   Q    Okay.

20        Taking a look at 40.

21             (Whereupon, the exhibit was displayed.)

22   A    That's a view of the tub with the scale indicating

23   the area where the swab was recovered.

24   Q    Okay.

25        And People's 41.

Det. Markoski - People - Direct/Ms. Chu

1            (Whereupon, the exhibit was displayed.)

2        A    Close-up view of the previous photograph, SM Number

3    10.

4        Q    Okay.

5            Thank you very much, Detective.

6            MS. CHU:   If I can have one moment, your

7        Honor.

8            (Whereupon, there was a brief pause in the

9        proceedings.)

10       Q    How long were you at the scene?

11       A    I was at the scene for about five-and-a-half hours.

12       Q    And you said that the apartment was cold when you

13   got there.  What did you mean by that?

14       A    Well, it was -- it was January and it didn't appear

15   that there was any heat in the apartment and I think the

16   temperature that we took when we were there was 28 degrees.

17   The medical examiner took that temperature while we were

18   examining the body.

19       Q    The room temperature was 28 degrees?

20       A    Yes.

21           MS. CHU:   Thank you very much.

22           I have nothing further.

23           THE COURT:   Cross.

24   CROSS-EXAMINATION

25   BY MR. WALENSKY:

Det. Markoski - People - Cross/Mr. Walensky

1    Q    Detective, did anybody move the body while you were
2  there to take photos?

3    A    Yes.

4    Q    Did you move it or did another officer?

5    A    My partner and the medical examiner moved it while
6  I took the photographs.

7    Q    And the body actually was not north -- not north to
8  south on the bed, wasn't it on an angle or sideways?

9    A    No, the body was in a north to south direction as
10  you can see on the sketch here.

11    Q    Is that how the body was when you came in?  That's
12  what I mean.

13    A    Yes.

14    Q    Prior to moving?

15    A    Yes.

16    Q    You weren't a witness to this crime, were you?

17    A    No, sir.

18    Q    Did you take a swab of the blood spattering on the
19  doorway of the bathroom?  There was some on the wall and then
20  some on the doorframe.

21    A    The only swabs I took are the ones I testified to.

22        MR. WALENSKY:  Where are the pictures?  Can I

23        have the photos?  Can I have 18, 16, 17 and 18?

24        (Whereupon, the exhibits were handed to

25        counsel.)

34

Det. Markoski -- People - Cross/Mr. Walensky

1          THE COURT:  Lights.

2          (Whereupon, the exhibit was displayed.)

3     Q    Did you take a swab from this area (indicating),

4     either the doorframe --

5          THE COURT:  It's not a doorframe.  It's -- I

6     don't know if -- what is your view of this?

7          THE WITNESS:  To be honest with you, I am kind

8     of having trouble recognizing that photograph.

9     Q    I'd like you to take a look at the photograph

10    directly, then.  I think it actually shows it better.

11         MS. CHU:  What number was that?

12         MR. WALENSKY:  This is, I believe, photo 18.

13         (Whereupon, the exhibit was handed to the

14    witness.)

15         MS. CHU:  I have the photograph number written

16    small along the edge.

17         THE WITNESS:  Okay.

18    Q    That is from the inside of the bathroom?

19    A    Yes.

20         Okay, that picture is depicting the possible

21    bloodstains, they are to the left side of the wall -- I'm

22    sorry -- left side of the toilet along the wall.

23    Q    That is the one you took bloodstains from, you took

24    swabs?

25    A    I took actually from the opposite side.

Det. Markoski - People - Cross/Mr. Walensky

1    Q    You didn't take any swab from --

2    A    From the left side of the toilet?

3    Q    Yeah.

4    A    No, I took it from the right side of the toilet.

5    Q    Can you show that photo to the jury over there?

6              THE COURT:  Is that the right side?

7              THE WITNESS:  There was bloodstains on both

8    sides of the toilet.

9              THE COURT:  Is this photo of the right side of

10   the toilet?

11             THE WITNESS:  No, sir, that's the left.

12             THE COURT:  Possible bloodstains from the left

13   side of the toilet?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Wall, right?

16             THE WITNESS:  Yes.

17   Q    Is the bathtub in here?

18   A    Yes.

19   Q    And the toilet is here (indicating)?

20             (Whereupon, the exhibit was displayed.)

21   A    That is a bucket.

22   Q    You can't see it?

23   A    Yes.

24   Q    There were no --

25        There is no swab there?

Det. Markoski -- People - Cross/Mr. Walensky

1          No swabs were taken from these stains here

2    (indicating), where my thumb is?

3       A    No, I took it from the other side of the toilet.

4              THE COURT:  I don't understand.

5              Those little specks there?

6              THE WITNESS:  Yes.

7              THE COURT:  Are those possible bloodstains?

8              THE WITNESS:  Possible, yes.

9              THE COURT:  You took the photo of this?  You

10       took the photo of them?

11             THE WITNESS:  Yes.

12             THE COURT:  Were any possible bloodstains on

13       the wooden frame?

14             THE WITNESS:  On the wooden frame,

15       possibility, yes.

16             THE COURT:  Did you swab it?

17             THE WITNESS:  No, sir.  I swabbed the other

18       side of the toilet.

19             THE COURT:  Okay.

20             (Whereupon, the exhibit was displayed.)

21      Q    I'm pointing down here (indicating).  This is the

22   other side of the toilet, right, the right side?  You took

23   your swab from that side (indicating)?

