42

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS:  CRIMINAL TERM:  PART 2
 2   ----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3                                        Indictment No.:
                  -against-               6615/2012
 4                                        (Trial)
     ATARA WISDOM,
 5
                       Defendant.
 6   ----------------------------------------X

 7
                            Supreme Courthouse
 8                          320 Jay Street
                            Brooklyn, New York 11201
 9                          July 1, 2014

10
     B E F O R E:
11
                  THE HONORABLE ALBERT TOMEI, JUSTICE
12                (And a Jury)

13   A P P E A R A N C E S:

14           HON. KENNETH P. THOMPSON, ESQ.
                  District Attorney - Kings County
15                350 Jay Street
                  Brooklyn, New York  11201
16           BY:  PHYLLIS CHU, ESQ.
                  Assistant District Attorney
17

18           DAVID WALENSKY, ESQ.
                  Attorney for Defendant
19                910 Stuart Avenue
                  Mamaroneck, New York
20           BY:  DAVID WALENSKY, ESQ.
                       - and -
21                JOSHUA POVILL, ESQ.

22

23

24
                            MARLIN CASSIDY
25                          Senior Court Reporter
```

mc

Proceeding

1           (Whereupon, the following took place in open

2      court:)

3           THE CLERK:  This is calendar number two, case

4      on trial, Indictment 6615 of 2012, People versus Atara

5      Wisdom.  Defendant is incarcerated, produced, present

6      with his (sic) attorney.

7           Appearances are the same.

8           THE COURT:  Yes?

9           MR. WALENSKY:  Two things, your Honor.

10          First, we would object to the People offering

11     up the testimony of the person from the Welfare

12     services agency.  There is no probative value to her

13     testimony.

14          You had yesterday asked me to prepare a

15     curative instruction, and essentially the woman's going

16     to testify that the benefits card of Anthony Wilson was

17     used in the area subsequent to his death.

18          THE COURT:  And when was it used?

19          When was it used?

20          MS. CHU:  Oh, I'm sorry.

21          It was used -- we have records from September

22     1st, 2011 through May 12th -- I'm sorry -- May 31st,

23     2012 and around the time of the 911 call, the last time

24     there was any activity on the --

25          THE COURT:  When was the 911 call, the 29th?

Proceeding

1          MS. CHU:  Yes, November 29th, 2011.

2          THE COURT:  When was the first time that it

3    was used outside of the area where he generally --

4          MS. CHU:  The next entry or use of that card

5    was on December 6th, 2011.

6          THE CLERK:  I'm sorry, Ms. Chu, is he one of

7    the witnesses?

8          MS. CHU:  No, this is my paralegal.

9          THE COURT:  December 6th, 2011.

10          And when --

11          MS. CHU:  That's the first time it's used

12    after November 29th, 2011.

13          THE COURT:  Where is it used?

14          MS. CHU:  It's used at 241C Rockaway Avenue.

15          THE COURT:  Did he ever use it at 241C?

16          MS. CHU:  No.

17          THE COURT:  My question to you is -- what this

18    is, really, is a Molineaux application -- for what

19    purpose is this being introduced?

20          MS. CHU:  It's not actually to establish

21    that on November 29th, 2011 -- the date is very

22    pertinent to this case because that's the time period

23    where we are charging her for the murder.  Sometime

24    between 11/29/2011 and January 3rd he died, he was

25    killed.

Proceeding

1          THE COURT:  This establishes a timeline.

2          MS. CHU:  Establishes a timeframe and activity

3     changed before 11/29 and after 11/29/2011.

4          MR. WALENSKY:  Your Honor, you have the

5     admission of Ms. Wisdom in a police statement written

6     and recorded that she stabbed Mr. Wilson.

7          THE COURT:  Does she say when?

8          MR. WALENSKY:  At the end of November, right

9     around Thanksgiving.

10         MS. CHU:  In his opening he said that when she

11    left he was still alive so that's implying that somehow

12    somebody else came in and --

13         MR. WALENSKY:  No, it doesn't imply anything.

14    My theory is he didn't expire right at that time, he

15    had expired that evening, but that when she left he

16    wasn't dead.  It's not like he got up and pranced

17    around and ran around anywhere.  He was dead that

18    evening.

19         THE COURT:  Well, you don't know.

20         MR. WALENSKY:  But the thing is there was no

21    inference that -- that he used the card afterwards

22    because she testified directly that --

23         THE COURT:  It's not a question of whether he

24    used the card, it's a question of whether she used the

25    card.

Proceeding

1        MS. CHU:  She denies using his card in her

2    statement.

3        THE COURT:  And he never used it with respect

4    to that particular location.

5        MR. WALENSKY:  There are two things.  One, you

6    need a PIN number to access the card.  We don't know who

7    he gave his PIN number to, how someone got the PIN

8    number.

9        Secondly, --

10        MS. CHU:  That goes to weight.

11        MR. WALENSKY:  Secondly, she did testify

12    that she left the wallet at a friend's house, it could

13    have been the friend.  It's really -- it has nothing to

14    do with the timeline.  She admitted she stabbed the

15    person, they're calling Matthew Shepard, who she told

16    that night she stabbed him.  He didn't get wounds from

17    some other person, that's not it.  This is

18    justification.  She stabbed him and he died and it's the

19    justification.

20        So, it's really -- the People's argument is

21    weak, it really goes to the probative value outweighing

22    the prejudice now.  They did not charge her with any

23    crimes.

24        THE COURT:  They didn't have to.

25        MR. WALENSKY:  And there was no Molineaux

Proceeding

1    application.  They also don't have proof that she's

2    actually the person who used the card because this is a

3    week later and there is an intervening factor.

4              THE COURT:  There's circumstantial evidence as

5    to whether she used it or not.

6              MS. CHU:  The witness is not going to say she

7    used it.  It was used here from these dates, it was then

8    used here after that date.

9              MR. WALENSKY:  So what is the point?

10             MS. CHU:  He is not implying -- she is

11   saying the card was used on these dates at these

12   locations and the card was used on these dates at these

13   locations.

14             MR. WALENSKY:  There is an inference that

15   it's the defendant who used it.  It doesn't add

16   anything to this case because we're not doubting that

17   it was her actions that caused his death.  So,

18   therefore, it's just, really, they're just bootstrapping

19   it and they're just -- the word I am looking for, which

20   I've lost, it's not -- just the prejudice.  They are

21   essentially just trying to lay something extra on this.

22   It really isn't -- it has no evidentiary value,

23   essentially, if the defense is that she stabbed him and

24   he died.

25             MS. CHU:  I would disagree.

mc

Proceeding

1          MR. WALENSKY:  It occurred at the end of

2     November.  The fact that it was used December 6th really

3     doesn't show anything except that it's inferring she

4     used his card.  That is the inference the People wish to

5     draw.  It's disingenuous.  This was an inference, it was

6     used after his death or whatever.

7          She said, I took his wallet, I took his keys.

8     I took his wallet and his keys and his phone, and that's

9     not anything we're contesting.

10          MS. CHU:  The People don't plan on arguing

11     that because there is no proof that she is the one who

12     used his card after.

13          THE COURT:  But I still question the probative

14     value of this evidence.

15          MS. CHU:  Because it establishes when, the

16     actual time of death, when the actual incident took

17     place.

18          THE COURT:  She admits being there.  She

19     admits --

20          MS. CHU:  She doesn't give any dates.  All she

21     says is sometime in November.

22          MR. WALENSKY:  And this is --

23          THE COURT:  Sometime in November so --

24          MS. CHU:  Let me just check her -- just one

25     second, to make sure that is an accurate statement.

Proceeding

1          THE COURT:  So she said sometime in November?

2          MR. WALENSKY:  Actually, she says --

3          THE COURT:  When you're ahead, --

4          MR. WALENSKY:  Yes, exactly.

5          THE COURT:  -- keep your head.

6          Go ahead.

7          MS. CHU:  Well, I would also seek to introduce

8    her EBT records through this same representative who can

9    show that she is in different places, that she's here in

10   Brooklyn, then after November 29th then she's popping up

11   in Pennsylvania, in New Jersey.  We're also seeking to

12   elicit her card was being used in Pennsylvania, was

13   being used in New Jersey.

14         THE COURT:  Her own card?

15         MS. CHU:  Her own card.

16         In addition --

17         THE COURT:  To show what?

18         MS. CHU:  To show that her card was being

19   used, that she may have been in Pennsylvania.  She

20   actually states in her statement that she was, that she

21   had gone someplace.

22         THE COURT:  But for Molineaux purposes,

23   what -- I mean, what -- what's the probative value?

24         MS. CHU:  The probative value is it shows it

25   wasn't as innocuous, painting the picture in the

mc

Proceeding

1   statements -- her statements are she is trying to do

2   this, she is so afraid she has to defend herself, and

3   in the meantime then she takes his keys, she takes his

4   phone, his EBT card, then the EBT card is actually

5   used, whether she gave it to someone else to use or

6   whether she took it and used it herself.  That's the

7   argument.

8           THE COURT:  But then --

9           MS. CHU:  It goes towards the weight.

10          THE COURT:  But, first of all, those are --

11  taking the EBT card and taking his keys, that's --

12  those are two uncharged crimes, right, so if I were to

13  give -- allow this to come in under Molineaux, I would

14  have to tell them it's being introduced to -- not to

15  show propensity to commit the crime in question but for

16  what?

17          MS. CHU:  It completes the narrative of all

18  that she did after she killed this person.

19          THE COURT:  What about that?

20          MR. WALENSKY:  Your Honor, it doesn't complete

21  any narrative.  The narrative is given and completed in

22  her statement.  She says it happens around Thanksgiving

23  time, she took this stuff.  She's not denying that she

24  took it.  She said she left it somewhere.  It's

25  irrelevant that it was used or who used it.

Proceeding

1      The fact is, if she took his wallet, she took

2      his wallet, it's out there for someone to use.  This is

3      really to show these are bad acts and she's done this,

4      yeah, and -- and it really does, it invites speculation,

5      which is --

6              THE COURT:  Speculation of what?  What

7      speculation?

8              MR. WALENSKY:  That she's been using this

9      card.  You know, that -- they are trying to show that

10     she took it, she used it.

11             THE COURT:  The purpose of the charge is to

12     show or to tell the jury it's not, just the opposite of

13     what you're saying.  In other words, that it's not being

14     offered for, to show propensity to commit the crime in

15     question but to complete the narrative.

16             MR. WALENSKY:  But --

17             THE COURT:  In other words, there would be a

18     lacuna here.  If I were to tell the jury to disregard

19     any statements already made or any evidence that's been

20     introduced regarding the taking of those items or

21     even -- I don't know if there was any evidence regarding

22     the EBT, but there's a gap.  If you are talking about

23     speculation, then there is a gap there.

24             MR. WALENSKY:  It's a fait accompli by her

25     other statements.  I mean, she's stated this happened

Proceeding

1   around Thanksgiving.  She took the stuff.  Why are we

2   even discussing the card or its used?

3           It becomes irrelevant.  It doesn't add

4   anything to any timeline.  This occurred at this

5   particular point in time, around November sometime I

6   stabbed him, I took his wallet, whatever happens with

7   the stuff in the wallet afterward is irrelevant.

8           THE COURT:  My point is --

9           MS. CHU:  Well, --

10          MR. WALENSKY:  On the one hand --

11          THE COURT:  With all due respect, my point is

12  that if you don't want me to give -- if you believe I

13  shouldn't give a Molineux charge, I don't see how that

14  helps your case because you are talking about

15  speculation.  It's almost like a curative instruction.

16  It's like saying, you know, you are not to consider

17  propensity to commit any crime, I mean the crime in

18  question, and it's being offered solely for this

19  purpose, to complete the narrative.

20          MR. WALENSKY:  Well, because I don't think you

21  need to get a witness on the stand to talk about these

22  charges and whatever.  That to me is more prejudicial to

23  my client.  I rather be able to argue that --

24          THE COURT:  She's a witness.

25          MS. CHU:  If anything, it corroborates what

Proceeding

1    she says in the statement.

2              THE COURT:  All right, I'm going to -- I'll

3    give a Molineux charge.  I believe the probative

4    value outweighs any prejudice to the defendant's

5    probative value.  It's being offered to complete the

6    narrative.

7              MR. WALENSKY:  Again, and co-counsel pointed

8    this out when we first talked about Seroquel, people

9    were given this drug for all sorts of reasons and

10   essentially the notes from the treating physician says

11   that Mr. Wilson noted hallucinations, to harm himself or

12   others.

13             He's diagnosed with major depressive disorder

14   with psychotic features and pursuant to that he is given

15   Prozac for his depression and Benadryl, which is for

16   allergy, to help him sleep, and Seroquel, which is an

17   antipsychotic, and then a month later -- he isn't there

18   for a month, he has stomach surgery.  Also in these

19   records, he's -- when he's dead he has .2 alcohol in his

20   system.

21             In these records it shows he tells the

22   interviewer he has half his stomach removed because of

23   alcoholic ulcers and that he tells the person he's

24   giving up alcohol, doesn't do alcohol or cocaine anymore

25   but he has residue of, essentially, of cocaine in his

Proceeding

1    system, a byproduct that he's metabolized, plus he has a

2    drug used for cutting, which is a horse dewormer, which

3    is very popular in terms of cutting cocaine right now, I

4    have it here but --

5            MS. CHU:  Levamisole.

6            MR. WALENSKY:  He has it here, Levamisole,

7    which is detected and that's metabolized more slowly

8    than cocaine, but it belies what he's telling the

9    treatment person.  Essentially he is saying, I'm

10   hearing -- I have hallucinations, I want to hurt myself

11   and other people, which goes --

12           MS. CHU:  Or others, not "and others."

13           MR. WALENSKY:  Myself or others.  Regardless,

14   it makes no difference.  It's showing --

15           THE COURT:  What is the point?

16           MR. WALENSKY:  The point I want to make, I

17   want to use -- I am going to be subpoenaing the

18   physician who he spoke with.  Because he's dead, there

19   is no protection and I also wish to --

20           THE COURT:  In subpoenaing -- what is the

21   doctor?  Is it the doctor?

22           MR. WALENSKY:  Yes.

23           THE COURT:  What would that doctor say?

24           MR. WALENSKY:  I want to put a certified copy

25   of these records into evidence which will show what he

mc

Proceeding

1   said to the doctor.  That's step one.  I think I ought

2   to be allowed to.

3         They find Seroquel on the scene, they don't

4   find Seroquel in his system.  So if I don't have that

5   physician, I want to put on my expert, Dr. Siegel, he

6   will -- who can talk about psychosis.  I can ask him

7   what drugs are given for psychosis and he would

8   undoubtedly say he gives some of them and Seroquel.

9         THE COURT:  I think I already litigated this

10  with you and I said what you're trying to establish

11  through this expert testimony is, number one, an

12  inference and then an inference upon an inference.  And

13  that's what it seems to me to be.

14        MR. WALENSKY:  I will tell you why it's not an

15  inference, because he was directly -- he had a treating

16  physician, he was being treated for hallucinations

17  and --

18        THE COURT:  No, no.  I read the record, he

19  wasn't being treated for hallucinations, he was being

20  treated because he was depressive.  That was the

21  analysis.

22        MR. WALENSKY:  But the diagnosis --

23        THE COURT:  According to the DMS (sic),

24  whatever --

25        MS. CHU:  DSM.

Proceeding

1          THE COURT:  The DSM, he is not psychotic.

2     They don't have him down as psychotic, they don't

3     have him -- or anti -- some kind of anti-personality

4     trait.  They got him as depressive.  That is what they

5     have.

6          MR. WALENSKY:  She's treating him.  She's

7     treating him, that is why I need to speak with -- she is

8     treating for -- one of the drugs is for hallucinations

9     and you know it's part of -- they might say he's

10    depressive but if he has hallucinations...

11         THE COURT:  Your premise is going to be, in

12    light of the fact that he is being treated for this, we

13    know he has this mental problem, right, he may want to

14    harm himself or others, all right, and consequently

15    because he didn't take Seroquel that's why he attacked

16    Ms. Wilson (sic).

17         MR. WALENSKY:  No, what I'm saying, he also

18    has a follow-up for a month later --

19         THE COURT:  He didn't --

20         MR. WALENSKY:  -- where it states that he was

21    hearing the voices less.  He's still hearing voices and

22    I think I can question.  There's a reason for the

23    Seroquel, why were you prescribed Seroquel, was it to

24    sleep, he said no, I am prescribing the Seroquel because

25    he is hallucinating, it's an antipsychotic.  Now --

Proceeding

 1          MS. CHU:  Who's going to say that?

 2          MR. WALENSKY:  -- whether or not it caused

 3    him -- whether or not it caused him to attack Ms.

 4    Wisdom, that could be speculation.

 5          The problem is he is supposed to be taking

 6    this to control these hallucinations.  If you don't take

 7    it, what can happen.

 8          THE COURT:  Again, you're speculating because

 9    he didn't take it that's what happened.

10          MR. WALENSKY:  No.  Perhaps, I understand --

11          THE COURT:  If you say "perhaps," it's

12    speculation.

13          MR. WALENSKY:  But the thing is --

14          THE COURT:  It isn't.

15          MR. WALENSKY:  There is a reason for the

16    Seroquel.  Here you say it's depressive, it helps him

17    sleep.  That is speculation also.  I want to ask

18    directly.

19          THE COURT:  It's not speculation.  If that's

20    one of the benefits of taking it, that's what it is.

21          MR. WALENSKY:  You're hearing voices and one

22    of the benefits, you won't have hallucinations, and he's

23    hearing voices and we can ask --

24          THE COURT:  There is no evidence here that he

25    was hearing voices, none whatsoever.  There is no

Proceeding

1    evidence based upon what your client said to the police

2    that he was hallucinating.  All he was interested in,

3    like she said, all right, I want a little pussy.  That

4    is what he said.  That doesn't seem to me to be

5    hallucinations.

6            MR. WALENSKY:  She did say it was out of

7    character.  When you see the video -- I'd like you to

8    reserve till you see the video because on the video she

9    is saying I never had a problem before, just as Ms. Chu

10   said in her opening, I want some pussy, okay.  She said,

11   I will leave, thinking he's going to see someone.  No, I

12   am going to get some and he became more violent than

13   ever before, he became --

14           THE COURT:  But you know what, the report

15   doesn't say that he's violent, all right, or he

16   committed any violent acts and the report doesn't say

17   the hallucinations were violent in nature, all right.

18           You're really, in my opinion, going beyond the

19   pale, so to speak.

20           MR. WALENSKY:  The record does say, notes,

21   hallucinations, harm to self or others.  I don't know

22   how much more you could say in terms of violence.  It

23   comes down to, okay, he may not want to kill people, he

24   wants to harm himself or others.  What did he say he

25   wanted to --

Proceeding

1           THE COURT:  Does he have any record or any

2      evidence of violence in his past?

3           MS. CHU:  No.

4           MR. WALENSKY:  We are going to ask for DIR

5      records because it was in Family Court where he's

6      accused of --

7           THE COURT:  What is DIR?

8           MS. CHU:  Domestic Incident Report.

9           MR. WALENSKY:  Yes, Domestic Incident

10     Report.

11          MS. CHU:  He had problems with his baby's

12     mother.

13          THE COURT:  He was going to Family Court, he

14     was seeking custody of the child.

15          MS. CHU:  That is actually in the records.

16          THE COURT:  That's in the record?

17          MR. WALENSKY:  He is also lying in terms of I

18     don't drink anymore and I don't do drugs anymore and

19     right here --

20          THE COURT:  What you are trying to do is dirty

21     the defendant.  That's what you're trying to do.

22          MR. WALENSKY:  The defendant is dirty.

23          MS. CHU:  Dirty the victim.

24          THE COURT:  I mean the victim.

25          MR. WALENSKY:  The victim, I mean.

Proceeding

1        THE COURT:  I'm sorry.

2        MR. WALENSKY:  And it's -- and I don't think

3    he comes through as a regular -- I think the whole point

4    is he should have been taking the Seroquel and he

5    wasn't.

6        THE COURT:  There is no evidence of the fact

7    that he didn't take the Seroquel caused him allegedly,

8    according to your client, to attack, simply none at all.

9    You are trying to establish an inference from the fact

10    that he didn't take this particular medication, in light

11    of not taking the medication that caused him to become

12    violent and that caused him to attempt or -- to attempt

13    to rape your client.

14        MR. WALENSKY:  And the reason that he was

15    prescribed the Seroquel was specifically because of

16    that, the hallucinations.

17        THE COURT:  No, it wasn't specifically because

18    of that.

19        MR. WALENSKY:  Let me bring in --

20        THE COURT:  Seroquel is a drug that is used

21    for a lot of different reasons, not just because he is

22    having hallucinations.

23        MR. WALENSKY:  Let me bring in the doctor for

24    an in camera inspection by the Court because here we are

25    both speculating, it seems to me.

mc

Proceeding

1       THE COURT:  No, I am not speculating at all.

2   I am telling you what you have and you have told me what

3   you have.  I am basing it on, simply, what you have.

4   You have no evidence at all that the failure to take the

5   Seroquel caused him to harm or want to harm Ms. Wilson

6   (sic).

7       MS. CHU:  Wisdom.

8       THE COURT:  In fact, if anything, it's the

9   alcohol in his system that in all probability caused him

10  to do what she alleged -- alleges that he did.

11      MR. WALENSKY:  I'd like to know --

12      THE COURT:  If in fact he did.

13      MR. WALENSKY:  -- does the alcohol abuse

14  exacerbate the hallucinations.

15      MS. CHU:  That is speculation.

16      THE COURT:  All right, that is my ruling.

17      MR. WALENSKY:  Note my exception.

18      THE COURT:  You got it.

19      Let's go.

20      MS. CHU:  I just have one question.  Does that

21  work to play a CD?

22      THE CLERK:  It should.

23      MS. CHU:  This does?

24      THE CLERK:  Audio?  Not this main thing.  You

25  have to set up the computer.

Proceeding

1          MS. SCHWARTZKOPF:  Yes.

2          MS. CHU:  Okay, I'll do that.

3          THE COURT:  I want to note for the record, Mr.

4    Walensky, in my opinion, if you believe so strongly in

5    your argument, you should have supported that with some

6    kind of memorandum of law, some kind of medical support,

7    et cetera.  And I am not holding a hearing to determine

8    or make a determination whether I should let this in or

9    not, all right.  I think you should have done that to

10   aid the Court.  But based upon your argument, that's my

11   decision.

12         MR. WALENSKY:  I sought advice from my expert,

13   Dr. Siegel, and I will look further into it by next --

14   by Tuesday.

15         THE COURT:  All right.

16         MS. CHU:  So I should turn this on, Phil?

17         THE CLERK:  Yes.

18         MS. CHU:  Thank you.

19         THE COURT:  Ms. Wilson is the first witness,

20   right?

21         MS. CHU:  Yes, Victoria Wilson.

22         THE COURT:  She's --

23         MS. CHU:  She's the sister.

24         THE COURT:  She identified the body?

25         MS. CHU:  Yes, she identified the body.  And

Proceeding

1    she also listened to the 911 call so she can identify

2    that's her brother's voice.

3             THE COURT:  All right.

4             MS. CHU:  Your Honor, I also had the 911 call

5    that I am about to play transcribed.  I gave it over to

6    defense counsel.  I took the liberty of making several

7    copies of it so that it could be distributed, if needed,

8    to the jurors.

9             THE COURT:  Have they seen it?

10            MS. CHU:  He has a copy of it, yes.

11            THE COURT:  Do you have an objection to it?

12   It's going to be offered as an aid.

13            MR. WALENSKY:  I'm sorry, which was this?

14            MS. CHU:  The 911 call transcript.

15            MR. WALENSKY:  I have no objection.

16            MS. CHU:  Should I play it just to see if we

17   can hear it?

18            THE CLERK:  Yes.

19            THE COURT:  What is -- this is the statement?

20            MS. CHU:  The 911 call.

21            THE COURT:  Hold the jury.  Hold it.

22            (Whereupon, there was a brief pause in the

23   proceedings.)

24            (Whereupon, the exhibit was played in open

25   court.)

Proceeding

1        MS. CHU:  That actually used your speakers.

2    And that's it.

3        Do you want me to take this out and see if it

4    plays louder?

5        MS. SCHWARTZKOPF:  I am saying, people usually

6    put the microphone next to it because it makes it

7    louder.

8        (Whereupon, the exhibit was played in open

9    court.)

10       THE COURT:  That's better.

11       MS. CHU:  Okay, it's better.

12       THE COURT:  What is that dated?

13       MS. CHU:  This is November 29th, 2011.

14       THE COURT:  Before we bring in the jury, when

15   the jury comes in, I'm going to give them an instruction

16   on Molineux indicating that it's -- this evidence that's

17   already in about her taking the benefit card and the --

18   what else?  The keys and wallet -- was offered -- was

19   not offered to show a propensity to commit the crime in

20   question but solely to complete the narrative.  That's

21   it.

22       COURT OFFICER:  Jury entering.

23       (Whereupon, the Jury entered the courtroom.)

24       THE CLERK:  All the jurors are present and

25   properly seated.

mc

Proceeding

1          Do both sides waive the roll call?

2          MS. CHU:  So waived.

3          MR. WALENSKY:  Yes.

4          THE COURT:  Ladies and gentlemen, before we

5    begin, first of all, I apologize for the delay but

6    there are times when the Court has to deal with other

7    business unrelated to the trial itself so that will

8    cause a delay.  So I apologize for your -- for the

9    delay.

10         And, also, at this time I want to instruct you

11   that there's evidence that after the defendant allegedly

12   stabbed the victim in this case she took some items off

13   the bureau, a wallet of the defendant, keys and benefit

14   card.  That evidence -- those are uncharged crimes and

15   they are not offered to show a propensity on the part of

16   the defendant to commit the crime in question.  They are

17   only being -- that evidence is only offered to complete

18   the narrative, complete the narrative, that's all.

19   Okay.

20         All right, you can proceed.

21         MS. CHU:  People call Victoria Wilson.

22         (Whereupon, there was a brief pause in the

23   proceedings.)

24         COURT OFFICER:  Ready for the witness?

25         THE COURT:  Yes.

mc

V. Wilson - People - Direct/Ms. Chu

 1            COURT OFFICER:  Witness entering.

 2            (Whereupon, Victoria Wilson entered the

 3       courtroom and took the witness stand.)

 4            THE CLERK:  Raise your right hand, please.

 5            Do you solemnly swear or affirm that the

 6       testimony that you're about to give will be the truth,

 7       the whole truth and nothing but the truth, so help you

 8       God?

 9            THE WITNESS:  Yes.

10            THE CLERK:  Please state your name.

11            THE WITNESS:  Victoria Wilson.

12            THE CLERK:  Spell your first and last name.

13            THE WITNESS:  V-I-C-T-O-R-I-A, W-I-L-S-O-N.

14            THE CLERK:  Thank you.

15            You can have a seat.

16            THE COURT:  Just pull your chair up, Ms.

17       Wilson, to the microphone.

18            And when you're responding to a question, just

19       put your lips close to the microphone and answer it.

20            Proceed.

21            MS. CHU:  Thank you.

22  V I C T O R I A        W I L S O N, called as a witness by and

23            on behalf of the People of the State of New York,

24            after having been first duly sworn, was examined

25            and testified as follows:

V. Wilson - People - Direct/Ms. Chu

1    DIRECT EXAMINATION

2    BY MS. CHU:

3         Q    Good morning.

4         A    Good morning.

5         Q    How old are you?

6         A    Forty-four.

7         Q    And can you tell me what you do for a living?

8         A    I work for ACS.

9         Q    How long have you been working there?

10        A    Eighteen years.

11        Q    Did you know someone by the name of Anthony

12   Wilson?

13        A    Yes, that was my brother.

14        Q    Can you tell me, was he older or younger than you?

15        A    Older.

16        Q    How many siblings were you all in the family?

17        A    Five.

18        Q    Now, do you remember where he was living back in

19   November of 2011?

20        A    832 Bushwick Avenue.

21        Q    And had you ever been to his apartment before?

22        A    Yes.

23        Q    And can you tell me, did you know how he paid his

24   rent?

25        A    He had Section 8 and public assistance.

V. Wilson - People - Direct/Ms. Chu

1    Q    And you said -- I'm sorry.

2         You said you had been to his apartment?

3    A    Yes.

4    Q    On what occasions would you go to his apartment?

5    A    I went there for like when -- the birth of his

6    daughter and that is when I frequently started visiting his

7    apartment.

8    Q    About how many times have you ever been there?

9    A    About four times.

10   Q    How did he normally keep his apartment?

11   A    It was nice, it was neat.

12   Q    Now, did he have any --

13        You said he had a daughter?

14   A    Yes.

15   Q    That's when you started visiting him at that

16   apartment?

17   A    Yes.

18   Q    Now, how often would you see your brother?

19   A    Like maybe monthly.

20   Q    What about around the holidays?

21   A    Every holiday.  We always got together on

22   holidays.

23   Q    Where would you get together?

24   A    Thanksgiving my mom's house, Christmas is my

25   house.

V. Wilson - People - Direct/Ms. Chu

1    Q    And I want to direct your attention to January 3rd

2   of 2012.

3         Did there come a time when you received any

4   information with regard to your brother?

5    A    Yes.

6    Q    And who was it that contacted you?

7    A    My mom contacted me first because the detectives

8   called her and said he had to speak with her in regards to my

9   brother.

10   Q    Based upon what she said to you, where did you go?

11   A    I went to her house.

12   Q    During the time that you were at her house did

13  there come a time the detectives actually arrived there?

14   A    Yes.

15   Q    Now, based upon the conversations that were had

16  with the police, did you then go to the Office of the Chief

17  Medical Examiner on January 5th, 2012?

18   A    Yes.

19   Q    Can you tell me, why did you go there?

20   A    To identify my brother's body.

21   Q    And did you do that?

22   A    Yes.

23   Q    Now, when was the last time that you saw Mr. Wilson

24  alive?

25   A    On Thanksgiving.

V. Wilson - People - Direct/Ms. Chu

1      Q     Thanksgiving at your mom's house?

2      A     Yes.

3      Q     And can you tell me, did you try and get

4  together --

5            You said that Christmas was normally at your house?

6      A     Yes.

7      Q     Did you try and reach out to him at all for

8  Christmas?

9      A     Yes.

10      Q     Why was it that you tried to reach out to him?

11      A     Because it wasn't like him not to call on Christmas

12  morning.  So like around the afternoon me and my sister rode

13  to his house to see was he there, but there was no answer.

14      Q     Now, did you know whether he had a phone,

15  cellphone?

16      A     Um, I believe he had like the phone from public

17  assistance, that Assurance phone, I believe.

18      Q     Okay.

19            Did you ever have his number?

20      A     No, I didn't have that number.

21      Q     So you never tried to contact him via the

22  telephone, you just went to his house?

23      A     Correct.

24      Q     When you went to his apartment at 832 Bushwick

25  Avenue, can you tell me, did you try and see if the door was

mc

71

V. Wilson - People - Direct/Ms. Chu

1  open or unlocked?

2     A    I just knocked on the door.

3     Q    And there was no answer?

4     A    No answer.

5     Q    Now, I let you listen to a tape before.  Have you

6  ever spoken to your brother on the telephone?

7     A    Yes.

8     Q    Would you recognize his voice if you heard it?

9     A    Yes.

10          MS. CHU:  Your Honor, if I can have this

11    deemed marked People's Number 42 for identification.

12          THE COURT:  You object?

13          MR. WALENSKY:  Yes, I am.  Objection, exactly.

14          THE COURT:  Overruled.

15          (Whereupon, the 911 call was deemed marked as

16    People's Exhibit 42 for identification.)

17          THE COURT:  I am going to allow it subject to

18    connection.

19          MS. CHU:  Yes, subject to connection.

20          (Whereupon, the exhibit was handed to the

21    witness.)

22     Q    Ms. Wilson, is that the DVD that I had played for

23  you earlier?

24     A    Yes.

25          MS. CHU:  At this time, your Honor, I would

mc

V. Wilson - People - Direct/Ms. Chu

1      like to offer it into evidence as People's 42 subject to

2      connection.

3                  THE COURT:  Objection is noted, it's

4      overruled.  All right.

5                  MR. WALENSKY:  Thank you.

6                  (Whereupon, the 911 call was marked as

7      People's Exhibit 42 in evidence subject to connection.)

8                  MS. CHU:  At this time, your Honor, I'd like

9      to play it for the witness.

10                 (Whereupon, the exhibit was played in open

11     court.)

12     Q    Ms. Wilson, did you recognize the voice that was on

13     that 911?

14     A    Yes.

15     Q    I'm sorry?

16     A    Yes.

17     Q    Do you recognize that voice?

18     A    Yes.

19     Q    Whose voice is that?

20     A    My brother, Anthony Wilson.

21     Q    Thank you.

22                 MS. CHU:  At this time, if I can have exhibits

23     2 through 41, please.

24                 (Whereupon, the exhibits were handed to

25     counsel.)

73

V. Wilson - People - Direct/Ms. Chu

1          THE COURT:  Come on up.  Ms. Chu, come on up.

2     Come around.

3               (Whereupon, a sidebar conference was held off

4     the record.)

5               (Whereupon, the exhibit was displayed.)

6     Q    Showing you People's Number 3 in evidence, Ms.

7     Wilson, you said that you had been to your brother's

8     apartment before?

9     A    Yes.

10    Q    Do you recognize this photograph?

11    A    Yes, that's the front door.

12    Q    That is the front door to his apartment?

13    A    Yes.

14    Q    Okay.

15         Taking a look at People's Number 5 in evidence.

16              (Whereupon, the exhibit was displayed.)

17    Q    Do you recognize that photograph?

18    A    Yes, that's inside the apartment.

19    Q    Okay.

20         Now, can you tell me, is this how you would see his

21    apartment when you came to visit?

22    A    Never.

23    Q    Now, I notice in this picture there are some jars

24    here on the right-hand side (indicating).

25    A    Yeah, uh-huh.

V. Wilson - People - Direct/Cross

1    Q    What is that?

2    A    Baby food.

3    Q    You said that he had a baby.  That is when you went

4    to visit him at this apartment?

5    A    Yes.

6    Q    Taking a look at People's Number 6 in evidence.

7             (Whereupon, the exhibit was displayed.)

8    Q    Did you ever see his apartment like that?

9    A    No.

10   Q    Thank you very much.

11            MS. CHU:  You can turn the lights on.

12            Thank you very much.  I have nothing further.

13            THE COURT:  Cross.

14   CROSS-EXAMINATION

15   BY MR. WALENSKY:

16   Q    Sorry, for your loss, ma'am.

17        Your brother was trying to get control of his

18   eleven-month old daughter?

19   A    Yes.

20   Q    And he'd been accused of being physically abusive

21   to the daughter's mother?

22            MS. CHU:  Objection.

23            THE COURT:  Objection sustained.

24            Jurors, disregard.

25   Q    Were you aware of any illnesses your brother might

V. Wilson - People - Cross/Mr. Walensky

1    have had?

2        A    What illnesses?

3        Q    Well, were you --

4             Did you ever visit your brother in a hospital when

5    he had stomach surgery?

6        A    No.

7        Q    Were you aware he had stomach surgery?

8        A    No, I did not.

9        Q    Were you aware he had a long-standing problem

10   with --

11                MS. CHU:  Objection.

12                THE COURT:  Objection is sustained.  Jury is

13        to disregard it.

14       Q    Did your brother abuse alcohol?

15                MS. CHU:  Objection.

16                THE COURT:  Sustained.

17                MR. WALENSKY:  No further questions.

18                THE COURT:  You may step down.  Thank you.

19                (Whereupon, Victoria Wilson stepped down from

20        the witness stand and exited the courtroom.)

21                THE COURT:  Call your next witness.

22                MS. CHU:  People call Mr. Donet Robinson.

23                (Whereupon, there was a brief pause in the

24        proceedings.)

25                SERGEANT:  Ready for the witness?

Robinson - People - Direct/Ms. Chu

1          THE COURT:  Yes.

2          (Whereupon, Donet Robinson entered the

3      courtroom and took the witness stand.)

4          THE CLERK:  Please raise your right hand.

5          Do you solemnly swear or affirm the testimony

6      that you're about to give will be the truth, the whole

7      truth and nothing but the truth, so help you God?

8          THE WITNESS:  Yes.

9          THE CLERK:  Put your hand down.

10         Please state your name.

11         THE WITNESS:  Donet Robinson.

12         THE CLERK:  Spell your first name.

13         THE WITNESS:  D-O-N-E-T.

14         THE CLERK:  Thank you.

15         THE COURT:  Mr. Robinson, just pull your chair

16     up and in answering the questions just put your lips

17     towards the microphone, okay.

18         Go ahead.  Proceed.

19         MS. CHU:  Thank you.

20  D O N E T     R O B I N S O N, called as a witness by and

21         on behalf of the People of the State of New York,

22         after having been first duly sworn, was examined

23         and testified as follows:

24  DIRECT EXAMINATION

25  BY MS. CHU:

Robinson - People - Direct/Ms. Chu

| 1 | Q | Good afternoon, Mr. Robinson. |
|---|---|---|

1    Q    Good afternoon, Mr. Robinson.

2    A    Good afternoon.

3       THE COURT:  You gotta say it.

4    A    Yes, good afternoon.

5    Q    Okay.

6       Can you tell me, how old are you, sir?

7    A    Seventy-one.

8    Q    And what do you do for a living?

9    A    I'm retired right now.  I'm not doing anything.

10    Q    Are you familiar with a location of 832 Bushwick

11 Avenue?

12    A    Yes.

13    Q    And how long --

14       How do you know that location?

15    A    I live there.

16    Q    Do you have any role that you play for the building

17 itself?

18    A    Take care of it.

19    Q    So you're like a landlord?

20    A    Uh-huh.

21    Q    Yes?

22    A    Yes.

23    Q    Do you own it?

24    A    My wife own it.

25    Q    Now, can you tell me, you said you lived in that

mc

78

Robinson - People - Direct/Ms. Chu

1   building?

2       A    Yes.

3       Q    Did you know someone by the name of Anthony Wilson?

4       A    Yes.

5       Q    How did you know him?

6       A    He was a tenant.

7       Q    Now, 832 Bushwick Avenue, is there a cross street

8   that's near where that building is?

9       A    Kosciuszko and Bushwick.

10      Q    That's the corner?

11      A    Yes.

12      Q    Now, can you tell me, where did Anthony Wilson live

13  in 832 Bushwick Avenue?

14      A    On Kosciuszko.

15      Q    He entered on the Kosciuszko side?

16      A    Yes.

17      Q    Where were you living in 832 Bushwick Avenue?

18      A    On the Bushwick Avenue side.

19      Q    So you were around the corner?

20      A    Yes.

21      Q    Now, could you hear if anything was going on in his

22  apartment from where you were in your apartment?

23      A    No.

24      Q    Now, how long had Mr. Wilson lived in that

25  building?

mc

Robinson - People - Direct/Ms. Chu

1     A    About a year, year-and-a-half.

2     Q    And can you tell me, what arrangements did he have

3 as far as the rent was concerned?

4     A    He had Section 8 and also Welfare.

5     Q    So how did the rent get paid?

6     A    Section 8 paid one part and Welfare paid the other

7 part.

8     Q    So did Mr. Wilson have to give you what he got from

9 Section 8 and Welfare or did it get mailed directly to you?

10    A    No, it comes from -- Section 8 send it to us and

11 the Welfare also send it to us.

12    Q    Once you received those things from Section 8 as

13 well as Welfare, is there anything that you have to get him

14 to sign with regard to his rent?

15    A    The Welfare rent.

16    Q    Now, did he have any roommates?

17    A    He had a friend.

18    Q    Okay.

19          Was that the woman that he had a baby with?

20    A    Yes.

21    Q    Okay.

22          Did there come a time when she moved out of that

23 apartment?

24    A    Yes, I believe so.

25    Q    Do you remember when it was that she moved out?

Robinson - People - Direct/Ms. Chu

1    A    Not exactly.

2    Q    Now, on January 3rd, 2012, did there come a time

3  when you actually entered into Anthony Wilson's apartment?

4    A    That's when I went to check for the mail.

5    Q    Check for...

6    A    Mail.

7    Q    For mail?

8    A    Yes.

9    Q    Meaning mail you get in the post office?

10   A    Yes.

11   Q    Now, had you ever visited his apartment to deliver

12  the mail to him?

13   A    No.

14   Q    Where did the mail get dropped off for that

15  location?

16   A    832 Bushwick Avenue.

17   Q    That is on the Bushwick side?

18   A    Yes.

19   Q    In order for Mr. Wilson to get his mail he had to

20  exit his apartment and go to your entrance?

21   A    Yes.

22   Q    Can you tell me, did you ever take any of the mail

23  that belonged to Mr. Wilson and go and try to deliver it

24  under his door?

25   A    Yes.

Robinson - People - Direct/Ms. Chu

1    Q    And can you tell me, on January 3rd, 2012, did you

2   do that as well?

3    A    January 3rd?  I believe that was the day that I

4   came into the apartment.

5    Q    Yes.

6         Why did you go in the apartment?

7    A    Because he wasn't picking up the mail.  It was like

8   on the floor, you know, next to the gate of the door.

9    Q    The gate of the door?

10    A    Uh-huh.  There's a gate.

11    Q    Had you ever delivered mail there before and it

12   hadn't been picked up?

13    A    It hadn't been picked up.

14    Q    When you went January 3rd, it was still there?

15    A    Yes.

16    Q    You had a key to his apartment?

17    A    Yes.

18    Q    Had you ever been inside his apartment to do

19   regular maintenance or repairs?

20    A    Maintenance, yes.

21    Q    Can you tell me, how did Mr. Wilson keep his

22   apartment?

23    A    He -- it was a neat apartment.

24    Q    Now, when you entered into Mr. Wilson's apartment

25   on January 3rd, 2012, did you ever have to use your key?

Robinson - People - Direct/Ms. Chu

1      A     Yes.

2      Q     So was the door locked?

3      A     Yes.

4      Q     Was there any sign that there had been any forced

5  entry into the door at all?

6      A     No.

7      Q     What did you do or -- sorry.

8            What happened after you entered his apartment?

9      A     Well, when I opened up the door, when I looked into

10  the place, it looked like it was some red stuff on the floor.

11  I don't know exactly what it was, but it was orange looking.

12  And it was like stuff on the -- on the -- what you call it,

13  the countertop, you know, like red stuff was just like messed

14  up.

15      Q     Can you tell me, was that normally how Mr. Wilson

16  kept his apartment?

17      A     No, not -- I haven't been there that many times but

18  he kept the apartment pretty neat.

19      Q     It wasn't like you saw it on January 3rd?

20      A     No, no.

21      Q     Did you ever look in the other side of his

22  apartment, other than what you saw initially when you walked

23  in?

24      A     Yes.  When I get ready to walk out, I went to check

25  behind the door because the door, I have to shut it, so when

mc

Robinson - People - Direct/Ms. Chu

1   I went to look behind it, I see him laying on the bed.

2       Q    You saw Mr. Wilson laying on the bed?

3       A    Laying on the bed.

4       Q    How does the door to Mr. Wilson's apartment open,

5   you have to pull it towards you or push it?

6       A    It goes in.

7       Q    It goes in?

8       A    Yes.

9       Q    You actually had to peek around the door?

10      A    Right, right.

11      Q    You said you saw him...where was he?

12      A    Laying in the bed.

13      Q    Can you tell me, how was his body when you saw him?

14      A    His back was facing me and his head was facing the

15  wall in front of him.

16      Q    Did you go to touch him at all?

17      A    No, I didn't.  I didn't step no further when I

18  looked around that door.

19      Q    Can you tell me, was the apartment -- how was that

20  apartment heated?

21      A    Steam heat.

22      Q    Does a tenant have the ability to turn off the

23  steam heat so there is no more heat coming into the

24  apartment?

25      A    Yes.

mc

84

Robinson - People - Direct/Ms. Chu

1        MR. WALENSKY:  Objection to the leading, your

2    Honor.

3        THE COURT:  Don't lead the witness.

4    A    Answer the question?

5    Q    How does the heat work inside the apartment?

6    A    Well, if he wants to turn the heat on, he can turn

7    it on or turn it off.  But it -- it's controlled by a

8    thermostat.

9    Q    Can you tell me, how did Mr. Wilson normally keep

10   that apartment?

11   A    Well, --

12       MR. WALENSKY:  Objection.

13       If he knows.

14       THE COURT:  If you know.

15   A    Say that again.

16       THE COURT:  If you know.

17   A    Well, actually, I don't know how he keep the

18   apartment.

19       THE COURT:  Sustained as far as the question

20   is too open ended.

21   Q    When you went in on January 3rd, 2012, what was the

22   temperature?  Let me ask you, what was the temperature like?

23   A    It was cool.

24   Q    It was cool?

25   A    It was cool.

mc

Robinson - People - Direct/Ms. Chu

1    Q    Okay.

2         Now, you said once you saw him you immediately

3    stepped out of the apartment?

4    A    Uh-huh.

5    Q    Did you lock the door?

6    A    Yes.

7    Q    And then what did you do?

8    A    I called my wife and I called the police.

9    Q    Did there come a time when the police came to the

10   apartment?

11   A    Uh-huh.

12   Q    Yes?

13   A    Say that again.

14   Q    Did there come a time when police actually

15   responded based upon your 911 call?

16   A    Yeah, they came.

17   Q    Now, do you remember the last time that you saw Mr.

18   Wilson prior to January 3rd, 2012, if you remember?

19   A    Could have been like two months, maybe.

20        MS. CHU:  Now, at this time, your Honor, if I

21        can have the witness -- I am going to show him a couple

22        of photographs.

23        THE COURT:  Go ahead.

24   Q    Mr. Robinson, taking a look at People's Number 3

25   for identification -- I'm sorry, 3 in evidence.

mc

Robinson - People - Direct/Ms. Chu

1              (Whereupon, the exhibit was displayed.)

2      Q     Do you recognize that?

3      A     Yes.

4      Q     What is that?

5      A     That's the apartment.

6      Q     Mr. Wilson's apartment?

7      A     Yes.  That's the door to the apartment.

8      Q     If I were standing here looking at this, if I were

9   taking this picture, what street would this be (indicating)?

10     A     Kosciuszko.

11     Q     Taking a look at People's 4 in evidence.

12              (Whereupon, the exhibit was displayed.)

13     Q     Do you recognize what this is a picture of?

14     A     Yes.

15     Q     What is that a picture of?

16     A     That's a picture of the apartment.

17     Q     Okay.

18           Now, you had mentioned that there were some sort of

19   red or orange stuff.  Do you see it in this picture?

20     A     Yes, I see it.

21     Q     There's like a remote.

22              THE COURT:  A laser pointer.

23     Q     It has a red button.  That's a laser pointer.

24     A     Right there (indicating).

25              MS. CHU:  Let the record reflect he is

mc

Robinson - People - Direct/Ms. Chu

1          pointing just inside the door.

2          Q    If you walk in?

3          A    Uh-huh.

4          Q    Now, Mr. Robinson, taking a look at People's Number

5   5 in evidence, do you recognize this?

6          A    Yes.

7          Q    What part of the apartment is this?

8          A    That's right in front of the door.

9          Q    Okay.

10               Do you see -- is that the kitchen area?

11         A    Yes, that's the kitchen area.

12         Q    Based upon the times when you have actually entered

13  the apartment before January 3rd, 2012, was it -- did he ever

14  keep his apartment like this?

15         A    No.

16         Q    Taking a look at People's 7 in evidence.

17               (Whereupon, the exhibit was displayed.)

18         Q    Do you recognize that?

19         A    Yeah, but I didn't see it like that.

20         Q    Okay.

21               You weren't all the way in the apartment?

22         A    No.  When I peeked around the door.

23         Q    Was that the approximate area where you saw Mr.

24  Wilson's body when you looked and saw him on the bed?

25         A    Yes.

mc

Robinson - People - Cross/Mr. Walensky

1    Q    Thank you very much.

2             MS. CHU:  And if I can just have one moment,

3    your Honor.

4             (Whereupon, there was a brief pause in the

5    proceedings.)

6             MS. CHU:  Thank you.  I have no further

7    questions.

8             THE COURT:  Lights, please.

9             THE WITNESS:  That's it?

10            THE COURT:  No, no.

11            Cross.

12   CROSS-EXAMINATION

13   BY MR. WALENSKY:

14   Q    Mr. Robinson, when Mr. Wilson lived in that

15   apartment with his lady friend, did you ever hear them

16   arguing?

17   A    No.

18   Q    Were the police ever called to that apartment?

19            MS. CHU:  Objection.

20            THE COURT:  Sustained.

21            You have to speak into the microphone, sir.

22            THE WITNESS:  Okay.

23            THE COURT:  Go ahead.

24   Q    Only if you know, do you know if --

25            MS. CHU:  Objection.  That was just sustained,

LeBlond - People - Direct/Ms. Chu

1       that question.

2                   THE COURT:  I don't know what the question is

3       now.

4                   What is your question?

5       Q    Was his girlfriend at the time ever escorted out of

6  the apartment by police officers?

7                   MS. CHU:  Objection.

8                   THE COURT:  Sustained.

9                   MR. WALENSKY:  No further questions.

10                   THE COURT:  You may step down.

11                   Thank you.

12                   COURT OFFICER:  You may step down, sir.

13                   (Whereupon, Donet Robinson stepped down from

14       the witness stand and exited the courtroom.)

15                   THE COURT:  Go ahead.

16                   MS. CHU:  The People call Richard LeBlond.

17                   THE COURT:  What's the name?

18                   MS. CHU:  Richard LeBlond.  He wasn't on the

19       witness list because I didn't know who it was.

20                   THE COURT:  How do you spell his last name?

21                   MS. CHU:  L-E-B-L-A-N-D.

22                   COURT OFFICER:  Ready for the witness?

23                   THE CLERK:  Yes.

24                   (Whereupon, Richard LeBlond entered the

25       courtroom and took the witness stand.)

LeBlond - People - Direct/Ms. Chu

1          THE CLERK:  Please raise your right hand.

2          Do you solemnly swear or affirm the testimony

3     you're about to give will be the truth, the whole truth

4     and nothing but the truth, so help you God?

5          THE WITNESS:  I do.

6          THE CLERK:  Please state your name.

7          THE WITNESS:  Investigator Richard LeBlond.

8          THE CLERK:  Spell your last name.

9          THE WITNESS:  L-E-B-L-O-N-D.

10         THE CLERK:  L-E-B --

11         THE WITNESS:  Larry, Oscar, Nora, David.

12         THE CLERK:  Thank you.

13         THE COURT:  All right, proceed.

14         MS. CHU:  Thank you.

15  R I C H A R D     L E B L O N D, called as a witness by and

16         on behalf of the People of the State of New York,

17         after having been first duly sworn, was examined

18         and testified as follows:

19  DIRECT EXAMINATION

20  BY MS. CHU:

21     Q    Good afternoon, Mr. LeBlond.

22     A    Good afternoon.

23     Q    By whom are you employed?

24     A    New York City Human Resources Administration.

25     Q    In what capacity do you work?

LeBlond - People - Direct/Ms. Chu

