```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS:  CRIMINAL TERM:  PART 2
 2   -----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3                                    Indictment No.:
                   -against-                6615/2012
 4                                          (Trial)
     ATARA WISDOM,
 5
                        Defendant.
 6   -----------------------------------------X

 7
                              Supreme Courthouse
 8                            320 Jay Street
                              Brooklyn, New York 11201
 9                            July 8, 2014

10
     B E F O R E:
11
                    THE HONORABLE ALBERT TOMEI, JUSTICE
12                  (And a Jury)

13   A P P E A R A N C E S:

14           HON. KENNETH P. THOMPSON, ESQ.
                  District Attorney - Kings County
15                350 Jay Street
                  Brooklyn, New York  11201
16           BY:  PHYLLIS CHU, ESQ.
                  Assistant District Attorney
17

18           DAVID WALENSKY, ESQ.
                  Attorney for Defendant
19                910 Stuart Avenue
                  Mamaroneck, New York
20           BY:  DAVID WALENSKY, ESQ.
                       - and -
21                JOSHUA POVILL, ESQ.

22

23

24                       MARLIN CASSIDY
25                       Senior Court Reporter
```

Proceeding

1              (Whereupon, the following took place in open

2        court:)

3              THE COURT:  Do you have your witness?

4              MS. CHU:  I have one witness.

5              THE COURT:  Come on up.

6              (Whereupon, a sidebar conference was held off

7        the record.)

8              THE COURT:  Bring the jury out.

9              COURT OFFICER:  Jury entering.

10             (Whereupon, the Jury entered the courtroom.)

11             THE CLERK:  All the jurors are present and

12        seated.

13             Do both sides waive the roll call?

14             MS. CHU:  So waived.

15             MR. WALENSKY:  Yes.

16             THE CLERK:  Thank you.

17             THE COURT:  Ladies and gentlemen, sorry for

18        the delay, but the Court did have other business to

19        attend to, so please accept the apology of the Court for

20        the delay.  I know how frustrating it can be while

21        sitting in the jury room.

22             So, we will proceed.

23             Call your next witness.

24             MS. CHU:  The People call Sarah Phillips.

25             (Whereupon, there was a brief pause in the

308

Phillips - People - Direct/Ms. Chu

1     proceedings.)

2            COURT OFFICER: Witness entering.

3            (Whereupon, Sarah Phillips entered the

4     courtroom and took the witness stand.)

5            THE CLERK: Raise your right hand.

6            Do you solemnly swear or affirm the testimony

7     you're about to give will be the truth, the whole truth

8     and nothing but the truth, so help you God?

9            THE WITNESS: I do.

10           THE CLERK: Put your hand down, please.

11           State your name for the record.

12           THE WITNESS: My name is Sarah Phillips.

13           THE CLERK: Spell your first name.

14           THE WITNESS: S-A-R-A-H.

15           THE CLERK: Spell your last name.

16           THE WITNESS: P-H-I-L-L-I-P-S.

17           THE CLERK: P-H-I-L...

18           THE WITNESS: L-I-P-S.

19           THE CLERK: Thank you.

20           THE COURT: All right, proceed.

21           MS. CHU: Thank you.

22     S A R A H     P H I L L I P S, called as a witness by and

23           on behalf of the People of the State of New York,

24           after having been first duly sworn, was examined

25           and testified as follows:

Phillips - People - Direct/Ms. Chu

1  DIRECT EXAMINATION

2  BY MS. CHU:

3       Q    Good morning, Ms. Phillips.

4       A    Good morning.

5       Q    By whom are you employed?

6       A    I'm employed at the Office of the Chief Medical

7  Examiner in the Department of Forensic Biology.

8       Q    Can you tell the members of the jury, what is your

9  title?

10      A    I am a criminalist level four.

11      Q    Can you describe your duties and responsibilities

12  as a criminalist?

13      A    As a criminalist level four I'm responsible for

14  examining physical evidence for biological fluids such as

15  blood, semen or saliva, I supervise lower level criminalists

16  in their duties, I write reports which reflect my findings,

17  and I testify in court as necessary.

18      Q    What is your educational background?

19      A    I have a bachelor's degree in genetics and

20  microbiology from Rutgers University and a Master's in

21  forensic sciences from Pace University.

22      Q    How many years have you working in the ME's office?

23      A    Since September 2005.

24      Q    Now, did you have any training that -- I'm sorry.

25           Did you have any training after your educational

mc

Phillips - People - Direct/Ms. Chu

1  training?

2      A      After being hired at the office I underwent a

3  six-month training program that was intense and I had to

4  observe a trained analyst perform a task.  I was then given

5  practice samples and my supervisor had to review my results,

6  and if I passed, I was then given competency samples which

7  the results were only known to the training group.  Once I

8  was reviewed on those results, I could then perform that task

9  in casework.  I also had to undergo an oral exam and go

10  through mock court training.

11      Q      Now, what is forensic science?

12      A      Forensic science is the application of natural

13  sciences, such as chemistry or biology, to matters of law.

14      Q      What is forensic biology?

15      A      Forensic biology is a subset of forensic science in

16  which you use biological techniques to first identify a

17  stain, such as blood, semen or saliva, then attempt to give a

18  source or individualize the stain.

19      Q      Is the lab that you work at at the Medical

20  Examiner's Office accredited?

21      A      Yes.

22      Q      What does that mean, that your office is

23  accredited?

24      A      Accreditation means outside inspectors come into

25  our laboratory and make sure we meet or exceed standards set

Phillips - People - Direct/Ms. Chu

1  in areas such as operations, personnel and safety.  We're

2  accredited by both the American Society for Lab Directors

3  Laboratory Accreditation Board and New York State.

4      Q    Can you tell me, are you a member of any

5  professional organization?

6      A    Yes.  I'm an associate member in the American

7  Academy of Forensic Sciences.

8      Q    Now, how many tests have you conducted using DNA?

9      A    Thousands.

10     Q    And how many cases have you worked on?

11     A    Hundreds.

12     Q    Have you ever testified in courts of law?

13     A    Yes.

14     Q    And have you been qualified as expert in the field

15  of forensic biology?

16     A    Yes.

17     Q    How many times have you testified so?

18     A    I testified approximately 40 times.

19     Q    In what jurisdictions have you testified?

20     A    I've testified in grand juries and Supreme courts

21  in all five boroughs of New York City.

22     Q    Have you ever been denied qualification as an

23  expert?

24     A    No.

25          MS. CHU:  At this time, your Honor, I would

Phillips - People - Direct/Ms. Chu

1      offer Ms. Phillips as expert in the field of forensic

2      biology.

3                    THE COURT:  Any objection?

4                    MR. WALENSKY:  No.

5                    THE COURT:  Deemed an expert in that field.

6                    Proceed.

7                    MS. CHU:  Thank you.

8      Q     Ms. Phillips, can you explain to the members of the

9      jury, what is DNA?

10     A     DNA stands for deoxyribonucleic acid.  We get half

11     of our DNA from our mother and half our DNA from our father.

12     So, it's the hereditary material of life.

13                   About 99 percent of DNA is the same between

14     individuals, that is why we all have two eyes, a nose and a

15     mouth; about one percent is different, and this percent we

16     look at in the laboratory in order to individualize stains

17     and people.

18     Q     Now, can you tell me, where can you find DNA in

19     someone's body?

20     A     You can find DNA in most cells of the body, so

21     you'll find it in white blood cells, skin cells and sperm

22     cells.

23     Q     Now, are you familiar with what a locus is?

24     A     Yes.

25           A locus is a specific location on the DNA that we

Phillips -- People - Direct/Ms. Chu

1   test for.  So, for our testing we look at 15 locations on the
2   DNA plus a sex determining gene.

3       Q    Now, are you also familiar with what an allele is?
4       A    Yes.  At the specific locations we test for, our
5   testing is length based, so we are looking at the number of
6   times a specific DNA unit will repeat over and over again,
7   and it's assigned a number.  So, the alleles represent the
8   different numbers that you can have at the specific
9   locations.

10      Q    Now, how do you go about getting a profile?
11      A    So a DNA profile is generated when we undergo four
12  steps of DNA testing, and the first step is called
13  extraction.  So using a series of heat and chemicals we are
14  able to release DNA into a solution, then we do quantitation
15  to determine, number one, if DNA is present, and number two,
16  how much DNA is present because that is necessary for the
17  next step, called amplification, where we make multiple
18  copies of the specific locations we test for in the
19  laboratory.  And after a sample has been amplified, it's then
20  run through a DNA detection instrument, we will generate a
21  DNA profile and an analyst will review the results for its
22  accuracy, then as custodian of the case file I would also be
23  responsible for reviewing the DNA results and making
24  interpretations.

25      Q    Now, I want to direct your attention to this case.

Phillips - People - Direct/Ms. Chu

1          As part of your duties and responsibilities at the

2     ME's office Forensic Biology Department did you receive

3     evidence in connection with a deceased person by the name

4     Anthony Wilson?

5          A    Yes.

6          Q    Can you tell me, what did you receive?

7               THE WITNESS:  Your Honor, may I refer to my

8          notes?

9               THE COURT:  You may.

10              THE WITNESS:  Thank you.

11         A    On January the 6th, 2012, we received postmortem

12    items from Anthony Wilson that included a blood sample, a

13    piece of bone, and a sexual assault kit that contained swabs

14    taken from various orifices of the body, and hair samples.

15         Q    Now, can you tell me, was this case assigned a

16    specific number for the Forensic Biology Department?

17         A    Yes, it was.

18         Q    What was the number?

19         A    It was assigned FB, which stands for forensic

20    biology, 12, for the year 2012, 00046.

21         Q    Was there a corresponding FB number assigned to

22    this case?

23         A    That is FB12 dash 00046.

24         Q    Okay.

25              Now, can you tell me, did you prepare -- I'm sorry.

Phillips - People - Direct/Ms. Chu

1        Do you have to prepare reports in connection with

2   your testing?

3        A     Yes.

4              MS. CHU:  At this time, your Honor, I would

5        offer this into evidence as People's 50...I think we are

6        up to 57, certified copies of the DNA case file.

7              MR. WALENSKY:  No objection.

8              MS. CHU:  Collectively.

9              THE COURT:  Deemed in evidence.  I mean, it is

10       in evidence.

11             (Whereupon, the DNA case file was marked as

12       People's Exhibit 57 in evidence.)

13       Q     Was there also a suspect file that was added to the

14   case?

15       A     Yes.

16       Q     Was there an FB number assigned?

17       A     That was assigned FBS 13 dash 00571.

18       Q     You mentioned you got various pieces of evidence.

19   What was the first thing you did when you got the evidence?

20       A     The evidence was brought to our laboratory and

21   stored with our Evidence Unit in a locked storage facility

22   until it was signed in and ready for examination.

23             When I went to go examine the items of evidence, I

24   took them from the Evidence Unit and documented the packaging

25   that the items were received in sealed, I made sure that the

1  documentation on the bags matched up with the voucher numbers

2  assigned by the N.Y.P.D., and then I began my examination and

3  made notes.

4      Q    Did you also receive samples that were taken from

5  the scene by Detective Markoski?

6      A    I'm referring to a voucher in my case file which is

7  3000018795, which contained samples taken from around the

8  apartment, and according to the paperwork Stephen Markoski

9  did collect them.

10     Q    Okay.

11          Now, you had mentioned you had gotten items from

12  Anthony Wilson upon his autopsy?

13     A    Correct.

14     Q    Did you receive any other evidence to test?

15     A    We also received a voucher Z004877 on January 31st,

16  2012, which contained samples that were taken from two

17  bottles.

18     Q    Two prescription bottles?

19     A    Yes.  It's listed as Seroquel or Fluoxetine.

20     Q    Now, can you tell me, were all the items that were

21  contained on the vouchers actually in the items that you had

22  that were sealed?

23     A    Yes.

24     Q    What did you do with these items once you received

25  them?

Phillips - People - Direct/Ms. Chu

1    A    The blood sample from Anthony Wilson underwent the

2  four steps of DNA testing that I previously described in

3  order to generate a known DNA profile for him.  As for the

4  samples that were taken from either the two bottles or from

5  around the apartment, they were visually examined to see if

6  there was any possible blood on them, and in order to do that

7  you would do a visual examination to see if there's any

8  reddish brown staining.  If a sample had reddish brown

9  staining, it then undergoes our screening test for possible

10  blood, so a small cutting is taken from the swabs that were

11  used to collect the samples and it's put into a test tube,

12  then one colorless liquid is added, I make sure there is --

13  no color change occurs, then a second colorless liquid is

14  added, and if I note a pinkish color change, that means

15  possible blood is present and those samples would then go on

16  to see if we can develop a DNA profile.

17    Q    What were the results of your testing that you just

18  mentioned?

19    A    So testing indicated the presence of human blood on

20  samples 6.3 from the cap ridges of the Seroquel bottle;

21  sample 6.4 from the exterior of the Seroquel bottle; sample

22  7.2 from the cap ridges of the Fluoxetine bottle; sample 7.3

23  from the exterior of the Fluoxetine bottle; sample SM8 from

24  the nightstand west side of the bed in bedroom; sample SM9

25  from the kitchen cabinet; sample SM10 from inside of tub in

Phillips - People - Direct/Ms. Chu

1    bathroom; sample SM11 from the east bathroom wall.

2        Q    Now, -- I'm sorry, go ahead.

3        A    Also, for the penile swab that was received from

4    the victim we were able to find semen on, that was done by

5    sending it on for confirmatory tests of P30, which is a

6    protein that's found in very high concentrations in semen, so

7    this sample tested positive for semen.

8        Q    What did you do next?

9        A    The samples that had indicated human blood was

10   present, they underwent our four steps for DNA testing, so we

11   were able to develop DNA profiles for some of the samples and

12   the penile swab from Anthony Wilson also underwent DNA

13   testing.

14       Q    And were you able to obtain a profile from any of

15   these items?

16       A    Yes.

17       Q    What was that?

18       A    On sample 6.4 from the exterior of the Seroquel

19   bottle, sample 7.3 from the cap ridges of the Fluoxetine

20   bottle, sample SM8 from the nightstand west side of bed in

21   bedroom, sample SM9 from the kitchen cabinet, and the sperm

22   cell and epithelial fraction of the penile swab were

23   determined to be from a male individual and this DNA profile

24   would be expected to be found in one in greater than 6.8

25   trillion people.  And in order to break that down, our Earth

Phillips - People - Direct/Ms. Chu

1    has a population of approximately 6.8 billion people.  So,

2    you would need 1,000 planet Earths, each with a population of

3    6.8 billion people before you'd expect to see this DNA

4    profile again.

5              So, I compared this male DNA profile to the known

6    profile of Anthony Wilson and it was the same, so he's the

7    source of the DNA on those samples that I listed.

8         Q    Okay.

9              Now, can you tell me, you had mentioned that the

10   penile swab that was taken from Mr. Wilson upon his autopsy

11   tested positive for sperm?

12        A    Correct.

13        Q    Or semen, I should say.

14        A    That's correct, it tested positive for semen.

15        Q    Now, does that finding support a claim of sexual

16   activity before death?

17              MR. WALENSKY:  Objection, beyond the scope

18        of --

19              THE COURT:  If she can answer, I'll let her.

20        A    I can't specifically give a reason as to why semen

21   would be found on the victim's penis, but that is a

22   possibility as to why it could be present.

23        Q    Okay.

24              And is it also a possibility -- I'm sorry.

25              Are you familiar with, if someone dies by unnatural

mc

320

Phillips - People - Direct/Ms. Chu

1  causes, whether or not there would be traces of ejaculate in

2  a man's penis?

3              MR. WALENSKY:  Objection.  Beyond the scope of

4      the expertise.  This is not a medical doctor, it is a

5      forensic biologist testing for DNA.

6              THE COURT:  Repeat the question.

7              (Whereupon, the referred-to question was read

8      back by the Reporter.)

9              THE COURT:  Can you answer the question?

10     A    I have seen that that is possible in the

11  literature, yes.

12             MR. WALENSKY:  Objection.  It's -- your Honor,

13     can I voir dire?

14             THE COURT:  You may.

15  VOIR DIRE

16  BY MR. WALENSKY:

17     Q    You are not a medical doctor, correct?

18     A    That's correct.

19     Q    And you are not trained as a medical examiner,

20  right?

21     A    Correct.

22     Q    So anything --

23          You don't have expertise in the field of human

24  biology -- withdrawn.

25          You don't have --

mc

Phillips - People - Direct/Ms. Chu

1          You don't have expertise in -- withdrawn.

2          Your expertise is pretty much limited to your

3     testing of DNA samples?

4     A     That's correct.

5     Q     So anything else is just something you might read

6     without having personal knowledge or expertise, is that

7     correct?

8     A     Correct.

9               MR. WALENSKY:  All right.

10              I move to strike any answer regarding that.

11              THE COURT:  All right, it's stricken, the

12         question and the answer.

13    DIRECT EXAMINATION

14    BY MS. CHU:  (Continued)

15    Q     Now, can you tell me, what did you do with the

16    other items that you tested?

17    A     So on sample 6.3, from the cap ridges of the

18    Seroquel bottle, there was a mixture of DNA present, meaning

19    more than one person contributed their DNA to the sample.

20    And I compared Anthony Wilson's DNA profile to this, the

21    mixture.  I could see all of his DNA alleles, so that means

22    he could be a contributor, but the minor contributor or the

23    person that did not -- who donated, I'm sorry, the least

24    amount of DNA, there wasn't enough information there in order

25    for me to make a comparison.

Phillips -- People - Direct/Ms. Chu

1          There were two other samples, sample SM10 from the

2     inside of the tub in bathroom, and sample SM11 from the east

3     bathroom wall, that developed a female DNA profile and this

4     was referred to as female donor A.

5          For that specific sample I also did a statistical

6     calculation and you would expect to find this profile in

7     approximately one in greater than 6.8 trillion people.  So,

8     again, you would need a thousand planet Earths each with a

9     population of approximately 6.8 billion people before you'd

10    expect to see this DNA profile again.

11         This profile from female donor A was then uploaded

12    into a database called CODIS, which stands for Combined DNA

13    Indexing System, where you can upload samples of forensic

14    unknowns in order to search them against other databases.

15    Q    Okay.

16         What were the results when you uploaded it into the

17    CODIS system?

18    A    We received notification that there was a match

19    between a known person already in the database and female

20    donor A.

21    Q    Okay.

22         Who was that match to?

23    A    According to the paperwork that we received from

24    the New York State Division of Criminal Justice Services, the

25    person was listed as Atara Wisdom.

mc

Phillips - People - Direct/Ms. Chu

1    Q    Did there come a time when you actually obtained a

2    profile from Atara Wisdom?

3    A    Yes.

4    Q    And when was that?

5    A    We received voucher R490270 on May 9th, 2013 and

6    this contained oral swabs from Atara Wisdom, and a cutting

7    from a swab underwent the steps in order to develop a DNA

8    profile.

9    Q    And what were the results of your testing?

10   A    When I compared the DNA profile of Atara Wisdom to

11   the DNA profile of female donor A, they were the same.

12   Q    They were the same person?

13   A    Correct.

14   Q    Okay.

15        Now, can you tell me, is there any way to

16   distinguish between menstrual blood and other types of blood

17   that comes from a female's body?

18   A    Our types of testing in the lab do not distinguish

19   where the blood comes from.

20   Q    Now, can you tell me, you had mentioned the

21   statistics for both the ones that matched Anthony Wilson,

22   which you said something about one in 6.8 trillion is the

23   statistical analysis?

24   A    Correct.

25   Q    Now, can you tell me, so, in your expert opinion is

mc

Phillips - People - Direct/Cross

 1  the blood and semen that was found in the apartment as well

 2  on various items, as well as from the penile swab, that of

 3  Anthony Wilson?

 4       A    Yes.  Some of the blood samples and semen samples

 5  are from Anthony Wilson.

 6       Q    And the blood that you found in the bathroom -- I'm

 7  sorry -- the swabs that were taken from the bathroom, in your

 8  expert opinion, are those samples that are from Atara Wisdom?

 9       A    Yes.

10       Q    Now, could you do anything else with the mixture

11  that you said was the majority donor who was Anthony Wilson?

12       A    The minor contributor, again, is not suitable for

13  comparison, so there's nothing further that can be done.

14            MS. CHU:  Thank you very much.  I have nothing

15       further.

16            THE COURT:  Cross-examination.

17  CROSS-EXAMINATION

18  BY MR. WALENSKY:

19       Q    There was no amylase found on the penile swab, is

20  that correct?

21       A    That is correct.

22       Q    Now, amylase would indicate a mixing of perhaps

23  saliva or vaginal secretions or bacteria?

24       A    That is possible.  So, amylase testing in our

25  laboratory is what we use to screen for possible saliva, but

Phillips - People - Cross/Mr. Walensky

1  it's just a screening test, it's not confirmatory, so vaginal

2  secretions or bacteria can also give a positive reading for

3  the amylase test.

4      Q    And, so, the semen swab was just -- just contained

5  Anthony Wilson's DNA, nothing else?

6      A    That's correct, the penile swab.

7              MR. WALENSKY:  Thank you.

8              I have no further questions.

9              THE COURT:  You may step down.  Thank you.

10             THE WITNESS:  Thank you.

11             (Whereupon, Sarah Phillips stepped down from

12         the witness stand and exited the courtroom.)

13             THE COURT:  All right, ladies and gentlemen,

14         due to circumstances that are beyond the control of this

15         Court, we are going adjourn to 2:00 P.M.

16             Do not discuss the case amongst yourselves or

17         with anyone else.  Do not visit the place where the

18         alleged crimes occurred.  Have no contact with any

19         parties involved in this matter, including the Court.

20         Again, do not resort to utilizing any digital or

21         electronic devices for the purpose of obtaining any

22         information about this case or contacting anyone about

23         this matter.

24             See you at two o'clock.

25             Thank you very much.

Proceeding

1          Have a good lunch.

2          Leave your books there.

3          THE CLERK:  Remain seated as the jury exits.

4          (Whereupon, the Jury exited the courtroom.)

5          THE COURT:  All right, the Court is adjourned

6     till 2:00 P.M.

7          (Whereupon, a lunch recess was held.)

8          *                    *                    *

9          A F T E R N O O N      S E S S I O N

10         *                    *                    *

11         THE CLERK:  Come to order, Part 2 is back in

12    session, the Honorable Albert Tomei presiding.

13         THE CLERK:  Case back on trial continues.

14    Defendant is present with attorney, all parties are

15    present.  Appearances are the same.

16         THE COURT:  All right.

17         Get the jury.

18         THE CLERK:  Something needs to go on the

19    record, Judge.

20         THE COURT:  All right, let's go.

21         Is the case called in?

22         THE CLERK:  I called it in.

23         MS. CHU:  Your Honor, I just wanted to keep

24    the Court apprised of the status of my final two

25    witnesses.

Proceeding

1      We had made arrangements for Mr. Shepard to

2  appear today, however he has since been incommunicado

3  with my detective who has his cellphone number.  I had

4  given up a material witness order as well as some phone

5  work-up that we'd like for this witness and I ask the

6  Court to allow us till tomorrow to produce our witness.

7      In addition, your Honor, I just wanted to put

8  on the record what we spoke about before lunch, which

9  was that I had asked Mr. Walensky whether or not he'd be

10  willing to stipulate as to the swabbing of certain items

11  that were vouchered from the scene by a person by the

12  name of Amy Dorsey from the Trace Unit.  I informed Mr.

13  Walensky as well as the Court that Ms. Dorsey was asked

14  to leave the New York City police lab because there are

15  allegations of either something having to do with

16  transference of DNA, that she was contaminating items

17  that she was actually testing, so I told Mr. Walensky

18  about it and in light of the fact that in this case the

19  swabbing that they did comes back to our victim, it

20  really has no consequence for the defendant, I asked

21  whether or not he'd be willing to stipulate.  He

22  indicated that he was.

23      MR. WALENSKY:  I do stipulate.

24      THE COURT:  Okay.

25      Get the jury.

Proceeding

1      COURT OFFICER:  Jury entering.

2      (Whereupon, the Jury entered the courtroom.)

3      THE COURT:  Come on up.  Come on up.

4      (Whereupon, a sidebar conference was held off

5   the record.)

6      THE CLERK:  Both sides waive the roll call?

7      MS. CHU:  Yes.

8      MR. WALENSKY:  Yes.

9      THE CLERK:  Thank you.

10      THE COURT:  All right, ladies and gentlemen,

11   at this time, again because of these unforeseen

12   circumstances, I am going to have to adjourn this matter

13   to 9:30 tomorrow.

14      Tomorrow, I would say, and I'm hedging this,

15   but you never know what is going to happen, but I would

16   think that this matter will be concluded tomorrow.  And,

17   therefore, I will just see you tomorrow at 9:30, all

18   right.  And bear with the heat and be here on time and

19   maybe we'll finally complete this matter, all right.

20      So, have a good afternoon.

21      Goodnight and see you tomorrow morning.

22      Do not discuss the case amongst yourselves or

23   with anyone else.

24      (Whereupon, the Jury exited the courtroom.)

25      THE COURT:  All right.

Proceeding

 1              I know you indicated that you would like to

 2     have a charge conference so I think we should at this

 3     particular time.

 4              Is your client going to testify?

 5              MR. WALENSKY:  Yes, your Honor.  My client, I

 6     believe, will be testifying, if she wishes to.

 7              I told her the dangers of testifying, that

 8     she's not required to testify.  I also believe that the

 9     statement that we saw is enough for a justification

10     defense.  However, all that in mind, she does wish to

11     testify.

12              Is that true, Ms. Wisdom?

13              THE DEFENDANT:  Yes.

14              THE COURT:  You understand it's your right and

15     your right alone, you need not take your lawyer's advice

16     regarding testifying, but nevertheless, if that is your

17     desire, you have every right to testify in this matter.

18              Is that what you want to do?

19              THE DEFENDANT:  Yes.

20              THE COURT:  Are you doing so voluntarily and

21     of your own free will?

22              THE DEFENDANT:  Yes.

23              THE COURT:  All right.

24              What is your application with respect to the

25     charges?

Proceeding

1    MR. WALENSKY:  Your Honor, we would like the

2 charge on justification, the section that's in the Penal

3 Law 35.15 Subsection 2B, which specifically relates that

4 a person is justified to use deadly force for themselves

5 or another if they are in imminent danger of being

6 raped, rape, kidnapping, et cetera.

7    It is that subsection that we wish the use of

8 deadly force to be under as opposed to use of deadly

9 force if you feel you're life is in danger, because all

10 of the evidence in this case specifically, and really

11 the only evidence, is the statement of Ms. Wisdom that

12 she believed she was being raped -- he was attempting to

13 rape her.

14    We have --

15    THE COURT:  What else?

16    MR. WALENSKY:  Circumstantial evidence charge.

17    THE COURT:  I am going to charge

18 circumstantial evidence.

19    MR. WALENSKY:  I'm sorry, you will?

20    THE COURT:  Yes.

21    MR. WALENSKY:  Okay.

22    If Mr. Shepard appears, we want the charge

23 regarding an outcry because it's -- the People are

24 saying it's a third-party admission and we are saying

25 it's not a third-party admission that she did something

Proceeding

1    wrong.  She said the man tried to have sex with me and I

2    poked him.

3            MS. CHU:  That's not what she said.

4            THE COURT:  What did she say?

5            MS. CHU:  The allegation, the witness says

6    that she told him -- she says, I wasn't going to pay him

7    rent and have sex with him, so I poked him.

8            There's a definite difference in meaning.

9            MR. WALENSKY:  We do not believe so.  But this

10   is only if Mr. Shepard testifies, otherwise there's, at

11   present, no outcry witness.

12           Then the standard charges regarding intent,

13   expert witness.

14           THE COURT:  What's this witness's name that

15   you're looking for?

16           MS. CHU:  Matthew Shepard.

17           THE COURT:  Oh, Shepard.

18           I'm not sure if I'm going to charge outcry.

19           What were the circumstances regarding the

20   admission?

21           MS. CHU:  The admission, she had contacted my

22   witness on the night that the 911 call was made and

23   arranged to meet with him.  He says he meets with her,

24   she told him she had a situation.  He asked her what.

25   She says, I poked him.  He says, what do mean?  She

Proceeding

332

1    says, well, I wasn't going to pay him rent and fuck him,

2    so I poked him.

3              MR. WALENSKY:  She also asked him to go back

4    to the apartment with her to check on him.

5              MS. CHU:  That's only after he asked her how

6    was he when you left.  She said, come back and we

7    will -- come back with me and we'll check it out.

8              THE COURT:  I'm not sure right now.  I will

9    have to research it and -- it's -- it's -- to some

10   extent it's ambiguous, I'm not sure if I should charge

11   it, but I'll see.

12             What else, intent and --

13             MR. WALENSKY:  Intent, expert witness.  If Ms.

14   Wisdom ultimately changes her mind and does not testify,

15   the standard charge that she has no obligation to

16   testify.  Just if she doesn't.  She does plan on

17   testifying.

18             MS. CHU:  Expanded intent you asked for?

19             MR. WALENSKY:  No, the standard intent.

20             It doesn't have to be premeditation, no

21   planning is required.

22             THE COURT:  I'll give that.

23             Anything else?

24             I am only going to give one count, that's all.

25             MR. WALENSKY:  Murder in the second degree.

333

Proceeding

```
 1              THE COURT:  Murder in the second degree.

 2              MR. WALENSKY:  I understand.

 3              No, I don't perceive any other.

 4              THE COURT:  And the justification will be an

 5    element of the crime.  In other words, guilty or not

 6    guilty, but one of the elements will be that the People

 7    have to prove beyond a reasonable doubt that there was

 8    no justification.

 9              MR. WALENSKY:  Right, right.

10              As I said, this is specific to rape and it's

11    Penal Law 35 point -- you know, okay.

12              Thank you.

13              THE COURT:  Anything else?

14              MR. WALENSKY:  No, thank you.  That's about

15    it.

16              THE COURT:  All right, so tomorrow 9:30.

17              MS. CHU:  Thank you.

18              THE COURT:  Just wait a minute, please.

19              (Whereupon, there was a brief pause in the

20    proceedings.)

21              THE COURT:  All right.

22              See you tomorrow, 9:30.

23              (Trial adjourned to July 9, 2014.)
              ********************************
24    CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
      THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS
25    PROCEEDING.    /Marlin Cassidy/
                    MARLIN CASSIDY, Senior Court Reporter
```

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS:  CRIMINAL TERM:  PART 2
 2   -------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3                                       Indictment No.:
                    -against-            6615/2012
 4                                       (Trial)
     ATARA WISDOM,
 5
                         Defendant.
 6   -------------------------------------------X

 7
                              Supreme Courthouse
 8                            320 Jay Street
                              Brooklyn, New York 11201
 9                            July 9, 2014

10
     B E F O R E:
11
                 THE HONORABLE ALBERT TOMEI, JUSTICE
12               (And a Jury)

13   A P P E A R A N C E S:

14               HON. KENNETH P. THOMPSON, ESQ.
                 District Attorney - Kings County
15               350 Jay Street
                 Brooklyn, New York  11201
16           BY: PHYLLIS CHU, ESQ.
                 Assistant District Attorney
17

18               DAVID WALENSKY, ESQ.
                 Attorney for Defendant
19               910 Stuart Avenue
                 Mamaroneck, New York
20           BY: DAVID WALENSKY, ESQ.
                     - and -
21               JOSHUA POVILL, ESQ.

