# United States District Court
# Eastern District of New York

### 20-CV-2196
### (MATSUMOTO, D.J.)

### ATARA WISDOM,

*Petitioner,*

*— against —*

### ADA PEREZ, SUPERINTENDENT,

*Respondent.*

## REPLY MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

PAUL SKIP LAISURE
Attorney for Petitioner
111 John Street, 9th Floor
New York, N.Y. 10038
(212) 693-0085

TAMMY E. LINN
*Of Counsel*

<u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................1

POINT I

     THE TOTALITY OF THE CIRCUMSTANCES, WHICH
     THE APPELLATE DIVISION UNREASONABLY
     FAILED TO CONSIDER, SHOW THAT PETITIONER
     UNEQUIVOCALLY INVOKED HER RIGHT TO
     REMAIN SILENT, AND ADMITTING HER
     SUBSEQUENT CUSTODIAL STATEMENT WAS NOT
     HARMLESS ERROR. ........................................................................ 2

POINT II

     THERE IS NO REASONABLE BASIS TO CONCLUDE
     THAT RESTRICTING DEFENSE ACCESS TO A KEY
     PROSECUTION WITNESS WAS HARMLESS
     BEYOND A REASONABLE DOUBT. ..................................................... 16

POINT III

     THE UNWARRANTED PRECLUSION OF
     EVIDENCE OF WILSON'S MENTAL ILLNESS AND
     SUBSTANCE ABUSE FUNDAMENTALLY IMPAIRED
     PETITIONER'S CONSTITUTIONAL RIGHTS, AND
     THE ERROR WAS NOT HARMLESS.......................................................21

POINT IV

     THE PEOPLE'S CONCLUSORY AND SPECULATIVE
     RESPONSE FAILS TO SHOW THE DECEASED'S 911
     CALL WAS ADMISSIBLE, AND THEIR POSITION
     THAT THE CALL DISPROVED JUSTIFICATION
     DEMONSTRATES THAT ITS ERRONEOUS
     ADMISSION DEPRIVED PETITIONER OF A FAIR
     TRIAL. .........................................................................................28

CONCLUSION ...............................................................................................31

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
ATARA WISDOM,                                               :

                Petitioner,                        :

      -against-                                       :

ADA PEREZ, Superintendent, Bedford Hills          :
   Correctional Facility, Department of Corrections
   and Community Supervision,                       :

              Respondent.               :
-------------------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR A WRIT OF HABEAS CORPUS

This memorandum of law is submitted in reply to the Affidavit and Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, filed by the People of the State of New York ("the People") on November 12, 2020.[1]

## INTRODUCTION

Petitioner Atara Wisdom raised four claims: (1) in violation of her constitutional right to remain silent, police continued to question her after she invoked that right, and the People used her subsequent statement to undermine her credibility; (2) the People and trial court restricted her attorney's access to a prosecution witness, thereby violating petitioner's rights to due process, to present a defense, and to the effective assistance

---

[1] On November 20, 2020, petitioner's deadline to submit a reply was extended from December 14, 2020, to January 13, 2021.

1

of counsel; (3) she was deprived of the right to present a defense when precluded from introducing medical records about the decedent's background and from cross-examining prosecution witnesses on the same topics; and (4) she was deprived of her due process right to a fair trial by the patently erroneous admission of hearsay in the decedent's 911 call, which the People relied upon heavily to strengthen their circumstantial case.

No fair reading of the record and relevant legal precedent supports the People's defense of these errors.

I.   THE TOTALITY OF THE CIRCUMSTANCES, WHICH THE APPELLATE DIVISION UNREASONABLY FAILED TO CONSIDER, SHOW THAT PETITIONER UNEQUIVOCALLY INVOKED HER RIGHT TO REMAIN SILENT, AND ADMITTING HER SUBSEQUENT CUSTODIAL STATEMENT WAS NOT HARMLESS ERROR.

   A.   The State Courts Misapplied Supreme Court Law and Unreasonably Determined the Facts of Petitioner's Case

Petitioner contends that the state courts misapplied controlling Supreme Court law, and the Appellate Division additionally made an unreasonable determination of the facts of her case, with regard to the admission of a statement obtained after she invoked her right to silence. Specifically, the hearing court wrongly believed that new *Miranda* warnings were not required before the police resumed questioning petitioner, and the Appellate Division unreasonably refused to consider her interrogator's testimony that supported petitioner's claim. Defending these errors, the People incorrectly frame the question in this case as whether petitioner validly invoked her right to remain silent "at

the time of the pause suggested by ADA Purce" (Opposition MOL at 11). The People's parroting of the Appellate Division's conclusions, based on viewing the video interview in isolation and rejecting the only defense-favorable testimony by the People's fully-credited hearing witness, also misapplies Supreme Court law.[2]

The cases cited by the People are nothing like petitioner's, but nevertheless support her argument, rather than the People's, by illustrating the need to consider the totality of the circumstances when determining whether a defendant invoked the right to silence. *See* Opposition MOL at 9-11. Their most recent case aptly distills the principles that courts apply to the sometimes—but not here—thorny question of what a defendant meant. For example, "[g]eneric statements such as 'I have nothing to do with anything else,' or 'I'm not going to talk about nothin',' . . . appear not to suffice because they do not relate to a specific investigation, case, or offense." *United States v. Coronado*, 12-CR-83S, 2017 WL 2930573, at *17 [W.D.N.Y. July 10, 2017 [Scott, U.S.M.J.]). In addition, when a person in custody continues to participate in the interview, as defendant Coronado did by selectively answering questions including about the crime, that will undermine passing remarks that could otherwise be seen as

---

[2] Though not at issue here since the Appellate Division reached the merits of this claim, the hearing court did not "f[i]nd that defendant had not cut-off any further questioning at the end of her video-recorded statement" (Opposition Aff. at 7). To the contrary, the court ruled that petitioner "wanted to stop" but, over defense objection, also ruled that fresh *Miranda* warnings were "not required. Once she's informed, she's been warned. She doesn't have to be re-advised" (220). Defense counsel then seemed to mistakenly believe that New York case law undermined his position. The Appellate Division nevertheless reached the merits of petitioner's claim, which was based on clearly established Supreme Court law.

invoking the right to silence. *Id.* No such generic statements or selective responses occurred in this case.

