UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

ATARA WISDOM,

                Petitioner,                **<u>MEMORANDUM & ORDER</u>**

                                              20-cv-02196(KAM)

     -against-


ADA PEREZ, Superintendent, Bedford
Hills Correctional Facility,
Department of Corrections and
Community Supervision,

                Respondent.

--------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

     Petitioner Atara Wisdom ("Petitioner") currently incarcerated in the custody of the New York State Department of Corrections and Community Supervision, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On July 10, 2014, Petitioner was convicted after a jury trial of murder in the second degree (N.Y. Penal Law § 125.25[1]).  (*See* ECF No. 1, Petition for Writ of Habeas Corpus ("Pet."), at 1; ECF No. 5, State's Affidavit in Opposition ("State Opp."), at 26.)  On October 8, 2014, the trial court sentenced Petitioner to an indeterminate prison term of 18 years to life for the murder.  (State Opp. at 26.)  The Petitioner claims that (1) her custodial statements were improperly admitted

1

as evidence in trial, (2) the trial court violated her rights to due process, to present a defense, and to the effective assistance of counsel by requiring defense counsel to interview a state's witness in the presence of the prosecutor, (3) the trial court violated her right to present a defense by precluding her from admitting records and from cross-examining prosecution witnesses on certain topics, and (4) the trial court violated her due process right to a fair trial by admitting Anthony Wilson's 911 call as a hearsay exception. (Pet. at 42, 54, 60, 72.) For the reasons set forth below, the petition is respectfully DENIED.

**BACKGROUND**

### I.  Factual Background[1]

At trial, the prosecution presented evidence showing that on November 29, 2011, Petitioner stabbed Anthony Wilson to death inside his studio apartment at 832 Bushwick Avenue in Brooklyn, New York. (State Opp. at 2.) In March 2012, DNA evidence recovered at the scene was found to match the DNA profile of Petitioner, and, following a search, NYPD detectives learned in July 2012 that Petitioner was staying at a women's homeless shelter. (*Id.* at 3.) Detectives subsequently brought Petitioner to the NYPD's 83rd Precinct on July 25, 2012, to conduct an interview, where the

---

[1] Because the petitioner was convicted, the court summarizes the facts in the light most favorable to the verdict. *See United States v. Wasylyshyn*, 979 F.3d 165, 169 (2d Cir. 2020) (citing *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012)).

petitioner was advised of, and waived her *Miranda* rights and agreed to speak with the Detective Christopher Scandole. (*Id.* at 3-4.) Petitioner admitted to stabbing Mr. Wilson, claiming that she had done so in self-defense, and was subsequently arrested after being identified in a lineup by a witness who knew Mr. Wilson. (*Id.* at 5-6, 16.) Following her arrest, Petitioner made two further statements on the evening of July 25, 2012, and gave an additional statement to Detective Scandole the following morning, on July 26, 2012. (*Id.* at 16-18.)

## II.  Pre-trial Proceedings

### A. Pre-trial *Huntley/Wade* Suppression Hearing

On October 30, 2013, the Kings County Supreme Court held a *Huntley/Wade* hearing regarding Petitioner's motion to suppress her statements from July 26, 2012. (ECF No. 5-1, Exhibit 1 to State's Opposition ("Ex. 1"), at 9.)[2]  Detective Scandole provided testimony recounting his interviews with Petitioner on July 25 and July 26, 2012. (*Id.* at 10-22.)  Detective Deborah Batanjany also testified with respect to the lineup she conducted on July 25, 2012. (*Id.* at 27-39.)

The trial court determined that there were two issues to be resolved in the hearing, including whether the identification of Petitioner during the lineup was "unduly suggestive in this case,"

---

[2] All pin citations to the record refer to the page number assigned by the court's CM/ECF system.

and whether the Petitioner voluntarily and knowingly waived her *Miranda* rights during the interrogation.  (*Id.* at 40-42.)

The court, after reviewing the lineup photos and Detective Batanjany's testimony, determined that there was no serious issue regarding the suggestiveness of the lineup to warrant suppressing the identification testimony.  (*Id.* at 41.)  Based on the documented *Miranda* form, the written statement read to and signed by Petitioner, and a video statement where the Detective provided Petitioner with another set of *Miranda* warnings on July 25, 2012, the court ruled on October 30, 2023, that Petitioner knowingly and voluntarily waived her rights to remain silent and agreed to speak with the police.  (*Id.* at 41-42.)  The court denied Petitioner's motion to suppress in full.  (*Id.* at 42.)

### B. Second *Huntley* Hearing

On July 1, 2014, during trial, defense counsel made an oral motion for a mistrial arguing that the testimony of a prosecution witness regarding the use of Mr. Wilson's Electronic Benefits Transfer (EBT) card was inadmissible for its prejudicial effect. (ECF No. 5-4, Exhibit 4 to State's Opposition ("Ex. 4"), at 160.) The defense counsel made an alternative request to strike the witness's testimony.  (*Id.* at 162.)  The trial court denied the application for a mistrial and to strike the testimony regarding the use of the EBT card but granted a separate second *Huntley* hearing to determine the admissibility of Petitioner's July 26

statements, in which Petitioner stated, among other things, that she did not use Mr. Wilson's benefits card. (*Id.* at 162-67.)

During the second *Huntley* hearing before the trial court, Detective Scandole testified that on the morning of July 26, 2012, he reminded Petitioner that she had waived her *Miranda* rights the previous day, and asked if she would be willing to speak with him further. (*Id.* at 165.) Detective Scandole further testified that Petitioner agreed to speak with him and provided further details regarding her actions on the night of Mr. Wilson's death. (*Id.* at 165-67.) The trial court also questioned Detective Scandole regarding how Petitioner was advised of her *Miranda* rights, and how Petitioner's interview on the evening of July 25, 2012, concluded. (*Id.* at 168-70.) Defense counsel cross-examined Detective Scandole and asked if Petitioner stated on July 25 that "she didn't want to speak anymore," to which Detective Scandole answered: "Correct." (*Id.* at 173.) Upon redirect questioning by the prosecution, Detective Scandole clarified that Petitioner never asked for a lawyer and did not say anything about not wanting to speak with Detective Scandole on the morning of July 26, 2012. (*Id.* at 175.)

The prosecution argued at the close of the hearing that Petitioner's statements were admissible because she had acknowledged that Detective Scandole provided her with *Miranda* warnings on July 25, she did not refuse to speak with Detective

Scandole when he reminded her of the *Miranda* warnings given on
July 25 and asked on the morning of July 26 to follow up with more
questions, and because the police did not "force[] her to talk."
(*Id.* at 176.)   The prosecution also argued that the video of
Petitioner's statement on the evening of July 25, 2012, showed
that Petitioner was "visibly upset," which was the reason that the
Assistant District Attorney present asked if she wanted to stop
the interview at the time.  (*Id.*)   The court read in the relevant
portion of the video transcript to the record, which was as
follows:

> [A.D.A's ]QUESTION: You okay? You want to take a
> minute? You want us to stop for a second or do you
> want to continue? You want to stop for a second?
> [Petitioner]: All right.
> A.D.A. Purce: We're just going to hold out here for a
> little bit. You just take your time, all right?
> [Petitioner]: All right.
> [A.D.A. Purce: ]You know what, I think we're going to-
> we're going to stop now, and if you want to continue,
> we'll talk in a second, okay.
> You want us to stop right now?
> [Petitioner's] ANSWER: Yeah.
> A.D.A. Purce: All right, just stop the tape for now.
> There will be no further questions until we resume the
> tape.

(*Id.* at 178-79.)   The trial court noted that the next day, July
26, Detective Scandole reminded Petitioner of her rights and asked
if she wanted to continue, and that a full recitation of the
*Miranda* rights again was not required.  (*Id.* at 179.)  Accordingly,
the trial court ruled that Petitioner voluntarily, knowingly, and
intelligently made statements on July 26, 2012, to the police,

6

thereby rendering the statements admissible at trial. (*Id.* at 181.)