24      A    Yes.

25      Q    You didn't take it from what would be this side

Det. Markoski - People - Cross/Mr. Walensky

1    (indicating).  I just want to get it clear.

2              All right, thank you.

3              And after you --

4              When was the last time prior to coming in today,

5    last time you reviewed this file?

6        A    I had a preparation with the District Attorney a

7    couple of months ago.

8        Q    So you came in today and looked at your notes and

9    testified, right?

10       A    Yes, sir.

11       Q    And, really, your job is really collecting evidence

12   and photographing or trying to preserve a scene?

13       A    Correct.

14             MR. WALENSKY:  Thank you.

15             I have no further questions.

16             THE COURT:  You may step down.  Thank you very

17       much.

18             THE WITNESS:  Thank you.

19             (Whereupon, Detective Markoski stepped down

20       from the witness stand and exited the courtroom.)

21             THE COURT:  Come on up.

22             (Whereupon, a sidebar conference was held off

23       the record.)

24             THE COURT:  Ladies and gentlemen, at this time

25       we are going to adjourn for the evening.

Proceeding

38

1    Do not discuss the case amongst yourselves or

2    with anyone else.  Do not visit the place where the

3    alleged crimes occurred.  Have no contact with any of

4    the parties involved in this matter, including the

5    Court.

6    Again, do not resort to utilizing any digital

7    or electronic device for the purpose of obtaining any

8    information or contacting anyone about this case.  That

9    proscription against the use of your digital, electronic

10   devices is based on the fact that the courtroom is the

11   place to determine the truth of what occurred, in other

12   words, and you do that or that's done in this setting

13   because the attorneys have the opportunity to examine

14   and question the witnesses.  If you go outside of the

15   courtroom to seek information about this matter, you

16   will not have that examination, you will not have that

17   ability to hear anything about the retrieval of that

18   evidence or the value of that evidence, et cetera.

19   This is the testing ground, the courtroom,

20   nowhere else, so that's why you're told not to use any

21   outside sources.

22   All right.

23   So, we are going to adjourn till tomorrow ten

24   o'clock.  And again, have a very good evening.  See you

25   tomorrow at 10:00.

mc

Proceeding

1            SERGEANT:  Ladies and gentlemen, just leave

2      your booklets on the seat and the pens.

3            THE COURT:  You have to be here at ten

4      o'clock.

5            What is the problem you have?  You had your

6      hand up?

7            JUROR:  How long do I advise my job I will be

8      away from work?

9            THE COURT:  I just said that we are not going

10     to be meeting on Thursday and Friday and we'll be back

11     on Tuesday of next week, okay.

12            SERGEANT:  Just put your juror number on the

13     booklet.

14            (Whereupon, the Jury exited the courtroom.)

15            THE COURT:  Mr. Walensky, what do you have?

16            MR. WALENSKY:  Yes, your Honor.

17            In my opening I made reference of the fact

18     that Ms. Wisdom wasn't charged with any larcenies, any

19     robberies.  The Court -- it appeared the People had not

20     made a Molineux application.

21            THE COURT:  That's true.

22            MR. WALENSKY:  And the Court had indicated

23     that, sua sponte, they were going to give --

24            THE COURT:  I am -- not sua sponte.  The truth

25     of the matter is, you know, I'm not sure I should give a

40

Proceeding

1    Molineux.

2              MR. WALENSKY:  That was my --

3              THE COURT:  A Molineux ruling.

4              MR. WALENSKY:  I think it would be error

5    because it's not for the Court to try the People's case,

6    of course, and --

7              THE COURT:  I am not trying the People's case.

8    All I'm saying is that it wasn't made, the Molineux

9    application wasn't made, and I don't believe the

10   reference to -- well, there's some question now as to

11   the reference to the wallet being taken and benefits,

12   Welfare benefits being utilized by the defendant; isn't

13   that true?

14             MS. CHU:  No, there is no allegation as to

15   that.  What happens, she in her own statement says, I

16   take his Welfare card.  She admits that in her statement

17   to the police officers, that she took the card but she

18   denies using it.  So what I was planning on doing was

19   submitting the EBT records for Mr. Wilson's card to show

20   that after the date of November 29th, 2011 her phone

21   use, her phone numbers and EBT where she frequented was

22   being used.

23             THE COURT:  Frequented?  She goes to Welfare?

24             MS. CHU:  To different places to use her EBT

25   card than the victim would go.  So the victim --

mc

Proceeding

1          THE COURT:  But the EBT card was used post?

2          MS. CHU:  I am not making an allegation that

3     she was the one that did it.  After he died, that EBT

4     card was not used at his usual locations, it was now

5     being used in areas where she used to frequent.

6          MR. WALENSKY:  It's prejudicial.  It's the

7     only stores in the neighborhood.  She said she went to

8     the woman's house and left the wallet and the woman very

9     well --

10          THE COURT:  Then what I would suggest is that

11     if you want me to give a curative charge to the jury, I

12     will, regarding those items.

13          If you will have one tomorrow, I'll look at it

14     and I will indicate to the jury she's not being charged

15     with any crime other than this crime and they are not to

16     take into consideration that, the testimony regarding

17     those items, all right, have no bearing on her guilt or

18     innocence.

19          All right, tomorrow.

20          (Whereupon, the trial was adjourned to July 1,

21     2014.)

          ********************************

22     CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
       THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS
23     PROCEEDING.

24

25     MARLIN CASSIDY
       Senior Court Reporter