```
 1     A     I'm an investigator.

 2     Q     Can you tell me, what are your duties and

 3  responsibilities as an investigator for HRA?

 4     A     I investigate allegations of Welfare fraud

 5  committed by individuals or groups.

 6     Q     How long have you worked for HRA?

 7     A     Almost six years.

 8     Q     Can you explain to the members of the jury what HRA

 9  does?  What are their duties?

10              MR. WALENSKY:  Objection, your Honor.

11              May we approach?

12              THE COURT:  Want to frame your question

13        differently?

14              MS. CHU:  Okay.

15     Q     Are you familiar with what Welfare is?

16     A     Yes.

17     Q     Can you tell me, does that have any part in what

18  you do for HRA?

19     A     Yes.

20     Q     What is Welfare?

21     A     It's also known as public assistance.  It's

22  generally broken down into three program areas.

23              MR. WALENSKY:  Your Honor, note my continuing

24        objection to this testimony.

25              Could we please have a sidebar with the
```

mc

LeBlond - People - Direct/Ms. Chu

1        Reporter?

2                        THE COURT:  No, I'll let it go in.

3        Q    You said there are three different types of public

4   assistance?

5        A    There are three main programs, which would be cash

6   assistance, Medicaid benefits, and SNAP or food stamp

7   benefits.

8        Q    Can you tell me, how would someone go about

9   obtaining public assistance?

10       A    They would apply at their local job center.

11       Q    How is it that HRA determines whether they get cash

12  benefits, Medicaid benefits or food stamp benefits?

13       A    Depends on -- you have to be a resident of New York

14  City.  It depends on, usually, your income and your assets.

15       Q    Now, are there any rules for how a client can use

16  their benefits?

17       A    Yes.  Depending on which program it would be.  For

18  example, food stamp benefits can only be used for food items.

19       Q    Okay.

20            What about cash benefits?

21       A    There is no regulation on cash benefits.  You can

22  use the cash for whatever you want.

23       Q    And how is it that a client actually can use their

24  benefits, like are they given anything, do they have to

25  use -- like in the old days you were actually given paper,

mc

LeBlond - People - Direct/Ms. Chu

1    right?

2         A    So now it's through a benefit card.  It's basically

3    like a bank card.  All your benefits are on one single card,

4    so if you go to the store and make a purchase for a loaf of

5    bread, you use that card along with your PIN number.  If you

6    go to the doctor or a pharmacy or dentist, you also provide

7    that card, like it would be your health coverage card.

8         Q    Now, if you were to enter a store, let's say, and

9    try and get either cash benefits or food stamp benefits, are

10   you always required to use a PIN or can you give the actual

11   I.D. number?

12        A    You are always required to use your PIN number.

13        Q    Now, can you tell me, does HRA keep records of the

14   transaction history of their clients?

15        A    We do.

16        Q    Can you tell me, did there come a time in May of

17   2012 when you were contacted by a Detective Christopher

18   Scandole?

19        A    Yes.

20        Q    And can you tell me, did you provide him with any

21   records as a result of his contact with you?

22        A    I did.

23        Q    Whose records did you provide him with?

24        A    The records for Anthony Wilson and Atara Wisdom.

25        Q    Were you given a timeframe or a time period that

LeBlond - People - Direct/Ms. Chu

1  you were supposed -- that you were giving them the records

2  for?

3      A    I was.

4      Q    What's the timeframe?

5      A    September 1st, 2011 until May 31st, 2012.

6      Q    Now, were those records kept in the regular course

7  of business for the Human Resources Administration?

8      A    Yes.

9      Q    And can you tell me, is it part of the regular

10 course of business to record the use of benefits on the card?

11     A    Yes.

12     Q    And is it also in the regular course of business

13 for you to produce and maintain the transaction history for

14 your clients' accounts?

15     A    Yes.

16     Q    Were you a custodian of those records?

17     A    Yes.

18     Q    What does that mean, to be a custodian of the

19 records?

20     A    We -- we have and hold the history of the

21 transactions.

22          MS. CHU:  At this time, your Honor, if I can

23     show the witness People's -- I can deem this People's 43

24     and 44.

25          (Whereupon, the exhibits were shown to

mc

LeBlond - People - Direct/Ms. Chu

1    counsel.)

2              (Whereupon, the documents was marked as

3    People's Exhibits 43 and 44 for identification.)

4              (Whereupon, the exhibits were handed to the

5    witness.)

6              MR. WALENSKY:  Your Honor, may we have a

7    sidebar?

8              THE COURT:  Come on up.

9              (Whereupon, a sidebar conference was held off

10   the record.)

11             THE COURT:  You have an objection to the

12   introduction of these records?

13             MR. WALENSKY:  Yes, your Honor, I do.

14             THE COURT:  All right.  Objection is noted and

15   overruled.

16             Proceed.

17   Q    Mr. LeBlond, can you take a look at what's been

18   marked People's 43 for identification and tell me, what is

19   that?

20   A    This is the transaction history, the EBT

21   transaction history or Electronic Benefit Transfer history of

22   Anthony Wilson.

23   Q    Can you tell me, what time period is that for?

24   A    September 1st, 2011 to May 31st, 2012.

25             THE COURT:  What are the dates?

LeBlond - People - Direct/Ms. Chu

1       THE WITNESS:  September 1st, 2011.

2       THE COURT:  September 1st, 2011 to when?

3       THE WITNESS:  May 31st, 2012.

4       THE COURT:  Okay.

5   Q     Who created that transaction history for Mr.

6   Wilson?

7   A     Who -- who printed it?

8   Q     Right.

9         Were you the one that provided that to Detective

10  Scandole?

11  A     I was.  I was.

12  Q     Can you tell me, do those EBT records pertain to

13  the account that's in the name of Anthony Wilson?

14  A     Yes, they do.

15      MS. CHU:  At this time, your Honor, I would

16      like to move that into evidence as People's 43.

17      MR. WALENSKY:  Objection.

18      THE COURT:  Objection is noted.  Overruled.

19      (Whereupon, the document was marked as

20      People's Exhibit 43 in evidence.)

21      MR. WALENSKY:  I would request another

22      curative instruction to the jury.

23      THE COURT:  There's no need to do that.

24      Proceed.  Let's go.

25  Q     Mr. LeBlond, can you tell me, taking a look at

LeBlond - People - Direct/Ms. Chu

1   People's 44 for identification, do you recognize that

2   document?

3       A    Yes.

4       Q    What is that document?

5       A    This is the transactions, the EBT, Electronic

6   Benefit Transfer transactions for Atara Wisdom.

7       Q    How is it that you can recognize that that's what

8   that is?

9       A    I obtained this record, I printed this record.

10      Q    For Detective Scandole?

11      A    Correct.

12           MS. CHU:  Now, at this time, your Honor, I

13      would offer that into evidence as People's 44.

14           THE COURT:  Same objection.

15           MR. WALENSKY:  Same objection.

16           THE COURT:  Overruled.

17           Electronic Benefits...what is the T?

18           THE WITNESS:  Transfer.  That's the T.

19           (Whereupon, the document was marked as

20      People's Exhibit 44 in evidence.)

21           THE COURT:  Go ahead.

22      Q    Looking at the EBT records that pertain to Mr.

23   Wilson, do you have a copy of that on you?

24      A    I do.

25           MS. CHU:  So, your Honor, if I can have the

mc

LeBlond - People - Direct/Ms. Chu

1     exhibits so I can put them on the board?

2                 THE COURT:  Go ahead.

3                 (Whereupon, the exhibits were handed to

4     counsel.)

5                 THE COURT:  Lights, please.

6                 (Whereupon, the exhibit was displayed.)

7     Q     So taking a look at People's 43 in evidence, you

8     stated that this was the record, the transaction history for

9     Mr. Wilson.  Where on this document do you see his name?

10    A     Under Receip name, or recipient's name is what it

11    stands for, here (indicating).

12    Q     Anthony Wilson, right here (indicating)?

13    A     Correct.

14    Q     What are the different --

15          What are all the different pieces of information

16    that are -- that you can learn based upon this transaction

17    history?

18    A     You would learn -- the basics are the name of the

19    store where a transaction took place, the address of that

20    store.

21    Q     Okay?

22    A     The card number which was used.

23    Q     Okay?

24    A     The date and time of the transaction.

25          What type of transaction was it, was it a debit or

LeBlond - People - Direct/Ms. Chu

1    was it a credit.

2         Q    Okay?

3         A    Was the card, the physical card, swiped or was the

4    card number keyed in.

5              And then the amount completed, which is how much

6    you made the purchase for and then the balance remaining.

7         Q    Okay.

8              Now, I just scrolled across the top of People's 43

9    on the first page.  Can you tell me, what is DB in this

10   column here, DB, CR, IND?

11        A    That's the debit or credit indicator.  So, CR would

12   be credit, where your card is being credited money.

13        Q    Okay?

14        A    Or DB, debit, where you go and make a transaction

15   and money is debited off the card.

16        Q    You also had mentioned that there is a difference

17   in the card entry type, whether it's swiped versus keyed in.

18        A    Correct.

19        Q    Can you tell me where you would see that on this

20   exhibit, on page 1?

21        A    Right.  So under the "card entry type" column it

22   would either have S or a K.  S would be swiped, meaning a

23   physical benefit card was swiped through the machine.  If for

24   some reason the magnet strip on the card is broken and it

25   can't be read by the machine, the card number can be punched

LeBlond - People - Direct/Ms. Chu

1   into the machine.

2       Q    So it's manually put in?

3       A    Correct, which would be K.

4       Q    So on the first two entries, which are these two,

5   CR, that was monies that were put into the account?

6       A    Correct.  That was his benefit update, his monthly

7   allotment.

8       Q    Now, did Mr. Wilson have cash benefits related to

9   his HRA benefits?

10      A    He did.

11      Q    Did he also have food stamp benefits?

12      A    He did.

13      Q    If I can just direct your attention to -- I'm

14  sorry.

15          Taking a look at this first page of People's 43 in

16  evidence, can you tell me where were -- can you tell where

17  and the frequency that Mr. Wilson or that Mr. Wilson's card

18  was used in September of 2011?

19              THE COURT:  You mean the site?

20              MS. CHU:  The location of where he was using

21      it, right.

22      A    In September of 2011?

23      Q    2011, right.

24      A    It would be 1075 Broadway, 1117 Broadway -- these

25  are all in Brooklyn, New York -- 1173 Broadway, 928 Broadway,

LeBlond - People - Direct/Ms. Chu

1    1184 Broadway, 1076 Broadway, 1082 Broadway.

2         Q    Did that continue into November -- I'm sorry --

3    October and November?

4         A    Yes, along with some other locations.

5         Q    Okay.

6              So mostly around Broadway where he was or where the

7    card was being used?

8         A    Yes.

9         Q    Taking a look at page 2 of People's 43.  For

10   November 22, 2011 where was the terminal that he used, that

11   the card was used at?

12        A    It was at 1254 Broadway, Brooklyn, New York.

13        Q    Now, starting December 6th of 2011, was the card

14   used at different locations than what you just previously

15   mentioned?

16             THE COURT:   September 6th?

17             MS. CHU:   December 6th, 2011.

18        A    Yes.

19        Q    Now, where was the card being used?

20        A    At 6241 Rockaway Avenue, Brooklyn, 146 East 98th

21   Street, Brooklyn, 80 East 93rd Street, and it goes on back to

22   Rockaway Avenue.

23             MR. WALENSKY:   Can we have the dates?

24             THE WITNESS:   So December 6th was 241 Rockaway

25        Avenue.   Again December 6th, 146 East 98th Street.

LeBlond - People - Direct/Ms. Chu

1      Again on December 6th, 80 East 93rd Street.   December

2      22nd, back at 241 Rockaway Avenue.   January 7th, 2012,

3      706 Ralph Avenue.   Again on the 7th, 1033 Rutland Road,

4      again.

5                  THE COURT:   What date?

6                  THE WITNESS:   Again on January 7th.

7                  THE COURT:   Yes.

8                  THE WITNESS:   706 Ralph Avenue was the first

9      one on January 7th.

10                 THE COURT:   What was the second one?

11                 THE WITNESS:   1033 Rutland Road, Brooklyn, New

12     York.

13     Q      Can you tell me, of those transactions that you

14     just mentioned, starting from December 6th on, were there --

15     remember you had mentioned either swiped the card or keyed in

16     the card?

17     A      Yes.

18     Q      How was the item used?

19     A      So for the first transaction on December 6th, 2011

20     at 241 Rockaway Avenue, that transaction was keyed in.

21     Q      "Keyed in" meaning the person just entered --

22     A      The card number was punched into the machine.

23     Q      And so that would be indicated by -- under the card

24     entry type -- a K?

25     A      Correct.

mc

LeBlond - People - Direct/Ms. Chu

1    Q    And the S, if that was under that column, that

2    would mean that the actual card was swiped?

3    A    Correct.

4    Q    Thank you.

5         Now, taking a look at People's 44 in evidence, can

6    you tell me, does the record give the same type of

7    information for Atara Wisdom?

8    A    Yes.

9    Q    Can you tell me, starting in September of 2011,

10   where are the places that that card was being used?

11   A    In September 2011 the card was being used at 912

12   Gates Avenue, 1011 Rutland Road, 846 Broadway, 361 Sutter

13   Avenue, 441 Mother Gaston Boulevard.

14              THE COURT:   4-1...

15              THE WITNESS:   4-4-1.

16              THE COURT:   Oh, 4-4-1.

17              THE WITNESS:   Mother Gaston Boulevard.

18              1113 Rutland Road.

19   Q    Okay.

20        And taking a look at People's 44, page 2.

21              (Whereupon, the exhibit was displayed.)

22   Q    I'm sorry.

23        Yes, People's 44, page 2, towards the bottom.

24        Is there any entries for December of 2011?

25   A    Yes.

mc

LeBlond - People - Direct/Ms. Chu

1     Q     Where was the card utilized on those dates?

2     A     They were used at 8811 Flatlands Avenue, 1011

3   Rutland Road, 980 Rutland Road.

4                 THE COURT:  Go ahead.

5     Q     Can you tell me, how do you determine whether or

6   not the cash benefit -- I'm sorry, withdrawn.

7                 Did Ms. Wisdom obtain cash benefits on her HRA

8   account?

9     A     She did.

10    Q     Did she also obtain food stamps?  Was she getting

11  food stamps?

12    A     She was.

13    Q     And can you tell me how --

14                Can you tell from this chart that you have whether

15  or not the cash benefit was being used or the Welfare part

16  was being used -- I'm sorry -- the food stamp was being used?

17    A     That would be under the "transaction type."

18    Q     Okay.

19    A     Column for transaction.

20    Q     Towards the right-hand side, that is this column

21  right here (indicating)?

22    A     It would be the one after the debit or credit

23  indicator.

24    Q     Towards the right-hand side of the chart?

25    A     Correct.

LeBlond - People - Direct/Ms. Chu

1    Q    And can you tell me, what are the different codes

2  that you have here, 301, 201?

3    A    So the different codes would differentiate between

4  whether it was food stamp, debit or credit or cash debit or

5  credit, if it's just your monthly allotment being credited to

6  your card.

7    Q    Okay.

8         Can you tell me, what was the code for cash, for a

9  cash advance?  What do they call it?

10   A    A cash purchase or transaction would be 306.

11   Q    So 306 indicates that you actually received cash

12 back for when you used your card?

13   A    That is incorrect.  306 would indicate if it was a

14 cash transaction, so I made a cash purchase.

15   Q    So you could buy anything you want with that?

16   A    Right.

17        MR. WALENSKY:  Objection, your Honor.  This is

18     so far afield of the narrative essence of this.

19        THE COURT:  Overruled.

20   Q    So with the benefit card that Mr. Wilson had he was

21 able to actually obtain cash just to have in his hand?

22   A    Yes.

23   Q    And what would be the code for that?

24   A    306.

25   Q    You said that it has -- you have to actually make a

mc

LeBlond - People - Direct/Ms. Chu

1   purchase.  I don't understand what you meant.

2       A    So using your benefit card, if you wanted to -- if

3   you had cash benefits and you wanted to buy a nonfood item,

4   because you can only buy food with food stamps or food stamp

5   benefits, you could go to the register and let's say it was a

6   roll of paper towels, you would use your benefit card, the

7   cash portion of your benefit card and swipe it like you would

8   your bank card or credit card.

9       Q    So my question for you is, then, the benefits that

10  were being received by Ms. Wilson -- I'm sorry -- Mr. Wilson

11  and Ms. Wisdom, allow them to actually get cash in their

12  hand?

13      A    Yes, you can also draw cash from an ATM.

14      Q    What would be the code for that?

15      A    I believe it would also be 306.

16      Q    Is there any way to distinguish between whether

17  they had purchased something at a store that's nonfood items

18  versus actually getting cash in hand?

19               MR. WALENSKY:  Objection, your Honor.  This

20      has nothing to do with the narrative.

21               THE COURT:  Objection sustained.

22      Q    Okay.

23               Now, can you tell me, directing your attention to

24  People's 44, I guess it's the third page, did there come a

25  time when the EBT card for Ms. Wisdom was used outside of

mc

LeBlond - People - Direct/Cross

1    Brooklyn?

2                    MR. WALENSKY:   Objection.

3         A    Yes.

4                    THE COURT:   Overruled.

5                    The record's in evidence.   Overruled.

6         Q    Where was it being used?

7         A    It was being used in Pennsylvania, in New Jersey,

8    along with Brooklyn.

9         Q    Along with Brooklyn?

10        A    Yes.

11                   MS. CHU:   Thank you very much.

12                   I have no further questions for this witness.

13                   THE COURT:   Cross.

14   CROSS-EXAMINATION

15   BY MR. WALENSKY:

16        Q    Sir, do you have any way of knowing who was using

17   the benefits cards of Anthony Wilson subsequent to November

18   30, 2011?

19        A    No.

20        Q    Could have been anybody, right?

21        A    Anyone with his PIN number.

22        Q    Anyone with his PIN, anyone with access to it?

23        A    Correct.

24        Q    Could be any number of people, couldn't it?   Could

25   be one person, right?

LeBlond - People - Cross/Mr. Walensky

1      A     Could.

2      Q     Could be two or three, right?

3      A     It could.

4      Q     Now, there were charges at different stores in

5    different areas, right?

6      A     Yes.

7      Q     In your experience as an investigator, sometimes

8    several people will use a benefits card, isn't that true?

9                THE COURT:  Reframe your question.

10     Q     Okay.

11              You've had experience with stolen benefits cards?

12     A     I have.

13     Q     Benefits cards sometimes being used by --

14              Stolen cards sometimes used by several people or

15    you just don't know?  You don't know?

16     A     I'm going to say I don't know.

17              MR. WALENSKY:  No further questions.

18              THE COURT:  You may step down.  Thank you.

19              THE WITNESS:  Thank you.

20              (Whereupon, Richard LeBlond stepped down from

21        the witness stand and exited the courtroom.)

22              THE COURT:  Come on up.

23              (Whereupon, a sidebar conference was held off

24        the record.)

25              THE COURT:  All right, call your next witness.

1          MS. CHU:  The People call Police Officer

2     Garrett Marsden.

3          (Whereupon, there was a brief pause in the

4     proceedings.)

5          COURT OFFICER:  You ready for the witness?

6     Judge, ready for the witness?

7          THE COURT:  Yes.

8          COURT OFFICER:  Witness entering.

9          (Whereupon, Police Officer Garrett Marsden

10     entered the courtroom and took the witness stand.)

11          THE CLERK:  Please raise your right hand.

12          Do you solemnly swear or affirm the testimony

13     you're about to give will be the truth, the whole truth

14     and nothing but the truth, so help you God?

15          THE WITNESS:  Yes.

16          THE CLERK:  Please put your hand down.

17          State your name for the record.

18          THE WITNESS:  Officer Marsden.

19          THE CLERK:  Spell your first and last name.

20          THE WITNESS:  G-A-R-R-E-T-T.

21          THE CLERK:  Last name?

22          THE WITNESS:  M-A-R-S-D-E-N.

23          THE CLERK:  Can you give your shield number?

24          THE WITNESS:  4797.

25          THE CLERK:  Your command?

P.O. Marsden - People - Direct/Ms. Chu

1             THE WITNESS:  Currently in harbor.

2             THE CLERK:  Thank you.

3             You can have a seat.

4             THE COURT:  Pull up your chair.

5             When you respond to the question, just put

6        your lips close to the microphone.

7             THE WITNESS:  Sure.

8             THE COURT:  Proceed.

9             MS. CHU:  Thank you.

10   G A R R E T T      M A R S D E N, Police Officer, Shield No.

11             4797, Harbor, New York City Police Department,

12             called as a witness by and on behalf of the

13             People of the State of New York, after having been

14             first duly sworn, was examined and testified as

15             follows:

16   DIRECT EXAMINATION

17   BY MS. CHU:

18        Q    Good afternoon, Officer.

19        A    Good afternoon.

20        Q    How long have you been a member of the New York

21   City Police Department?

22        A    For nine years.

23        Q    And you said you're currently assigned to Harbor.

24   What is that?

25        A    That's correct.  It's police on the water.

mc

P.O. Marsden - People - Direct/Ms. Chu

1   Q   Okay.

2       Can you tell me, how long have you been there?

3   A   For two years.

4   Q   Where were you prior to that?

5   A   In the 83rd Precinct, Bushwick.

6   Q   And prior to the 83rd Precinct?

7   A   In the 7-5 Precinct, East New York.

8   Q   How long were you at the 83rd Precinct?

9   A   For about six years.

10  Q   Now, can you just tell me --

11      Directing your attention to January 3rd, 2012.

12  A   Yes.

13  Q   Were you working as an officer in the 83rd Precinct

14  on that date?

15  A   Yes, I was.

16  Q   Can you tell the members of the jury what hours you

17  were assigned to work?

18  A   Day tour, seven o'clock to about 3:30 in the

19  afternoon.

20  Q   Were you in uniform that day?

21  A   Yes, I was.

22  Q   And were you assigned to a car?

23  A   Yes.

24  Q   Was the car marked or unmarked?

25  A   It was a marked police car, the numbers were 3307.

mc

P.O. Marsden - People - Direct/Ms. Chu

1    Q    Now, were you assigned to a partner?

2    A    Yes.

3    Q    Who was that?

4    A    Officer Ortiz.

5    Q    And what is Officer Ortiz' first name?

6    A    Juana.

7    Q    Now, can you tell me, at approximately 10:30 A.M.

8  what, if anything, happened?

9    A    At 10:32 A.M. I received a job for an aided victim

10 at 832 Bushwick Avenue.

11   Q    Did they give you --

12        When you got the job, did they give you a code for

13 it?

14   A    It was a 10-54.

15   Q    What is a 10-54?

16   A    Aided victim.

17   Q    Did you actually respond to 832 Bushwick Avenue?

18   A    Yes, I did.

19   Q    Approximately how long after you were notified did

20 you actually arrive at the location?

21   A    At about 10:58 I arrived at the location, less than

22 a half an hour, 26 minutes.

23   Q    Okay.

24        Can you tell me, 10-54 for a male aided, is that --

25 are there different urgencies for different codes?

mc

P.O. Marsden - People - Direct/Ms. Chu

1      A     Yes.

2      Q     10-54 male aided, is that an urgent code?

3      A     There are other codes that are more urgent than

4   that.

5      Q     Can you tell me, describe 832 Bushwick for me.

6      A     The address that I responded to was a side entrance

7   off of Bushwick Avenue.  I believe it was on Kosciuszko

8   street or avenue.

9      Q     And when you got to the location, did you actually

10  speak with anybody that was there with regard to the call

11  that came in?

12     A     Yes, I spoke with the owner of the building, the

13  landlord.

14     Q     All right.

15           Can you tell me, did he then bring you someplace?

16     A     Yes, he bought me to the side entrance where he

17  then opened the door for me.

18     Q     Tell us what you saw?

19     A     At that time the door opened up, I entered a large

20  apartment building or apartment room.  Off to the left-hand

21  side was a bed where I observed a dead male or deceased male

22  lying in the bed.

23     Q     Can you tell me, what was the state of the actual

24  apartment itself?

25     A     It was -- it was a mess.  There was clothing and

mc

P.O. Marsden - People - Direct/Ms. Chu

1    towels randomly placed throughout the -- or laid throughout

2    the apartment.  There was blood.  There was a foul odor as

3    soon as the door opened up as well.

4         Q    Can you tell me how long you were at the scene?

5         A    If I can refer to my notes?

6              THE COURT:  You may.

7         A    10:30 in the morning until -- actually, it's 10:58

8    when I arrived and I was relieved by Officer Carlin at 3:55

9    P.M.

10        Q    Now, while you were there did Crime Scene Unit

11   detectives arrive and process the scene?

12        A    Yes, they did.

13        Q    Now, was an ambulance called to the scene while you

14   were there?

15        A    Yes, I believe they were there when I arrived but

16   they had not made entry.

17        Q    They had not gone in?

18        A    Not until I arrived.

19        Q    Okay.

20             And I want to direct your attention now to January

21   the 9th of 2012.

22             Did you go to the Office of the Chief Medical

23   Examiner here in Brooklyn?

24        A    Yes, I did.

25        Q    And what was your purpose for going there?

mc

P.O. Marsden - People - Direct/Ms. Chu

1    A    To identify the deceased's body.

2    Q    Now, did you learn the name of the individual that

3 you saw deceased on the bed inside of the apartment at 832

4 Bushwick Avenue?

5    A    Yes, I did.  It was Anthony Wilson.

6    Q    Now, did you identify his body on January 9th, 2012

7 at the office of the M.E.?

8    A    At 11:10 hours.

9    Q    Is that the same person that you had seen

10 apparently dead on the bed?

11    A    That's correct.

12    Q    Now, did you actually get to look at the body when

13 you were inside the apartment?

14    A    Yes, I did.

15    Q    Could you see any obvious injuries at all?

16    A    There were small puncture wounds on the chest and

17 there was some little blood.

18    Q    Other than the duties and responsibilities that you

19 just described, did you have any further involvement in the

20 case?

21    A    I just secured the crime scene.

22         MS. CHU:  At this time, your Honor, if I can

23    just show the witness some exhibits.

24         THE COURT:  Go ahead.

25    Q    Taking a look at People's 3 in evidence.

mc

P.O. Marsden - People - Direct/Ms. Chu

1          (Whereupon, the exhibit was displayed.)

2     Q    What is that a picture of?

3     A    That's the entry door to the apartment.

4     Q    That you responded to on January 3rd, 2012?

5     A    That's correct.

6     Q    Okay.

7          Can you tell me, taking a look at People's 4 in

8  evidence, what is that a picture of?

9     A    That's the door open into the apartment room.

10    Q    Does this picture fairly and accurately depict how

11 the scene appeared when you arrived at around 10:58 A.M. on

12 January 3rd, 2012?

13    A    Yes, it does.

14    Q    Taking a look at People's 5 in evidence.

15         (Whereupon, the exhibit was displayed.)

16    Q    Do you recognize this photo?

17    A    Yes, I do.

18    Q    What is that a picture of?

19    A    It's also the apartment.

20    Q    Is this photograph a fair and accurate depiction of

21 how the apartment appeared when you were there on January

22 3rd, 2012?

23    A    Yes, it is.

24    Q    Taking a look at People's 6 in evidence.

25         (Whereupon, the exhibit was displayed.)

mc

P.O. Marsden - People - Direct/Ms. Chu

1    Q    Do you recognize this?

2    A    Yes, I do.

3    Q    And what is this a picture of?

4    A    This is also the apartment.

5    Q    If you were to walk into the apartment, which way

6    would you turn in order to see this?

7    A    I believe the door's on the right there.

8    Q    That is the front entrance?

9    A    Yes.

10   Q    Thank you.

11        And taking a look at People's 7 in evidence.

12             (Whereupon, the exhibit was displayed.)

13   Q    What are we looking at here?

14   A    Once you enter the apartment through that door,

15   that would be to the left.  It's -- it's the deceased male

16   lying on the bed.

17   Q    Is that the --

18        Does this picture fairly and accurately depict how

19   the victim appeared when you first arrived at the location on

20   January 3rd, 2012?

21   A    Yes.

22   Q    Now, you had mentioned that you saw some what

23   appeared to be puncture wounds to the chest of the victim.

24   A    That's correct.

25   Q    I just ask you to take a look at People's Number 11

                    P.O. Marsden - People - Direct/Ms. Chu

1    in evidence.

2                    (Whereupon, the exhibit was displayed.)

3         Q    Taking a look at People's 11, do you see the

4    puncture wounds that you remember seeing on January 3rd,

5    2012, in this photograph?

6                    MR. WALENSKY:  Objection as to form.

7                    THE COURT:  What was the question?

8                    (Whereupon, the referred-to question was read

9         back by the Reporter.)

10                   THE COURT:  Overruled.

11        Q    You can answer.

12        A    Yes, I do.

13        Q    Can you just --

14             There's a remote in front of you with a red button.

15   That is a laser pointer.

16        A    Yes.

17        Q    Can you show me where it is that you saw what you

18   say appeared to be puncture wounds?

19        A    There (indicating), right there (indicating).

20                   MS. CHU:  Let the record reflect that he is

21        referring to the bottom portion of People's 11 in

22        evidence as well as directly above that.

23                   If I can have one moment, your Honor.

24                   (Whereupon, there was a brief pause in the

25        proceedings.)

                                                              mc

Proceeding

1          MS. CHU:  I have no further questions for this

2    witness.

3          THE COURT:  Cross.

4          Any cross?

5          MR. WALENSKY:  No, your Honor.

6          THE COURT:  Thank you very much.  You may step

7    down.

8          (Whereupon, the Police Officer Marsden stepped

9    down from the witness stand and exited the courtroom.)

10          THE COURT:  All right, ladies and gentlemen,

11    at this time we're going to adjourn for the luncheon

12    recess.

13          Do not discuss the case amongst yourselves or

14    with anyone else.  Do not visit the place where the

15    alleged crimes occurred.  Have no contact with any of

16    the parties involved, including the Court.

17          And, again, do not resort to utilizing any

18    electronic digital devices for the purpose of obtaining

19    any information about this matter.

20          Have a very good lunch and you return 2:15, No

21    later.

22          Thank you.

23          Just leave your books there.

24          (Whereupon, the Jury exited the courtroom.)

25          THE COURT:  All right, the Court is in recess

mc

Proceeding