22

23

24
                         MARLIN CASSIDY
25                       Senior Court Reporter
```

mc

Proceeding

1              (Whereupon, the following took place in open

2      court:)

3              THE CLERK:   Come to order, Part 2 is now in

4      session, the Honorable Albert Tomei presiding.

5              MS. CHU:   People.

6              MR. WALENSKY:   People did bring in Matthew

7      Shepard and I wanted to ask if he would speak with me.

8      And Ms. Chu asked him, and I have no doubt that she told

9      me the truth, that he said he didn't wish to speak with

10     me, however I would like to personally ask him.

11             There are three detectives outside the door,

12     I'd like to go in and ask him if we can talk and I think

13     I'm entitled to try to speak to a witness and I don't

14     think I have to rely on --

15             THE COURT:   You can just tell him who you are

16     and what you want to do.

17             MR. WALENSKY:   Thank you very much, your

18     Honor.

19             Go ahead.

20             THE COURT:   Go ahead.

21             (Whereupon, there was a brief pause in the

22     proceedings.)

23             THE COURT:   Call the case.

24             THE CLERK:   This is calendar number one, case

25     on trial, Indictment 6615 of 2012, People versus Atara

336

Proceeding

1    Wisdom.  Defendant is incarcerated, produced before the

2    Court, present with her attorney.

3              Appearances are the same.

4              MR. WALENSKY:  Your Honor, I just went in to

5    speak to Mr. Shepard.  The detective wouldn't stay

6    outside while I wanted to ask him if he said he didn't

7    want to speak to anyone.  I said, can I talk to you?  He

8    said yes, and -- but there's a detective there, there's

9    Ms. Chu there and --

10             MS. CHU:  You're not his lawyer.  It's not

11   like you have a meeting.

12             MR. WALENSKY:  I believe completely there is a

13   matter of security, he is in a conference room outside

14   with three detectives standing outside the door on the

15   21st floor of a building which you only can get down in

16   the elevators.

17             So, I think I should be able to go in and

18   close the door and ask him a few questions.  It's

19   certainly intimidating to have an A.D.A. there, have a

20   detective there.  It's very simple, there is no security

21   risk and it will take me a minute, if he truly doesn't

22   want to.

23             THE COURT:  Go there.  My direction is that

24   you go in there and you tell the witness who you are and

25   if he wants to talk to you, all right, simple as that.

mc

Proceeding

1    If he says no, you leave.

2            MR. WALENSKY:  Can I go in alone without a

3    detective holding the door open?

4            MS. CHU:  I object.  He is not his lawyer.  He

5    is entitled to speak to his lawyer separately.  He is my

6    witness pursuant to a material witness order that I got

7    from you yesterday.

8            THE COURT:  Let the detective open the door

9    and let the detective stand outside with the door open

10   so he can hear what you do and say.  All right, fine,

11   let's go.

12           MR. WALENSKY:  I want to put my objection on

13   the record.

14           THE COURT:  You have an objection.

15           (Whereupon, there was a brief pause in the

16   proceedings.)

17           MR. WALENSKY:  He said he is going to talk to

18   me.  I requested they close the door while I speak to

19   him and so we are coming up to the Court because People

20   don't want to close the door and, you know, if it's a

21   witness, I think I am allowed to talk to him without

22   everybody hearing what I'm saying.

23           THE COURT:  Did you tell him who you were?

24           MR. WALENSKY:  I told him who I was.  They

25   heard me say I'm Atara's lawyer and Ms. Chu says that is

Proceeding

1  Renee, and I said, she is on trial for murder.  That is

2  what I said.

3           MS. CHU:  Your Honor.

4           MR. WALENSKY:  I said, can I speak with you

5  and then he said okay.  And I wanted to talk to him.  I

6  asked them to close the door, it was refused, so I came

7  in.

8           THE COURT:  So what's the problem?

9           MS. CHU:  The problem is he is going to take

10  the stand, there is a material witness order, he is

11  willing to testify, he will have ample opportunity --

12           THE COURT:  He has a right to speak to the

13  witness.

14           MS. CHU:  If that is how the Court wants to

15  rule...

16           THE COURT:  Yeah.  Go and speak to him.

17           MS. CHU:  Whether he is allowed to speak to

18  the witness privately and whether or not I am allowed to

19  be present, he is my witness, he is not his witness, he

20  is not his lawyer.

21           MR. WALENSKY:  Your Honor, the rules allow the

22  People to speak to any of my witnesses, they can go

23  privately, and they go privately, but they go without me

24  and they are allowed to talk without me.

25           There is no requirement that I am with a

1    witness and the same, there is no requirement People

2    know what I am saying to their witness.  I am an

3    officer of the Court, I am not going to say anything

4    unethical.

5             THE COURT:  One minute.

6             (Whereupon, there was a brief pause in the

7    proceedings.)

8             THE COURT:  I will let you speak to him and

9    allow Ms. Chu to be present.

10            Go ahead.

11            MR. WALENSKY:  I would object to that.  It

12   just --

13            THE COURT:  Your objection is noted.  If you

14   want to speak to him, you can, and Ms. Chu can be there

15   when you speak to him.

16            MR. WALENSKY:  Your Honor, Ms. Chu would be

17   free to cross -- to examine him.  When she examines him,

18   she can ask him what I said in that room.  I think

19   that's fine.  Also, that puts me, in a sense, on the

20   spot not to do anything inappropriate.

21            THE COURT:  I am not putting you on the spot

22   or anything.  If you want to speak to him, you can

23   speak to him.  If he wants to answer your questions,

24   fine.  Ms. Chu is just there, she has a right to be

25   there.

Proceeding

340

1       Go ahead.

2           (Whereupon, there was a brief pause in the

3       proceedings.)

4           MR. WALENSKY:  Your Honor, I went in and I

5       told Mr. Shepard that I was not allowed to speak to

6       him privately without an A D.A. present and that I

7       wasn't going to talk to him in that type of situation

8       and that we'd speak on the stand.  But, again, it's -- I

9       think it's objectionable and I would move for a

10      mistrial.

11          THE COURT:  What is objectionable about it?

12          MR. WALENSKY:  I believe I'm allowed to speak

13      to him privately without anybody there.  It's a matter

14      of security.

15          THE COURT:  Under what rule, what principle or

16      rule?

17          MR. WALENSKY:  Witnesses are available to

18      either side and there is no rule that requires that a

19      prosecutor or a defense attorney needs to be there.  I

20      think that's common law.

21          THE COURT:  It's common law?

22          MR. WALENSKY:  Yeah, I believe so.  If I'm

23      incorrect, I'm incorrect.

24          THE COURT:  All right.  You may be right.

25          Let's go.  Come on.

Proceeding

1          Get the witness.

2          Get the jury out.

3          MS. CHU:  Your Honor, this witness is here

4     obviously pursuant to a material witness order.  I ask

5     that the order be vacated now that he is present.

6          THE COURT:  The material witness order?

7          MS. CHU:  Yes.

8          THE COURT:  Yes, that's vacated at this time.

9          (Whereupon, there was a brief pause in the

10    proceedings.)

11          COURT OFFICER:  Ready for the jury, your

12    Honor?

13          THE COURT:  Yes.

14          COURT OFFICER:  Jury entering.

15          (Whereupon, the Jury entered the courtroom.)

16          THE CLERK:  All members of the jury are

17    present and seated.

18          Both sides waive the roll call?

19          MS. CHU:  So waived.

20          MR. WALENSKY:  Yes.

21          THE CLERK:  Thank you.

22          THE COURT:  Call your next witness.

23          MS. CHU:  The People call Matthew Shepard.

24          (Whereupon, there was a brief pause in the

25    proceedings.)

342

Shepard - People - Direct/Ms. Chu

1          COURT OFFICER:  Judge, are you ready for the

2     witness?

3          THE COURT:  Yes.

4          COURT OFFICER:  Witness is entering.

5          Follow me.

6          (Whereupon, Matthew Shepard entered the

7     courtroom and took the witness stand.)

8          THE CLERK:  Raise your right hand.

9          Do you solemnly swear or affirm the testimony

10    you're about to give will be the truth, the whole truth

11    and nothing but the truth, so help you God?

12          THE WITNESS:  I affirm.

13          THE CLERK:  Put your hand down, please.

14          State your name for the record.

15          THE WITNESS:  Matthew Shepard.

16          THE CLERK:  Spell your last name.

17          THE WITNESS:  S-H-E-P-A-R-D.

18          THE CLERK:  Have a seat.

19          Thank you.

20          THE COURT:  All right, Mr. Shepard, just take

21    a seat, pull it up close to the microphone and when you

22    speak, put your lips close to the microphone in

23    responding to any questions.

24          Proceed.

25          MS. CHU:  Thank you.

Shepard - People - Direct/Ms. Chu

1  M A T T H E W      S H E P A R D, called as a witness by and

2           on behalf of the People of the State of New York,

3           after having been first duly sworn, was examined

4           and testified as follows:

5  DIRECT EXAMINATION

6  BY MS. CHU:

7     Q    Good morning, Mr. Shepard.

8     A    Good morning.

9     Q    I can't hear you.

10    A    Good morning.

11    Q    How old are you, sir?

12    A    Forty-nine.

13    Q    And have you ever gone by the name Matthew

14 Bridgeton (phonetic)?

15    A    Yes.

16    Q    And I am going to ask you, do you have a criminal

17 record?

18    A    Yes.

19    Q    Yes?

20    A    Uh-huh.

21    Q    Do you recall going to jail for a drug case back in

22 2011?

23    A    I don't know when I have been locked up for drugs.

24    Q    And did you also have a criminal history in

25 Pennsylvania?

344

Shepard - People - Direct/Ms. Chu

1      A      Yes.

2      Q      And what about in New Jersey?

3      A      Yes.

4      Q      That was for drugs?

5      A      Yes.

6      Q      Yes?

7      A      Uh-huh.

8             THE COURT:  Were you convicted for these

9      crimes, yes or no?

10            THE WITNESS:  Yes.

11            THE COURT:  All right, Mr. Shepard, you are

12     going to have to keep your voice up loud.

13            All right, proceed.

14     Q      You had a couple of things that happened in New

15     Jersey for drugs where you were arrested and you were

16     convicted, right?

17     A      Yes.

18     Q      Now I want to direct your attention to the fall of

19     2011.

20            Do you recall living on Cedar Street here in

21     Brooklyn?

22     A      Yes.

23     Q      And can you tell me, did you know a person by the

24     name Tony or were you familiar with this person?

25     A      From seeing him, yes.

mc

Shepard - People - Direct/Ms. Chu

1    Q    I'm sorry?

2    A    From seeing him.

3    Q    And where would you see him?

4    A    Basically just panhandling and doing whatever he

5  doing.  I mean, I didn't make it a point, I'm saying, like to

6  interact with him.  But I saw him, he lived in my hood.

7    Q    He lived in your neighborhood?

8    A    Uh-huh.

9    Q    Can you tell us, where would you --

10        Do you remember the streets that you used to see

11  him on?

12    A    Not any one specific.

13    Q    Do you remember seeing him on Broadway where the

14  doctor's office was?

15        MR. WALENSKY:  Objection, leading the

16    witness.

17        THE COURT:  Don't lead the witness, please.

18    Q    Did you ever see him on Broadway?

19    A    From time to time.

20    Q    Now, did you have any relationship with him other

21  than just seeing him in the neighborhood?

22    A    No.

23    Q    Did you know where he lived?

24    A    Not specifically.

25    Q    Are you familiar with the corner of Bushwick and

mc

1  Kosciuszko?

2      A    Yes.

3      Q    Do you know whether or not he lived anywhere near

4  there?

5      A    I didn't know specifically.  I later learned he

6  lived there.

7      Q    Okay.

8           Now, can you tell me, did you meet a woman by the

9  name of Renee?

10     A    Yes.

11     Q    And how did you meet her?

12     A    I was introduced to her by a mutual friend.

13     Q    And who's this mutual friend?

14     A    I don't know his name.  They call him Bear.

15     Q    Where were you when you met her?

16     A    I was in the parking lot, the laundromat parking

17 lot across from the clinic.

18     Q    Can you tell me, how did it come to be that you

19 were -- that you met her?

20     A    I was introduced to her.

21     Q    Did you ask to be introduced to her or did Bear

22 just do it on his own?

23     A    I asked Bear who was she.  He introduced me to

24 her.

25     Q    Did you have a conversation with Renee at this

Shepard - People - Direct/Ms. Chu

1   time?

2       A    Briefly.

3       Q    And what did she tell you?

4       A    She said that she was staying with Tony.  She said

5   she didn't have anywhere to stay, that is who she staying

6   with.

7            THE COURT:  Mr. Shepard, I will ask you again

8       to speak louder.

9            THE WITNESS:  I have a condition.

10           THE COURT:  Okay, but just try to speak a

11      little louder so the jury and everyone else can hear

12      you, okay.

13           You had a brief conversation, and what was

14      your question?

15      Q    You said that she had mentioned that she was

16   staying with Tony?

17      A    Yes.

18      Q    And she said because she didn't have any other

19   place to stay?

20      A    Yes.

21      Q    Now, did you ask her for her phone number?

22      A    Sure.

23      Q    And did you give her yours?

24      A    Yes.

25      Q    Did you have a cellphone at the time?

Shepard - People - Direct/Ms. Chu

1     A    Yes.

2     Q    Can you tell me, was the cellphone you got in your

3 name?

4     A    I'm not sure.  I think so.

5     Q    Okay.

6          Well, your name is Matthew Shepard?

7     A    That's my name.

8     Q    Okay.

9          Do you recall what your phone number was back

10 then?

11    A    No, I don't.

12    Q    Now, but you did have a phone that was in your

13 name?

14    A    I'm almost sure I did.

15    Q    Okay.

16         Can you tell me, do you recall what time of the

17 year it was that you met Renee across the street from the

18 clinic?

19    A    It was one of the warmer months.  I'm not sure.

20    Q    That's 2011?

21    A    I'm not sure.

22    Q    Let me ask you, can you just take a look around the

23 courtroom and see if you see Renee here?

24    A    I think that's her, I'm not sure.  She looks

25 different.

Shepard - People - Direct/Ms. Chu

1      Q    Can you tell me who you are talking about?

2      A    The young lady sitting right there between the

3  attorneys.

4      Q    Can you tell me something that she's wearing?

5      A    There is only one young lady sitting there.

6      Q    You have to state for the record.  The record can't

7  see her.

8      A    The young lady with the pink -- what is that, pink

9  shirt on or something?

10               THE COURT:  Indicating the defendant.

11               Proceed.

12     Q    This person is the person that was introduced to

13  you as Renee?

14               MR. WALENSKY:  Objection.

15     A    She looks different.

16               THE COURT:  What?

17     Q    What did she --

18     A    Gained some weight or something.  I don't know.

19  She looks different.

20     Q    How you remember her, she looked different?

21     A    Yes.

22     Q    Does that look like it's her?

23     A    I think so.  She looks different.

24     Q    Other than weight?

25     A    She looks different.  It's been a long time.

Shepard - People - Direct/Ms. Chu

1    Q    Okay.

2         Now, can you tell me, did you know -- other than

3    her saying she was living with Tony, did she give you any

4    indication as to the type of relation she had?

5    A    Not at all.  We didn't converse about that at

6    length, you know.  I was just talking to her, you know.  At

7    that time, you know, I was looking at her, I was talking to

8    her.  I'm a single man, you know.

9    Q    You found her attractive?

10   A    At the time.

11   Q    And can you tell me, sometime around Thanksgiving

12   of 2011, I guess a couple of days after Thanksgiving, did

13   there come a time when you received a phone call in the early

14   morning?

15   A    Yes.

16   Q    And can you tell me, who was it from?

17   A    It's from Renee.

18   Q    Can you tell me, what did she want on the phone?

19   A    She called me, she asked me what was I doing and

20   asked if she could come by.

21   Q    Did you make arrangements to meet her?

22   A    I said, yeah, we can meet.

23   Q    Can you tell me, where did you make arrangements to

24   meet her?

25   A    On De Kalb.

Shepard - People - Direct/Ms. Chu

1    Q    On De Kalb Avenue?

2    A    Yes.

3    Q    The phone number that she called you from -- I'm

4    sorry.

5         Did your cellphone have the capacity to know what

6    caller I.D. was?

7    A    Sure.

8    Q    Can you tell me, when Renee called you on the

9    phone, do you remember what number it -- did your phone

10   recognize that phone number?

11   A    Sure.  She gave me the phone number prior to that.

12   The number was given under Tony.

13   Q    It was Tony's cellphone number?

14   A    Yes, it was Tony cellphone number that was given to

15   me because I didn't want my girl to find out another girl was

16   talking to me, I put it under Tony.

17   Q    That is the phone number she had given to you when

18   she was introduced by Bear?

19   A    Yes.

20   Q    Can you tell me, did there come a time when you

21   actually met her on De Kalb?

22   A    Yes.

23   Q    Can you tell me, did she have anything with her

24   when she met you?

25   A    Yes, she had a few bags.

Shepard - People - Direct/Ms. Chu

1      Q      Do you remember how many?

2      A      I don't know, three or four.

3      Q      Three or four?

4      A      Maybe.

5      Q      Can you tell me, why did she want to meet you?  Did

6   she tell you?

7      A      Initially, no, you know.  I'm not sure, man.  I'm

8   not sure.  You are talking about two years ago or something,

9   you know.

10     Q      Do you recall what she said to you when you saw her

11  on De Kalb?

12     A      Joking about the bags she had.  I don't know.  I

13  mean, my mind was on some sex.

14     Q      You wanted to have sex with her?

15     A      My mind was on some sex.  She called me that time

16  in the morning, I'm a single man, you know what I mean?

17     Q      So you wanted to have sex with her?

18     A      You calling me at that time of the morning, I'm a

19  single man...

20     Q      Okay.

21             Did she tell you anything about Tony when she saw

22  you?

23     A      Initially, no.  I asked her what was going on, you

24  know, because she seemed a little bit, you know, and she was

25  like, you know, she and her friend had an altercation.

Shepard - People - Direct/Ms. Chu

1    Q    Okay?

2    A    You know, I'm really not paying attention, you

3    know.

4    Q    What did she say happened?

5    A    She said they had an altercation.

6    Q    Okay.

7    A    All right.  And I assumed, you know, what was going

8    on.  I wasn't really taking her serious about that.  You know

9    what I'm saying?  And she said, I'm not paying rent and

10   fucking him.  I am not going to pay rent and fuck him too.

11           THE COURT:  Repeat what he said, please.

12           (Whereupon, the referred-to answer was read

13   back by the Reporter.)

14   Q    Did she say anything else?

15   A    That was it.

16   Q    Did she say anything about what she might have done

17   to Tony?

18   A    She said she poked him.

19   Q    She what?

20   A    She poked him.

21   Q    What does that mean, poke?

22   A    I don't know.  Ask her.

23   Q    I am asking you, do you know what that means?

24   A    I don't know.  That's what she said.  I don't know.

25   Q    After she said that, what did you do?

mc

1       A    What you mean, what I did?

2       Q    Did you stay with her?

3       A    Sure.  She asked me could she come by.  I said, you

4   know, all right, la-da-da.  My mind was, you know.  Anyway,

5   look, I don't know nothing.  I don't know her, I don't know

6   him.  I don't know her, I don't know him.  I met her, that's

7   that.  All I can tell you is what she told me, that's that.

8       Q    After she told you this, did you go to your house?

9       A    Huh?

10      Q    After she told you this, did you go to your house?

11      A    Yeah, I went to my house.

12      Q    Was she with you?

13      A    Sure.

14      Q    Can you tell me, how long did she stay at your

15  house?

16      A    She didn't stay long.  A few hours, maybe.

17      Q    I'm sorry?

18      A    A few hours, maybe.

19      Q    And you told her she couldn't stay?

20      A    Yeah, I gotta take care of things.  I got things to

21  do.  I had things to do, I had to go to Manhattan.

22      Q    She had to leave by the time you were leaving?

23      A    That's right.

24      Q    Can you tell me, did you know whether she had any

25  injuries on her when you saw her?

mc

Shepard - People - Direct/Ms. Chu

1    A    I'm not sure.  I'm not sure, but I'm almost sure

2  she had a swelling up on her face, a little bit, you know

3  what I mean?

4    Q    Other than that, did you see any blood on her

5  clothes, anything like that?

6    A    No, I didn't see none of that.  She wouldn't be

7  going to my crib if she had.

8    Q    I'm sorry?

9    A    She would never got to my house if she had that on

10 her.

11   Q    Okay.

12        What was her demeanor like when she was talking to

13 you?

14        MR. WALENSKY:  Objection.

15   A    I don't know.

16        THE COURT:  Overruled.

17        Did you understand the question?

18   A    Repeat it.

19        THE COURT:  How did she appear to you at the

20     time?

21        THE WITNESS:  No specific way.  I mean, you

22     know, I wouldn't have -- you know, I'm saying she would

23     have done what they said she done, I don't know.  I

24     don't know.  How does a person act, you know what I'm

25     saying?

1       Q     Was she acting unusual at all?

2       A     I never been around her so I don't know how she

3   acts.  I never been around her, I don't know what her norm

4   is.

5       Q     Now, you said she left your apartment eventually

6   because you had to go out?

7       A     Yeah, I had to go.

8       Q     Did you see who came to get her?

9       A     I don't remember who came and got her.  I think it

10   was a gentleman.

11      Q     Okay.

12            Can you tell me, did you have any contact with her

13   after that day?

14      A     Excuse me?

15      Q     After she left your apartment --

16      A     No.

17      Q     -- did you have any contact with her?

18      A     No.  Nah.

19      Q     Now I want to direct your attention to the

20   following year in January, January 3rd of 2012.

21            Did there come a time when you were in the vicinity

22   of Bushwick and Kosciuszko?

23                  THE COURT:  January 3rd, what?

24                  MS. CHU:  2012.

25      A     I don't know about the date you're talking about.

Shepard - People - Direct/Ms. Chu

1    Q    Do you remember seeing --

2         Do you know Shakeema Fortune?

3    A    You're talking about Keema?

4    Q    Yeah, Keema.

5    A    I know Keema.

6    Q    Do you recall her being in the vicinity of

7 Kosciuszko and Bushwick when there was police around?

8    A    Yes.

9    Q    All right.

10        Can you tell me, did you speak with Keema at that

11 time?

12    A    Sure, police stopped me.

13    Q    Did you also speak to the police?

14    A    They made me spoke to him.

15    Q    When you spoke to them, did you tell them about the

16 conversation you had with Renee that night when she told you?

17    A    No.

18    Q    Not initially?

19    A    No.

20    Q    Did you eventually tell them that?

21    A    Yeah.

22    Q    You recall also speaking to a District Attorney

23 from my office, do you remember that, on audiotape?

24    A    I heard the tape.

25    Q    Do you recall if you told the A.D.A. on --

Shepard - People - Direct/Ms. Chu

1          MR. WALENSKY:  Objection, your Honor,

2     impeaching her own witness.

3          THE COURT:  What she's saying is impeaching?

4          MR. WALENSKY:  Well, about to.

5          THE COURT:  Overruled.

6          Proceed.

7     Q    Do you remember speaking to the A.D.A. on the

8     audiotape?

9     A    Yes.

10    Q    And you told them what happened when you saw Renee

11    that morning?

12    A    Uh-huh.

13    Q    Yes?

14         THE COURT:  You gotta answer yes or no, sir.

15    A    Yes.

16    Q    Do you also recall when you first met me when you

17    came to the Grand Jury?

18    A    Vaguely.

19    Q    Do you remember talking about what happened with

20    Renee in the Grand Jury?

21    A    Yes.

22    Q    Now, sometime around the time that you came to the

23    Grand Jury, a couple of days before that, do you remember

24    going to the precinct to look at a lineup?

25    A    You came to pick me up to do so.

Shepard - People - Direct/Ms. Chu

1    Q    Do you remember looking at a lineup?

2    A    Yes.

3    Q    Did you recognize anyone in the lineup?

4    A    Yes.

5    Q    Who did you recognize?

6    A    I recognized Renee.

7    Q    Do you recall what position she was in?

8    A    No, I don't.

9    Q    But you remember that she was in the lineup?

10    A    Yes.

11    Q    Now, can you tell me, did you tell -- I'm sorry.

12        Were you with a detective when you looked at this

13 lineup?

14    A    I'm not sure.  I think so.

15    Q    Did you tell the detective that you recognized her?

16    A    Sure.  I think so.

17    Q    When was the last time that you had seen Renee

18 prior to you seeing her in the lineup?

19    A    On De Kalb and at my house.

20    Q    The night she came to get you with the four bags,

21 the three or four bags?

22    A    Uh-huh.

23    Q    Yes?

24    A    Uh-huh.  Yes.

25        MS. CHU:  I have nothing further for this

Shepard - People - Cross/Mr. Walensky

1      witness.

2                  Thank you.

3                  THE COURT:   Cross.

4   CROSS-EXAMINATION

5   BY MR. WALENSKY:

6      Q    Good morning, Mr. Shepard.

7      A    Good morning.

8      Q    You remember a little while ago I wanted to speak

9   with you?

10     A    Yes.

11     Q    And I wasn't permitted to speak --

12                 MS. CHU:   Objection.

13                 THE COURT:   Objection sustained.   The jury is

14         to disregard the question.

15     Q    You were brought in today in handcuffs?

16     A    Initially.

17     Q    Initially, right.

18          Police got you and brought you in?

19     A    Uh-huh.

20                 THE COURT:   You have to say yes or no, not

21         "uh-huh," okay?

22                 THE WITNESS:   Okay.

23     Q    Now, you identified the woman sitting there as

24   Renee, right?

25     A    Yes.

Shepard - People - Cross/Mr. Walensky

1    Q    And that was an assumption, wasn't it?

2              MS. CHU:  Objection.

3    A    She looks different.

4    Q    She looks different.  You didn't recognize her as

5    the woman that you knew back in 2011, right?

6              MS. CHU:  Objection.

7    A    She looks different.

8              THE COURT:  Sustained.  He didn't say that.

9         He said that he thinks she looks different, that is

10        all.

11   Q    Do you recognize her as that woman?

12   A    She looks different.

13   Q    Does she --

14             THE COURT:  Do you recognize her, yes or no,

15        as that woman?

16             THE WITNESS:  She looks different, I keep

17        telling you.

18             THE COURT:  What do you mean, she looks

19        different?

20             THE WITNESS:  She looks different, that's all.

21        She gained weight.  I don't know what she looks like.  I

22        met her two times in my life.  I see a lot of people.  I

23        do music, you know.

24             THE COURT:  The question, sir, --

25   A    She looks different.  I seen her before, she looks

1  different.

2          THE COURT:  All right, go ahead.  Proceed.

3      Q    You can't identify her as the person you saw then?

4  That's a simple question.

5      A    No, I couldn't.  I couldn't put my life on it.

6      Q    Okay.  Thank you.

7          MR. WALENSKY:  Move to strike the prior

8      identification.

9          MS. CHU:  Objection.

10          THE COURT:  Overruled.

11      Q    Now, Mr. Shepard, you haven't had any problems with

12  the law in a while now?

13      A    In a while I haven't.

14      Q    Is it fair to say that drugs have been -- have been

15  a problem?

16      A    Yes, they have.

17      Q    Right.

18          And I'm not going through your whole -- through

19  your criminal record.

20      A    It's public information.

21      Q    Now, in 2011 you were convicted of criminal

22  possession of drugs, possessing drugs?

23      A    Okay.

24      Q    Did you go to a drug treatment program pursuant to

25  that?

Shepard - People - Cross/Mr. Walensky

1     A    A short time.

2     Q    Was it an inpatient program?

3     A    No, it was not.

4     Q    Outpatient?  Because you got a sentence of

5 four-and-a-half to nine years?

6     A    Uh-huh.

7     Q    And how much --

8           That was --

9           You were sentenced on October 25th of 2011?

10    A    Uh-huh.

11    Q    Did you go to jail after that?

12    A    Yes.

13    Q    When you were sentenced?

14    A    Yes.

15    Q    How long did you go to jail?

16    A    I did, look, jail time.  I don't know.  I got

17 charged to New Jersey jail, all right.  I came out.  As far

18 as my drugs history, I've had a problem with drugs.

19    Q    October 25th, 2011, you went to jail?

20    A    I don't know what date I went to jail.  I been in

21 jail a couple of times.

22    Q    That's the last time, apparently, so --

23           MS. CHU:  It was 2000 -- it's the year 2001.

24           MR. WALENSKY:  So this is a misprint?

25           MS. CHU:  That was a misprint.

Shepard - People - Cross/Mr. Walensky

1          MR. WALENSKY:  Thank you.  Wonderful.

2     Q    All right.

3          So back then you did four-and-a-half to nine, but

4     that's a long time ago.

5          You also got a conviction for --

6          When was the last time you got high?  It's not --

7     no one is arresting you.

8     A    Then why you ask me?

9     Q    It's just -- I just --

10    A    I'm not going to answer it.

11    Q    Okay.

12         Did you get high last week?

13    A    I don't want to answer it.  You going to make me

14    answer it?

15    Q    Nah.

16    A    Okay.

17    Q    I won't make you answer it.

18         I'm going to deal with that night, though, okay,

19    that Renee called you; all right?

20    A    Right.

21    Q    You are not on trial, all right?

22    A    I see that.

23    Q    She called your cell early in the morning, 4:00,

24    5:00 in the morning?

25              THE COURT:  The response is yes or no.

Shepard - People - Cross/Mr. Walensky

1     A    I think so.  I'm not sure.  It's two years ago.

2     Q    And you said that she sounded stressed when she

3 first called you; you recall that?

4     A    I think so.  I think so.

5     Q    And then you met her, and as you said, you were

6 thinking about having sex when you met her?

7     A    Sure.

8     Q    You thought that she wanted to get down with you?

9     A    Sure.

10    Q    And when you saw her, she had all these bags,

11 right?

12    A    Yes.

13    Q    And you joked, said, what are you a bag lady,

14 something like that?

15    A    Something to that.

16    Q    Because in your mind you're thinking you are

17 getting down and you didn't know what this was about, right?

18    A    Call me 2:00, 3:00, 4:00 in the morning, single

19 man, you know.

20    Q    You had been in Jersey the night before, right?

21    A    Sure.

22    Q    So you had been up the whole night?

23    A    Possibly.  Possibly.  Very much possibly.

24    Q    In fact, when you made a video, an audio, the audio

25 with the D.A., you told him that you were bad fucked up at

 1   that time, right?

 2        A    I may have been.

 3        Q    And you also told them that you weren't paying

 4   attention to what she was telling you?

 5        A    Not really.

 6        Q    'Cause you were concentrating on --

 7        A    Yeah.

 8        Q    -- what could happen?

 9        A    Right.

10        Q    And you did say that you did see she was a little

11   swollen?  She did tell you she was hit by Anthony, right?

12        A    Yes, she did.

13        Q    She looked a little swollen around the eye?

14        A    Yeah, I think so.  I think so.

15        Q    But, again, you came back, she said you want to go

16   back to the house, right?

17        A    No.  She said -- she asked me could she come there.

18   She asked me that when she called.

19        Q    You brought her back and you were still hoping that

20   something would happen between you two?

21        A    That is what I took her there for.

22        Q    Yeah.

23             When you got there, she was talking?  Was she

24   talking a bit?

25        A    She wasn't talking about that.

Shepard - People - Cross/Mr. Walensky

1     Q   Did she tell you that Anthony tried to rape her at

2 that time?

3     A   He tried to force his self on her, she did say

4 that.

5     Q   He tried to force --

6         THE COURT:  When did she say that?  Where did

7   she say that?

8         THE WITNESS:  She said that at my house that

9   morning.

10        THE COURT:  In what context?  How did she say

11   that?  How did that come up?

12        Did you hear what I just said?

13        THE WITNESS:  I'm thinking so I can answer

14   correctly.

15        THE COURT:  The question is, how did it come

16   up at your house?

17        THE WITNESS:  Okay.  I was asking her what

18   was -- you know, what was wrong with her, you know.  She

19   was telling me, you know, listen, I'm -- this guy is

20   crazy, I'm not going to pay rent and fuck him.

21        THE COURT:  So --

22        THE WITNESS:  He tried to take it.

23        You asked me a question, let me answer it.

24        THE COURT:  He tried to what?

25        THE WITNESS:  He tried to take it, tried to

Shepard - People - Cross/Mr. Walensky

1        force his self on her.

2                    THE COURT:  Go ahead.

3                    THE WITNESS:  That is where I got that from,

4        out her mouth.  I was not there.

5                    THE COURT:  This was said at your house?

6                    THE WITNESS:  Yes, this was said at my house.

7                    THE COURT:  Okay.

8        Q    Now, did you tell her that you should check on him,

9    on Anthony?  Do you remember?

10       A    I may had.  I may had.

11       Q    Did she ask you to go back with her and check on

12   Anthony?

13       A    She said -- yes, she did say, you know.  I think

14   she did.

15       Q    And you didn't want to go?

16       A    Hell no.  I ain't going to that man's house.

17                   MR. WALENSKY:  I have no further questions.

18       Thank you.

19                   MS. CHU:  If I may, I have a couple of

20       questions for the witness, your Honor.

21                   THE COURT:  One minute.

22                   Come on up.

23                   (Whereupon, there was a brief pause in the

24       proceedings.)

25                   THE COURT:  Come on up, People, please.  Come

mc

1       on up.

2              (Whereupon, a sidebar conference was held off

3       the record.)

4   REDIRECT EXAMINATION

5   BY MS. CHU:

6       Q    Mr. Shepard, I just have a couple of questions for

7   you.  You were asked several times by myself as well as

8   defense counsel about whether or not the person sitting there

9   is the person that you remember being Renee back in 2011,

10  2012.  Do you remember that?

11      A    Yes.

12      Q    You have to answer.  I can't hear you.

13      A    Yes.

14      Q    You said that because of the way she looks now,

15  that she looks different to you, that you are not quite sure

16  that's the same person?

17      A    She looks different.  She has gained weight.  She

18  looks different.

19      Q    But is that the same person?

20      A    Possibly.  I only seen her twice in my whole life.

21      Q    You're not saying because she looks different --

22      A    I met her briefly, briefly.  I haven't been with

23  her more than a total of two hours and a half in my whole

24  life.

25      Q    Let me ask you, when you looked at the lineup --

Shepard - People - Redirect/Ms. Chu

1   you remember looking at the lineup?

2       A    Sure.  More recent, sure.

3       Q    July 25th, 2012, is in fact when you looked at the

4   lineup?

5       A    I don't know what the date was.  I do remember

6   looking at the lineup.

7       Q    You had looked at a lineup and you recognized Renee

8   in the lineup?

9       A    Sure.

10      Q    Okay.

11           And you were sure that that was Renee when you saw

12   her?

13      A    I'm positive.

14      Q    When you recognized her and were sure it was her,

15   you were being honest when you told them that that's her,

16   that's Renee?

17      A    That was Renee.

18      Q    Okay.  Thank you very much.

19           MS. CHU:  I have nothing further.

20           MR. WALENSKY:  Nothing further.

21           THE COURT:  You may step down.  Thank you.

22           (Whereupon, Matthew Shepard stepped down from

23       the witness stand and exited the courtroom.)

24           THE COURT:  Call your next witness.

25           MR. WALENSKY:  Your Honor, may we have a

Proceeding

1    break?  My client --

2              THE COURT:  All right, we will take a short

3    recess.

4              Ladies and gentlemen, do not discuss the case

5    amongst yourselves or with anyone else.

6              Leave your books on your seat.

7              Take a ten-minute break.

8              (Whereupon, the Jury exited the courtroom.)

9              THE COURT:  All right, ten-minute recess.

10             (Whereupon, a brief recess was held.)

11             THE COURT:  Bring her out.

12             Get the jury.

13             What is she going to do, Mr. Walensky?

14             MR. WALENSKY:  Your Honor, she will not be

15   testifying.

16             I just will make a record.

17             THE COURT:  All right.

18             THE CLERK:  Case on trial continues.  All

19   parties present.  Defendant present with her attorney.

20             THE COURT:  All right.

21             Is someone getting the jury?

22             SERGEANT:  Yes.

23             (Whereupon, there was a brief pause in the

24   proceedings.)

25             COURT OFFICER:  Ready for the jury?

Det. Batanjany - People - Direct/Ms. Chu

1          THE COURT:  Bring the jury out, please.

2          COURT OFFICER:  Jury entering.

3          (Whereupon, the Jury entered the courtroom.)

4          THE CLERK:  All jurors are present and seated.

5          Both sides waive the roll call?

6          MS. CHU:  So waived.

7          MR. WALENSKY:  Yes.

8          THE COURT:  Call your next witness, please.

9          MS. CHU:  People call Deborah Batanjany.