Similar ambiguities in the remaining cases provided by the People resulted in rulings that the defendants did not invoke their right to silence. As in *Coronado*, the defendant in *Bradley v. Meachum* "cannot be said to have invoked his fifth amendment right . . . because, in the same breath, he denied any involvement," and "'changed his story' and provided an alibi, a clear indication of willingness to discuss his involvement." 918 F.2d 338, 343 (2d Cir 1990). Several cases involved defendants who were uncertain about wanting to speak to police, or who personally suggested they would do so later and/or under certain conditions. *See Burket v. Angelone*, 208 F.3d 172, 200 (4th Cir 2000) (defendant's own words were equivocal—"I just don't think that I should say anything"—and he indicated he might be willing to talk after speaking to "somebody" first); *Williams v. Bradt*, 10-CV-3910 (DLI), 2016 WL 1273228, at *3-4, 21 (E.D.N.Y. Mar. 30, 2016 [Irizarry, U.S.D.J.]) ("Far from expressing a desire not to speak, Petitioner communicated an absolute willingness to talk to the police as long as the right authority figure was present" when he stated, "I'm not speaking unless the district attorney is here"; he later reiterated that he wanted the district attorney present to "cut him a deal"); *People v. Horton*, 46 A.D.3d 1225, 1226 (3d Dep't 2007) ("I think I'll wait" and "I think I'll wait a minute" suggested willingness to talk later); *People v. Caruso*, 34 A.D.3d 860, 863 (3d Dep't 2006) (same for "not right now").

4

Here, petitioner did not immediately contradict her wish to stop speaking by continuing to do so; her last remark on the video was a straightforward and unambiguous "yeah" when asked if she wanted to "stop right now"; and she was not the one who suggested she merely wanted a break.  Moreover, the totality of the circumstances demonstrate that petitioner made it crystal clear that evening that her willingness to speaking about the incident had ended, again unlike the defendants in the People's case law.  *See* Opposition MOL at 9-10 (citing *United States v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006) (purported invocation could easily have been a taunt under the circumstances, made before questioning began and as defendant indicated he might talk if apprised of the allegations); *Thomas v. Lamarque*, 121 Fed. Appx. 220, 222 (9th Cir. 2005) (no invocation because, under the circumstances, defendant could have been "merely mimicking" the interrogating detective by saying "we're done" or agreeing that their alibi discussion was complete)).

It does not matter that "[t]he idea for ending the interview" belonged to A.D.A. Purce or that he merely intended a temporary pause (Opposition MOL at 6-9).  *People v. Wisdom*, 164 A.D.3d 928, 929-30 (2d Dep't 2018).  The People do not explain why this was relevant to whether petitioner subsequently made clear she wanted to stop, let alone cite to any authority for the proposition that a valid invocation cannot be made in response to an interrogator's offer to stop.

Moreover, there was no legal or factual basis for the Appellate Division to look only at the video in determining whether petitioner invoked her right to silence, as the

People continue to do.  The People's hearing evidence consisted primarily of lead detective Christopher Scandole's testimony, which the hearing court credited in full. Scandole described his involvement in investigating this case, his apprehension of petitioner at around 9:45 a.m., and his lengthy initial interrogation of her beginning around 11:00 a.m. after he administered her *Miranda* warnings.  He spoke to her for two to three hours, obtained an oral statement that he recounted in detail at the hearing, and drafted a written version that was admitted into evidence at the hearing.  Scandole was present for Purce's interview (210), and testified that he did not leave the precinct until "sometime later" that evening.  He acknowledged that he questioned petitioner the following morning without re-reading her *Miranda* rights, instead simply reminding her that she had waived them.  Critically, as set forth in detail in the main petition (and state court briefs), Scandole was asked repeatedly by defense counsel whether petitioner ever said, "I don't want to talk anymore," and Scandole consistently agreed that this was true, at one point expressly stating, "She said I don't want to talk about it anymore" (214-16).

Like the Appellate Division did, the People unreasonably fixate on a moment captured on video, refusing to accept the portion of Scandole's testimony that supports petitioner's Fifth Amendment claim even though it acknowledges that the totality of the circumstances must be considered (Opposition MOL at 6-11).  First, it makes no sense that, even though Purce clearly intended to pick up where they left off, the parties simply sat in silence until each eventually went their own way without Purce or Scandole

6

ever asking petitioner if she was ready to resume the interview.  Scandole's testimony compels the far more logical conclusion that petitioner was asked to continue and said she "didn't want to talk about it anymore."

The Appellate Division grossly mischaracterized Scandole's testimony and, therefore, inappropriately rejected petitioner's position as "speculation and conjecture that reads into the record information that simply is not present." *Wisdom*, 164 A.D.3d at 930; *see* Opposition MOL 6 n.15, 11.   Defense counsel did not limit his question to whether petitioner "did not want to talk anymore <u>during the prior evening's videotaped interview</u>," and Scandole did not merely answer that counsel was "Right" and "Correct" about that.  *Wisdom*, 164 A.D.3d at 930 (emphasis added).  Counsel asked about the evening in general, and Scandole, who was with Purce, never suggested, despite multiple opportunities, that the only time petitioner indicated she wanted to stop talking was when Purce offered.  In other words, there was nothing in the way counsel or Scandole framed the issue to suggest that they were only discussing what happened on video rather than interactions that occurred afterward.  There also was no basis for rejecting, Scandole's testimony on this subject while crediting everything else he said  about the many hours he spent with petitioner that day.