### C. Admissibility of the 911 Call

On June 30, 2014, the prosecution submitted a *Molineux* application to admit a 911 call made by Mr. Wilson at 12:37 A.M. on the early morning of the stabbing. (ECF No. 5-2, Exhibit 2 to State's Opposition ("Ex. 2"), at 2.) The 911 call was determined to be 26 seconds long, and contained only the following statement by Mr. Wilson: "I got this girl in my house and I don't know what's wrong with her, she's acting all crazy and I want her out of my house." (Ex. 4 at 131; Ex. 2 at 2-3). The prosecutor argued that the audio recording of Mr. Wilson's 911 call was admissible under the present sense impression or the excited utterance exception to the hearsay rule. (Ex. 2 at 3.) Defense counsel objected to the inclusion of the evidence, arguing that the prejudice to Petitioner outweighed the probative value. (*Id.* at 3.) Defense counsel further argued that there was uncertainty about the context of the 911 call – whether the call referred to the stabbing or a different matter. (*Id.*)

The prosecution responded by arguing that phone records showed that, shortly after the 911 call, Petitioner used Mr. Wilson's cell phone, including to call an individual that the prosecution planned to call as a witness. (*Id.* at 4-5.) The court

admitted the 911 call recording under the present sense impression exception.  (*Id.* at 6.)

## III.   Trial

Jury selection for the trial against Petitioner began on June 26, 2014, and concluded on June 30, 2014, at which point the trial began.  (ECF No. 5-1, Exhibit 1 to State's Opposition ("Ex. 1"), at 43; Ex. 2 at 292.)  Petitioner's trial defense was based upon justification under N.Y. Penal Law § 35.15 Subsection 2B, relating to the justified use of deadly force when a person reasonably believes that the person they kill is "committing or attempting to commit a kidnapping, forcible rape, forcible criminal sexual act or robbery."  (ECF No. 5-7, Exhibit 7 to State's Opposition ("Ex. 7"), at 25.)

### A. The Testimony of Prosecution Witness Matthew Shepard

During the trial, on July 9, 2014, the prosecution obtained a material witness order to compel Matthew Shepard to testify at trial.  (*Id.* at 32.)  Prior to Mr. Shepard testifying, the trial court granted defense counsel's request to confirm with Mr. Shepard that the prosecutor had accurately represented Mr. Shepard's unwillingness to speak with defense counsel.  (*Id.* at 30.)  Defense counsel subsequently spoke with Mr. Shepard but objected to the presence of a detective and the prosecutor during the conversation.  (*Id.* at 31.)  Defense counsel asked the trial court to direct the prosecutor to permit a closed-door conversation with the witness,

however, the prosecutor objected, stating that defense counsel was not Mr. Shepard's lawyer, and Mr. Shepard was the prosecutor's witness pursuant to a material witness order signed by the trial court the previous day. (*Id.* at 32.) The trial court ultimately decided to allow the prosecutor to be present for defense counsel's conversation with Mr. Shepard. (*Id.* at 34.) Defense counsel objected to the condition and the trial court acknowledged the objection. (*Id.*)

Mr. Shepard testified at the trial following the dispute over defense counsel being able to speak with him alone. (*Id.* at 37.) Mr. Shepard testified that Petitioner called him a few days after Thanksgiving in the early morning hours from Mr. Wilson's cell phone number. (*Id.* at 45-46.) Mr. Shepard testified that later that day, following the call, he met Petitioner on DeKalb Avenue in Brooklyn. (*Id.* at 45-47.) Mr. Shepard testified that Petitioner arrived with three or four bags and explained to Mr. Shepard that she and Mr. Wilson had an altercation and that she was "not going to pay rent and fuck him too," and that she had "poked" him. (*Id.* at 47-48.) Mr. Shepard testified that he was "almost sure" Petitioner "had a swelling up on her face, a little bit," but did not see any blood on her. (*Id.* at 50.) Mr. Shepard testified that he had had no further contact with Petitioner after she left his apartment. (*Id.* at 51.)

**B. Trial Court's Exclusion of Victim's Medical Records**

Also during the trial, on July 1, 2014, the trial court held a *Molineux* hearing to discuss various evidentiary issues raised by the parties.  (Ex. 4, at 2.)  Defense counsel explained that he wanted to admit a certified copy of Mr. Wilson's mental health medical records into evidence and to call Mr. Wilson's physician to testify about the use of Seroquel (which was not detected in Mr. Wilson's toxicology report) and alcohol and their effects on hallucinations.  (*Id.* at 13-20.)  Defense counsel explained that Mr. Wilson's medical records would be used to establish that Mr. Wilson had experienced hallucinations in the past and was prescribed Seroquel.  (*Id.* at 15-16.)  The trial court reviewed the records and declined to admit the medical records, noting that that Mr. Wilson was being treated for depression and not psychosis, that there was no evidence that Mr. Wilson's reported hallucinations were violent, that Mr. Wilson was not hearing voices, that there was no evidence that Seroquel was prescribed to Mr. Wilson for hallucinations or that failure to take Seroquel caused Mr. Wilson to harm or want to harm Petitioner, and that defense counsel was attempting to "dirty the victim" with the evidence.  (*Id.* at 13-17-20.)  The trial court found that Mr. Wilson was treated for depression and that the defense theory was speculative, and that Petitioner never told police that Mr. Wilson had been hallucinating.  (*Id.* at 15-20.)

**C. Defense Counsel's Motion to Dismiss**

At the close of the prosecution's case, defense counsel moved to dismiss the case, arguing that the prosecution failed to substantiate the crime of intentional murder in the second degree. (Ex. 7, at 92-94.)  The court denied the defense counsel's motion to dismiss.  (*Id.* at 96.)

## IV.   **Verdict and Sentence**

On July 10, 2014, the jury found Petitioner guilty of murder in the second degree.  (Ex. 7, at 220.)  On October 8, 2014, Petitioner was sentenced to 18 years to life in prison for second-degree murder. (ECF No. 5-6, Exhibit 6 to State's Opposition ("Ex. 6"), at 13.)

## PROCEDURAL HISTORY

## I.   **State-Murder Conviction Direct Appeal**

Petitioner, represented by counsel, appealed her conviction to the Appellate Division, Second Department, arguing that (1) the verdict was against the weight of the evidence; (2) the trial court violated Petitioner's right to due process, to present a defense, and to the effective assistance of counsel in its decision to allow the prosecutor to be present during defense counsel's interview of Mr. Shepard; (3) the trial court violated Petitioner's right to present a defense by declining to admit Mr. Wilson's medical records and medical testimony in evidence; (4) the trial court erred in admitting Mr. Wilson's 911 call; (5) the trial court erred by refusing to suppress Petitioner's July 26, 2012, statement; and

(6) the prosecutor's summation violated Petitioner's right to a fair trial. (ECF No. 1-2 ("App. Div. Appellant Brief"), at 3-4.)

On August 29, 2018, the Appellate Division unanimously affirmed the judgment of conviction and sentence. *People v. Wisdom*, 82 N.Y.S.3d 97 (2d Dep't 2018). First, the Appellate Division concluded that the prosecution's case was legally sufficient to disprove the defendant's justification defense beyond a reasonable doubt and to establish the defendant's guilt of murder in the second degree beyond a reasonable doubt. *Id.* at 98. Second, the Appellate Division agreed with the trial court's decision to deny suppression of Petitioner's July 26, 2012, statement:

> After waiving her *Miranda* rights (*see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694), the defendant freely and voluntarily made a videotaped statement at the police station on July 25, 2012, beginning at approximately 9:00 p.m. The interview ended after approximately 30 minutes, not because the defendant unequivocally invoked her right to remain silent, but rather, to allow her to compose herself. The idea for ending the interview and stopping the videotape was that of the Assistant District Attorney (hereinafter ADA) conducting the interview. The ADA said, "Let's stop the tape for now," and "there will be no further questions until we resume the tape." Questioning resumed the following morning at approximately 10:00 a.m., at which time the defendant was reminded of the rights she had been read the previous day, and the defendant agreed to continue answering more questions. During that session, the defendant stated that after she stabbed the victim, she took the victim's cell phone, keys, and wallet. The wallet contained the victim's welfare benefit card, but the defendant specifically denied ever using the card.