```
 1        until 2:15.

 2              MR. WALENSKY:  Your Honor, I would like to

 3        make a motion.

 4              THE COURT:  Just one minute.

 5              MR. WALENSKY:  Your Honor, we were litigating

 6        whether the representative from Welfare should testify

 7        at all and Ms. Chu had represented that she needed it as

 8        a narrative, to complete the narrative.  She spoke about

 9        one date, December 6th, and the Court was giving an

10        instruction to the jury regarding the fact that, you

11        know, she -- first I think the Court's instruction, one,

12        wasn't strong; two, was error, in terms of the people

13        never made a Molineux application.

14              THE COURT:  So what?  They were -- they were

15        negligent in making it earlier but there is no rule that

16        says they could not make it at that time.

17              MR. WALENSKY:  And they far exceeded the

18        narrative, the extent.  I think the Court also stated

19        that it didn't matter that she had used the card in New

20        Jersey or -- I mean, what probative value that she had

21        it in New Jersey, in Queens, in all these areas.  By

22        allowing in those records, that does, in escence,

23        contradict your own ruling and --

24              THE COURT:  How?

25              MR. WALENSKY:  The People could have
```

mc

Proceeding

1    established --

2              THE COURT:  How?

3              MR. WALENSKY:  By letting it in, it's showing

4    where this is used all over and you had said that the

5    prejudice exceeded the probative value.

6              Additionally, --

7              THE COURT:  I didn't say --

8              MR. WALENSKY:  Additionally, the length of

9    time that --

10             THE COURT:  I didn't say the prejudice

11   exceeded the probative value.  I said that the probative

12   value exceeded any prejudice.  And, so, I don't

13   understand your argument.

14             MR. WALENSKY:  Additionally, what I'm saying

15   is that the People, without putting all of the records

16   into evidence, which extend for a long period of time,

17   they just wanted to show that subsequent to November

18   30th the card was used.  It could have been used --

19             THE COURT:  What purpose would it serve the

20   People to put in all of the records?

21             MR. WALENSKY:  Because it shows, even though

22   you are saying she is not charged with this uncharged

23   crime, it prejudices her because it's showing that this

24   card is being used by somebody.

25             THE COURT:  It's already established that the

Proceeding

1    card was used.

2              MR. WALENSKY:  Yeah.

3              THE COURT:  And I already ruled on the issue

4    and the records, business records came in under the

5    business record rule and he testified as to what these

6    records showed.  They are in evidence.

7              MR. WALENSKY:  It was incorrect to allow all

8    those records in under the business record rule.  It

9    could have been an exhibit and they could have just

10   argued on this date and this date, that would have been

11   fine, it would have been testified that the card was

12   used on several subsequent dates and then the People are

13   then comparing the usage and this is why -- this, to me,

14   was disingenuous.  People are comparing the usage, how

15   Atara Wisdom used this card at these stores on these

16   dates and subsequent to the death of Mr. Wilson the card

17   was used at the same stores that Atara Wisdom

18   frequented.  And that's not being shown to show the

19   narrative, that is being shown to show that she used

20   those cards and that this was a dishonest act and it

21   doesn't do anything about narrative, all it does is

22   support the fact that the People are trying to get

23   across she took the card, she used it illegally and

24   she's bad for that reason and it is used far in excess.

25              I think there has to be at least another

mc

Proceeding

1    attempt at a curative instruction.  But, actually, I am

2    moving for a mistrial regarding these errors.

3               THE COURT:  The application is denied.  At the

4    close of the case I will reinstruct the jury on the

5    Molineux.

6               MR. WALENSKY:  Please.  Thank you.

7               THE COURT:  All right, 2:15.

8               Thank you.

9               (Whereupon, a lunch recess was held.)

10              *                *                *

11              A F T E R N O O N    S E S S I O N

12              *                *                *

13              THE CLERK:  Come to order, Part 2 is back in

14   session.

15              THE COURT:  Okay, bring the defendant back

16   out.

17              Who is your next witness?

18              MS. CHU:  My next witness is Richard Schoen,

19   he's from the 911 Communications Department,

20   S-C-H-O-E-N.

21              THE COURT:  Richard, you say?

22              MS. CHU:  Richard, yes.

23              THE CLERK:  Case back on trial.  Defendant is

24   present with her attorney, all parties present.

25              (Whereupon, there was a brief pause in the

Proceeding

1          proceedings.)

2                    THE COURT:  Bring the jury in.

3                    COURT OFFICER:  Jury entering.

4                    (Whereupon, the Jury entered the courtroom.)

5                    THE CLERK:  All the jurors are present and

6          seated.

7                    Both sides waive the roll call?

8                    MS. CHU:  Yes.

9                    THE CLERK:  Mr. Walensky?

10                   MR. WALENSKY:  Yes.

11                   THE COURT:  Call your next witness.

12                   MS. CHU:  The People call Mr. Richard Schoen.

13                   (Whereupon, there was a brief pause in the

14         proceedings.)

15                   COURT OFFICER:  Ready for the witness?

16                   THE COURT:  Yes.

17                   COURT OFFICER:  Witness entering.

18                   (Whereupon, Richard Schoen entered the

19         courtroom and took the witness stand.)

20                   THE CLERK:  Raise your right hand.

21                   Do you solemnly swear or affirm the testimony

22         that you're about to give will be the truth, the whole

23         truth and nothing but the truth, so help you God?

24                   THE WITNESS:  Yes.

25                   THE CLERK:  Please state your name for the

Schoen - People - Direct/Ms. Chu

1                record.

2                          THE WITNESS:  My first name is Richard,

3          Schoen, spelled S-C-H-O-E-N.

4                          THE CLERK:  S-C-H --

5                          THE WITNESS:  O-E-N.

6                          THE CLERK:  Thank you.

7                          THE COURT:  Proceed.

8    R I C H A R D      S C H O E N, called as a witness by and

9                on behalf of the People of the State of New York,

10                after having been first duly sworn, was examined

11                and testified as follows:

12   DIRECT EXAMINATION

13   BY MS. CHU:

14        Q    Good afternoon, Mr. Schoen.

15        A    Hi.

16        Q    By whom are you employed?

17        A    By the New York City Police Department.

18        Q    And in what capacity do you work for the New York

19   City Police Department?

20        A    I'm presently a police communication technician.

21        Q    So are you a civilian or are you an officer?

22        A    Civilian.

23        Q    What is --

24             What are your duties and responsibilities as a

25   technician?

1      A      Well, part of them I am in the capacity of tape

2   technician and we retrieve the messages and as far as 911

3   calls and radio transmissions and route them to the

4   appropriate District Attorney's office.

5      Q      Okay.

6             In that capacity are you a legal custodian for 911

7   records?

8      A      Yes.

9      Q      How long have you worked for the department?

10     A      Thirty-eight years.

11     Q      And how long have you been in the Communications

12   section?

13     A      I've been in Communications for 38 years and tape

14   and records for 25 years.

15     Q      Can you explain to the members of the jury what

16   happens when someone calls 911?

17     A      Once the 911 call is received by a 9-11 operator,

18   it is the duty of the operator to screen the call to see if

19   police, fire or medical assistance referral is necessary.

20     Q      Okay.

21            Can you tell me, as the 911 operator, can you see

22   the phone number that the 911 caller is calling from?

23     A      Yes.

24     Q      Have you had an opportunity to review 911

25   recordings from November 29th, 2011?

mc

Schoen - People - Direct/Ms. Chu

1    A    Yes.

2    Q    And did that include the 911 call from a number

3  (347) 793-1940?

4    A    Yes.

5    Q    Were those records kept in the regular course of

6  business for the Police Department?

7    A    Yes.

8    Q    Is it part of the regular course of business to

9  record calls received by 911 operators?

10   A    Yes.

11   Q    And is it also in the regular course of business

12 for you to produce and maintain a master copy of that

13 recording?

14   A    Yes.

15   Q    Are there duplications made of the master

16 recordings?

17   A    Yes.

18   Q    Are they changed in any way from the original 911

19 call?

20   A    No.

21   Q    Are you a custodian of those records?

22   A    Yes.

23        MS. CHU:  At this time, your Honor, if I can

24    have the witness shown People's 42 in evidence subject

25    to connection.

mc

1                THE COURT:   Show him.

2                (Whereupon, the exhibit was handed to the

3        witness.)

4        Q      Mr. Schoen, taking a look at People's 42 in

5   evidence, do you recognize that?

6        A      Yes.

7        Q      What do you recognize that to be?

8        A      It's one of our disks that we had put a call on to.

9        Q      Do you make the copies on to that?

10       A      Yes.

11       Q      Are there markings that are made on the actual disk

12   itself?

13       A      Yes, there is a title called New York City Police

14   Department.  We also put the tape room location and job

15   number.

16       Q      What were the tape room job number and location

17   assigned to that disk that you have in your hands?

18       A      The tape room job number is 201224557.

19       Q      Is there a reference to the phone number that

20   called 911 on that tape?

21       A      Yes.

22       Q      What is that?

23       A      (347) 793-1910 is listed on here.

24       Q      Okay.

25              But according to your records, is it from 1940?

Schoen - People - Direct/Ms. Chu

1    A    That's what the request has, yes.   That is the

2  printed request.

3    Q    Can you tell me, is there a date of that 911 call

4  on that disk?

5    A    11/29/11.

6         MS. CHU:   Okay.

7         At this time, your Honor, I'd like to play

8    People's 42 for the witness, and I do have a transcript

9    for easy reading for any of the jurors, if they want, or

10   anyone in the courtroom.

11        THE COURT:   All right, hand them out.

12        By the way, ladies and gentlemen, the

13   transcript is merely an aid, it's not in evidence.   It's

14   to help you understand the tape that's being played.

15        (Whereupon, there was a brief pause in the

16   proceedings.)

17        THE COURT:   Go ahead.

18        MS. CHU:   Thank you.

19   Q    Mr. Schoen, I'm going to play for you a tape.   If

20  you can just tell me whether or not you recognize it.

21   A    Okay.

22        (Whereupon, the exhibit was played in open

23   court.)

24   Q    Mr. Schoen, do you recognize what was played for

25  you?

mc

Schoen - People - Direct/Ms. Chu

1     A     This was on the disk, the 9-11 call.

2     Q     Is that an exact reproduction of the 911 call that

3  was made on November 29th, 2011, number (347) 793-1940,

4  according to your records?

5     A     Best of my knowledge, yes.

6               MS. CHU:  At this time, your Honor, I would

7        move it into evidence.  It was subject to connection.

8               THE COURT:  Any objection?

9               MR. WALENSKY:  I'd like to voir dire.

10              THE COURT:  Go ahead.

11  VOIR DIRE

12  BY MR. WALENSKY:

13    Q     Mr. Schoen, did you listen to this -- withdrawn.

14          How do you know that this is the recording?  How

15  can you identify this as the actual recording?

16    A     As far as I know, that the call was received -- the

17  call has the operator's number on it which gives me an idea

18  that the operator is handling this and she conducted an

19  interview.  That is the best --

20    Q     Do you know --

21          How do you know that it hasn't been changed in any

22  way or that it is accurate?

23    A     I don't know.

24              MR. WALENSKY:  Thank you.

25              I object, your Honor.

mc

Proceeding

1              THE COURT:  Objection is overruled.

2              All right.

3              MS. CHU:  Just one more question.

4    DIRECT EXAMINATION

5    BY MS. CHU:  (Continued)

6         Q    Mr. Schoen, from the records, can you tell me, what

7    time did that call come in?

8         A    There is no exact time that I have.  The only thing

9    I have is the timeframe.  The call was received between 0020

10   hours and through 0040 hours, which is military time, which

11   is 20 minutes after midnight, between 20 and 40 minutes after

12   midnight, twelve o'clock.

13        Q    On November 29th, 2011?

14        A    Yes.

15             MS. CHU:  Thank you very much.  I have nothing

16        further.

17             MR. WALENSKY:  Nothing further.

18             THE COURT:  You may step down.  Thank you.

19             (Whereupon, Richard Schoen stepped down from

20        the witness stand and exited the courtroom.)

21             THE COURT:  Come on up, please.

22             (Whereupon, a sidebar conference was held off

23        the record.)

24             THE COURT:  Call your next witness, please.

25             MS. CHU:  The People call Shakeema Fortune.

Fortune - People - Direct/Ms. Chu

1            (Whereupon, there was a brief pause in the

2       proceedings.)

3            COURT OFFICER:  Ready for the witness?

4            THE COURT:  Yes.

5            COURT OFFICER:  Witness entering.

6            (Whereupon, Shakeema Fortune entered the

7       courtroom and took the witness stand.)

8            THE CLERK:  Raise your right hand, please.

9            Do you solemnly swear or affirm that the

10      testimony that you are about to give will be the truth,

11      the whole truth and nothing but the truth, so help you

12      God?

13           THE WITNESS:  Yes.

14           THE CLERK:  Please state your name for the

15      record.

16           THE WITNESS:  Shakeema Fortune.

17           THE CLERK:  Spell your first and last name.

18           THE WITNESS:  Spell it?

19           THE CLERK:  Yeah.

20           THE WITNESS:  S-H-A-K-E-E-M-A.

21           THE CLERK:  Last name.

22           THE WITNESS:  F-O-R-T-U-N-E.

23           THE CLERK:  Thank you.  You can have a seat.

24           THE COURT:  Just move up.  Sit up close to the

25      microphone and respond to the question by putting your

Fortune - People - Direct/Ms. Chu

1          mouth close to the microphone.

2                    Proceed.

3     S H A K E E M A      F O R T U N E, called as a witness by

4               and on behalf of the People of the State of New

5               York, after having been first duly sworn, was

6               examined and testified as follows:

7     DIRECT EXAMINATION

8     BY MS. CHU:

9          Q    Good afternoon, Ms. Fortune.

10         A    Good afternoon.

11         Q    What is your age?

12         A    Twenty-nine.

13         Q    And can you tell me, did you know someone by the

14    name of Anthony Wilson?

15         A    Yes, I did.

16         Q    How did you know Mr. Wilson?

17         A    He considered me as his sister.

18         Q    So did you --

19              When did you first meet him?

20         A    It was a long time.  He used to baby-sit my kids

21    for me.

22         Q    And can you tell me, did you know where he lived

23    back in November of 2012?

24         A    Yes.

25         Q    I'm sorry, November 2011.

Fortune - People - Direct/Ms. Chu

1      A      Yes.

2      Q      Where was he living?

3      A      On Kosciuszko and Broadway.

4      Q      Okay.

5             The cross street, was it near Bushwick Avenue at

6      all?

7      A      Yes.

8      Q      Can you tell me, had you ever been to his house

9      before?

10     A      Yes.

11     Q      And can you describe for me how he used to keep the

12     house?

13     A      Very clean.  He's a neat man.

14     Q      Did you know, also, someone by the name of Matthew

15     Shepard?

16     A      Yes.

17     Q      How did you know him?

18     A      He grew up around us in the neighborhood.

19     Q      Now I want to direct your attention to around

20     November 20th, sometime before Thanksgiving, in the year

21     2011.

22            Did there come a time when you went to visit

23     Anthony Wilson?

24     A      Yes.  And I was asking him was he going out with us

25     that day.

Fortune - People - Direct/Ms. Chu

1    Q    Okay.

2         Did you actually go into his apartment?

3    A    Yes.

4    Q    Can you tell me, was anyone else in the apartment

5    with Mr. Wilson when you came to visit?

6    A    Yes.

7    Q    Who else was there?

8    A    A young woman named Renee.

9    Q    How did you know her name was Renee?

10   A    That is what he had introduced me when I walked in,

11   he said this is Renee I was talking about.

12   Q    Okay.

13        Did he give you an indication as to what type of a

14   relationship he had with her?

15   A    Yeah, it was his girlfriend.

16   Q    Now, did he say that in front of her, when he

17   introduced you to her?

18   A    Yes.

19   Q    This is Renee, my girlfriend?

20   A    Yes.

21   Q    Can you tell me, where was Renee when you first

22   walked in or while you were in the apartment?

23   A    She was sitting in a brown single chair.

24   Q    The single chair?

25   A    Yes.

Fortune - People - Direct/Ms. Chu

```
 1     Q     Where was Mr. Wilson?

 2     A     On his bed.

 3     Q     Now, did you have an arrangement with Mr. Wilson to

 4  go out that night?

 5     A     Yes.

 6     Q     After you were in the apartment did there come a

 7  time when you asked him whether or not he was going to come

 8  with you?

 9     A     Yes, and she was bothered and said no, he's not

10  going anywhere.

11     Q     Now, once she said that, did you -- what did you

12  do?

13     A     I was kind of upset because he said he was going

14  out with us, but I then left.

15     Q     And the relationship that was had between the two

16  of them, he had indicated that was his girlfriend?

17     A     Right.

18     Q     Had he spoken to you about her before the day that

19  you were there in his apartment?