10          (Whereupon, there was a brief pause in the

11    proceedings.)

12          COURT OFFICER:  Judge, ready for the witness?

13          THE COURT:  Yes.

14          COURT OFFICER:  Witness is entering.  Follow

15    me.

16          (Whereupon, Detective Deborah Batanjany

17    entered the courtroom and took the witness stand.)

18          THE CLERK:  Raise your right hand.

19          Do you solemnly swear or affirm the testimony

20    you're about to give will be the truth, the whole truth

21    and nothing but the truth, so help you God?

22          THE WITNESS:  Yes, I do.

23          THE CLERK:  Please state your name for the

24    record.

25          THE WITNESS:  Detective Batanjany.

Det. Batanjany - People - Direct/Ms. Chu

1            THE CLERK:  Spell your first name and last

2      name.

3            THE WITNESS:  D-E-B-O-R-A-H, Batanjany,

4      B-A-T-A-N-J-A-N-Y.

5            THE CLERK:  Can you give your shield?

6            THE WITNESS:  1408.

7            THE CLERK:  And your command?

8            THE WITNESS:  8-3 Squad.

9            THE CLERK:  Thank you.

10           THE COURT:  Proceed.

11           MS. CHU:  Thank you.

12   D E B O R A H    B A T A N J A N Y, Detective, Shield No.

13           1408, 83rd Precinct, New York City Police

14           Department, called as a witness by and on behalf of

15           the People of the State of New York, after having

16           been first duly sworn, was examined and testified

17           as follows:

18   DIRECT EXAMINATION

19   BY MS. CHU:

20      Q    Good morning, Detective.

21      A    Good morning.

22      Q    How long have you been working for the New York

23   City Police Department?

24      A    Fifteen years.

25      Q    Can you tell me, how long have you been with the

Det. Batanjany - People - Direct/Ms. Chu

1   83rd Precinct?

2       A    About six-and-a-half years.

3       Q    Can you tell us about your career, starting from

4   when you got out of the Academy?

5       A    I was originally assigned to the 7-7 Precinct,

6   that's patrol, and after about six-and-a-half years I went to

7   the 83rd Precinct Detective Squad as an investigator.

8       Q    Now, did there come a time when you became involved

9   in an investigation into the death of a person by the name of

10  Anthony Wilson?

11      A    Yes.

12      Q    And how did you become involved in the case?

13      A    The original case detective was transferred from my

14  command somewhere else.

15      Q    Who was the original case detective?

16      A    Geoffrey Hernandez.

17      Q    When did you become involved in the case?

18      A    It was April 16th of 2012.

19      Q    Now, at the time that you came into the case was an

20  investigation already -- I'm sorry, withdrawn.

21           By the time you came into the case were they

22  looking for someone by the name Atara Wisdom?

23      A    Yes, they were.

24      Q    Do you know whether or not Detective Hernandez had

25  prepared an investigative card for Ms. Wisdom?

mc

Det. Batanjany - People - Direct/Ms. Chu

1       A    Yes, he did.

2       Q    Do you remember when it was prepared?

3       A    It was April the 2nd of 2012.

4       Q    Now I want to direct your attention to July of

5   2012.

6            Did there come a time when you were notified that

7   Atara Wisdom had been located?

8       A    Yes.

9       Q    Who were you notified by?

10      A    Detective Scandole (pronunciation).

11      Q    Scandole?

12      A    Scandole, sorry.

13      Q    Where is he from?

14      A    He is from the Homicide Squad.

15      Q    Now, do you remember what date it was that you were

16  notified and about what time?

17      A    It was July 25th and I believe he picked her up at

18  9:45 in the morning, so it was somewhere around that time.

19      Q    Where were you when you were notified?

20      A    I was at the 8-3 Squad.

21      Q    You were already working?

22      A    Yes, I was.

23      Q    Did there come a time when she was brought to the

24  precinct?

25      A    Yes.

Det. Batanjary - People - Direct/Ms. Chu

1    Q    And where was she put when she was brought into the

2    precinct?

3    A    The interview room in the Detective Squad.

4    Q    What area of the precinct --

5         How many floors is the precinct?

6    A    It's the second floor, and the precinct has two

7    floors.

8    Q    Okay.

9         Now, where was she when you first saw her?

10   A    She was in the interview room.

11   Q    She was already in the room?

12   A    Yes.

13   Q    You didn't see her being brought up and into the

14   room?

15   A    No.

16   Q    Can you take a look around the courtroom and tell

17   if you see Atara Wisdom here and indicate what she's wearing?

18   A    Yes.  She's wearing a striped shirt, a maroonish,

19   red striped shirt.

20        THE COURT:  Indicating the defendant.

21        MS. CHU:  Thank you.

22   Q    On July 25th, 2012 did there come a time when you

23   began to arrange for a lineup?

24   A    Yes.

25   Q    Can you explain to the members of the jury, what is

Det. Batanjany - People - Direct/Ms. Chu

1  a lineup?

2     A    A lineup consists of anywhere from five to six

3  people, including the subject.  There are, like I said, about

4  four to five fillers that are in it and we usually try to get

5  people that have similar features and the subject.

6     Q    Okay.

7          Who was going to be the subject of the lineup that

8  you were preparing?

9     A    Atara Wisdom.

10    Q    Now, did you contact any witnesses to come to the

11  precinct to look at the lineup?

12    A    Yes.

13    Q    Who did you contact?

14    A    Sorry.  Matthew Shepard.  My mind went blank.

15    Q    How did you contact him?

16    A    By phone.

17    Q    Did you make any arrangements with Mr. Shepard to

18  bring him to the precinct?

19    A    Yes.

20    Q    Now, what time was it that you brought Mr. Shepard

21  back to the precinct?

22    A    I would say it was about a half hour, 45 minutes

23  prior to the lineup.  So, maybe around, I think it was -- the

24  lineup was at 5:15 so it was probably around 4:30-ish, 4:30.

25    Q    Did anyone go with you when you went to pick up Mr.

Det. Batanjany - People - Direct/Ms. Chu

1  Shepard?

2       A    Yes, Detective Hernandez did.

3       Q    Did there come a time when you brought Mr. Shepard

4  back to the precinct?

5       A    Yes.

6       Q    Where in the precinct?

7       A    In the BRAM interview room.

8       Q    Where is that?

9       A    That's an office next to the squad.

10      Q    Did you have to pass by the interview room where

11  the defendant was in order to bring Mr. Shepard to where he

12  was?

13      A    No.

14      Q    Once you placed him in that room, did you stay with

15  him?

16      A    I stayed with him or another detective did.

17      Q    Okay.

18           Can you tell me, did you give him any instruction

19  about not wandering the precinct or anything like that?

20      A    Yes, he was told to stay in the room.

21      Q    You had mentioned fillers are part of the lineup.

22  Can you tell me, where did you get your fillers from?

23      A    We got -- four fillers were from a woman's shelter

24  and one filler was an officer.

25      Q    Where did you make arrangements for the officer to

Det. Batanjany - People - Direct/Ms. Chu

1  participate in the lineup?

2      A    Prior to the lineup I spoke with her, and she has

3  an office in the precinct so we asked her if she could be in

4  the lineup, then we asked her to stay inside the office until

5  we got her.

6      Q    Why did you ask her to do that?

7      A    So that the witness would not see her.

8      Q    Okay.

9           Now, at the time you brought Mr. Shepard to the

10  precinct was the officer already notified to stay in her

11  office?

12     A    Yes.

13     Q    Now, do you know who it was that went to get the

14  fillers?

15     A    Detective Hernandez did.

16     Q    Do you know whether he took any photographs of Ms.

17  Atara Wisdom in order to go to the shelter?

18     A    I'm not sure.

19     Q    Did there come a time when he brought back fillers

20  to the precinct?

21     A    Yes.

22     Q    Can you tell me, do you remember how he brought

23  them into the precinct?

24     A    He first brought them into the hallway right before

25  the squad for a brief moment and then about a minute later

Det. Batanjany - People - Direct/Ms. Chu

1 they were brought into the interview room that Atara Wisdom

2 was in.

3     Q   Did they have to go --

4     Did any of the fillers have to go past the area

5 where your witness, Mr. Shepard, was?

6     A   No.

7     Q   Was Mr. Shepard in a room that had a door?

8     A   Yes.

9     Q   Was that door closed?

10     A   Yes.

11     Q   Is there any way to see out of that room once

12 you're in there with the door closed?

13     A   No, because the interview room is another office.

14 So it's one door shut into an office, into the interview

15 room, which there is another door shut, so it's actually two

16 doors into -- from -- like you walk in the hallway, you go in

17 to the BRAM regular office, then the interview room is inside

18 of that.  It's actually two doors in.  You cannot see from

19 the hallway at all.

20     Q   Now, once the fillers were eventually brought into

21 the room, did you get the officer to go into the room as

22 well?

23     A   Yes.

24     Q   Do you remember, what position was the defendant in

25 in the lineup?

Det. Batanjany - People - Direct/Ms. Chu

1     A    Position number two.

2     Q    Do you know how she came to be in position number

3  two?

4     A    She picked position number two.

5     Q    Okay.

6         Once she picked position number two, were the other

7  fillers just placed randomly?

8     A    Yes, I believe so.

9     Q    Can you tell me, did they have anything to identify

10  which position they were?

11     A    They were each handed numbers.

12     Q    And what do you mean, numbers on...

13     A    They each had a number, one through six, that they

14  had to hold, it was like on cardboard.

15     Q    Okay.

16         Can you tell me, was the lineup memorialized in any

17  way?

18     A    Yes, pictures were taken.

19     Q    Do you recall who took the pictures?

20     A    Detective Hernandez did.

21     Q    Do you have those photos with you today?

22     A    Yes, I do.

23         THE COURT:  Before you proceed, who originally

24    had the case?

25         THE WITNESS:  Detective Hernandez.

Det. Batanjany - People - Direct/Ms. Chu

1       THE COURT:  Okay.

2       And you took over when?

3       THE WITNESS:  April 16th of 2012.

4       THE COURT:  And on July 25th was Hernandez

5   still working?

6       THE WITNESS:  He got moved to the Homicide

7   Squad, so Homicide Squad assists us.

8       THE COURT:  Go ahead.  Okay.

9   Q    You said you do have the photos with you?

10  A    Yes, I do.

11  Q    How many are there?

12  A    Let me get them out.

13      (Whereupon, there was a brief pause in the

14  proceedings.)

15  A    There's four photos here.

16      MS. CHU:  Okay.

17      Your Honor, if I can have them deemed 58A

18  through D, please.

19      THE COURT:  Any objection?

20      MR. WALENSKY:  No.

21      THE COURT:  All right.

22      (Whereupon, the photographs were marked as

23  People's Exhibit 58A through 58D for identification.)

24  Q    Detective, People's 58A through D, can you tell me,

25  do you recognize those photos?

mc

Det. Batanjany - People - Direct/Ms. Chu

1      A    Yes, I do.

2      Q    What are those photographs?  Photos of the...

3      A    Of the lineup.

4      Q    Do those photos fairly and accurately depict how

5  the lineup appeared when it was shown to Mr. Shepard on July

6  25th, 2012?

7      A    Yes, they do.

8           MS. CHU:  At this time, your Honor, I would

9      offer them into evidence as People's 58A through D.

10          MR. WALENSKY:  No objection.

11          THE COURT:  All right, in evidence.

12          (Whereupon, the photographs were marked as

13     People's Exhibit 58A through 58D in evidence.)

14     Q    Detective, after the lineup was set up, did you

15 then go get Mr. Shepard?

16     A    Yes, I did.

17     Q    And was he still in the room that you had placed

18 him in earlier, in the RAM (sic) office?

19     A    Yes, he was.

20     Q    Did you explain to him what was going to be

21 happening?

22     A    Yes, I read lineup instructions to him.

23     Q    Prior to you actually speaking to him right before

24 the lineup, did you tell him why he was coming to the

25 precinct when you contacted him?

Det. Batanjany - People - Direct/Ms. Chu

1    A    The only thing I had mentioned, to view a lineup

2  and I would explain to him when he got to the precinct.

3    Q    Other than that, you didn't mention anything else

4  about the lineup?

5    A    No.

6    Q    Once you went into the room to get him to view the

7  lineup, what did you tell him?

8    A    I explained the lineup instructions.  I basically

9  read off the forms that were provided by the N.Y.P.D.

10    Q    What did you tell him?

11    A    The lineup form basically states he will be viewing

12  a lineup, he will view it through a two-way glass, two-way

13  mirror/glass, that he can see into the room, that they cannot

14  see out to him.  I explained to him that there was going to

15  be six people inside, they would each be holding a number,

16  not to assume that I knew who the suspect was or to assume

17  that I knew anything about the lineup, nor to look to me for

18  any questions about it.

19        At that point I would ask him, after he viewed the

20  lineup, two questions, one would be if he can identify

21  somebody, if so which number are they holding, and what does

22  he remember that person from, then the lineup would be

23  concluded.

24    Q    Okay.

25        Did you read him those instructions that you just

Det. Batanjany - People - Direct/Ms. Chu

1    described for me?

2         A    Yes.

3         Q    Did you then take Mr. Shepard into the area where

4    he viewed the lineup?

5         A    Yes, I did.

6         Q    Did he have any questions for you based upon the

7    instructions you gave him initially when you were in the RAM

8    (sic) unit with him?

9         A    No, I did not.

10        Q    Once he got to the area where the lineup was being

11   held, can you tell me, the window that you described as being

12   that two-way glass/mirror, --

13        A    Yes.

14        Q    -- can you tell me, could you immediately see into

15   the room once you got there or did you have to indicate --

16        A    No, we lift a shade.  We shut the door so there is

17   no light in the room then we lift the shade up.

18        Q    Did there come a time when the shade was lifted?

19        A    Yes.

20        Q    And did Mr. Shepard indicate that he recognized

21   anyone?

22        A    Yes, immediately.

23        Q    And did he tell you what position he recognized?

24        A    Yes, he did.

25        Q    What did he say?

mc

Det. Batanjany - People - Direct/Ms. Chu

1    A    He said number two.

2    Q    And who was in position number two?

3    A    Atara Wisdom.

4    Q    Can you tell me, did he identify who he knew in

5    position number two, what that person's name was?

6    A    Yes, he said that's Renee.

7    Q    Now, after he viewed the lineup did you then take

8    him out of the viewing room?

9    A    Yes, I did.

10    Q    Where did you take him?

11    A    I brought him back to the BRAM interview office.

12    Q    Then, at that point, did you ask him any questions

13    about what he had just done?

14    A    At that point I just had him sign the paperwork

15    that he did pick out position number two and that he had

16    stated that's Renee, he signed that form, then I told him

17    that it was over, that the lineup was over at this point.

18    Q    Okay.

19         Did you then allow him to leave or did you take

20    him?

21    A    We transported him back to his house.

22    Q    Now, let me just ask you, what happened to the

23    fillers?

24    A    After it was done, Detective Hernandez brought the

25    four fillers that were from a shelter back and the officer

Det. Batanjany - People - Direct/Ms. Chu

1   was let back into her office.

2       Q    Okay, if I can just have the photos, please.

3               (Whereupon, the exhibits were handed to

4       counsel.)

5               MS. CHU:   Thank you.

6       Q    Now, you had mentioned there was an officer that

7   participated as a filler in this lineup?

8       A    Yes.

9       Q    Do you know what position she was in?

10      A    She was position six.

11      Q    If I can just have this -- I can put it up on the

12  screen.  I will go through some other questions before to

13  sort of let this warm up.

14              Now, Detective, did you then begin to process the

15  defendant's arrest?

16      A    Yes.

17      Q    As part of this process -- I'm sorry.

18              During the time that she was at the precinct was

19  she allowed to go to the bathroom, eat anything, drink

20  anything?

21      A    Yes, she was given numerous bathrooms breaks.  She

22  had tea, water, cigarettes she requested, and Chinese food.

23      Q    Okay.

24              Now, as part of the arrest processing did you get

25  what's known as pedigree information from the defendant?

Det. Batanjany - People - Direct/Ms. Chu

1    A    Yes.

2    Q    Can you explain to the members of the jury, what is

3  pedigree information?

4    A    Just when you ask the defendant what their height,

5  weight, if they have any tattoos, age, stuff like that, date

6  of birth.

7    Q    Okay.

8         And as far as the height and weight, do you

9  actually measure, like at a doctor's office, how much they

10  weigh and how tall they are?

11    A    No, we do not.

12    Q    You just get it from them, what their height and

13  weight is?

14    A    Yes.

15         MR. WALENSKY:  Your Honor, we will stipulate

16      to the fairness of the lineup.

17         THE COURT:  Go ahead.  Proceed.  You can

18      proceed.

19    Q    What age did she tell you she was?

20    A    Twenty-five.

21    Q    Now, as part of the arrest processing did you

22  also -- was a photograph taken of the defendant?

23    A    Yes.

24    Q    And can you tell me --

25         First I want to show you -- before I get to that I

Det. Batanjany - People - Direct/Ms. Chu

1    am going to show you People's 58A through D.

2                     This is People's 58A.

3                     (Whereupon, the exhibit was displayed.)

4        Q    Can you tell us what we are looking at here?

5        A    This is the first four people in the lineup.

6        Q    Okay?

7        A    The defendant is position number two.

8        Q    Taking a look at People's 58B.

9                     (Whereupon, the exhibit was displayed.)

10       Q    What are we looking at here?

11       A    That's three to six, the rest of the defendants

12   (sic).

13       Q    You said which one, which number was the one that

14   was the officer?

15       A    The officer is number six.

16       Q    Okay.

17            Taking a look at People's 58C.

18                     (Whereupon, the exhibit was displayed.)

19       A    That's also a picture of the lineup.

20       Q    Numbers one through what?

21       A    It's two to six.

22       Q    Taking a look at People's 58D.

23                     (Whereupon, the exhibit was displayed.)

24       A    That's the complete lineup, one through six.

25       Q    Okay.

Det. Batanjany - People - Direct/Ms. Chu

1          Now, you had mentioned that there was a photograph

2     taken of her.

3               MS. CHU:  I'd like to have this deemed

4          People's 59 and shown to the witness.

5               (Whereupon, the photograph was marked as

6          People's Exhibit 59 for identification.)

7               (Whereupon, the exhibit was handed to the

8          witness.)

9     Q     Detective Batanjany, do you recognize what is being

10    shown to you?

11    A     Yes.  It is a photo of the defendant.

12    Q     Does that photograph fairly and accurately depict

13    how the defendant appeared when she was with you on July 25th

14    of 2012?

15    A     Yes, it does.

16               MS. CHU:  At this time, your Honor, I would

17          offer it in evidence as People's 59.

18               THE COURT:  Any objection?

19               MR. WALENSKY:  No.

20               THE COURT:  In evidence.

21               (Whereupon, the photograph was marked as

22          People's Exhibit 59 in evidence.)

23    Q     What was the defendant -- I'm sorry.

24          What weight and height did the defendant give to

25    you?

Det. Batanjany - People - Cross/Mr. Walensky

1    A    I'd have to view the lineup.  Can I?

2              THE COURT:  Yes.

3              (Whereupon, there was a brief pause in the

4    proceedings.)

5    A    Height was five six, weight is 115 pounds.

6              MS. CHU:  Okay.

7              Thank you very much.  I have nothing further.

8              THE COURT:  Cross.

9    CROSS-EXAMINATION

10   BY MR. WALENSKY:

11   Q    Detective, this lineup -- excuse me.

12        Mr. Shepard was there to identify Atara Wisdom,

13   correct?

14   A    Yes.

15   Q    He wasn't a witness to the crime?

16   A    No, he was not.

17   Q    Or to the incident?  He wasn't?

18   A    No, he was not.

19             MR. WALENSKY:  I have no further questions.

20             THE COURT:  You may step down.  Thank you.

21             THE WITNESS:  Thank you.

22             (Whereupon, Detective Deborah Batanjany

23   stepped down from the witness stand and exited the

24   courtroom.)

25             THE COURT:  Ms. Chu, do you have any further

Proceeding

1    witnesses or --

2              MS. CHU:  Your Honor, I have three

3    stipulations defense counsel and I agreed upon.

4              THE COURT:  Ladies and gentlemen, at this time

5    Ms. Chu is going to read into the record three

6    stipulations that have been entered into between the

7    Assistant District Attorney and defense counsel wherein

8    they agree upon certain facts, and you can take these

9    stipulations just like a witness's testimony and give it

10   the value you believe it warrants.

11             Proceed.

12             MS. CHU:  Thank you.

13             The first is, the prosecution and the defense

14   have entered into the following stipulation:

15             Should Police Officer Christian Carlin have

16   been called by the prosecution, Police Officer Carlin

17   would have testified as follows:

18             He would have stated that he is employed by

19   the New York City Police Department in the 83rd Precinct

20   as a patrol officer.

21             He would have testified that on January 3rd

22   2000 --

23             THE COURT:  Go a little slower.

24             MS. CHU:  I'm sorry.

25             He would have testified that on January 3rd,

Proceeding

1    2012 he was working as a police officer assigned to the

2    83rd Precinct.  That he was scheduled to work from 4:00

3    P.M. to midnight.  That at approximately 4:00 P.M. he

4    was assigned to relieve P.O. Marsden from a scene at 832

5    Bushwick Avenue.  That he remained at that scene until

6    he received property from Crime Scene detectives which

7    he vouchered as follows:  DNA swabs marked SMA8 through

8    11 under voucher 3000013771, prescription pills bottle

9    SM5 and SM6 under voucher 3000013773, black sock marked

10   SM1, blue jeans with attached belt marked SM2, brown

11   long sleeved turtleneck marked SM3, white towel marked

12   SM4, and pink towel marked SM7 under voucher 3000013777.

13   That these items were then forwarded for testing.

14            The second stipulation is as follows:

15            The prosecution and the defense have entered

16   into the following stipulation:

17            Should Amy Dorsey have been called by the

18   prosecution, Ms. Dorsey would have testified as follows:

19            She would have stated that she is currently

20   employed by the New York City Police Department

21   Laboratory and was formally assigned to the Latent Print

22   Development Unit and has received extensive training in

23   the area of latent print development and in the

24   collection of DNA, she has conducted thousands of

25   examinations for the trace evidence and taking of DNA

mc

Proceeding

1   swabs.   She would have testified that in connection with

2   this case she received a sealed container vouchered

3   under voucher number 3000013773 that included

4   prescription pill bottles marked SM5 and SM6.   That she

5   examined this evidence and collected DNA samples for

6   further testing by the Office of the Chief Medical

7   Examiner Forensic Biology Department.   That she swabbed

8   the cap ridge and exterior of the Seroquel bottle, which

9   were marked lab numbers 6.3 and 6.4 respectively.   In

10  addition, she swabbed the cap ridge and the exterior of

11  the Fluoxetine bottle, which were marked lab number 7.2

12  and 7.3 respectively.   That she vouchered these swabs

13  under voucher Z00004877, that these items were then sent

14  to the Office of the Chief Medical Examiner Forensic

15  Biology Department for examination.

16          The third stipulation is as follows:

17          The prosecution and defense have entered into

18  the following stipulation:

19          Should Detective Investigator Iris Ortiz have

20  been called by the prosecution, Detective Ortiz would

21  have testified as follows:

22          She would have stated that she is currently

23  employed by the Kings County District Attorney's Office

24  as a detective investigator.   That she has been employed

25  as a detective investigator for approximately 14 years.

Proceeding

1    That she has received extensive training in the area of

2    the collection of DNA, she has collected hundreds of DNA

3    swabs.

4            She would have testified that in connection

5    with this case she was assigned to obtain the buccal

6    sample from the defendant, Atara Wisdom.  That on May

7    6th, 2013 she met the defendant, Atara Wisdom, and

8    collected a DNA swab from the inside of her cheek.  That

9    after obtaining said sample, she sealed and vouchered

10   the sample and had it forwarded to the Office of the

11   Chief Medical Examiner Forensic Biology Department for

12   examination under voucher number R490270.

13           THE COURT:  What is her name, again?

14           MS. CHU:  Iris Ortiz.

15           THE COURT:  All right.

16           Do you have any other witnesses at this time?

17           MS. CHU:  No, I do not.  The People rest.

18           THE COURT:  Okay.

19           You reserve your motions at this time?

20           MR. WALENSKY:  Yes, your Honor.

21           THE COURT:  All right.

22           Does defense have any witnesses before we

23   proceed?

24           We are going to take a short recess, ladies

25   and gentlemen.  Again, do not discuss the case among

mc

Proceeding

1    yourselves or with anyone else.  Just leave your books

2    there.  We will take a very, very brief recess.

3              Take the jury out.

4              (Whereupon, the Jury exited the courtroom.)

5              THE COURT:  All right, you may make your

6    motion at this time.  And, also, do you have any

7    witnesses at this time?

8              MR. WALENSKY:  No, your Honor.

9              We spoke with Ms. Wisdom, and based upon the

10   testimony we heard this morning we've decided, and she

11   has decided not to testify.  We felt that was a very

12   strong witness for Ms. Wisdom.

13             THE COURT:  All right.

14             Ms. Wisdom, do you understand that you have a

15   right to testify in this matter and that right is your

16   right and your right alone?  In other words,

17   notwithstanding any advice given to you by counsel, you

18   can testify if you so wish.  Do you understand that?

19             THE DEFENDANT:  Yes.

20             THE COURT:  And now I've been told that --

21   earlier you said you wanted to testify, is that correct?

22             THE DEFENDANT:  Yes, I did.

23             THE COURT:  And I've been informed by your

24   counsel that you now do not wish to testify.  Is that

25   correct?

397

Proceeding

1           THE DEFENDANT:  Yes.

2           THE COURT:  Are you giving up your right to

3      testify voluntarily and of your own free will?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Anybody force or coerce you to

6      give up that right?

7           THE DEFENDANT:  No.

8           THE COURT:  Okay.

9           You want to make your motion at this

10      particular time?

11           MR. WALENSKY:  Yes, your Honor.

12           People have failed to prove a prima facie case

13      in this instance, and often these motions are pro forma

14      but in this case it is not.  The evidence they put

15      forward is that Anthony Wilson was killed and he was

16      stabbed seven times.  His blood was found at the scene,

17      which is his apartment.  The separate blood was found in

18      the bathroom, the blood of Ms. Wisdom.  The apartment

19      was in disarray.  The only evidence they have is a 911

20      tape saying something to the effect of this woman is

21      crazy, you've got -- I want her out of my house.  Absent

22      that, the only testimony you have is Ms. Wisdom's

23      statement where she's saying that she was being

24      attacked, he said I'm going to get some pussy tonight,

25      hit her several times and she defended herself and then

Proceeding

398

1    left the apartment.  She's not charged with anything but

2    murder in the second degree.  The People put on Matthew

3    Shepard whose purpose was to be a third person

4    admission.  What we really had from Matthew Shepard was

5    outcry, yes, because he said she wasn't going to fuck

6    him and pay him rent.  But she said to him -- yes, she

7    said, he tried to force himself upon her, which is rape

8    and because of that, that is an outcry.  So you really

9    have consistency with the fact of her not being guilty

10   of this.  But more than that, you certainly don't have

11   issues where this would be beyond a reasonable doubt for

12   a jury to consider.

13          You have granted the charges of circumstantial

14   evidence and justification, and in circumstantial

15   evidence, as the Court knows, the circumstances must be

16   so strong as to flow into pretty much one conclusion.

17   What we have here is entirely speculative.  It could

18   have happened this way, it could have happened that way.

19   There is no corroboration for any theory the People

20   could put forward.  That is one of the problems that

21   they have failed to overcome.

22          Secondly, we have justification, and under

23   35.15 2B a woman has the right to defend herself with

24   deadly force if she reasonably beliefs she is being

25   raped.

mc

Proceeding

1          Here she was hit, it was -- Mr. Shepard

2     testified that he saw that she had some swelling around

3     the eye, which is consistent with having been hit in the

4     face, we have her saying she was upset and that she

5     asked to return to check upon him.

6          All of those things show, that aside from

7     regret or anything else, there is just nothing to

8     substantiate the crime of intentional murder in the

9     second degree.  Even if there was an immediate intent at

10    that point, she was entitled under the circumstances to,

11    and justified, to use the force necessary to prevent the

12    completion of that rape.

13         So, for those reasons I move that the charge

14    against her of murder in the second degree, difficult

15    though I know this is, be dismissed.

16              THE COURT:  People?

17              MS. CHU:  Your Honor, I believe there is

18    sufficient evidence that has been presented to this jury

19    that makes out a prima facie case.  The fact that she

20    might have told Mr. Shepard during her stay with him or

21    trying to convince him to allow her to stay in his

22    apartment is of no consequence.  The fact of the matter

23    is she admitted that she stabbed him because she wasn't

24    going to pay him rent and have sex with him.  For those

25    reasons, in addition to the 911 tape and the fact that

Proceeding

1    the forensic evidence doesn't support what her claim is,

2    the People believe that we have proven -- I'm sorry --

3    made out a prima facie case and we oppose the motion.

4              THE COURT:  You are not putting on any

5    witnesses?

6              MR. WALENSKY:  No, your Honor.

7              THE COURT:  Do you want to make your motion to

8    dismiss at the close of the case now?

9              MR. WALENSKY:  Yes, your Honor.

10             THE COURT:  Same reasons?

11             MR. WALENSKY:  For the same reasons, yes.

12             Additionally, one last response.

13             Forensically, the forensic evidence does not

14   support the People's contention.  What we have here is a

15   man who's, ultimately, naked on the bed but we have his

16   clothing on the floor with feces mixed with blood.  We

17   have one side of the apartment where Ms. Wisdom said

18   that he had attacked her near the kitchen and the

19   refrigerator, with a knocked-over table and the counter

20   space over there, and then we have lots of blood on the

21   table next to the bed which shows -- and that was the

22   decedent's, Mr. Wilson's blood -- which shows he had

23   moved over there at that particular time.  So, there was

24   a scuffle on one side, he goes to the other and the

25   forensics really show he pulled down his pants because

1  there wouldn't be excrement on the floor, there wouldn't

2  be what appeared to be urine stains to the ME on the

3  pants.  So, something happened and we don't know what

4  and it doesn't -- it certainly cannot support any

5  verdict of guilt beyond a reasonable doubt.

6          This is all speculative, frankly, from both

7  sides.  No one really knows what happened, and that's

8  the question here.  To let this case go to the jury, a

9  case that is speculative at the outset, I think would be

10  wrong.  So, for those reasons I move that the case be

11  dismissed.

12          THE COURT:  You object on the same grounds?

13          MS. CHU:  I object.  Your Honor, there was

14  sufficient evidence to put before the jury.  They need

15  to make a decision as to what happened here.

16          THE COURT:  All right.

17          Before I bring in the jury, counsel had made

18  an application yesterday during their charge conference

19  to submit the outcry, definition of outcry.  In light of

20  the evidence I am going to do that, all right.

21          MS. CHU:  In addition to that, your Honor, I

22  know also yesterday that Mr. Walensky had indicated that

23  he did not wish to ask for manslaughter in the first

24  degree as a lesser included of the murder two but the

25  People are asking that the Court submit that because

Proceeding

1    there is a reasonable view of the evidence that could

2    support that although she was acting in self defense,

3    she didn't really intend to kill, seriously injury him.

4                THE COURT:  With seven stab wounds?  I will

5    deny that application.

6                MR. WALENSKY:  Your Honor, my request -- are

7    we summing up after lunch?  If we are going to sum up

8    before, I want to get things ready, the photographs, the

9    video.  I don't want the jury -- I don't want to be in a

10   position to have to wait a few minutes.

11               THE COURT:  How long is your summation?

12               MR. WALENSKY:  Probably 30 or 40 minutes, but

13   I might be more.  I am going to play some of the video,

14   I'm not sure how much.

15               THE COURT:  What we'll do, we'll adjourn at

16   this time but we'll commence with the summations at two

17   o'clock, all right?

18               MR. WALENSKY:  That is fine.

19               THE COURT:  All right.

20               Bring in the jury, please.

21               Bring the jury in.

22               COURT OFFICER:  Jury entering.

23               (Whereupon, the Jury entered the courtroom.)

24               THE CLERK:  All members of the jury are

25   present and seated.

403

Proceeding

1    Do both sides waive the roll call?

2    MR. WALENSKY:  So waived.

3    MS. CHU:  Yes.

4    THE CLERK:  Thank you.

5    THE COURT:  Mr. Walensky, do you have any

6 witnesses?

7    MR. WALENSKY:  Your Honor, the defense rests.

8    THE COURT:  And, Ms. Chu, do you rest --

9    MS. CHU:  Yes.

10    THE COURT:  -- at the conclusion of this

11 matter --

12    MS. CHU:  Yes.

13    THE COURT:  All right, ladies and gentlemen,

14 I'm going to adjourn for the -- I am going to have this

15 matter adjourned until two o'clock for the presentation

16 of the summations and the charge, so I'm going to ask

17 you to go to lunch and then return no later than two

18 o'clock so we can start on time.

19    And do not discuss the matter amongst

20 yourselves or with anyone else.  Do not visit the place

21 or places where the alleged crime occurred.  Have no

22 contact with any of the parties involved in this matter,

23 including the Court.  And do not resort to utilizing any

24 digital devices for the purpose of obtaining any

25 information regarding this matter or contacting anyone

Proceeding

1      about this matter.

2                Have a very good lunch and see you at two

3      o'clock.  Just leave your books on your seats.

4                Thank you.

5                (Whereupon, the Jury exited the courtroom.)

6                THE COURT:  All right, this matter is

7      adjourned to two o'clock for summations.  So, court is

8      adjourned until 2:00 P.M.

9                Thank you.

10                Do you want a no inference charge?

11                MR. WALENSKY:  Yes, I do.

12                Thank you.

13                THE COURT:  Thank you.

14                All right, two o'clock.

15                (Whereupon, a lunch recess was held.)

16                *                *                *

17                A F T E R N O O N       S E S S I O N

18                *                *                *

19                (Whereupon, subsequent trial proceedings were

20      stenographically recorded and transcribed separately.)
                 ********************************
21      CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
        THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS
22      PROCEEDING.

23

24                                  _Marlin Cassidy_

25      MARLIN CASSIDY
        Senior Court Reporter

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS:  CRIMINAL TERM:  PART 2
 2   -----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3                                        Indictment No.:
                   -against-             6615/2012
 4                                        (Trial)
     ATARA WISDOM,
 5
                        Defendant.
 6   -----------------------------------------X

 7
                            Supreme Courthouse
 8                          320 Jay Street
                            Brooklyn, New York 11201
 9                          July 9, 2014

10
     B E F O R E:
11
                   THE HONORABLE ALBERT TOMEI, JUSTICE
12                 (And a Jury)

13   A P P E A R A N C E S:

14           HON. KENNETH P. THOMPSON, ESQ.
                  District Attorney - Kings County
15                350 Jay Street
                  Brooklyn, New York  11201
16           BY:  PHYLLIS CHU, ESQ.
                  Assistant District Attorney
17

18           DAVID WALENSKY, ESQ.
                  Attorney for Defendant
19                910 Stuart Avenue
                  Mamaroneck, New York
20           BY:  DAVID WALENSKY, ESQ.
                       - and -
21                JOSHUA POVILL, ESQ.

22

23

24                         MARLIN CASSIDY
25                         Senior Court Reporter
```