B.   <u>Admitting Petitioner's Statement Was Not Harmless in This Weak Case</u>

While acknowledging that justification was the only question for the jury, the People fail to appreciate that Wisdom's credibility was central to that question, and they are incorrect in arguing that her improperly admitted statement had no "substantial and

injurious effect" on the jury's view of her account (Opposition MOL at 12-17).  The People's only direct evidence in this case consisted of petitioner's emotional written and video-recorded statements describing the attempted rape, and the circumstantial evidence was consistent with innocence.[3]

First, petitioner's statement was corroborated by Matthew Shepard's testimony about her prompt outcry, facial swelling, and upset demeanor.  The record still does not support the People's insistence that the outcry occurred hours after Shepard picked up petitioner, essentially making it too belated to be credible (Opposition MOL at 14).  Shepard lived less than a mile from Wilson's apartment.[4]  It could not have taken more than a few minutes, before dawn, to drive to Shepard's home where the outcry occurred, and there was no evidence as to how soon her outcry came after they arrived.

In any event, even a few hours is well within the parameters of "prompt" outcry in New York prosecutions.  *E.g.*, *People v. Rosario*, 17 N.Y.3d 501, 513, 515 (2011) (<u>weeks</u> after abuse started deemed prompt, noting other examples include morning after sexual assault and within 12 hours).  Through such prosecutions, the People undoubtedly are

---

[3]  Notably, the People needed the jury to credit petitioner's admission to stabbing Wilson because there would otherwise have been insufficient proof of identity.

[4]  Shepard lived on Cedar Street in Brooklyn and Wilson's apartment was at 832 Bushwick Avenue (Victoria Wilson: 67; Shepard: 344).  Petitioner respectfully requests judicial notice of this distance, which is based on a Google Maps calculation.  *See Carreiro v. Colbert*, 45 Misc.3d 1221(A), *1 (Sup. Ct., Tompkins Cty. 2014) (taking judicial notice of distance between two residences based on Google Maps while noting, "[c]ourts commonly use internet mapping tools to take judicial notice of distance and geography") (citations omitted).

familiar with the trauma associated with sexual assault and the myriad reasons victims hesitate to disclose what happened, including shame, expectation of blame, and fear. *E.g.*, *People v. Hatcher*, 130 A.D.3d 648, 648 (2d Dep't 2015) (court properly admitted testimony "from the People's expert as to why victims of sexual abuse or rape may delay in reporting the crime"); *see* Cameron Kimble, *Sexual Assault Remains Dramatically Underreported*, Brennan Center for Justice (Oct. 4, 2018), www.brennancenter.org/our-work/analysis-opinion/sexual-assault-remains-dramatically-underreported ("nearly 80 percent of rapes and sexual assaults go unreported"; survivors suffer "fear of revictimization [or retaliation], distortion of allegations, and generally not being believed," as well as shame and self-blame "because in our culture we tend to blame victims in general").

Second, even assuming Wilson's 911 call was admissible (*but see* Point IV, *post*, and in Petition), it did not "disprove[]" justification (Opposition MOL at 13-14). Petitioner stated that Wilson attacked her and that was when she stabbed him. The 911 recording does not contradict her and reveals only that the two <u>may</u> have had some sort of argument before the incident occurred. Wilson evidently did not genuinely want police assistance, since he made no attempt to call again after his 911 call abruptly ended. Notably, he described no threats or violence, there were no sounds of a struggle before he hung up, and the People have never suggested that petitioner could have snatched the phone away from an inebriated man larger and older than her. Indeed, the People do not contend that Wilson called 911 as or after petitioner stabbed him,

and argued to the jury that "the call was not about a stabbing" (Opposition Aff. at 23 (citing 449-51)).

Instead, the People used the call as proof that petitioner was acting "crazy" but it is completely unclear what Wilson meant by this vague allegation, or even what the People meant since they conceded the stabbing had not yet occurred.  And, there was good reason to question Wilson's reliability without any corroborating background noise or detail about what petitioner was supposedly doing.[5]  The People conveniently ignore the toxicology report that indisputably established Wilson was "under the influence of intoxicants" (Opposition MOL at 13 n.17): he had a .20 percent blood alcohol content <u>and</u> was possibly high on cocaine.  Accordingly, it is impossible to use Wilson's statement, made hours before the stabbing apparently occurred, to somehow show that Wilson did not attack petitioner as she described.

Nor did the call establish motive (Opposition MOL at 13-14).  The People speculated that petitioner was so angry about Wilson saying he wanted her out of his apartment that she killed him.  But she had already decided to leave his apartment after previous unwanted sexual contact and his verbal abuse days earlier when she told him, yet again, she did not want to have sex with him.  Phone records corroborated that

---

[5] Petitioner maintains that the People's case was weak even if this Court rejects her claims in Points III and IV regarding the preclusion of Wilson's mental health background and admission of the 911 call.  Of course, if this Court agrees that Wilson's background should have been before the jury, that would have further weakened the reliability of his statements, and excising the 911 call would have removed the only motive the People could posit.

Wilson then called her incessantly, 25 times in two days.[6]  She returned only because she needed her clothing for a scheduled job interview the following morning, and stayed the night only because it was nearby and Wilson was being "nice."  The People's theory that petitioner killed Wilson because she was desperate to live with him makes no sense because that act made it impossible for her to stay anyway.  The People also made inconsistent and equally speculative arguments that petitioner lived with Wilson by choice rather than a friend or sister.