> . . . The suppression hearing testimony of a detective
> who, in response to questions by defense counsel that
> the defendant did not want to talk anymore during the
> prior evening's videotaped interview, answered, "Right,"
> and in another instance said, "Correct," does not
> require a different result. This testimony does not
> change the fact that there was no unequivocal invocation
> of the defendant's right to remain silent at that time.
> The suggestion that the detective's answers refer
> instead to an unrecorded communication by the defendant,
> despite the colloquy on the videotape that there would
> be no further questioning until the tape is resumed, is
> mere speculation and conjecture that reads into the
> record information that simply is not present, and
> provides no basis for concluding that the defendant's
> 10:00 a.m. statement should have been suppressed.

*Id.* at 98–99.  Third, the Appellate Division agreed with the trial court's determination to "admit evidence of a prior uncharged crime involving [Petitioner's] theft and use of certain property that belonged to the victim, as it completed the narrative and provided circumstantial evidence of the date of the victim's death."  *Id.* at 99.  The Appellate Division found that the "probative value of the evidence outweighed its prejudicial effect and the court's limiting instruction was sufficient to avert any potential prejudice."  *Id.* (citation omitted).  Fourth, the Appellate Division found that Petitioner's contention that she was denied a fair trial by the admission of the 911 call was "unpreserved for appellate review" under N.Y. Crim. Proc. Law § 470.05, but was nonetheless "without merit."  *Id.*  Fifth, the Appellate Division found Petitioner's contention that certain comments made by the prosecutor during summation deprived her of a fair trial was partially unpreserved for appellate review, but that "to the extent

that the prosecutor exceeded the bounds of permissible rhetorical comment or made other improper remarks during summation, the remarks were not so egregious as to have deprived the defendant of a fair trial, and any other error in this regard was harmless." *Id.* at 100. Sixth, the Appellate Division found that "it was improper for the Supreme Court to condition her ability to interview a prosecution witness upon the interview occurring either in the presence of the prosecutor or a detective" but that "the error was harmless." *Id.* Finally, the Appellate Division noted that Petitioner's remaining contention was "without merit." *Id.*

On February 14, 2019, the New York Court of Appeals denied Petitioner's application for leave to appeal, in which she raised the same arguments and incorporated her briefs submitted to the Appellate Division. *People v. Wisdom*, 122 N.E.3d 1140 (N.Y. 2019) (Rivera, J.).

## II. Habeas Corpus Petition

On May 14, 2020, Petitioner filed this petition, raising a subset of the claims she raised on appeal: first, that the trial court erred in refusing to suppress her July 26 statement and that the use of the statement prejudiced her in trial, (Pet. at 42); second, that the trial court violated her right to due process and to the effective assistance of counsel by conditioning defense counsel's ability to interview Mr. Shepard on the presence of

14

either a detective or prosecutor, (*id.* at 54); third, that the trial court violated her right to present a defense by declining to admit Mr. Wilson's medical records, (*id.* at 60); fourth, that the trial court violated her right to due process by improperly admitting Mr. Wilson's 911 call at trial, (*id.* at 72.).

On November 12, 2020, Respondent filed a memorandum of law in opposition to the petition.  (State Opp. at 1.)  On January 13, 2021, Petitioner filed a reply brief in support of her petition. (ECF No. 7 ("Pet. Reply"), at 1.)

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits.  28 U.S.C. § 2254(d).  A federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.*; *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant

state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13. The court reviews the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

A petitioner can seek federal habeas corpus relief only after she exhausts state court remedies and gives the state courts a

fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of [her] federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

## DISCUSSION

### I.   Refusal to Suppress the July 26 Statement

Petitioner renews her claim that the trial court should have suppressed her statement made on July 26, 2012, because she invoked her right to remain silent, and the questioning detective subsequently failed to fully readminister her *Miranda* rights. (Pet. at 42.) The Appellate Division's decision rejecting Petitioner's claim that the July 26, 2012, statements should have been suppressed is entitled to AEDPA deference, and Petitioner must show that the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

For the foregoing reasons, this Court finds that the Appellate Division's decision was consistent with clearly established federal law and was based on a reasonable determination of the

facts in light of the evidence presented, specifically, from the video transcript of Petitioner's questioning on the evening of July 25, 2012.  (Ex. 4 at 176-78.)

### A. Invoking the Fifth Amendment

It is well-settled law that when an individual in custody has shown that they intend to invoke their Fifth Amendment right to remain silent, the interrogation must cease.  *Michigan v. Mosley*, 423 U.S. 96, 100 (1975) (citing *Miranda v.* Arizona, 384 U.S. 436, 473-74 (1966)).   This right is invoked when the individual indicates in any manner, at any time prior to or during questioning, that they wish to remain silent.  *Id.*  In a parallel line of cases, the Supreme Court held that an individual must unambiguously and unequivocally invoke their right to counsel to prevent further police questioning.  *Davis v. United States*, 512 U.S. 452, 462 (1994) (explaining that an individual in custody merely stating, "[m]aybe I should talk to a lawyer," is not a request for counsel.)  Subsequently, in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the Supreme Court clarified that this unambiguous standard applies both to the invocation of an individual's right to counsel and their right to remain silent.  *Id.* at 381-82 (holding that had the petitioner stated "that he wanted to remain silent or that he did not want to talk with the police . . . either of these simple, unambiguous statements [] would have invoked his right to cut off questioning").

Even prior to the Supreme Court's holding in *Berghuis,* however, the Second Circuit Court of Appeals had consistently required an unambiguous assertion of the right to remain silent in cases where a defendant sought to suppress statements made while in custody. In *United States v. Ramirez*, 79 F.3d 298 (2d Cir. 1996), the Second Circuit found that the defendant did not unambiguously invoke his right to remain silent because he continued to answer questions by interrogating officers after previously refusing to answer questions by those officers. *Id.* at 303. In *United States v. Plugh*, 648 F.3d 118 (2d Cir. 2011), the only statements that the defendant made to the interrogating officers were: "I am not sure if I should be talking to you," and "I don't know if I need a lawyer." *Id.* at 121. In both cases, the Second Circuit found that the statements did not expressly invoke the defendant's right to counsel or right to remain silent in a manner sufficient to cut off all further questioning. *Id.* at 126*; Ramirez*, 79 F.3d at 303.

Further, a court will assess the entire context of the situation, including anything said by the Petitioner before or after the statement that the petitioner alleges invoked their right to remain silent. *See Bradley v. Meachum*, 918 F.2d 338, 342 (2d Cir. 1990) (finding that there was not an unambiguous invocation where the petitioner stated he did not want to talk about the alleged crime but continued to speak, denying the officer's

allegations and proffering explanations of his whereabouts).
Recently, a district court in the Eastern District of New York
applied the *Berghuis* standard to a statement made by a defendant
while in custody: "I don't want to talk and get myself into more
trouble, man." *See United States v. Ross*, No. 21-CR-571 (BMC)
(LB), 2023 WL 6160436, at *10 (E.D.N.Y. July 31, 2023), report and
recommendation adopted, 2023 WL 6158840 (E.D.N.Y. Sept. 21, 2023).
The court noted that such a statement could have been considered
an unambiguous invocation of the right to remain silent when
considered alone, but that the defendant continued to speak,
stating: "But I got a lot of stuff going on. I don't know what the
fuck is going on. My whole life is fucked up." *Id.* The court
reasoned that the defendant's subsequent statements turned what
may have been an unequivocal statement into an ambiguous one. *Id.*
As a result, the court found that the defendant's statements were
insufficient to invoke his Fifth Amendment rights. *Id.* at *11.