20     A     Yeah, uh-huh.

21     Q     He had?

22     A     Yes.

23     Q     And how did he refer to her as?

24     A     He just -- like we had conversations, he asked

25  me -- well, he was telling me something about her, like prior
```

mc

Fortune - People - Direct/Ms. Chu

1  to when I came in.

2            MR. WALENSKY:  I'm sorry, I missed something

3      about what --

4            THE WITNESS:  He was telling me like something

5      about their relation before I came in, like prior to

6      coming into the apartment.

7      Q    Now, tell me, once you left the apartment, was

8  Renee still in the apartment with him?

9      A    Yeah.

10     Q    And then where did you go?

11     A    I went to the pool hall with my baby father.  Me

12  and him left.

13     Q    Now, when was the next time you saw Anthony Wilson?

14     A    I didn't.  I was coming around, I was asking about

15  him and I haven't seen him.

16     Q    So you never saw him since that day?

17     A    Since that day.

18     Q    That was sometime before Thanksgiving of 2011?

19     A    Yes.

20            MS. CHU:  Okay.

21            Thank you very much.  I have nothing further.

22            I'm sorry, if I can just have the photographs,

23      People's 2 through 41.

24            (Whereupon, the exhibits were handed to

25      counsel.)

mc

Fortune - People - Direct/Ms. Chu

1              MS. CHU:  If we can have the lights.

2              THE CLERK:  The lights.

3              MS. CHU:  Yes, the lights, otherwise you can't

4        see the picture.

5     DIRECT EXAMINATION

6     BY MS. CHU:   (Continued)

7        Q     Taking a look at People's Number 3 in evidence.

8              (Whereupon, the exhibit was displayed.)

9        Q     Ms. Fortune, can you take a look at that photograph

10    and tell us, what did you recognize, if at all?

11       A     Yes, that is his front door and his window.

12       Q     Okay.

13             Can you tell me, you said you had been to this

14    apartment before?

15       A     Right.

16       Q     That is where you went when you saw him just before

17    Thanksgiving in 2011?

18       A     Yes.

19       Q     Okay.

20             Taking a look at People's 4 in evidence.

21             (Whereupon, the exhibit was displayed.)

22       Q     Do you recognize that portion of his apartment?

23       A     Yes.

24       Q     Now, can you tell me, did you ever see his

25    apartment in that condition before?

Fortune - People - Direct/Ms. Chu

1   A   No.

2   Q   And how many times had you been to that apartment?

3   A   Well, a few times.

4   Q   Okay.

5       Taking a look at People's 5 in evidence.

6           (Whereupon, the exhibit was displayed.)

7   Q   Do you recognize that?

8   A   The kitchen area, yes.

9   Q   And is that how he had it at any time that you had

10  been there?

11  A   Uh-uh, never.

12  Q   You have to answer out loud.

13  A   Never.

14  Q   I am just going to ask that you take a look at

15  People's 7 in evidence.

16          (Whereupon, the exhibit was displayed.)

17  Q   Do you recognize this photograph?

18          MR. WALENSKY:  Objection.

19          THE COURT:  Sustained.

20  Q   I am asking, you had mentioned that when you

21  went --

22          MR. WALENSKY:  I ask it be removed.

23          THE COURT:  Sustained.

24          MS. CHU:  Your Honor, may we approach?

25          THE COURT:  No.

mc

Fortune - People - Direct/Cross

1    Q    You had mentioned that there was...a brown single

2  chair is it?  That is what you called it?

3    A    Yes.

4    Q    Where was it in the apartment?

5    A    It was like directly next to the bathroom, like

6  maybe like on a single wall.

7    Q    And can you tell me --

8              MS. CHU:  Your Honor, if I can show this

9        exhibit.  It's to see if she sees it in the photograph.

10             THE COURT:  Sustained.

11   Q    You said it was right by the bathroom?  Yes?

12   A    Yes.

13   Q    Did Mr. Wilson have a sofa other than that single

14 chair in that apartment?

15   A    No.

16   Q    Okay.

17       Was that the chair that she was sitting in, the one

18 right by the bathroom?

19   A    Yes.

20             MS. CHU:  Thank you very much.  I have nothing

21       further.

22             THE COURT:  Cross.

23 CROSS-EXAMINATION

24 BY MR. WALENSKY:

25   Q    Good afternoon, Ms. Fortune.

mc

Fortune - People - Cross/Mr. Walensky

1     A    Good afternoon.

2     Q    Ms. Fortune, you said you were like brother and

3  sister.  How long did you know him?

4     A    For about twelve, thirteen years.

5     Q    Twelve to thirteen years.

6          He babysat your kids?

7     A    Yes.

8     Q    How old were your kids in 2011, November 2011?

9     A    Well, my son was still small.  He was about going

10  on three, three.

11    Q    The last couple of years, say from 2009 to 2011,

12  did you -- did you see Mr. Wilson often?

13    A    Yeah.

14    Q    Did you see him once a week?

15    A    I see him maybe four, five times a week.

16    Q    And Mr. Wilson was a heavy drinker, wasn't he?

17          MS. CHU:  Objection.

18    A   Not that I --

19          THE COURT:  Sustained.

20          MS. CHU:  Objection.

21          MR. WALENSKY:  Your Honor, may we have a

22     sidebar?  This is -- I think it's --

23          THE COURT:  You got a question of the witness?

24          MR. WALENSKY:  Yes.

25          THE COURT:  Ask a question.

142

Fortune - People - Cross/Mr. Walensky

1   Q    Did you ever drink with Mr. Wilson?

2        MS. CHU:  Objection.

3   A    No.

4        THE COURT:  She said no.

5   Q    Did you ever see him drunk?

6   A    No.

7   Q    Did you ever see him stoned?

8   A    No.

9        MS. CHU:  Objection.

10       THE COURT:  She said no.

11  Q    Never, okay.

12       He spoke to you about his personal life?

13  A    No.

14  Q    He didn't, but you're a close friend?

15  A    Right.

16  Q    Did he speak to you about any health issues he

17  might have?

18       MS. CHU:  Objection.

19       THE COURT:  Sustained.

20  Q    What did you talk about when you saw him?

21       MS. CHU:  Objection.  What's the relevance?

22       THE COURT:  I'll allow it.

23  Q    What did you talk about when you saw him?

24  A    School, the kids, he was leaving, going to his

25  mother house.

mc

Fortune - People - Cross/Mr. Walensky

1   Q   Did you talk about his child?

2   A   Yeah, I seen his child a few times.

3   Q   The infant?

4   A   Yeah.  He was mad when the baby mother left.

5   Q   The baby's mother left?

6   A   Yeah.

7   Q   And took the baby with her?

8   A   Yeah.

9   Q   Now, you're saying that --

10      When you did talk, he talked to you about his

11  personal relationships?

12              MS. CHU:  Objection.

13              THE COURT:  Just yes or no.

14  A   No, not really.

15  Q   Well, he told you that this young woman living with

16  him was his girlfriend?

17  A   When I walked in, he said this is my girlfriend.  I

18  asked to use the bathroom.  I asked was he going with us, he

19  told me no.

20  Q   Okay.

21      So you met her that one time?

22  A   That one time.

23  Q   And how old was Anthony, if you know?

24  A   Forty-something.  Forty-something.  I can't

25  remember.

Fortune - People - Cross/Mr. Walensky

1    Q    Early 40s?

2    A    Yeah.

3    Q    Do you know, did you see him during the month of

4  October of 2011?

5    A    Do I remember seeing him?

6    Q    Yeah.

7    A    Not that I can remember.

8    Q    Did you see him when you were going out November of

9  2011?

10   A    We was going out May, we went out June.

11   Q    That day you went over.

12   A    It was rapid, we were going out.

13   Q    That particular day, when was it?

14   A    It was late at night, like nine, ten o'clock.

15   Q    Late what night?

16   A    The night we were going to go out but he stayed.

17   Q    That's fine.  I'm trying -- was it in October, was

18  it in November?

19   A    November.

20   Q    Was it a week before Thanksgiving, two weeks before

21  Thanksgiving?

22   A    Yeah, two weeks before.

23   Q    About two weeks before?

24   A    Uh-huh.

25            THE COURT:  That's yes or no.  You gotta

Fortune - People - Cross/Mr. Walensky

1       answer yes or no.

2                  THE WITNESS:  Okay.

3                  THE COURT:  Go ahead.

4       Q     Was it a weekend night?

5       A     I can't remember.

6       Q     Do you know if Anthony was on public assistance?

7                  THE COURT:  Objection sustained.

8       Q     Do you know how Anthony made a living?

9                  MS. CHU:  Objection.

10                 THE COURT:  Sustained.

11                 MR. WALENSKY:  One moment.

12                 (Whereupon, there was a brief pause in the

13      proceedings.)

14      Q     Where were you going that night, the night you were

15      going out?

16      A     To play pool.

17      Q     To play pool?

18      A     Yes.

19      Q     Did Anthony play pool with you other times?

20      A     Uh-huh.

21                 THE COURT:  Answer yes or no.

22      A     Yes.

23      Q     But he never brought --

24      A     No.

25      Q     Did he bring his baby's mother to play pool with

mc

Proceeding

1    you at any --

2              MS. CHU:  Objection.

3              THE COURT:  Sustained.

4              MR. WALENSKY:  I have no further questions.

5              THE COURT:  You may step down.  Thank you.

6              (Whereupon, Shakeema Fortune stepped down from

7    the witness stand and exited the courtroom.)

8              THE COURT:  All right, ladies and gentlemen,

9    at this time we are going to adjourn for the day.

10             Do not discuss the case amongst yourselves or

11   with anyone else.  Do not visit the place where the

12   alleged crimes occurred.  Have no contact with any

13   parties involved, including the Court.

14             Again, do not resort to utilizing any digital

15   electronic device for purpose of obtaining any

16   information about this case or contacting anyone.

17             We'll resume tomorrow at ten o'clock.

18             Thank you very much.

19             Please be here on time.

20             Just leave your books on your seats.

21             (Whereupon, the Jury exited the courtroom.)

22             MR. WALENSKY:  Your Honor?

23             THE COURT:  Yes.

24             MR. WALENSKY:  I believe that I ought to be

25   allowed to go into certain personal aspects of the

mc

147

Proceeding

1    decedent's life, if there are people who know him very

2    well and we have medical records which aren't in

3    because of your prior ruling, but which I intend to

4    pursue further through further research and perhaps

5    through testimony that would make it relevant.  But

6    these records show that he had lost half his stomach

7    due to alcohol abuse and people who know him well

8    and see him regularly would know that he drinks a

9    lot.

10            What makes it pertinent to this particular

11   case is the fact that the night in question he had an

12   alcohol level, at the time of death, so it was higher

13   even before that, of .2.

14            So, his habits regarding drinking are

15   important.  I also am trying to establish whether he

16   became aggressive if he drank or if not --

17            THE COURT:  She said that she didn't.  She

18   answered the question.

19            MR. WALENSKY:  Right.

20            THE COURT:  She answered the questions.  I

21   don't know what you're objecting to.

22            MR. WALENSKY:  I think it's making the medical

23   records more relevant in terms of rebuttal.

24            THE COURT:  Rebuttal of what?

25            MR. WALENSKY:  Because she hasn't seen him

mc

Proceeding

1    drinking, here's somebody that had half his stomach

2    removed, has known him for twelve or thirteen

3    years --

4              THE COURT:  It's not rebuttal, number one, all

5    right.

6              MR. WALENSKY:  Yes.

7              THE COURT:  You made your argument regarding

8    medical records.  I still stand by my decision, all

9    right.

10             MR. WALENSKY:  Okay.

11             THE COURT:  And the fact of the matter is in

12   evidence is the fact that he had .2 and you can explore

13   that in whatever fashion you wish.  You're trying the

14   case.

15             MR. WALENSKY:  Thank you.

16             I do have another subpoena which I may or may

17   not call, depends on whether it's pertinent, in the

18   future.

19             (Whereupon, there was a brief pause in the

20   proceedings.)

21             THE COURT:  All right.

22             (Whereupon, the trial was adjourned to July 2,

23   2014.)

         *********************************

24   CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
     THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS

25   PROCEEDING.
         MARLIN CASSIDY, Senior Court Reporter

                                                        mc

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS:  CRIMINAL TERM:   PART 2
 2   -----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3                                          Indictment No.:
                   -against-               6615/2012
 4                                          (Trial)
     ATARA WISDOM,
 5
                           Defendant.
 6   -----------------------------------------X

 7
                              Supreme Courthouse
 8                            320 Jay Street
                              Brooklyn, New York 11201
 9                            July 2, 2014

10
     B E F O R E:
11
                     THE HONORABLE ALBERT TOMEI, JUSTICE
12                   (And a Jury)

13   A P P E A R A N C E S:

14           HON. KENNETH P. THOMPSON, ESQ.
                  District Attorney - Kings County
15                350 Jay Street
                  Brooklyn, New York  11201
16           BY:  PHYLLIS CHU, ESQ.
                  Assistant District Attorney
17

18           DAVID WALENSKY, ESQ.
                  Attorney for Defendant
19                910 Stuart Avenue
                  Mamaroneck, New York
20           BY:  DAVID WALENSKY, ESQ.
                      - and -
21                JOSHUA POVILL, ESQ.

22

23

24
                         MARLIN CASSIDY
25                       Senior Court Reporter
```

mc

Proceeding

1          (Whereupon, the following took place in open

2     court:)

3          THE CLERK:  Come to order, Part 2 is now in

4     session, the Honorable Albert Tomei presiding.

5          THE COURT:  Who is the first witness?

6          MS. CHU:  The phone rep and then the

7     detective.

8          THE CLERK:  This is calendar number one, case

9     on trial, Indictment 6615 of 2012, People versus Atara

10    Wisdom.  Defendant is incarcerated and produced before

11    the Court, present with her attorney.

12          Appearances are the same.

13          MS. CHU:  Your Honor, I just have one matter

14    that I would like to put on the record before we begin.

15          THE COURT:  Go ahead.

16          MS. CHU:  After preparing all my information

17    for today, I realized, after looking over the hearing

18    minutes, that there was a statement that was made by the

19    defendant the following day after she was apprehended

20    that was never litigated at the hearing.  I mentioned it

21    during my opening, and as did Mr. Walensky mentioned it

22    during his opening as well, so I didn't know how the

23    Court wanted to proceed.

24          THE COURT:  What is the statement?

25          MS. CHU:  The statement had to do with the

Proceeding

1    fact that he asked her -- after he got out of the

2    bathroom, she said she saw the victim on the bed and

3    that she took the phone the keys, the cellphone.

4              THE COURT:  She said this to who?

5              MS. CHU:  To Detective Scandole.

6              MR. WALENSKY:  It was 10:00 in the morning the

7    next day, and I was going to try to make some hay out of

8    it cross-examining the Officer, why didn't they take her

9    to Central Booking.

10             THE COURT:  This was never litigated?

11             MS. CHU:  It was not.

12             I got distracted by the Judge when I was

13   asking about the video, then I completely forgot to ask

14   it.

15             THE COURT:  Who's the Judge?

16             MS. CHU:  It was Judge Marrus.

17             Usually, when you talk about the video, you

18   then put it on, you let it play.  He was like just go

19   through the rest of your questions.  It kind of threw me

20   off.

21             I apologize, it was my fault I did not ask

22   questions about those statements.

23             However, my argument is that he opened on it,

24   I opened on it and I wasn't sure where he was going with

25   this, but there is this issue that is outstanding.

                                                          mc

Proceeding

1          MR. WALENSKY:  Well, --

2          THE COURT:  Well...go ahead.  Go ahead.

3          MR. WALENSKY:  I mean, this was an error and

4    it's not decided, and we opened and I think we both --

5    the judge had said the statement has been decided in all

6    respects but it really hadn't, so this was opened on in

7    error and also --

8          THE COURT:  Let me ask you a question.

9          What was the statement?

10         MS. CHU:  The oral statement, the written

11   statement that she signed and the videotape.

12         THE COURT:  This statement that was not

13   litigated was made when?

14         MS. CHU:  After the video.

15         MR. WALENSKY:  The next day.

16         THE COURT:  Was notice given about it?

17         MS. CHU:  Yes.

18         THE COURT:  Notice was given?

19         MR. WALENSKY:  Yes, notice was given.

20         THE COURT:  What I can do, I can do a hearing

21   now.

22         MS. CHU:  I have the Detective right outside.

23         THE COURT:  Yes, I can do that.

24         Why don't you just put on the phone rep then

25   we'll do the hearing.

mc

Proceeding

1          MS. CHU:  Okay.  Thank you.

2          THE COURT:  Get the jury.

3          (Whereupon, there was a brief pause in the

4     proceedings.)

5          THE COURT:  Bring in the jury.

6          COURT OFFICER:  Jury entering.

7          (Whereupon, the Jury entered the courtroom.)

8          THE CLERK:  All jurors are present and seated.

9          Both sides waive the roll call?

10          MS. CHU:  So waived.

11          MR. WALENSKY:  Yes.

12          THE COURT:  Call your next witness.

13          MS. CHU:  People call Norman Ray Clark.

14          (Whereupon, there was a brief pause in the

15     proceedings.)

16          COURT OFFICER:  Witness entering.

17          (Whereupon, Norman Ray Clark entered the

18     courtroom and took the witness stand.)

19          THE CLERK:  Raise your right hand.

20          Do you solemnly swear or affirm that the

21     testimony that you are about to give will be the truth,

22     the whole truth and nothing but the truth, so help you

23     God?

24          THE WITNESS:  Yes.

25          THE CLERK:  State your name for the record.

Clark - People - Direct/Ms. Chu

1              THE WITNESS:  Norman Ray Clark, III.

2              THE CLERK:  Can you spell your first and last

3      name?

4              THE WITNESS:  N-O-R-M-A-N, C-L-A-R-K.

5              THE CLERK:  Thank you.

6              THE COURT:  Go ahead.

7              MS. CHU:  Thank you.

8    N O R M A N     R A Y     C L A R K , called as a witness

9            by and on behalf of the People of the State of New

10           York, after having been first duly sworn, was

11           examined and testified as follows:

12   DIRECT EXAMINATION

13   BY MS. CHU:

14        Q    Good morning, Mr. Clark.

15        A    Good morning.

16        Q    Are you employed?

17        A    Yes, I am.

18        Q    By whom are you employed?

19        A    I work for Sprint.

20        Q    And is that the phone company?

21        A    Yes, cellphone company.

22        Q    What is your position at Sprint?

23        A    I'm a records custodian.

24        Q    What are your duties and responsibilities as a

25   records custodian for Sprint?

Clark - People - Direct/Ms. Chu

1      A      I'm responsible for maintaining as well as

2   retrieving different documents that are produced in response

3   to court orders, search warrants and subpoenas as well as

4   come to court to testify about those same documents and

5   verify them.

6      Q      Now, I just want to ask you some beginning

7   questions about recordkeeping for Sprint.

8      A      Sure.

9      Q      Now, when someone purchases a phone, does Sprint

10  maintain subscriber information for that purchaser?

11     A      Yes, we do.

12     Q      What is meant by "subscriber information?"

13     A      Primarily it's the name and address, if given,

14  contact information, as well as information about the

15  services that we provide, such as telephone number, the phone

16  they have, dates of service, those kinds of things.

17     Q      Now, as a records custodian can you authenticate

18  subscriber information of a Sprint customer?

19     A      Yes, I can.

20     Q      Now, as to billing, as a records custodian do you

21  authenticate the phone records for the Sprint customers?

22     A      Yes.

23     Q      When I say -- I am talking about incoming and

24  outgoing calls to a specific number.

25     A      Yes.

Clark - People - Direct/Ms. Chu

1    Q    Now, when someone uses a Sprint phone, is a

2    recording of the incoming and outgoing calls maintained by

3    Sprint?

4    A    We record the fact that there are calls coming in

5    and going out but we don't record the actual call itself.

6    Q    Okay.

7         Now, as a records custodian do you authenticate

8    incoming and outgoing calls for Sprint customers?

9    A    Yes.

10   Q    Now, when a person purchases a Sprint service plan,

11   does Sprint maintain the phone records and subscriber

12   information in the ordinary course of business?

13   A    Yes, we do.

14   Q    Does it matter if the phone is provided by public

15   assistance?

16   A    No.

17   Q    Are those records kept in the course of regularly

18   conducted business activity?

19   A    Yes, it is.

20   Q    And is Sprint required to keep those records for a

21   certain period of time?

22   A    Yes, we are.

23   Q    Are phone records made at the same time or shortly

24   after the time period that a person actually purchases the

25   service?

mc

Clark - People - Direct/Ms. Chu

1      A     Yes.

2      Q     And prior to testifying today did you have an

3  opportunity to review phone records regarding an

4  investigation into the death of a person by the name of

5  Anthony Wilson?

6      A     Yes, I did.

7      Q     How many numbers were you asked to review?

8      A     There were three primary numbers.

9      Q     And can you tell me, what numbers were you asked to

10 review?

11     A     I don't recall three of them off the top of my

12 head.  If I saw them, I'd recognize them.

13             MS. CHU:  All right, if I can just have this

14     shown to the witness.

15             If I can have this deemed marked People's --

16             THE CLERK:  45.

17             MS. CHU:  -- 45, 46 and 47.

18             (Whereupon, the Sprint records were marked as

19     People's Exhibits 45 through 47 for identification.)

20             (Whereupon, the exhibits were shown to

21     counsel.)

22             MR. WALENSKY:  Officer, here.

23             THE COURT:  Hats off, please.

24             (Whereupon, the exhibits were handed to the

25     witness.)

Clark - People - Direct/Ms. Chu

1          THE WITNESS:  Thank you.

2     A    Would you like me to state those three numbers now?

3     Q    Yes, please.

4     A    Okay.

5          They were (347) 793-1940, (347) 546-9337, and

6     (347) 231-3340.

7     Q    Now, what information were you required to provide

8     to us based on those three phone numbers?

9     A    I was requested to provide subscriber information

10    as well as call detail records, which would be incoming and

11    outgoing phone calls and text message transactions.

12    Q    Now, what you have in front of you, People's 45, 46

13    and 47, are those the records that you provided to our

14    office?

15    A    Yes.

16          MS. CHU:  At this time, your Honor, I would

17     offer them into evidence as People's 45, 46 and 47.

18          MR. WALENSKY:  No objection.

19          THE COURT:  In evidence.

20          (Whereupon, the Sprint records were marked as

21     People's Exhibits 45, 46 and 47 in evidence.)

22    Q    Now, were you subsequently also asked to provide

23    subscriber information for three more numbers?

24    A    Yes.

25          MS. CHU:  At this time, your Honor, if I can

mc

Clark - People - Direct/Ms. Chu

1      have the witness shown -- if we can have this deemed

2      People's 48 for identification.

3                  (Whereupon, the Sprint record was marked as

4      People's Exhibit 48 for identification.)

5                  (Whereupon, the exhibit was shown to counsel.)

6                  (Whereupon, the exhibit was handed to the

7      witness.)

8                  THE WITNESS:  Thank you.

9      Q    Mr. Clark, taking a look at People's 48, can you

10 tell me, do you recognize that?

11     A    I do recognize it.

12     Q    What is that?

13     A    This is a series of subscriber records for Sprint

14 phone numbers.

15     Q    Was that requested by our office with regard to

16 this case?

17     A    Yes, it was.

18     Q    Okay.

19          Can you tell me, what numbers were you asked for

20 subscriber information for?

21     A    (347) 231-8819, (347) 889-3277, and (347) 830-3060.

22                THE COURT:  What is the last one?

23                THE WITNESS:  (347) 830-3060.

24     Q    Okay.

25          Now, going back to -- I'm sorry.

mc

Clark - People - Direct/Ms. Chu

1      Are those the records that you provided to us based

2   upon our request for subscriber information for those three

3   numbers?

4      A    Yes.

5           MS. CHU:   At this time, your Honor, I would

6      offer that into evidence as People's 48.

7           MR. WALENSKY:   No objection.

8           THE COURT:   All right, in evidence.

9           (Whereupon, the Sprint record was marked as

10     People's Exhibit 48 in evidence.)

11     Q    Now, Mr. Clark, if you can just take a look at the

12   first one, People's 45 in evidence.

13          COURT OFFICER:   The first one on top.

14     A    Okay.

15     Q    What information, again, did you provide to us for

16   that number?

17     A    I provided subscriber information as well as

18   accompanying call detail.

19     Q    Can you tell me what the subscriber information for

20   that number --

21          Can you just tell us what the number was then tell

22   us --

23          THE COURT:   What is the number?

24     Q    -- who the subscriber was?

25          THE WITNESS:   (347) 793-1940.

mc

Clark - People - Direct/Ms. Chu

1              THE COURT:  793-1...

2      A    1940.

3           Subscribed to Anthony Wilson.

4      Q    Okay.

5           Can you tell me, are those records kept in the

6  normal course of business?

7      A    Yes.

8      Q    And were those records made at or near the time of

9  the actual occurrence?

10     A    Yes.

11     Q    Meaning when they made the phone calls?

12     A    Yes.

13     Q    Now, when a person purchases a phone from your

14  company, can you tell me, are they -- I'm sorry.  Withdraw

15  that question.

16          You said that being on public assistance does

17  not -- if the phone is gotten through public assistance that

18  would not affect what your records are?

19     A    Well, it doesn't affect in the sense that however

20  the means they get it, that we still record the information

21  that is provided to us for opening the account.

22     Q    Can you tell me, what type of service did Mr.

23  Wilson have for that phone ending 1940?

24     A    It was a prepaid phone service through Virgin

25  Mobile.

                                                        mc

Clark - People - Direct/Ms. Chu

1    Q    And "prepaid phone service," what does that mean?

2    A    Well, as opposed to receiving a monthly bill after

3    making the phone calls, this is a service where monies are

4    provided upfront and you can use the phone until the monies

5    then run out at which point in time the phone call activity

6    for outgoing calls cannot happen until new monies have been

7    added.

8    Q    Now, with prepaid phones is there a requirement

9    that the person show I.D. when they are purchasing a prepaid

10   phone?

11   A    There is not a requirement though it is suggested

12   since to be able to put money on to the account you have to

13   verify your information, so you recommend that someone put

14   something down that they are going to easily recognize such

15   as their name and their address, but it's not required.

16   Q    Okay.

17        You said that --

18        What type of plan did Mr. Wilson have on this

19   phone?

20   A    It was a prepaid.

21   Q    So did that enable him to only make voice calls or

22   can he also text?

23   A    It was for voice and for text message.

24   Q    Okay.

25        Now I just want to give you some scenarios, if you

mc

Clark - People - Direct/Ms. Chu

1    can just tell me whether or not that would affect your

2    recordkeeping at your company.

3                If someone were to -- I'm sorry.

4                If someone were making an outgoing call, would

5    every outgoing call be recorded in your records?

6        A    Yes.

7        Q    Now, what happens if the person calls someone and

8    that person doesn't pick up?

9        A    It still makes a record of it.

10       Q    Now, is there any way to tell whether or not

11   someone actually picked up the phone and there was a

12   conversation versus it goes to voicemail on the other

13   person's phone?

14       A    Not easily on outgoing calls.  We do know a couple

15   of things, that generally 25 seconds is how long it takes

16   for a phone to ring four times, so even on outgoing calls, if

17   it's around 25 seconds, then we can't be sure at all.  If

18   it's longer than 25 seconds but under a minute-and-a-half,

19   then it could still have gone to someone's voicemail and

20   that could be a time for the greeting and leave a message,

21   as an example.  Anything over two minutes you would assume

22   probably had to have some type of open line.  But even with

23   all the circumstances, we can't say what was being said or

24   if there was even conversation at all.  So, outgoing calls

25   are a little bit difficult to determine with any precision.

mc

Clark - People - Direct/Ms. Chu

1    Q    What about incoming calls?

2    A    They're easier.  On an incoming call, if it goes to

3  voicemail, our records indicate it was answered by voicemail.

4  And if it doesn't show an answer by voicemail and it's beyond

5  the 25 seconds, we can assume that there had been a

6  connection with the person picking up in some way.

7    Q    Now, what happens if the phone, your subscriber's

8  phone, rings and the caller who's calling them hangs up,

9  would that still be recorded in your records?

10   A    Yes.

11   Q    Now, is there anytime that any calls that are made

12  by that phone are not recorded at all?

13   A    All outgoing calls, as long as they reach the

14  network, meaning they connect to a cell tower, will be

15  recorded, as well as any incoming call to the phone.  Even if

16  the phone doesn't ring but the network receives it, it will

17  also be recorded since it at least made it to the network.

18  Pretty much you will see the activity, whether successful or

19  not, is recorded on our system.

20   Q    What happens if the phone is off?

21   A    Then it would still be a phone call coming in and

22  it would immediately be transferred to voicemail.

23   Q    You said this phone was a prepaid phone?

24   A    Yes.

25   Q    What happens if they ran out of minutes?

mc

Clark - People - Direct/Ms. Chu

1        A     Well, if you are out of minutes, you would see a

2    period of time where there would be no outgoing activity but

3    you continue to see incoming activity.

4              MS. CHU:  Now, if I can just have this deemed

5         People's 49A and B.

6              (Whereupon, the blowup of Sprint records were

7         marked as People's Exhibit 49A and 49B for

8         identification.)

9              THE COURT:  What is this, 40-what?

10             MS. CHU:  49A and B.

11       Q     Mr. Clark, taking a look at People's 49A, can you

12   tell me, do you recognize that?

13       A     I do.

14       Q     What is that?

15       A     It is a blowup of page 7 of 11 of the call records

16   that we've been discussing.

17       Q     Okay.

18             Can you tell me, that's contained -- this is just a

19   blowup of what is contained in People's 45?

20       A     Yes, it's a blowup of one of those pages in its

21   entirety.

22       Q     Can you look now at People's 49B for

23   identification.

24             Do you recognize that?

25       A     I do.

mc

Clark - People - Direct/Ms. Chu

1    Q    What is that?

2    A    That is also a blowup of another page from the same

3    record.

4    Q    Of 1940, the phone number ending in 1940?

5    A    Yes.

6    Q    What page is the blowup on this?

7    A    That's page 8.

8    Q    Okay.

9         Now, those are exact duplicates of what you have in

10   evidence as People's 45?

11   A    Yes.

12        MS. CHU:  At this time, your Honor, I would

13   offer it into evidence as People's 49A and B.

14        THE COURT:  Any objection?

15        MR. WALENSKY:  No.

16        THE COURT:  In evidence.

17        (Whereupon, the blowup of Sprint records were

18   marked as People's Exhibits 49A and 49B in evidence.)

19        MS. CHU:  If I can just have 49A posted on the

20   board, I mean on the easel, please.

21        (Whereupon, the exhibit was posted.)

22        MS. CHU:  Your Honor, may the witness approach

23   the exhibit?

24        THE COURT:  You may step down and approach the

25   exhibit.

Clark - People - Direct/Ms. Chu

1              (Whereupon, the witness stepped down and

2      approached the exhibit.)

3      Q     Okay.

4              Mr. Clark, if you could, can you just tell us,

5      across the center of the diagram it says -- what does it

6      say?

7      A     It says "call records for PT," that's personal

8      telephone, (347) 793-1940.

9      Q     Okay.

10             Now, each of the columns in that diagram are

11     labeled on the top.  Can you tell us, the first column, what

12     is that?

13     A     First column is calling number.  This is the phone

14     number initiating or making the phone call.

15     Q     Okay.

16             What's the next column?

17     A     The next is called number.  This is the number

18     that's ultimately receiving the phone call.  Or in the case

19     of an incoming call that went to voicemail, as we see here on

20     the fourth line down, there's a 1-1 prior to that, that means

21     the number ending in 1940, the voicemail answered as opposed

22     to a person picking up.

23     Q     Okay.

24             Now, can you tell us, for the third column what is

25     the heading?

mc

Clark - People - Direct/Ms. Chu

1    A    It's dialed digits, and this is what is dialed as

2  captured by our system to make the phone call complete.

3    Q    So is that --

4         If it has dialed digits, that means that's the

5  person who's initiating the call?

6    A    It's what the person who's initiating the call,

7  what they dialed.

8         And as you can see here, sometimes you have

9  letters.  Letters represent different keys.  Like for

10  instance, the B is the star key, the letter C indicates the

11  pound key was hit.

12   Q    What does that mean 6C?

13   A    It means they dialed six pound on their phone,

14  which, depending on the circumstances, may be trying to

15  retrieve information or it may have been a misdial since you

16  see it was a two-second duration and no one answered, didn't

17  go to that.  So that just indicates how the network received

18  it and probably hung up saying that is incomplete or a pocket

19  dial or something of those sorts.

20   Q    What is the next column?

21   A    Next is MR then the number sign.  That stands for

22  mobile roll.  In other words, the roll of the phone ending in

23  1940 in the call there is outbound, meaning being made by

24  that number, inbound being received by that number or we can

25  have it routed, and a routed call means one of two things,

mc

Clark - People - Direct/Ms. Chu

1    routed being going to voicemail or a routed call can be part

2    of an incoming call process.

3            In the Greater New York City area, as you can

4    imagine, there are a lot of people, a lot of phones and

5    there's just some pieces of equipment that do nothing more

6    than pay attention to where those phones are.  If you change

7    a couple of blocks, you can change from one area's control to

8    another.

9            So, on an inbound call, especially if you are

10   outside of your area that you normally are associated with,

11   it may have to route from the locator to the area where

12   you're at.  So, you can tell if it's voicemail by what's 1-1

13   and if it's a routed call not going to the voicemail you

14   won't see that then in that line.

15       Q    So a routed call only occurs if it either, you

16   said, goes to voicemail or someone's calling you and it's

17   routed through another number?

18       A    That is correct.  Routed through a temporary local

19   dialed number.  That's just how the network makes phone calls

20   happen behind the scene.

21       Q    Only pertains to incoming calls?

22       A    Yes.

23       Q    The next column, fifth column, what is the

24   heading?

25       A    That's start date, and makes sense, end date as

Clark - People - Direct/Ms. Chu

1    well.  The next column, this is the month, day and year, then

2    the hour, minute and second in a 24-hour format for when the

3    phone call begins and ends.  Let's say, the 24-hour format at

4    midnight it's saying 12-something, it will say 0, then

5    however many minutes.  When you get to one o'clock in the

6    afternoon it -- instead of 1:00 P.M., it will say 13, go on

7    through the hours till 23.

8         It should be noted, too, that we are talking about

9    the times there for voice calls.  In other words, actual

10   phone calls themselves, they will be local to where the call

11   is taking place.  So, New York City, that would be Eastern

12   time.  But if we see text messages, and how to identify that,

13   I will show you, text messages are always recorded in Central

14   time so you have to add an hour to that time stamp to

15   understand what time it would be in Eastern time.

16        Q    So the actual times and dates that are indicated on

17   the record that you provided, they don't account for the

18   Central standard time if it was texted?

19        A    Correct, they're showing order based on the times

20   listed but you have to do that mental math to get to the

21   difference and understand the chronology.

22        Q    Okay.

23             Now, the next column, what is that?

24        A    That is duration, and that's in seconds.  That is

25   how many seconds the network had the phone call.

1    Q    Okay.

2         What is the last column?

3    A    The last column is repoll, that is R-E-P-O-L-L.

4    That is the term we use to refer to a switch.  A switch is a

5    simple computer that controls communications.  There are

6    switches assigned to voice communication, there are switches

7    assigned to text messages.  The best way to know if it's a

8    text message, anything that is 292 to 298 inclusive, and 506

9    to 533, also inclusive, are text messaging.  Any number

10   outside of those ranges, such as the 678, the 271 that you

11   see here, those are all going to be for voice calls.  Once

12   again, it's not text message, it will be a voice call.

13   Q    Okay.

14        Now, you said this is page 7 of Mr. Wilson's phone

15   records?

16   A    Yes.

17   Q    Okay.

18        Can you tell me --

19        I want to direct your attention to the records at

20   0027 on November 29th, 2011.

21        Did Mr. Wilson's phone have a call?

22             THE COURT:  What's the O-O what?

23             MS. CHU:  0027.

24   A    On the 29th?

25   Q    Yes.

Clark - People - Direct/Ms. Chu

1    A    I see 37 but not 27.

2    Q    I'm sorry.

3         0037.

4    A    Yes, there's actually two calls at 0037.

5    Q    Can you tell me, what is the first call?

6    A    They dialed the number 8 for the first call.

7    Q    What does that mean?

8    A    Once again, they dialed number 8 then pressed

9    "send."  There's a chance it could have been a misdial or a

10   pocket dial of some sort because it shows a two-second

11   duration, which wouldn't indicate a completed call.

12   Q    What's the next number that's dialed by Mr.

13   Wilson's phone?

14   A    911.

15   Q    Can you tell me, what time did that phone call --

16   what time was that phone call made?

17   A    It was at 12:37 A.M. and 36 seconds.

18   Q    Was that a voice call?

19   A    It was.

20   Q    And how long was the call?

21   A    It was a total of 26 seconds.

22        THE COURT:  20-what?

23        THE WITNESS:  Twenty-six seconds.

24   Q    And the reason why you know it is a voice call is

25   because of the repoll number?

Clark - People - Direct/Ms. Chu

1      A     Yes, with it being 271, that would show that it's a

2    voice call.  And the fact that it dialed 911 then routed over

3    to an actual number would also indicate a voice call versus a

4    text message.

5      Q     Now, what's the next time that Mr. Wilson's phone

6    was used?

7      A     At 12:57 A.M. and 14 seconds.

8      Q     Can you tell me, was it an outgoing or incoming

9    call?

10     A     It was an outgoing call.

11           THE COURT:  What time, 12:57?

12           THE WITNESS:  Yes.

13     Q     Can you tell me, how long did that phone call

14   last?

15     A     Forty seconds.

16     Q     Now, can you tell me, what -- were you able to

17   obtain what number called -- was called by Mr. Wilson's phone

18   at 12:57?

19     A     Yes.  That was (347) 231-8819.

20     Q     Now, I had asked you --

21           If you can, take a look at People's 40.

22           THE COURT:  I'm sorry, the receiver number was

23       what?

24     A     (347) 231-8819.

25           THE COURT:  Okay.

Clark - People - Direct/Ms. Chu

1    Q    If you can take a look at People's 48.

2         Was that number one of the subscriber information

3   numbers that we requested from you?