mc

406

Proceeding

1          (Whereupon, the following took place in open

2     court:)

3          THE CLERK:  Come to order, Part 2 is back in

4     session.

5          THE COURT:  All right, get the jury.

6          MS. CHU:  Your Honor, I'd like to address the

7     Court.

8          THE COURT:  Go ahead.

9          MS. CHU:  I want to wait for defendant.

10         SERGEANT:  Bring her out.

11         THE CLERK:  Case back on trial continues.  All

12    parties present.  Defendant is present with her

13    attorney.

14         MS. CHU:  Your Honor, I know before we left

15    for the break we were talking about you adding a charge

16    for outcry concerning what Mr. Matthew Shepard said.

17    People would like to renew my application to oppose that

18    and not have that charge read to the jury for the

19    following reasons:

20         First off, according to the phone records that

21    are in evidence that are made from the defendant's

22    record, Matthew Shepard is not the first person, she

23    speaks to several people during the hours about

24    12:50-something to about five o'clock when she actually

25    called Matthew Shepard, and those are documented, the

Proceeding

1   actual phone calls, meaning they got through, they were

2   actually talking to each other according to the witness

3   that testified for Sprint, that they were long enough

4   minutes or long enough seconds in time to know there was

5   actually a voice call made.

6            In addition to that --

7            THE COURT:  I don't understand the

8   significance of that with respect --

9            MS. CHU:  The significance of that,

10  immediately after it happens she doesn't -- she is not

11  talking to Matthew Shepard, she is talking to a whole

12  bunch of other people.

13           THE COURT:  We don't know what she said to

14  those other people.

15           MS. CHU:  She could outcry and she's not

16  outcrying to them.  The fact of the matter is, even if

17  you take Matthew Shepard, that she tells about it, the

18  first thing she says to him is not that he had tried to

19  rape me and that I had to poke him, she says, I'm not

20  going to have sex with him and pay him rent, so I poked

21  him.  That was what she first said to him.  It wasn't

22  until after she was at his house already that she told

23  him she couldn't stay there.  Now she is telling him it

24  was an excuse.

25           THE COURT:  You can make that argument to the

mc

Proceeding

1    jury.

2                MS. CHU:  I don't think --

3                THE COURT:  The fact of the matter is, based

4    upon the evidence, that it should be given, okay.

5                MS. CHU:  Note my exception on the record.

6                THE COURT:  Let's get the jury out.

7                MS. CHU:  Your Honor, how do these stips. go

8    in, are they Court exhibits when they go in or are they

9    mine?

10               THE COURT:  Well, they're in the record.

11               Come on up.

12               There's not much to the verdict sheet.

13               (Whereupon, a sidebar conference was held off

14   the record.)

15               THE COURT:  Bring in the jury, please.

16               COURT OFFICER:  Jury entering.

17               (Whereupon, the Jury entered the courtroom.)

18               THE CLERK:  All jurors are present and seated.

19               Both sides waive the roll call?

20               MS. CHU:  So waived.

21               MR. WALENSKY:  Yes.

22               THE COURT:  Ladies and gentlemen, the

23   attorneys are going to present their summations to you.

24   In effect, what the attorneys are going to do is review

25   the evidence or lack of evidence in this case and in

Proceeding

1        doing so ask you to draw certain inferences from that

2        evidence and ultimately support their position in this

3        matter.

4                Now, please understand that a trial is not a

5        contest between the attorneys.  The style, the

6        personality of an attorney, must not affect your

7        verdict.

8                Additionally, you are not to speculate on

9        matters outside of the evidence.  Please understand that

10       whatever the lawyers say in summation is not evidence,

11       rather, they will be making arguments based on their

12       memory of the evidence.  However, as I shall explain in

13       my charge, it is not their memory or analysis of the

14       evidence that controls, it's yours.

15               Now, sometimes a lawyer will become a bit

16       overzealous and use expressions like:  "I know," "I

17       think," "I believe," "I'm sure," the evidence strikes me

18       as, "my view is," or "I tell you that."  If a lawyer

19       slips and uses such an expression, he or she doesn't

20       mean it because you have already heard and seen all the

21       evidence in this matter.  And if this lawyer were to use

22       one of those expressions, that lawyer would be

23       expressing or giving you additional evidence.  That

24       lawyer's personal view, however, isn't important anyway

25       because it's your view that counts.

1          Now, our law doesn't allow a lawyer to give

2     their personal opinion.  If one of the lawyers slips in

3     an excess of zeal, I should say, and does use one of

4     these expressions, just translate it into what is really

5     meant, such as "I submit to you, that based on the

6     evidence such and so follows."

7          We will proceed at this time.

8          Mr. Walensky.

9          MR. WALENSKY:  Thank you, your Honor.

10          Ladies and gentlemen, I want to thank you for

11     your attention.  This is a difficult case.  As you know,

12     anytime somebody's lost their life and anybody's on

13     trial for an incident -- I call it "an incident" because

14     it will be up to you to decide whether this was in fact

15     a crime.

16          Now, you're only going to have to consider one

17     charge and that one charge is Murder in the Second

18     Degree.  I read it to you in voir dire.

19          There's a certain circuitousness to this, we

20     ask questions in the beginning when we are selecting a

21     jury, you hear the evidence, then we come to the

22     summations.

23          Well, as I brought out and I spoke to some of

24     you, but not a lot of you, the People have to prove

25     beyond a reasonable doubt that Atara Wisdom intended to

Summation - Defendant/Mr. Walensky

1    kill Anthony Wilson. And in this particular case

2    there's a defense. Colloquially most people would call

3    it self defense, but here in court it's called

4    justification. And the Judge will tell you how you view

5    the evidence because there's a difference in the

6    justification charge. Her ability to defend herself,

7    legally that occurs when somebody tries to rape

8    somebody.

9        I'm not about to tell you it, the Judge is the

10   rule of the law, the arbiter of the law, but I can tell

11   you that there is a specific instruction regarding

12   whether Ms. Wilson -- Ms. Wisdom is justified in using

13   the force that was used and what a reasonable person

14   would think at that time.

15       Now, there's probably few more things

16   terrifying for a woman than a man trying to rape her.

17   And the evidence we have here shows that in fact Anthony

18   Wilson did assault her and that what we have supports

19   the contention.

20       Now, in this country there's an evolution of

21   law. Sometimes we hear about people saying we want to

22   know what the founders intended the law should be, how

23   it was when the constitution first started. But when we

24   first had the birth of this country with the

25   constitution, African-Americans were slaves and then

mc

412

Summation - Defendant/Mr. Walensky

1      when that was changed they still weren't allowed the

2      vote.

3                    MS. CHU:  Objection, your Honor.

4                    THE COURT:  Sustained.

5                    Please stick to the evidence or lack of

6      evidence in this case, all right, we don't need a

7      history lesson.  Let's go.

8                    MR. WALENSKY:  Well, what has happened is the

9      rights of women have been recognized.

10                   MS. CHU:  Objection.

11                   THE COURT:  Sustained, counsel.

12                   MR. WALENSKY:  Yes, your Honor.

13                   So we come into the evidence in this case.

14     And how is it supported?

15                   Where are the photos, Sergeant?

16                   COURT OFFICER:  You are asking for the photos?

17                   MR. WALENSKY:  Yes, please, may I have the

18     photos?

19                   Just give it to me the way they are.  I

20     prearranged them.

21                   I will just take them.

22                   Fine.

23                   (Whereupon, the exhibits were handed to

24     counsel.)

25                   MR. WALENSKY:  Thank you.

1          There's a lot of evidence in this case that

2   calls for speculation, and if you find yourself in the

3   jury room saying, maybe it happened this way or maybe it

4   happened that way, then you must acquit 'cause that's

5   certainly not proof beyond a reasonable doubt.  If you

6   start sitting there and saying, well, this happened but

7   it could have been this way or it could have been that

8   way, then you must acquit because that is not evidence

9   beyond a reasonable doubt.

10          Can you play -- Ms. Chu, would you play the

11   911?

12          (Whereupon, the exhibit was played in open

13   court.)

14          MR. WALENSKY:  Thank you.

15          You very well may hear it again.  And anything

16   that is evidence, all of these photos, all of these

17   recordings, the video statement of Ms. Wisdom, you are

18   free to hear at any time.  Any testimony that you've

19   heard can be read back to you and rather than -- I mean,

20   I saw people taking notes and, frankly, if you can have

21   the testimony read back to you, it's far better than any

22   notes that somebody is taking because then you are

23   getting the direct testimony.

24          Now, that 911 tape, what do we know about it?

25          We know that Anthony Wilson at some point in

mc

1    time that night is asking whether -- is asking -- is

2    saying, This woman is crazy, I have to get her out of my

3    house.

4              When did it happen?

5              We know the call was made about 12:37 A.M.,

6    his phone is then used about 12:57, one o'clock.

7              Now, did it happen before this event where

8    she's -- remember, according to the only evidence we

9    have, Atara's statement, that she was sleeping.  He

10   went out, she came in, he went out, he came back again,

11   he might have awakened her and said, you know, or she

12   felt him touching her and she's like get away from me

13   and he's going crazy and going you have to get this

14   woman out of my house.  She might have stabbed him

15   already.

16             MS. CHU:  Objection.  It's speculation.

17             MR. WALENSKY:  Exactly, this is all

18   speculation.

19             THE COURT:  Objection is sustained.  It's not

20   what the attorney says that is evidence, it's your

21   recollection of the facts in this case as to what the

22   evidence is.

23             Proceed.

24             MR. WALENSKY:  What I'm bringing to you,

25   ladies and gentlemen, is exactly that, it's speculation.

1    The entire thing is speculation.  You don't know.  You

2    know just you have that call, you don't know anything

3    else about it.  You don't know if he's been stabbed then

4    says you have to get this lady out of here now.

5    Somebody might say, you stabbed me, I've been stabbed.

6    Now, let's talk about Anthony Wilson.  Pretty

7    decent fellow, he has family here, Miss Wisdom has

8    family here.

9    MS. CHU:  Objection, your Honor.

10    THE COURT:  Sustained.

11    MR. WALENSKY:  It's tragic.

12    THE COURT:  The jury is to disregard that

13    statement, all right.

14    Proceed.

15    MR. WALENSKY:  He is a pretty decent fellow,

16    apparently, except when he drinks and when he gets

17    high.

18    MS. CHU:  Objection.

19    MR. WALENSKY:  That was testified to on the

20    video by Miss Wisdom.

21    THE COURT:  Ladies and gentlemen, you are the

22    best judge of what the evidence shows, so that

23    determination rests, resides with you.

24    MR. WALENSKY:  Now, Ms. Wisdom told you in her

25    statement, which has been uncontradicted, that, you

1    know, I got along with him pretty well and a couple of

2    times he tried to come on to me, I said get away.

3            She's twenty-five, he's around fifty, she is

4    not interested in that.

5            She's staying there, needs a place to stay and

6    contributes a little bit, not a lot.  He let's her stay.

7            In her statement she is saying to him, you

8    know, keep away from me.  He is pretty good but when he

9    drinks, when he gets high, he changes, he's a different

10   man.

11           I submit, and on this evening his alcohol at

12   the time of death was almost three times, at least two

13   and a half times the legal limit.  He was drunk.  He had

14   residue of cocaine use.  He had the byproducts of his

15   cocaine use in his blood.  He was stoned, he was drunk,

16   and he wanted to get some.

17           Now, if you examine the phone records of

18   Anthony Wilson, you'll see that he called, made several

19   calls from about 8:40 on and he called certain numbers

20   multiple times, he had a conversation with a couple of

21   people.  Of course we don't know whether he's trying to

22   get a date, talk to a friend.  But he gets home and

23   Atara Wisdom's there, and she's a young woman and he's

24   drunk and he's out of it.  It's a small room.  And he

25   says, I'm going to get some pussy tonight.  And she gets

1    up and she goes to leave and it's, uh-uh, it's going to

2    be you.

3              MS. CHU:  Objection.  That's not what she said

4    on the video.

5              THE COURT:  It's the jury's recollection that

6    counts.

7              MR. WALENSKY:  I am summarizing.

8              And, so, watch the video, rather than sit here

9    for half an hour in summation and play this entire video

10   for you, ladies and gentlemen, I may characterize.  I

11   urge you to watch the video again.  I will probably play

12   some of it.

13             So let's go over the evidence.

14             You see there's a lot here, this collection of

15   evidence, but there's no evidence that points to Atara

16   Wisdom intentionally killing Anthony Wilson in a

17   criminal way.  It's a collection of DNA, it's a

18   collection of evidence, and then it's like, well,

19   doesn't it look like this, or doesn't it look like that.

20   If, again, you're saying "well, maybe," then you must

21   acquit because then what you're doing is you're trying

22   to put it together, you're trying to speculate.

23             Now, there's a criminal charge.  We call them

24   "charges," it's really an instruction that the Judge

25   will read to you regarding circumstantial evidence and I

Summation - Defendant/Mr. Walensky

1    urge you -- the Judge will read you these instructions

2    at the close, when he says it's a jury charge, and it

3    gets boring, it's boring for everybody at times.  And

4    the Judge will reread these instructions to you if you

5    ask.  And what I am urging you to do, if even one of you

6    hasn't really heard it, come back and listen because the

7    charge for justification is all important.

8             And the People's case is a circumstantial

9    evidence case, there is no real direct evidence, there

10   is no witness to say I saw Atara Wisdom do this or I saw

11   this happen, I heard about it, there's none.  If you go

12   back there and look at the evidence, you don't have any

13   statements, you don't have anything.

14            So circumstantial evidence is very strong.

15   The Judge will tell you exactly what it is.  But,

16   essentially, viable reasons why she -- that point to

17   non-guilt, then you have -- you have to acquit her, he

18   will tell you, you must acquit her.

19            So I am asking you regarding these

20   instructions for circumstantial evidence, for

21   justification, she's justified as a reasonable person in

22   acting the way she did under the circumstance that

23   night, at that time, and you must acquit her.

24            The Judge will also give you an instruction

25   for outcry.  That is, if somebody attempts to rape

1    somebody or sexually abuse them, there is an instruction

2    how a person can outcry.  Look at that as evidence, her

3    outcry.  She tells somebody about it, he tried raping

4    me.

5              Now, it's a terrifying thing when a woman

6    faces somebody and can't get away.

7              We have the home (indicating).  This is the

8    outside of the apartment of Mr. Wilson (indicating).

9              Now, Ms. Chu asked several witnesses, was this

10   a nice, neat apartment.  She asked the landlord who

11   really hadn't really been there, maybe once, fine, neat.

12   She asked Ms. Fortune.  And, in fact, she asked Ms.

13   Fortune, she came that one time.  I submit, she came one

14   time, this is my friend, she was seeing him in that

15   manner.  There is no evidence that she was his

16   girlfriend.  Some sort of fight?  Again, it would be

17   speculation.  This woman comes over when he couldn't

18   come, and he wasn't coming out that night.

19             But what we do have here is the apartment and

20   the physical evidence will support what I am saying.

21   And, again, if you say, well, maybe it happened this

22   way, maybe it happened another way, you must acquit.

23   Maybes aren't beyond a reasonable doubt.  Maybes aren't

24   even close to beyond a reasonable doubt.

25             We see here a view of the kitchen

1      (indicating).  No, it's a view of the kitchen.

2                  MS. CHU:  What number is it?  What number is

3      it?

4                  MR. WALENSKY:  Six.

5                  Looking down the opposite end of the apartment

6      from where the bed is, and this is knocked over and it's

7      bloody and the table is knocked over and it's bloody and

8      the floor is bloody and this runs into -- we see how

9      small it is 'cause here's a table next to the bed, here

10     are the pants (indicating).

11                 Now, Atara tells you that she was walking

12     around that way to get her stuff.  There's a ledge where

13     there's this stuff (indicating), she is walking around

14     and he prevents her from getting out.

15                 Here's the door (indicating).  Things happened

16     here (indicating).

17                 And if you recall, Ms. Chu in her opening

18     statement -- and if I am wrong, it's your

19     recollection -- was intimating, because Ms. Wisdom in

20     her statement said I was bent over and going

21     (demonstrating), he was grabbing me, but then -- Mr.

22     Povill, can you stand up, come over here? -- but then

23     she said, I got up and he was holding me, he hit me a

24     couple of times.

25                 We know from Matthew Shepard her face was

1    swollen.

2              And he is a bit taller than the defendant.

3    Mr. Shepard is five nine according to the ME and Ms.

4    Wisdom is five six.  Mr. Povill is about six feet tall.

5              MR. POVILL:  Five eleven.

6              MS. CHU:  Objection.

7              THE COURT:  Sustained.

8              MR. WALENSKY:  He is a little bit taller, I

9    submit, and she is stabbing, he is grabbing her and he

10   stabs her, and you'll see --

11             THE COURT:  And "he" stabs her or "she?"

12             MR. WALENSKY:  I'm sorry.  She stabs him.

13             And as the ME said, it happened quickly, it's

14   close in succession.

15             What does it show?

16             It shows a pattern, doesn't show a deliberate

17   like we see a psycho or something, it's a quick thing.

18             Thank you.

19             So what we have are the wounds.  And these are

20   the wounds, ladies and gentlemen (indicating).  And

21   there's one that doesn't go in very deeply in the back.

22             I submit, he goes away, and you know he's

23   going quickly and he moves away from her and that's just

24   a skimming kind of cut, move, it's not a deep thing.

25             Everything is right here and it conforms to

422

Summation - Defendant/Mr. Walensky

1      the theory of she's grabbing him.

2                   And when did she stop stabbing him?

3                   When he let her go and moved away, because as

4      you know from the Medical Examiner, there are no

5      defensive wounds.  This isn't someone comes at you with

6      a knife like this (demonstrating), you go like that and

7      I'm holding-- for the record, I am holding my hands up

8      in front of my face -- where you would expect to get

9      cuts on your forearm or on the hand or somebody grabbing

10     for it and getting cuts in the hand.

11                  Everything is straightforward, and I submit to

12     you that if she suddenly struck out, quick one or two,

13     he would, if he was at all far from over, push her, put

14     his hand up, there would be some sort of defensive

15     wound, and there's nothing.  And there is nothing

16     because he has her and he's loaded.

17                  I can't stress this enough.  You see it from

18     the only medical records.  This man is drunk and he's

19     not feeling things as much.

20                  You can use your own experience, but sometimes

21     people get drunk and you bang into something --

22                  MS. CHU:  Objection.

23                  THE COURT:  Objection sustained.

24                  MR. WALENSKY:  I submit to you, he wasn't

25     feeling it.  And, when this happened, this doesn't

mc

Document 5-7 Filed 11/12/20 Page 118 of 244 PageID #: 1604

Summation - Defendant/Mr. Walensky

1    happen over a long period of time, this is a very quick

2    event.  That's how she wants to get out.

3              He says, You are not going anywhere, he grabs

4    her and puts her sweater over her, she reaches for her

5    knife in the pocket, she said it's a sweater with a

6    pocket, and she starts to strike out.  I think I cut him

7    in the legs.  We don't know.  Then she gets up and she

8    says, "I went," and she uses the thrusting motion up and

9    down to stab him.  And it's hard, it's a deep wound, she

10   is undoubtedly very stressed, very panic stricken by

11   this.

12             So how did he get naked on the bed?

13             I submit to you, we know that all of the blood

14   and the DNA in the main room was from Anthony Wilson.

15   None of his blood was in the bathroom.

16             Now, there's blood around the kitchen and then

17   you have next to the floor, which as the officer said

18   looked liked feces and blood, and the Medical Examiner

19   was examining this, and she was guessing --

20             MS. CHU:  Objection.

21             MR. WALENSKY:  She doesn't know, they asked

22   for a guess, that is what the record says.

23             THE COURT:  It's up to jury to make a

24   determination regarding what was the testimony regarding

25   this feces and blood.

Summation - Defendant/Mr. Walensky

1          MR. WALENSKY:  Her words were, it looked more

2     like urine on the jeans.

3          I submit to you that this occurred, he's

4     stabbed, maybe calls 911, this woman's crazy, he isn't

5     feeling, maybe not.  Again, maybe, maybe.  She's in the

6     bathroom because it's her DNA alone that's in the

7     bathroom.  We have these droplets on the wall.  We have

8     something on the shower.  We have the rag in the sink,

9     somebody cleaning themself (sic) up, who probably cut

10    herself while this is happening.

11         MS. CHU:  Objection.

12         THE COURT:  Sustained.

13         MR. WALENSKY:  It's her blood here

14    (indicating).

15              How did it get there?

16              We don't know.

17              It's not menstrual blood.

18         MS. CHU:  Objection.  That was not the

19    testimony.

20         THE COURT:  Sustained.

21         MR. WALENSKY:  There was a question whether it

22    was menstrual blood and --

23         THE COURT:  Sustained.

24         MR. WALENSKY:  Thank you.

25         So, this on the floor (indicating), I submit

Summation - Defendant/Mr. Walensky

1    to you, that he was dressed as Ms. Wisdom stated, when

2    this occurred, when this started happening.  There was

3    apparently some semen found on the swab so there was

4    some sort of ejaculate, anticipatory, perhaps, we don't

5    know.

6              But here's a man who wanted sex, he's

7    wounded, and he drops his pants and he let's loose, his

8    bowels let loose, and the Medical Examiner said that

9    that can happen.  Urine on the pants, he's peeing

10   because, I submit to you, he didn't know how badly he

11   was injured.

12             He is in a state of shock.  He's stabbed, this

13   happened, it's sudden and people don't necessarily think

14   I'm dying, not like somebody shoots you, it's a cut, you

15   are not even feeling it for that moment, his adrenaline

16   was racing through his body so he drops this and drops

17   his pants, the phone call stops.  He doesn't say I have

18   been stabbed or whatever, it's like hello, hello.  We

19   don't know if he staggers, closes the phone.  We don't

20   know if he just falls on the bed.

21             Regarding the bed itself, when we look at

22   this, these photos, it's all smeared.  This is the table

23   next to the bed (indicating).  There's blood here

24   (indicating).  This is smeared over here (indicating).

25             How would it get there?

1          It's getting there from his walking around or

2     grabbing at something.

3          The fight didn't occur right at that point.

4          We have the pill bottles, the Seroquel and the

5     Prozac.  The Seroquel -- one's an antidepressant, the

6     other the ME told you was classified -- we don't know

7     what it was used for, but it was classified as an

8     antipsychotic.

9          Now, this is on here (indicating) is not

10    because he is trying to take pills, I submit, but he is

11    grasping that bottle and just knocks them off.  They are

12    on top of the table and he knocks it off the table.

13         And there's blood all around.

14         So, we have the shirt (indicating).

15         There's no evidence of knife wounds in the

16    shirt but there's evidence of the mess from the pants.

17         What you have here is a lot of questions.

18    There is nothing here.

19         Ms. Chu will get up and tell you her belief of

20    the evidence but, again, you have dueling beliefs.  And

21    what's stronger or whatever, it's not that kind of

22    weight, maybe it's this, maybe it's that, it's not a

23    matter of choosing, it's what's the evidence, the

24    evidence gives you answers.

25         If you recall, I had told you in the beginning

Summation - Defendant/Mr. Walensky

1    that you may not be satisfied, you may not have an

2    answer, but we don't have to prove anything.  People

3    have made a promise to you that they have to prove their

4    case beyond a reasonable doubt.

5            Now, that night, it's a fact, Anthony Wilson

6    was intoxicated, heavily intoxicated.

7            It's a fact Atara Wisdom went to the house.

8            Was she sleeping?

9            Maybe, maybe not.  The only evidence you have

10   is her statement to the police.

11           Let's go over her statement.

12           Atara's taken into custody about seven months

13   later.

14           And why doesn't she go immediately?

15           She's afraid.

16           MS. CHU:  Objection.  That was not the

17   testimony.

18           THE COURT:  Sustained.

19           MR. WALENSKY:  I submit to you, my argument is

20   that, that --

21           THE COURT:  Ladies and gentlemen, what the

22   attorney says or believes is not evidence, all right,

23   it's the facts that reflect the evidence.

24           MR. WALENSKY:  That's fine, okay.

25           Now, she is taken into the precinct July 25th.

Summation - Defendant/Mr. Walensky

1    Officers go get her in the shelter, they bring her, they

2    put her into a room and it's a locked room.  They call

3    it an interview room, it's an interrogation room.  If

4    you can't come and go as you please, you're in custody.

5    And he said she wasn't arrested, technically, but she

6    wasn't free to go.

7              So they talk to her, they give her Miranda

8    rights at 11:00 A.M. maybe.  There's nothing to

9    contradict that.

10             Now, we talk for about three hours.

11             And as you recall, I asked, what did you talk

12   about?

13             Well, we were investigating the death of Mr.

14   Wilson and we wanted to know what happened.

15             And I said, well, that takes five or ten

16   minutes.  What were you talking about for three hours?