Third, the physical evidence did not contradict petitioner (Opposition MOL at 14-15).  The People misrepresent and cherry-pick her statement to claim that the location and number of wounds were inconsistent with her account.  Petitioner did not say Wilson was "moving around" during the stabbing.  Rather, she described them as essentially at a standstill: Wilson bent her over and hit her back as she faced the floor; she eventually struggled upright but could not push him away; and she stabbed Wilson as he continued to hold her.  So, while she thought she "must have" stabbed Wilson's legs, the People ignore both her uncertainty and the fact that her description of stabbing Wilson after she was upright, as he would not let go, was consistent with his wounds and lack of defensive wounds.  In addition to misrepresenting petitioner's description

---

[6]  It is hardly fair to characterize this period as petitioner "remain[ing] in contact with the man via phone" (Opposition Aff. at 4).

of what happened, the People overlook Wilson's intoxication, which could explain why he did not immediately react to such serious injuries.

As for the state of the apartment and Wilson's nudity, the People accuse petitioner of staging the scene "to conform to her story of an attempted rape." If that were true, petitioner would have given a story that matched the scene she supposedly created. Yet she told police that Wilson was fully clothed when he attacked her, and made no attempt to explain the disarray in a way that would somehow corroborate an attempted rape. That Wilson caused the blood and fecal smears is the most logical inference based on the medical examiner's testimony. She agreed that serious injuries can cause someone to defecate, and it makes perfect sense that Wilson would have instinctively removed his own, soiled clothing, given the medical examiner's equivocal testimony about the effect of Wilson's wounds on his mobility. Petitioner does not contend that Wilson was trying to clean the scene, just himself and possibly without realizing how seriously injured he was due to his intoxication.

Mere consciousness of guilt evidence should not tip the scales in the People's favor with respect to harmless error, especially under the circumstances here. The People accuse petitioner—a young, 25-year-old impoverished woman—of "minimiz[ing] her flight" by citing fear of not being believed as a reason why an innocent person might flee, when she was, in fact, not believed. She had no contemporaneous injuries that would have proven a sexual assault took place, or which would have required medical attention, which the People seem to imply was more proof

she lied.  But, again, Shepard corroborated that he saw swelling on her face.  He also described her as appearing upset, continuing to ask her what was wrong, and the People largely ignore petitioner's distraught demeanor during the video-recorded interview.  It is hard to reconcile that with the People's portrayal of her, especially to the jury, as someone so callous and cold-hearted that she decided to kill Wilson merely because he did not want her to live with him anymore.  The People also conveniently ignore Shepard's testimony that petitioner wanted him to go check on Wilson with her but Shepard declined.

Finally, there could not logically be both "overwhelming" proof of petitioner's guilt <u>and</u> a reasonable view of the evidence that supported her justification claim.  Under state law, as the People recognize, she simply would not have received the justification jury charge if it her statements were "patently false" (Opposition MOL at 12-17, 19).

C. <u>The People Used the Improperly Admitted Statement to Significantly Damage Petitioner's Credibility</u>

Contrary to the People's suggestion, the second-day statement was not cumulative, and played a central role in the prosecution here (Opposition MOL at 17-19).  Absent the suppression error, the People may well have made similar (speculative) arguments that petitioner "conceal[ed] her crime"—despite her admission to Shepard immediately following the incident and his testimony that she wanted to go check on Wilson—and that she had lived with Wilson by choice instead of with a friend or her sister.  But it was far more damaging to use petitioner's <u>own words</u> to undermine her

credibility when the main question for the jury was whether to believe her account of an unwitnessed incident.

In addition to using her sole inconsistency, about where she went after the stabbing, the People introduced extrinsic evidence—both documentary and testimonial—to impeach petitioner's denial of using Wilson's benefits card. Although unsuccessful on those grounds, the prosecutor argued that the benefits evidence "show[ed] it wasn't as innocuous, painting the picture in the statements -- her statements are she is . . . so afraid she has to defend herself, and in the meantime then she takes his keys, she takes his phone, his EBT card, then the EBT card is actually used, whether she gave it to someone else to use or whether she took it and used it herself. That's the argument" (49-50). Petitioner's guilt of the uncharged theft was the only reasonable inference for the jury, as the trial court recognized (40-41), and it made her look like a thief and a liar. Indeed, the trial prosecutor's opening statement explicitly made the connection for the jury that the benefits evidence proved petitioner lied to police about not using Wilson's card (JS. 309).

The People made only a passing remark that it was not accusing petitioner of the theft, in the midst of describing her as a prostitute who killed Wilson essentially because she no longer wanted to hold up her part of their purported "arrangement" that she would provide sex instead of rent money and he, in turn, kicked her out. Given the

extremely derogatory summation,[7] it is unpersuasive that the jury would have given any weight to the People's fleeting acknowledgment that it could not prove petitioner used Wilson's benefit card.

Exacerbating the problem, the court failed to keep its promise to instruct the jury that the benefits evidence in particular had "no bearing on [petitioner's] guilt or innocence" (41). It merely said that this, along with her taking Wilson's property in general, were "not offered to show a propensity on the part of the defendant to commit the crime in question," but to "complete the narrative" (65). Thereafter, the court denied defense counsel's numerous requests for additional curative instructions when the fraud investigator compared the cards' activity and testified that Wilson's card could be used to obtain cash. And its final charge was worse than its first: not only did it leave the jury free to conclude that petitioner in fact stole Wilson's benefits, but it affirmatively invited the jury to consider this in ways that actually went to guilt or innocence. The court curtly instructed the jury not to consider that petitioner took Wilson's phone, wallet, and keys as proof of a propensity or predisposition to commit the charged murder. But by instructing the jury that it could consider this evidence to "complete the narrative of what happened on the night of the incident" (495-96; emphasis added), without ever explaining what that meant, the jury could consider

---

[7]   The Appellate Division held that petitioner's summation misconduct claim was "partially unpreserved," and that "to the extent that the prosecutor exceeded the bounds of permissible rhetorical comment or made other improper remarks during summation," the remarks did not deprive petitioner of a fair trial and were harmless. *Wisdom*, 164 A.D.3d at 931.

petitioner's admitted theft and the implicitly proven theft exactly how the prosecutor intended—as proof that petitioner lied to police and as consciousness of guilt.