When an individual in custody unambiguously and unequivocally
invokes the right to remain silent, the admissibility of statements
obtained by questioning officers after this invocation depends on
whether their "right to cut off questioning" was "scrupulously
honored." *Mosley*, 423 U.S. at 104. After the invocation of that
right, however, there is no "per se proscription of indefinite
duration upon any further questioning by any police officer on any

subject" with that individual.[3]  *Id.* at 102-03.  Accordingly, the Second Circuit has held that when a person has invoked the right to remain silent, questioning can resume after new *Miranda* warnings have been administered and the right to remain silent is otherwise scrupulously honored.  *Perkins v. Herbert*, 596 F.3d 161, 174 (2d Cir. 2010).

## B. Whether Petitioner Invoked the Fifth Amendment

In contending that her July 26, 2012, statements should be suppressed, Petitioner argues that she invoked her Fifth Amendment right to remain silent when, on July 25, 2012, she "agreed during the [ADA's] videotaped interview about the stabbing that she wanted to 'stop right now.'" (Pet. at 42.) Petitioner refers to language from *Miranda v. Arizona*, 384 U.S. 436 (1966), cited in *Mosley,* which states that the invocation of the right to remain silent can be done "in any manner, at any time prior to or during questioning." (Pet. at 44.)  Petitioner contends that her invocation was sufficient because she "did not remain mute or express uncertainty about wanting to stop" or "merely request a break." (*Id.* at 44-45.)  Petitioner also argues that because she invoked her right to remain silent, the investigators were

---

[3] The Supreme Court in *Mosley* reasoned that instituting a categorical prohibition of voluntary statements after someone has invoked their right to remain silent would transform the *Miranda* safeguards into "wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Mosley*, 423 U.S. at 102.

accordingly "required to re-read her rights before questioning her again." (*Id.* at 46.)

This Court finds Petitioner's argument that she invoked her right to remain silent unpersuasive. The statements Petitioner made on July 25, 2012, cannot be read in isolation from the actual context of the interrogation. The video transcript[4] referenced by the trial court reflects the following conversation after Petitioner became emotional:

> QUESTION: You okay? You want to take a minute? You want us to stop for a second or do you want to continue? You want to stop for a second?
> [Petitioner]: All right.
> A.D.A. Purce: We're just going to hold out here for a little bit. You just take your time, all right?
> [Petitioner]: All right.
> You know what, I think we're going to-we're going to stop now, and if you want to continue, we'll talk in a second, okay.
> You want us to stop right now?
> [Petitioner's] ANSWER: Yeah.
> A.D.A. Purce: All right, just stop the tape for now. There will be no further questions until we resume the tape.

(Ex. 4 at 178-79.)

Courts in this District have previously found an individual's invocation of the Fifth Amendment to be ambiguous where they merely display reticence to answering questions, they remain silent, they equivocate in exercising their rights, or they indicate that they may not want to continue speaking, but nevertheless continue

---

[4] This court also reviewed the video of the interrogation, provided as Petitioner's Exhibit G, and finds it consistent with the transcript utilized by the trial court.

speaking and answering questions. *See Lopez v. Keyser*, No. 19-CV-2655 (ARR), 2020 WL 6873427, at *6 (E.D.N.Y. Nov. 23, 2020) (determining that under *Berghuis*, the petitioner's reticence to answer questions did not invoke his right to remain silent); *see also Festus v. Noeth,* No. 17-CV-3941 (JMA), 2020 WL 7042666, at *11 (E.D.N.Y. Nov. 30, 2020) (reasoning that a petitioner's silence did not invoke his Fifth Amendment rights, especially in light of the fact that the petitioner had already waived his *Miranda* rights); *Plugh*, 648 F.3d at 125 (finding that although the petitioner refused to sign a waiver of his *Miranda* rights, his concurrent statements, such as "I am not sure if I should be talking to you," were too ambiguous to cut off further questioning); *Ross*, 2023 WL 6160436, at *10-11 (finding that although the petitioner may have invoked his right to silence, his actions in continuing to speak with the questioning officers after doing so rendered his invocation ambiguous).  The Court finds that such ambiguity also exists here.

In this case, Petitioner waived her *Miranda* rights in writing prior to speaking to officers during the July 25, 2012, questioning.  (Ex. 4 at 168.)  Further, Petitioner at no point explicitly stated that she did not wish to speak to the questioning officers any further.  Rather, Petitioner agreed with the ADA's suggestion to take a break and resume questioning at a later time.  (*Id.* at 178.)  When the ADA told Petitioner that "there will be no

further questions until we resume the tape," Petitioner did not object to continued questioning later. (*Id.* at 175.)  The next day, the questioning officer reminded Petitioner of her *Miranda* rights and asked if she wanted to continue.  (*Id.* at 175.) Petitioner agreed and continued to answer questions. (*Id.* at 176.) Furthermore, Petitioner does not suggest that she subsequently invoked her Fifth Amendment rights at any point on July 26, 2012.

Based on Petitioner's mere acquiescence to suggestions to pause questioning by the ADA, the fact that she did not initiate the cessation in questioning herself, and that after being reminded of her *Miranda* rights administered the day before, she continued answering questions the next day, a reasonable officer would have understood only that the Petitioner agreed to the ADA's suggested break from questioning at that moment on July 25, 2012, and that it would resume at a later time, not that she was unambiguously invoking her right to remain silent. *See Ramirez*, 79 F.3d at 303 (when a suspect has "waived [her] right to remain silent and has answered some questions . . . [s]he must articulate [her] desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be assertion of the right to remain silent") (internal quotation marks and citation omitted).  Consequently, this Court finds that the Petitioner did not unambiguously invoke her right to remain silent on July 25, 2012, and that the Appellate Division was

correct in finding no error in the trial court's decision to admit the statement Petitioner made on July 26, 2012.  Because Petitioner's *Miranda* claim fails, it cannot be the basis of federal habeas relief, and the Court therefore denies habeas relief on this ground.

## II.  The Trial Court's Ruling Conditioning Defense Counsel's Ability to Interview a Witness During Trial

Petitioner asserts that the trial court erred when it "refused to allow defense counsel to interview [Witness Matthew Shepard] alone." (Pet. at 54.)  Petitioner contends that this interference violated "[her] rights to due process, to present a defense, and to the effective assistance of counsel." (*Id.*)  The Appellate Division held that "it was improper for the [trial court] to condition [Petitioner's] ability to interview a prosecution witness upon the interview occurring either in the presence of the prosecutor or a detective." *People v. Wisdom*, 82 N.Y.S.3d 97, 100 (2d Dep't 2018).  Despite the fact that the condition was improper, however, the Appellate Division found the error to be harmless. *Id.*  As such, the Appellate Division's merits-based decision rejecting the claim is entitled to AEDPA deference and Petitioner must show that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

### A. Conditions on Access to Witnesses

Second Circuit precedent clearly establishes that "constitutional notions of fair play and due process dictate that defense counsel be free from obstruction, whether it come from the prosecutor [or other officials]" in their interviews of "prospective prosecution witness[es]." *Int'l Bus. Machines Corp. v. Edelstein*, 526 F.2d 37, 44 (2d Cir. 1975) (citing *Coppolino v. Helpern*, 266 F. Supp. 930, 935 (S.D.N.Y. 1967)); *see also United States v. Hyatt*, 565 F.2d 229, 232 (2d Cir. 1977) ("[W]e shall not tolerate the view that the government has some special right or privilege to control access to trial witnesses."). Similarly, "New York State courts have consistently held that prosecutors may not refuse defense counsel requests for interviews with prosecution witnesses, and that courts will enable these interviews if necessary." *Schulz v. Marshall*, 528 F. Supp. 2d 77, 98 (E.D.N.Y. 2007), *aff'd sub nom. Schulz v. Marshal*, 345 F. App'x 627 (2d Cir. 2009) (citing several New York appellate and trial court decisions in support).