4    A    Yes.

5    Q    Can you tell me, what was the subscriber for that

6   phone number?

7    A    It was subscribed to a Paul Gerard.

8    Q    Did Paul Gerard give an address when he obtained

9   that phone?

10   A    Yes.  The most recent address that we had, you

11  know, for that date range was at 561 East 89th Street in

12  Brooklyn, New York.

13   Q    Can you tell me, what was the next call that was --

14  I'm sorry.

15        What time was Mr. Wilson's phone used next?

16   A    It was next used at 12:59 A.M. and 31 seconds.

17   Q    Okay.

18        Can you tell me, was that phone call incoming or

19  outgoing?

20   A    It was outgoing as well.

21   Q    Can you tell me what number was dialed by Mr.

22  Wilson's phone?

23   A    (347) 889-3277.

24        THE COURT:  889-2377?

25        THE WITNESS:  3277.

Clark - People - Direct/Ms. Chu

1          THE COURT:  Oh, 3277.

2     Q    That number that you mentioned, was that included

3  in the subscriber information that we requested from you in

4  People's 48?

5     A    Yes.

6     Q    Can you tell me, who was the subscriber for that

7  phone number?

8     A    Layton Bora (phonetic).

9     Q    Can you tell me, was there a contact address given

10 for Layton Bora?

11    A    Yes.  224 Grafton Street, Brooklyn, New York.

12    Q    Now, how long was that phone call?

13    A    That phone call was for 58 seconds.

14    Q    And are you able to tell whether that was a voice

15 call?

16    A    It is a voice call.

17    Q    Okay.

18         Can you tell me, what's the next time that Mr.

19 Wilson's phone was used?

20    A    Next time was at 1:00 A.M. and 32 seconds.

21    Q    And what phone number was called or what phone

22 number -- I'm sorry.

23         Was it incoming or outgoing?

24    A    It was outgoing.

25    Q    What number was called?

mc

Clark - People - Direct/Ms. Chu

1    A    The Layton Bora phone was called again.

2    Q    Okay.

3         Now, can you tell me, after the 911 call on

4    November 29th, 2011, at 12:37 in the morning, until about

5    5:00 in the morning, can you tell me what were -- was Mr.

6    Wilson's phone used for incoming or outgoing?

7              THE COURT:  Wait a minute, start all over

8         again.

9              What is your question?

10   Q    From November 29th, 2011 at approximately right

11   after the 911 call, can you tell me what type of calls were

12   made by that phone?

13             MR. WALENSKY:  Objection.

14             THE COURT:  Sustained.

15   Q    Okay.

16        Just taking a look at the records on page 7, the

17   one you have up on the board, the numbers in the MR column,

18   after the 911 call, for the remainder of that page, what is

19   the direction of the phone calls that were had -- had by that

20   phone?

21   A    They show all outbound.

22   Q    All outbound?

23   A    Yes.

24   Q    Can you tell me, did you review the call pattern

25   before and after the 911 call was made on Mr. Wilson's

Clark - People - Direct/Ms. Chu

1    phone?

2              MR. WALENSKY:  Objection.

3              What is "call pattern?"  It hasn't been

4        explained, what it is.

5              THE COURT:  Do you understand the question?

6        A    I think you're asking did I look at the phone

7    numbers that were in communication with the phone prior to

8    the 911 and then after that, correct?

9        Q    That's correct.

10       A    Okay.

11             THE COURT:  Overruled.

12       A    Yes, I did look at that pattern.

13       Q    What did you find when you looked at the pattern?

14       A    There were different numbers that were being called

15   after the 911 call as to prior.

16       Q    Okay.

17             And you said that for the remainder of page 7 on

18   the records for Mr. Wilson's telephone, that after -- after

19   the 911 call they were all outgoing calls?

20       A    That's correct.

21       Q    Now, before the 911 call, did Mr. Wilson's phone

22   ever call the phone that you -- the phone records that you

23   gave us ending in 9337?  I believe if you look --

24             THE COURT:  Before the 911 call...what was the

25        question?

Clark - People - Direct/Ms. Chu

1    Q    Prior to the 911 call on November 29th, 2011 at

2    12:37 A.M. did Mr. Wilson's phone call the number

3    (347) 546-9337?

4              THE COURT:  347...what?

5              MS. CHU:  546-9337.

6    Q    I ask you to look at People's 46 for that answer.

7    A    Sure.

8              (Whereupon, the witness resumed the witness

9         stand.)

10             THE COURT:  You want to know if that number

11        was called prior to?

12             MR. WALENSKY:  Objection.

13             THE COURT:  Overruled.

14             MS. CHU:  Yes.

15             THE COURT:  You are objecting to what I'm

16        saying?

17             MR. WALENSKY:  No, to the question.

18             THE COURT:  Overruled.

19   A    Prior to that, yes, those two numbers had been in

20   communication.

21   Q    Okay.

22        Can you tell me what date were they in

23   communication most recently before the 9-11 call?

24             THE COURT:  Repeat the question again.

25             What is the question, again?

Clark - People - Direct/Ms. Chu

1          MS. CHU:  I'm sorry.

2    Q    When was the most recent phone call from that

3  number ending in 9337?

4          THE COURT:  I don't understand the question.

5    What do you mean?

6    Q    Do you understand the question, Mr. Clark?

7    A    The most recent time that the phone number

8  (347) 793-1940 was in communication with (347) 546-9337?

9    Q    Yes.

10    A    Okay.

11        The most recent --

12          MR. WALENSKY:  Objection.

13    A    -- phone conversation --

14          MR. WALENSKY:  Objection as to when the most

15  recent phone number.  There is no time period.

16    Q    With relation to just before the 911 call.

17          THE COURT:  Before the 911 call, the number

18  (347) 546-9377 was called, right?

19          THE WITNESS:  Yes.

20          THE COURT:  When?

21          MS. CHU:  It's 9337.

22          THE COURT:  It's not 9377.

23         This number was called.  When was it called

24  last prior to the 911 call?

25         THE WITNESS:  The last phone call to that

mc

Clark - People - Direct/Ms. Chu

1   number was at 8:16 A.M. on the 28th of November.

2                THE COURT:  8:16?

3                THE WITNESS:  Uh-huh.

4                Though there was a text message to that number

5   as well that records it at 11:41 A.M. Central time,

6   which would be 12:41 P.M. Eastern time.

7   Q    Okay.

8   A    Also on the same date.

9   Q    There was a phone call, a voice call and text

10  message that were sent at 8:00 A.M. or around 8:15 in the

11  morning on 11/28 of 2011, then a subsequent text message at a

12  little after noon?

13  A    Yes.

14  Q    That same day?

15  A    That is correct.

16  Q    And then are there any more communications between

17  those two phones, up to the 911 call?

18  A    None that I see.

19  Q    Can you tell me, were you able to provide me with

20  the subscriber information for that number ending in 9337?

21  A    Yes.

22  Q    Can you tell me, who was the subscriber for that

23  phone number?

24  A    Yes, that's the phone number that's listed as

25  People's Exhibit 46 in evidence.

mc

Clark - People - Direct/Ms. Chu

1          THE COURT:  That is the 9337?

2          THE WITNESS:  Yes.

3          THE COURT:  Who's the subscriber.

4          THE WITNESS:  That was the subscriber of Atara

5     Wisdom.

6     Q    Now, I want you to go back to Mr. Wilson's records,

7     if you would.  And can you tell me, at approximately 5:00

8     A.M. was his phone used?

9          THE COURT:  Mr. Wilson's records?

10         THE WITNESS:  Yes.

11    A    Yes.

12         MS. CHU:  If I can have People's 49B posted,

13    please.

14         (Whereupon, the exhibit was posted.)

15         THE COURT:  Now we are on Wilson's records?

16         MS. CHU:  Yes, we are back on Wilson's

17    records.

18         THE COURT:  You want to know what date,

19    November 29th?

20         MS. CHU:  Correct, at approximately 5:00 A.M.

21         THE COURT:  A call was made?

22         THE WITNESS:  Yes.

23         THE COURT:  Outgoing, incoming?

24         THE WITNESS:  Outgoing.

25    Q    Can you tell me, taking a look at People's 49B,

Clark - People - Direct/Ms. Chu

1    what page of the records is it that you have and what page

2    is it on the call detail that you provided in People's 46?

3        A    It's --

4        Q    I'm sorry, 45.

5        A    It's page 8.

6        Q    Now, can you just take a look -- step down to the

7    diagram.

8                    (Whereupon, the witness stepped down from the

9        witness stand and approached the exhibit.)

10       Q    Just show us where that five o'clock call would

11   have been.

12       A    (Indicating).  It's there, about halfway down the

13   page, a phone call at 5:00 A.M. and 53 seconds.

14       Q    Okay.

15            Was that an incoming or outgoing call?

16       A    It was an outgoing call.

17       Q    Now, can you tell me, did that -- was there anymore

18   communications between Mr. Wilson's phone and the phone

19   number ending in 3340?

20       A    Yes, there is additional communications between

21   those numbers.

22       Q    What would that be?

23       A    We see at 5:14 A.M., two different calls from

24   (347) 231-3340, and then at 5:14 another call from Mr.

25   Wilson's phone (347) 231-3340.

Clark - People - Direct/Ms. Chu

1    Q    What kind of calls were they?

2    A    The first two show routed calls and the second

3    shows it successfully going to voicemail.  The first one does

4    not indicate if it went to voicemail, though it does say

5    routed.  The third one is an outbound call to that number.

6    Q    And is there any indication whether or not that is

7    a voice call or a text message?

8    A    It shows that it is a voice call.

9    Q    Now, can you tell me, were you able to provide me

10   with the subscriber information for that number ending in

11   3340?

12   A    Yes.

13   Q    I would like to direct you to People's 47 in

14   evidence.

15            (Whereupon, the witness resumed the witness

16       stand.)

17   A    Okay.

18   Q    Can you tell me, who was the subscriber for that

19   phone number ending in 3340?

20   A    It's listed as Theo Theo.

21   Q    Okay.

22            THE COURT:  Theo?

23            THE WITNESS:  T-H-E-O, then repeated,

24       T-H-E-O.

25   Q    T, as in Tom?

mc

Clark - People - Direct/Ms. Chu

1    A    That's correct.

2    Q    Can you tell me, was there any other information

3  provided with your subscriber information for any other

4  person?

5    A    Yes.  In addition to the number on the same record

6  here, we also provided for a phone number of (347) 314-2257

7  that is connected with the (347) 231-3340 being that that

8  number ending in 3340 was the account contact number for the

9  second number.

10    Q    So, who was the subscriber for that second number

11  you just mentioned?

12    A    Matthew Shepard.

13    Q    So Matthew Shepard was somehow affiliated with the

14  number ending in 3340?

15    A    Well, Matthew Shepard, in the second account,

16  listed that number, 3340 being another Sprint phone, as the

17  account contact number or the number to call as a secondary

18  number.

19    Q    Okay.

20         THE COURT:  Explain that again.  Matthew

21    Shepard was what?

22         THE WITNESS:  Well, on all our accounts we

23    require that they provide an additional method to get

24    ahold of you in the event that we need to, you know,

25    there's a problem, things like that, need to verify, and

mc

Clark - People - Direct/Ms. Chu

1    so the account contact number that was provided was

2    (347) 231-3340, which goes back to another Sprint

3    prepaid phone with the name Theo Theo.

4        Q    With a prepaid phone are you required to give I.D.

5    at all to tell who you are?

6        A    Once again, no.

7        Q    So Theo Theo could be someone giving a nickname or

8    whatever?

9        A    Potentially.  In the case of that as well, he

10   didn't also provide an address, it's a generic P.O. Box that

11   we use anytime that no address is given.  So, very little

12   information was given.

13            THE COURT:  What was Shepard's connection to

14       231-3340?

15            THE WITNESS:  He provided 3340 as his contact

16       phone number, his non-cellular contact phone number,

17       which happens to be a cellular.

18       Q    The phone number associated with Mr. Shepard, what

19   was the phone number that gave you the contact number of the

20   3340?

21       A    (347) 314-2257.

22            THE COURT:  So if you couldn't get 3340, if

23       you couldn't get 3340, you could contact Shepard through

24       (347) 314-2577?

25            THE WITNESS:  It's actually the opposite.

mc

Clark - People - Direct/Ms. Chu

1              THE COURT:  It's the opposite?

2              THE WITNESS:  If they couldn't get ahold of

3      him.

4              THE COURT:  Then they're supposed to contact

5      him at 3340?

6              THE WITNESS:  That's correct.

7              THE COURT:  Go ahead.

8              (347) 314-2577, the subscriber was whom?

9              THE WITNESS:  Matthew Shepard.

10             THE COURT:  3340 was Theo Theo?

11             THE WITNESS:  That's correct.

12      Q    Now, can you tell me, the phone call that was made

13      at 5:00 A.M. to 3340, how long was that phone call?

14      A    The one at 5:00 A.M. was 131 seconds.

15      Q    Would you be able to determine whether or not that

16      was an actual voice call?

17      A    Yes, it is a voice call.

18      Q    And the next time that those two numbers are in

19      communication?

20             THE COURT:  Wait.

21             At 5:00 A.M. there was an out call made from

22      Wilson's number, is that right?

23             THE WITNESS:  Yes.

24             THE COURT:  And it went to what number?

25             THE WITNESS:  (347) 231-3340.

187

Clark - People - Direct/Ms. Chu

1    Q    That's the number associated with Matthew

2  Shepard?

3    A    Yes.

4              THE COURT:   Okay.

5    Q    Now, at 5:14 A.M. on 11/29/2011 was there any

6  communication between Mr. Wilson's phone and the phone

7  associated with Mr. Shepard?

8    A    There is an attempted voicemail call, but there's

9  the outbound call from the Wilson phone to the Shepard phone

10  at 5:14 A.M. 58 seconds for a total of 33 seconds.

11    Q    So Mr. Shepard was trying to contact Mr. Wilson's

12  phone, then Mr. Wilson's phone calls him back?

13    A    Yes.

14    Q    Thank you very much.

15         Now, the one you said that a total of 30 -- how

16  many seconds was that?

17    A    Thirty-three.

18    Q    So what does that mean?

19    A    Being that it's 33 seconds and a voice call, it

20  went beyond the time of the 25 seconds required for four

21  rings, so a connection of some sort had to have happened.

22  Whether that be to the voicemail or not, I'd have to look at

23  the records for 3340.

24    Q    Okay.

25         So you are unable to tell whether it was a voice

mc

Clark - People - Direct/Ms. Chu

1  call?

2      A    It is a voice call, not text message.  I can't

3  determine if it was answered by voicemail or answered by an

4  individual.

5      Q    Okay.

6      A    Not unless I look at the other records.  Would you

7  like me to do that?

8      Q    Yes, please.  If you can take a look at the call

9  detail for Mr. Shepard's associated phone.

10     A    It shows on the records here that it was received

11 as a 23-second call and does not indicate that it went to

12 voicemail, so that would indicate that, you know, either they

13 answered or, you know, it was hung up prior to answering, but

14 being that the other one was longer than 33 seconds, more

15 than likely it was communication.

16            THE COURT:  Basically you're saying, or your

17        testimony reflects the fact that on November 29th at

18        about 5:00 A.M., through November 29th 5:17 A.M. there

19        was a connection between Mr. Wilson's cellphone number

20        and Matthew Shepard's cell, is that correct?

21            THE WITNESS:  At least two times, yes.

22     Q    Thank you.

23        Now, I'd like you to look at People's 46.

24     A    Okay.

25            MS. CHU:  I am going to have this deemed

mc

Clark - People - Direct/Ms. Chu

1          People's 50 for identification.

2                          (Whereupon, the exhibit was shown to counsel.)

3                          (Whereupon, the blowup of phone record was

4          marked as People's Exhibit 50 for identification.)

5                          THE COURT:  What is this, People's 50?

6                          MS. CHU:  Yes.

7                          (Whereupon, the exhibit was shown to the

8          witness.)

9          A     Okay.

10         Q     Can you tell me, do you recognize that?

11         A     I do.

12         Q     What do you recognize that to be?

13         A     That is one page, specifically page 35 of the phone

14    records that are found in People's 46.

15         Q     Whose -- I'm sorry.

16               Can you tell us who the subscriber is for that

17    phone number?

18         A     Yes.  That's the Atara Wisdom phone.

19         Q     Okay.

20               What page of the record is that a blowup of?

21         A     Page 35.

22         Q     Okay.

23               Is that an exact duplication, just blown up, of

24    what is in evidence already as People's 46?

25         A     Yes, it is.

                                                              mc

Clark - People - Direct/Ms. Chu

1      MS. CHU:  At this time, your Honor, People

2   offer that into evidence as People's 50.

3      MR. WALENSKY:  No objection.

4      THE COURT:  It's in evidence.

5      (Whereupon, the blowup of phone record was

6   marked as People's Exhibit 50 in evidence.)

7      MS. CHU:  If I can have that posted, please.

8      (Whereupon, the exhibit was posted.)

9   Q    Mr. Clark, if you can just step down.

10     MS. CHU:  Your Honor, may he approach the

11  exhibit?

12     THE COURT:  He may.

13     (Whereupon, the witness stepped down from the

14  witness stand and approached the exhibit.)

15  Q    Mr. Clark, can you just tell us, you said it's page

16  35 of the records, right?

17  A    Yes.

18  Q    What dates are included in that page?

19  A    It starts on the 27th of November 2011 and ends on

20  the 29th of November 2011.

21  Q    Can you tell me, what were the last -- I'm sorry.

22     Were there any communications between Mr. Wilson's

23  phone and Ms. Wisdom's phone on November 28th of 2011?

24  A    Yes.

25  Q    Can you tell me, what time were those calls?

Clark - People - Direct/Ms. Chu

1    A    We see that there was a phone call that happened on

2    the records here at 8:17 A.M. on the 28th.

3    Q    Okay.

4         Can you tell me, what type of call was that?

5    A    It was an inbound call.

6    Q    And who -- I'm sorry.

7         Inbound call meaning?

8    A    Meaning the Wilson phone called the Wisdom phone.

9    Q    Okay.

10        How long was that phone call?

11   A    Fifty-six seconds.

12            THE COURT:   Inbound call meaning that who

13   called, Wilson called?

14            THE WITNESS:   The Atara Wisdom number.

15            THE COURT:   I have a quick question.

16            Atara Wisdom.   So Wilson called Wisdom?

17            THE WITNESS:   Yes.

18   Q    There are two entries for Mr. Wilson's phone on

19   those records, one at 8:17:00 and one at 8:17:06.   Now, what

20   does that mean?

21   A    If you recall, I said that sometimes an inbound

22   call has to use a locator service, and that's what you see

23   here.   The first one showing routed, indicates that the

24   locator, which happens to be 678, which was referred to as a

25   Manhattan gateway, it's part of their job, besides directing

Clark - People - Direct/Ms. Chu

1    phone calls, to pay attention to where the cellphones are on

2    the network, especially on the western half of the city.  And

3    there's one for the eastern half, which covers mostly Long

4    Island.  But it routed the call then to the -- where the

5    actual phone was at, which is the second line.  So, for all

6    intents and purposes, the second line, and the inbound call

7    is the actual phone call.  The previous line is just showing

8    the process of using the locator.

9         Q    So it's not actually two times that Mr. Wilson's

10   phone called Ms. Wisdom's phone?

11        A    No, it's still just one time.

12        Q    Is that true whenever you see a routed call and

13   then an inbound?

14        A    Yes, especially if the time stamp between the two

15   of them is a few seconds after one another, that is often the

16   case.

17        Q    Now, what's the first communication that Ms.

18   Wisdom's phone has on November 29th, 2011?

19        A    The first one that she has is, once again, a routed

20   call.  So it's one that came in but does not look like it was

21   completed.  It happened at 12:03 A.M. and 44 seconds.

22        Q    So is there any indication whether or not the

23   person that was calling Ms. Wisdom was able to get in touch

24   with her?

25        A    What is here on the record would indicate probably

Clark - People - Direct/Ms. Chu

1    that they were not but --

2         Q    What number called for Ms. Wisdom?

3         A    (347) 889-3277.

4         Q    Did you already provide us with the subscriber

5    information for that phone number?

6              I believe it's People's 48 you can find that

7    information.

8         A    Yes, that was the Layton Bora phone.

9         Q    That was the phone number that was called by Mr.

10   Wilson's phone after the 9-11 call?

11        A    That's correct.

12        Q    Can you tell me, what time did Mr. Bora reach out

13   to Miss Wisdom November 29th, 2011?

14        A    At 12:03 A.M.

15        Q    What's the next time that Ms. Wisdom's phone was

16   used?

17        A    There's no activity until a text message was

18   received on the 29th of November, it shows here 1433, which

19   is 2:33 Central, which would have been 3:33 P.M. Eastern

20   time.

21        Q    So from just after midnight to around 3:30 on

22   November 29th she didn't use her phone at all?

23        A    That's correct.

24             MS. CHU:  Okay.

25             One moment, your Honor.

mc

Clark - People - Direct/Ms. Chu

1          (Whereupon, there was a brief pause in the

2      proceedings.)

3              THE COURT:  Wisdom made a text?

4              THE WITNESS:  At that time they received a

5      text, then two minutes later they sent a text.

6              THE COURT:  Wisdom sent a text?

7              THE WITNESS:  Yes.

8              THE COURT:  To whom?

9              THE WITNESS:  At 3:35 P.M. it would have been

10     the Layton Bora phone.

11             THE COURT:  And the Layton Bora phone

12     responded with a text?

13             THE WITNESS:  It doesn't indicate on this

14     page.  It shows multiple text messages to the Layton

15     Bora phone.

16     Q    Now, I am asking you to now look at People's 47.

17     A    Okay.

18     Q    What subscriber and phone number are we looking at

19     in People's 47?

20     A    This is the one for (347) 231-3340 that's

21     associated with Matthew Shepard.

22             MS. CHU:  At this time, your Honor, I'd like

23     to have this deemed marked People's 51 for

24     identification and shown to the witness.

25             (Whereupon, the exhibit was shown to counsel.)

Clark - People - Direct/Ms. Chu

1          (Whereupon, the blowup of phone record was

2    marked as People's Exhibit 51 for identification.)

3          THE COURT:  These are the phone records of

4    Matthew Shepard?

5          MS. CHU:  Yes.

6          (Whereupon, the exhibit was shown to the

7    witness.)

8    A    Okay.

9          THE COURT:  What is his number, by the way?

10         THE WITNESS:  (347) 231-3340.

11         THE COURT:  Okay.

12    Q    Taking a look at People's 51 for identification, do

13  you recognize that?

14    A    I do.

15    Q    What do you recognize that to be?

16    A    It is page 35 of the call records.

17    Q    Is that an exact duplicate, just blown up, of what

18  you already have in your hand, People's 47 in evidence for

19  Matthew Shepard?

20    A    Yes.

21         MS. CHU:  At this time, your Honor, I offer it

22    into evidence as People's 51.

23         MR. WALENSKY:  No objection.

24         THE COURT:  In evidence.

25         (Whereupon, the blowup of phone record was

Clark - People - Direct/Ms. Chu

1    marked as People's Exhibit 51 in evidence.)

2              MS. CHU:  Can you post it, please?

3              (Whereupon, the exhibit was posted.)

4              MS. CHU:  May the witness approach the

5    exhibit, please?

6              THE COURT:  He may.

7              MS. CHU:  Thank you.

8              (Whereupon, the witness stepped down from the

9    witness stand and approached the exhibit.)

10    Q     Mr. Clark, can you just tell us, you said this is

11    page 37 of the records?

12    A     Yes.

13    Q     And what dates are encompassed within this page?

14    A     It starts on the 28th of November 2011 and ends on

15    the 29th of November 2011.

16    Q     Can you tell me, taking a look at November 29th,

17    2011 at approximately 5:00 A.M., was there any communication

18    between this phone for Matthew Shepard and the phone that was

19    subscribed to Anthony Wilson?

20    A     Yes.

21    Q     And can you tell me, was it an incoming or outgoing

22    call that Mr. Shepard -- that the phone had?

23    A     It was an incoming call.

24    Q     So that means that Mr. Wilson's phone was calling

25    Mr. Shepard's phone?

Clark - People - Direct/Ms. Chu

1      A     Yes.

2      Q     Can you tell me, how long was this phone call?

3      A     It was a total of 122 seconds, once again shows two

4  lines but the second line being the actual phone call.

5      Q     Can you tell me, are you able to determine whether

6  or not that was an actual voice call?

7      A     Yes.

8      Q     Now, --

9            THE COURT:  When you say "inbound," it was a

10     call from Wilson to Shepard?

11           THE WITNESS:  Yes.

12     Q     What is the next time that there's communication

13 between Mr. Shepard's phone and Mr. Wilson's phone?

14     A     At 5:13 A.M. and 56 seconds there was an attempted

15 phone call from the Shepard phone to the Wilson phone, and

16 then again at 5:14 A.M. and 18 seconds.

17           THE COURT:  There is an attempt to connect

18     with Wilson at 5:13?

19           THE WITNESS:  Yes.  And then another again at

20     5:14.

21           THE COURT:  Was there a connection or not?

22           THE WITNESS:  It does not indicate.  Since

23     they're 15 seconds and 11 seconds, that's not long

24     enough to make a determination.

25           THE COURT:  Okay.

Clark - People - Direct/Ms. Chu

1          THE WITNESS:  I believe on other records it

2     shows them going to voicemail.

3     Q     So how many communications are had between Mr.

4     Wilson's phone and Mr. Shepard's phone during that time

5     period of 5:00 A.M. to about 5:15, 5:16 A.M.?

6     A     There's a total of four.

7     Q     Four communications?

8     A     Yes.

9     Q     Can you just do me a favor, use this blue

10    highlighter and put a mark in front of that line that you are

11    talking about.

12    A     (Witness complied.)

13          Where there's two lines I actually put it in front

14    of the line that's the actual call, not the routed using the

15    locator.

16    Q     Okay.

17          And you said that the first --

18          The four times that those two numbers communicated,

19    the first one was a what, incoming or outgoing?

20    A     Incoming.

21    Q     Okay.

22          And the next, the second communication?

23    A     Outgoing.

24    Q     And the third communication?

25    A     Outgoing.

Clark - People - Direct/Ms. Chu

1   Q    And the fourth communication?

2   A    Incoming.

3        THE COURT:  At 5:13 and 56 seconds there was

4   an outgoing attempt to connect?

5        THE WITNESS:  Yes.

6        THE COURT:  With Wilson, right?

7        THE WITNESS:  Yes.

8        THE COURT:  Then there was another attempt

9   made at when?

10       THE WITNESS:  5:14 A.M. and 18 seconds.

11       THE COURT:  5:14 and how many seconds?

12       THE WITNESS:  Eighteen.

13       THE COURT:  When's the fourth?

14       THE WITNESS:  At 5:15 A.M. and 7 seconds was

15   the call that was received from the Wilson number.

16   Q    Can you tell me, are you able to determine whether

17   all those phone calls were either voice calls or text

18   messages or went to voicemail?

19   A    They were all voice calls.  Some of them, on the

20   outbound calls, went to the Wilson voicemail, yes, but they

21   were all voice calls, not text messages.

22   Q    Okay, thank you very much.

23       MS. CHU:  I have no further questions.

24       THE COURT:  Cross.

25       MR. WALENSKY:  I have no questions.  Thank

mc

Proceeding

1      you.

2                  THE COURT:  You may step down.  Thank you,

3      sir.

4                  THE WITNESS:  Thank you.

5                  (Whereupon, Norman Ray Clark stepped down from

6      the witness stand and exited the courtroom.)

7                  THE COURT:  We will take a short recess.

8      Ladies and gentlemen, ten minutes.

9                  Do not discuss the case amongst yourselves or

10     with anyone.

11                 Just leave your books here.

12                 COURT OFFICER:  Remain seated until the jury

13     exits.

14                 THE COURT:  Remain seated, please.

15                 (Whereupon, the Jury exited the courtroom.)

16                 THE COURT:  All right, ten-minute break.

17                 (Whereupon, a brief recess was held.)

18                 THE COURT:  Who's the next witness?

19                 MS. CHU:  Detective Scandole.

20                 MR. WALENSKY:  I also have another motion for

21     a mistrial.

22                 THE COURT:  All right.

23                 THE CLERK:  Case back on trial continues.  All

24     parties present, defendant is present with attorney.

25                 THE COURT:  What is your application?

                                                              mc

Proceeding

1          MR. WALENSKY:  Your Honor, I wish to move for

2     a mistrial based upon the fact, again, I think we had

3     more information, yesterday you allowed the testimony of

4     the Welfare agent, for lack of a better term, and People

5     said that they wanted to do it to complete the

6     transaction.

7          THE COURT:  The narrative.

8          MR. WALENSKY:  But the People were -- well,

9     being without prejudice, ultimately we went through way

10    beyond January 3rd when Mr. Wilson's body was found and

11    so there was excess regarding the transaction subsequent

12    to that, but really what is even a stronger argument,

13    and I feel that that was prejudicial, we were going

14    through it and also Ms. Chu brought out the full point

15    that somebody needed a PIN number and it would be more

16    likely that somebody who lived with him would have a PIN

17    number than some stranger.  But we started to,

18    essentially, get into anyone can use the card, but that

19    wasn't the point, it was supposed to be for the

20    transaction.

21          However, the point is, with the phone

22    testimony that we had today where the People were able

23    to show that Mr. Shepard's phone was used subsequent to

24    that to call these other numbers and to call Matthew

25    Shepard, which will be a witness, if the People are

mc

Proceeding

1      attempting to provide as a witness, they were certainly

2      able to show the transit -- I'm sorry -- to show the

3      transaction that he called 911 up to a certain time,

4      subsequent to that time calls were made in a totally

5      different pattern and that the pattern matched the

6      pattern of Atara Wisdom's phone calls prior to that.

7      Essentially, Matthew Shepard's phone -- not Matthew --

8      essentially, Anthony Wilson's phone was now being used

9      to call numbers that Atara Wisdom had previously called

10     with her phone and that subsequent to that, that was the

11     pattern on that and it really -- without the damage in

12     terms of the prejudice regarding the uncharged crime,

13     the illegal use, and again the People did not present

14     this as -- Judge, we want through this -- as a charged

15     crime, of Molineux, we believe that the Court sua sponte

16     initiated it.  I would move that with this additional

17     information, it really shows that the purpose of the

18     testimony of yesterday's witness was not transactional,

19     it was really a matter of trying to put before the jury

20     something that is far more prejudicial than it was

21     probative, considering all of the other information they

22     had, and that the Court at the time perhaps did not have

23     enough information, but based upon all of the

24     information the Court has and the strength of the

25     People's witness regarding transactions through the

Proceeding

1     cellphone, that it obviously was used for prejudice as

2     opposed to a probative value.  And, therefore, I believe

3     there should be a mistrial, or at the very least all of

4     the testimony of the EBT witness -- I'm sorry -- the

5     Welfare witness should be, at a minimum, stricken.

6                 Thank you.

7                 THE COURT:  Application's denied.

8                 MR. WALENSKY:  Note my exception.

9                 THE COURT:  All right, we'll have the Wade

10    hearing.

11                MS. CHU:  Thank you.

12                THE COURT:  Call your witness.

13                MS. CHU:  Huntley.

14                THE COURT:  I mean Huntley.

15                Call your witness.

16                MS. CHU:  The People call Detective

17    Christopher Scandole.

18                He's in the conference room.

19                (Whereupon, there was a brief pause in the

20    proceedings.)

21                COURT OFFICER:  Witness entering.

22                (Whereupon, Detective Scandole entered the

23    courtroom and took the witness stand.)

24                THE CLERK:  Please raise your right hand.

25                Do you solemnly swear or affirm the testimony

mc

Det. Scandole - People - Direct/Ms. Chu       (Hearing)

1      you're about to give will be the truth, the whole truth

2      and nothing but the truth, so help you God?

3                  THE WITNESS:  Yes, I do.

4                  THE CLERK:  Please put your hand down.

5                  State your name for the record.

6                  THE WITNESS:  Detective Christopher Scandole.

7                  THE CLERK:  Spell your last name.

8                  THE WITNESS:  S-C-A-N-D-O-L-E.

9                  THE CLERK:  Give your shield.

10                 THE WITNESS:  5735.

11                 THE CLERK:  And your command?

12                 THE WITNESS:  Brooklyn North Homicide Squad.

13                 THE CLERK:  Thank you.

14                 THE COURT:  Proceed.

15                 MS. CHU:  Thank you.

16  C H R I S T O P H E R        S C A N D O L E, Detective,

17          Shield No. 5735, Brooklyn North Homicide Squad,

18          New York City Police Department, called as a

19          witness by and on behalf of the People of the State

20          of New York, after having been first duly sworn,

21          was examined and testified as follows:

22  DIRECT EXAMINATION

23  BY MS. CHU:

24      Q    Good afternoon, Detective.

25      A    Good afternoon.

Det. Scandole - People - Direct/Ms. Chu        (Hearing)

1     Q     Do you recall testifying at a hearing back on

2 October 30th of 2013 with regard to the case of the People of

3 the State of New York versus Atara Wisdom?

4     A     Yes.

5     Q     And do you recall when you were at that hearing you

6 spoke about various statements that you had taken from Ms.

7 Wisdom after Miranda on July 25th of 2011 -- I'm sorry --

8 July 25th, 2012?

9     A     Yes.

10     Q     Now, I want to direct your attention to the

11 following morning, July 26th, 2012.

12           Did you have occasion to speak to her again?

13     A     I did.

14     Q     Now, was this after you had already taken the oral

15 statement and had her sign her written statement?

16     A     Yes.

17     Q     And did she already go on video with the District

18 Attorney's Office at the time you went to go speak with her

19 at 10:00 in the morning?

20     A     Yes.

21     Q     Now, can you tell me, what was your purpose for

22 going in there to speak to her?

23     A     We just had a couple more questions to ask her to

24 clear up some things.