17             They were grilling her, and they were grilling

18   her and breaking her down.  And the evidence of that is

19   when you look at that statement.  When you look at her

20   in the beginning, this is a woman who's totally, to use

21   a colloquialism, fried, she's exhausted, she's tired,

22   she's been put through a wringer.  A woman who says I

23   was raped is put through a wringer to elicit some sort

24   of confession, which doesn't come, what comes is a

25   statement.

429

Summation - Defendant/Mr. Walensky

1           Now, Ms. Chu in her opening stated, or voir

2      dire said, somebody is going to put it in the best

3      light.  You be the judge of the statement.  It's not a

4      bald faced statement, I submit to you.  Use your own

5      judgment.  She is so exhausted by that time, she's being

6      put through the wringer, she is not trying to fool

7      anyone.

8           I can't vouch for my witnesses anymore than

9      Ms. Chu could.  You use your own judgment.  You see what

10     happened.

11          But there are things that are hints as to how

12     willingly and willfully she was speaking at that point.

13          We have this, the statement.  Well, it was a

14     written statement.  We took it, you know, like by 2:00,

15     3:00 in the afternoon, then they have a lineup and the

16     lineup for Mr. Shepard is just to identify that he knows

17     who Atara Wisdom is.  He knows nothing about what

18     happened at the place.

19          He has the fact that she says he tried to

20     force himself on her but we will get to Matthew in a

21     little bit.

22          I am going to try to talk to you without

23     putting all of you to sleep.

24          So what is interesting about this statement,

25     the officer said -- the detective said he wrote it out.

mc

Summation - Defendant/Mr. Walensky

1      If you notice -- and he said he read it to her.  She

2      read it.  There is not one cross-out, there's not one

3      correction, it's signed.

4              When did he give it to her?

5              7:30 that night.

6              He talked to her about three o'clock or so,

7      and I submit, by 7:30, after everything else, when they

8      put this in front of her, she just signed it.

9              MS. CHU:  Objection.  There is no evidence to

10     support that.

11             THE COURT:  Sustained.

12             MR. WALENSKY:  This is my argument, your

13     Honor.

14             THE COURT:  All right, you know what, I am

15     going to reverse myself.  Let the jury make a

16     determination as to whether on that she was forced.

17             MR. WALENSKY:  You look at -- look at what

18     happened during that period and what I -- perhaps this

19     was her statement, perhaps she didn't want to make one

20     correction, cross out one word, perhaps.  Again, maybe.

21     If you're saying "maybe," you gotta acquit.

22             So that's 7:30.

23             And then we go to nine o'clock that night and

24     she makes a video statement.

25             Could you run this for a little bit?

1              We are not going to watch the whole thing.

2       We're not going to be a half hour.

3              (Whereupon, there was a brief pause in the

4       proceedings.)

5              MR. WALENSKY:  Can we have the lights,

6       Sergeant?

7              Thank you.

8              (Whereupon, the exhibit was played in open

9       court.)

10             MR. WALENSKY:  That's enough.  We don't have

11      to see anymore.

12             Lights again, Sergeant.

13             Ladies and gentlemen, I played that so you can

14      look at her face and see how she was at nine o'clock

15      that night.  She is exhausted.  She's been put, as I

16      said, through a wringer, and then she had testified.

17      And I hope that you will watch it again.

18             If Ms. Chu doesn't play it for you, you do

19      what you like because that's the thing, you have total

20      freedom.  When I started this, I said you have no bosses

21      ahead of you.

22             So what you do, look at the evidence.  I urge

23      you to watch that because that's really the only

24      evidence in the case.  Everything else is smoke and

25      mirrors.  It's a collection, as I say.

1          Now we are talking about the kitchen and

2     blood.

3          And where is all the blood?

4          Well, this is a kitchen cabinet (indicating),

5     I believe.  Blood on the floor here (indicating),

6     kitchen cabinet (indicating).  Most of the bleeding

7     didn't even occur on the bed.  If you look at the bed,

8     there's some bleeding there.  Most of the bleeding

9     occurred down next to the bed.  That's where he was.

10    And he falls on the bed and he may not even have been in

11    that position, we know from the officer.  When he first

12    fell, we don't know.

13         Atara, I believe -- if I'm wrong in the

14    statement, correct me -- this happened, she runs to the

15    bathroom, doesn't hear anything, goes out.  But we know

16    she runs into the bathroom afterward.  There's a rag in

17    the sink, looks like there's blood, but that rag wasn't

18    checked.  But near the bathtub it was checked and it was

19    her blood and near -- and on the door frame there were

20    droplets of her blood.

21         Now, of course, we don't know if it happened

22    that night because it's not absolute.  My argument to

23    you is that it did happen that night.

24         The entire episode happened -- the actual

25    action probably took, his stopping her and fighting her

1      or whatever, probably took less than a minute.

2                  MS. CHU:  Objection, calls for speculation.

3                  THE COURT:  Sustained.

4                  MR. WALENSKY:  I know that the wounds happened

5      quickly if one is to believe the ME.  Also, the Medical

6      Examiner testified that these wounds were not in and of

7      itself fatal.  And on my questioning she said, well, I

8      don't know, it could have been a few minutes, it could

9      have been, you know, longer than that.

10                 Ms. Chu, to draw it back out, I submit to you,

11     it was like, okay, you know, she sort of changed, she

12     doesn't know.  The point is --

13                 MS. CHU:  Objection.

14                 MR. WALENSKY:  -- she doesn't know if it's a

15     few seconds.

16                 THE COURT:  Sustained.

17                 Who are you talking about?

18                 MR. WALENSKY:  The Medical Examiner.

19                 THE COURT:  I thought you were talking about

20     Ms. Chu, all right.  Just be specific.

21                 MR. WALENSKY:  I'm sorry.

22                 The Medical Examiner didn't know if it was a

23     few seconds or a few minutes.  She said deep wounds, he

24     could have lived a few minutes and maybe he died, but

25     they weren't quickly.

Summation - Defendant/Mr. Walensky

1      I submit, he wasn't killed instantly, that

2   seemed to be definite.  And he could have lost

3   consciousness, maybe he didn't.  Of course we're back to

4   maybe.  We are back to maybe and maybe you don't know,

5   but the physical evidence you have is the clothing on

6   the floor, the naked body, because I submit to you, he

7   wasn't running around after her naked saying I'm getting

8   some.  He started out -- he started out probably wanting

9   her to agree to it by rubbing her stomach, then she

10   goes, get away from me and he says, whoa, wait a minute,

11   I'm going to get some, so she acts, get away.

12      He goes back, and I submit to you that he's

13   wounded and then calls and is in shock.  Now that might

14   have been what happened.  To some people it might be

15   unbelievable.  I submit, he was in shock, didn't feel or

16   know the exact number of wounds.  Somehow though, his

17   clothes went down on the floor, somehow there's his own

18   feces on the floor, this blood is mixed in.  Nobody came

19   in afterwards.

20      The People went through pains to show the

21   locked door.  The door was locked when the landlord

22   came, no evidence that nobody else went into that

23   apartment.  The place apparently didn't appear to be

24   burglarized, that it's pretty much untouched from the

25   time that this event occurred.

Summation - Defendant/Mr. Walensky

1    So after this happens, Ms. Wisdom, I submit

2    to you, leaves the bathroom and grabs the stuff, grabs

3    his phone, his keys, she tells you, his wallet.  This

4    case isn't about who uses somebody's card or whatever.

5    The Judge gave you an instruction specifically.  What

6    it's about was the narrative to show that she might

7    have had or somebody had his stuff afterwards.  But,

8    again, we don't know who used his card and it doesn't

9    matter.  She's only charged with what happened in that

10   apartment at that time.  That's the only thing you're

11   going to have to consider, was she justified in acting

12   the way that she did when Anthony Wilson tried to rape

13   her.

14   So she goes out and she calls some people.

15   And you can look at the phone records, but they're

16   quick.  And the Sprint rep is saying, well, some are

17   connecting, some aren't connecting.  If you look,

18   they're very quick, even the one that might have

19   connected.  It's 3:00 in the morning, I have to get out

20   of here, I have nothing to say to you.  It's not a long

21   conversation.

22   She hooks up with Matthew Shepard in terms of

23   the phone, not what we say in slang, I mean.  I mean,

24   Matthew Shepard -- and Matthew Shepard tells you that,

25   you know, I meet her on De Kalb Avenue.  And I asked

Summation - Defendant/Mr. Walensky

1    specifically how she sounded.  She sound stressed.  And

2    she was stressed.

3              MS. CHU:  Objection.  That's not what he

4    said.

5              THE COURT:  Sustained.

6              MR. WALENSKY:  That's exactly what he said.

7              THE COURT:  Ladies and gentlemen, again, it's

8    up to you, based upon the evidence or lack of evidence,

9    to make that determination.

10             MR. WALENSKY:  Have his testimony read back,

11   ladies and gentlemen, if you so desire.

12             I submit that when she first called, on my

13   cross-examination I asked, was she stressed.  He said

14   yes.

15             Now, Mr. Shepard was saying, I was just

16   interested, basically, in having sex.  A woman calls me

17   at 5:00 in the morning, I'm such an attractive guy, and

18   so he goes and talks to her and he's not really even

19   listening to her, he says.  He tells you, I'm not

20   listening.

21             He's been up all night, he's been in New

22   Jersey, it's 5:00 in the morning, he has a history of

23   getting high, we don't know whether he got high that

24   night.

25             MS. CHU:  Objection.  There is no history of

1    getting high.  There is no testimony.

2              MR. WALENSKY:  Actually, he said -- I asked

3    him.

4              THE COURT:  Again, it's the jury's

5    recollection that controls.

6              Proceed.

7              MR. WALENSKY:  So, I submit to you, and you

8    can hold me to it, that he says, yeah, I've had trouble

9    with drugs or something to that effect.  He used drugs a

10   long time.  He was up, apparently, all night, he was in

11   New Jersey somewhere, he came home at about 5:00 in the

12   morning, we don't know what kind of condition Matthew

13   Shepard was in, but he still wanted to try to sleep with

14   or have sex with Atara.

15             And she asked, can I go back to your house?

16             And he says okay.

17             She has her stuff, no place to go.  He's

18   thinking, I'm going to get some.

19             And when they're talking she says, he is not

20   going to -- talking about Anthony Wilson to Matthew --

21   he is not going to get rent and have me sleep with him

22   too, so I poked him.

23             I submit, this is in the street, it's 5:00 in

24   the morning, it's hours later and she is upset and this

25   is what happened.  It's not like, Hey, I'm not going to

1    give you sex, bang, bang, stabbing him.  That's not what

2    happened.  She is talking street talk to him, she is

3    angry, it's what happened.

4         She gets back into the house where she's a

5    couple of hours and he sees he is not getting sex and

6    she is then there, and I submit to you, among other

7    things, she said, when I asked him, Did she say he tried

8    to rape her?  He tried to force himself and she is

9    upset.  That makes sense.

10        You're allowed to use your own judgment in

11   this.  I don't know what else was said, but you do know

12   that he, Matthew Shepard, said that Anthony Wilson tried

13   to force himself on her.  And that is rape, that is

14   attempted rape.

15        When you tell -- when a man puts his arm

16   around you and you say no, that means no.  When a man

17   starts to rub your stomach and you say get away from me

18   and push him away, that means no.  When a man starts to

19   grab your clothes and put your sweater over your head

20   and hit you in the face, that's rape, that's attempted

21   rape, that's a sexual -- attempted sexual assault.

22        And I submit to you, that's what occurred that

23   night.  And all this other stuff, we have to put it in

24   perspective of where and when.

25        And so what happens is that night after this

Summation - Defendant/Mr. Walensky

1    happens, doesn't matter if she grabs his phone, she is

2    making calls, she is calling friends or people,

3    undoubtedly people she knows, she's not calling

4    strangers, I think we can use common sense for that.

5    The only one that really picks up immediately with her

6    is Matthew Shepard who she tells this to.  It's not a

7    strutting this man thinks he can get some sex from me

8    and I pay him rent, so I just poked him.  That is just

9    an excited thing, he did this and I poked him.

10          She gets back and she is relaxed, she's more

11   relaxed but still undoubtedly upset, saying he tried to

12   force himself on me, because Matthew is not listening,

13   but he listened there, you know, what's really

14   significant, and then she wants him to go and check on

15   Anthony.

16          She doesn't know that he is dead at that

17   time.

18          MS. CHU:  Objection.  He didn't say she wanted

19   to check.  He asked her --

20          THE COURT:  Objection is sustained.

21          MR. WALENSKY:  Excuse me, your Honor, we'll

22   let the record --

23          THE COURT:  I will make the decisions and

24   determination.  Objection sustained.

25          MR. WALENSKY:  All right.

mc

Summation - Defendant/Mr. Walensky

1        She asked him to go back with him, and he said

2    he didn't want to.

3        That's -- you can ask that be read back.

4        As I said, you can ask that Matthew Shepard's

5    testimony be read back in its entirety, if you want, or

6    cross, whatever you want.

7        I submit that's significant because, one, it

8    shows she didn't know what his condition was.

9        And, two, she wanted to find out or help him.

10   And if you're intentionally killing somebody, it's not

11   the action of somebody who's intending to kill somebody.

12   Even if you wanted to hurt him, she is not charged with

13   assaulting him.  He's dead.  She's not charged with

14   manslaughter, she's charged with intentionally wanting

15   to kill him at that time.  And the defense, ladies and

16   gentlemen, is that she was justified because he was

17   trying to rape her.

18       When you look at the evidence, you're going to

19   have a lot of maybes in this.  When you look at the

20   evidence, if you start to question and say I wonder if

21   maybe it's this, maybe it's that, what if.  It's not

22   proof beyond a reasonable doubt.  It takes more than a

23   911 phone call without any surrounding circumstances.

24   His death is not the surrounding circumstance as

25   regarding the causation of the death.  There is a

Summation - Defendant/Mr. Walensky

1    difference here.  We don't know what happened.  We don't

2    know what happened before or after.

3            So there are -- I just want to leave you with

4    several things.

5            One, listen to the Judge's instructions.  I

6    can't stress enough that his instruction regarding

7    justification really is at the heart of our defense,

8    it's one that she was entitled to act the way she did,

9    and the Judge will tell you what it is.  Listen to it.

10           But two, which is about as equally important,

11   is circumstantial evidence, because if you look at the

12   evidence, it is circumstantial.

13           We've all heard about it.  We watch detective

14   shows and things.  The Judge will give you what the real

15   definition of circumstantial evidence is in this state

16   and I can tell you that it holds the People to a very

17   high standard.

18           MS. CHU:  Objection.

19           THE COURT:  Objection is sustained, all right.

20           MR. WALENSKY:  Listen to the circumstantial

21   evidence charge.  The People have to prove, in regard to

22   justification, they have to prove two things:  One, that

23   she intended to kill Anthony Wilson.  And two, that

24   under the circumstances, as a reasonable person, she

25   wasn't justified.  They have to prove she wasn't

Summation - Defendant/Mr. Walensky

1    justified in acting that way.

2         So, if they haven't proved that she wasn't

3    justified in acting that way, you must acquit.  And if

4    they haven't proved circumstantially their case beyond a

5    reasonable doubt, then you must acquit.

6         And as I said, we may not have answers in this

7    and when one looks at the evidence there aren't answers

8    here, we really don't know how it happened, it's not a

9    matter of finesse, it's not a matter of how much is

10   collected.  The only evidence we have is this statement.

11   The only direct evidence is the statement of Atara and

12   she's interested, undoubtedly.  And then you have what

13   Matthew Shepard said, that when she -- shortly after

14   this happened, I mean, it's -- yeah, it's five hours or

15   whatever, but this is a traumatic experience.  Shortly

16   after this happens she outcries by saying this guy tried

17   to rape me.

18        And we can get wrapped up in poking or

19   whatever, it's semantics.  The gist of it is she says he

20   tried to force himself on me.

21        And that's what the case is about.

22        So, ladies and gentlemen, I urge you to look

23   at the evidence, examine it, watch her statement again,

24   have read back what you need read back, and at the end

25   of this you must come back with a verdict of not guilty.

Summation - Defendant/Mr. Walensky

1          Thank you very much.

2          THE COURT:  Go ahead, Ms. Chu.

3          (Whereupon, subsequent trial proceedings were

4      recorded stenographically and transcribed separately.)
       **********************************

5      CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
       THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS

6      PROCEEDING.

7

8

9

10     MARLIN CASSIDY
       Senior Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

mc

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS:  CRIMINAL TERM:  PART 2
 2   ----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3                                       Indictment No.:
                     -against-               6615/2012
 4                                           (Trial)
     ATARA WISDOM,
 5
                         Defendant.
 6   ----------------------------------------X

 7
                             Supreme Courthouse
 8                           320 Jay Street
                             Brooklyn, New York 11201
 9                           July 9, 2014

10
     B E F O R E:
11
                    THE HONORABLE ALBERT TOMEI, JUSTICE
12                  (And a Jury)

13   A P P E A R A N C E S:

14          HON. KENNETH P. THOMPSON, ESQ.
                 District Attorney - Kings County
15               350 Jay Street
                 Brooklyn, New York  11201
16          BY:  PHYLLIS CHU, ESQ.
                 Assistant District Attorney
17
18          DAVID WALENSKY, ESQ.
                 Attorney for Defendant
19               910 Stuart Avenue
                 Mamaroneck, New York
20          BY:  DAVID WALENSKY, ESQ.
                      - and -
21               JOSHUA POVILL, ESQ.