Accordingly, the *Miranda* error warrants habeas relief.

## II. THERE IS NO REASONABLE BASIS TO CONCLUDE THAT RESTRICTING DEFENSE ACCESS TO A KEY PROSECUTION WITNESS WAS HARMLESS BEYOND A REASONABLE DOUBT.

Since the People demand deference to the Appellate Division's decision that it was "error" for the trial court to rule that the prosecutor could insist on being present if defense counsel interviewed Shepard, who was willing to speak to counsel but was detained as a material witness, the People cannot also complain that counsel was not actually denied access (Opposition MOL at 20). *Wisdom*, 164 A.D.3d at 931. To the extent the People suggest it was merely an "improper condition" that did not interfere with petitioner's constitutional rights, the People fail to address the fact that the Court of Appeals, applying Supreme Court law, has already recognized that the type of restriction in this case interferes with the rights to effective assistance of counsel and to present a defense (Petition at 55-56). *Int'l Bus. Machines Corp. v. Edelstein ("IDM")*, 526 F.2d 37, 42-44 (2d Cir. 1975); *see Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)).

The People's lack of prejudice argument is threefold: (1) counsel's cross-examination of Shepard was "quite thorough," making it speculative to suggest counsel could have uncovered additional exculpatory information had he been permitted a private interview; (2) counsel could have spoken to Shepard previously; and (3) counsel

was satisfied with Shepard's testimony (Opposition MOL at 21-23). These arguments are belied by the record and the People's own caselaw.

True, counsel's cross-examination was vigorous—in making every effort to impeach Shepard's credibility and memory, including by asking whether he was sleep-deprived and "bad fucked up" when he picked up petitioner. It would have been completely illogical for counsel to aggressively attack Shepard's reliability had he known Shepard would corroborate petitioner. Counsel's questioning about the outcry, however, was cursory. That counsel ended cross-examination so quickly following the surprise outcry testimony demonstrates his reluctance to delve deeper in front of the jury, as does the fact that it was the judge who actually solicited more detail about the outcry.

Shepard's unexpected testimony clearly distinguishes petitioner's case from those cited by the People. In *Kines v. Butterworth*, the witnesses did not want to speak to counsel after the prosecutor followed the court's order to instruct them that, contrary to a police trooper's instruction, they could do so if they wished. Accordingly, the First Circuit concluded there was no actual denial of access.[8] Moreover, the defendant did not "claim[] surprise at the testimony"; the defense also called numerous witnesses with

_____

[8] Similarly, in *United States v. White*, 454 F.2d 435, 438-39 (7th Cir. 1971), the prosecution told witnesses they had no obligation to speak to defense counsel, but did not instruct them to refuse an interview. In *Salemme v. Ristaino*, 587 F.2d 81, 87-88 (1st Cir. 1978), a case involving organized crime, safety concerns made it reasonable to restrict access while witnesses were in protective custody and the prosecution "cooperated fully" to provide access before they testified.

a different version of events.  669 F.2d 6 (1st Cir. 1981).  Likewise, in *United States v. Kemp*, there was "no showing" that the witness "testified untruthfully, <u>or at variance with her prior statements</u> to either defense counsel or the government."  379 F. Supp. 2d 690, 693 (E.D. Pa. 2005), *aff'd*, 500 F.3d 257 (3d Cir. 2007) (emphasis added).  *See also Salemme*, 587 F.2d at 87-88 (defendant "does not particularize in what fashion he was prejudiced").

Regarding the possibility of additional exculpatory information, counsel would have been able to explore whether petitioner had also disclosed the attempted rape before arriving at Shepard's home, her demeanor, whether she provided any details about how Wilson attacked her, and who knows what else.  The People are correct that this is speculative but that is exactly the point; petitioners was entitled to have her attorney investigate whatever issues he wanted with Shepard <u>in advance</u>; it is unfair to expect him to have done so in front of the jury risking that Shepard would strengthen the People's case.  *IBM*, 526 F.2d at 42-43 ("legitimate need for confidentiality" "insur[es] the presentation of the best possible case at trial");  *Gregory v. United States*, 369 F.2d 185, 189 (D.C. Cir. 1966) ("The defense could not know what the eye witnesses to the events in suit were to testify to or how firm they were in their testimony unless defense counsel was provided a fair opportunity for interview.").

The People unreasonably dispute that Shepard could have felt intimidated by a government official standing guard during any interview that took place with defense counsel, when the People already needed a material witness order to get Shepard to

cooperate.  To the contrary, being compelled to testify could easily have sent the message to Shepard that there would be additional consequences if he refused to continue supporting the People's case, making it all the more important for counsel to have access to Shepard in advance.  It is equally unreasonable to speculate that counsel could have spoken to Shepard previously, based on the assumption that Shepard's criminal history and long-ago physical attraction to petitioner might have made him more willing to speak to the defense before trial.  Shepard and petitioner barely knew each other and never spoke again after the night of the incident.  *Cf. Kemp*, 379 F. Supp. 2d at 712-13 (defendant had intimate relationship with witness at issue, and his attorney had in fact interviewed her by telephone prior to trial).  Notably, the record suggests that petitioner did <u>not</u> have Shepard's phone number as the People assert—his number was in Wilson's phone.

Finally, it is irrelevant that counsel described Shepard as a good witness for the defense (Opposition MOL at 21-22), a true statement in light of the outcry testimony. That does not change the fact that the court helped the prosecutor obstruct a legitimate means of defense preparation that could have resulted in additional exculpatory testimony and certainly would have changed counsel's approach to cross-examination. Counsel also could not have foreseen, when he made that remark, how the prosecutor and the court would unfairly weaken the impact of Shepard's testimony in summation.