However, this right is not without limit, as courts are permitted to, for example, limit the disclosure of the identity or address of a confidential informant pre-trial, unless their testimony is "material to [the] defense." *United States v. Saa*,

859 F.2d 1067, 1073 (2d Cir. 1988); *see also United States v. Heatley*, 994 F. Supp. 483, 489 (S.D.N.Y. 1998) (ordering the government to disclose the identities of informants and cooperators to the court a week before trial and make them available for interviews as needed). Further, while not binding authority from this Circuit, Respondent cites to a case from the Eastern District of Pennsylvania in which a court, confronted with facts similar to the instant case, stated:

> Here, [defendant] does not allege that the prosecution told [the witness] not to talk to [defendant's] counsel or in any other way denied [defendant] access to witnesses. Neither does [defendant] allege that the Court in any way prevented or limited his access to [the witness] before or during trial, except at the moment she was arriving to testify. Therefore, [defendant's] argument that he was prevented from having a fair opportunity to interview [the witness] is unpersuasive.

*United States v. Kemp, 379 F. Supp. 2d 690,* 714 (E.D. Pa. 2005), aff'd, 500 F.3d 257 (3d Cir. 2007) (trial court's limitation on defense counsel's access to a witness by requiring an FBI agent to be present to protect the witness from harassment did not violate defendant's constitutional rights). As such, not all limitations on access to a witness prior to or during a trial necessarily constitute a constitutional violation.

### B. Harmless Error

On federal habeas review, unless the "error 'had substantial and injurious effect or influence in determining the jury's verdict'", a violation of a petitioner's federal rights during her

state criminal proceeding is harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). As compared to direct review, a showing of harmlessness on collateral review requires "more than a 'reasonable possibility' that the error was harmful." *Davis v. Ayala*, 576 U.S. 257, 268 (2015) (quoting *Brecht*, 507 U.S. at 637). However, if a "conscientious judge [remains] in grave doubt about the likely effect of an error on the jury's verdict" — that is, "in the judge's mind, the matter is so evenly balanced that [the judge] feels ... in virtual equipoise as to the harmlessness of the error," — then "the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (*i.e.*, as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." *O'Neal v. McAninch*, 513 U.S. 432, 435, (1995) (quoting *Brecht*, 507 U.S. at 623). "[I]n [section] 2254 proceedings[,] a [federal] court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, ... whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard" generally applicable on direct review. *Fry v. Pliler*, 551 U.S. 112, 121-22, (2007) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

However, "[w]hen a state court holds that a federal constitutional violation tainted a defendant's trial but that the violation as harmless" the analysis of harmless error becomes more complicated, as "the state court has adjudicated a constitutional claim on the merits." *Wilson v. Capra*, No. 15-CV-6495 (MKB), 2020 WL 10506052, at *21 (E.D.N.Y. Oct. 12, 2020), *aff'd*, 2023 WL 7179268 (2d Cir. Nov. 1, 2023) (internal quotation marks and citation omitted). Accordingly, the AEDPA prohibits habeas relief unless the state court's adjudication on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "[A] state-court decision [finding a federal constitutional violation harmless] is not unreasonable if 'fairminded jurists could disagree on [its] correctness.'" *Ayala*, 576 U.S. at 269 (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). A federal court "may not grant [a petitioner's] habeas petition, however, if the state court simply erred in concluding that the errors were harmless; rather, habeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner." *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (per curiam) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). "While a federal habeas court need not formally apply both *Brecht*

and AEDPA/*Chapman*, AEDPA nevertheless sets forth a precondition to the grant of habeas relief." *Ayala*, 576 U.S. at 268 (internal quotation marks omitted) (citing *Fry v. Pliler*, 551 U.S. 112, 119-120, (2007)).

### C. Defense Counsel's Attempted Interview

Petitioner argues that because "the [trial] court refused to allow defense counsel to interview [Mr. Shepard] alone," her counsel "was unable to effectively prepare to defend Petitioner and attacked [Mr.] Shepard's credibility before [Mr.] Shepard unexpectedly revealed petitioner's outcry." (Pet. at 54.) The Court finds that the trial court's condition on defense counsel's access to the witness just prior to testimony was harmless error and did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623

In Petitioner's case, Mr. Shepard had been disclosed as a witness and thus was not a surprise witness, defense counsel was not restricted by the court or prosecutor from contacting the witness prior to trial, and Petitioner does not allege that the prosecutor did anything to dissuade Mr. Shepard from speaking with defense counsel. (State Opp. at 55; Pet. at 54.) Rather, defense counsel sought to speak to Mr. Shepard after he had been held on a material witness order to testify, and the trial court granted defense counsel's request to interview Mr. Shepard. (Ex. 7 at 30.) Defense counsel stated that Mr. Shepard was willing to speak

with him, but defense counsel objected to the presence of a detective in the room. (*Id.* at 31.) Defense counsel acknowledged "there is a matter of security" but stated he should be able to interview Mr. Shepard alone due to the fact that the room had "three detectives standing outside" and was "on the 21st floor of a building which you can only get down in the elevators." (*Id.*) The prosecution objected to defense counsel interviewing Mr. Shepard without a detective in the room on the grounds that defense counsel was "not [Mr. Shepard's] lawyer." (*Id.* at 32.) Ultimately, the trial court ruled that a detective should "stand outside with the door open so he can hear what you do and say." (*Id.* at 32.) Defense counsel again objected after being prevented from speaking with Mr. Shepard with the door closed, and the Court again denied the defense request, and stated that the prosecutor could be present if she desired. (*Id.* at 34.) Ultimately, defense counsel again returned to Mr. Shepard and stated to the witness that he was not allowed to speak to him privately and that they would "speak on the stand." (*Id.* at 35.) Defense counsel told the court that he "think[s] it's objectionable and I would move for a mistrial." (*Id.*) The trial court responded that defense counsel "may be right" regarding the legal principle regarding access to a witness but nonetheless proceeded with the trial. (*Id.* at 35-36.)

Petitioner is correct in contending that courts do "not tolerate the view that the government has some special right or privilege to control access to trial witnesses." *United States v. Hyatt*, 565 F.2d 229, 232 (2d Cir. 1977). It is also true, however, that a court may exercise discretion to protect witnesses from harassment immediately prior to testimony, *see United States v. Kemp*, 379 F. Supp. 2d 690, 714 (E.D. Pa. 2005), or issue a court order preventing contact with a witness by a defendant to prevent harassment and intimidation, *see United States v. Soape*, 169 F.3d 257, 270–71 (5th Cir. 1999).

It is not clear from the record why the trial court in the instant case required the presence of a detective or the prosecutor during a defense interview with Mr. Shepard, or whether the trial court was motivated to prevent intimidation of a witness who had required a material witness order to secure his testimony. Similarly, the trial court did not state whether the presence of a detective was necessary for the safety of defense counsel, or to prevent flight by the witness. Nonetheless, even though the Appellate Court found, and this Court agrees, that the trial court's conditions were improper, this Court does not find that the trial court's condition on defense counsel's ability to question Mr. Shepard had a substantial and injurious effect or influence in determining the jury's verdict, *Brecht*, 507 U.S. at 623, and does not find that the condition rises to the level of a

constitutional violation.   The Appellate Division's conclusion
that the trial court's condition was improper but a harmless error,
*People v. Wisdom*, 82 N.Y.S.3d 97, 100 (2d Dep't 2018), is not "an
unreasonable application of[] clearly established Federal law"
and, as such, is entitled to AEDPA deference, 28 U.S.C. § 2254(d).
Accordingly, assuming that the condition was improper, this Court
will turn to the Appellate Division's conclusion that any error
was harmless under the standard set out by *People v. Crimmins*, 326
N.E.2d 787, 791 (N.Y. 1975) (explaining the New York state
appellate standard of review for constitutional errors—which
mirrors *Chapman*'s beyond a reasonable doubt standard—and non-
constitutional errors—which requires a showing of a "significant
probability" of acquittal by the jury had it not been for the
error).