25     Q     So, now, where was she when you spoke with her?

Det. Scandole - People - Direct/Ms. Chu      (Hearing)

1    A     At the 83rd Detective Squad.

2    Q     What room was she in?

3    A     Interview room.

4    Q     Can you tell me, before -- I'm sorry.

5          When you went into the interview room with Atara

6    Wisdom, what did you say to her?

7    A     I just reminded her that we read her rights

8    yesterday and she agreed to speak with us, we just had a few

9    more questions, if that was okay.

10   Q     What did she indicate to you after you told her?

11   A     She said yes.

12   Q     Can you tell me, what questions did you ask her?

13   A     I asked her about the victim's property.

14   Q     Okay.

15         Did you ask her specifically anything about like

16   what happened after she came out of the bathroom?

17   A     Yes.

18   Q     And what did she tell you?

19   A     She said that after it happened, after I stabbed

20   him, I came out of the bathroom, I saw him laying on the

21   bed, then I picked up his phone, his wallet, his keys and I

22   left.

23         She said she was using the phone --

24              THE COURT:  Hold on a minute.

25              After I stabbed him, saw him on the bed?

                                                              mc

Det. Scandole - People - Direct/Ms. Chu      (Hearing)

1                    THE WITNESS:  Yes.

2                    THE COURT:  And what?  And what?

3                    THE WITNESS:  She picked up his phone, his

4        wallet, his keys and she left.

5                    THE COURT:  Go ahead.

6        A    She said that when she left she was using the phone

7   but she was in a bit of a fog and she didn't remember who she

8   was talking to.

9                She said that at one point she threw away the keys,

10  she kept the wallet.

11                   THE COURT:  Just a minute.

12                   She left, she was using the phone.

13                   Go ahead.

14       A    She threw away his keys but kept his wallet and

15  didn't use it.  She said she then went to her friend

16  Tiffany's house, which is in the neighborhood of East 93rd

17  Street and Rutland Road.

18                   THE COURT:  Go on.

19                   All right, one second.

20                   (Whereupon, there was a brief pause in the

21       proceedings.)

22                   THE COURT:  What was the address?

23                   THE WITNESS:  In the vicinity of East 93rd

24       Street and Rutland Road.

25                   THE COURT:  Her name was Tiffany?

mc

Det. Scandole - People - Direct/Ms. Chu     (Hearing)

1          THE WITNESS:  Yes.

2          THE COURT:  Go ahead.

3      A    She said that she stayed there for a couple of

4  days.  She said she continued to use the phone for a while

5  but then she also threw that out.

6      Q    Go ahead.

7      A    Then I asked her directly, did you use Mr. Wilson's

8  benefit card, and she answered absolutely not.

9          THE COURT:  Go ahead.

10     A    That's it.

11     Q    Now, Detective, the person that you were talking to

12  who gave you these statements on July the 26th of 2012, do

13  you see them here in the courtroom?

14     A    I do.

15     Q    Can you please point to that person and indicate

16  something they're wearing?

17     A    She's wearing a brown shirt (indicating).

18         THE COURT:  Indicating the defendant.

19         MS. CHU:  Thank you.

20         I have nothing further.

21         THE COURT:  The prior day, what was it, July

22  25th -- when did you first speak to the defendant?

23         THE WITNESS:  I first met her about 9:45 A.M.

24         THE COURT:  On July 25th?

25         THE WITNESS:  Yeah.

mc

209

Det. Scandole - People - Direct/Ms. Chu        (Hearing)

1          THE COURT:  Where did you speak to her?

2          THE WITNESS:  I met her at a women's shelter,

3      then we went back to the 83rd Precinct.

4          THE COURT:  When you went back to the 83rd

5      Precinct, where did you go?

6          THE WITNESS:  To the interview room in the

7      detectives squad.

8          THE COURT:  And were you with anyone?

9          THE WITNESS:  Myself and my partner, Detective

10      Collins.

11          THE COURT:  And what time did you get into

12      that room?

13          THE WITNESS:  We first booked her in the room

14      at about 11:00 A.M.

15          THE COURT:  When did you first advise her of

16      her rights?

17          THE WITNESS:  About 11:00 A.M.

18          THE COURT:  And how did you advise her of her

19      rights?

20          THE WITNESS:  I read them to her off a

21      preprinted form, recorded her answers and then she

22      signed it, I signed it and Detective Collins signed

23      it.

24          THE COURT:  And how long did the interview

25      take?

mc

Det. Scandole - People - Direct/Ms. Chu      (Hearing)

1           THE WITNESS:  Which interview is that, your

2      Honor?

3           THE COURT:  The 25th.

4           THE WITNESS:  We spoke to her for two to three

5      hours.

6           THE COURT:  And during the course of that

7      interview or interrogation did you take notes?

8           THE WITNESS:  Afterwards I documented it.

9           THE COURT:  Afterwards you documented it?

10          THE WITNESS:  Yes.

11          THE COURT:  Did there come a time when an

12     Assistant D.A. spoke to her?

13          THE WITNESS:  Yes.

14          THE COURT:  When was that?

15          THE WITNESS:  That was at about 9:00 P.M. on

16     the 25th.

17          THE COURT:  A.D.A. who?

18          THE WITNESS:  Purce.

19          THE COURT:  Purce?

20          THE WITNESS:  Purce.

21          THE COURT:  Did a video interview?

22          THE WITNESS:  Yes.

23          THE COURT:  Were you in the room?

24          THE WITNESS:  I was.

25          THE COURT:  Anyone else?

Det. Scandole - People - Cross/Mr. Walensky   (Hearing)

1           THE WITNESS:  Myself, Ms. Wisdom and A.D.A.

2      Purce.

3           THE COURT:  How long did that last?

4           THE WITNESS:  Maybe half an hour.

5           THE COURT:  What time did you leave her?

6           THE WITNESS:  I left the precinct sometime

7      later.  That was pretty much my last contact with her

8      that evening.

9           THE COURT:  Then you went back on the 26th.

10     What time did you go?

11          THE WITNESS:  About 10:00 A.M.

12          THE COURT:  At the 83rd Precinct?

13          THE WITNESS:  Correct.

14          THE COURT:  You say you advised her, reminded

15     her of the fact that she --

16          THE WITNESS:  I didn't read the whole thing,

17     just said, remember yesterday when we read you your

18     rights, I just have a couple more questions.

19          THE COURT:  Go ahead, counsel.

20 CROSS-EXAMINATION

21 BY MR. WALENSKY:

22     Q    Detective, you picked up Ms. Wisdom on the 25th at

23 the shelter about 9:45, right?

24     A    Yes.

25     Q    And you took her back to the precinct at about

mc

Det. Scandole - People - Cross/Mr. Walensky    (Hearing)

1    11:00, you gave her her Miranda rights?

2         A    Yes.

3         Q    And from that time on did you speak to her for two

4    to three hours?

5         A    Yes.

6         Q    And you obtained a written -- you wrote out a

7    statement, didn't you?

8         A    Yes.

9         Q    Now, was she in the interrogation or interview room

10   all that time?

11        A    Yes.

12        Q    So she was there right up until the time of the

13   lineup, wasn't she?

14        A    Yes.

15        Q    And the lineup occurred about 5:00, quarter after,

16   something like that?

17        A    Thereabouts.

18        Q    But you were talking to her right up until that

19   time, weren't you, to maybe half an hour before that?

20        A    No.

21        Q    Couldn't have been longer than two to three hours?

22        A    No.

23        Q    And after she was placed in the lineup, she was

24   placed in a lineup not by -- and identified by someone who

25   knew who she was, right?

mc

Det. Scandole - People - Cross/Mr. Walensky   (Hearing)

1    A    Yes.

2    Q    It was an identification lineup, it wasn't a lineup

3 to say that that -- that person was a witness to the crime,

4 correct?

5    A    Yes.

6    Q    And subsequent to the lineup you placed her under

7 arrest, right?

8    A    I don't know exactly what time she was placed under

9 arrest.

10   Q    At 5:00 -- at 7:30 you presented her with a written

11 statement, right?

12   A    Yes.

13   Q    And you and -- you and/or your fellow detective

14 wrote out a statement?  Was it you who wrote it out?

15   A    I wrote it out, yes.

16   Q    You presented it to her and she read it?

17   A    Yes.

18   Q    And signed the statement?

19   A    Yes.

20   Q    Then you asked her if she wanted to give a video

21 statement?

22   A    Yes.

23   Q    And she had agreed?

24   A    Yes.

25   Q    And the video was taken.  So after --

Det. Scandole - People - Cross/Mr. Walensky    (Hearing)

1                At 7:30 where was she placed?

2     A     In the interview room.

3     Q     Was she cuffed all that time?

4     A     No.

5     Q     Okay.

6                Is it procedure to cuff someone, to leave them on

7     the rail, or is that the discretion of the officer?

8     A     That's the discretion.

9     Q     And so about eleven o'clock -- I am not pinning you

10    exactly on the video -- A.D.A. Purce came in and you had a --

11    withdrawn.

12               A.D.A. Purce came in and made a video, took a video

13    statement from Ms. Wisdom, right?

14    A     That was about nine o'clock.

15    Q     Nine o'clock, I'm sorry.

16               And she spoke, then she stopped speaking, she

17    didn't want to speak anymore, correct?

18    A     Correct.

19    Q     She said, I don't want to speak anymore?

20    A     Correct.

21    Q     Now, at nine o'clock, after she didn't want to

22    speak anymore, she was already arrested, right?

23    A     I would have to double check, but I believe so.

24    Q     She was arrested?  You told us she was arrested

25    right after the lineup, after the lineup identification, so

mc

Det. Scandole - People - Cross/Mr. Walensky    (Hearing)

1   that was hours before she made the video statement?

2       A    Yes.

3       Q    And subsequent to her saying she didn't want to

4   talk anymore, you didn't take her to Central Booking, did

5   you?

6       A    No.

7       Q    And she was held in the interview room overnight?

8       A    I wasn't at the 83rd Precinct overnight, I don't

9   know where she was held.  I don't know if in the interview

10  room or in the cell.  I'm not --

11      Q    She didn't want to talk, say anything else?  She

12  said, I don't want to talk anymore, right?

13      A    Right.

14      Q    But you held her overnight then took a statement in

15  the morning, didn't you?

16      A    Yes.

17      Q    And moreover, that morning, on the 26th at 10:00 in

18  the morning, you came in and you orally reminded her of her

19  Miranda warnings, saying do you remember, do you remember we

20  gave you those warnings about your not having to talk,

21  something like that?

22      A    Correct.

23      Q    You didn't go through the --

24      A    I did not.

25      Q    -- the entire --

mc

1    A    I did not.

2    Q    But she had said the night before that she didn't

3 want to make anymore statements, correct?

4    A    She said I don't want to talk about it anymore.

5              MR. WALENSKY:  Thank you.  No further

6    questions.

7              MS. CHU:  Redirect.

8              THE COURT:  Proceed.

9 REDIRECT EXAMINATION

10 BY MS. CHU:

11    Q    Detective Scandole, did Ms. Wisdom at any time ask

12 for a lawyer?

13    A    No.

14    Q    When you went in to speak to her the following day

15 at about 10:00 A.M., did she say anything about not wanting

16 to talk to you?

17    A    No.

18              MS. CHU:  I have nothing further.

19              THE COURT:  All right, you may step down.

20              (Whereupon, Detective Scandole stepped down

21    from the witness stand and exited the courtroom.)

22              THE COURT:  Want to be heard?

23              MS. CHU:  Yes, your Honor.

24              I believe that the statements that were

25    obtained by Detective Scandole of the defendant the

Proceeding

1    following day are -- should be admissible on the

2    People's direct case in light of the fact that the

3    defendant, although she stopped and did not want to

4    continue speaking to Mr. Purce on the video, she never

5    indicated she wanted a lawyer, she never says I don't

6    want to talk to anybody anymore.  She was actually

7    visibly upset, that was the reason Mr. Purce allowed her

8    to stop the interview at the time on video, which you

9    can see on video.

10          In addition to that, the defendant even -- she

11   had the opportunity, just like she did on video, to say

12   you know what, I don't want to talk anymore right now.

13   She didn't.

14          When Detective Scandole came in to speak to

15   her, told her about the Miranda rights he read to her

16   the day before, she acknowledged that and then he said,

17   I just want to ask you a couple more questions.  She

18   never says look, I don't want to talk about this

19   anymore.  She could have repeated what she said on video

20   but she didn't.  She had opportunities.

21          It's not like they forced her to talk, they

22   just asked, we want to ask you a couple more questions,

23   she said okay.  For those reasons the People submit that

24   these statements should be admissible on our direct

25   case.

mc

Proceeding

1          MR. WALENSKY:  Your Honor, this is somebody

2     who's arrested at 5:30 in the afternoon, does give a

3     video statement, is clearly upset, says I don't want to

4     talk anymore.  Rather than take Ms. Wisdom to Central

5     Booking, she is under arrest, that would be the

6     procedure, she is kept overnight and --

7          THE COURT:  So is this an unreasonable delay?

8          MR. WALENSKY:  One, it is unreasonable,

9     especially after somebody has said I don't want to talk

10     anymore, that should suffice and be enough and --

11          THE COURT:  She said she didn't want to talk

12     anymore to the A.D.A., so the next day -- actually, I

13     don't know, what were her exact words on the video?

14          MS. CHU:  Just give me one minute, I'll tell

15     you.

16          MR. WALENSKY:  Here it is.  May I read it?

17          THE COURT:  Let me see it.

18          Sergeant.

19          MS. CHU:  There's a transcript.

20          MR. WALENSKY:  We have the transcript.

21          MS. CHU:  Here's the last two pages.

22          THE COURT:  Give me a copy.

23          (Whereupon, the document was handed to Judge

24     Tomei.)

25          THE COURT:  Actually, yeah, but -- is this

Proceeding

1      it?

2                MS. CHU:  That's the ending of her video.

3                THE COURT:  The way I read this is that she

4      didn't even -- the question --

5                Well, I will put it on the record.

6                MS. CHU:  It's actually Mr. Purce who

7      suggests, you want to stop.

8                THE COURT:  The reason I am reading from the

9      transcript, page 29:

10               "QUESTION:  You okay?  You want to take a

11     minute?  You want us to stop for a second or do you want

12     to continue?  You want to stop for a second?

13               "All right."

14               A.D.A. Purce:

15               "We're just going to hold out here for a

16     little bit.  You just take your time, all right?

17               "All right.

18               "You know what, I think we're going to --

19     we're going to stop now, and if you want to continue,

20     we'll talk in a second, okay.

21               "You want us to stop right now?

22               "ANSWER:  Yeah."

23               A.D.A. Purce:

24               "All right, just stop the tape for now.

25     There will be no further questions until we resume the

Proceeding

1      tape."

2              Did they resume the tape?

3              MS. CHU:  No.

4              THE COURT:  She wanted to stop.  That doesn't

5      mean they couldn't the next day -- did they resume the

6      tape?

7              He reminded her, according to the detective,

8      that he did, of the fact that he had given her rights

9      and if she wanted to continue.

10             MR. WALENSKY:  It's our position he should

11     have gone through her rights again in their entirety.

12             THE COURT:  It's not required.  Once she's

13     informed, she's been warned.

14             She doesn't have to be re-advised.

15             MR. WALENSKY:  Well, perhaps at some point the

16     Court of Appeals will change their mind.  I am aware of

17     the status of the law.

18             But we feel that it's too long a delay.

19     Regardless, it was too long a delay to hold her

20     overnight.  He could have asked her the questions a

21     little bit later.  It's overnight, she softened up.

22             THE COURT:  She was really arrested when?

23     After the lineup, right?

24             MS. CHU:  I was actually going to look about

25     when on the online booking sheet.

mc

Proceeding

1          MR. WALENSKY:  She is in custody at a quarter

2     to 10:00 in the morning on the 25th, she is arrested

3     officially right after the lineup about 5:30.

4          THE COURT:  Then she is arraigned when?

5          MR. WALENSKY:  She's not arraigned until, I

6     believe, the 28th.

7          THE COURT:  The 28th?

8          MR. WALENSKY:  Arraigned on the 28th.

9          MS. CHU:  There was a 730 issue.  She needed

10    to go to Bellevue.

11         MR. WALENSKY:  There was -- right, there was a

12    730 issue.

13         MS. CHU:  That is the reason why there was a

14    delay in arraignment.

15         There was medical attention that was needed

16    when they were trying to process her.

17         THE COURT:  It's the Court's opinion the fact

18    that there was a delay from say the time that she was

19    placed under arrest until the next morning, that the

20    fact that there -- that fact doesn't make it

21    unreasonable to her arraignment later on.

22         MR. WALENSKY:  Note my exception.

23         THE COURT:  All right.  All right.

24         So it's the Court's opinion, after listening

25    to Detective Scandole, that the People have proven

mc

Proceeding

1    beyond a reasonable doubt that the defendant did make a

2    statement on the 26th of July and that statement was

3    knowingly made, voluntarily made, and intelligently made

4    and is admissible at trial.  All right.

5                    MR. WALENSKY:  Exception.

6                    THE COURT:  Motion to suppress said statement

7    or statements is denied.

8                    All right, get the jury out.

9                    What we'll do is --

10                   You have Scandole, then who else?

11                   MS. CHU:  The ME is this afternoon.  I have Ed

12   Purce for the video.

13                   THE COURT:  It's almost lunch so I will just

14   send them out.

15                   MS. CHU:  Okay.

16                   THE COURT:  We will continue at one o'clock --

17   I mean, at two o'clock.

18                   (Whereupon, there was a brief pause in the

19   proceedings.)

20                   THE COURT:  Bring out the jury, please.

21                   COURT OFFICER:  Jury entering.

22                   (Whereupon, the Jury entered the courtroom.)

23                   THE CLERK:  All members of the jury are

24   present.

25                   Both sides waive reading of the roll call?

Proceeding

1          MS. CHU:  Yes.

2          MR. WALENSKY:  Yes.

3          THE CLERK:  Thank you.

4          THE COURT:  Ladies and gentlemen, in light of

5     the hour, it's now 12:45, we're going to adjourn for the

6     luncheon period and we'll return at two o'clock and then

7     we'll continue on with the hearing -- I mean, with the

8     trial.

9          So, do not discuss the case amongst yourselves

10    or with anyone else.  Do not visit the place where the

11    alleged crimes occurred.  Have no contact with any of

12    the parties involved in the matter, including the

13    Court.

14         Again, do not resort to utilizing any digital

15    or electronic devices for the purpose of obtaining any

16    information about this matter.

17         Have a very good lunch and return at two

18    o'clock.  See you then.

19         Just leave your books.

20         THE CLERK:  Audience, remain seated until the

21    jury exits.  Audience.

22         (Whereupon, the Jury exited the courtroom.)

23         THE COURT:  Okay, two o'clock.

24         (Whereupon, a lunch recess was held.)

25              *              *              *

mc

Proceeding

1              A F T E R N O O N      S E S S I O N

2              *                    *                    *

3              THE CLERK:  Come to order, Part 2 is back in

4    session, the Honorable Albert Tomei presiding.

5              THE COURT:  Bring her out.

6              (Whereupon, there was a brief pause in the

7    proceedings.)

8              THE COURT:  All right, bring her out.

9              THE CLERK:  Case back on trial continues.

10   Defendant is present with her attorney, parties are

11   present.  Appearances are the same.

12             THE COURT:  All right, get the jury out,

13   please.

14             (Whereupon, there was a brief pause in the

15   proceedings.)

16             MS. CHU:  We're doing the doctor first.

17             THE COURT:  Who's this, Frederic?

18             MS. CHU:  No, Dr. Irini Scordi-Bello.

19             THE COURT:  Okay, bring the jury out, please.

20             COURT OFFICER:  Jury entering.

21             (Whereupon, the Jury entered the courtroom.)

22             THE CLERK:  All the jurors are present and

23   seated.

24             Both sides waive the roll call?

25             MS. CHU:  So waived.

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1           MR. WALENSKY:  Yes.

2           THE COURT:  Call your next witness, please.

3           MS. CHU:  The People call Dr. Irini

4    Scordi-Bello.

5           (Whereupon, there was a brief pause in the

6    proceedings.)

7           COURT OFFICER:  Witness entering.

8           (Whereupon, Dr. Irini Scordi-Bello entered the

9    courtroom and took the witness stand.)

10          THE CLERK:  Raise your right hand, please.

11          Do you solemnly swear or affirm that the

12   testimony you're about to give will be the truth, the

13   whole truth and nothing but the truth, so help you

14   God?

15          THE WITNESS:  Yes.

16          THE CLERK:  Put your hand down.

17          State your name for the record.

18          THE WITNESS:  My first name is Irini.

19          THE CLERK:  Spell your first name.

20          THE WITNESS:  I-R-I-N-I.

21          My last name is Scordi-Bello, S-C-O-R-D-I

22   hyphen B-E-L-L-O.

23          THE CLERK:  Thank you.

24          THE COURT:  Proceed.

25          MS. CHU:  Thank you.

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    I R I N I        S C O R D I - B E L L O, called as a witness

2                by and on behalf of the People of the State of

3                New York, after having been first duly sworn, was

4                examined and testified as follows:

5    DIRECT EXAMINATION

6    BY MS. CHU:

7         Q    Good afternoon, Doctor.

8         A    Good afternoon.

9         Q    Are you licensed to practice medicine in the State

10   of New York?

11        A    Yes, I am.

12        Q    And what is your field of specialty?

13        A    Forensic pathology.

14        Q    Can you explain to the members of the jury, what

15   does forensic pathology allow you to do?

16        A    Forensic pathology is a branch of pathology which

17   in turn is a branch of medicine.  Forensic pathology deals

18   with determining the cause of death and the manner of death,

19   why people died and how they died.

20        Q    Now, did you have any specific training to become

21   specialized in forensic pathology?

22        A    Yes.

23        Q    And what was that?

24        A    I completed first a Bachelor's degree, which was

25   followed by a doctorate degree, which was followed by a

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    medical degree and then three years of pathology residency

2    followed by a year of forensic pathology fellowship.

3        Q    Now, are you currently employed as a forensic

4    pathologist?

5        A    Yes.

6        Q    In what agency?

7        A    At the Office of the Chief Medical Examiner for the

8    City of New York.

9        Q    And what is your title?

10       A    I'm a medical examiner two.

11       Q    Now, in your position with the ME's office have you

12   had occasion to perform autopsies?

13       A    Yes.

14       Q    Can you please describe what an autopsy is?

15       A    An autopsy is a surgical procedure, it starts with

16   a very careful, thorough examination of the outside of the

17   body where we determine and document any signs of natural

18   disease or any signs of injury and then continues with an

19   internal examination where we examine all the organs in the

20   chest, abdomen, pelvis, as well as the brain, again to

21   determine if there is any natural disease or any injury.

22       Q    Now, how many autopsies have you performed in your

23   career?

24       A    Approximately a thousand by now.

25       Q    And in your position as a Medical Examiner have you

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    had occasion to testify in courts of law?

2         A    Yes, I have.

3         Q    In which courts have you done so and how many

4    times?

5         A    In Grand Jury as well as Supreme Court in New York

6    County and Kings County, in approximately I think this will

7    be the thirtieth time.

8         Q    Now, on each occasion have you been qualified as an

9    expert?

10        A    Yes.

11        Q    In what field?

12        A    In the field of forensic pathology.

13             MS. CHU:  At this time, your Honor, I would

14        offer Dr. Scordi-Bello as an expert in the field of

15        forensic pathology.

16             THE COURT:  Which you say is the study of

17        cause...

18             THE WITNESS:  Cause and manner of death.

19             THE COURT:  And manner, yes, all right.

20             Any objection?

21             MR. WALENSKY:  No objection, your Honor.

22             THE COURT:  She is deemed an expert in the

23        field of forensic pathology.

24             MS. CHU:  At this time, your Honor, pursuant

25        to CPLR 4518 I'm going to offer the certified copies of

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    the autopsy report into evidence as People's 52.

2             THE COURT:  Okay.  People's what?

3             MS. CHU:  52.

4             COURT OFFICER:  52.

5             (Whereupon, the exhibit was shown to counsel.)

6             MR. WALENSKY:  No objection.  No objection.

7             THE COURT:  All right, received.

8             (Whereupon, the autopsy report was marked as

9    People's Exhibit 52 in evidence.)

10    Q    Doctor, on January 4th of 2012 was an autopsy

11  performed on a body that was identified to your office as

12  Anthony Wilson?

13    A    Yes.

14    Q    Can you tell me, was there a case number assigned

15  to that case?

16    A    Yes.

17    Q    What was the case number?

18    A    Case was K12-41.

19    Q    Now, can you tell me who actually conducted the

20  autopsy?

21    A    The autopsy was conducted by Dr. Frede Frederic.

22    Q    Can you tell me where she is now?

23    A    She is happily retired.

24    Q    Now, can you tell me, as a medical examiner, when

25  you perform autopsies are you mandated to prepare an autopsy

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    report with regard to your findings?

2        A    Yes.

3        Q    And is that considered a business record for you to

4    prepare?

5        A    Yes.

6        Q    Now, have you had an opportunity to review the

7    autopsy report and photographs that were taken of the autopsy

8    conducted on Anthony Wilson?

9        A    Yes, I did.

10       Q    Now, can you tell me, what was the height, weight

11   and approximate age of Anthony Wilson on the autopsy?

12       A    The approximate weight was 155 pounds, his height

13   was approximately 69 inches, which would be five feet nine

14   inches, and his age was approximately 50 years old.

15       Q    Okay.

16            THE COURT:  How old?

17            THE WITNESS:  What did you say?

18            THE COURT:  How old?

19            THE WITNESS:  Fifty.

20       Q    Can you tell me, what was Mr. Wilson's -- how was

21   he upon autopsy?  What did he appear like?

22       A    He appeared to be a well-developed, well-nourished

23   black male.

24       Q    Were there any recent injuries or anything unusual

25   about his body?

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    A    There were injuries.  There were a total of seven

2    stab wounds on the body, which was also in a state of what we

3    call morbid putrefaction.

4    Q    What is morbid putrefaction?

5    A    Morbid putrefaction is the breakdown of the body

6    after death, which happens with time.  So, Mr. Wilson's body

7    was morbidly putrefied, it showed green discoloration of the

8    skin, of the face and the trunk and as well as his arms and

9    legs.  There were areas of skin blistering, which is another

10   change that happens after death, as well as some maggot

11   activity on his face as well as his body.

12   Q    You said that the autopsy revealed that there were

13   seven stab wounds to Mr. Wilson's body?

14   A    Correct.

15   Q    Can you tell me, did Dr. Frederic assign numbers to

16   each of those seven wounds?

17   A    Yes, she did.

18   Q    How did she assign those numbers?

19   A    The numbers are assigned arbitrarily.

20   Q    What does that mean?

21   A    That means that there is no sequence implied as to

22   which stab wound was inflicted first or second, it's just

23   arbitrary.

24        We usually start with the head and then, you know,

25   depending on the Medical Examiner's style, we proceed, you

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    know, to go down the body and number the stab wounds.

2         Q    So you go front top to bottom and then back?

3         A    Usually.  Again, like I said, depending on the

4    Medical Examiner's style.

5         Q    Now, if you can just -- the wound that was given

6    the label number one by Dr. Frederic, can you just tell us,

7    where was that wound and describe it for us?

8         A    Yes.

9              That wound was on the right side of the chest,

10   approximately as measured with the body on the table, 13

11   inches below the top of the head, and the depth of that stab

12   wound was approximately half an inch with minimal amount of

13   damage or minimal amount of bleeding.

14                  THE COURT:  What was the depth?

15                  THE WITNESS:  Half an inch.

16                  THE COURT:  One-half inch.

17         Q    Can you show me on your body, where was that first

18   wound that was labeled number one?

19         A    Yes.

20              It was on the right chest, right here (indicating).

21         Q    Where you are pointing?

22         A    Yes.

23         Q    Just below the right clavicle?

24         A    Right.

25         Q    Can you tell me, were there any organs affected at

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1   all by that stab wound?

2       A    No.

3       Q    Was Dr. Frederic able to determine the direction of

4   the stab wound?

5       A    Yes.

6       Q    What was it?

7       A    The direction was from right to left, front to back

8   and downward.

9       Q    Okay.

10          Was she able to determine the dimensions of the

11  wound?

12      A    The dimensions were approximately three-eighths of

13  an inch long and one-eighth of an inch wide.

14      Q    Now, can you describe for us the second wound?

15      A    Okay.

16          The second wound was on the left chest and it was

17  approximately ten inches from the top of the head and two

18  inches to the left of midline.

19          We measure things from the top of the head and from

20  the midline of the body, again with the body flat on the

21  table.

22          And the wounds on the left chest, there's actually

23  not just wound number two, but number two, three, four and

24  five, she described those as a group, as a cluster, because

25  they were close to each other.

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    So in that area of the body, approximately ten

2  inches below the head and two inches to the left of the

3  middle, of the midline of the body, there were four stab

4  wounds labeled two, three, four and five.

5    Q    Okay.

6    Can you tell me, for two, three, four and five,

7  were there any organs affected by any of those wounds?

8    A    Yes.  The heart and the left lung.

9    Q    Okay.

10    Which of the wounds that she labeled two, three,

11  four, five pertain to the heart versus the lung?

12    A    Okay.

13    Stab wound number four is the wound that enters the

14  left chest and injures the heart.  And stab wound number five

15  from that cluster enters and injures the lung.

16    Q    Can you tell me, wound number two and three, they

17  do not affect any organs?

18    A    No, they do not.  They did not enter the chest

19  cavity, they just go through the skin and some of the tissues

20  under the skin.

21    Q    Can you tell me, was Dr. Frederic able to determine

22  the direction of those stab wounds, two, three, four and

23  five?

24    A    Yes.  The direction for those four stab wounds was

25  from left to right, from front to back and all downward.

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    Q    Now, what about, you had mentioned a depth of the

2  wound.  Was she able to determine the depth of the wound for

3  those four stab wounds, two, three, four and five?

4    A    Yes.

5    Q    What was the depth?

6    A    For stab wounds two and three, which two and three

7  were the more superficial ones that do not enter the chest

8  cavity, the depth was approximately two inches.

9         For stab wounds four and five, which enter the

10  chest cavity, injure the heart and the lung, the approximate

11  depth was five to six inches.

12              THE COURT:  Two or three were how many

13        inches?

14              Wounds two and three, what was the depth?

15              THE WITNESS:  Approximately two inches.

16              THE COURT:  Do me a favor, open all these

17        doors, that door and that door, it's too hot.

18              (Whereupon, there was a brief pause in the

19        proceedings.)

20    Q    Can you tell me, was there a dimension taken of the

21  actual wound itself for any of these two, three, four and

22  five wounds that she labeled?

23    A    Yes.

24         One of them measured about a quarter of an inch by

25  quarter of an inch and the others measured approximately

Dr. Scordi-Bello - People - Direct/Ms. Chu

1   three-eighths of an inch by a quarter of an inch.

2       Q    Now, did the decomposition of Mr. Wilson's body

3   affect, at all, her ability to examine the actual wound

4   itself?

5       A    Yes, because the edges of the wounds become very

6   dry and so it's difficult to examine in great detail what the

7   angles, what the edges of the wound look like.

8       Q    Did the decomposition affect her ability at all to

9   determine dimensions or depth of the wounds?

10      A    No.

11      Q    Now, can you tell me, we've gone through up to the

12  wound that she labeled number six?

13      A    Yes.

14      Q    Can you describe that one for us?

15      A    Wound number six was in the left lower chest or

16  upper abdomen and measured three-eighths of an inch.

17                THE COURT:  Where was this wound number six?

18      Sorry, say that again.  Wound number six, what?

19                THE WITNESS:  Was on the left side lower

20      chest, upper abdomen, measured three-eighths of an inch

21      by a quarter of an inch.

22                THE COURT:  Wait.

23                THE WITNESS:  And --

24                THE COURT:  Wait.  How many inches?  Measured

25      what?

Dr. Scordi-Bello - People - Direct/Ms. Chu

1          THE WITNESS:  Measured three-eighths of an

2     inch by a quarter of an inch.

3          THE COURT:  Go ahead.

4     A    That stab wound also entered the chest and injured

5     the left lung.

6     Q    Can you tell me, was Dr. Frederic able to determine

7     the direction of that wound?

8     A    Yes.  The direction of stab wound number six was

9     front to back, from left to right and upwards.

10    Q    What was the depth of that wound?

11    A    That was also measured at approximately five to six

12    inches deep.

13    Q    Now, where was the seventh wound?

14    A    The seventh wound was on the left upper back.

15    Q    Can you just show us on your body where that is?

16    A    Left upper back (indicating), sort of posterior

17    shoulder.

18    Q    Just on the opposite side of your shoulder?

19    A    Yeah, right here.

20    Q    Can you tell me, can you describe that wound for

21    us?

22    A    Yes.

23         That wound measured five-eighths of an inch by a

24    quarter inch and penetrated into the skin as well as the

25    muscle of the upper back, and its depth was approximately

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    two-and-a-half inches.

2         Q    Was there a directionality that was able to be

3    determined?

4         A    Yes.  Stab wound number seven went from back to

5    right, left to right and downward.

6         Q    Have you completed your remarks regarding all seven

7    stab wounds?

8         A    Yes.

9         Q    Based on the autopsy that was performed by Dr.

10   Frederic, did you concur with her cause of death that she --

11   the same conclusion she came to?

12        A    Yes.

13        Q    Can you tell me, what was the cause of death for

14   Anthony Wilson, to a reasonable degree of medical

15   certainty?

16        A    The cause of death was stab wounds to the trunk

17   with heart, lung and musculoskeletal injuries.

18        Q    Now, can you tell me on wound number --

19             THE COURT:  Stab wounds to trunk and what?

20             THE WITNESS:  With heart, lung and

21        musculoskeletal injuries.

22             THE COURT:  Okay, go ahead.

23        Q    Now, I just want to go back to wound number four.

24   You indicated that wound number four was the one that

25   affected the heart?

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    A    Yes.

2    Q    And can you tell me, you said the depth of that

3  wound was how many inches?

4    A    Approximately five to six.

5    Q    Now, did that wound affect anything other than

6  organs when it went in?

7    A    That cluster of wounds, not number four

8  specifically, but the cluster of two, three, four and five

9  also injured the left fourth rib.