22

23

24                       MARLIN CASSIDY
25                       Senior Court Reporter
```

445

1          (Whereupon, the following took place in open

2     court:)

3          MS. CHU:  I just want to set up.

4          THE CLERK:  Mr. Walensky, you took some of the

5     evidence.

6          MR. WALENSKY:  Excuse me.

7          MS. CHU:  Good afternoon, ladies and

8     gentlemen.

9          There are certain things in this case that are

10     undisputed, all right.  First thing is that you know

11     that the defendant, Atara Wisdom, and Anthony Wilson

12     knew each other.

13          How do you know that?

14          You know that from Matthew Shepard, you know

15     that from Shakeema Fortune, and you know that from the

16     defendant's own statements right on the videotape, with

17     what she told the detectives.

18          Now, what else do you know?

19          You know they were living together.

20          How do you know they were living together?

21          Because Matthew Shepard says he knew from

22     when he first met her she was staying with Anthony

23     because she told him.  You also it know from Shakeema

24     because she said she went to his house and Renee was

25     there and you also know from the defendant because in

mc

1    her statement she says, I was living with him.

2              What else do you know that's undisputed?

3              You know that Anthony Wilson called 911 on

4    November 29th, 2011 at 12:37 A.M.

5              How do you know that?

6              You have his phone records that are in

7    evidence that show at 12:37 A.M. he made a phone call to

8    911.

9              You also heard from his sister who said, when

10   she listened to the tape, she said, Yes, that's my

11   brother's voice.  You know that was his voice, not

12   anyone else, calling at 12:37 on 11/27/2011.

13             Now, we also know that Anthony Wilson died

14   because he was stabbed, okay.

15             Now, how do you know that?

16             You know that because you saw -- I'm sorry --

17   you heard from Police Officer Marsden who said when he

18   responded to the scene he saw what looked to be stab

19   wounds on the chest area of Mr. Wilson.  You also know

20   from Dr. Scordi-Bello, who testified about the autopsy

21   that was done on Mr. Wilson, that she concurred.  Dr.

22   Frederic found seven stabs wounds to his body that

23   caused his death and her expert opinion was that those

24   stab wounds made Mr. Wilson die.  She talked about where

25   they were, she said there was one in the back left

Summation - People/Ms. Chu

1    shoulder here (indicating), there were five over here

2    (indicating) and then there was one more on the right

3    upper chest (indicating).

4              We also know that it was the defendant that

5    killed Anthony Wilson.

6              How do we know that?

7              We know that Matthew Shepard told you when

8    he first saw her that night at 5:15 A.M. on 11/29/2011

9    she said, I wasn't going to pay him rent and fuck him,

10   so I poked him up.  That's what she said to him first,

11   okay.

12             We will talk about what he said later on in

13   the evening, about what she said to him at the house.

14             But we know that she was the one who stabbed

15   and killed him because that is what she told Matthew

16   Shepard.  We also know that because she admits that she

17   stabbed Anthony Wilson on video to the detective.  You

18   heard the statements.  And then she also signed whatever

19   Detective Scandole wrote out for her, which was the same

20   as what she had said to him.

21             What else do we know from the evidence?

22             We also know that she intended to kill him,

23   okay, because she, according to her defense, is saying

24   that he was trying to rape her.  I had to kill him

25   because he was trying to rape her.

448

Summation - People/Ms. Chu

1        You heard from her statements to the

2    detectives as well as to the A.D.A. --

3        MR. WALENSKY: Objection. That's not really

4    what was said.

5        THE COURT: It is this jury's recollection

6    that controls.

7        MS. CHU: How do you know she intended to kill

8    him? How do you know?

9            How many stab wounds were there?

10           Seven. Not one, not two, not three...seven

11   stab wounds. That's how you know.

12           Look at where they were located, all in this

13   area here (indicating), here (indicating), up here where

14   the heart is (indicating), right.

15           Where does she stab?

16           Most of the stab wounds are right here

17   (indicating), in the left upper chest.

18           And we know she wanted to kill him. According

19   to her defense she is saying he is trying to rape me so

20   I had to kill him, right. She wants that self-defense,

21   justification because he was trying or allegedly trying

22   to rape her.

23           So the only thing that you have to decide

24   here, ladies and gentlemen, is whether or not she was

25   acting in self-defense that day. That is all you have

mc

1    to decide.  Because if she wasn't acting in

2    self-defense, then she's guilty of murder.

3            So the first thing that you should be asking

4    yourselves when you are deliberating is:  Was she trying

5    to prevent Anthony Wilson from raping her at the time

6    that she stabbed him, okay, and did he forcibly compel

7    her to try and have sex with him at that time when she

8    actually stabbed him.

9            And I submit to you that the evidence that's

10   before you proves beyond a reasonable doubt that he was

11   not trying to rape her at the time that she stabbed him.

12   And here's how we know it wasn't a rape.

13           First I want to talk about was it a rape at

14   all.

15           How do we know it wasn't a rape?  How do we

16   know that Anthony Wilson wasn't trying to rape Atara

17   Wisdom on November 29th, 2011?

18           MR. WALENSKY:  Objection.  It's what's in the

19   mind of the --

20           THE COURT:  Ladies and gentlemen, the

21   objection is overruled.

22           Proceed.

23           MS. CHU:  We have the 911 tape, the 911 tape

24   that was authenticated by the 911 recorder who said that

25   is what we generated, a copy of a 911 call made by that

1    number at 12:37 on November 29th, 2011.  We also have it

2    authenticated by his sister, that's actually his voice.

3    That is one of the last things that's recorded of him

4    saying before he died.

5              (Whereupon, the exhibit was played in open

6    court.)

7              MS. CHU:  Those are his last words before the

8    phone cut off.  I submit to you, the reason why you know

9    that it wasn't rape was because what did she tell you on

10   the video?

11             She says that it's during the rape or

12   attempted rape that she stabs him, right.  She says it's

13   during when he is trying to rape her, he pulls the

14   sweater over her shoulders and she says she is bent down

15   like this (demonstrating).  She says at that point she

16   stabs him.  She is saying that she is stabbing him while

17   he is trying to rape her, okay.

18             If that were true, Anthony Wilson would never

19   have been able to make that phone call, he would have

20   never been able to call 911 because he would have

21   already been dead.

22             She doesn't say that they have a fight about

23   the sex, then he goes and, you know, that there's some

24   other things that goes on.  We know that at the time he

25   called 911 he didn't say anything about anybody

Summation - People/Ms. Chu

1      stabbing, he just said she's acting crazy.

2                    I submit to you, ladies and gentlemen, the

3      fact that he called 911 shows you that she was not being

4      raped at the time she stabbed him.

5                    MR. WALENSKY:  Objection, your Honor.

6                    MS. CHU:  How else --

7                    THE COURT:  That's for the jury's

8      determination.

9                    MS. CHU:  How else do you know?

10                    I submit to you, the reason why he called 911,

11     or the fact that he called 911 on her, that was motive

12     for why she stabbed him, because whatever arrangements

13     they had, how they were living together, she's a

14     25-year-old girl living with a 50-year-old man, is it

15     okay for him to assume that if she's going to stay there

16     she might give him some sex?

17                    MR. WALENSKY:  Objection.

18                    MS. CHU:  Good, bad, indifferent.

19                    MR. WALENSKY:  Well beyond the evidence,

20     speculation.

21                    THE COURT:  Overruled.

22                    MS. CHU:  We don't know what their arrangement

23     was, whatever it was that made it so she would be

24     allowed to stay with him.  She says on the tape she'd

25     give him some money, you wouldn't call it rent, it was

mc

1    like $20 here, $30 here, something like that, no more

2    than $60 bucks is what she said on the tape, and that's

3    not rent.

4         But what does she tell Matthew Shepard?

5         She says, I wasn't going to pay him rent and

6    have sex with him so I poked him.

7         Maybe the deal got renegotiated.  Maybe he

8    tried to have sex with her.  I am not saying he didn't

9    try to have sex with her.  Just because you don't want

10   to have sex with someone doesn't mean that they are

11   trying to rape you, okay.  One is totally different from

12   another.

13        I submit to you, what made her stab him and

14   proves to you that -- I'm sorry -- he wasn't trying to

15   rape her, she actually stabbed him, because you don't

16   hear him saying anything about being injured on that

17   911.  He is calling because I got this girl in my house,

18   she is acting all crazy and I want her out.  And that is

19   what upset her.  That's the motive for why she stabbed

20   him, because from 12:37 --

21        MR. WALENSKY:  Objection.  There is absolutely

22   no evidence regarding that.

23        THE COURT:  Overruled.

24        MS. CHU:  You will look at the phone records

25   from 12:37, the 911 call, the next phone call that's

453

1  made is made to her person, that's 12:50-something. She

2  makes a phone call, I submit to you, from 12:37 that 20

3  minutes, that's when the murder happened 'cause she was

4  pissed that not only was he going to try and have sex

5  with her, but now he is going to kick her out because he

6  says I want her out.

7  No doubt he told her, look, if you are not

8  going to have sex with me, you gotta get out, and then

9  that's what put her over the edge and that is what made

10  her stab him.

11  And remember what the doctor told you, the

12  doctor tells you that these stab wounds were not

13  something that was indicative of it being a struggle

14  when he actually received them, meaning that Mr. Wilson

15  wasn't moving around a lot when he was getting those

16  stab wounds because how did he get them all in the same

17  area, the cluster, right? He had to have been still

18  enough for her to get five of those stab wounds in the

19  same area on the left upper chest.

20  What else does the 911 call prove to you, that

21  shows it wasn't rape?

22  If he was trying to rape her, why would he

23  call 911?

24  If he was trying to forcibly compel her to

25  have sex with him, why would he call 911?

454

Summation - People/Ms. Chu

1    Why would he call 911 to have the police

2    involved, law enforcement involved to come to his

3    house, someone who, you know he used cocaine, it was

4    in his system, there was byproduct of it in his

5    system?

6    You don't know when he used it, but why would

7    somebody like Anthony Wilson want the police to come to

8    his house unless he wanted her out, okay?  Why would he

9    do that if he was wanting to rape her, that he is the

10   one that is being aggressive?

11   What the 911 actual proves is the only one

12   that was angry here was her.  She is the only one

13   that's acting crazy, not Mr. Wilson.  She was the one

14   that he says she is acting crazy, I want her out.

15   She is the only one that's in an arousal state like

16   that.

17   How else do you know that this wasn't a

18   rape?

19   You have Matthew Shepard.  I submit to you,

20   ladies and gentlemen, you know I don't pick my

21   witnesses, they don't get picked, selected out of

22   central casting, he is who he is.  He is the person that

23   she calls at five o'clock on November 29th, 2011, after,

24   I submit to you, when Anthony Wilson was killed, five

25   hours after he's killed.

1        And what does she say to him?

2        She doesn't say, he tried to rape me so I

3   stabbed him.  She says, I wasn't going to give him sex

4   and pay him rent so I poked him.  That is what she said

5   to him the first time.

6        I submit to you, the defense counsel, you

7   know, he said when she got back to the house that, oh,

8   he was trying to force himself on me, that is why I

9   stabbed him.  If you think about it, ladies and

10  gentlemen, the way she was when she first spoke to him

11  versus now, a couple of hours later when she's at his

12  house, she knows that he doesn't -- he is not going to

13  let her stay, she needs him, okay.  He is the only one

14  that met her that morning or was willing to meet her at

15  five o'clock in the morning to come get her, right, and

16  now she's at the point where she needs something from

17  him.

18        MR. WALENSKY:  Objection.  There is absolutely

19  no evidence regarding any of this.  It's speculation.

20        MS. CHU:  She --

21        THE COURT:  Overruled.

22        MS. CHU:  He testified that she wanted to stay

23  with him.  You heard Mr. Shepard, he said she wanted to

24  stay with me, I was like umm, umm.  So if you think

25  about it, ladies and gentlemen, umm, umm, if you just

1    told somebody you just stabbed somebody, if you told

2    Matthew Shepard you stabbed this guy, you want him to

3    allow you to stay in his house, why would anybody want

4    to let you stay in the house if she just said I stabbed

5    somebody because she didn't want to have sex with

6    them?

7           Now, I submit to you, the motives are

8    different for why she is telling him, oh, well, I was

9    afraid, he tried to force himself on me, now I had to

10   stab him, because everybody knew why Mr. Shepard wanted

11   her to come to his house.  He said he wanted to have

12   sex.  If you are calling me at 5:00 in the morning, that

13   is a booty call, okay, so I'm thinking she is a young

14   girl, I'm whatever, I'm single, hey, he wants to have

15   sex with her.  And when she tells him that she did that

16   to Anthony Wilson, I'm not trying to have that, I submit

17   to you, the reason why she said that is because she was

18   trying to make excuses for why she did it.

19          She is also trying to send a message to Mr.

20   Shepard, don't you try that either, don't you try and

21   have sex with me because I'm telling you what happened

22   to Anthony Wilson, I'll do the same thing.

23          The next thing or the next piece of evidence

24   that you have that proves that she was not being raped

25   at the time that she stabbed Anthony Wilson is, what

Summation - People/Ms. Chu

1     does she do after, according to the videotape?

2              She says, I take his keys, I take his wallet,

3     I take his phone.

4              And you know she used the phone because you

5     have the phone records.  You have the phone records from

6     her phone, her cellphone, and you also have the phone

7     records from Anthony Wilson's phone, and you'll see on

8     there that the phone numbers that are called by Anthony

9     Wilson's phone are the patterns that she has on her own

10    phone.  And, in fact, on her own she never uses it from

11    12:03 A.M. on November 29th, 2011 all the way until

12    three o'clock that afternoon.  She doesn't use the phone

13    at all.  And the only reason why she gets something at

14    three-something is because somebody texted her

15    something.

16             For the entire period of time of 12:03 or --

17    I'm saying after the entire time from 12:03 up till

18    three-something in the afternoon on November 29th, whose

19    phone is being used?

20             Anthony Wilson's phone is being used, okay,

21    it's being used to call people --

22             MR. WALENSKY:  Objection.

23             MS. CHU:  -- on her list.

24             MR. WALENSKY:  This is not about the phone,

25    it's about what happened in that apartment.

1          THE COURT:  Objection is overruled.

2          MS. CHU:  We also know that --

3          What did she do with the keys?

4          She took the keys, she took the phone, she

5     took the wallet.  She locked the door.  She locked the

6     door to that apartment.

7          Now, you know it was locked because Donet

8     Robinson told you he had to use the key to get in five

9     weeks later.

10          What did she do by locking Mr. Wilson in?

11          Remember what Donet Robinson said, you have

12     the ability in the apartment to turn the heat off.

13          It was cold, January 2011.  You heard from

14     the Crime Scene detective, he said it was cold that

15     night, it was like 28 degrees out and that heat was

16     off.

17          Why do you think that happened?

18          That shows you that it wasn't a rape, that she

19     wasn't trying to defend herself from a rape that night.

20     It was murder.  She was trying to cover up what she did.

21     She tries to cover it up, the heat's off, she locks the

22     door so no one can find him.

23          MR. WALENSKY:  Objection.  There is no

24     testimony the heat was on at any time.

25          THE COURT:  Objection is overruled.  It's the

mc

1    jury's recollection that controls.

2         MS. CHU:  She has the wherewithal to lock

3    the door so that no one goes in.  She doesn't leave it

4    wide open so somebody can, oh, my gosh, look at him, let

5    me go in there and find him.  No, for five weeks they

6    don't find Anthony Wilson, his body is just there

7    presumably sort of kept because of the fact that the

8    room is so cold, but he is just there because nobody did

9    discover him.  Shakeema, she tried.  She goes to the

10   house, there was no answer.  The siblings, his sister,

11   Anthony Wilson's sister, he didn't show up for Christmas

12   so she knocked on the door, went by the house, no

13   answer.

14        So no one could discover him, these are the

15   actions of someone who has everything to hide, someone

16   who did something wrong and is trying to hide the

17   evidence so that they can't find out.

18        MR. WALENSKY:  Objection.  This was a tale of

19   speculation without --

20        THE COURT:  Objection's overruled.

21        MS. CHU:  Now, what about that Welfare

22   card?

23        We heard from a representative from the HRA,

24   they told you that his card was used at certain places

25   before November 29th, 2011 and then his card is used at

1    other places after November 29th, 2011, okay.  And she

2    says in her statement to the police officer, she says

3    about that Welfare card, I took it but I never used it.

4    I am not suggesting to you that it was used by her, but

5    I am suggesting to you that it was used by someone that

6    wasn't Anthony Wilson because it's going to all

7    different places now, all right.

8              And she says in her statement, she goes, not

9    only does she flee from the house, I lock the door, make

10   sure no one can discover what happened --

11             MR. WALENSKY:  That is not the testimony.

12   Objection.

13             THE COURT:  Whatever the testimony is, it's

14   the jury's recollection of the testimony that controls.

15             Proceed.

16             MS. CHU:  She flees, okay.  She flees from the

17   scene and she is not apprehended until July, the end of

18   July 2012, that's eight months later, okay.  We know

19   from her benefit card that her card was being used in

20   Pennsylvania, in New Jersey, back to Brooklyn, back to

21   New Jersey, to Pennsylvania, and she says, she admits on

22   her statement that she went to different places because

23   she is not trying to get caught up in what happened

24   there.

25             MR. WALENSKY:  Objection.  That's not the

Summation - People/Ms. Chu

1       testimony.

2               THE COURT:  Again, it's the jury's

3       recollection that controls.

4               MS. CHU:  How else do you know it wasn't rape

5       and that there was some sort of arrangement between her

6       and Anthony Wilson with regard to how and why he was

7       allowing her to stay at his house?

8               She says that he's, you know -- in the video

9       statement you hear her tell you, he tried to get fresh

10      with me, I got mad, I went to Ebony's house, then went

11      to her sister's house, then went to a friend's house.

12      You hear about different people, like her sister, like

13      Tiffany, Ebony, all these people that she goes to when

14      she is supposedly angry at Anthony Wilson for trying to

15      have sex with her.

16              Now, if you think about it, you know the

17      scenario, it's a little -- you know, you might not

18      approve.  I am not saying you should or shouldn't, I am

19      just saying that's the deal they had.  She is a

20      25-year-old girl staying with a 50-year-old man, okay,

21      in a small room, 19 by 15.  If you look at the crime

22      scene diagram, you will see he measured the room, 19 by

23      15.  That is a small room with just a bed, a

24      kitchenette, not even a sofa.

25              She said she is sitting on a couch, right.

Summation - People/Ms. Chu

1   It's a lounge chair, a single lounge chair. There is

2   only one bed in that room and that's Anthony Wilson's

3   bed. And whether he assumed she was going to give him

4   sex because he let her stay there or he made an

5   arrangement with her, you can stay at my apartment if

6   you have sex with me, I mean, we don't know what the

7   arrangement was.

8          I am not asking you to speculate as to what it

9   was, but the fact of the matter is that she had other

10  places to go when she was supposedly mad at Mr. Wilson

11  for trying to have his way with her. She had Ebony's

12  house, she had her sister's house, she had Tiffany's

13  house, but no, she chose to continue going back there.

14  She chose --

15         MR. WALENSKY: Objection. There is no

16  testimony as to where she could have stayed for the long

17  term, your Honor.

18         THE COURT: Objection's overruled.

19         MS. CHU: I'll move on.

20         How else do we know that it wasn't a rape

21  that was occurring when she actually stabbed Anthony

22  Wilson?

23         The only phone that called 911 is Mr. Wilson's

24  phone. We know it was Mr. Wilson who called 911 because

25  we heard his voice. There is no 911 call made by any of

1    those numbers, not Atara Wisdom's number, not Matthew

2    Shepard's number, no phone call to 911.

3           There wasn't a 911 call after Anthony Wilson

4    called 911.  She never tried to call the police to let

5    them know that this guy just tried to rape me and I

6    stabbed him.  She never tried to get any medical

7    attention.

8           She said she had some bruises on her but she

9    never went to the police, she never went to a doctor or

10   a hospital or anything like that to get checked out,

11   make sure she is okay, never did any of that.  That is

12   not behavior of someone who's saying that she was about

13   to be violently raped by Anthony Wilson.

14          I submit to you, her failure to call the

15   police proves that she was trying to hide something

16   about what happened in that apartment at 832 --

17          MR. WALENSKY:  Objection.  There is no

18   evidence.

19          THE COURT:  Objection is sustained.

20          The defendant had no burden to call the police

21   and you are not to speculate as to why she didn't call

22   the police.  Sustained.

23          MS. CHU:  Let's talk about how many times she

24   stabbed Anthony Wilson.

25          And she says she is doing this because she is

1    trying to prevent a rape, right, and Anthony Wilson,

2    there's -- well, she labels it number one (indicating),

3    the first one is labeled here (indicating).  These are

4    randomly labeled (indicating).  That means that the

5    doctor has no way of knowing which one of them occurred

6    first, she just chooses -- she chooses the one up here

7    (indicating) as the first one.

8              So, we have five wounds to the left chest, we

9    have one wound to the right chest, we have one wound to

10   the back of the left shoulder, okay, right there

11   (indicating).

12             How do you know from these wounds that she

13   wasn't trying to be raped at the time she stabbed him?

14   What does she say on the video?

15             She says, I am bent over, right.  She says, he

16   punches me in the face and then he pulls my sweater over

17   my head.  She said now she is bent forward like this

18   (demonstrating).  She says, I am bent forward like this

19   (demonstrating), he is on top of me.  So, he's facing

20   her and on top.  She says he is pounding or he is

21   beating on my shoulders, right, he has the hood over the

22   thing, so she says, I take out the knife, which she put

23   in her pocket, right.  She has that knife that was in

24   her bag, she took it out.  When he took the sweater, she

25   takes out the knife, I start stabbing him, okay.  I

Summation - People/Ms. Chu

1    start stabbing him, and she says, I got him probably on

2    the legs, because according to the way she's standing

3    she had to have got him on the legs.  Bent over, the

4    part of his body she reached would be down here

5    (indicating), right.

6              But what do we know about the evidence,

7    because science doesn't lie?

8              His wounds, not one of them was a slash wound.

9    Not one of them was what the doctor called a laceration,

10   meaning that it's more long than it is deep.  She said

11   all of these stab wounds that he got, all seven of them,

12   were more deep than they were wide, meaning they were

13   actually puncture wounds, that the knife goes in.  No

14   slash wounds, nothing on his legs, not on his hands, not

15   on his wrists, not on his arms.  None of them were what

16   might be considered defensive wounds, okay.  He had no

17   defensive wounds on his body whatsoever, okay.

18             So, if she's saying that he supposedly is on

19   top of her, punching her and everything, first of all,

20   it's not supported by the medical evidence because he

21   has no injury whatsoever to his legs.  If he was allowed

22   to come up a little bit -- you think about it, he is 155

23   pounds, he is a little taller than her, she was 115

24   pounds, five foot six, right, she said she is trying to

25   get up.

Summation - People/Ms. Chu

1    What did the doctor tell you about the wounds?

2    He tells you -- I'm sorry -- she told you that

3  the wounds, with the exception of wound number six, they

4  were all what are front to back, left to right, and

5  downward.  If you're having a knife in your right hand

6  and you are stabbing somebody like this (demonstrating),

7  someone's facing you, the left side of your body would

8  be where the person's right hand was, exactly how the

9  knife went in, it went from left to right, back to

10  front -- I'm sorry -- front to back, meaning going

11  towards the back of him and downward.

12    There's no way she could have had leverage to

13  get the knife in at that angle, at that direction and

14  that deep if she was merely trying to hit at him like

15  this (demonstrating), which is what she testified to,

16  which is what she said to the police and to the District

17  Attorney on the video.  There's no way that those wounds

18  support what she said.

19    MR. WALENSKY:  Objection.  It's not what she

20  said on the video, your Honor.

21    THE COURT:  The jury will look at the video

22  and make a determination, or has looked at the video,

23  they will make a determination.

24    MS. CHU:  What else did the doctor tell you?

25    She told you three of the wounds were six --

1   sorry -- five to six inches deep, okay.  That's not

2   someone who's slashing around, that's someone who's got

3   anger plunging that knife right into his chest five to

4   six inches deep, with enough force for that knife to cut

5   through a bone, okay.  We are not talking about soft

6   tissue here, we are talking about that went through his

7   chest, it punctured his lung and went right through the

8   fourth rib of Anthony Wilson.

9              MR. WALENSKY:  Objection.  There was

10   significant testimony that cut the bone, not it cut

11   through.

12              THE COURT:  Objection is overruled.

13              MS. CHU:  Whether it cut the bone or cut

14   through the bone, the fact of the matter is the knife

15   cut the bone, okay, it went through something hard like

16   a bone.  That's how much force she was using when she

17   stabbed him.

18              And I submit to you that the injuries also,

19   the doctor told you, they are not consistent with him

20   moving around.  At the time he is getting stabbed he is

21   stationary because otherwise how would she be able to

22   get it all in the same area at that time?

23              And remember, if supposedly he was being

24   killed at the time he's trying to rape her, the 911 call

25   would never have been made.  Remember?  Forget about

1       that 911 call?

2                We know that at the time she stabbed him she

3       was not being raped.  Forgot about that.

4                So if you are not preventing a rape, then that

5       means the only other thing it could be is you

6       intentionally murdered him.

7                She intentionally plunged that knife seven

8       times into Anthony Wilson's body because she wanted him

9       dead.  She wanted him dead because he had the nerve to

10      not only try and maybe change the arrangements that she

11      had for her living there, or maybe he was trying to have

12      sex with her, she just didn't feel like it, whatever it

13      was, she was mad because he had the nerve to call the

14      cops, that when he calls the cops he says I want her

15      out, he was kicking her out.  And you knew she was

16      having trouble finding a place to stay.  She told that

17      to Matthew when she first met him, I am staying with

18      Tony because I don't have a place to stay.

19               He was terminating her ability to stay where

20      she was and give $20 whenever she could to pay for

21      food.  He was going to stop that free trade that she

22      had.

23               So the only person that you can conclude from

24      all the evidence that was acting irrationally or angry

25      was the defendant, it wasn't Mr. Wilson, because you

1    heard his call, he was just upset because she was acting

2    that way.  She is the only one that was angry that

3    night, on November 29th, 2011.

4              And the same evidence that proves that she

5    was not acting in self-defense when she stabbed him is

6    the same evidence that proves she was intentionally

7    causing his death, okay.  I say that to you only because

8    the Judge is going to inform you we have the burden of

9    proving she was not acting in self-defense.  That

10   doesn't mean I have to offer extra evidence, offer

11   other evidence.  The same evidence that proves she was

12   intentionally causing the death of Anthony Wilson is

13   the same evidence that proves that she wasn't trying

14   to prevent him from raping her at the time she stabbed

15   him.

16             MR. WALENSKY:  Objection.

17             THE COURT:  Overruled.

18             MS. CHU:  And we know it's intentional

19   murder because, again, I go back to the 911 call.  If

20   he is trying to rape her, why would he be calling 911?

21             We know that she, according to her statement,

22   she says, I stabbed him when he was trying to rape me,

23   not after, not anything like that.  At the time he is

24   trying to rape her, that is when she stabs him, okay.

25             She tells Mr. Shepard, he wants to have sex

470

Summation - People/Ms. Chu

1      and have me pay rent too so I poked him, right.

2              We know that the cluster of the wounds was all

3      in this area (indicating) where it's very vulnerable.

4      That is why you have ribs, to protect the major organs.

5      What knife wounds do, the three that were the most fatal

6      went right through his heart and two times through his

7      left lung.

8              What did Dr. Scordi-Bello tell you?

9              Dr. Scordi-Bello told you that would have

10     affected his ability to breathe, not instantly drop but

11     he would have had difficulty breathing, difficulty

12     moving, at some point he would have lost consciousness,

13     couldn't give you an exact time.  But that proves to you

14     that at the time he made -- at the time Anthony Wilson

15     made that phone call he didn't have any of those

16     injuries yet, he was perfectly fine when he called 911,

17     it wasn't until after that 20-minute period between

18     12:37 and 12:57, when she starts making phone calls on

19     his phone that she committed this murder, it's because

20     he was trying to kick her out of that house.  The free

21     ride that she was getting all of November was going to

22     end and she killed him.

23             What else do you know that shows it was

24     murder?

25             Now, I'm not saying that she planned this

mc

1    ahead of time.  She could have made up her mind to kill

2    him the very moment she did the first plunge into his

3    body.

4         The Judge is going to give an instruction on

5    intent.  Intent doesn't have to be premeditated, that

6    you don't have to lay in wait and plan things out for

7    weeks and weeks.

8         MR. WALENSKY:  Objection.

9         THE COURT:  Overruled.

10        MS. CHU:  You can have that intent up to and

11   including the very moment that you're actually engaging

12   in the conduct, meaning first knife in.  She could be

13   formulating that intent in her mind right then and

14   there, and that's what the law says.

15        Now, what else do we know about intent?

16        I told you about the whole key thing.  She

17   locks the house up to prevent discovery of Mr. Anthony

18   Wilson.

19        What else is there?

20        You saw, from the exhibits, the floor.

21        This is People's Number 6 in evidence

22   (indicating) and you see all the blood on the floor.  It

23   looks like someone was trying to wipe it up.  The same

24   thing with the feces, looks as though someone was trying

25   to wipe it up, okay.

1          So, we know Anthony Wilson wasn't trying to

2     clean his house after he got stabbed.  She was the only

3     one in there.

4          This is yours.

5          She was the only one in there.  And why is she

6     trying to clean up?

7          Maybe because she's trying to cover up that

8     she intentionally stabbed Anthony Wilson seven times

9     causing his death.

10         Another thing that's very interesting is that

11    now we talked about we don't know what type of

12    relationship the defendant had with Mr. Wilson as far as

13    what their arrangement was for her being able to live

14    there, but we do know from Shakeema Fortune, when she

15    did go there she says Anthony Wilson introduces Shakeema

16    to Renee as his girlfriend.  He says, this is my

17    girlfriend Renee, right.

18         Then what does Renee say or what does the

19    defendant say when Shakeema Fortune goes are you going

20    to come out with us to play pool?

21         She says, He's not going anywhere.

22         Is that the words of someone who's just a

23    roommate of yours or is that the words of a woman who's

24    your girlfriend, and a possessive one at that, that he's

25    not going anywhere, right?

Summation - People/Ms. Chu

1           I submit to you, that's how you know that

2      there was some other arrangement or that they may have

3      been even boyfriend and girlfriend, that she was

4      consensually having sex with him and maybe on November

5      29th he wanted to have sex, she didn't.  That doesn't

6      mean it's rape, that just means I didn't want to have

7      sex with him, okay.

8           How else do you know that this is Murder in

9      the Second Degree, intentional murder?

10          How we find Mr. Wilson's body.

11          When you hear her on video she says --

12     remember, Mr. Purce asked her, what was he wearing?  She

13     said jeans and T-shirt, right.  She says on the video at

14     the time he is trying to rape her he's wearing jeans and

15     a T-shirt.

16          This is how he ends up (indicating), he's on

17     the bed and there's blood on the floor near the kitchen

18     but there's also blood on the mattress and under the

19     mattress.

20          I submit to you, ladies and gentlemen, him·

21     being naked, she says when she leaves he is on the bed

22     already, she leaves the apartment after she goes and

23     grabs the keys, the wallet and the cellphone.  She says

24     he is on the bed by now.  She says, I just go out.  We

25     know that's not true, because how did he get naked?

1          Remember all those questions I asked the

2    Medical Examiner about the pants?

3          I said, these pants, can you take a look at

4    them and tell me what it looks like, there's some stains

5    on them?

6          Those look like diluted feces or urine, not

7    blood, because blood would be darker.  That is what she

8    said.

9          If you look at these pants -- now, the defense

10   has this theory that, you know, he drops his pants after

11   he defecates then he plops himself on the bed.  I submit

12   to you --

13          MR. WALENSKY:  Not after he defecates.  It's

14   not what was said.

15          THE COURT:  Do you have an objection?

16          MR. WALENSKY:  Objection.

17          THE COURT:  Just object.

18          MR. WALENSKY:  Objection.  It's not what was

19   said.

20          THE COURT:  Ladies and gentlemen, it's your

21   recollection that controls.

22          Overruled.

23          MS. CHU:  I submit to you, ladies and

24   gentlemen, that because of what Dr. Scordi-Bello told

25   you, you know that he was wearing his pants at the

Summation - People/Ms. Chu

1   time he defecated because we have evidence of poop

2   being in there and, you know, some urine in there,

3   right.  And if he's wearing the pants at the time he

4   commits -- I'm sorry -- at the time he's murdered, Dr.

5   Scordi-Bello tells you, in fact, when Mr. Walensky

6   questioned her, he had asked her, is it common for

7   people to release their bowels and their urine when

8   they die and she says yes, that is possible, that is

9   common, in fact.

10          So if his pants were on when he died and the

11  poop -- I'm sorry -- the feces ended up in his pants,

12  look at how the pants end --

13          MR. WALENSKY:  Your Honor.

14          MS. CHU:  What is the most important --

15          MR. WALENSKY:  Objection.  There is no

16  evidence regarding feces in the pants.  There was no

17  testimony, there was nothing.  That's not -- that wasn't

18  the argument made.

19          THE COURT:  Objection is overruled.

20          It's the jury's recollection that controls.

21          Proceed.

22          MS. CHU:  Dr. Scordi-Bello told you that

23  those stains look like diluted feces and urine, not

24  blood.

25          You can ask to have her testimony read back to

mc

1    you.

2              I submit to you, that the state of these pants

3    is very important here because how do pants get inside

4    out?

5              You heard from the Crime Scene detective,

6    these were regular blue jeans, these weren't skinny

7    jeans, they weren't leggings or nothing that would stick

8    to your body so that when you took them off they might

9    end up being inside out.  Just regular old jeans.

10   And -- I'm sorry.

11             I submit to you, the way they got inside out

12   was because after Anthony Wilson was stabbed to death by

13   Atara Wisdom, she took his pants off because that is the

14   only way you can get them inside out, like if someone

15   else takes off your pants, they grab you from there,

16   they just pull them off like that (indicating).  That is

17   exactly how they were.  That is exactly how the feces

18   would have ended up on the floor, because when she took

19   them off and threw them on the floor, then the poop or

20   the feces comes out, ends up on floor.

21             You know there was an attempt to try and clean

22   it up because there were smears, there were smears of

23   blood, smears of feces.

24             MR. WALENSKY:  Objection to what the jury

25   knows.

Summation - People/Ms. Chu

1          THE COURT:  Overruled.

2          MS. CHU:  Now, remember, Atara Wisdom didn't

3     see Matthew Shepard until five hours later, okay.  If

4     the 911 call's at 12:37 A.M., she doesn't reach out to

5     Matthew Shepard until 5:00 A.M., that's over four hours

6     in that apartment where she could have done a lot of

7     things.  You know she cleaned up because Mr. Shepard

8     told you when he saw her she didn't have any blood on

9     her, she didn't have any indication that she had been in

10    some sort of altercation or -- he thought maybe her face

11    was swollen.  And if you're trying to kill somebody, you

12    would imagine they are trying to hit at you, she

13    probably did get hit in the face while she's trying to

14    stab Anthony Wilson to death.

15          And I submit to you, ask yourselves, why was

16    he naked?  Why was it necessary for him to be naked on

17    the bed like that?

18          And I submit to you, it's because the

19    defendant had already started thinking how she is going

20    to answer for this.  And I submit to you, she wanted to

21    make it look exactly how she wanted to say it, right,

22    that he was trying to rape her.  So she takes off his

23    clothes and she leaves him in the bed like that because

24    that is -- because that supports her story that, look,

25    he's naked, he was trying to rape me.

Summation - People/Ms. Chu

1          Now, remember, when she is talking to the

2     District Attorney and when she's talking to the

3     detectives, we are talking about eight months after

4     she's already committed this crime, right.  She says

5     after, she says five weeks, they don't even find Anthony

6     Wilson till January 3rd, okay.  January 3rd is when they

7     find the body and then they are looking for her.  When

8     they start looking for her in March and April because

9     there's a DNA hit, right, from the blood in the

10    bathroom, they find her DNA there.

11         And if you recall what the DNA person said,

12    now the defense counsel argued that it's not menstrual

13    blood, in fact she says we don't have a test that can

14    determine or distinguish between regular blood that

15    comes out of your veins and menstrual blood.  She says,

16    we don't know that.  We don't separate.  There is no way

17    for us to distinguish between the two types of blood.

18    We don't know how long that blood in the bathroom had

19    been there.  We don't know whether she might have cut

20    herself stabbing Anthony Wilson that very night.  We

21    don't know.

22         And I submit to you, ladies and gentlemen,

23    that eight months later when she is talking to the

24    police, she's already been churning this story in her

25    mind because she already created it.  From the moment

Summation - People/Ms. Chu

1    she left that apartment on November 29th, 2011, she

2    already had it in her mind, he tried to rape me so I

3    killed him.  He tried to rape me, I killed him.

4         When she gets to see Matthew Shepard five

5    hours later she doesn't say that, she says, he is trying

6    to have sex with me and make me pay rent so I poked him.

7    It wasn't until after she realizes he's not going to let

8    her stay at his house either that she tried to mitigate

9    what she was doing, makes an excuse why she had to kill

10   Anthony Wilson.  She tries to make excuses why she had

11   to kill Anthony Wilson.

12        How do we know that she is lying about how all

13   this occurred?

14        Because from what I told you earlier having to

15   do with the Medical Examiner, that the Medical

16   Examiner said the injuries on Anthony Wilson's body

17   talked from the dead because his wounds don't

18   corroborate how she says she had to kill him during a

19   rape.  His wounds are more consistent with an

20   intentional, quick, fast (demonstrating).  She is right

21   in front of him stabbing him with all her might to get

22   that blade right through that bone.

23        In a little while the Judge is going to give

24   you instructions regarding circumstantial evidence and

25   justification.  I know everybody -- you know you have

Summation - People/Ms. Chu

1    what you see on TV, what you might know yourselves,

2    you all have different ideas about what justification

3    might be or self-defense or even circumstantial

4    evidence.  And I ask you to set aside what you think and

5    only listen to what the Judge tells you because he is

6    the one that is going to give you the law.  Even if you

7    don't believe or think that, oh, my gosh, that is not

8    what I thought it was, you still have to follow what he

9    says.

10            You all promised as jurors that you would

11   follow the law as given to you by the Judge and I ask

12   you to please listen carefully to what he says because

13   he will give you justification, that if the defendant

14   thought that she was being -- going to be raped or that

15   she was being raped, that she has a right to self --

16   to use deadly physical force, she has to reasonably

17   believe.  There are a couple of tests that have to

18   go --

19            MR. WALENSKY:  Objection, your Honor.  The

20   Court will give the instruction.

21            THE COURT:  Overruled.

22            MS. CHU:  She has to reasonably believe that

23   he was trying to rape her at the time that she actually

24   stabbed him.  But we know from all the evidence that he

25   wasn't trying to rape her at the time she stabbed him.

Summation - People/Ms. Chu

1    We have the 911 call, what she said to Matthew Shepard.

2    So if it's not self-defense, meaning that she was not

3    being or he wasn't trying to rape her at the time she

4    actually stabbed him, then it's -- the only thing it

5    could be is murder, intentional murder, that she stabbed

6    him because he wanted her out of the apartment, that's

7    the reason why that flipped her head like, oh, you

8    trying to renegotiate our deal and you want to kick me

9    out now because I won't give you sex, I'm going to kill

10   you now, okay.  She knows he --

11           MR. WALENSKY:  Objection.  There is no

12   evidence, it's sheer speculation.

13           THE COURT:  Overruled.

14           MS. CHU:  He calls the police.  He calls the

15   police while she's there and says she's acting crazy,

16   she's in my house and I want her out.

17           MR. WALENSKY:  Objection.  We don't know

18   whether she is there at the time.

19           THE COURT:  Objection is overruled.

20           MS. CHU:  He says the girl is in my house and

21   I want her out.  He doesn't say there was a girl in my

22   house, he says there is a girl in my house.  He doesn't

23   say anything about being injured, not I'm being stabbed,

24   not even she has a knife and I want her out.  He doesn't

25   mention anything of that because, I submit to you, that

Summation - People/Ms. Chu

1   knife wasn't taken out until after she got proof from

2   Anthony Wilson that he was going to try and get her out

3   because he calls 911 and that is what set her off, that

4   is what made her go take that knife out of her pocket

5   that was in her sweater, conveniently, and then stab

6   him.

7           And I submit to you, if you are standing

8   right in front of somebody and you're stabbing them

9   repeatedly in the chest like they got one here

10  (indicating), she's got five here (indicating), it's

11  easy to go right here (indicating).  This one wasn't

12  very deep (indicating), was only a half inch deep,

13  right.  But all these are the ones (indicating), two

14  inches, five to six inches, these are the ones that

15  were the ones that killed him, the ones that went

16  through his heart, the ones that went through his

17  lungs.

18          I submit to you, ladies and gentlemen, the

19  defendant's statements to the police and to the

20  District Attorney's Office don't make sense in light

21  of all the other evidence that you have in this case,

22  the forensic evidence from the ME's office, you have

23  the evidence from the scene, pictures and other stuff.

24          I submit she staged that scene.  She wanted it

25  to look like there was some sort of melee.  And you

Summation - People/Ms. Chu

1    heard from his sister from his friend Keema, from his

2    landlord, he was neat, he never kept his apartment like

3    that.  She is the one who made it like that.

4         Self-defense, the Judge is going to tell you,

5    is available in very limited circumstances and the

6    self-defense that he is going to give you, the

7    instructions he is going to give you, says that she has

8    to believe that she was about to be raped or was being

9    raped at the time she stabbed him.  We know from the

10   evidence that couldn't possibly be true.  It couldn't

11   possibly be true.

12        And if it doesn't fit according to how the

13   test asks you to do, then you're simply not entitled to

14   that defense as a defendant.  If you meet the criteria,

15   it's a very specific definition of what fits -- I'm

16   sorry -- what meets the criteria --

17        MR. WALENSKY:  Objection, your Honor,

18   instructing the jury.

19        THE COURT:  Overruled.

20        MS. CHU:  If it doesn't meet that criteria,

21   she's not entitled to that defense.

22        I submit to you, the evidence in this case

23   proves Atara Wisdom intentionally stabbed Anthony

24   Wilson one, two, three, four, five, six, seven times,

25   until he died from his wounds and she just left him

Proceeding

1      there, and I ask you to return a verdict of guilty of

2      Murder in the Second Degree because that is what she

3      did.

4                  THE COURT:  All right, ladies and gentlemen,

5      we will take a ten-minute break.  At 4:10 I will charge

6      you on the law, all right.

7                  Just leave your books there and do not discuss

8      the case amongst yourselves.

9                  (Whereupon, the Jury exited the courtroom.)

10                 THE COURT:  All right, ten minutes.

11                 (Whereupon, a brief recess was held.)

12                 (Whereupon, subsequent trial proceedings were

13     stenographically recorded and transcribed separately.)
       ***********************************
14     CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
       THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS
15     PROCEEDING.

16

17

18

19     _Marlin Cassidy_
       MARLIN CASSIDY
20     Senior Court Reporter

21

22

23

24

25

mc

```
 1  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS:  CRIMINAL TERM:  PART 2
 2  -----------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
 3                                       Indictment No.:
               -against-                 6615/2012
 4                                       (Trial)
    ATARA WISDOM,
 5
                    Defendant.
 6  -----------------------------------------X

 7
                         Supreme Courthouse
 8                       320 Jay Street
                         Brooklyn, New York 11201
 9                       July 9, 2014

10
    B E F O R E:
11
                 THE HONORABLE ALBERT TOMEI, JUSTICE
12               (And a Jury)

13  A P P E A R A N C E S:

14          HON. KENNETH P. THOMPSON, ESQ.
                 District Attorney - Kings County
15               350 Jay Street
                 Brooklyn, New York  11201
16          BY:  PHYLLIS CHU, ESQ.
                 Assistant District Attorney
17

18          DAVID WALENSKY, ESQ.
                 Attorney for Defendant
19               910 Stuart Avenue
                 Mamaroneck, New York
20          BY:  DAVID WALENSKY, ESQ.
                      - and -
21               JOSHUA POVILL, ESQ.