The parties' summations exacerbated the prejudice of the ruling and further illustrated that it was not harmless beyond a reasonable doubt.  The People conveniently

19

do not address the fact that the court sustained objections to defense counsel's accurate description of Shepard's testimony, and then overruled defense objections to the prosecutor's unfounded argument that the outcry was "hours later," as well as the inflammatory rhetoric that the outcry was an implicit threat to stab Shepard if he made any sexual advances (*see* Petition at 58-59). *See Jackson v. Conway*, 763 F.3d 115, 141-42 (2d Cir. 2014) ("we are convinced that [defendant's improperly admitted] statement influenced the jury because of the way the prosecutor mischaracterized that statement in her closing argument," and "[t]he degree to which the prosecutor found it necessary to mischaracterize the latter portion of [defendant's] statement is indicative of its centrality to the State's case").

For all the reasons explained in the main petition and Point I, *ante*, only speculation about circumstantial evidence could support the verdict. Preventing petitioner from adequately preparing to challenge the People's key witness caused her, at a minimum, to unknowingly undermine defense-favorable evidence that went directly to her justification claim, even setting aside that she may have discovered additional helpful evidence. It was completely unreasonable for the Appellate Division to either refuse to apply the proper standard for constitutional error, or, if it did, to decide there was no "reasonable possibility [the error] might have contributed" to the verdict. *People v. Crimmins*, 36 N.Y.2d 230, 237 (1975).

In short, the materiality and impact of the error warrants habeas relief.

20

III.   THE UNWARRANTED PRECLUSION OF EVIDENCE OF WILSON'S MENTAL ILLNESS AND SUBSTANCE ABUSE FUNDAMENTALLY IMPAIRED PETITIONER'S CONSTITUTIONAL RIGHTS, AND THE ERROR WAS NOT HARMLESS.

As an initial matter, petitioner does not complain about an ordinary error of state evidentiary law (*see* Opposition MOL at 24, 27-36). Petitioner argues that the court misunderstood Wilson's medical records to conclude he had no history of psychosis, and then issued several rulings that separately and cumulatively violated petitioner's rights to a fair trial, to present a defense, and confrontation by: precluding her from "explor[ing], through Wilson's medical records, doctor, or an expert, whether Wilson's Seroquel noncompliance and extreme intoxication increased the likelihood of experiencing hallucinations and/or acting aggressively"; refusing to at least "conduct an in camera interview of Wilson's doctor to ascertain the purpose of the Seroquel prescription"; and restricting cross-examination "about Wilson's psychiatric prescription and substance abuse" (Petition at 57-67).

Standing alone, refusing to grant counsel's request for *in camera* questioning of Wilson's doctor to determine the Seroquel prescription's purpose, clearly appropriate under New York law (*id.* at 63-65), required reversal. Much like the Shepard ruling, it fundamentally obstructed petitioner's ability to challenge the People's case and present her defense. If Seroquel was prescribed to treat Wilson's violent hallucinations and hearing voices, this would have gutted the basis for the court's rulings restricting defense use of Wilson's background. It could not possibly be said that counsel would

21

be calling for speculation, as the court mistakenly believed, by revealing information supporting petitioner's claim that Wilson was the violent aggressor from Wilson's own doctor to the jury; and counsel would have had an even stronger argument for exploring through either Wilson's doctor or an expert how alcohol and drug use would likely affect him in light of his mental illness and Seroquel noncompliance.

Without addressing the *in camera* interview request other than to mischaracterize the record,[9] the People argue that the court properly precluded Wilson's records, related expert testimony, and cross-examination about his mental illness and substance abuse, for several reasons. They first contend that it would have invited unfair speculation because there was "no evidence [he] was hallucinating," "psychotic," "irrational," or exhibited a "loss of mental control" "when he allegedly attempted to rape defendant" (Opposition MOL at 31). Rape would obviously not be a rational and controlled response to a woman saying no to sex, and there was additional evidence that Wilson may have been having a psychotic episode. Angrily pacing back and forth, violently preventing petitioner from leaving his apartment, and engaging in "vulgar and abusive" name-calling (*id.*), all out of the blue, is not normal behavior. The 911 call was just as

---

[9] The People incorrectly imply that counsel wanted the court to conduct an *in camera* interview of his proposed expert, "Dr. Siegel" (Opposition MOL at 26 (citing 60-61)). The preceding discussion makes clear that counsel wanted to subpoena Wilson's treating physician to ask why Seroquel was prescribed, because the court was disagreeing with the contents of Wilson's records and relying on its own assumption that Seroquel must have been prescribed for depression. If counsel could not call Wilson's doctor, he wished to present his own expert to discuss psychosis and Seroquel more generally (54-57).

indicative of a hallucination as the truth of its contents given the silence in the background and lack of corroboration that a "crazy" woman was doing anything at all. And, had counsel been permitted to determine the Seroquel prescription's purpose and the effect of noncompliance, especially combined with substance abuse, the toxicology report could have further suggested Wilson was having a psychotic episode.

The People's authority for precluding medical records is completely inapposite. Those cases involved records that were either remote and contained no evidence of hallucinations, or were about a witness whose behavior at the time of the crime was not in dispute (*id.* at 31-32) (citing *People v. Washington*, 221 A.D.2d 391 (2d Dep't 1995); *People v. Smith*, 192 A.D.2d 806 (3d Dep't 1993); *People v. Graham*, 117 A.D.2d 832 (3d Dep't 1986)).   Here, Wilson's records were recent, <u>did</u> contain evidence of hallucinations, and his behavior <u>was</u> in dispute.