The Court agrees with the Appellate Division that the trial
court's condition on defense counsel's interview of Mr. Shepard
was harmless error, to the extent it was error.   The prosecution
disclosed Mr. Shepard's grand jury testimony to Petitioner prior
to trial, and listed Mr. Shepard as a witness at the beginning of
trial.   (State Opp. at 55.)   As such, defense counsel knew that
Mr. Shepard would be testifying, and what the contents of his
testimony would likely be.   Furthermore, defense counsel conducted
an extensive and successful cross-examination of Mr. Shepard,
which elicited Mr. Shepard's statement that Wilson "tried to take

33

it, tried to force his self on [Petitioner]." (Ex. 7 at 62-63.) Petitioner argues here, as she did before the Appellate Division, that defense counsel "may have been able to elicit additional exculpatory evidence, such as [P]etitioner's exact words to [Mr.] Shepard, given a fair and meaningful opportunity to interview [Mr.] Shepard." (Pet. at 58; *see also* App. Div. Appellant Brief at 54.) However, Petitioner does not proffer any further "additional exculpatory evidence" that Mr. Shepard might have provided, or explain how Mr. Shepard's "exact words" would have made a meaningful difference in proving her justification defense.

Petitioner also argues that defense counsel "surely would have done things differently" and would have refrained from impeaching [Mr.] Shepard's credibility if defense counsel had known [Mr.] Shepard would state Wilson had tried to "force" himself on Petitioner. (Pet. at 59.) As noted by Petitioner, defense counsel elicited Mr. Shepard's criminal history and reminded Mr. Shepard that he told "[the D.A.] that you weren't paying attention to what [Petitioner] was telling you." (Ex. 7 at 57-61.) However, defense counsel's cross-examination of Mr. Shepard was not focused solely on impeaching Mr. Shepard, but was also focused on eliciting evidence supporting Petitioner's justification defense. Shortly after impeaching Mr. Shepard, defense counsel asked "[Petitioner] did tell you she was hit by Anthony [Wilson], right?" (*Id.* at 61.) Subsequently, defense counsel asked if "[Petitioner told]

you that Anthony [Wilson] tried to rape her at that time?"  (*Id.* at 62.)  Defense counsel clearly intended to use-and did use-his cross-examination not just to impeach Mr. Shepard, but also to elicit information that would be helpful to Petitioner's justification defense.  Immediately afterward, defense counsel appeared quite pleased with the result of that cross-examination, as well, noting that "based upon the testimony we heard this morning . . . [Petitioner] has decided not to testify."  (*Id.* at 91.)  Defense counsel continued, stating that "[w]e felt that [Mr. Shepard] was a very strong witness for [Petitioner]."  (*Id.*)

In light of the facts of this case, the Court finds that the Appellate Division was not unreasonable in deeming any error related to defense counsel's access to Mr. Shepard harmless. Defense counsel was able to elicit information helpful to Petitioner on cross-examination, and there is no evidence that further helpful information might have been uncovered in a private interview of Mr. Shepard just prior to his testimony.  Furthermore, any strategic error regarding impeachment of Mr. Shepard was harmless.  Though Mr. Shepard did offer testimony helpful to the defense, he also offered testimony that corroborated the prosecution's version of events, stating that "[Petitioner] said, I'm not paying rent and fucking him . . . [s]he said she poked him."  (*Id.* at 48.)  As such, a decision by defense counsel *not to* impeach Mr. Shepard would also have carried strategic risks, given

his importance to the prosecution's case.   Taken together, the Court finds that to the extent there was an error in conditioning defense counsel's access to Mr. Shepard on the day of trial, it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. Accordingly, the Appellate Division's holding was not unreasonable, and is entitled to AEDPA deference.

### III.   The Trial Court's Decision to Admit the 911 Call and Preclude Use of Mr. Wilson's Medical Records

Petitioner contends that the trial court deprived her of her right to a fair trial and to present a defense by preventing defense counsel from admitting Mr. Wilson's medical records relating to his mental health. (Pet. at 60-62.) Petitioner argues she was entitled to present evidence showing Mr. Wilson was "quarrelsome, vindictive, or violent" to demonstrate her state of mind. (*Id.* at 61.)   She also argues that she was entitled to introduce documentary evidence-Mr. Wilson's medical records-proving Mr. Wilson was exhibiting aberrant behavior sufficient to cause fear and warrant a forceful response. (*Id.* at 62.)   Finally, Petitioner argues that by preventing her counsel from cross-examining the medical examiner, Mr. Wilson's sister, and Mr. Wilson's friend about Mr. Wilson's psychiatric prescription and substance abuse, her right to confrontation was "improperly curtailed." (*Id.* at 67.)

Petitioner also contends that the state court violated her right to a fair trial by improperly admitting Mr. Wilson's statements made in a 911 call under the present sense impression exception to the rule against hearsay. (*Id.* at 72.) Petitioner argues that the call was inadmissible for lack of contemporaneity and corroboration as required under New York State Law, and further alleges that the admission of the call into evidence removed reasonable doubt that would have otherwise existed on the record, resulting in the deprivation of a fundamentally fair trial. (*Id.* at 73-78.)

The Appellate Division dismissed Petitioner's claims regarding the admission of medical records and cross-examination of witnesses as "without merit." *People v. Wisdom*, 82 N.Y.S.3d 97, 100 (2d Dep't 2018). Regarding the admission of the 911 call, the Appellate Division found the contention "unpreserved for appellate review" but nonetheless agreed with the trial court's "determination to admit the recording under the present sense impression" exception to the hearsay rule on the merits.[5] *Id.* at 99. The Appellate Division's merits-based decision rejecting both

---

[5] As noted in the State's Affidavit in Opposition, the state "did not argue before the Appellate Division that the claim was unpreserved, nor is that an argument now being raised in response to [Petitioner's] habeas petition." (State Opp. at 71.) Petitioner argues that there is no indication that "perfect compliance" with state procedural rules in the objection to the 911 call "would have made a difference [], since the trial court clearly understood and decided the legal question presented." (Pet. at 86) (citing *Lee v. Kemna*, 534 U.S. 362, 387 (2002)). The Court agrees with Petitioner and, in light of the Appellate Division's alternative merits-based decision, will address Petitioner's claim on the merits.

claims is entitled to AEDPA deference, and as such, Petitioner must show that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

### A. Review of Trial Court Evidentiary Rulings Under AEDPA

In reviewing a habeas petition pursuant to the AEDPA, courts in this Circuit have found that the "unreasonable application of the law" prong cannot be satisfied by showing a ruling was "merely . . . incorrect or erroneous." *Delancy v. Lee*, No. 15-CV-891 (RRM) (CLP), 2019 WL 9051134 at *14 (citing *Williams v. Taylor*, 529 U.S. 362, 409-411 (2000)).  Rather, the ruling must be so unreasonable that it is impossible for fair-minded jurists to disagree that it was in violation of Supreme Court precedent. *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  This is an intentionally high standard, as the purpose of habeas relief is to "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction." *Id.* at 102 (internal quotation marks and citation omitted).

Where a petitioner alleges an incorrect evidentiary ruling at trial, this Court must first ascertain whether the state court ruling was proper under state law; if the ruling correctly applied the state evidentiary rule, there is no constitutional violation.