10    Q    So when you say it injured the left fourth rib,

11  what do you mean by that?

12    A    It cut the rib.

13    Q    It cut through the rib?

14    A    Yes.

15    Q    So was the rib completely separated or there was

16  actually a stab wound that goes right through the bone?

17    A    It was -- she describes it as the left fourth rib

18  is cut.

19    Q    Okay.

20         How much pressure would you need to have on a knife

21  to go through a body and actually cut through bone?

22              MR. WALENSKY:  Objection.  It's not -- it's

23         not the testimony.

24              THE COURT:  What is your interpretation of Dr.

25         Frederic's conclusion that or observation that -- that

mc

240

Dr. Scordi-Bello - People - Direct/Ms. Chu

```
 1      was the left rib?

 2                  THE WITNESS:  Yes.

 3                  THE COURT:  Was cut, what does that mean?

 4                  THE WITNESS:  It takes more force or more

 5      pressure to go through bone than it does to go through

 6      soft tissue, like the skin or soft organs like the

 7      heart.  So, I can't give you a number but I can, you

 8      know --

 9                  THE COURT:  The word "cut," does that mean

10      that the rib itself, the bone, was cut?

11                  THE WITNESS:  Yes.

12                  THE COURT:  All right.

13                  And do you know if --

14                  Does the report reflect the dimension of the

15      cut?

16                  THE WITNESS:  No.

17                  THE COURT:  Okay.

18      Q    Now, I'd like to give you a hypothetical, Doctor.

19           Given the state of decomposition of Mr. Wilson's

20      body, is that consistent with the time of death being around

21      November 29th, 2011?

22      A    Yes.

23      Q    Okay.

24           Can you tell us why?

25      A    Given the environmental conditions that were stated
```

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1   in the report, specifically the temperature of the room being

2   cold, approximately somewhere in the mid-thirties, it's very

3   consistent that Mr. Wilson was -- died in late November and

4   not discovered until January.

5       Q    Okay.

6            And can you tell me, were any of the stab wounds

7   that you found to -- I'm sorry -- that Dr. Frederic found to

8   Mr. Wilson's body, were any of them slash wounds?

9       A    No.

10      Q    What is the difference between a stab wound and a

11  slash wound?

12      A    A stab wound is deeper than it is long on the skin.

13  A slash wound is usually a long wound on the skin without

14  much depth.

15      Q    Okay.

16           And, so, did Mr. Wilson have any injuries on him

17  that were consistent with a laceration or a slash from a

18  knife?

19      A    No.

20      Q    Now, were there any injuries to his hands or his

21  arms that would be consistent with someone putting up his

22  arms or hands in front of him?

23      A    No, he had no injuries to his hands or arms.

24      Q    Now, you also mentioned that the wounds, two, three

25  four, five, were clustered?

Dr. Scordi-Bello - People - Direct/Ms. Chu

1       A     Correct.

2       Q     And can you tell me, is the clustering consistent

3  with the wounds having been inflicted in close succession?

4       A     Yes.

5       Q     And why is that?

6       A     Their proximity.  The fact that they're so close to

7  each other would suggest that they were inflicted, you know,

8  quickly, one after the other.

9       Q     Now, is that suggestive of someone who's actively

10  moving and struggling with the person with a knife or is it

11  more consistent --

12              MR. WALENSKY:  Objection.  Beyond the scope of

13          the expertise.

14              THE COURT:  First off, finish your question,

15          all right.

16       Q     Is that suggestive of someone who's actively moving

17  and struggling with a person that has the knife or is it more

18  consistent with someone who's not moving and is passive?

19              MR. WALENSKY:  Objection.  It's beyond the

20          expertise of this witness.

21              THE COURT:  I don't know.

22              Can you answer that question yes or no?

23              THE WITNESS:  It could be suggestive of rapid

24          succession in someone who's not actively --

25              MR. WALENSKY:  Objection.  It sounds like a

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1        guess as opposed to knowledge through training.

2                THE COURT:  The question is, is it

3        consistent -- repeat the question, all right.  Not you,

4        the Reporter.

5                (Whereupon, the referred-to question was read

6        back by the Reporter.)

7                THE COURT:  Can you, with any degree of

8        medical certainty, give an opinion?

9        A      In my opinion, it is more suggestive of someone

10   who's not actively moving.

11               THE COURT:  Okay.

12       Q      Now, you had mentioned that there was that one

13   injury to the back of the shoulder or back of the arm?

14       A      Correct.

15       Q      I'm sorry, just on the other side of the arm.

16              Yes?

17       A      Yes.

18       Q      Okay.

19              What did that -- I'm sorry, withdrawn.

20              Is it possible that someone who's standing in front

21   of you could give you a stab wound to the back?

22       A      It's possible.

23       Q      Okay.

24              Now, --

25               MR. WALENSKY:  Objection, your Honor.  I'd

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    like to voir dire the witness on expertise regarding

2    their ability to know how wounds are --

3            THE COURT:  You will have the time to

4    cross-examine the witness.

5    Q    Now, Doctor, I want to give you another

6    hypothetical.

7            If the person who has the knife is bent forward

8    from the waist and the victim is leaning over them while also

9    facing them, would you expect the stab wounds would be

10   oriented upwards or downwards?

11           MR. WALENSKY:  Objection.  It's --

12           THE COURT:  I'm sorry.

13           Reframe your question, please.

14   Q    I'd like to give you a hypothetical.

15           Let's assume that the person who has the knife is

16   standing but bent forward from the waist and that the person

17   that they're going to stab is standing in front of them but

18   leaning over them and on top of them.

19           If the person who has the knife were to stab the

20   person that's standing in front of them and over them, would

21   you expect the stab wounds to be oriented upwards or

22   downwards?

23           MR. WALENSKY:  Objection, your Honor.  It's --

24   it's -- one, it's leading.  Two, the witness is a

25   forensic pathologist, is a forensic expert but has not

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1     shown any expertise regarding any -- training regarding

2     where wounds are.  She looks at autopsies or autopsies

3     bodies.  There's been no expertise shown.

4                THE COURT:  She is an expert in forensic

5     pathology.

6                MR. WALENSKY:  But she's not necessarily an

7     expert in terms of how --

8                THE COURT:  You will have an opportunity to

9     cross-examine the witness.

10               MR. WALENSKY:  Note my objection.

11               THE COURT:  It's noted.

12               The objection to that is sustained.

13    Q     Let me ask you this, Doctor.  Did you understand

14  what I was asking in that last question?

15    A     Yes, I did.

16    Q     Okay.

17          So let's assume that you have two people that are

18  in those positions, the first one --

19               MR. WALENSKY:  Objection.  You just sustained

20    it.

21               THE COURT:  Sustained.

22    Q     Other than stab wound number six, did Mr. Wilson

23  have any other wounds that were in an upward direction?

24    A     No.

25    Q     Were toxicology exams requested on the fluids from

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1  Anthony Wilson?

2      A    Yes.

3      Q    Can you explain to the members of the jury what

4  toxicology exams are?

5      A    Toxicology is examination or analysis of fluids

6  from the body for the presence of either prescription

7  medications or illicit drugs.

8      Q    Can you tell me, what were the fluids that were

9  submitted for testing?

10      A    The fluids that were submitted were blood as well

11  as brain tissue.  Because the body of Mr. Wilson was -- was

12  putrefied, no other fluids were available, such as urine or

13  vitreous fluid, which is something we usually submit for the

14  toxicology.

15      Q    Okay.

16          Can you tell us, what were the results?

17      A    Yes.

18          The blood that was submitted was positive for

19  ethanol, that's alcohol, Fluoxetine, which is an

20  antidepressant, and Benzoylecgonine, which is a metabolite

21  or breakdown product of cocaine, as well as Levamisole,

22  which is a drug that is usually used to -- it usually

23  accompanies cocaine, it's something that is used to cut the

24  cocaine.

25          THE COURT:  It was positive for alcohol, what

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    else?

2            THE WITNESS:  Alcohol, Fluoxetine, that's an

3    antidepressant.

4            THE COURT:  Could you spell that?

5            THE WITNESS:  F-L-U-O-X-E-T-I-N-E.

6            THE COURT:  X-E-T-I-N-E.

7            What is Fluoxetine?

8            THE WITNESS:  Antidepressant medication.

9            THE COURT:  What was the other two?

10           THE WITNESS:  Benzoylecgonine.

11           THE COURT:  Spell that.

12           THE WITNESS:  B-E-N-Z-O-Y-L-E-C-G-O-N-I-N-E.

13           THE COURT:  C-G-O...

14           THE WITNESS:  N-I-N-E.

15           THE COURT:  What is that?

16           THE WITNESS:  That is a byproduct of cocaine.

17           THE COURT:  What was the other last one?

18           THE WITNESS:  Last one, Levamisole.

19           THE COURT:  L-E --

20           THE WITNESS:  V-A-M-I-S-O-L-E.

21           THE COURT:  What is that?

22           THE WITNESS:  That's -- I would call it an

23    adulterant or a contaminant in the cocaine.

24           THE COURT:  Okay, go ahead.

25    Q    Now, Doctor, did the stage of decomposition in

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    Mr. Wilson's body affect the results of the toxicology at

2    all?

3        A    Decomposition does affect toxicology results

4    slightly.  The levels might be slightly increased or slightly

5    decreased but doesn't alter them significantly.

6        Q    Okay.

7             Now, can you tell me, were there any other injuries

8    to Mr. Wilson's body?

9        A    No.

10            MS. CHU:  At this time, your Honor, if I can

11       have this marked People's Number 53 for identification.

12            (Whereupon, the exhibit was shown to counsel.)

13            (Whereupon, the blowup of diagram was marked

14       as People's Exhibit 53 for identification.)

15            (Whereupon, the exhibit was shown to the

16       witness.)

17       Q    Dr. Scordi-Bello, --

18            THE COURT:  What is this, number 53?

19       Q    -- do you recognize what's being shown to you?

20       A    Yes.

21       Q    What do you recognize that to be?

22       A    It's a magnified copy of the diagram that Dr.

23    Frederic completed at the time of autopsy.

24       Q    Is that one of the diagrams -- one of the things

25    that you reviewed before you testified here on this case?

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1    A     Yes.

2              MS. CHU:  At this time, your Honor, I would

3    offer it into evidence as People's 53.

4              THE COURT:  Any objection?

5              MR. WALENSKY:  No objection, no.

6              THE COURT:  It's in evidence.

7              (Whereupon, the blowup of diagram was marked

8    as People's Exhibit 53 in evidence.)

9              MS. CHU:  Can I have it posted, please?

10             (Whereupon, the exhibit was posted.)

11             MS. CHU:  I am going to hand up a marker to my

12   witness.

13             Your Honor, may the witness approach the

14   exhibit?

15             THE COURT:  You may.

16             (Whereupon, the witness stepped down from the

17   witness stand and approached the exhibit.

18   Q     Doctor, if you can just walk us through what we are

19   looking at here.

20   A     These are the seven stab wounds that Dr. Frederic

21   describes in her report.

22             Stab wound number one is on the right chest.  That

23   stab wound is approximately half an inch deep and has a

24   downward direction.

25             Stab wounds two and three are on the left upper

mc

Dr. Scordi-Bello - People - Direct/Ms. Chu

1   chest, each one is approximately two inches deep, and both

2   have a downward direction.

3          Stab wounds --

4          Stab wound number four is the stab wound that

5   injures the heart.  It also has a downward direction and it

6   is approximately five to six inches deep.

7          Stab wound number five injures the left lung, it's

8   a downward direction, it's approximately five to six inches

9   deep.

10          Stab wound number six also injures the left lung,

11   has an upward direction and is five to six inches deep.

12          Stab wound number seven is the last one, it has a

13   downward direction and is approximately two-and-a-half inches

14   deep without any injury to any vital organs.

15   Q     Thank you very much, Doctor.  You can have a seat.

16             (Whereupon, the witness resumed the witness

17       stand.)

18             MS. CHU:  Can I just have one moment, your

19       Honor?

20             (Whereupon, there was a brief pause in the

21       proceedings.)

22             MS. CHU:  I have no further questions.

23             THE COURT:  Cross.

24             MR. WALENSKY:  Sergeant, can you please slide

25       this?

Dr. Scordi-Bello - People - Cross/Mr. Walensky

1  CROSS-EXAMINATION

2  BY MR. WALENSKY:

3       Q    Good afternoon, Doctor.

4       A    Good afternoon.

5       Q    Now, do any photos of this autopsy exist?

6       A    Yes.

7       Q    Did you view these photos?

8       A    I did.

9       Q    Do you have any of them with you?

10      A    No, I do not.

11      Q    Now, you didn't do this autopsy, of course?

12      A    No, I did not.  I was present the day that Dr.

13  Frederic did the autopsy but I did not personally perform the

14  autopsy.

15      Q    Were you present at the autopsy?

16      A    Yes, I was.

17      Q    Did you review the autopsy as it was being done?

18      A    Yes.

19           I didn't have a very specific recollection of it.

20  It was a couple of years ago.

21      Q    Essentially that's my question.  You don't have a

22  recollection, so you're working off the report of Dr.

23  Frederic?

24      A    And the pictures, correct.

25      Q    And the pictures.

Dr. Scordi-Bello - People - Cross/Mr. Walensky

1    Now, Ms. Chu was asking you about how a stab wound

2 could have happened, essentially, right?

3    She said if somebody is stabbing this way, would

4 it create this type of wound, meaning up to down, side to

5 side?

6       THE COURT:  You objected to that.  Sustained.

7       MR. WALENSKY:  Some of the first part was.

8   The last part was --

9       THE COURT:  She was asked --

10      Why don't you limit it to the direction.

11 Q Well, Doctor, your training doesn't --

12    You weren't trained in knowing how wounds are --

13 how somebody obtains a wound, correct?

14       MS. CHU:  Objection.

15       THE COURT:  Sustained.

16       MR. WALENSKY:  I will withdraw it.

17 Q You didn't receive --

18    It appeared when --

19       THE COURT:  How do you determine the

20   direction?

21       THE WITNESS:  The direction is determined by

22   examining the path of the wound inside the body.  So,

23   when we state that a stab wound goes from front to back,

24   left to right and upwards, it means that from the skin,

25   the path and the track of the injuries are in that

Dr. Scordi-Bello - People - Cross/Mr. Walensky

1         direction, it suggests the direction of the blade as it

2         enters the body.

3         Q    That is what your training is, it's the direction

4    the blade might be?

5         A    Correct.

6         Q    You weren't trained in how people might be standing

7    for wounds to be given?

8         A    That's correct.

9         Q    Because, Doctor, you're looking at the result of

10   the wound, right?

11        A    That's correct.

12        Q    You are not looking at how the wound occurred,

13   correct?

14             When you look at this, a knife wound has a

15   certain -- would have a certain -- there would be a certain

16   indication that something is caused by a knife or a sharp

17   object, right?

18        A    Correct.

19        Q    And if there's a bullet wound, sometimes you will

20   find a bullet, other times --

21             MS. CHU:  Objection.

22             THE COURT:  Sustained.  There is no bullet

23        here.

24             MR. WALENSKY:  She's an expert.  I'm asking --

25             THE COURT:  I know she's an expert.

mc

Dr. Scordi-Bello - People - Cross/Mr. Walensky

1          MR. WALENSKY:  I am asking an opinion.

2     Q     Essentially, but you are giving opinions as to
3 tracks of wounds?

4     A     Correct, based on the facts that I have, that the
5 body gives me.

6     Q     So you see the result, you don't see the how, how
7 it happened?

8     A     Correct.

9     Q     Thank you.

10         Regarding the toxicology report, monoacetylmorphine
11 was not detected?  That is an opiate, correct?

12    A     Monoacetylmorphine is a byproduct of heroin.

13    Q     And Hydrocodone, that is a synthetic painkiller?

14    A     Correct.

15    Q     Hydromorphone is a synthetic of morphine?

16    A     Correct.

17    Q     Would that be Dilaudid or something that is a brand
18 name?

19    A     I believe so, yes.

20    Q     And Oxycodone is another type of synthetic --

21         THE COURT:  I don't understand something.

22    What is your question?

23         MR. WALENSKY:  I'm going through -- I'm asking

24    this of an expert witness.

25         THE COURT:  Asking what about those drugs?

                                                        mc

Dr. Scordi-Bello - People - Cross/Mr. Walensky

1                MR. WALENSKY:   I am asking about what these

2      drugs are.

3                MS. CHU:   They weren't detected.

4                THE COURT:   Sustained, about what these drugs

5      are.

6        Q    Doctor, I'm sorry, someone is trying to call me

7   when they shouldn't have been.

8             Doctor, Fluoxetine is an antidepressant?

9        A    Correct.

10       Q    Would that be something like Prozac?

11       A    Yes.

12       Q    That's the generic name for Prozac?

13       A    Yes.

14       Q    And that's classified as an antidepressant?

15       A    Correct.

16       Q    And Fluoxetine is also classified as an

17   antidepressant?

18       A    It is a byproduct of Fluoxetine.

19       Q    And was there a test for Seroquel?

20       A    No, it was not detected.

21       Q    That was classified as an antipsychotic?

22                MS. CHU:   Objection.

23       Q    Let me ask the second question, I'll clarify it.

24            Is that --

25            That is classified as an antipsychotic medication,

mc

Dr. Scordi-Bello - People - Cross/Mr. Walensky

1    isn't it?

2                    MS. CHU:   Objection.

3         A    As well as --

4                    THE COURT:   As well as what?

5                    THE WITNESS:   An antidepressant.

6         Q    That is why I said also indicated for

7    antidepressant, for sleeplessness?

8         A    Correct.

9         Q    Generally, if somebody hasn't had better drugs for

10   sleeplessness, hasn't had a prior --

11                   MS. CHU:   Objection.

12                   THE COURT:   Sustained.

13        Q    Now, in this body, this person, Mr. Wilson had an

14   ethanol level of .20?

15        A    Correct.

16        Q    When a person expires, metabolizing stops, doesn't

17   it?

18        A    Yes.   Breakdown stops.

19        Q    The breakdown stops?

20        A    Yes.

21        Q    So at the time of his death it was .20?

22        A    Close to .20, yes.

23        Q    And even after, in this case, about 35 days, almost

24   40 days, right?

25                   Now, when somebody expires, do their bowels open

Dr. Scordi-Bello - People - Cross/Mr. Walensky

1   up?

2        A    I don't understand the question.

3        Q    What I mean is, if somebody dies, will they lose

4   retention, will they defecate?

5        A    Sometimes, yes.

6        Q    Sometimes.

7             And sometimes urinate?

8        A    Correct.

9        Q    When somebody's grievously wounded, will they also

10  sometimes defecate?

11       A    Sometimes.

12       Q    With the wounds that you examined on Mr. Wilson, he

13  could have lived for five, ten, 20 minutes?

14       A    I can't give you an approximate.  I can't give you

15  a specific number of minutes but they were not

16  instantaneously lethal.

17       Q    That's my question.

18            Whereas a wound to the brain might be

19  instantaneously lethal?

20       A    Yes.

21       Q    But these wounds were bleeding, had something to do

22  with loss of blood, right?

23       A    Yes.

24       Q    How significant the wound was to the particular

25  vital organ, correct?

Dr. Scordi-Bello - People - Redirect/Ms. Chu

1    A    Yes.

2    Q    So someone might live five, ten or 20 minutes,

3 right?  You don't have a specific way of knowing?

4    A    Correct.

5    Q    But it wasn't immediately fatal?

6    A    Correct.

7    Q    And you, of course, don't know --

8         You know that this man died from stabbing but you

9 don't know the circumstances surrounding that, correct?  You

10 weren't a witness to this?

11   A    No, I was not.

12             MR. WALENSKY:  Okay.

13             Thank you very much, Doctor.

14             MS. CHU:  Your Honor, I have a couple of

15     questions.

16             THE COURT:  Redirect.

17 REDIRECT EXAMINATION

18 BY MS. CHU:

19   Q    Doctor, you had mentioned that none of the wounds

20 would have been instantaneously lethal?

21   A    Correct.

22   Q    Now, let's talk about wounds four, five and six,

23 the one that went to the heart and the one -- and two that

24 went into the left lung.

25         What affect would that have had on Mr. Wilson's

mc

Dr. Scordi-Bello - People - Redirect/Ms. Chu

1  ability to function, his body?

2      A    Wound number four went into his heart, number

3  five and six injured his lung, so he would have been

4  bleeding at that point so it would have impaired him at

5  some level.

6      Q    Okay.

7           Can you tell me, based upon those injuries,

8  specifically, though, three, four, five and six stab

9  wounds, would that have affected his ability to move around

10 at all?

11     A    It could, yes.

12     Q    Okay.

13          Can you tell me, how long would it take if someone

14 had an injury to the heart, say also Mr. Wilson, for him to

15 actually lose consciousness?

16              MR. WALENSKY:  Objection, asked and answered.

17              THE COURT:  I didn't hear it before.  I'll let

18      it, if she knows.

19              Can you answer?

20     A    In very general terms, I can't give you a specific

21 number of minutes.  Just as I couldn't give you a specific

22 number of minutes, it could be a few seconds, it could be a

23 couple of minutes.

24     Q    Now, that injury to the heart in conjunction with

25 the two stab wounds to the left lung, would that have

Dr. Scordi-Bello - People - Redirect/Ms. Chu

1   affected his -- how long it would have taken him to actually

2   lose consciousness from the loss of blood?

3       A    The more injuries, the more blood loss, the quicker

4   someone will lose consciousness.

5       Q    Now, you were also asked some questions with regard

6   to when someone's impaired or seriously injured, that they

7   might defecate on themselves?

8       A    Correct.

9       Q    Or urinate on themselves?

10      A    Correct.

11           MS. CHU:  Your Honor, if I can have People's 2

12      through 41.

13           (Whereupon, the exhibits were handed to

14      counsel.)

15           (Whereupon, the exhibit was displayed.)

16      Q    Doctor, if you can just take a look at People's --

17  I'm sorry -- 8 in evidence.

18           If you can just tell us, I just want you to look at

19  the pants that are in the left corner of the picture.

20      A    Excuse me.

21      Q    And do you see any staining on the pants?

22      A    I do.

23      Q    Can you tell me, in your expertise, would that

24  staining be more consistent with feces, more consistent with

25  blood or urine?

1         MR. WALENSKY:  Objection.

2         THE COURT:  Want some water?

3         THE WITNESS:  Yes, please.

4         MR. WALENSKY:  Objection, 'cause this is

5   really a guess, it's beyond looking at -- looking at a

6   stain as posted.

7         THE COURT:  She will answer whether she can

8   respond to the question.

9   A     The staining that you indicated is somewhat light

10  in color so I think, in my opinion, it's not consistent with

11  blood, it would be more consistent with urine or it could be

12  more consistent with diluted feces, but it's too light to be

13  blood.

14        MS. CHU:  Okay.  Thank you, very much, Doctor.

15  I have nothing further.

16        THE COURT:  Any recross?

17        MR. WALENSKY:  No, nothing further.

18        Thank you very much, Doctor.

19        THE COURT:  Thank you, Doctor.

20        THE WITNESS:  Thank you.

21        (Whereupon, Dr. Scordi-Bello stepped down from

22  the witness stand and exited the courtroom.)

23        THE COURT:  Come on up.

24        (Whereupon, a sidebar discussion was held off

25        the record.)

mc

Proceeding

1          THE COURT:  We'll take a very short recess,

2     ladies and gentlemen, ten minutes.

3          Do not discuss the case amongst yourselves or

4     with anyone else.

5          (Whereupon, the Jury exited the courtroom.)

6          THE COURT:  All right, ten minutes.

7          (Whereupon, a brief recess was held.)

8          THE CLERK:  Case back on trial continues.

9     All parties present, defendant present with her

10    attorney.

11         MR. WALENSKY:  Your Honor, I don't anticipate

12    speaking anymore about any psychiatric condition of the

13    decedent unless something is opened up and I would be

14    permitted to under the case law.  But I spoke to Ms.

15    Chu, you see in evidence is already pictures of the

16    pills on the floor and the Seroquel bottle, which is why

17    this was delayed for months as we got the medical

18    reports, with DNA blood samples taken from that bottle

19    which are matched to Mr. Wilson, so the fact that there

20    was a Seroquel bottle, without mentioning as to why, and

21    39 pills which were in fact vouchered, is relevant and I

22    think when --

23         THE COURT:  What is it relevant to?

24         MR. WALENSKY:  In summation --

25         THE COURT:  What is it relevant to?

Proceeding

1          MR. WALENSKY:  -- I can bring up what was

2     found in the apartment.

3          THE COURT:  So bring that up.

4          MR. WALENSKY:  That is all.  Because rather

5     than open my mouth and have objections sustained, I

6     wanted you to know.

7          THE COURT:  I am not trying your case.  You

8     want to make an objection, you make an objection.

9          MR. WALENSKY:  I'm meaning, you know, if the

10    Court sustains it on their own, if I mention the word

11    Seroquel, I'm afraid --

12         THE COURT:  You were mentioning things that

13    were not found in her body -- in his body.

14         MR. WALENSKY:  I understand.

15         THE COURT:  That's the reason I sustained the

16    objection.

17         MR. WALENSKY:  I understand.  But --

18         THE COURT:  I understand, too, why you were

19    doing this, so, all right.  All right.

20         Get the jury, please.

21         Who is your next witness?

22         MS. CHU:  Detective Scandole.

23         THE COURT:  Scandole.

24         COURT OFFICER:  Ready for the jury?

25         THE COURT:  Yes.

Det. Scandole - People - Direct/Ms. Chu

1          COURT OFFICER:  Jury entering.

2          (Whereupon, the Jury entered the courtroom.)

3          THE CLERK:  All the jurors are present and

4    seated.

5          Do both sides waive the roll call?

6          MS. CHU:  Yes.

7          THE CLERK:  Mr. Walensky?

8          MR. WALENSKY:  Yes.

9          THE COURT:  Call your next witness.

10         MS. CHU:  The People call Christopher

11   Scandole.

12         COURT OFFICER:  Ready for the witness?

13         THE COURT:  Yes.

14         (Whereupon, Detective Christopher Scandole

15   entered the courtroom and took the witness stand.)

16         THE CLERK:  Raise your right hand.

17         Do you solemnly swear or affirm that the

18   testimony you're about to give will be the truth, the

19   whole truth and nothing but the truth, so help you

20   God?

21         THE WITNESS:  Yes, I do.

22         THE CLERK:  Please state your name for the

23   record.

24         THE WITNESS:  Detective Christopher Scandole.

25         THE CLERK:  Give your shield and command,

mc

Det. Scandole - People - Direct/Ms. Chu

1              please.

2                         THE WITNESS:  5735, Brooklyn North Homicide

3              Squad.

4                         THE CLERK:  Thank you.

5                         THE COURT:  Proceed.

6                         MS. CHU:  Thank you.

7     C H R I S T O P H E R        S C A N D O L E, Detective,

8                    Shield No. 5735, Brooklyn North Homicide Squad, New

9                    York City Police Department, called as a witness by

10                   and on behalf of the People of the State of New

11                   York, after having been first duly sworn, was

12                   examined and testified as follows:

13    DIRECT EXAMINATION

14    BY MS. CHU:

15         Q    Good afternoon, Detective.

16         A    Good afternoon.

17         Q    How long have you been with the New York City

18    Police Department?

19         A    Approximately 27 years.

20         Q    And you said you're currently assigned to Brooklyn

21    North Homicide.  How long have you been there?

22         A    Approximately ten years.

23         Q    Now, can you tell us about your career with the

24    N.Y.P.D. starting from when you get out of the Academy?

25         A    I worked on patrol in the 79th Precinct, then I

1    worked in the Brooklyn North Narcotics Unit.  From the

2    Narcotics Unit I was assigned back to the 79th Precinct

3    Detective Squad, from the 79th Detective Squad I was assigned

4    to the Brooklyn North Homicide Squad.

5         Q    Can you tell me, directing your attention to

6    January 3rd, 2012, were you working as a detective in the

7    Brooklyn North Homicide?

8         A    Yes, I was.

9         Q    Can you tell me, what hours did you work that day,

10   if you remember?

11        A    I believe I was doing a day tour, which I believe

12   would be 8:00 to 4:00.

13        Q    Did there come a time on that day that you became

14   involved in an investigation into the death of a person by

15   the name of Anthony Wilson?

16        A    Yes.

17        Q    And how was it that you became involved in the

18   case?

19        A    I was notified by detectives from the 83rd

20   Precinct Detective Squad that there was a death to be

21   investigated.

22        Q    Now, what is your role as a homicide detective when

23   there's a homicide in a precinct?

24        A    We assist the precinct detective squad detectives

25   in investigating their homicides.

mc

Det. Scandole - People - Direct/Ms. Chu

1   Q      Who was assigned to the 83rd Precinct to

2  investigate this homicide?

3   A      Detective Hernandez.

4   Q      Now, did you actually respond to the scene?

5   A      I did.

6   Q      Can you tell me what time you got there?

7   A      About 2:00 P.M.

8   Q      Now, when you arrived, did you observe anyone

9  injured there?

10   A      Yes.

11   Q      And who was that?

12   A      That was Anthony Wilson.

13   Q      Was he already -- I'm sorry.

14          What was his condition when you arrived?

15   A      He was already deceased.

16   Q      Now, during the course of your investigation did

17  you or your fellow detectives speak with any witnesses?

18   A      Yes.

19   Q      And based upon your investigation, did there come a

20  time when you began to look for anyone in particular?

21   A      Yes.

22   Q      Who was that?

23   A      Atara Wisdom.

24   Q      How soon after January 3rd, 2012, were you looking

25  for Ms. Wisdom?

Det. Scandole - People - Direct/Ms. Chu

1    A    That was late March of 2012.

2    Q    Now, was an investigative card prepared for Miss

3  Wisdom?

4    A    Yes, it was.

5    Q    What is an investigative card?

6    A    It's a form that is filled out and entered into

7  the Police Department's databases that the investigating

8  detectives will be notified if the person has any police

9  contact, such as an arrest or summons on a name check.

10    Q    What date was that prepared?

11    A    That was on April 2nd.

12    Q    I want to direct your attention to July 2012.  Did

13  there come a time that you were notified that Ms. Wisdom had

14  been located?

15    A    Yes.

16    Q    And can you tell me, how did you learn of this

17  information?

18    A    We conducted a check of the New York City

19  Department of Homeless Services shelters, we found her to be

20  a resident of one of the women's shelters.

21    Q    When was it you found out this information?

22    A    That was on July 24th.

23    Q    Of 2012?

24    A    2012.

25    Q    Did there come a time when you actually went to the

Det. Scandole - People - Direct/Ms. Chu

1   women's shelter?

2        A     Yes, on July 25th, 2012.

3        Q     What time?

4        A     About 9:45 A.M.

5        Q     And were you with anybody when you went to that

6   location?

7        A     I was with Detective Collins.

8        Q     Now, did there come a time when you saw Atara

9   Wisdom?

10       A     Yes.

11       Q     Can you tell me, what did you do when you saw her?

12       A     We asked her to accompany us back to the 83rd

13  Precinct Detective Squad.

14       Q     I ask you to look around the courtroom today and

15  see if you see the person that was identified to you as Atara

16  Wisdom here.

17       A     Yes, I do.

18       Q     Can you just point to her and indicate something

19  that she is swearing?

20       A     She's sitting at the table wearing the brown shirt

21  (indicating).

22             THE COURT:   Indicating the defendant.

23       Q     Thank you.

24             Now, where did you bring Ms. Wisdom?

25       A     To the 83rd Precinct Detective Squad.

mc

Det. Scandole - People - Direct/Ms. Chu

1    Q    Where did you place her?

2    A    In an interview room.

3    Q    Now, where is the 83rd Precinct Detective Squad

4  within the precinct?

5    A    On the second floor of the building.

6    Q    Now, you said you brought her into the interview

7  room?

8    A    Yes.

9    Q    Was she handcuffed?

10    A    No.

11    Q    Was she handcuffed leading up to getting into that

12  room?

13    A    No.

14    Q    Now, was anyone else present when you brought her

15  back to the precinct?

16    A    Yes, myself and Detective Collins.

17    Q    Now, did there come a time, once she was back at

18  the precinct, that you spoke with her?

19    A    Yes.

20    Q    And before you spoke with her did you read her what

21  are commonly known as Miranda rights?

22    A    Yes, I did.

23    Q    How were you able to read the Miranda rights to

24  her?

25    A    I read them from a preprinted form.

Det. Scandole - People - Direct/Ms. Chu

1    Q    Now, do you have the rights that you read to Miss

2    Wisdom on July 25th, 2012, with you today?

3    A    I do.

4              MS. CHU:  At this time, your Honor, if I

5         can have them deemed marked People's 54 for

6         identification.

7              (Whereupon, the Miranda rights was marked as

8         People's Exhibit 54 for identification.)

9              MS. CHU:  Mr. Walensky, do you want to see

10        it?

11             MR. WALENSKY:  I've seen it, thank you.

12   Q    Detective, looking at People's 53 for

13   identification, do you recognize -- I'm sorry -- 54 for

14   identification, do you recognize that item?

15   A    I do.

16   Q    What is that?

17   A    This is the form I used to read the Miranda rights

18   to Ms. Wisdom and to record her answers.

19   Q    Now, can you tell me, were any markings made on the

20   Miranda rights at the time that you read them to Miss Atara

21   Wisdom?

22   A    No.

23   Q    No markings were made on it?

24   A    I made the markings as I was reading them.

25   Q    You made the markings?

Det. Scandole - People - Direct/Ms. Chu

1    A    Yes.

2    Q    Did Ms. Wisdom make any markings on that Miranda

3  rights sheet that you have?

4    A    She signed her name to it.

5              MS. CHU:  Okay.

6              At this time, your Honor, I would offer that

7         in evidence as People's 54.

8              MR. WALENSKY:  No objection.

9              THE COURT:  In evidence.

10             (Whereupon, the Miranda rights was marked as

11        People's Exhibit 54 in evidence.)

12   Q    Now, Detective, would you please demonstrate the

13 manner in which you read Miss Wisdom her Miranda rights,

14 including any answers she gave to your questions.