22

23

24                       MARLIN CASSIDY
25                       Senior Court Reporter
```

mc

Charge

1              (Whereupon, the following took place in open

2       court:)

3              THE CLERK:  Case back on trial continues.  All

4       parties present, defendant with attorney.

5              THE COURT:  Get the jury.

6              COURT OFFICER:  Jury entering.

7              (Whereupon, the Jury entered the courtroom.)

8              THE COURT:  All jurors are present and seated.

9              Do both sides waive the roll call?

10             MR. WALENSKY:  Yes.

11             MS. CHU:  So waived.

12             THE CLERK:  Thank you.

13             THE COURT:  Madam forelady, ladies and

14      gentlemen of the jury, I will now state to you some of

15      the general principles of law applicable to this and all

16      criminal cases.

17             I charge you that you must accept the

18      principles of law as stated by the Court, whether you

19      agree with them or not.  You have no discretion

20      whatsoever to depart from the principles of law which I

21      shall now state.

22             You and I are sitting here together as judges,

23      you as the judges of the facts and I as the judge of the

24      law.

25             The first and most important principle for you

jurors to remember is that you are the sole and exclusive judges of the facts in this case.  In that capacity you will decide the facts cooly, calmly and deliberately, and without fear or favor or prejudice or passion or empathy.

You must not, under any circumstances, indulge in speculation or guesswork, nor are you to consider anything outside of the evidence.  In other words, don't try to be detectives, don't try to conjecture what you would do, or what should have been done, or what might have been done or could have been done.

Your own recollection, understanding and evaluation of the facts presented by evidence at this trial is what controls, regardless of what counsel for either side of the case may say about the facts, and even regardless of what the Court may say about the facts.  I wish to advise you, also, at this time, that you are not to consider anything I said during the trial or any questions I've asked, nor anything that I may say to you during the course of this charge, as indicative that I have any opinion on this case one way or another. I have no opinion whatever.

I have no power to tell you what the facts are or to tell you that one fact is more important than another fact, or what witness is truthful or what

Charge

1    witness is untruthful.  These are all matters within

2    your own exclusive power as judges of the facts.

3            You are not bound to accept the arguments  of

4    respective counsel.  If you find that any argument urged

5    by either of them is reasonable and logical and based

6    upon the evidence as you recall it and is consistent

7    with that evidence, you are free to accept that argument

8    as your own and give it as such weight as you deem

9    advisable.  On the other hand, if you find that any

10   argument or conclusion is not based upon the evidence,

11   or it's unreasonable, illogical or  inconsistent with

12   the evidence, you may disregard it entirely.

13           As to the law of the case, however, you, as

14   jurors, must not set up your own conceptions or

15   preconceived notions of what the law should be.  You

16   must accept the law as given to you for your guidance in

17   the determination of issues of fact.

18           We now turn to the fundamental principles of

19   our law that apply in all criminal trials, the

20   presumption of innocence, the burden of proof, and the

21   requirement of proof beyond a reasonable doubt.

22           Throughout these proceedings the defendant is

23   presumed to be innocent.  As a result, you must find the

24   defendant not guilty, unless on the evidence presented

25   at this trial, you conclude that the People have proven

1    the defendant guilty beyond a reasonable doubt.

2          Defendant is not required to prove that he is

3    not guilty.  In fact, the defendant is not required to

4    prove or disprove anything.  To the contrary, the People

5    have the burden of proving the defendant guilty beyond a

6    reasonable doubt.  That means, before you could find the

7    defendant guilty of a crime, the People must prove,

8    beyond a reasonable doubt, every element of a crime,

9    including that the defendant is the person who committed

10   that crime.  The burden never shifts from the People to

11   the defendant.  If the People fail to satisfy their

12   burden of proof, you must find the defendant not guilty.

13   If the People satisfied their burden of proof, you must

14   find defendant guilty.

15          What does our law mean when it requires proof

16   of guilt "beyond a reasonable doubt?"

17          The law uses the term, quote, proof beyond a

18   reasonable doubt, close quote, to tell you how

19   convincing the evidence of guilt must be to merit a

20   verdict of guilty.  The law recognizes that, in dealing

21   with human affairs, there are very few things in the

22   world that we know with absolute certainty.  Therefore,

23   the law does not require the People to prove the

24   defendant guilty beyond all possible doubt.  On the

25   other hand, it's not sufficient to prove that defendant

Charge

is probably guilty.  In a criminal case, the proof of
guilt must be stronger than that, it must be beyond a
reasonable doubt.

A reasonable doubt is an honest doubt of the
defendant's guilt for which a reason exists based upon
the nature and quality of the evidence.  It is an actual
doubt, not an imaginary doubt.  It is a doubt that a
reasonable person, acting in a matter of this
importance, would be likely to entertain because of the
evidence that was presented or because of the lack of
convincing evidence.

Proof of guilt beyond a reasonable doubt is
proof that leaves you so firmly convinced of the
defendant's guilt that you have no reasonable doubt of
the existence of any element of the crime or of the
defendant's identity as the person who committed the
crime.

In determining whether or not the People have
proven the defendant's guilt beyond a reasonable doubt,
you should be guided solely by a full and fair
evaluation of the evidence.  After carefully evaluating
the evidence, each of you must be convinced beyond a
reasonable doubt of the defendant's guilt.

Whatever your verdict may be, it must not rest
upon baseless speculations, nor may it be influenced in

Charge

1    any way by bias, prejudice, sympathy, or by a desire to

2    bring an end to your deliberations or to avoid an

3    unpleasant duty.

4         If you are not convinced beyond a reasonable

5    doubt that the defendant's guilty of a charged crime,

6    you must find the defendant not guilty of that crime.

7    If you are convinced beyond a reasonable doubt that the

8    defendant is guilty of a charged crime, you must find

9    the defendant guilty of that crime.

10        Now, defendant did not testify in this matter,

11   and the fact that he did not testify is not a factor

12   from which any inference unfavorable is to be drawn as

13   against the defendant by you, the jury.

14        Are you getting water?

15        THE CLERK:  Yes.

16        THE COURT:  Now, you've heard the term

17   "evidence" used over and over during the course of

18   trial.  I will now explain to you what evidence is and

19   give you some rules to help you in considering the

20   evidence in this matter.

21        As you have already seen, criminal cases are

22   started by charges in an indictment.  An indictment is

23   just a piece of paper that accuses someone of a crime,

24   it's not evidence, it doesn't prove anything.

25        Rather, the evidence you must consider is the

Charge

1   testimony of the witnesses and any stipulations that

2   were made during the trial by counsel and, of course,

3   as well as any exhibits which I have allowed into

4   evidence.

5          Can I please have some water?

6          COURT OFFICER:  Sure.

7          THE COURT:  Testimony which I struck from the

8   record, or exhibits which were marked for identification

9   but which I did not allow into evidence, are not

10  evidence.  Questions alone are not evidence.  It is the

11  questions together with the answer that constitutes

12  evidence.

13         Of course, you must each follow the solemn

14  oath or affirmation you took to completely ignore

15  prejudice and sympathy in arriving at your verdict.

16         Go over all of the evidence, including the

17  testimony of each witness, and decide whether you

18  believe all or part or none of the witness's testimony

19  and decide how important it is.

20         Now, the People rely on two kinds of evidence

21  to support their position that the defendant's guilty

22  beyond a reasonable doubt.

23         The two types of evidence are direct evidence

24  and circumstantial evidence.

25         In this case the People contend that there

Charge

1    is both direct and circumstantial evidence of the

2    defendant's guilt.  Let me explain what constitutes

3    direct and circumstantial evidence and how they

4    differ.

5              Direct evidence is evidence of a fact based

6    upon a witness's personal knowledge or observation of

7    that fact.  A person's guilt of a charged crime may be

8    proven if, standing alone, that evidence satisfies a

9    jury beyond a reasonable doubt of the defendant's guilt

10   of that crime.

11             Circumstantial evidence is direct evidence of

12   a fact from which a person may reasonably infer the

13   existence or nonexistence of another fact.

14             A person's guilt of a charged crime may be

15   proven by circumstantial evidence, if that evidence,

16   while not directly establishing guilt, gives rise to an

17   inference of guilt beyond a reasonable doubt.

18             Now let me give you an example of the

19   difference between direct evidence and circumstantial

20   evidence.

21             Suppose that in a trial one of the parties is

22   trying to prove that it was raining on a certain

23   morning.  A witness testifies that on that morning she

24   walked into the subway, and as she walked she saw rain

25   falling, she felt it striking her face, she heard it

1   splashing on the sidewalk.  That is testimony of the

2   witness's perception and that would be direct evidence

3   that it rained on that morning.

4           Suppose, on the other hand, the witness

5   testified that it was clear as she walked into the

6   subway, that she went into the subway, got on the train

7   and that while she was on the train she saw passengers

8   come in at one station after another carrying wet

9   umbrellas and wearing wet clothes and raincoats.  That

10  testimony constitutes direct evidence of what the

11  witness observed, and because an inference that it was

12  raining in the area would flow naturally, reasonably and

13  logically from that direct evidence, the witness's

14  testimony constitutes circumstantial evidence that it

15  was raining in the area.

16          The law draws no distinction between

17  circumstantial evidence and direct evidence in terms of

18  weight or importance.  Either type of evidence may be

19  enough to establish guilt beyond a reasonable doubt,

20  depending on the facts of the case as the jury finds

21  them to be.  Because circumstantial evidence requires

22  the drawing of inferences, I will explain the process

23  involved in analyzing that evidence, what you must do

24  before you may return a verdict of guilty based on

25  circumstantial evidence.

Charge

1    Initially you must decide, on the basis of all
2    the evidence, what facts, if any, have been proven.  Any
3    facts upon which an inference of guilt can be drawn must
4    be proven beyond a reasonable doubt.  After you have
5    determined what facts, if any, have been proved beyond a
6    reasonable doubt, then you must decide what inferences,
7    if any, can be drawn from those facts.

8    Before you may draw an inference of guilt,
9    however, that inference must be the only one that can be
10   fairly and reasonably drawn from the facts.  It must be
11   consistent with the proven facts and it must flow
12   naturally, reasonably and logically from them.

13   Again, it must appear that the inference of
14   guilt is not only one that can fairly and reasonably be
15   drawn from the facts and that the evidence excludes
16   beyond a reasonable doubt every reasonable hypothesis of
17   innocence.  If there is a reasonable hypothesis from the
18   proven facts consistent with the defendant's innocence,
19   then you must find the defendant not guilty.  If the
20   only reasonable inference you find is that the defendant
21   is guilty of the charged crime and that inference is
22   established beyond a reasonable doubt, then you must
23   find the defendant guilty of that crime.

24   Now, there's evidence in this case that the
25   defendant, Atara Wisdom, took the cellphone, wallet and

Charge

1  keys belonging to Anthony Wilson when she left his

2  apartment.  She has not been charged with any crime

3  relating to these items.  That evidence was not offered,

4  and it must not be considered, for the purpose of

5  proving defendant had a propensity or predisposition to

6  commit the crime charged in this case.  It was offered

7  as evidence for your consideration to complete the

8  narrative of what happened on the night of the incident.

9  If you find the evidence believable, you may consider it

10  for that limited purpose and for none other.

11  You will recall that the attorneys stipulated

12  and agreed to certain facts during the course of the

13  trial.  The attorneys' three stipulations means there is

14  no dispute as to the facts that were read into the

15  record and upon which both attorneys agreed.

16  You may consider these stipulated facts along

17  with all the evidence other in the case and give such

18  facts the weight you deem to be appropriate under the

19  circumstances.

20  Since you are the exclusive judges of the

21  facts in this case you have a duty to evaluate the

22  testimony of the various witnesses.  It is your duty to

23  sort out the credible evidence and disregard any

24  testimony which is not credible.  In doing that you

25  should use your common sense, as you do every day of

mc

Charge

1     your life.  In doing that you should ask yourselves

2     certain questions:

3               Could the witness see or hear clearly at the

4     time?

5               How accurate is the witness's memory?

6               What was the witness's mental and physical

7     condition at the time these events occurred?

8               Was the witness's ability to see, hear or

9     remember affected by intoxication or otherwise?

10              You should consider the witness's demeanor at

11    the time he or she testified.

12              What was the conduct of the witness upon the

13    stand or the attitude of the witness while testifying?

14              Did the witness answer the questions

15    forthrightly and directly, or did the witness seek to

16    avoid answering any of the questions asked?

17              Did the witness have any bias or prejudice or

18    other reason to be untruthful?

19              In determining the credibility of any witness

20    and the weight to be given by you to his or her

21    testimony, you may consider the interest of the witness

22    in the outcome of the trial.  Did the witness have a

23    stake in the outcome or result of the trial?

24              A witness is an interested witness when, by

25    reason of relationship, friendship, antagonism, or

1    prejudice, in favor of or against one party or the

2    other, his or her testimony, in your judgment, is in

3    fact biased, or likely biased, toward the side or party

4    he or she favors.  If you find that any witness is an

5    interested witness, you should consider such interest in

6    determining the believability of the testimony and

7    weight to be given to it.

8              There is no legal presumption that an

9    interested witness is untruthful.  There is no legal

10   presumption that a disinterested witness tells the

11   truth.  How believable is the witness's testimony in

12   light of all the evidence?  Does the witness's testimony

13   make sense to you when tested against your common sense,

14   everyday experience?

15             If any witness has deliberately lied about any

16   material fact, you may ignore all of that witness's

17   testimony, or you may ignore the part that was false and

18   accept the part that was true.

19             It is the convincing quality of the evidence

20   that controls, not the amount of testimony or the number

21   of witnesses that testify for either side.

22             When there are any inconsistencies in the

23   testimony of a witness, or between one witness and

24   another, you must reconcile them, if you honestly can,

25   because often persons seeing the same facts at the same

mc

Charge

1   time may not be able to describe them in the same

2   manner.

3          Were the inconsistencies substantial or were

4   they the kind of minor inconsistencies that one might

5   expect under the circumstances?

6          You are not to reject arbitrarily the

7   testimony of any witness.  You should consider the

8   testimony of every witness carefully and determine

9   whether you will accept or reject it in whole or in

10  part.

11         Now, with respect to the credibility of a

12  witness's testimony, there was testimony that Atara

13  Wisdom, after she allegedly committed this crime or

14  allegedly -- I'm sorry.

15         You may consider the testimony regarding Atara

16  Wisdom's outcry after she stabbed the victim.  In this

17  case you may consider whether the defendant, Atara

18  Wisdom, complained of the crime promptly or within a

19  reasonable period of time after its alleged commission,

20  the crime being that she was -- that there was an

21  attempt to either rape her or -- attempt to rape her,

22  all right.

23         If you find that the complaint was made

24  promptly, within a reasonable time, you may consider

25  whether, and to what extent, if any, that fact tends to

mc

Charge

1     support the believability of her statements, defendant's

2     statements.  If you find the complaint was unreasonably

3     delayed, you may consider whether, and to what extent,

4     if any, that fact tends not to support the believability

5     of defendant's statements.

6           In determining whether a complaint was made

7     within a reasonable period of time you may consider

8     such circumstances as the defendant's age, past

9     experiences and mental state, whether or not the

10    defendant feared for her own safety or safety of others,

11    whether or not the defendant had an opportunity to make

12    a complaint, and any other circumstance that operated to

13    prevent or delayed disclosure within a reasonable period

14    of time.

15          Now, there has been testimony in this trial

16    that the witness, Matthew Shepard, had been previously

17    convicted of certain crimes and that he committed bad

18    acts.  Our law provides that, while a person who has

19    been convicted of a crime or committed a bad act is

20    nevertheless a competent witness, such conviction or bad

21    act may be shown for the purpose of affecting the

22    credibility of his testimony.  You may, therefore, take

23    such conviction or convictions into consideration as a

24    factor in determining the believability of such

25    witness's testimony.

Charge

1     Now, you will recall that certain police

2 officers testified in this case.  You should use the

3 same tests in evaluating their testimony as you would in

4 evaluating the testimony of any other witness.  In other

5 words, the mere fact that a witness is a police officer

6 does not require that his or her testimony be given any

7 greater or lesser believability than that of any other

8 witness.

9     You will recall that certain witnesses gave

10 testimony concerning their qualifications as experts in

11 their particular field of expertise.

12     Where scientific, technical or other

13 specialized knowledge will assist a jury to understand

14 the evidence or determine a fact in issue, our law

15 permits a witness qualified as an expert by knowledge,

16 skill, experience, training or education to state his or

17 her opinion on questions in controversy in the trial,

18 for the information of the Court and jury.

19     Please understand that the opinions stated by

20 such expert who testified were based on particular facts

21 as the expert observed them, or as the attorney who

22 questioned that expert asked such expert to assume.

23     To assist you in deciding any question in

24 controversy at trial, you may consider the opinion of

25 any expert, together with the reasons given for such

Charge

1    opinion, if any.  You may also consider the

2    qualifications and credibility of such expert.

3         You may reject an expert's opinion if you find

4    the facts to be different from those which served as a

5    basis for his or her opinion.  You may also reject an

6    expert's opinion if, after careful consideration of all

7    the evidence in the case, expert and otherwise, you

8    disagree with the expert's opinion.  In other words, you

9    and you alone are to form your own opinion or draw your

10   own conclusions as to any question in controversy in

11   this case.

12        As I said, all of you bring your life

13   experience to this case, and so long as you follow my

14   instructions on the law, you may rely upon those life

15   experiences as an aid in your deliberations.  However,

16   when I spoke of life experience, I was referring to the

17   types of common experiences that we all as adults have

18   had in the course of our lifetimes and in our day-to-day

19   dealings with others.

20        Some you may have life experience which,

21   because of your chosen profession, includes particular

22   knowledge of specialized subjects that are not normally

23   within the life experience of most people.  For example,

24   a doctor or nurse may have particular knowledge of

25   certain medical subjects, or an attorney or law

mc

enforcement officer may have life experience in legal or
criminal matters.  I instruct you that this type of life
experience and knowledge, the type of experience that is
not common to most people, but is part and parcel of a
particular profession or occupation, cannot enter into
your deliberations and verdict in this case.  Jurors who
possess facts and/or opinions concerning subjects that
are not within the normal life experience of the average
person may not share those facts and/or opinions with
other jurors, nor should the other jurors consider those
facts and/or opinions in the course of their
deliberations.

Now we come to the second part of my charge
in which I will analyze the charge in the indictment,
I will instruct you with respect to the material legal
principles applicable to the crime which this defendant
is charged, and briefly explain the application of
the law to the facts, all of which will be submitted
for your consideration and upon which you will be
required to deliberate and render your verdict as to
the guilt or non-guilt of the defendant.  I do not
intend to marshal the evidence or refer to it to any
greater extent than is necessary for such explanation,
all right.

With respect to the only count of the

Charge

1    indictment, charging Murder in the Second Degree, that

2    is the only count that you are to consider in this case,

3    one of the elements that the People must prove beyond a

4    reasonable doubt is that the defendant was not

5    justified.  The defendant is not required to prove that

6    she was justified, the People must prove that she was

7    not.

8              I will now explain when, under our law, a

9    person is justified in using deadly physical force to

10   prevent or terminate a forcible rape.

11             Under our law, a person may use deadly

12   physical force upon another individual when she

13   reasonably believes such to be necessary to prevent or

14   terminate the commission or attempted commission of

15   forcible rape.

16             Some of the terms used in this definition have

17   their own special meaning in our law.  I will now give

18   you the meaning of the following terms:  "Forcible

19   rape," "deadly physical force," and "reasonably

20   believes."

21             A person commits forcible rape when that

22   person engages in sexual intercourse with another person

23   by forcible compulsion.

24             "Forcible compulsion" means to compel by

25   either the use of physical force or a threat, expressed

mc

1    or implied, which places a person in fear of immediate

2    death or physical injury to herself.

3              "Physical injury" means impairment of physical

4    condition or substantial pain.

5              "Deadly physical force" means physical force

6    which, under the circumstances in which it is used, is

7    readily capable of causing death or other serious

8    physical injury.

9              "Serious physical injury" means physical

10   injury which creates a substantial risk of death, or

11   which causes death or serious and protracted

12   disfigurement, protracted impairment of health, or

13   protracted loss or impairment of the function of any

14   bodily organ.

15             A defendant reasonably believes that deadly

16   physical force to be necessary to prevent or terminate

17   what she reasonably believes to be the commission or

18   attempted commission of a forcible rape by another

19   individual when the two -- when the following two

20   circumstances exist:

21             First, the defendant actually believes that

22   another individual is committing or attempting to commit

23   a forcible rape, and also actually believes that her use

24   of deadly physical force is necessary to prevent or

25   terminate the commission or attempted commission of that

1    forcible rape.  It does not matter whether those beliefs

2    are mistaken, provided the defendant actually holds

3    them.

4         Second, a reasonable person in the defendant's

5    position, knowing what the defendant knows and being in

6    the same circumstances, would also hold those same

7    beliefs.

8         That's the definition of reasonable person.

9         The People are required to prove beyond a

10   reasonable doubt that the defendant was not justified.

11   It's thus an element of Murder in the Second Degree that

12   the defendant was not justified.  As a result, if you

13   find that the People have failed to prove beyond a

14   reasonable doubt that the defendant was not justified,

15   then you must find the defendant not guilty of Murder in

16   the Second Degree.

17        Under our law, a person is guilty of Murder in

18   the Second Degree when, with the intent to cause the

19   death of another person, she causes the death of such

20   person.

21        "Intent" means conscious objective or purpose.

22   Thus, a person acts with intent to cause the death of

23   another when that person's conscious objective or

24   purpose is to cause the death of another.

25        In other words, "intent" does not require

1      advance planning, nor is it necessary that the intent be

2      in a person's mind for any particular period of time.

3      The intent can be formed, and need only exist, at the

4      very moment the person engages in prohibited conduct or

5      acts to cause the prohibited result, and not at any

6      earlier time.

7              The question naturally arises as to how to

8      determine whether or not a defendant had the intent

9      required for the commission of a crime.

10             To make that determination in this case, you

11     must decide if the required intent can be inferred

12     beyond a reasonable doubt from the proven facts.  In

13     doing so, you may consider the person's conduct and all

14     of the circumstances surrounding that conduct, including

15     but not limited to the following:

16             What, if anything, did the person do or say?

17             What result, if any, followed the person's

18     conduct?

19             And, was that result the natural, necessary

20     and probable consequence of that conduct?

21             Therefore, in this case, from the facts you

22     find to have been proven, decide whether or not you

23     can infer beyond a reasonable doubt that the defendant

24     had the intent required for the commission of this

25     crime.

Charge

1    In order for you to find the defendant guilty

2    of Murder in the Second Degree, the People are required

3    to prove, from all the evidence in the case, beyond a

4    reasonable doubt, the following three elements:

5    One, that on or about and between November

6    29th, 2011, and January 3rd, 2012, in the County of

7    Kings, the defendant, Atara Wisdom, caused the death of

8    Anthony Wilson by stabbing him with a knife.

9    And, two, that the defendant did so with the

10   intent to cause the death of Anthony Wilson.

11   And, three, Defendant was not justified.

12   Now, let me explain motive.

13   You have heard the term "intent" and I have

14   explained what "intent" is.  Now let me explain "motive"

15   because you heard the term "motive" used during the

16   course of this trial, in particular the difference

17   between motive and intent.

18   "Intent" means, as I have indicated, conscious

19   objective or purpose.  Thus, a person commits a criminal

20   act with intent when that person's conscious objective

21   or purpose is to engage in an act which the law forbids

22   or to bring about an unlawful result.

23   "Motive," on the other hand, is the reason why

24   a person choses to engage in criminal conduct.

25   If "intent" is an element of a charged crime,

mc

1    that element must be proved by the People beyond a

2    reasonable doubt.  In this case intent is, as I have

3    explained, an element of the crimes -- of the crime of

4    Murder in the Second Degree.

5            Motive, however, is not an element of the

6    crime charged, therefore the People are not required

7    to prove a motive for the commission of the charged

8    crime.  Nevertheless, evidence of a motive or evidence

9    of the lack of a motive may be considered by the

10   jury.

11           For example, if you find from the evidence

12   that defendant had a motive to commit the crime charged,

13   that is a circumstance you may wish to consider as

14   tending to support a finding of guilt.

15           On the other hand, if the proof establishes

16   that the defendant had no motive to commit the crime

17   charged, that is a circumstance that you may wish to

18   consider as tending to establish that the defendant is

19   not guilty of the crime charged.

20           All right.

21           Can I have some water, please?

22           Now, before I conclude, I must remind you that

23   in a few minutes you will go into the jury room to begin

24   your deliberations on this case.  All of you have a duty

25   and obligation to participate in the deliberations,

1    voice your opinions and listen to the opinions of the

2    other jurors.  Under no circumstances may a juror refuse

3    to listen to the opinions of the other jurors and

4    decline to discuss the evidence with fellow jurors.  The

5    word "deliberations" means to carefully and thoughtfully

6    consider and discuss the evidence in this case.  By

7    implication, the term "deliberations" has an even

8    greater meaning, one that calls for discussion and

9    consideration of the evidence in a civil and respectful

10   manner.  I am aware that at times deliberations can

11   become quite intense and emotion rather than careful

12   reasoning, will rear its head up and seek to take

13   control of the deliberations.  At those times you must

14   listen to our inner voice and avoid at all costs any

15   personal attacks upon your fellow jurors.  Personal

16   attacks and name calling have no place in your

17   deliberations.

18          During the course of your deliberations you

19   should be governed by reason and rational thought.

20   You should make every effort to harmonize the various

21   views expressed by the different jurors and make every

22   effort to come to an agreement which will speak the

23   truth as far as the facts of this case are concerned.

24   However, you have a right, if you believe you are

25   right, to stick to your arguments and your

Charge

1    conclusions.

2              To the best of your ability I ask you to apply

3    common sense and good judgment, be impartial and fair in

4    your judgment.  Do not let sympathy or prejudice sway

5    your minds in any way in analyzing the testimony, decide

6    the case on the evidence and under the law as I have

7    given it to you.

8              Your verdict in this case must be unanimous,

9    that is, all twelve of you must unanimously agree.  Your

10   verdict will be announced through your foreperson.

11             Your verdict shall be as follows -- there is

12   only one count, as I indicated, that count is a count of

13   Murder in the First Degree (sic).

14             THE CLERK:  Second degree.

15             THE COURT:  Second degree, I should say.

16             Not guilty or guilty.

17             Whatever your verdict in count one, just

18   report to the Court.

19             So, you are going to make that determination

20   after you go into the jury room.

21             If at time the jury is unable to come to a

22   decision, you're at an impasse, do not tell this Court

23   how you stand, eight to four for not guilty, or eight to

24   four for guilty.  I don't want to know numbers, if that

25   should happen, okay.

1          You also have a right to have all the physical

2     evidence before you, okay.

3          You also have a right to have any portion of

4     any of the witnesses that you heard, a portion of their

5     testimony read back to you.  And what you would do if

6     you do want any part of the witnesses' testimony read

7     back, reduce the request to writing, give it to your

8     foreperson and the foreperson will submit it to the

9     Court.

10          If there is a delay in getting, or if there is

11     a delay in retrieving that testimony, please be patient

12     because the Court Reporter will have to go through her

13     notes to find it, okay.

14          If any of you are smokers and you want a

15     smoking break, you can take it.  They should be limited

16     so as not to unduly hamper these proceedings.  If there

17     is a smoking break taken, then you should cease

18     deliberations and wait until the smoker or smokers

19     return to the jury room deliberation -- I mean to the

20     jury room.  Once they return, then you may restart your

21     deliberations.

22          Also, some of you have taken notes during the

23     trial.  Jurors may consult their notes during

24     deliberations.

25          Your notes are for your personal use, for the

mc

1    purpose of refreshing your recollection. I remind

2    everyone that the notes are merely memory aids, and they

3    are not superior to any juror's independent recollection

4    of what took place during the proceedings. Most

5    importantly, they are not a substitute for the official

6    record of the proceedings which is assembled by the

7    Court Reporter.

8         If what you remember about what occurred

9    during the proceedings is different than what you have

10   written in your notes, you should request a readback

11   of the transcript. If there is a difference between

12   your notes and the official transcript of the

13   proceedings, you must rely on the official transcript

14   and not the notes. This rule applies not only to the

15   evidence, but also to any differences that might exist

16   between your notes and the official record of my

17   instructions on the principles of law that govern the

18   case.

19        Those of you who did not take notes should

20   rely on your own recollection of the evidence and my

21   instructions on the law, and must not be swayed by the

22   fact that another juror may have notes indicating that

23   the evidence or Court's charge on the law was different

24   than you recall it.

25        If there is a disagreement about the evidence

Charge

1       or the Court's instruction, you should request a

2       readback of the transcript to resolve the dispute, and

3       you must rely on the official transcript.

4                   All right.

5                   Now, are there any exceptions, any requests at

6       this time?

7                   MR. WALENSKY:  No, your Honor.

8                   MS. CHU:  No, your Honor.

9                   THE COURT:  Come on up a minute.

10                  (Whereupon, a sidebar conference was held off

11      the record.)

12                  THE COURT:  All right, at this time I am

13      going to ask the jurors, the twelve jurors, to go

14      into the jury room and begin their deliberations, all

15      right.

16                  The four alternates are going to remain here.

17                  Take the jurors in, please.

18                  All right.

19                  (Whereupon, the deliberating jurors exited the

20      courtroom.)

21                  THE COURT:  Madam alternates, gentlemen

22      alternates, at this time I want to take the opportunity

23      to thank you for serving as alternates because you're

24      put in an unenviable position.  In other words, you do

25      not get the opportunity that the other twelve jurors

Charge

1    get to deliberate and still you did the same job and

2    you still followed the Court's instructions and you

3    did your duty as jurors, and you're commended for

4    that.

5              Additionally, your experience in this matter

6    is yours and yours alone.  You need not share it with

7    anyone.  If the attorneys or anyone else comes to ask

8    you about a matter, that rests within your discretion

9    as to whether or not you want to speak to them, all

10   right.

11             And on a final note, I want to personally

12   thank all of you for serving in the capacity that you

13   did serve.

14             And additionally, I want to wish you all good

15   health and good fortune for the remaining months of this

16   years and your years.

17             Thank you very much.  You are excused.

18             (Whereupon, the alternate jurors exited the

19   courtroom.)

20             THE COURT:  Do I have a stipulation by and

21   between the attorneys, should the jurors request any

22   of the physical evidence in this case, that it be

23   submitted in the absence of the attorneys and the

24   defendant?

25             MS. CHU:  Yes.

Proceeding

516

1           MR. WALENSKY:  Yes.

2           THE COURT:  All right.  If they wish to have

3      the video played --

4           MS. CHU:  Or the 911, we will do so in court.

5           THE COURT:  It will be played in court.

6           All right, I'll let them deliberate till 5:30.

7      Okay.

8           MR. WALENSKY:  Thank you, your Honor.

9           (Whereupon, the jury deliberations continued.)

10           THE CLERK:  Case back on trial continues.

11      All parties present, defendant is present with her

12      attorney.

13           THE COURT:  All right, get the jury out.

14           (Whereupon, there was a brief pause in the

15      proceedings.)

16           THE COURT:  Bring the jury in, please.

17           COURT OFFICER:  Jury entering.

18           (Whereupon, the Jury entered the courtroom.)

19           THE CLERK:  All jurors are present and

20      properly seated.

21           Do both parties waive the roll call?

22           MS. CHU:  So waived.

23           MR. WALENSKY:  Yes.

24           THE CLERK:  Thank you.

25           THE COURT:  All right.  I have a note from the

1    jury:  We are approaching 5:00 P.M.  The jury would like

2    to know if there is a definite end time -- I was not

3    going to keep them beyond 5:30 -- or if deliberations

4    would last till we reach a decision.

5         As indicated just now, I wasn't going to

6    keep you beyond 5:30 because it has been a long, long

7    day.

8         We request to resume deliberations until

9    tomorrow morning because we are not -- we were not made

10   aware we might be needed past 5:30 P.M.

11        All right.  You know what, at this time I'm

12   going to permit you to separate and return home but you

13   must be here tomorrow at 9:30 in the jury room.  I don't

14   want anybody to come late.  If you come late, I am only

15   going to keep you later.

16        I mean, this morning I know a number of people

17   came late and I know we have been delayed a couple of

18   times, but I've had other matters.

19        So, you have to be here at 9:30, all right.

20   So once all of you are here, then you will resume your

21   deliberations.  So be here at 9:30, all right.  Leave

22   home, whatever, make sure you have enough time to get

23   here on time, all right.

24        Remember, you are not to discuss this case

25   with anyone outside of the jury deliberations.  You are

Proceeding

1    not to resort to utilizing any digital devices for the

2    purpose of obtaining any information regarding this

3    matter or contacting anyone about this matter, and you

4    are to avoid reading any newspaper or listening to any

5    media reports of this matter, if they should be

6    reported.

7          You are not to conduct any individual

8    investigation into the facts in this case nor are you to

9    make any attempt to visit the location.  If anyone

10   should attempt to interfere with you in any way, report

11   that matter to myself or one of the Court Officers

12   immediately.

13         Also, remember that you are not to discuss

14   this case with your fellow jurors outside of the jury

15   deliberation room, so cease all discussions until you

16   return to the deliberation room tomorrow at 9:30 A.M.

17         Furthermore, you shall not resume your

18   deliberations tomorrow until you have been specifically

19   instructed to do so by the Court Officer.  So once

20   you're all there, he will instruct you to continue with

21   your deliberations.

22         So have a very good night and see you tomorrow

23   morning at 9:30, all right.  Leave your books.

24         Thank you.

25         (Whereupon, the Jury exited the courtroom.)

Proceeding

1        THE COURT:  Let the record reflect that

2   although I did not read this note prior to the jury

3   entering the courtroom, that the attorneys were aware of

4   the content of the note.

5        Is that correct?

6        MR. WALENSKY:  Yes, your Honor.

7        MS. CHU:  Yes.

8        THE COURT:  So, that's noted for the record.

9        And leave contact numbers with the Clerk and

10  if they request -- if there is any request, we'll

11  contact you.  All right.

12       Have a good evening.

13       Thank you.

14       MS. CHU:  Have a good evening.

15       (Whereupon, the trial was adjourned to July

16  10, 2014.)

    **********************************

17  CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
    THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS
18  PROCEEDING.

19

20

21

22  MARLIN CASSIDY
    Senior Court Reporter

23

24

25

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS:  CRIMINAL TERM:  PART 2
2   ------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
3                                      Indictment No.:
                   -against-          6615/2012
4                                      (Trial)
    ATARA WISDOM,
5
                       Defendant.
6   ------------------------------------------X

7
                           Supreme Courthouse
8                          320 Jay Street
                           Brooklyn, New York 11201
9                          July 10, 2014

10
    B E F O R E:
11
                    THE HONORABLE ALBERT TOMEI, JUSTICE
12                  (And a Jury)

13  A P P E A R A N C E S:

14          HON. KENNETH P. THOMPSON, ESQ.
                District Attorney - Kings County
15              350 Jay Street
                Brooklyn, New York  11201
16          BY: PHYLLIS CHU, ESQ.
                Assistant District Attorney
17

18          DAVID WALENSKY, ESQ.
                Attorney for Defendant
19              910 Stuart Avenue
                Mamaroneck, New York
20          BY: DAVID WALENSKY, ESQ.
                    - and -
21              JOSHUA POVILL, ESQ.

22

23

24
                        MARLIN CASSIDY
25                      Senior Court Reporter

Proceeding

1          (Whereupon, the following took place in open

2     court:)

3          THE CLERK:  This is calendar number one, case

4     on trial, Indictment 6615 of 2012, People versus Atara

5     Wisdom.  Defendant's incarcerated, produced before the

6     Court, present with her attorney.

7          Appearances are the same.

8          THE COURT:  All right.  I have a number of

9     notes from the jury.  This one is -- it's 10:00 A.M.,

10     10:07 A.M.  We would like to see evidence 52 and 53.

11     We'd also like to see 50 and 51.

12          THE CLERK:  That was given.

13          THE COURT:  That was given, good.

14          There's another one, another note at 10:35.

15     We need the phone board with Anthony Wilson's phone

16     records.

17          THE CLERK:  That was given.

18          THE COURT:  Records for (347) 793-1940.  We

19     need to see pictures, Exhibits 2 through 42.  Atara

20     Wisdom's interview eleven o'clock.  Can we have written

21     statement from Detective Scandole signed by Atara

22     Wisdom.  Also, can we view the video interview.

23          Is the written statement in evidence?

24          MS. CHU:  Yes.

25          THE COURT:  Was that given to them?

Proceeding

522

1           THE CLERK:  When you were coming down they

2      wrote that, so I'm not sure.

3           THE COURT:  All right.  So we'll give it to

4      them.  If it's in evidence, you can give it to them.

5           Also, can we view the video.

6           COURT OFFICER:  You want the jury now?

7           THE COURT:  Yes.

8           MS. CHU:  I'm all set up with the video.

9           THE COURT:  Bring the jury out.

10          (Whereupon, there was a brief pause in the

11     proceedings.)

12          THE COURT:  Bring the jury in.

13          COURT OFFICER:  Jury entering.

14          (Whereupon, the Jury entered the courtroom.)

15          THE CLERK:  All members of the jury are

16     present and seated.

17          Both sides waive the roll call?

18          MS. CHU:  So waived.

19          MR. WALENSKY:  Yes.

20          THE COURT:  I have a number of notes from the

21     jury.  First note:  We would like to see evidence 52 and

22     53.  We'd also like to see 50 and 51.

23          I believe they have been submitted.

24          Also another note, we need the phone board

25     with Anthony Wilson's phone records for (347) 793-1940.

Proceeding

1    We need to see picture Exhibits 2 through 42.  We need

2    to see Atara Wilson's (sic) interview.

3              And the last note is:  Can we have the written

4    statement from Detective Scandole signed by Atara Wilson

5    (sic).

6              That will be submitted to you.

7              And also, can we view the video interview.

8              We'll play the video for you.

9              (Whereupon, the video was played in open

10   court.)

11             THE COURT:  Okay.

12             Lights, please.

13             All right, ladies and gentlemen, you may

14   resume your deliberations.

15             And the written statement will be submitted to

16   you.

17             (Whereupon, the Jury exited the courtroom.)

18             THE COURT:  All right.  Okay.

19             (Whereupon, the jury continued deliberating.)

20             (Whereupon, a lunch recess was held.)

21             *              *              *

22             A F T E R N O O N      S E S S I O N

23             *              *              *

24             THE CLERK:  Case back on trial continues.  All

25   parties present, defendant is present with her

Proceeding

524

1    attorneys.

2              THE COURT:  The jury has a verdict.  We will

3    line up the jury.

4              (Whereupon, there was a brief pause in the

5    proceedings.)

6              THE COURT:  Bring the jury in.

7              COURT OFFICER:  Jury entering.

8              (Whereupon, the Jury entered the courtroom.)

9              THE CLERK:  Okay.  All the jurors are present

10   and seated.

11             Both sides waive the roll call?

12             MS. CHU:  So waived.

13             MR. WALENSKY:  Yes.

14             THE CLERK:  Thank you.

15             THE COURT:  Take the verdict.

16             THE CLERK:  Will the Foreperson please rise.

17             In the matter of the People of the State of

18   New York against Atara Wisdom, has the jury agreed upon

19   a unanimous verdict?

20             JURY FOREPERSON:  Guilty.

21             THE CLERK:  Well, has the jury agreed upon a

22   unanimous verdict?

23             JURY FOREPERSON:  Yes.

24             THE CLERK:  Count one charging Murder in the

25   Second Degree, what is your verdict?

Proceeding

525

1          JURY FOREPERSON:  Guilty.

2          THE CLERK:  Please be seated.

3          Members of the jury, please hear your verdict

4    as it stands recorded.  You said you find the defendant,

5    Atara Wisdom, guilty of count one charging Murder in the

6    Second Degree.  Is that what your verdict is and so say

7    you all?

8          (Whereupon, the jurors responded.)

9          THE CLERK:  Members of the jury, please answer

10   the following question:  Is the verdict announced by

11   your Foreperson your verdict in all respects?

12         Juror number one, is that your verdict?

13         JUROR NO. 1:  Yes.

14         THE CLERK:  Juror number two, is that your

15   verdict?

16         JUROR NO. 2:  Yes.

17         THE CLERK:  Juror number three, is that your

18   verdict?

19         JUROR NO. 3:  Yes.

20         THE CLERK:  Juror number four, is that your

21   verdict?

22         JUROR NO. 4:  Yes.

23         THE CLERK:  Juror number five, is that your

24   verdict?

25         JUROR NO. 5:  Yes.

Proceeding

1      THE CLERK:  Juror number six, is that your
2  verdict?
3      JUROR NO. 6:  Yes.
4      THE CLERK:  Juror number seven, is that your
5  verdict?
6      JUROR NO. 7:  Yes.
7      THE CLERK:  Juror number eight, is that your
8  verdict?
9      JUROR NO. 8:  Yes.
10      THE CLERK:  Juror number nine, is that your
11  verdict?
12      JUROR NO. 9:  Yes.
13      THE CLERK:  Juror number ten, is that your
14  verdict?
15      JUROR NO. 10:  Yes.
16      THE CLERK:  Juror number eleven, is that your
17  verdict?
18      JUROR NO. 11:  Yes.
19      THE CLERK:  Juror number twelve, is that your
20  verdict?
21      JUROR NO. 12:  Yes.
22      THE CLERK:  All jurors being polled answer the
23  verdict as their own.
24      THE COURT:  You reserve motions at this time,
25  counsel?

527

Proceeding

1          MR. WALENSKY:  Yes, your Honor.

2          THE COURT:  What's the sentencing date?

3          THE CLERK:  You usually dismiss the jury.

4          THE COURT:  Ladies and gentlemen of the jury,

5     I'm sorry, I want to take this time to thank each and

6     every one of you for serving on this matter, serving in

7     the way you did.  I noticed all of you were very

8     attentive and you all complied with your obligation as a

9     juror.  This was nct the easiest matter to be on or to

10    decide, so you have the thanks of the Court and everyone

11    involved in the criminal justice system.

12          Your experience in this matter is yours and

13    yours alone.  If the attorneys come and ask to speak

14    with you, or anyone else, it rests within your

15    discretion whether you speak to them or not.

16          Additionally, on a more personal note, I'd

17    like to wish all of you good health and good fortune the

18    remaining months of the year and the rest of your years.

19          Thank you very much.  You are excused.

20          JUROR:  Thank you.

21          (Whereupon, the Jury exited the courtroom.)

22          THE COURT:  All right, you reserve your

23    motions, defense?

24          MR. WALENSKY:  Yes, your Honor.  I believe I

25    am going to present a 330 motion.

Proceeding

528

1          THE COURT:  Give me a date.  When are you

2     going to do that?

3          MR. WALENSKY:  I'd like a month to get it

4     because I am going away for a couple of weeks.

5          THE COURT:  Why don't we put this over to

6     September, then.

7          MR. WALENSKY:  That is fine.

8          THE COURT:  All right.

9          MR. WALENSKY:  Yes, thank you very much.

10          THE CLERK:  Monday, 9/9, Tuesday --

11          MR. WALENSKY:  Let me just check.

12          THE CLERK:  That is good, Ms. Chu?

13          MS. CHU:  That is fine.

14          THE CLERK:  September 9th for sentence.

15          THE COURT:  Okay.

16          Remand continued.

17          THE CLERK:  Part 2 is adjourned.

18          COURT OFFICER:  Step out, please.

19          (Whereupon, the trial was concluded.)
            ********************************
20     CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
       THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS
21     PROCEEDING.

22

23

24                    _Marlin Cassidy_

25                    MARLIN CASSIDY
                      Senior Court Reporter

                                              mc

1  SUPREME COURT OF THE STATE OF NEW YORK

2  COUNTY OF KINGS:  CRIMINAL TERM:  PART 2

3  - - - - - - - - - - - - - - - - - - - - - -X

4  THE PEOPLE OF THE STATE OF NEW YORK,     X Indictment No:
                                              6615/2012
5              - against -                   X

6  ATARA WISDOM,                            X

7                    Defendant.             X

8  - - - - - - - - - - - - - - - - - - - - - -X

9                           September 9, 2014
                           320 Jay Street
10                          Brooklyn, New York 11201

11 B E F O R E:   THE HONORABLE ALBERT TOMEI,
                           Supreme Court Justice
12
   A P P E A R A N C E S:
13
        FOR THE PEOPLE:
14          KENNETH P. THOMPSON, ESQ.
            District Attorney - Kings County
15          350 Jay Street
            Brooklyn, New York 11201
16      BY: PHYLLIS CHU, ESQ.

17
        FOR THE DEFENDANT:
18          DAVID WALENSKY, ESQ.
            910 Stuart Avenue
19          Marmaroneck, New York

20

21

22

23                           SCOTT ISAACS,
                           Official Court Reporter
24

25

                                              si

Proceedings

1      THE CLERK:  This is calendar number two off the

2  sentence calendar, indictment 6615 of 2012, People versus

3  Atara Wisdom.  The defendant is incarcerated, not produced

4  before the Court.

5      MR. WALENSKY:  David Walensky, 910 Stuart Avenue,

6  Mamaroneck, for Ms. Wisdom.

7      MS. CHU:  From the Office of the District

8  Attorney, Phyllis Chu.  Good morning.

9      MR. WALENSKY:  Your Honor, there are two things.

10      I was requesting a 390 examination of Ms. Wisdom.

11  She's refused two probation interviews.  She has a

12  significant psychiatric history.  I had in fact wanted to

13  do a psychiatric offense, and she was adamant against it.

14  I believe I erred frankly.

15      Additionally, I was ill for quite a bit of this

16  summer.  I wasn't able to write up this 330.  I'm

17  requesting I be given until October 6th to write up a 330

18  and have it submitted by that date.

19      THE COURT:  When are you going to get it in?

20      MR. WALENSKY:  I'm going to get it in by

21  October 6th -- prior to October 6th.

22      THE COURT:  Why so late?

23      MR. WALENSKY:  I need at least two weeks.  I just

24  wasn't able to write.

25      THE COURT:  I'm a little confused.  What are you

si

Proceedings

1    going to do exactly?

2              MR. WALENSKY:  I'm going to complete the 330

3    motion, that will take me to October 6th.  I mean I will

4    submit it on October 6th.

5              THE COURT:  For me to consider?

6              MR. WALENSKY:  Yes.  And I'm requesting a 390 to

7    see if she is capable of being sentenced.  This was --

8              THE COURT:  That's in aid of sentence?

9              MR. WALENSKY:  In aid of sentence, yes, Your

10   Honor.

11             THE COURT:  It's post conviction; right?

12             MR. WALENSKY:  390 is post conviction, yes, an

13   aid of sentence.  It's similar --

14             MS. CHU:  It's similar to a 730.

15             MR. WALENSKY:  But it's post conviction.

16             If I felt that during trial, I would have asked

17   for a 730.  Now it's a 390.

18             THE COURT:  Do you have any objection, Ms. Chu?

19             MS. CHU:  No, I leave it to the Court's

20   discretion.

21             THE COURT:  October 6th.

22             MR. WALENSKY:  Thank you, very much.

23             THE CLERK:  Is that the adjourned date,

24   October 6th?

25             MR. WALENSKY:  No, the adjourned date I guess

                                                      si

Proceedings

1    would be November 6th or November 7th.

2                MS. CHU:  Your Honor, we are talking about you

3    are giving him four weeks to write his motion?

4                MR. WALENSKY:  No, it's --

5                MS. CHU:  If you are ordering a 390, that takes

6    about 30 days.  Get your papers within two weeks.

7                MR. WALENSKY:  I will try to get it in by Monday

8    the 30th, but I'm taking into account the high holy days

9    and I won't be working for several days.

10               We have a return date of 11/6, Your Honor?

11               THE COURT:  That's a lot of time.

12               MR. WALENSKY:  I will get it in by the

13   30th then?

14               MS. CHU:  If you can get a date in October, that

15   would be preferrable.  Before the week of the 20th would

16   work for me.

17               THE COURT:  Give me a date.

18               MS. CHU:  The 15th, 16th, 17th, any of

19   those days is fine with me.

20               THE COURT:  What's the 15th or 16th?

21               MS. CHU:  A Wednesday.

22               THE COURT:  October what?

23               MS. CHU:  15th.

24               THE COURT:  All right.  October 15th.

25               THE CLERK:  Is the adjourned date?

                                              si

Proceedings

1           THE COURT:  Yes.

2           THE CLERK:  10/15.

3           MS. CHU:  Would be on for decision and 390?

4           MR. WALENSKY:  Yes, 390 psychiatric.  They will

5    bring her in.  What they do is they bring her in and she's

6    interviewed generally here.

7           THE COURT:  All right.  October 15th.

8                        * * * * *

9           CERTIFIED TO BE A TRUE AND ACCURATE
            TRANSCRIPT.

10

11

12                              SCOTT ISAACS,
                                Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS : CRIMINAL TERM : PART 2

- - - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK    :    INDICTMENT NO.
                                            6615/2012
          - against -                  :

ATARA WISDOM                           :

                    DEFENDANT          :    CALENDAR CALL

- - - - - - - - - - - - - - - - - - - -X

                         320 JAY STREET
                         BROOKLYN, NEW YORK 11201

                         OCTOBER 7, 2014


BEFORE:    HONORABLE ALBERT TOMEI,
                              JUSTICE


APPEARANCES:

          KENNETH P. THOMPSON, ESQ.
               District Attorney, Kings County
               BY:  PHYLLIS CHU, ESQ.
                    Assistant District Attorney


          DAVID WALENSKY, ESQ.
               Attorney for Defendant




                         LAUREN K. GANZMAN
                         SENIOR COURT REPORTER

PROCEEDINGS                    2

1        THE CLERK:  This is calendar number one off the

2    sentence calendar, Indictment 6615 of 2012, People versus

3    Atara Wisdom.  Defendant is incarcerated, not produced

4    before the Court.

5             Appearances, for the record.

6             MR. WALENSKY:  David Walensky, for Ms. Wisdom.

7             MS. CHU:  For the Office of the District

8    Attorney, Phyllis Chu.

9             Good morning.

10             THE COURT:  Let the record reflect that the

11    defendant has refused to come out for sentencing and the

12    Court has ordered -- the Court has signed a force order to

13    have her produced in court.  Consequently, preparations

14    have to be made to effectuate the order and we're going to

15    adjourn this to tomorrow at 12:30.

16             Thank you very much.

17             MS. CHU:  Thank you.

18             THE CLERK:  Part 2 is adjourned.

19             THE COURT:  And if it's not 12:30, it will be

20    two o'clock tomorrow.  Thank you very much.

21             *      *      *      *      *

22    CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE MINUTES

23             TAKEN IN THE ABOVE-TITLED PROCEEDING.

24                              LAUREN K. GANZMAN

25                              SENIOR COURT REPORTER

- LKG -

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS, PART: 2
 2   --------------------------------------------------------
     THE PEOPLE OF THE STATE OF NEW YORK
 3

 4            -against-

 5

 6   ATARA WISDOM

 7                        (DEFENDANT)

 8   --------------------------------------------------------

 9   DATED: October 8, 2014

10
     IND # 06615/2012
11

12   BEFORE THE HONORABLE ALBERT TOMEI, JSC

13
     APPEARANCES:
14

15        FOR THE PLAINTIFF:

16        BY:  MR. PHYLIS CHU, ESQ.

17        (Assistant District Attorney)

18

19        FOR THE DEFENDANT:

20        BY: MR. DAVID WALENSKY, ESQ.

21

22

23
                    MICHAEL RIZZO
24
                 SENIOR COURT REPORTER
25
```