Next, the People argue that, unless petitioner knew Seroquel noncompliance could make Wilson violent, it was "not probative of the reasonableness of [her] supposed fear" (*id.* at 32-34).  But this confuses prior violent acts with objective medical evidence tending to show the victim may have been acting "crazy"—a view the New York Court of Appeals rejected decades ago when it unanimously endorsed the following reasoning for allowing proof of a victim's drug use unknown to the defendant:

> we see no legal barrier to . . . evidence of contemporaneous
> drug usage to support a justification defense where a
> defendant, though ignorant of drug use, reports crazed

> behavior consistent with such evidence. The report of the
> victim's physical condition at the time of death bears little
> resemblance to the character or reputation evidence at issue
> in *People v. Miller,* 39 N.Y.2d 543, 384 N.Y.S.2d 741, 349
> N.E.2d 841 [1976] and its progeny, and is far more
> scientifically reliable as a basis for gauging the victim's
> behavior at the time of the incident.

*People v. Chevalier*, 20 A.D.2d 114, 116-18 (1st Dep't 1996), *aff'd.* 89 N.Y.2d. 1050, 1053

(1997).  Here, too, evidence that Wilson required psychiatric medication to control

violent hallucinations and hearing voices, and was not taking that medication, was

consistent with petitioner's description of his suddenly violent behavior while saying

"crazy shit."  Thus, it provided a scientifically reliable basis for gauging his behavior,

which was relevant to whether he tried to rape petitioner, regardless of what she knew

about Seroquel.

Despite the People's claim that the reasonableness of petitioner's fear was never

at issue (Opposition MOL at 34), petitioner's entire defense was that she reasonably

feared rape, and the reasonableness of her belief was an element the People had to

disprove.  To that end, the prosecutor conceded Wilson tried to have sex with petitioner

but insisted that it did not mean he tried to rape her (452, 468, 473).  The People seem

to believe, as the trial prosecutor argued to the jury, that their position that petitioner

was lying about the attempted rape meant the jury did not have to even consider

whether it was reasonable for her to fear Wilson.  This is simply not true.  The court

determined that petitioner's statements interposed justification, and the People

therefore had the burden to disprove it beyond a reasonable doubt, which requires more than merely calling petitioner a liar.

Another puzzling argument is that petitioner failed to make an adequate record that Seroquel treated a condition that made Wilson potentially violent (*id.* at 34-35). In fact, defense counsel discussed the records in detail when seeking to use them, saying: "Wilson noted hallucinations, to harm himself or others," and reported hearing "voices"; was "diagnosed with major depressive disorder with psychotic features"; and was prescribed "Prozac for his depression," Benadryl for allergies and sleeplessness, and Seroquel, "which is an antipsychotic." Accordingly, counsel wanted to introduce the records and to call Wilson's treating physician to ask whether Seroquel was prescribed to "control [his] hallucinations," about the effect of noncompliance as shown by the toxicology report, and whether "alcohol abuse exacerbate[d] the hallucinations" (53-57). Since the court denied counsel's request for an *in camera* interview with Wilson's doctor to determine whether Seroquel was for psychosis, which the People do not address, it is difficult to see what more counsel could have possibly said to explain why this evidence was relevant.

Notably, the trial record demonstrates that the People agreed with counsel's representations of Wilson's records, which they provided. The prosecutor chimed in at times to clarify a detail, including that Wilson suffered hallucinations of harming himself or others, as opposed to himself and others (54). The People even acknowledge he had a diagnosis of psychosis in addition to depression, and yet they disingenuously

25

suggest (as they did on direct appeal) that the court correctly substituted its own judgment for that of a medical professional and determined that Wilson was being treated only for depression (Opposition MOL at 26 n.27, 33-35). Knowing full well that defense counsel was right about their contents, the People ask this Court to ignore the records, submitted with the petition and on direct appeal, because they were not made a trial court exhibit. Even if the medical records are not considered, the parties' discussion about them is sufficient to show that the trial court's rulings were based on mistaken factual assumptions.

Moreover, any procedural oversight should not shield the records from this Court. Petitioner could potentially spend the rest of her life wrongfully in prison for this conviction, and the People make no claim that the records petitioner provided to the Appellate Division or this Court are not a true copy of what the trial court reviewed. The general rule against consideration by a habeas court of evidence outside the state record is inapplicable here because petitioner is not providing anything new. The trial court reviewed Wilson's records and the Appellate Division had full access to them with no application by the People to strike them from the appellate record as being different from what the lower court reviewed. *Cf. Jackson*, 763 F.3d at 182-83, 185-86 ("Limiting § 2254(d)(1) review to state-court record" because that provision "focuses on what a state court knew and did").

This Court should also consider whether Wilson's records were admissible to assess his credibility during the call, which the People put in issue by arguing that his

statement to 911 was truthful and proved petitioner was the one who became violent.[10] The People contend that none of Wilson's documented mental illness symptoms were probative of his statement's truthfulness (Petition at 35-36), but ignore federal and state precedent that a history of hallucinations and hearing voices is probative of credibility, and that barring psychiatric history of a key prosecution witness violates the right to present a defense (*see* Petition at 65-67 (providing cases)). *See also People v. Rensing*, 14 N.Y.2d 210 (1964) (newly discovered evidence of testifying codefendant's psychiatric history, which included hallucinations, might have impacted jury's assessment of his testimony).