38

*Delancey*, 2019 WL 9051134, at *17.   Second, if this Court finds the evidentiary ruling was made in error, it must determine whether the error violated a constitutional right.   *Id.*   For a ruling to rise to such a level, the error must have deprived petitioner of a fundamentally fair trial.   *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985).   Courts have clarified that such deprivation occurs when the error in question has removed reasonable doubt that was otherwise present in the context of the entire record.   *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (citing *United States v. Agurs,* 427 U.S. 97, 112-13 (1976)).

**B. Admissibility of a Decedent's Mental Health Records**

Under New York evidence law "a defendant, in a prosecution for homicide, may introduce evidence that the deceased had a reputation as a 'quarrelsome, vindicative or violent' person, provided that the defendant was aware of this reputation at the time of the incident." *People v. Miller*, 349 N.E.2d 841, 845 (N.Y. 1976).   However, this is only applicable to the admission of medical records when it can be shown the accused had knowledge of the decedent's psychiatric history at the time of confrontation. *People v. Trivette*, 572 N.Y.S.2d 85, 87 (3d Dep't 1991).   Without establishing that the medical records are relevant to the defendant's state of mind at the time of the confrontation, medical records relating to the mental health of the decedent are inadmissible.   *People v. Adams*, 708 N.Y.S.2d 766, 767 (4th Dep't

2000).  This applies to other forms of documentary proof as well; "[e]vidence of a conviction for a violent act is, of course, acceptable documentary evidence that would support the defendant's contention, provided he was aware of the conviction at the time of the incident." *Miller*, 349 N.E.2d at 848.  An exception to this rule exists for toxicology reports of the decedent showing use of intoxicants at time of death, which are admissible regardless of the accused's knowledge. *People v. Chevalier*, N.Y.S.2d 508, 509 (1st Dep't 1996), *aff'd*, 681 N.E.2d 1292 (N.Y. 1997).

### C. The Trial Court's Preclusion of Mr. Wilson's Medical Records

At trial, defense counsel sought to admit evidence of Mr. Wilson's psychiatric health and past substance abuse, requesting to:

> "put a certified copy of [Mr. Wilson's medical] records into evidence which will show what he said to the doctor...if I don't have that physician, I want to put on my expert, Dr. Siegel, he will -- who can talk about psychosis. I can ask him what drugs are given for psychosis and he would undoubtedly say he gives some of them and Seroquel."

(Ex. 4 at 13, 14).  The trial court denied counsel's request, calling counsel's argument "an inference and then an inference upon an inference". (*Id.* at 14).  The trial court further disagreed with defense counsel's suggestion that the medical records showed that Mr. Wilson was psychotic, finding after court review of the medical records that Mr. Wilson's diagnosis was "depressive." (*Id.* at 15.)  Defense counsel subsequently argued

that it was possible that Mr. Wilson's failure to take Seroquel might have caused him to have hallucinations, or to attack Petitioner. (*Id.* at 16). The trial court again found defense counsel's argument to be speculative and stated that Mr. Wilson's medical records did not show any evidence of violence or violent hallucinations. (*Id.* at 16-17.) Ultimately, the trial court ruled that defense counsel had "no evidence at all that the failure to take the Seroquel caused [Mr. Wilson] to harm or want to harm [Petitioner]" and thus the medical records were not admissible. (*Id.* at 20).

Under New York law, the only proper purpose for which the records in question could be admitted by the trial court would have been to illustrate an underlying condition that Petitioner was aware of, and the impact of that awareness on Petitioner's state of mind. *See People v. Miller*, 349 N.E.2d 841, 845 (N.Y. 1976). Accordingly, what is pertinent is whether Petitioner had actual knowledge of Mr. Wilson's psychiatric history. This court finds no evidence in the record indicating as much. Petitioner argues that Mr. Wilson kept prescription bottles in plain view, asserting that "[Petitioner] undoubtedly was [] aware of Wilson's psychiatric issues, given that she had been living with him for about a month . . . ." (Pet. at 63). This argument, however, falls short of the required factual support in the record; no evidence was presented to the trial court that Petitioner observed

41

Mr. Wilson's medication or medical records, much less researched the information on the bottles to ascertain the myriad of psychiatric conditions Seroquel is prescribed to treat. Furthermore, evidence admitted at trial showed that the "pill bottles [] were recovered from under the bed," as opposed to being in plain sight. (Ex. 2 at 180.) Similarly, Petitioner's statement to police that Mr. Wilson was saying "crazy shit," (*id.*), is not sufficient to show prior knowledge of Mr. Wilson's psychiatric history, both because it generally refers to Mr. Wilson's statements during the altercation as opposed to beforehand, and because it is ambiguous enough that it simply indicates Mr. Wilson was saying things Petitioner found disagreeable, rather than reflective of an abnormal mental state.

Petitioner asserts in the alternative, that the trial court should have admitted Mr. Wilson's psychiatric records into evidence in order to impeach his character, claiming that the State put his character at issue when relying on Mr. Wilson's statements made during his call to emergency services. (Pet. at 65). Upon review of the trial record, this court cannot identify any point at which the argument regarding impeaching Mr. Wilson's character was raised, and as such this argument was not properly preserved under C.P.L. § 470.05(2). However, the Appellate Division plainly stated its intention to address the argument on its merits regardless. *See People v. Wisdom*, 82 N.Y.S.3d 97, 100 (2d Dep't

42

2018) ("The defendant's remaining contention is without merit."). This court is therefore obliged to contend with the substance of the Petitioner's argument, rather than finding it procedurally barred. *See Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000) ("[W]e follow the presumption established by the Supreme Court and ask not what we think the state court actually might have intended but whether the state court plainly stated its intention."). In evaluating the merits of the argument regarding use of the medical records for impeachment, this court finds that the Appellate Division was correct in finding no error in the trial court's decision to exclude Mr. Wilson's mental health records.

Under New York law, it is recognized that mental health history, including evidence of a history of delusions, is particularly probative of a witness' credibility. *People v. Rensing*, 199 N.E.2d 489, 491 (N.Y. 1964). However, the party seeking to admit such evidence must have a "good faith basis for believing that the witness' mental condition affected a material issue in the case, for example, [the witness'] ability to perceive or remember." *People v. Knowell*, 464 N.Y.S.2d 525, 529 (2d Dep't 1983). New York state courts typically only find an abuse of discretion in precluding evidence of a witness' mental health history when there is substantial, undisputed, documentation of a testifying witness' mental illness, such as multiple hospitalizations, diagnosis as paranoiac or schizophrenic, or

43

involuntary commitment. *See Rensing*, 199 N.E.2d at 491 (court, in reversing conviction and granting a new trial, held that the jury should have been made aware that a key witness experienced, *inter alia*, "visual and auditory hallucinations with marked memory defect" and had been diagnosed with "Paranoid Schizophrenia"); *see also People v. Knowell*, 512 N.Y.S.2d 190, 192 (2d Dep't 1987) (finding that a court erred in refusing to conduct an in camera inspection of psychiatric records of a witness who "had a lengthy history of psychiatric problems, had been confined in mental hospitals on several occasions in the recent past and had been diagnosed as paranoiac"). These circumstances simply do not exist in the instant case.