15   A    You have the right to remain silent and refuse to

16 answer questions.

17             Do you understand?

18             She answered "yes" and I wrote down "yes."

19             THE COURT:  Slow down.

20   A    Sorry.

21             THE COURT:  She has to take it down.

22   A    Anything you say may be used against you in a court

23 of law.

24             Do you understand?

25             She answered "yes" and I wrote down "yes."

mc

Det. Scandole - People - Direct/Ms. Chu

1          You have the right to consult an attorney before

2     speaking to the police, also have an attorney present during

3     any questioning now or in the future.

4          Do you understand?

5          She answered "yes" and I wrote down "yes."

6          If you cannot afford an attorney, one will be

7     provided for you without cost.

8          Do you understand?

9          She answered "yes" and I wrote down the word "yes."

10          If you do not have an attorney available, you have

11     the right to remain silent until you have had an opportunity

12     to consult with one.

13          Do you understand?

14          She answered "yes" and I wrote down "yes."

15          Now that I've advised you of your rights, are you

16     willing to answer questions?

17          She answered "yes," I wrote down "yes."

18     Q     What did you do next?

19     A     Then I asked her to sign the form, then myself and

20     Detective Collins signed the form as well.

21     Q     Okay.

22          Can you tell me, after she signed the form, did she

23     speak with you?

24     A     Yes.

25     Q     And can you tell me, how did the conversation begin

Det. Scandole - People - Direct/Ms. Chu

1    with you and Ms. Wisdom?

2         A    It was more of a conversation, a back and forth

3    type of asking questions about what's going on.

4              We started by telling her the investigation of the

5    incident that we are investigating, of what had happened and

6    how we had come to where we were.

7         Q    Did you tell her who the victim was?

8         A    Yes.

9         Q    Okay.

10             Can you tell me, did the conversation then become

11   more question and/or answer?  Did she give a narrative?

12        A    It evolved into more of a narrative.

13        Q    Can you tell us what, in sum and substance,

14   happened after you read her Miranda rights?

15        A    Yes.  Can I refer to my DD5 briefly?

16             THE COURT:  You could refresh your

17        recollection but then you cannot read it.

18             THE WITNESS:  I am not going to read from

19        it.

20        A    She told me she had lost her place to live and that

21   she had moved with this man she had met by the doctor's

22   office on Broadway.  She said she would give him money from

23   time to time for rent, when she had.  She told us that he was

24   a crack user and that when he smoked crack he became a

25   completely different person.

                                                              mc

Det. Scandole - People - Direct/Ms. Chu

1       One night, while she was sleeping, she told us that

2  she was woke up to find him touching her underneath her

3  shirt.  She told him, you know we're not -- we are not like

4  that, that is not why I'm here, and they got into an

5  argument, it became rather heated.

6       She left the apartment.  She called one of her

7  friends on the telephone and she calmed down after that.

8       A while later, which I believe was around

9  Thanksgiving time, she had gotten into another argument with

10  him that became loud and heated again.  She left the

11  apartment again this time and she went to stay with her

12  sister for a couple of days.

13       She had spoken to him on the phone a couple of

14  times and then she had to go back because she had set up an

15  interview, she needed to get some clothes out of the

16  apartment.

17       When she went back, everything was okay, he was

18  nice, it was like when they had first met, there was no

19  problems.

20       Later that night, the same day, she was sitting on

21  the couch getting her clothes and he says to her, I am going

22  to get some pussy tonight.  She says, well, okay, then I'll

23  get out of here.  And he steps in front of the doorway and

24  says, uh-uh.  At that point she tells us that he picks up a

25  belt and starts wrapping the belt around his hand.  At that

Det. Scandole - People - Direct/Ms. Chu

1   point she said, I picked up a knife and I put it inside my

2   sweater.

3       She went to get up off the couch, then he punched

4   her in the face.  After he punched her in the face, he

5   grabbed her sweater and she says he pulled the sweater over

6   her head and started punching her in the shoulders and in the

7   back.

8       While he was punching her, she said he was pushing

9   her head towards the ground.  As he is pushing her head

10  toward the ground, if my head hits the ground, thinking to

11  herself, I'm dead, and I stabbed at him.

12      She said she then ran into the bathroom, she saw

13  she had a big knot on her head and some bruises on her

14  shoulders.  She came out, gathered her stuff into a duffle

15  bag and then she left and went to her friend Ebony's house.

16      Q    As she made the statement, did you interrupt her

17  while she was talking to ask her any further questions?

18      A    Initially we were going back and forth.  At the end

19  she told us the story as to what happened.

20      Q    Did you take any notes while you were in the room

21  with her?

22      A    I did not.

23      Q    Was anyone else present when you had this

24  conversation with her?

25      A    Yes, Detective Collins.

Det. Scandole - People - Direct/Ms. Chu

1    Q    After she made the statement, did there come a time

2    when you left the room that she was in?

3    A    Yes.

4    Q    And was she still uncuffed?  At this point she

5    didn't have cuffs on?

6    A    Yes.

7    Q    Now, where did you -- I'm sorry.

8         Did there come a time when you actually transcribed

9    or wrote down what it is you remember her telling you?

10   A    Yes.

11   Q    Did you take that handwritten statement and bring

12   it back into the room with you?

13   A    I did.

14   Q    About what time was it that you did this?

15   A    That was at about 7:30 P.M.

16   Q    Now, when you initially spoke to her and read her

17   Miranda then got that oral statement, about what time was

18   that?

19   A    It was about 2:00 P.M.

20   Q    Now, can you tell me, when you went back in at 7:30

21   and you had the written statement, what did you do?

22   A    I read it to her, then I gave it to her to read,

23   she read it, I asked her is this accurate to what you told

24   us, she said yes, she signed it, I signed it and Detective

25   Collins signed it.

Det. Scandole - People - Direct/Ms. Chu

1    Q    Did she want to make any additions or corrections

2  to what you had wrote as far as what she had said earlier

3  that afternoon?

4    A    No, she did not.

5    Q    Now, do you have what you wrote out summarizing

6  what she told you in her oral statement?

7    A    I do.

8         MS. CHU:  At this time, your Honor, if I can

9    have that deemed marked as People's 55 for

10   identification.

11        THE COURT:  55?  I thought we did --

12        COURT OFFICER:  That was 54.

13        THE COURT:  54.

14        (Whereupon, the written statement was marked

15   as People's Exhibit 55 for identification.)

16   Q    Detective, do you recognize what is being shown to

17  you as People's 55 for identification?

18   A    I do.

19   Q    What do you recognize that to be?

20   A    These are my notes, my written statement, my

21  written statement of what she told me.

22   Q    And does it accurately reflect the signature that

23  you placed on it on July 25th, 2012?

24   A    It does.

25   Q    Does it also contain Atara Wisdom's signature and

mc

Det. Scandole - People - Direct/Ms. Chu

1    Detective Collins' signature?

2        A    Yes, it does.

3              MS. CHU:   At this time, your Honor, I would

4        offer that in evidence as People's 55.

5              MR. WALENSKY:   No objection.

6              (Whereupon, the written statement was marked

7        as People's Exhibit 55 in evidence.)

8        Q    Detective, --

9              THE COURT:   Wait a minute.

10             (Whereupon, there was a brief pause in the

11       proceedings.)

12             THE COURT:   Go ahead.

13       Q    Detective, if you would, would you please read to

14   us what you wrote as her statement and had her eventually

15   sign for accuracy.

16       A    I had lost my place to stay and I moved in with

17   this guy that I met over by the doctor's office, Broadway.

18             THE COURT:   Slow down.

19       A    Sorry.

20             THE COURT:   Go ahead.

21       A    I was giving him some money when I could.  He's a

22   crack user.  When he smokes crack he's like a different

23   person.

24             One night, when I was sleeping, I woke up and I

25   found him touching me under my shirt.  I told him we aren't

Det. Scandole - People - Direct/Ms. Chu

1  like that and that is why I am not here.  We argued and we

2  got really heated.  I left out and I called one of my friends

3  on the phone and I calmed down.

4         A little while later, right around Thanksgiving

5  time, we got into another argument that got real heated and

6  loud.  I left and I went to my sister's house for a couple of

7  days.  I talked to him on the phone a couple of times and I

8  went back to get my clothes because I had an interview set up

9  for the next day.  When -- when I got there he was okay, nice

10  like when I first met him.  Later that night I'm on the couch

11  getting my clothes and he tells me I'm getting some pussy

12  tonight.  I tell him okay, then I'll get out of here.

13         He stands in front of the door and he says uh-uh,

14  then he picks up a pink belt and he wraps it around his hand.

15  When he did that, I picked up the knife and I put it in my

16  sweater.  When I got up, he punched me in the face, then he

17  pulled the sweater over my head and he started punching me in

18  the shoulder and back.

19         As he's punching me, he's pushing my head to the

20  ground and I'm thinking if my head hits the ground, I'm dead.

21  That is when I took out the knife and I stabbed at him.

22         I ran into the bathroom and I see I have a big knot

23  on my head and my shoulder is all bruised.

24         I got all my stuff together in a duffel bag and I

25  left out to go to Ebony's house.  I didn't tell Ebony what

Det. Scandole - People - Direct/Ms. Chu

1    happened and I didn't tell anyone else what happened.

2         Q    Okay.

3              Detective, after she signed the written statement

4    that you wrote out for her, can you tell me, did you ask her

5    whether or not she would like to speak to someone from the

6    District Attorney's Office?

7         A    I did.

8         Q    And what was her response?

9         A    She did agree.

10        Q    Now, once she agreed to do that, did you make

11   arrangements for someone from the District Attorney's Office

12   to come to your precinct?

13        A    I did.

14        Q    And who was it that arrived?

15        A    Assistant District Attorney Ed Purce.

16        Q    What time was it that she spoke with Ed Purce on

17   July 25th, 2012?

18        A    It was about 9:00 P.M.

19        Q    Now, did there come a time the following day, July

20   26th, now of 2012, at about 10:00 in the morning that you

21   went to speak with her again?

22        A    Yes, I did.

23        Q    What was your purpose?

24        A    I just had a couple of quick questions to --

25   follow-up questions for her.

Det. Scandole - People - Direct/Ms. Chu

1    Q    Was anyone else present with you when you spoke

2    with her?

3    A    I was with Detective Collins.

4    Q    Now, when you first came into the room, she was

5    still in the same room that you had spoken to her in

6    earlier?

7    A    Yes.

8    Q    And was she handcuffed at all?

9    A    No.

10   Q    What did you say to her?

11   A    I reminded her yesterday that we read her rights

12   and she agreed to speak to us, it was okay, and we want to

13   ask her a couple more questions.

14   Q    What did she say?

15   A    She said okay.

16   Q    What did you do?

17   A    I asked her about the victim's property, his phone

18   and such.

19        She said that after it happened, after I stabbed

20   him, I came out of the bathroom and I saw him laying on the

21   bed, I picked up his phone, his keys and his wallet.  When I

22   left, I was on the phone talking to somebody but I was in a

23   bit of a fog, I don't remember who I was talking to.

24        As I was walking, I threw away his keys but I kept

25   his wallet and I didn't use it.  I went over to my friend

mc

Det. Scandole - People - Cross/Mr. Walensky

1    Tiffany's house, which was by East 93rd and Rutland Road and

2    I stayed there for a couple of days.

3            I continued to use the phone for a little while but

4    then I threw that away also.

5            Then I directly asked her if she had used Mr.

6    Wilson's benefits card, she said absolutely not.

7            MS. CHU:  Thank you very much, Detective.  I

8        have nothing further.

9    CROSS-EXAMINATION

10   BY MR. WALENSKY:

11       Q    Good afternoon, Detective.

12       A    Good afternoon.

13       Q    On July 25th, 2012, you went into a woman's shelter

14   and asked Ms. Wisdom to accompany you, correct?

15       A    Yes.

16       Q    And you took her back to the 83rd?

17       A    Yes.

18       Q    And you put her into, I call it an interrogation

19   room, you call it an interview room, right?

20       A    Yes.

21       Q    This is where you question, you speak to people,

22   right?

23       A    Yeah.

24       Q    Some are suspects, some aren't?

25       A    Yes.

mc

Det. Scandole - People - Cross/Mr. Walensky

1    Q    And there's a rail --

2         There's generally a bench alongside one wall of

3    this room, correct?

4    A    There's a bench in the room, yes.

5    Q    There is usually a rail.  I am not saying Ms.

6    Wisdom, but sometimes people are cuffed there, right?

7    A    Yes.

8    Q    That's up to the discretion of the officer?

9    A    Yes.

10   Q    But you didn't see any danger at that time so you

11   didn't cuff her?

12              MS. CHU:  Objection.

13              THE COURT:  Overruled.

14   A    I did not cuff her.

15   Q    Now, she was in that room from the time you got

16   back to the precinct about 10:00, quarter after 10:00?

17   A    Yes.

18   Q    And about eleven o'clock you went in to speak to

19   her about her Miranda rights?

20   A    Yes.

21   Q    So she's in there for 45 minutes, no one's talking

22   to her, right?

23   A    Approximately.

24   Q    There's no clock in that room, is there?

25   A    I don't believe so.

Det. Scandole - People - Cross/Mr. Walensky

1    Q    And the door is locked, she can't walk out?

2    A    Correct.

3    Q    But she wasn't arrested yet?

4    A    She had not been placed under arrest at that time,

5    right.

6    Q    But she wasn't free to go?

7    A    No.

8    Q    So at eleven o'clock you came in.

9         Now, you control that environment, don't you?

10             MS. CHU:  Objection.  What does that mean?

11   Q    Well, she can't leave, right?

12             MS. CHU:  Objection.  Asked and answered.

13             THE COURT:  Overruled.

14   A    Right.

15   Q    You control that whole environment?

16             MS. CHU:  Objection.

17             THE COURT:  Overruled.

18   Q    Now, you come in and talk to her.  What did you

19   tell her?  What did you ask her -- withdrawn.

20        Let me ask one question.

21        What did you tell her?

22   A    We introduced ourselves and told her the incident

23   that we are investigating.

24   Q    And you then asked her if she would speak with you,

25   correct?

mc

Det. Scandole - People - Cross/Mr. Walensky

1      A    Yes.

2      Q    And then you presented her with the Miranda

3  warnings which are in evidence?

4      A    Yes, we read her the warnings, yes.

5      Q    And she initialed them?

6      A    No, she signed it.  She signed her name.

7      Q    All right, she signed it.

8           And you proceeded to speak with her, correct?

9      A    Yes.

10     Q    And you spoke with her from 11:00 for several

11  hours, didn't you?

12     A    Yes.

13     Q    So from 11:00 to 12:00 to 1:00 to 2:00 you were

14  questioning her?

15     A    Yes.

16     Q    And during that period of time she never asked for

17  an attorney?

18     A    No.

19     Q    And you got that statement, it was three hours?  It

20  took you three -- actually, didn't you talk to her even

21  longer than two o'clock?

22     A    No, about two o'clock we got the statement.

23     Q    So it took three hours to get that information?

24     A    Yes.

25     Q    So it --

Det. Scandole - People - Cross/Mr. Walensky

1        Wasn't there prompting by you to pull more

2  information from Ms. Wisdom?

3     A    If by "prompting" you mean asking and answering

4  questions, yes.

5     Q    Yes.

6        Well, she didn't just immediately tell you all of

7  this?

8     A    No.  It was a process of asking and answering

9  questions and it evolved into this.

10     Q    She was volunteering this information?  She said

11  she wanted to and you wanted to speak with her, right?

12     A    Yes.

13     Q    And you said what happened, correct?

14     A    Well, it didn't start out with just what happened.

15  It started, we talked about the incident, we talked about who

16  the victim was, where it was it happened.

17     Q    That takes about five minutes, right?

18        You said, we are investigating the death of Anthony

19  Wilson, isn't that what you told her?

20     A    Yeah.

21     Q    We think it happened around Thanksgiving, sometime

22  around there?

23     A    Yes.

24     Q    It didn't take much longer than that?

25     A    It took a while to get the information because it

Det. Scandole - People - Cross/Mr. Walensky

1  was -- first it wasn't just -- she didn't come out right away

2  and tell us the whole story, it was asking questions back and

3  forth, and you know.

4      Q    At some point she said, I don't really want to talk

5  about it, correct?

6              MS. CHU:  Objection.

7              THE COURT:  Overruled.

8      A    That was later that evening.

9      Q    You don't videotape these question and answer

10  periods, do you?

11      A    No, we do not.

12      Q    You are not required?

13      A    No, we are not.

14      Q    You have the capacity to do it?

15              MS. CHU:  Objection.

16      A    No, we --

17      Q    You had the capacity to take the statement later,

18  didn't you?

19              THE COURT:  Overruled.

20      A    The District Attorney's Office took the statement.

21      Q    Right.

22           But while --

23           Before the District Attorney's office comes to

24  question her, you're questioning her and that is not

25  recorded?

mc

Det. Scandole - People - Cross/Mr. Walensky

1    A    Correct.

2    Q    So about 5:30, give or take 15, 20 minutes, you

3   placed her under arrest, correct?

4    A    One of the detectives.

5    Q    One of the detectives.

6        And was it three o'clock you asked her if she

7   wanted to make a video statement?

8    A    No.

9    Q    Was it after you placed her under arrest at

10  5:30?

11    A    No.

12    Q    Was it before that?

13    A    No.  It was when I went over her -- the written

14  statement with her.

15    Q    So two hours after -- so four-and-a-half hours

16  after she made the oral statement you came in with this

17  written statement, correct, at 7:30?

18    A    Yes.

19    Q    And she has been in that room since 10:00, 10:30

20  that morning, other than perhaps going to the bathroom,

21  right?

22    A    Yes.

23    Q    And you fed her?

24    A    Yes.

25    Q    So you brought in the statement.  This was a

mc

Det. Scandole - People - Cross/Mr. Walensky

1  statement that you had written out?

2      A    Correct.

3      Q    That was based upon your conversations earlier?

4      A    Correct.

5      Q    It wasn't written contemporaneously with the

6  conversation you had with her at 2:00 or 3:00 in the

7  morning -- I'm sorry -- in the afternoon, correct?

8      A    No, it was not.

9      Q    Correct me, between --

10     A    Correct?

11     Q    -- 11:00 and 3:00.

12          And at 7:30 you came in and presented this written

13  statement, asked her to read it?

14     A    Yes.

15     Q    So she had already been there for almost ten hours,

16  right, from 10:30 to 7:30, however long that is?

17     A    Yes.

18     Q    And she signed that statement, correct?

19     A    Correct.

20     Q    And at that particular point in time you didn't

21  take her to Central Booking, did you?

22     A    No.

23     Q    Now, was there an I-card out for Ms. Wilson -- I

24  mean Ms. Wisdom -- prior to that date?

25     A    To the date that we spoke to her?

mc

Det. Scandole - People - Cross/Mr. Walensky

1    Q    Yes.

2    A    Yes.

3    Q    Now, an I-card is what is called a wanted card?

4    A    Yes.

5    Q    When you have an I-card out, it's because she was a

6    suspect, correct?

7    A    Yes.

8    Q    She was a suspect for months, wasn't she?

9    A    Yes.

10   Q    Now, you don't get a warrant for her arrest

11   because if you get a warrant you couldn't question her,

12   right?

13                   MS. CHU:  Objection.  Objection.

14                   THE COURT:  Read the question back.

15                   (Whereupon, the referred-to question was read

16        back by the Reporter.)

17                   THE COURT:  I don't know --

18                   MR. WALENSKY:  I will reask.

19                   THE COURT:  -- in what context this is being

20        asked.

21                   Sustained.

22   Q    So there was an I-card, right?

23   A    Yes.

24   Q    With a wanted card you can take someone and

25   question them, correct?

Det. Scandole - People - Cross/Mr. Walensky

1   A   Yes.

2   Q   And with a warrant of arrest right to counsel

3 immediately attaches, doesn't it?

4           MS. CHU:  Objection.

5           THE COURT:  Objection is sustained.

6   Q   So at 7:30 she signed that.  Was it at that point

7 you asked her if she wanted to make a video statement?

8   A   Yes.

9   Q   Then you called the District Attorney's Office?

10  A   Correct.

11  Q   Had you called the District Attorney's Office

12 before 7:30?

13  A   Yes.

14  Q   And did you speak with Mr. Purce at that time?

15  A   I don't recall who I spoke to at the D.A.'s Office.

16 I recall just informing them of the events that were

17 proceeding.

18  Q   So 7:30, did you leave the room at that point?

19  A   Yes.

20  Q   After she signed?

21  A   Yes.

22  Q   And she's sitting there till Mr. Purce arrives?

23  A   Yes.

24  Q   And that's about 9:00 or 9:30?

25  A   About 9:00.

Det. Scandole - People - Cross/Mr. Walensky

1   Q    About nine o'clock?

2   A    Yes.

3   Q    And then Mr. Purce takes a statement, right?

4   A    Yes.

5   Q    And she's speaking and then she becomes upset,

6   doesn't she?

7   A    Yes.

8   Q    And Mr. Purce says, we can stop, if you want,

9   right?

10   A    Something to that effect.

11   Q    Something to that effect?

12   A    Yes.

13   Q    And she wants to stop, right?

14   A    Yes.

15   Q    And after that you don't take her to Central

16   Booking at that point either, do you?

17   A    No.

18   Q    She's -- she's been placed under arrest, she's

19   made -- she signed a written statement which you had produced

20   and she's made a videotape but you still had more questions,

21   right?

22           MS. CHU:  Objection, compound question.

23           THE COURT:  Sustained.

24   Q    So at 9:00 -- I'm sorry.

25           Whenever this ended, you put her back into -- did

mc

Det. Scandole - People - Cross/Mr. Walensky

1   you put her back into the interview room?

2       A    Yes.

3       Q    And she was there until the next morning at about

4   10:00 when you came in?

5       A    She was in the precinct lodged overnight.  I don't

6   know exactly where she was.  I wasn't there overnight.

7       Q    You came the next morning at 10:00?

8       A    Correct.

9       Q    Was she in that interview room?

10      A    Yes.

11      Q    So you don't know if she was in the interview room

12  or in a cell somewhere?

13      A    Correct.

14      Q    And at that point you reminded her of her Miranda

15  rights which she had signed the day before?

16      A    Yes.

17      Q    Almost exactly a little less than a day before.

18           You didn't read her Miranda rights again?

19      A    I did not.

20      Q    You just said, you remember the rights yesterday

21  when you signed?

22      A    Yes.

23      Q    And then you asked her to talk to you some more?

24      A    Yes.

25      Q    And then you asked her some more questions?

mc

Det. Scandole - People - Cross/Mr. Walensky

1  A    Yes.

2  Q    She still didn't ask for a lawyer, in all that

3  time?

4  A    No, she did not.

5  Q    She was wearing the same clothes?

6  A    Yes.

7  Q    Did she make any calls?

8       MS. CHU:  Objection.

9       THE COURT:  Did you make any calls?

10      THE WITNESS:  I did not.

11 Q    Did she.

12      Did Ms. Wisdom make any phone calls?

13      THE COURT:  Do you know?

14 A    I do not know.

15 Q    Did you ask her if she wished to make any phone

16 calls?

17 A    I did not.

18 Q    Did she ask you if she wished to make any phone

19 calls -- withdrawn.

20      So, to your knowledge, she did not call anybody

21 during that period of time?

22 A    Not that I know.

23 Q    And nobody offered to allow her to make a phone

24 call?

25      MS. CHU:  Objection.

Proceeding

1              THE COURT:  Sustained.  He doesn't know.

2      Q     You didn't offer her the chance to make a phone

3  call, did you?

4              MS. CHU:  Objection.  Asked and answered.

5      Q     Did you give her --

6              Did you make an offer for her to make a phone call?

7              MS. CHU:  Objection.

8      Q     Would you like to make a call?

9              MS. CHU:  Objection.  Asked and answered.

10             THE COURT:  Did you, yes or no?

11     A     No.

12             MR. WALENSKY:  Thank you.  Thank you,

13     Detective.

14             THE COURT:  Do you have any redirect?

15             MS. CHU:  I do not have any questions.

16             THE COURT:  You may step down.  Thank you.

17             (Whereupon, Detective Christopher Scandole

18     stepped down from the witness stand and exited the

19     courtroom.)

20             THE COURT:  Call your next witness.

21             MS. CHU:  The People call Ed Purce.

22             (Whereupon, there was a brief pause in the

23     proceedings.)

24             COURT OFFICER:  Witness entering.

25             (Whereupon, Ed Purce entered the courtroom and

mc

Purce - People - Direct/Ms. Chu

1      took the witness stand.)

2              THE CLERK:  Raise your right hand.

3              Do you solemnly swear or affirm that the

4      testimony you're about to give will be the truth, the

5      whole truth and nothing but the truth, so help you God?

6              THE WITNESS:  I do.

7              THE CLERK:  Please state your name for the

8      record.

9              THE WITNESS:  Ed Purce, P-U-R-C-E.

10             THE CLERK:  Thank you.

11             THE COURT:  Proceed.

12  E D         P U R C E, called as a witness by and on behalf

13             of the People of the State of New York, after

14             having been first duly sworn, was examined and

15             testified as follows:

16  DIRECT EXAMINATION

17  BY MS. CHU:

18      Q    Good afternoon, Mr. Purce.

19      A    Good afternoon.

20      Q    By whom are you employed?

21      A    The Office of the Kings County District Attorney.

22      Q    What is your title?

23      A    I'm a Deputy Chief in the Domestic Violence Bureau.

24      Q    Can you tell us about your career with the D.A.'s

25  Office; how long have you been there?

Purce - People - Direct/Ms. Chu

1    A    I started in September '98 and then I went through

2 a rotation where I worked in Criminal Court for about a year,

3 I worked in the Grand Jury for about a year, then I did

4 what's called a riding program where we would go out with the

5 police and enhance cases, you work like a 24-hour shift, get

6 statements, if defendants wanted to make statements, you

7 would interview witnesses to crimes and just work, you know,

8 hand to hand with the police, maybe do a search warrant or

9 things of that nature.  And then for about ten years I worked

10 under the Domestic Violence Bureau where I tried cases for

11 about ten years, starting with some of the misdemeanor cases

12 then I ended up doing homicide trials.

13        Then for about two-and-a-half years I was in the

14 Homicide Bureau where I tried homicide cases.  And then, just

15 very recently, I went back to Domestic Violence as a

16 supervisor.

17    Q    Can you tell me, in the two-and-a-half years that

18 you were in the Homicide Bureau are you familiar with a

19 program that they had called the riding program?

20    A    Yes.

21    Q    And what did that entail?

22    A    It was similar to what I did when I was a younger

23 assistant, and basically you were on call, 24-hour call, and

24 if witnesses needed to be interviewed or if suspects in cases

25 wanted to make statements, you would either go to the

Purce - People - Direct/Ms. Chu

1  precinct where the incident occurred or to the District

2  Attorney's Office and you would meet with the detectives and

3  the people that they brought in to speak with whoever was

4  riding on that particular night.

5       Q     How often would you have to ride?

6       A     It was like every six weeks.  We had a rotation, it

7  was like six teams, if you would, and we would do it on a

8  six-week basis and then you would do it three days a week one

9  time, then you would rotate and do four days a week the

10  following part of the routine, then it would go that way

11  throughout the year.

12      Q     Now, Mr. Purce, I want to direct your attention to

13  July the 25th, 2012.

14            Were you working as an assistant in the Homicide

15  Bureau on that day?

16      A     Yes, I was.

17      Q     Can you tell me, were you assigned to ride that

18  day?

19      A     Yes, I was.

20      Q     Did there come a time that evening when you were

21  notified that you were needed in the 83rd Precinct?

22      A     Yes.

23      Q     Who was it that contacted you, if you remember?

24      A     I think it was my supervisor, Ken Taub, and he

25  directed me to get in touch with, I believe it was Detective

mc

Purce - People - Direct/Ms. Chu

1   Scandole from the Homicide Bureau -- Homicide Squad.

2        Q    Did you do that?

3        A    Yes.

4        Q    Did there come a time when you actually responded

5   to the 83rd Precinct?

6        A    Yes, I did.

7        Q    Can you me, when you arrived at the 83rd Precinct,

8   did you speak with someone by the name of Atara Wisdom?

9        A    Yes, I did.

10       Q    Can you tell me about what time was it that you

11  spoke with her?

12       A    I am going to say it was around nine o'clock, 9:15,

13  somewhere around there.

14       Q    Okay.

15            Can you tell me, was the conversation that you had

16  with Ms. Wisdom recorded in any way?

17       A    Yes, it was.

18       Q    How was that?

19       A    As part of the riding program we have a team of

20  technicians, and if somebody wants to make a statement, they

21  generally would meet you at whichever precinct you were sent

22  to and they would videotape the statement that was made to

23  the Assistant District Attorney and to whomever other

24  detectives that might also be part of the investigation.

25       Q    Now, does this technician assign a unique number to

1    the videotape that is being taken of the conversation?

2        A    Yes.

3        Q    Can you tell me, do you remember what the video

4    number that was assigned to the statement that you took of

5    Ms. Wisdom?

6        A    R12 dash 83.

7                MS. CHU:  At this time, your Honor, if I can

8        have this deemed marked People's 56 for identification.

9                (Whereupon, the exhibit was shown to counsel.)

10               (Whereupon, the CD was marked as People's

11       Exhibit 56 for identification.)

12       Q    Mr. Purce, taking a look at People's 56 for

13   identification, do you recognize that envelope?

14       A    Yes.

15       Q    Can you tell me, what do you recognize that

16   envelope to be?

17       A    This will contain the CD in which the recorded

18   statement that Ms. Wisdom made on July 25th, 2012.

19       Q    Does it bear the same unique video number that was

20   assigned it by the technician on July 25th, 2012?

21       A    Yes.

22               MS. CHU:  Okay, at this time, your Honor, I

23       would offer it into evidence as People's 56.

24               THE COURT:  Any objection?

25               MR. WALENSKY:  No, no objection.

mc

Purce - People - Direct/Ms. Chu

1        THE COURT:  All right in evidence.

2        (Whereupon, the CD was marked as People's

3    Exhibit 56 in evidence.)

4        MS. CHU:  Does that work, any of the things in

5    there?

6        THE COURT:  I don't know.

7        MS. CHU:  I'm sorry, your Honor.

8        Does any of this work in here?

9        THE CLERK:  No, it's not working.

10        MS. CHU:  I can't get it to switch over.

11        THE CLERK:  There it is.

12        THE COURT:  Go ahead.

13        MS. CHU:  Thank you.

14        Your Honor, I'd asked it be played now for the

15    jury.

16        THE COURT:  Play it.

17        (Whereupon, the exhibit was played in open

18    court.)

19    Q    Mr. Purce, was that a fair and accurate recording

20 of the entire conversation that you had with Miss Atara

21 Wisdom on July 25th, 2012?

22    A    Yes.

23    Q    Did she ever want to speak with you -- I'm sorry.

24        Did you ever speak with her again after that tape

25 went off?

Purce - People - Direct/Ms. Chu

1    A    No, I didn't.

2         MS. CHU:  Thank you very much.  I have nothing

3    further.

4         MR. WALENSKY:  No questions.

5         MS. CHU:  I'm sorry, did I offer it into

6    evidence already?

7         THE COURT:  Yes.

8         MR. WALENSKY:  Yes.

9         THE COURT:  Let me ask you something, Mr.

10   Purce.

11        Did this video begin at 7:25 or 9:30 was it?

12        MS. CHU:  It was 9:05.

13        THE WITNESS:  I thought it started a little

14   after 9:00.

15        THE COURT:  9:05.

16        MR. WALENSKY:  9:03 or 9:04.

17        MS. CHU:  9:04.

18        THE COURT:  Okay.  Okay.  That's what I

19   thought.  All right.

20        Thank you very much, Mr. Purce.

21        THE WITNESS:  Thank you.

22        (Whereupon, Ed Purce stepped down from the

23   witness stand and exited the courtroom.)

24        THE COURT:  All right, ladies and gentlemen,

25   at this time we are going to adjourn for the day and we

Proceeding

1    will not return, or you will not return till Tuesday at

2    ten o'clock because of -- well, one of the reasons is

3    that we do have this holiday and I did indicate that we

4    wouldn't be meeting Thursday and Friday.

5            So, do not discuss the case amongst yourselves

6    or with anyone else.  Do not visit the place where the

7    alleged crimes occurred.  Have no contact with any of

8    the parties involved, including the Court.  And do not

9    resort to utilizing any digital or electronic devices

10   for obtaining any information about the matter or

11   contacting anyone about the matter.

12           Just leave your books on the seats.

13           And have a very good 4th of July.

14           See you Tuesday, ten o'clock.

15           Thank you.

16           (Whereupon, the Jury exited the courtroom.)

17           THE COURT:  All right, what are you going to

18   do on Tuesday?

19           MS. CHU:  Tuesday I anticipate that I will

20   have my last witnesses, but we are having some

21   difficulty locating Mr. Shepard.  Hopefully this weekend

22   we will be able to pin him down.

23           THE COURT:  How many witnesses are you going

24   to have?

25           MS. CHU:  I have three witnesses left.

Proceeding

1           THE COURT:  Okay.

2           Defense going to have any witnesses?

3           MR. WALENSKY:  I am not sure whether my client

4    will testify, at this time, and other than that I might

5    have one witness.

6           THE COURT:  All right.

7           MR. WALENSKY:  Which would be a short witness.

8           THE COURT:  Okay.

9           All right, see you on Tuesday.

10          MS. CHU:  I just have a question.

11          THE COURT:  What?

12          MS. CHU:  One of the officers that did the

13   vouchering, he was supposed to come in yesterday and

14   today.  He is RDO and never been approved.  I was

15   wondering if defense would consider stipulating to his

16   testimony with regard to the vouchering of the evidence.

17          MR. WALENSKY:  Including the stuff I want too,

18   right, yes, I would stipulate to the vouchering.

19          THE COURT:  So get a stipulation.

20          MS. CHU:  Thank you.

21          THE COURT:  All right.

22          Have a good 4th of July.

23          MS. CHU:  Same to you.

24          (Whereupon, the trial was adjourned to July

25   8th, 2014.)