AP

PROCEEDINGS

1          THE CLERK:   Part Two now in session. Honorable

2     Albert Tomei presiding.   Calendar Number One off the

3     sentencing calendar, 6615 of 2012, people versus Atara

4     Wisdom.   This matter is on for sentence.   The defendant is

5     incarcerated and produced before the court.

6          Appearances for the record.

7          MR. WALENSKY:   David Walensky for Wisdom Atara.

8          MS. CHU:   For the Office of the District

9     Attorney Phyllis Chu.   Good afternoon.

10          THE COURT:   Good afternoon.   Ms. Wisdom, do you

11     feel a little better?

12          THE DEFENDANT:   Yes.

13          THE COURT:   Okay.   For the record, yesterday we

14     had adjourned the matter to today.   And during the course of

15     yesterday's events I had entertained the motion of Counsel,

16     the post conviction motion the 330.30 and denied the motion

17     by Counsel to vacate the conviction.   And the decision and

18     order was submitted to Counsel.

19          MR. WALENSKY:   Yes, it was, Your Honor.   Note

20     my exception.

21          THE COURT:   Mr. Wisdom, I know that you filed a

22     motion claiming that there was ineffectiveness of Counsel.

23     However, you cannot file a motion for ineffectiveness of

24     Counsel pursuant to 330.30.   That motion has to be filed with

25     the Appellate Division or you can file a 440.10 motion which

PROCEEDINGS

1   if you are assigned counsel post conviction and an attorney

2   will make that judgement for you, okay.

3           THE DEFENDANT:  Okay.

4           THE COURT:  All right.  Now is there any legal

5   reason why the Defendant should not be sentenced at this

6   time?

7           MS. CHU:  No.

8           MR. WALENSKY:  No.

9           THE COURT:  Okay.

10          THE DEFENDANT: Could I address the Court for a

11  second, please?

12          THE COURT:  Yes. What is it?

13          THE DEFENDANT:  I had put in a motion for my

14  transcripts and it is not being spoken on.  I don't

15  understand why.  I would like my transcripts from my trial.

16          MR. WALENSKY:  Transcripts are submitted back

17  to The Court.  These are 18 B.  I have to submit them at

18  which time -- So the Appellate Attorney can get them.  The

19  Appellate Attorney or The Court will supply them to Ms.

20  Wisdom.  But prior to that they would have to be purchased

21  because the reporters have to be paid for those Francis

22  script is.  So, essentially again with the appeal, she can

23  ask herb appellate attorney for those transcript is.  And

24  they will be supplied to her.  I have to turn them?.

25          THE COURT:  Who does she ask?

4

PROCEEDINGS

1    MR. WALENSKY:  She sent in a request as a poor

2    person for the trial transcript.  But it is premature because

3    they have to be submitted to the Court first.  And that once

4    they are with the Court, she --  they could entertain that

5    request and they initially go to her appellate attorney.

6    THE DEFENDANT:  Okay.  Okay.

7    THE COURT:  You are filing a notice of appeal;

8    is that correct?

9    MR. WALENSKY:  I will file a notice of appeal

10   for her.  She could --  she will actually need to file one

11   because even though I ask an attorney be provided in my

12   notice of appeal, the Appellate Division is stating that the

13   defendants themselves have to also request an attorney.  I

14   will preserve her right regarding that.  But she should file

15   a notice to 30 Monroe Place.

16   THE COURT:  Okay.

17   THE DEFENDANT:  Could I address the Court

18   again, please?

19   THE COURT:  What else?

20   THE DEFENDANT:  I asked Mr. Walensky on

21   multiple occasions for my paperwork.  That has not happened.

22   I don't understand why.  Because we were at the end of my

23   trial.  We are at sentencing and I don't have my paperwork

24   which is a violation of my 14th Amendment.  But if it is, you

25   know, I mean, I guess that is --

5

PROCEEDINGS

1          MR. WALENSKY:  Her entire original file was
2   turned over.  There are transcripts of the recordings that
3   were made during trial because she can't have the DVDs.  But
4   the transcripts are there.  I retained the DVDs of the 911
5   call and of her statement. Some of the paperwork, some of the
6   paperwork, some of the papers requested, were just given to
7   me at trial.  That is the record of the card which is part of
8   my 330 motion.

9          The statements who Mathew Shephard (phonetic
10  spelling) was because Ms. Clue (phonetic spelling) had stated
11  she would tell me who the witness was, but I couldn't --
12  though Ms. Wisdom knew him, I couldn't turn it over to Ms.
13  Wisdom yet.  It was protected information up to the time of
14  trial.

15          As an officer of the Court, I had to keep the
16  confidence.  I had the statement but no identity of Mathew
17  Shephard.  The entire file is with her parents.  I gave them
18  instructions for mailing them to Ms. Wisdom.  I also told
19  them to make copies so if something happened to them.

20          One of the problems at Rikers, when there are
21  security checks officers take and throw out all of the
22  papers.  This happens time and time again.

23          THE COURT:  So, the paperwork work was turned
24  over to them?

25          MR. WALENSKY:  The entire original file.

AP

PROCEEDINGS

1          THE COURT:  Do you wish to be heard, Ms. Chu?

2          MS. CHU:  Yes.  I know this trial took place a

3    couple of months ago.  It was in July of this year that we

4    received the verdict.  However, having presided over the

5    trial I know you are fully familiar with the facts and

6    circumstances of the case that on November 29, 2011, the

7    Defendant stabbed Anthony Wilson seven times inside of his

8    home at 832 Bushwick Avenue.  She took his phone, his keys

9    and his wallet.  She locked up the apartment.  And she left.

10          She contacted a person by the name of Mathew

11    Shephard, help Shard.  She gave third party admissions to Mr.

12    Shephard that she wouldn't pay rent to Mr. Wilson and fuck

13    him so she poked him.

14          It was not until five weeks after that that Mr.

15    Bilson's body was discovered partially decomposed by his

16    landlord when he failed to pick up his mail from his

17    mailbox.  This Defendant since, she was apprehended, has

18    failed to be truthful with regard to both the method of how

19    she stabbed the Defendant and the motive for why she stabbed

20    him.

21          She said --  she made statements to the police

22    as well as to the D.A.'s Office about how the Defendant was

23    --  the victim was trying to rape her and, therefore, she

24    had to defend herself.

25          However, the evidence that was adduced during

PROCEEDINGS

1   the course of this trial did not support her version of

2   events.  In fact, it contradicted her version of events.  The

3   evidence at the scene, as well as the injuries that were

4   suffered by the victim, as well as the 911 call on November

5   29, 2011, claiming there was a girl in his house acting crazy

6   and he wanted her out.

7           The 911 tape evidences that this Defendant has

8   extremely violent anger issues and is a danger to society.

9   And for those reasons, The People are asking that the Court

10  sentence her to the maximum allowable under the law.  That is

11  25 years to life.

12          THE COURT:  Do you have somebody that plans to

13  speak?

14          MS. CHU:  Yes, Mr. Wilson's daughter Shaquana

15  Stewart-Wilson would like to make a statement to The Court.

16          MR. WALENSKY:  May I be seated?

17          THE COURT:  Yes you can sit.

18          THE CLERK:  State your name.

19          MS. STEWART-WILSON:  Shaquanna Stewart-Wilson.

20  I am the second oldest of Anthony Wilson.  So, I have a

21  little speech to say.

22          THE COURT:  Go ahead.

23          MS. STEWART-WILSON:  We are happy that we are

24  able to find out who was responsible for the terrible

25  ability, but at the same time my fear is gone.  And he will

AP

PROCEEDINGS

1  never come back. It was also -- he was also kindhearted,

2  caring and also willing to lend a helping hand. Anybody who

3  knew him know he loved to dance. He was too much of a good

4  person to be taken away from us. He didn't deserve to die

5  like that.

6          It is good that we -- I have my family here to

7  help a lending hand and strength and support. On behalf of

8  my grandmother, who chose not to be here, I know he is

9  smiling down because justice has been served on his behalf.

10          THE COURT: Thank you.

11          Counsel.

12          MR. WALENSKY: Yes, Your Honor. I am going to

13  ask for the minimum sentence allowed by law. Your Honor, we

14  were unaware, until the 390 exam --

15          This is a tragedy for everyone. Both families,

16  lost someone. Until the 390 exam I was unaware that Ms.

17  Wisdom had been sexually molested as a child for is a

18  substantial period of time. I was not aware she had fallen

19  and was in a coma for several weeks and when she came out

20  wasn't the same type of person.

21          I was aware there were certain psychiatric

22  issues. This was discussed with her in terms of the defense

23  that would be presented. But I wasn't aware of the extent of

24  these. And certainly not aware of the molestation.

25          Taking these into consideration we could,

AP

PROCEEDINGS

1   perhaps, understand -- well not to Ms. Wisdom but to

2   apparently a jury was an overreaction to the events that

3   transpired.

4   　　　　　Mr. Wilson was extremely intoxicated, .24

5   alcohol in his blood.  Ms. Wisdom had said he attacked her.

6   This was substantiated in terms of when Mathew Shephard

7   testified.  She said, yes, I poked him.  She also said he had

8   tried to rape her.  And she did have a swollen -- swelling on

9   her head around her face which is consistent with being

10  punched.  We don't know exactly what happened in that

11  apartment but Anthony Wilson is now deceased.

12  　　　　　I would like the Court to take into

13  consideration these factors brought out in the 390 Exam in

14  measuring justice with the understanding of a certain -- why

15  a certain person might act out as they are.

16  　　　　　Ms. Wisdom, to this day, denies that she

17  murdered Mr. Wilson with intent in cold blood and was, in

18  fact, defending herself.  Thank you.

19  　　　　　THE COURT:  What is the --

20  　　　　　The probation reports makes mention of a

21  program.

22  　　　　　MR. WALENSKY:  MICA (phonetic spelling) is a

23  psychiatric probationary program.

24  　　　　　THE COURT:  Ms. Wisdom, do you wish to speak at

25  this time?

AP

10
PROCEEDINGS

1          THE DEFENDANT: Yes.

2          THE COURT:  Go ahead.

3          THE DEFENDANT:  Excuse me, if I speak to the

4   family for a few seconds.

5          THE COURT:  Quiet.

6          THE DEFENDANT:  First off, I want to apologize

7   for your loss.  I want to apologize to each and every one of

8   ya'll.  Nothing was done intentionally.  Yes, Anthony was a

9   good person.  And I am never going to try to take that from

10  him.  I am never going to try to erase that.  I am never

11  going to make it seem like he was a horrible person.

12          I don't think that you guys understand that he

13  was fighting a demon that is way bigger than I think a lot of

14  people can understand.  It was not just his habit.  It was

15  his emotions.  His loneliness.  Everything that he has been

16  feeling.  I think that has been in order throughout his

17  life.

18          Everybody is entitled to feel what they feel.

19  I am not going to take that from ya'll.  I am not going to

20  make it seem like I am not supposed to like feel any type of

21   -- I don't know, like I am not supposed to be punished for

22  whatever, what happened.  I never felt right about the whole

23  thing in the first place.  I never did.  I am not going to

24  feel right.  I beat myself up the whole time ever since it

25  happened.  I am not happy about the circumstances.  I am not

AP

11

PROCEEDINGS

1   happy about what happened.  And know I didn't feel

2   comfortable with anything at all.

3            Like I said, it is nothing that I could replace

4   and give back to you guys.  Wish I could, but I can't.  I

5   know what a loss is like.  I apologize to each and everyone

6   of ya'll separately.

7            And God willing, and God knows in my heart that

8   I never tried to hurt him.  I always looked out for Anthony

9   to the best of my ability.  And he has done the same thing

10  for me.  So, everything right now is being misinterpreted to

11  make it seem like, you know --

12           I guess  I really don't exactly know the words

13  to say.  I am not a bad person.  I am not going to make it

14  seem like -- you know, make everybody anybody feel like I am

15  a bad person because I am not.  Things has happened in my

16  life.  Things has happened in his life.  It ended up being

17  uncontrolling situation that could not have been avoided.  I

18  walked away plenty of times.  I have.  I want ya'll to all

19  know that.  I have.  I want you to know that.  I avoided a

20  lot of things over the course of time.  Don't think I did

21  what I did, and did it intentional to make myself feel better

22  or make anybody else feel better or anything like that.  It

23  was not like that.

24           I can't replace what was taken from your

25  lives.  I wish I could but I can't.  I can't.  So, only thing

AP

PROCEEDINGS

1    I can say is that I hope God blesses ya'll and God protects

2    ya'll through everything.

3                    THE COURT:  Thank you.

4                    The Court has before it a New York City

5    Department of Probation Report.  And it does reflect a prior

6    conviction of the Defendant, bench trial for Attempted

7    Assault and Harassment.  I don't know exactly what date that

8    was.  Also, the Defendant was convicted of Assault Three in

9    Lower Court.  She was sentenced to 15 days and three years

10   probation and had an order of protection.

11                   The Defendant made probation.  She violated it

12   and was resentenced to nine 90 days in jail.  On the

13   Attempted Assault and Harrassment she was sentenced to 30 and

14   15 jail days respectively, and an order of protection.

15                   The Department of Probation also notes that the

16   Defendant refused to make a statement and was uncooperative

17   during the course of an attempted interview of the

18   Defendant.  It is a fact that the Defendant does suffer from

19   certain mental health issues.  And she was being medicated

20   through MICA, a program at Kings County Hospital.  However,

21   she reportedly stopped going to the program against medical

22   advice.

23                   Taking into consideration all of the facts and

24   circumstances of this matter, and the fact that after trial

25   the Jury found the Defendant guilty of Murder in the Second

13

PROCEEDINGS

1   Degree, Intentional Murder, The Court hereby sentences the

2   Defendant to 18 years in jail as a determinant sentence -- I

3   mean to say 18 to life.  I made a mistake.  I am sorry. 18 to

4   life.  And that will be the sentence of The Court.

5              THE CLERK:  Ms. Wisdom, this is your right to

6   appeal.  You are advised that you have the right from the to

7   file a written notice of appeal with the clerk of the court

8   and duplicate within 30 days of this date.  Similar notice

9   must be served on the DA of Kings County.

10             If you can not afford or retain Counsel, you

11  may apply to the Appellate Division 2d Department at 45

12  Monroe Place Brooklyn, New York and ask that Counsel be

13  assigned to you for the purpose of prosecuting your appeal.

14             There is a $300 mandatory surcharge.  $50 DNA

15  fee, $25 crime victim assistance which they take from inmate

16  funds.

17             THE COURT: You can take charge.

18

19

20

21

22

23

24

25

AP

PROCEEDINGS

14

1

2                    REPORTER'S CERTIFICATION

3

4       I hereby certify that the foregoing is a true and

5   accurate transcript recorded by me

6

7

8

9                       Michael Rizzo
                    Senior Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AP