Finally, contrary to the People's arguments (Opposition MOL at 36-37), it was extremely relevant to know whether Wilson "became aggressive if he drank" in light of the toxicology report showing his blood alcohol content was .20 percent (147). This went both to the likelihood of petitioner's version of events and reasonableness of her fear. *Fuentes v. T. Griffin*, 829 F.3d. 233, 252-53 (2d Cir. 2016) (granting habeas relief when People failed to turn over psychiatric records which "would have revealed a disorder that both provided a basis for questioning [the complainant's] credibility and provided further support for [defendant's] version of the events"). Thus, it was not

---

[10] Although the Appellate Division could have relied on a procedural default to deny this portion of petitioner's claim (*see* Opposition MOL at 35), it did not. *See Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) ("we may not assume that the state court's decision rested on a procedural default without an explicit statement to that effect").

improper (or "vague") to ask Wilson's sister if she knew about his history of alcohol abuse, or to seek to use Wilson's records to rebut Shakeema Fortune, who claimed she had known Wilson for 12 to 13 years, they were "like brother and sister" who saw each other regularly, and she <u>never</u> saw him drunk or "stoned."  As counsel argued, "people who know him well and see him regularly would know that he drinks a lot," as the records illustrated (Victoria Wilson: 74-75; Fortune: 133, 141-45; Colloquy: 146-48).

Wilson's failure to take Seroquel was not "alleged" (Opposition MOL at 35), but proven by the toxicology report, and restricting petitioner's right to present a defense by not letting her establish the importance of this fact was not harmless beyond a reasonable doubt (*id.* at 37).  While the jury knew Wilson was drunk and used cocaine somewhat recently before death, that is not the same as the possibility he was having violent hallucinations and hearing voices that night.  Had petitioner been permitted to explore and establish this, it would have supported her account and seriously undercut the People's trial arguments that Wilson's 911 call disproved justification.

IV.  THE PEOPLE'S CONCLUSORY AND SPECULATIVE RESPONSE FAILS TO SHOW THE DECEASED'S 911 CALL WAS ADMISSIBLE, AND THEIR POSITION THAT THE CALL DISPROVED JUSTIFICATION DEMONSTRATES THAT ITS ERRONEOUS ADMISSION DEPRIVED PETITIONER OF A FAIR TRIAL.

The People summarily conclude that Wilson's call must have been contemporaneous, as required by the present sense impression hearsay exception, simply because Wilson used a present tense verb—that a woman is "acting all crazy"—

and they add that the background silence and lack of detail about what the woman was doing was irrelevant (Opposition MOL at 40-41).  The problem is that without knowing what Wilson meant, it is impossible to know whether his statement was contemporaneous.  For example, if he called because petitioner was yelling and throwing things, then the statement was <u>not</u> contemporaneous given the background silence, regardless of him using the word "acting."

In any event, even if it was contemporaneous, the call's contents were not corroborated.  The People rely on the fact that Wilson was found stabbed in a messy apartment as corroboration that petitioner was acting crazy, disregarding that the mess could not fairly be attributed to her and there was no evidence establishing when it was made.  Wilson's death, alone, was not sufficient corroboration (*id.* at 41-42; *see* Petition at 74-77 (providing cases)).  *E.g.*, *People v. Watson*, 100 A.D.2d 452, 453-59, 463-69 (2d Dep't 1984) (deceased was beaten to death with blunt instrument in her bathroom and defendant-landlord's possession of bloody clothing, shoes, and pliers was insufficient to demonstrate reliability of deceased's statement during phone call with friend that defendant was entering apartment to fix a bathtub leak, since friend heard no background noise indicating someone actually entered); *see also Allstate Ins. Co. v. Stricklin*, 93 A.D.3d 717, 718-19 (2d Dep't 2012) (mere fact accident had occurred insufficient to corroborate bystander's report of hit-and-run driver's license plate).

The People's argument that the 911 call was relevant so long as the corroboration shows "it was more likely than not that the stabbing was unjustified" (Resp. Br. at 60),

misses the point.  The present sense impression inquiry is not about relevance but whether a hearsay statement is sufficiently reliable to be admitted for its truth without the benefit of cross-examination.  *People v. Brown*, 80 N.Y.2d 729, 736 (1993).

Ironically, the People accuse petitioner of "speculati[ng]" that Wilson may have been the one acting irrationally and that there may have been intervening events between the 911 call and the attempted rape and stabbing, while themselves speculating that "something was happening between defendant and Wilson that was serious enough to compel Wilson to try to call in the police to remove defendant" (Opposition MOL at 42-43; emphasis added).  Of course, the People have no idea what that "something" was, and concede the call was not about the stabbing and did not describe violence, threats, or fear (*id.* at 43).  After all, refusing Wilson's sexual advances is not corroboration that petitioner was "acting all crazy."  If anything, the People's theory supports petitioner's description of Wilson acting "crazy" if he called 911 because she did not want to have sex with him.  Essentially, the People's position is that they are allowed to speculate to help support their theory of the case, but the defense may not offer plausible alternatives consistent with innocence.

Finally, the People's argument that any error was harmless (Opposition MOL at 44-46), is at odds with their heavy reliance on the call at trial (450-54, 467-70, 481-82).  *See Brown v. Keane*, 355 F.3d 82, 92 (2d Cir. 2004).  Even on appeal, they insisted throughout their brief that the call, "by itself," disproved justification (Resp. Br. at 29, 40, 49).  Although the People now backtrack from that position, they maintain that it

30

was "strong" evidence of motive (Opposition MOL at 44; *see id.* at 13), and that is petitioner's point: the People have consistently, and unfairly, relied upon this vague inadmissible hearsay to try to bolster a circumstantial case.[11]

## CONCLUSION

For the reasons set forth above, and in the Petition, a writ of habeas corpus should be issued.

Respectfully submitted,

Paul Skip Laisure (PL 5560)
Attorney for Petitioner

By: Tammy E. Linn (TL 4059)
Appellate Advocates
111 John Street – 9th Floor
New York, New York 10038

January 13, 2021

---

[11]  Like the People, petitioner relies on her Appellate Division brief and reply brief for further discussion of the prosecutor's summation remarks, including the speculative motive based upon the unfounded assertion that petitioner had a sexual "arrangement" with Wilson, the false assertions that she admitted intent to kill as well as an intent to cover up what had happened, and the misstatements of the law on justification. Without specifying, the Appellate Division found at least some comments improper.