Mr. Wilson's medical records, reviewed by the trial court, spanned a three-month period – from September 6, 2011, through November 26, 2011. (ECF 1-7 ("Pet. Ex. H") at 11, 22.) Mr. Wilson was originally referred for substance abuse treatment but was given a psychiatric evaluation as part of his intake to the Chemical Dependency program. (*Id.* at 11-14.) As later noted by the medical provider who examined him, Mr. Wilson was diagnosed with "Major Depressive Disorder" and was taking "Seroquel, Benadryl, and Prozac while enrolled in [the] clinic." (*Id.* at 23.) The medical provider also stated in her notes from her psychiatric evaluation that Mr. Wilson "[n]otes hallucinations to harm self or others." (*Id.* at 14). However, the medical provider also noted

that Mr. Wilson had "no gross cognitive deficits, [d]enie[d] both suicidal and homicidal ideation, [and was] alert and oriented to time, place, and person." (*Id.*) Mr. Wilson was not diagnosed with a mental illness such as paranoid schizophrenia, and no other annotations regarding delusions, violence, or his ability to accurately perceive events are present in his medical records. Furthermore, Petitioner does not offer any evidence to suggest that Mr. Wilson exhibited any hallucinatory behavior in the month she lived with him, or on the night when he called 911 on November 29, 2011, or that she was aware of his psychiatric evaluation. Accordingly, the instant case is distinguishable from precedent cited by Petitioner and noted above. As such, this court cannot find that the trial court acted unreasonably in excluding evidence of Mr. Wilson's mental health records for purposes of impeachment. Considering Petitioner's claim under the standards set out by the AEDPA, the Court finds that the Appellate Division's rejection of this claim on appeal was not an objectively unreasonable application of existing federal constitutional principles, and Petitioner's claim regarding her right to present a defense is denied.

### D. New York State's Present Sense Impression Exception

For hearsay to be admissible under the present sense impression exception under New York state evidence law, a statement must be (1) "made while the declarant was perceiving the event or

condition, *or immediately thereafter*" and must be accompanied by
(2) "some independent verification of the declarant's descriptions
of the unfolding events." *People v. Vasquez*, 670 N.E.2d 1328,
1334 (N.Y. 1996). The New York Court of Appeals has emphasized
that the level and nature of the corroboration required "will
depend on the particular circumstances of each case and must be
left largely to the sound discretion of the trial court." *People
v. Brown*, 610 N.E.2d 369, 374 (N.Y. 1993). The inquiry must
determine "whether the corroboration offered to support admission
of the statement truly serves to support its substance and
content." *Vasquez*, 670 N.E.2d at 1335. *Brown* serves as an
example, where apprehension of a suspect matching a description in
a 911 call was found to be sufficient corroboration to admit the
underlying 911 call. 610 N.E.2d at 374. New York courts have
observed that "[t]he 'present sense impression' exception has been
utilized mainly to introduce 911 calls made by either the victim
or witnesses while they observe events as they are unfolding."
*People v. Semple*, 666 N.Y.S.2d 900, 902 (Sup. Ct. 1997) (citing
*People v. Hughes*, 645 N.Y.S.2d 493 (2d Dep't 1996) and *People v.
Cook*, 632 N.Y.S.2d 193 (2d Dep't 1995)).

Once a New York trial court finds that the hearsay statement
qualifies for admission under the present sense impression
exception, it retains discretion to refuse to admit the evidence
if "its probative value is substantially outweighed by the danger

that it will unfairly prejudice the other side or mislead the jury." *People v. Scarola*, 525 N.E.2d 728, 732 (N.Y. 1988).  As such, the decision to admit evidence that satisfies the present sense impression exception to hearsay is also reviewable by the Appellate Division for abuse of discretion.  *People v. Smith*, 5 N.E.3d 972, 974 (N.Y. 2013) (stating that a court retains discretion regarding excluding otherwise admissible evidence "when it reasonably finds that evidence to be more prejudicial than probative").

### E. The Trial Court's Ruling during the *Molineux* Hearing

Defense counsel objected to the admission of the 911 call during a *Molineux* hearing on the basis that it failed to satisfy both requirements of the present sense impression exception under New York State law, and that its prejudicial effect would outweigh its probative value.  (Ex. 2 at 3, 6.)  Specifically, defense counsel argued:

> "During the evening of this call we actually don't know when this man is killed. Time of death was never set, the date itself was never set. We don't know what it refers to, whether it refers to this incident or something else, and so absent any background or testimony, it is just this man calling. We don't know if there's an upsetment, an intervening event, things calm down and something happened. It's significant, there's nothing on the call like look out or ouch or hearing anything, it essentially just cuts off with that . . ."

(*Id.* at 3-4).   The prosecutor responded that both medical evidence and Mr. Wilson's phone records indicated that the call was made shortly before his death, and that phone records also showed Petitioner began using Mr. Wilson's phone shortly after the 911 call was made.  (*Id.* at 4-5.)

Specifically, the prosecution argued that Mr. Wilson's phone was used to call a witness, Matthew Shepard, following the 911 call, and that when Mr. Shepard answered the call, expecting Mr. Wilson, it was Petitioner calling.  (*Id.* at 4.)  The prosecution further argued that Petitioner subsequently made "third-party admissions" to Mr. Shepard that she was not going to give Mr. Wilson money and have sex with him, and subsequently "poked" Mr. Wilson as a result.  (*Id.* at 4-5.)  Continuing, the prosecutor noted that the medical examiner would be able to corroborate that the time of death was close in proximity to the time of the 911 call.  (*Id.* at 5.)  After further argument from defense counsel that there may have been intervening actions between the call and the stabbing, the trial court ultimately ruled that Mr. Wilson's call was admissible hearsay under the present sense impression exception.  (*Id.* at 6.)

This Court finds that the trial court was not unreasonable in its determination that Mr. Wilson's statements were adequately contemporaneous and corroborated.  First, the trial court properly considered extrinsic evidence that established the time of the

call in relation to Mr. Wilson's stabbing based on the proffered medical examiner's evidence, as well as subsequent phone calls from Mr. Wilson's phone that matched the petitioner's pattern of phone calls from her own cell phone in establishing the contemporaneity of the statements. (*Id.* at 4-5). Furthermore, based on the prosecution's characterization of Mr. Wilson's word choices in describing the perceived behavior on the 911 call as occurring while he was speaking, the trial court admitted the 911 call as a present sense impression exception to the hearsay rule. (*Id.* at 2-4.) The record sufficiently establishes that Mr. Wilson's statements were made while the described event was taking place.

With respect to corroboration of the call's substance, the trial court properly considered petitioner's later statements to Mr. Shepard, in which she acknowledged that an argument took place between her and Mr. Wilson. (*Id.* at 4-5.) Mr. Shepard's later testimony on the stand confirmed that this corroboration occurred. (Ex. 7 at 47-48.) Moreover, Petitioner admitted during her July 26, 2012, interview that she took Mr. Wilson's cell phone after she stabbed him. (Ex. 4 at 165-66.) This totality of evidence adequately corroborates Mr. Wilson's statements through independent means, as required under New York law regarding the present sense impression.

Finally, this court does not find persuasive Petitioner's claims that Mr. Wilson's statements were overly prejudicial and should have been excluded. Once properly admitted under the present sense impression exception to hearsay, Mr. Wilson's statements would have been admissible for the truth of the matter asserted. Whether or not Petitioner was indeed "acting crazy" shortly prior to Mr. Wilson's death would have been highly probative of the veracity of her justification defense. Furthermore, the fact that Mr. Wilson, the declarant, was unavailable weighs in favor of admissibility of the statement. See *People v. Buie*, 658 N.E.2d 192, 195 (N.Y. 1995) (holding that "the present sense impression exception does not require a showing of the declarant's unavailability as a *sine qua non* to admissibility," although the trial judge may weigh the declarant's availability in the "traditional probativeness versus undue prejudice calculus" for determining admissibility).

Based on the foregoing, this Court finds that the trial court's decision to admit Mr. Wilson's 911 call was a correct evidentiary ruling under New York State's present sense impression exception to hearsay. Accordingly, the Appellate Division's decision upholding the trial court's ruling was not an objectively unreasonable application of existing federal constitutional principles and Petitioner's due process claim is denied.

**CONCLUSION**

For the foregoing reasons, Petitioner's Section 2254 petition is respectfully denied and dismissed in its entirety. Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (discussing certificate of appealability standard); Rules Governing Section 2254 and 2255 Cases, Rule 11 ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").

The Clerk of Court is directed to enter judgment in favor of Respondent, and close this case.

**SO ORDERED**

Dated:      December 6, 2023
            Brooklyn, New York

_____
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York